**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE as Mother of MINOR DOE, HANNAH LANDERER, and STEVEN MARKS, on behalf of themselves and all others similarly situated, | Case No. 25-cv-3489 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CARELON BEHAVIORAL HEALTH, INC., | |
| Defendant. | |

Plaintiffs Jane Doe as mother of Minor Doe, Hannah Landerer, and Steven Marks bring this class action for damages, equitable relief, and injunctive relief against Carelon Behavioral Health, Inc. ("Carelon" or "Defendant"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, their own investigation, and the investigation of their counsel, and on information and belief as to all other allegations.

**NATURE OF THE ACTION**

1.     There is a mental health crisis in this country and in this state. It is afflicting men and women, children and adults, and people of all income levels and backgrounds. And it is exacerbated by companies, like the Defendant, that mislead people in need of qualified mental health providers by publishing grossly inaccurate directories of doctors and therapists. These inaccurate directories are known as "ghost networks."

2.     Ghost networks are directories provided by health insurers and administrators that list health care providers that purportedly are in-network with their insurance plan, but in reality, are not. These ghost networks are also replete with errors and duplications, which make them

inaccurate, incomplete, deceptive, and misleading. Mental health provider directories are more likely than any other medical specialty to be ghost networks.

3.     The Defendant's publication of an inaccurate provider directory is not just an inconvenience for people searching for mental health providers; it is far more insidious and costly. By publishing an inaccurate provider directory where the vast majority of doctors listed— more than 80%—either do not exist, are listed with non-working or inaccurate telephone numbers (making them virtually impossible to contact) or are not actually in-network with the Defendant, the Defendant did not just mislead people, but damaged them.

4.     These damages are not just financial, but also frequently contribute to exacerbating patients' mental health problems. The people using the Defendant's provider directory are often desperate for mental health care for themselves, their children, or their loved ones. And the inaccurate provider directory actually causes harm. Some patients, like the Plaintiffs, have had their treatment delayed. Many, like the Plaintiffs, have had to utilize out-of-network doctors and as a result have incurred thousands of dollars in mental health medical expenses.

5.     Other patients have abandoned their search for care, resulting in serious mental health consequences and complications.

6.     The Plaintiffs' insurance policies are supposed to cover mental health care, with a robust in-network community of mental health providers provided by the Defendant and administered by the Defendant. In reality, that "community" is threadbare: there are almost no mental health providers in New York who actually accept the insurance, are "in network," and accept new patients. Thus, the promised coverage is largely illusory. When there are very few— or no—doctors who are in-network with the Defendant, or when doctors are in-network but are

not within a reasonable distance, such a network violates the law, regulations, standards, and guidance regarding network adequacy.

7.    The Defendant knowingly publishes an inaccurate and misleading provider directory. It does so for several reasons.

8.    First, the Defendant publishes a large—albeit inaccurate—directory to attract potential customers. The Plaintiffs, and other members of the proposed class, are participants in the New York State Health Insurance Program ("NYSHIP," and sometimes referred to as the "Empire Plan"). So, like every other New York State employee (and many other New York municipal employees), they have multiple health insurance plan options. The Defendant competes against these other plans by advertising the benefits of its particular plan. By publishing a seemingly robust, if actually inaccurate, directory of participating providers, the Defendant is knowingly engaging in a deceptive advertising campaign intended to lure people (like the Plaintiffs) into choosing its plan.

9.    Second, by publishing a seemingly robust—but inaccurate—directory of providers, the Defendant is deceptively trying to appear to comply with state and federal requirements that its offered services are an adequate network of providers who actually accept its insurance plan.

10.    The Defendant's promise of an adequate network of qualified providers is deceptive advertising. The listings are inaccurate in numerous ways: Some are listings of doctors who don't exist. Others are listed with inaccurate or non-working telephone numbers—making them impossible to reach. Many of the doctors listed are not part of the Defendant's network. Some of the listings include incorrect specialties for the doctor. In sum, these are deceptive business practices on the part of the Defendant.

11.    By publishing inaccurate telephone numbers, the Defendant sent patients on a wild-goose chase searching for doctors supposedly covered by its plan. The time spent reaching wrong numbers or encountering non-working numbers is not just valuable time wasted, it is discouraging, delays care, and often contributes to patients abandoning their search for care. For people seeking mental health care for themselves, their children, or loved ones, this wild-goose chase for in-network doctors is not small potatoes; it is a time-consuming, exhausting, and frustrating experience that is detrimental to their mental health.

12.    Grossly inaccurate listings in a directory—a directory essential for directing patients to needed medical care—violate the federal No Surprises Act, the federal Mental Health Parity and Addiction Equity Act, the Defendant's third-party contractual obligations to Plaintiffs, New York's consumer protection laws (General Business Law §§ 349 and 350), New York Insurance Law § 4226, and the New York State Department of Financial Services' standards and guidance.

13.    The Plaintiffs—and other members of the proposed class—have suffered real injury and damages. The Plaintiffs have paid premiums for an insurance plan and, in exchange, the Defendant is responsible for providing coverage. In reality, however, that coverage never existed or was grossly inadequate. The Defendant has failed to provide an adequate network of mental health providers who actually accept the insurance or offer appropriate care.

14.    The Plaintiffs also suffered significant financial damage by having to pay thousands of dollars for out-of-network providers because there were no qualified in-network providers within a reasonable travel radius. Moreover, the Plaintiffs wasted time and were frustrated by having to spend countless hours calling providers who the Defendant represented as being qualified and participating in the Defendant's network, only to find out that the phone

numbers listed by the Defendant were wrong, or that the providers did not offer the services listed in the Defendant's provider directory, were not qualified, or did not participate in the Defendant's network.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

16.    This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy, exclusive of interests and costs, exceeds the sum or value of $5,000,000 and at least one member of the proposed class is a citizen of a state other than Massachusetts, which is the Defendant's state of citizenship.

17.    This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because there is diversity between the Plaintiffs and the Defendant. The amount in controversy, exclusive of interests and costs, exceeds the sum or value of $75,000. The citizenship of the Plaintiffs and the Defendant is diverse and further detailed below.

18.    This Court has personal jurisdiction over the Defendant because it is registered to do and transacts business in New York State, and it regularly conducts business in New York County.

19.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District. Venue is also proper under 18 U.S.C. § 1965(a) because the Defendant transacts substantial business in this Judicial District.

## THE PARTIES

### I.    Plaintiffs

20.    Plaintiff Jane Doe is the mother of 16-year-old Minor Doe. Jane Doe and Minor Doe are residents of Westchester County, New York. Jane Doe is a member of the NYSHIP Empire Plan through her husband, who is an employee of the Metropolitan Transportation Authority (MTA). She has been a member of the NYSHIP plan since 2022. NYSHIP contracts with Carelon to provide the mental health portion of the NYSHIP plan.

21.    Plaintiff Hannah Landerer is a resident of Nassau County, New York. She is an employee of the New York State Department of Education and has been a member of the NYSHIP plan since 2019.

22.    Plaintiff Steven Marks is a resident of Rockland County, New York. He is an employee of the State University of New York and has been a member of NYSHIP plan since 2023.

### II.    Defendant

23.    Defendant Carelon Behavioral Health, Inc. is the entity that administers the Empire Plan Mental Health and Substance Use Program of the NYSHIP plan. Prior to March 2023, Carelon was known as Beacon Health Options.[1]

24.    Carelon is a Massachusetts-based company registered to do business in New York.

25.    Carelon's state of incorporation is Massachusetts and its principal place of business is 200 State Street Suite 302, Boston, Massachusetts, 02109.

---

[1] Laura Lovett, Elevance Health's Beacon Health Options Rebrands to Carelon Behavioral Health, to Consolidate Payer's Portfolio of Services, BEHAVIORAL HEALTH BUSINESS (March 2, 2023), https://bhbusiness.com/2023/03/02/elevances-beacon-health-options-rebrands-to-carelon-behavioral-health-to-consolidate-payers-portfolio-of-services/; Carelon Behavioral Health Home Page, https://www.carelonbehavioralhealth.com.

## BACKGROUND & CONTEXT

I. **The Mental Health Crisis in America**

A. **The Adult Mental Health Crisis**

26.    There is a mental health crisis in the United States. According to the National Survey on Drug Use and Health by the Substance Abuse and Mental Health Service Administration, in 2022, there were an estimated 59.3 million adults in the U.S. with a mental illness. That is 23.1% of U.S. adults.[2]

27.    Younger adults reported a higher prevalence of mental health problems:

- ages 18–25: 36.2% of adults reported having a mental illness.

- ages 26–49: 29.4% of adults reported having a mental illness.

- ages 50+: 13.9% of adults reported having a mental illness.

28.    Some 49.4% of the 59.3 million adults with any mental illness did not receive mental health services within the previous year.[3]

29.    Treatment rates for adults aged 18–25 were lower than for all other adults: approximately 50.9% of the age group went without treatment.[4]

30.    In 2022, an estimated 15.4 million adults in the U.S. had a *serious* mental illness, some 6% of the population.[5] The National Institute of Mental Health defines serious mental illness as "a mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities," and it notes that

---

[2] National Institute of Mental Health, *Mental Illness Statistics*, https://www.nimh.nih.gov/health/statistics/mental-illness.

[3] *Id.*

[4] *Id.*

[5] *Id.*

"[t]he burden of mental illnesses is particularly concentrated among those who experience disability due to [serious mental illness]."[6]

31.    In total, 33.3% of those with serious mental illness did not receive mental health services.[7]

32.    In New York City, the disparate impact among adults of different races and ethnicities is great, with only approximately 38.2 percent of Asian American and Pacific Islander residents, 30.3 percent of Black residents, and 39.3 percent of Latinx residents, reporting being connected to mental health care.[8] There is also a disparity in availability of care among high- and low-income neighborhoods.[9]

### B.    The Child Mental Health Crisis

33.    According to the Centers for Disease Control and Prevention ("CDC"), among adolescents aged 12 to 17 years old:[10]

- 15.1% have had a major depressive episode.

- 36.7% have had persistent feelings of sadness or hopelessness.

---

[6] *Id.*

[7] *Id.*

[8] *Mental Health Data Dashboard*, NYC Mayor's Off. of Cmty. Mental Health, https://mentalhealth.cityofnewyork.us/dashboard/.

[9] *See* Janet Cummings et al., *Geographic Access to Specialty Mental Health Care Across High- and Low-Income US Communities*, JAMA PSYCHIATRY (May 2017), https://pubmed.ncbi.nlm.nih.gov/28384733/ ("When examining the distribution of mental health professionals, 25.3% of the communities (2014 of 7959) in the highest income quartile had a mental health specialist physician practice vs 8.0% (637 of 7959) of those in the lowest income quartile … .").

[10] Rebecca H. Bitsko *et. al.*, *Mental Health Surveillance Among Children – United States, 2013–2019*, Ctrs. for Disease Control and Prevention (2022), https://www.cdc.gov/mmwr/volumes/71/su/su7102a1.htm (citations omitted).

- 4.1% have had a substance use disorder.

- 1.6% have had an alcohol use disorder.

- 3.2% have had an illicit drug use disorder.

- 18.8% seriously considered attempting suicide.

- 15.7% made a suicide plan.

- 8.9% attempted suicide.

- 2.5% made a suicide attempt requiring medical treatment.

34.    The situation is so acute that the Surgeon General of the United States has described mental health as "the defining public health crisis of our time," and warned of the "devastating effects" of mental health challenges on young people.[11] This came as the suicide rate for young Americans jumped by 57 percent from 2009 to 2019, and pediatric visits for self-harm rose by 329 percent from 2007 to 2016.[12] The Surgeon General released a rare Advisory[13] titled *Protecting Youth Mental Health*, urging that "every child ha[ve] access to high-quality, affordable, and culturally competent mental health care."[14]

---

[11] Matt Richtel, *The Surgeon General's New Mission: Adolescent Mental Health*, N.Y. TIMES, (Mar. 21, 2023), https://www.nytimes.com/2023/03/21/health/surgeon-general-adolescents-mental-health.html.

[12] Bommersbach et al., *National Trends in Mental Health-Related Emergency Department Visits Among Youth, 2011-2020*, J. of the Am. Med. Ass'n (May 2, 2023), https://pubmed.ncbi.nlm.nih.gov/37129655/.

[13] "A Surgeon General's Advisory is a public statement that calls the American people's attention to an urgent public health issue … . Advisories are reserved for significant public health challenges that need the nation's immediate awareness and action." *Protecting Youth Mental Health: The U.S. Surgeon General's Advisory*, Off. of the Surgeon Gen. at 12 (2021), https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf.

[14] *Id.*

35.    Compounding this crisis are serious barriers to accessing needed mental health treatment. The CDC estimates that of the one in five children who have a mental, emotional, or behavioral disorder, only approximately 20 percent receive care from a mental health provider.[15]

36.    "The consequences of untreated mental illness in children and adolescents are profound and are associated with school failure, teenage pregnancy, unstable employment, substance use, violence including suicide and homicide, and poor medical outcomes."[16]

**C.    The Mental Health Crisis in New York**

37.    According to Mental Health America, in 2024, an estimated 21.11% of adults in New York, approximately 3,273,000 people, suffered from a mental illness.[17]

38.    According to the Kaiser Family Fund mental health survey of 2023:

- 28.8% of New York adults reported symptoms of anxiety disorder.

- 19.4% of New York adults reported symptoms of depressive disorder.

- 31.4% of New York adults reported symptoms of anxiety or depressive disorder.[18]

---

[15] Ctrs. for Disease Control and Prevention, *Improving Access to Care, Children's Mental Health Care*, https://archive.cdc.gov/#/details?q=mproving%20Access%20to%20Care,%20Children%E2%80%99s%20Mental%20Health%22&start=0&rows=10&url=https://www.cdc.gov/childrensmentalhealth/access.html.

[16] *School-Based Mental Health: Pediatric Mental Health Minute Series*, Am. Academy of Pediatrics, https://www.aap.org/en/patient-care/mental-health-minute/school-based-mental-health/.

[17] The State of Mental Health in America, *2024 Edition*, 15, https://mhanational.org/wp-content/uploads/2024/12/2024-State-of-Mental-Health-in-America-Report.pdf.

[18] Kaiser Family Fund, *Adults Reporting Symptoms of Anxiety or Depressive Disorder During COVID-19 Pandemic*, https://www.kff.org/other/state-indicator/adults-reporting-symptoms-of-anxiety-or-depressive-disorder-during-covid-19-pandemic/?currentTimeframe=0&selectedRows=%7B%22states%22:%7B%22new-york%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

II.     **Federal and State Requirements for Health Insurers**

A.     **Federal and New York State Law Impose Additional Obligations on Health Plans to Ensure Accuracy of Provider Directories**

39.     As discussed above, the federal government has expressed serious concern about the prevalence of ghost networks and the significant barriers they create to mental health care. In addition to the congressional inquiries and hearings, federal and state laws and regulations have been promulgated in an effort to protect consumers from the harms of ghost networks.

40.     In 2022, Congress passed the federal "No Surprises Act," which includes a section entitled "Protecting Patients and Improving the Accuracy of Provider Directory Information," establishing requirements for provider directories to help protect consumers from surprise bills from out-of-network providers.[19]

41.     The No Surprises Act requires health plans to publish and maintain accurate provider directories; specifically, insurance companies must update and verify their plans' provider directories at least every 90 days.[20] Where plans are unable to verify provider data, they must establish a procedure to remove providers from their directories.[21] Health plans must also update provider information within two business days of receiving an update from a provider.[22]

42.     The law also imposes obligations on health insurers directly in relation to their members. When a member requests information about whether a provider is in-network, the plan

---

[19] Pub. L. No. 116-260, 134 Stat. 1182, Division BB, (2020), https://www.congress.gov/bill/116th-congress/house-bill/133/text (adding 42 U.S.C. § 300gg, 29 U.S.C. § 1185i, and 26 U.S.C. § 9820).

[20] 42 U.S.C. § 300gg-115(a)(2)(A).

[21] 42 U.S.C. § 300gg-115(a)(2)(B). In addition, the terms of the contract between provider and plan may require the plan to remove the provider if the contract terminates.

[22] 42 U.S.C. § 300gg-115(a)(2)(C).

must respond within one business day of the request.[23] And where a member relies on inaccurate provider directory information and mistakenly receives services from an out-of-network provider, the member will not be responsible for cost sharing greater than in-network cost sharing.[24]

43.    New York State passed its own no surprises law in 2015, which also requires health plans to ensure that their provider directories are accurate. Under New York law, health insurers are required to update their provider directories within an even shorter time period—within 15 days of the "addition or termination of a provider from the insurer's network or a change in a physician's hospital affiliation"—and otherwise update their plans' directories annually.[25] State law also requires health plans to include in their directories whether a provider is accepting new patients and any restrictions on a provider's availability.[26]

44.    Since state laws are not preempted by the No Surprises Act,[27] and as made clear by New York's Department of Financial Services, health plans in New York are still required to update their directories within 15 days of a provider change.[28]

---

[23] 42 U.S.C. § 300gg-115(a)(3).

[24] 42 U.S.C. § 300gg-115(b)(1)(A).

[25] N.Y. Ins. Law § 3217-A(a)(17).

[26] *Id.*

[27] "Nothing in this section shall be construed to preempt any provision of State law relating to health care provider directories." 42 U.S.C. § 300gg-139(e).

[28] NYS Dept. Fin, Ins. Circ. Ltr, No. 12 (Dec. 29, 2021), https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2021_12 ("[T]he [No Surprises Act] does not preempt any provision of state law relating to health care provider directories. Insurance Law §§ 3217-a(a)(17) and 4324(a)(17) and Public Health Law § 4408(1)(r) require an issuer to annually update its provider directory, with certain updates to the provider directory on the issuer's website completed within 15 days as described above. The Insurance Law and Public Health Law requirements for provider directory content and updates within 15 days continue to

(continued…)

45.     These federal and state laws reflect that governments recognize the harmful consequences of inaccurate provider directories. Despite these legislative efforts to shield consumers from ghost networks, surprise bills, and inadequate in-network care, insurance companies in general, and the Defendant in particular, continue to violate these laws.[29]

**B.      Federal and New York State Law Require Health Plans to Ensure Sufficient In-Network Mental Health Providers**

46.     There is an additional set of federal and state laws implicated by inaccurate provider directories: "network adequacy" laws require that health plans offer a network that includes a "sufficient" number of in-network providers.

47.     The Affordable Care Act first established this network adequacy framework, requiring that all qualified health plans[30] ensure the provision of a network that is "sufficient in number and types of providers, including providers that specialize in mental health and substance use disorder services, to ensure that all services will be accessible without unreasonable delay."[31]

48.     New York State adopted this standard and applied it broadly to a majority of health plans offered in the state. New York law requires health plans to "ensure that the network is

---

apply at this time.").

[29] *See, e.g.*, Neel M. Butala et al., *Research Letter: Consistency of Physician Data Across Health Insurer Directories*, JAMA 329(10), 842 (Mar. 14, 2023), https://jamanetwork.com/journals/jama/article-abstract/2802329 (finding even after passage of No Surprises Act that "[i]n examining directory entries for more than 40% of US physicians, inconsistencies were found in 81% of entries across 5 large national health insurers").

[30] "Qualified health plans" are plans sold on a state or federal exchange. *See* 42 U.S.C. § 18021 (defining term).

[31] 45 C.F.R. § 156.230(a)(1).

adequate to meet the health and mental health needs of insureds and provide an appropriate choice of providers sufficient to render the services covered under the policy or contract."[32]

49.    Specifically, New York guidance provides "preferred time and distance standards," advising that mental health providers should be accessible within 30 minutes by public transportation in metropolitan areas and/or 30 minutes or 30 miles by public transportation or by car in non-metropolitan areas.[33] The guidance also states that, "to be considered accessible, the network should contain a sufficient number and array of providers to meet the diverse needs of the insured population and to ensure that all services will be accessible without undue delay. This includes being geographically accessible (i.e., meeting time/distance standards) and being accessible for people with disabilities."[34]

50.    The Defendant is in violation of federal and state law requiring network adequacy.

51.    As discussed below, a significant collateral consequence of an inaccurate, inflated provider directory is that an insurance plan appears to meet federal and state network adequacy requirements, when it does not.

52.    This was highlighted during a recent Senate Finance Committee hearing:[35]

> SENATOR WARREN: Do these ... plans stand to gain anything from having inaccurate information? In other words, is it inaccurate because you just haven't spent enough money to make it accurate, or is it inaccurate by design?

---

[32] N.Y. Ins. Law § 3241(a)(1).

[33] *See Network Adequacy Standards and Guidance*, N.Y. State Dep't of Fin. Servs., https://www.dfs.ny.gov/apps_and_licensing/health_insurers/network_adequacy_reqs_standards_submission_instructions.

[34] *Id.*

[35] This exchange focused on Medicare Advantage plans in particular, but it would apply to many other health plans.

> MS. GILIBERTI (the Chief Public Policy Officer of Mental Health America): Well, I think there are advantages that they have when their directories unfortunately are inaccurate. They use those directories for network adequacy standards.[36]

## III.    Ghost Networks

### A.    The United States Senate Finance Committee Ghost Networks Hearings

53.    In May 2023, the United States Senate Finance Committee held a hearing on this exact topic, titled "Barriers to Mental Health Care: Improving Provider Directory Accuracy to Reduce the Prevalence of Ghost Networks."[37] One testifying witness, a former official in the Obama Administration, summarized her Sisyphean experience trying to find a mental health provider through her insurance plan's directory:

> I was left to navigate the … provider directory to find a psychiatrist. Calling psychiatrists within D.C. and Maryland, selected out of what was like a digital white-pages phone book, turned into one rejection after another. Call after call resulted in the following types of responses:
>
> > "Who? Hmm, s/he doesn't work here. No, I don't know where s/he works now."
> >
> > "Who? I don't know who that is, not sure they ever worked here. Hold please ... . [dial tone]."
> >
> > Recorded message: "Dr _____ is no longer accepting new patients. If this is an emergency, hang up and call 911."
>
> I spent countless days and hours scouring the network, despite working long hours in a high-level management position. When was there time to find a psychiatrist? I had to make the time, though, as my job, and more importantly my life, depended on it. Continued

---

[36] *Barriers to Mental Health Care: Improving Provider Directory Accuracy to Reduce the Prevalence of Ghost Networks*, U.S. Senate Fin. Comm. (May 3, 2023), https://www.finance.senate.gov/hearings/barriers-to-mental-health-care-improving-provider-directory-accuracy-to-reduce-the-prevalence-of-ghost-networks [hereinafter Senate Hearings on Mental Health Care] (testimony of Senator Elizabeth Warren, which begins at 2:23:18).

[37] *See id*.

attempts finally led me to a psychiatrist who was taking new patients. Success, though, was short-lived. In our phone conversation to set up an initial in-person appointment, I was asked about my diagnosis. I had no worry or fear; this doctor, this psychiatrist, was taking new patients. I respond without hesitation—schizophrenia. A pause, a long silence ... and then the response:

> "Oh....I do not take patients with a schizophrenia diagnosis."

I ask if they have any suggestions or referrals to help me find a doctor who does. The answer is:

> "Check the provider directory."[38]

54.    The prevalence, and degree, of ghost networks of mental health providers is nothing short of astonishing. The Senate Finance Committee majority staff recently conducted a study where they reviewed 12 different directories across six states but were only able to make appointments with 18 percent of the mental health providers contacted[39]—that is, over 80 percent of the listed in-network providers were in reality "either unreachable, not accepting new patients, or not in-network."[40] For one state, no successful appointments could be made.[41] Another study from 2015 resulted in an appointment with a psychiatrist only 26 percent of the time.[42]

---

[38] *Id.* (Testimony of Keris Jän Myrick at 2–3).

[39] *Majority Study Findings: Medicare Advantage Plan Directories Haunted by Ghost Networks*, Senate Comm. on Fin. at 1 (May 3, 2023), https://www.finance.senate.gov/imo/media/doc/050323 Ghost Network Hearing - Secret Shopper Study Report.pdf [*hereinafter* Secret Shopper Study Report].

[40] *Id.* at 1.

[41] *Id.* at 7.

[42] Malowney et al., *Availability of Outpatient Care From Psychiatrists: A Simulated-Patient Study in Three U.S. Cities*, Psychiatry Online (2015), https://ps.psychiatryonline.org/doi/full/10.1176/appi.ps.201400051.

55.    Almost all people seeking a mental health provider on a ghost network spend countless, difficult hours searching for care.[43] This is dangerously exacerbated by the fact that the person may be experiencing a mental health emergency. As explained by Dr. Robert Trestman, representing the American Psychiatric Association, at the Senate Finance Committee hearing:

> For those who are healthy and well educated, going through an inaccurate provider list and being told repeatedly that "we are not taking new patients," "this provider has retired," "we no longer accept your insurance," or leaving a message with no one returning the call is at best frustrating. For people who are experiencing significant mental illness or substance use disorders, the process of going through an inaccurate provider directory to find an appointment with someone who can help them is at best demoralizing and at worst set up to precipitate clinical deterioration and a preventable crisis. Many are already experiencing profound feelings of worthlessness, fear, grief from loss and trauma, and/or the impact of substance use; some are in crisis and suicidal. Patients have told me that they felt rejected repeatedly or that somehow they themselves were at fault. Even when they make the effort to reach out to find help, something that can be very difficult anyway, their efforts to cull through an inaccurate provider list results in more rejection and failure, exacerbating these feelings. Some give up looking for care. Others delay care.[44]

56.    At the same hearing, Senator Thom Tillis spoke of his own personal experience seeking care when suffering from mental illness:

> Back in 2007, I was diagnosed with an illness that required me to take medications that caused me to have pharmacologically induced mania followed by clinical depression, so I got a window into mental health that I consider to be a blessing … . When I'm in mania[,] ... I simply would not have sought a health care or a behavioral health professional. And when I was in depression, if I went to a website and went through [the provider directory], I'd have said what's the use. So we need to

---

[43] In the study conducted by the Senate Finance Committee majority staff, "[c]all times ranged from 1-3 hours to contact 10 listings per plan." *See* Secret Shopper Study Report at 4, *supra* n. 39.

[44] Senate Hearings on Mental Health Care, *supra* n. 36 (Testimony of Robert L. Trestman, PhD, MD at 3).

understand this has real life consequences. And you're in the worst possible state to have the complexity, and maybe even have, in the middle of depression, finding out that you have to pay out of network costs, so now you've got financial stressors, you've got whatever the underlying condition is, the insurers and providers, everybody needs to understand that.[45]

57.    The government's findings described above are disturbing, and the barriers to mental health care caused by ghost networks are devastating. Obstructions to treatment manifest in several ways. Because people in need are unable to find a mental health provider covered by their insurance on their plan's provider directory, urgent mental health treatment is often delayed and, at worst, abandoned completely. Others seeking care rely on the directory to find a provider, only to find out later that the provider is not covered by their plan, and so they are subject to significant, unexpected costs. And, in other cases, people urgently seeking care knowingly settle for seeing an out-of-network provider because they desperately need help, and it is their only option. They are left to figure out how to shoulder the often exorbitant costs that follow.

58.    Yet another consequence of a ghost network is that individuals selecting an insurance plan in the first place incorrectly choose that plan either because the provider they already see is listed on the plan's directory or because there appears to be a robust network of potential providers. The plan's ghost network is the enticement: but for a plan's ghost network, consumers would have made different health care and financial decisions.

59.    Though the effects of ghost networks are far-reaching and complex, the wrongful conduct at issue is simple: insurance companies' ghost networks mislead consumers to buy health plans that purport to include a network of providers when they do not. As Senator and Chairman of the Senate Finance Committee Ron Wyden stated in his opening remarks at the

---

[45] *Id.* (Testimony of Senator Thom Tillis, which begins at 1:17:13).

Senate's hearing on ghost networks, insurance companies are at fault and their wrongdoing is

clear:

> [W]hen insurance companies host ghost networks, they are selling
> health coverage under false pretenses, because the mental health
> providers advertised in their plan directories aren't picking up the phone
> or taking new patients. In any other business, if a product or service
> doesn't meet expectations, consumers can ask for a refund….
>
> In a moment of national crisis about mental health, with the problem
> growing exponentially during the pandemic, the widespread existence
> of ghost networks is unacceptable. When someone who's worried about
> their mental health or the mental health of a loved one finally works up
> the courage to pick up the phone and try and get help, the last thing they
> need is a symphony of "please hold" music, non-working numbers, and
> rejection.
>
> Just take a moment and think about the impact that might have on an
> individual who's already in a challenging situation. It's not hard to
> imagine how many Americans simply give up and go on struggling
> without the help they need….
>
> I want to conclude by talking about accountability. My view is that
> insurance companies have gotten a free pass for too long letting ghost
> networks run rampant. If a student were writing an essay and 80 percent
> of their citations were incorrect or made up, they'd receive an "F." If a
> business gave the SEC false or incorrect information, it would face
> extremely severe consequences. So in my view insurance companies
> should face strict consequences if their products don't live up to the
> billing. That's the least that should be done….[46]

**B.     The New York Attorney General's Study**

60.    In December 2023, the New York State Office of the Attorney General ("OAG")

issued a report entitled, "Inaccurate and Inadequate: Health plans' mental health provider

---

[46] *Wyden Calls for Action to Get Rid of Ghost Networks, Releases Secret Shopper Study*, U.S.
Senate Fin. Comm., Chairman Ron Wyden (May 3, 2023),
https://www.finance.senate.gov/imo/media/doc/Wyden%20Ghost%20Networks%20Hearing%20
Remarks%205.3.23.pdf.

network directories." This report was an overview of the provider directories provided by the health insurance companies operating in New York, including the Defendant.[47]

61.    According to the report, the OAG "surveyed nearly 400 mental health providers listed on health plans' networks and found that the overwhelming majority, 86 percent, were 'ghosts,' meaning they were unreachable, not-in-network, or not accepting new patients. Inaccurate network directories are worsening the statewide mental health crisis and disproportionately impact marginalized communities, leading to adverse health outcomes, and increasing costs for patients."[48]

62.    The OAG stated:

New Yorkers struggling with mental health conditions rely on health plan provider directories to access affordable, quality health care services. However, when provider directories contain inaccurate listings or unavailable providers—known as ghost networks—patients may be unable to access treatment using their health insurance benefits. As a result, they are forced to choose between paying out-of-pocket, which is not possible for many, or forgoing treatment altogether.[49]

**C.    The OAG's Secret Shopper Survey**

63.    The Attorney General's secret shopper study investigated UnitedHealthcare ("UHC") among 13 health providers. Carelon administers the mental health services and directory for most UHC plans in New York.

---

[47] Office of the New York State Attorney General Letitia James, *Inaccurate and Inadequate: Health Plans' Mental Health Provider Network Directories* (2023), https://ag.ny.gov/sites/default/files/reports/mental-health-report_0.pdf.

[48] Press Release, *Attorney General James Uncovers Major Problems Accessing Mental Health Care through Insurance Companies* (Dec. 7, 2023), https://ag.ny.gov/press-release/2023/attorney-general-james-uncovers-major-problems-accessing-mental-health-care.

[49] *Id.*

64.    UHC provides the NYSHIP program's medical and surgical elements, while Carelon administers the mental health portion.

65.    Many people, when searching for care and trying to determine whether the provider is in-network, refer to the plan as the NYSHIP/UHC plan.

66.    The OAG found that "[a] study of UnitedHealthcare's New York directory found that only three percent of calls to psychiatrists in New York City resulted in being offered an appointment."[50]

67.    The OAG study did not distinguish between those plans—like NYSHIP—where the mental health portion is subcontracted to Carelon, and those UHC plans which use UHC's own Optum network.

68.    The OAG tried to reach 60 mental health providers throughout the state who are supposedly in the UHC network, but found that only half were actually in-network. And of those, only 13 would offer any type of appointment, and only six offered an in-person appointment. The OAG calculated the UnitedHealthcare ghost listing percentage at 78 percent.[51]

69.    The OAG's finding for providers who treated children was even worse. In two out of the three locations the OAG conducted secret shopper studies—New York City and Buffalo— they were able to make appointments zero times. (In Albany, they were able to get an appointment for a child 57 percent of the time.)[52]

70.    Significantly, this is not a new situation. The OAG previously brought enforcement actions against UHC/Carelon to remedy inaccurate provider directories and network inadequacy.

---

[50] *Supra* n. 47, at 17.

[51] *Id*. at 34.

[52] *Id.*

In 2006 and 2011, the OAG entered into settlement agreements with affiliates of UHC regarding

its inaccurate directory listings, including for behavioral health providers. The settlements

required UHC to verify the accuracy of its provider directories in New York by conducting

outreach to confirm participation and to reimburse consumers who paid more than they should

have after they went to providers who were erroneously listed as in-network. In 2015, the OAG

executed a settlement with Carelon, which administers behavioral health benefits for several

New York health plans, in which the company agreed to ensure network adequacy and the

accuracy of its online provider directory.

### D.    Additional Investigations of Ghost Networks

71.    On a national scale, the issue of ghost networks and their attendant harms to

consumers at large has been reported by *The New York Times*,[53] *The Washington Post*,[54] and

many other significant publications.[55]

72.    The American Medical Association co-authored a white paper on some of the

financial and non-financial injuries from ghost networks:

> When directory information is inaccurate, patients experience
> inconvenience (non-working phone numbers, longer time to find the
> right practitioner), and financial consequences (unplanned out of pocket
> expenses). Directory errors may also result in a patient selecting a health

---

[53] Jay Hancock, *Insurers' Flawed Directories Leave Patients Scrambling for In-Network Doctors*, N.Y. TIMES (Dec. 3, 2016), https://www.nytimes.com/2016/12/03/us/inaccurate-doctor-directories-insurance-enrollment.html.

[54] Katherine Ellison, *73 doctors and none available: How ghost networks hamper mental health care*, WASH. POST (Feb. 19, 2022), https://www.washingtonpost.com/health/2022/02/19/mental-health-ghost-network/.

[55] *See, e.g.*, Abigail Burman, *Laying Ghost Networks to Rest: Combatting Deceptive Health Plan Provider Directories*, 40 YALE L. & POL'Y REV. 78 (2021) [hereinafter "Laying Ghost Networks to Rest"].

plan based on inaccurate information about which clinicians are in-network.[56]

73.    A March 2022 report by the United States Government Accountability Office corroborated the findings outlined above, concluding that "consumers with coverage for mental health care experience challenges finding in-network providers,"[57] and that "[i]naccurate or out-of-date information on which mental health providers are in a health plan's network contributes to ongoing access issues for consumers and may lead consumers to obtain out-of-network care at higher costs to find a provider."[58]

74.    The federal Centers for Medicare & Medicaid Services similarly identified network directory inaccuracies, including those "with the highest likelihood of preventing access to care[.]"[59]

75.    In a study of adolescent psychiatrists in particular, researchers posing as parents seeking care for a child with depression were only able to obtain an appointment 17 percent of the time.[60]

---

[56] *Improving Health Plan Provider Directories*, CAQH & AM. MED. ASS'N., 3, https://www.caqh.org/sites/default/files/other/CAQH-AMA_Improving%20Health%20Plan%20Provider%20Directories%20Whitepaper.pdf ("Among the more common resources that patients use are health plan provider directories which, according to two surveys conducted in 2020, more than half of patients use to select a physician.") (citations omitted) [hereinafter "Improving Health Plan Provider Directories"].

[57] *Mental Health Care Access Challenges for Covered Consumers and Relevant Federal Efforts*, U.S. Gov't Accountability Office, Report to the Chairman, Comm. on Fin., U.S. Senate, 2, (Mar. 2022), https://www.gao.gov/assets/gao-22-104597.pdf.

[58] *Id.* at 12.

[59] *Online Provider Directory Review Report*, Ctrs. for Medicare & Medicaid Servs., 1, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/Provider_Directory_Review_Industry_Report_Round_3_11-28-2018.pdf.

[60] Shireen Cama et al., *Availability of Outpatient Mental Health Care by Pediatricians and Child Psychiatrists in Five U.S. Cities*, INT'L J. HEALTH SERV. 47(4) (2017),

(continued…)

76.    The crisis in access to mental health treatment is exacerbated by barriers to care imposed by health insurance companies, including the prevalence of ghost networks.[61]

**E.    Plaintiffs' "Secret Shopper" Studies**

77.    Between November 2024 and February 2025, counsel for the Plaintiffs conducted multiple simulated patient "secret shopper" surveys. These secret shopper studies were designed and conducted to recreate the Plaintiffs' experiences. The Plaintiffs' counsel used the same criteria each Plaintiff used when searching for mental health care: whether a psychologist, a therapist, or a psychiatrist. Based on the Plaintiffs' actual experiences, counsel also designated the distances they were willing to travel for an in-person appointment. If they were willing to use telehealth services, this too was noted. This information was then entered into the Defendant's online search engine, which generated a list of supposedly in-network providers for each Plaintiff.

78.    Plaintiffs' counsel then called each of the listed providers. If an answering machine picked up the call, Plaintiffs' counsel left messages asking for a return call and made sure to call three times. For every completed call, Plaintiffs' counsel recorded the provider's response: whether they were indeed the type of provider listed in the directory; whether they accepted the NYSHIP plan (and the descriptors "NYSHIP," "Empire Plan," and "Carelon" were used in each

---

https://pubmed.ncbi.nlm.nih.gov/28474997/ (studying availability of outpatient pediatrician and child psychiatry availability and finding that "[a]ppointments were obtained with 40% of the pediatricians and 17% of the child psychiatrists. The mean wait time for psychiatry appointments was 30 days longer than for pediatric appointments. Providers were less likely to have available appointments for children on Medicaid[.]").

[61] *See, e.g.*, Ellison, supra n. 54; Jack Turban, *Ghost networks of psychiatrists make money for insurance companies but hinder patients' access to care*, Stat News (June 17, 2019), https://www.statnews.com/2019/06/17/ghost-networks-psychiatrists-hinder-patient-care/ ("The numbers, however, never seem as bad for other specialties as they do for psychiatry.").

call); whether the provider was accepting new patients; and if they were accepting new patients, how long the wait was for an appointment.

79.    These secret shopper studies were similar in design to those conducted by the New York OAG and Senate Finance Committee but were more extensive: the number of providers contacted (or attempted) was larger. And the number of attempts to contact these supposed providers if they did not receive a response after the first call, was greater.

80.    The details of each secret shopper study are below.

## FACTUAL ALLEGATIONS

### I.    Plaintiffs' Needs for Mental Health Care

#### A.    Jane and Minor Doe

81.    Plaintiff Jane Doe is a resident of Westchester County, New York and is the mother of 16-year-old Minor Doe. Both Jane Doe and Minor Doe have been enrolled in the NYSHIP program for more than five years.

82.    Minor Doe was 14 years of age when she began getting bullied at school. Beginning in approximately 2023, both Jane Doe and her husband used the Defendant's directory to try to find mental health care for their daughter. They wanted someone who had experience working with teenage girls, and they were willing to travel up to 25 miles to get in-person therapy. Minor Doe's parents spent hours a night for several weeks calling providers listed in the Defendant's directory as accepting their insurance—to no avail. The Does estimate they called over 100 providers. The vast majority were not actually in-network; and the rest were not accepting new patients.

83.    The Does finally sought care from out-of-network providers beginning in or around September 2024.

84.    The Does pay approximately $62.28 every two weeks for their portion of the NYSHIP premium.

85.    The Does relied on the NYSHIP booklet, the Carelon website, and the Certificate of Insurance to understand their benefits.

**Secret Shopper Study on Behalf of Plaintiff Minor Doe**

86.    Between January and February 2025, the Plaintiffs' counsel conducted a secret shopper study that attempted to replicate the Does' experience when they sought mental health care for their daughter.

87.    Counsel used the Defendant's online directory to search for an in-network therapist with experience serving adolescent girls within 25 miles of Port Chester, New York. From the 293 names generated by the Defendant's provider directory search tool, Counsel called the first 100 names. Counsel made three attempts (over several days) to call each provider who did not pick up the phone.

88.    Out of 100 supposedly in-network providers, it was possible to make 6 appointments.



89.    Of the 100 providers listed in the Defendant's directory, 18 were unreachable.

"Unreachable" was defined as a disconnected phone, an incorrect phone number, or three

voicemail messages left with no return phone call.

90.    Among the 82 connected calls:

- **18** were not accepting the insurance plan
- **17** provided the wrong type of service
- **14** providers were not at the listed location[62]
- **2** providers accepted the insurance but did not have an appointment available within a month
- **1** provider accepted the insurance but was not accepting new patients
- **1** number had no provider there by the listed name
- **23** listings required the patient to jump through additional hoops: they did not allow for booking of appointments on the phone—only online—and they required submitting a registration form and insurance card details online[63]

---

[62] The Carelon directory lists providers' addresses. If, after making an appointment, a member goes to the listed address and the provider is not there, it makes little difference if the doctor moved across the street or across the state: the doctor would not be at the listed location. And the member would incur potentially serious treatment delays, frustration, and cost.

[63] The Carelon directory lists providers' telephone numbers, not their website addresses.

> ➢ **6 appointments could be made**

91.     That is a 94 percent ghost rate for all calls.

**B.      Plaintiff Hannah Landerer**

92.     Plaintiff Hannah Landerer is a resident of Nassau County, New York. She works for the New York State Department of Education.

93.     Ms. Landerer has been a member of the NYSHIP program since 2019. Beginning in 2019 and continuing thereafter, she tried to find an in-network mental healthcare provider without success.

94.     Ms. Landerer was willing to see various types of providers: therapist, social worker, psychiatrist, psychologist, or licensed clinical social worker (LCSW).

95.     Ms. Landerer used the Carelon directory to call providers who supposedly accepted her insurance. She called nearly a dozen providers who supposedly accepted the insurance but soon found that the directories were grossly inaccurate: most of the listed providers did not accept the NYSHIP plan and the few who did were not accepting new patients.

96.     Occasionally, Ms. Landerer found a provider who said they accepted the insurance, only to find out after she saw the provider that they really did not. Another provider who did accept the insurance treated Ms. Landerer for approximately five months, and then told Ms. Landerer she was no longer accepting the insurance.

97.     The inaccurate provider directory delayed Plaintiff's treatment and left her with two options: forgoing essential medical care or paying out of pocket for treatment. She needed the care, and beginning in 2023, she had to resort to paying out of pocket for out-of-network providers because she had difficulty finding in-network providers after the ones she had seen had gone out of network. Ms. Landerer had to spend thousands of dollars on out-of-network providers. And Carelon reimbursed only a tiny fraction of her out-of-pocket costs.

98.    Ms. Landerer began seeing her out-of-network therapist in July of 2023.

99.    Ms. Landerer finds the Carelon website to be very difficult to navigate and unreliable, and its customer service people to be unhelpful.

100.    She also feels she is forced to rely on paper copies to ensure proper documentation and reimbursement, as electronic submissions to the Carelon website often do not work.

101.    Mr. Landerer relied on the Carelon website and the NYSHIP booklet to understand her benefits.

102.    Ms. Landerer paid $165 a session for eight sessions to meet her deductible. She also paid a $33 copay for each session, and $360 for couples' therapy.

103.    Because of the significant out-of-pocket expense of being treated by an out-of-network provider, Ms. Landerer repeatedly tried to use the Defendant's directory to find in-network providers, to no avail. Throughout the period from 2019 through the present, the Plaintiff found the Defendant's provider directory to be grossly inaccurate.

104.    Ms. Landerer pays approximately $362 every two weeks for her portion of the NYSHIP premium.

**Secret Shopper Study on Behalf of Plaintiff Hannah Landerer**

105.    Between January and February 2025, Plaintiffs' counsel conducted a secret shopper study that attempted to replicate Ms. Landerer's experience when she sought mental health care.

106.    Counsel used the Defendant's online directory to search for an in-network therapist with experience serving adults within 25 miles of Levittown, New York. From the hundreds of names generated by the Defendant's provider directory search tool, Counsel called the first 100 names. Counsel made three attempts (over several days) to call each provider.

107. Out of 100 supposed in-network providers, it was possible to make 27 appointments.



108. Of the 100 providers listed in the defendant's directory, **26** were unreachable. Unreachable was defined as a disconnected phone, and incorrect phone number, no answer, or three voicemail messages left with no return phone call.

109. Among the 74 connected calls:

- **25** were not accepting the insurance plan
- **22** were not accepting new patients
- **5** providers were not at the listed location
- **4** providers accepted the insurance but did not have an appointment available within a month
- **2** providers were offering hospital in-patient services only
- **1** provider offered the wrong type of service

  ➢ **27 appointments could be made**

110. That is a 73 percent ghost rate for all calls.

### C.    Plaintiff Steven Marks

111.   Plaintiff Steven Marks is a resident of Rockland County, New York. He works for the State University of New York.

112.   Mr. Marks has been a member of the NYSHIP program since 2023. In late spring of 2023, Mr. Marks sought out a mental health provider. He used the Defendant's directory and chose someone listed as in-network.

113.   Mr. Marks saw that provider in July 2023. The provider charged Mr. Marks a $25 co-pay. Soon after, he received an Explanation of Benefits from the Defendant showing that the total billed amount was $1,017 from the provider. The Defendant only covered $537.

114.   Concerned about the surprise bill, Mr. Marks called the Defendant, which told him the provider had dropped out of the network a month earlier and that Mr. Marks was responsible for the remaining balance.

115.   Mr. Marks then used the Defendant's directory to try to find a provider who actually accepted the insurance. He called approximately 15 different providers. Although approximately half said they were technically in-network, none were accepting new patients covered by the Defendant's insurance plan.

116.   Mr. Marks has found the online search tool filters that are part of the Defendant's directory to be grossly inaccurate. For example, when Mr. Marks searches for a psychiatrist, the Directory yields hospice care—for dying people.

117.   Mr. Marks continues to use the Defendant's directory to try to find an in-network provider for his mental health needs. The closest in-network provider that would see him in-person was over 50 miles away.

118.   When Mr. Marks actually found a facility which was listed as in-network—and which he confirmed by phone was in-network—he saw that provider.

119.   This in-network provider was listed with an incorrect address: the provider was, in fact, only 5 miles of Mr. Marks' location. But if it were not for Mr. Marks' extra research, he would never have learned that from the Defendant's directory.

120.   The Defendant's directory is grossly inaccurate.

121.   Mr. Marks has wasted scores of hours using the Defendant's inaccurate directory and has incurred hundreds of dollars in unexpected out-of-network costs.

122.   Mr. Marks pays approximately $102.43 every two weeks for his portion of the NYSHIP premium.

123.   Mr. Marks relied on the NYSHIP booklet, the Carelon website, and the Certificate of Insurance to understand his benefits.

124.   Mr. Marks continues to try to rely on the Carelon directory to find an in-network therapist, to no avail. In the last three months he has called dozens of providers listed in the Carelon directory. Again, just as with his experience seeking a psychiatrist, the directory includes wrong telephone numbers, non-working telephone numbers, providers who supposedly – but in reality do not – accept the NYSHIP Plan insurance, wrong specialties and providers who are not accepting new patients.

**Secret Shopper Study on Behalf of Plaintiff Steven Marks**

125.   Between January and February 2025, the Plaintiffs' counsel conducted a secret shopper study that attempted to replicate Mr. Marks' experience when he sought mental health care.

126.   Counsel used the Defendant's online directory to search for an in-network therapist with experience serving adults within 25 miles of Suffern, New York. From the hundreds of

names generated by the Defendant's provider directory search tool, Counsel called the first 100

names. Counsel made three attempts (over several days) to call each provider.

127.  Out of 100 supposed in-network providers, it was possible to make 14

appointments.



128.  Of the 100 providers listed in the Defendant's directory, 17 were unreachable.

Unreachable was defined as a disconnected phone, an incorrect phone number, or three

voicemail messages left with no return phone call.

129.  Among the 83 connected calls:

- **67** were not accepting the insurance plan
- **4** providers were not at the listed location
- **3** providers were not accepting new patients (despite accepting the insurance)
- **3** providers were only offering hospital in-patient services
- **3** providers offered the wrong type of service
- **1** provider did not have an appointment available within one month (despite accepting the insurance)

> ➢ **14 appointments could be made**

130.  That is an 86 percent ghost rate for all calls.

## II.     The NYSHIP Plan and Mental Health Coverage

### A.     Plan Options

131.   As state/agency employees eligible for the NYSHIP plan, the Plaintiffs have a choice of health plans. Employees can choose a preferred provider organization (PPO) plan administered by UHC (for the medical and surgical parts of the plan) and Defendant Carelon (for the mental health portion) or a plan from one of the various regional health maintenance organizations (HMOs).

132.   New York State had, and still has, a contract with Carelon to provide the mental health services portion of the NYSHIP plan. Contract number C000625 between the New York State Department of Civil Service and Carelon was effective between February 26, 2016 and December 31, 2023, for $2,465,000,000. [64] A successor contract, number C000743, effective between January 1, 2024 and December 31, 2028, is for $2,785,391,306.[65]

133.    NYSHIP publishes an annual booklet, available online, called "At a Glance." The cover of the booklet says: "This guide briefly describes Empire Plan benefits. It is not a complete description and is subject to change. For a complete description of your benefits and responsibilities, refer to your Empire Plan Certificate and Certificate Amendments."[66]

134.   Members and prospective members are told that all plans have both inpatient and outpatient mental health coverage.[67]

---

[64] Office of the State Comptroller, Open Book New York, Contracts for Carelon Behavioral Health, Inc., https://wwe2.osc.state.ny.us/transparency/contracts/contractresults.cfm?ID=5024.

[65] *Id.*

[66] The Empire Plan, At a Glance January 2024, https://www.cs.ny.gov/employee-benefits/pa-market/shared/publications/at-a-glance/2024/paep-aag-jan-2024.pdf.

[67] NYSHIP Mental Health Choices for 2025, 9, https://www.cs.ny.gov/employee-benefits/nyship/shared/publications/choices/2025/active-choices-2025.pdf.

135. Members and prospective members are told: "The Mental Health and Substance Use (MHSU) Program offers both network and non-network benefits."[68]

136. When a member uses an in-network provider, there is a $25 co-pay.[69]

137. If there are no in-network provers, the NYSHIP booklet states:

> Even if there are no network providers in your area, you are guaranteed access to network benefits within the United States and its territories for the following services if you call The Empire Plan at 1-877-769-7447 beforehand to arrange care:
>   • Mental Health and Substance Use (MHSU) Program services

138. If a member uses an out-of-network provider, the NYSHIP booklet states: "**If you use a nonparticipating provider or non-network facility**, benefits for covered services are payable under the **Basic Medical Program** and are subject to a deductible and/or coinsurance." (Emphasis in the original.)

139. The NYSHIP plan also includes caps on out-of-pocket expenses when members use in-network providers. The caps vary slightly depending on the bargaining unit or position the member is affiliated with and are different for individuals and families. In 2025, the out-of-pocket cap for individuals ranges from $2,600 to $2,670 for medical, surgical, and mental health combined; and for individuals from $5,200 to $5,350.[70]

140. If a member uses an out-of-network provider, the member will be reimbursed at "80% of allowed amount; after applicable coinsurance max, 100% of allowed amount[.]"[71]

141. The allowed amount is:

---

[68] *Id.* at 14.

[69] *Id.* at 15.

[70] *Id.* at 18.

[71] *Id.* at 21.

The Empire Plan considers 80 percent of the allowed amount, which is based on 275 percent of the Medicare rates published by the Centers for Medicare & Medicaid Services (CMS), for the Basic Medical Program and non-network practitioner services for the MHSU Program, 50 percent of the network allowance for covered services for non-network HCAP or MPMP services and 90 percent of the billed charges for covered services for non-network approved facility services for the MHSU Program. You are responsible for the remaining 20 percent coinsurance and all charges in excess of the allowed amount for Basic Medical Program and non-network practitioner services, 10 percent for non-network MHSU-approved facility services and the remaining 50 percent of the network allowance for covered, non-network HCAP or MPMP services.[72]

142. Members pay a portion of the monthly health insurance premium for themselves and for their dependents. The amount differs depending on the member's pay grade.[73]

| ENROLLEE PAY GRADE | INDIVIDUAL COVERAGE | | DEPENDENT COVERAGE | |
|---|---|---|---|---|
| | State Share | Employee Share | State Share | Employee Share |
| Grade 9 and below* | 88% | 12% | 73% | 27% |
| Grade 10 and above* | 84% | 16% | 69% | 31% |

143. The individual and family contribution to the Empire Plan premium for 2025 is[74]:

| NEW YORK STATE HEALTH INSURANCE PROGRAM 2025 RATES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **ENROLLEE CONTRIBUTIONS FOR EMPLOYEES OF NEW YORK STATE** Note: To enroll in an HMO, you must live or work in the HMO's service area. If you no longer live or work in the NYSHIP service area of the HMO in which you are enrolled, you must change to another option. Service areas may change from year to year. Please check pages 6–7 for NYSHIP service area information. | | | **Biweekly Costs Schedule for employees of the State of New York who are Management/Confidential; represented by C-82, CSEA, DC-37, NYSCOPBA, PBANYS, PEF or UUP; justices, judges and nonjudicial employees of the Unified Court System (UCS); and Legislature** | | **Biweekly Costs Schedule for employees of the State of New York who are represented by PBA or PIA** | | | |
| | | | For Employees in the groups listed above and in titles allocated or equated to Salary Grade 9 and below* | For Employees in the groups listed above and in titles allocated or equated to Salary Grade 10 and above* | For Employees in the groups listed above and in titles allocated or equated to Salary Grade 9 and below | For Employees in the groups listed above and in titles allocated or equated to Salary Grade 10 and above | | |
| **Page in Choices** | **Code** | **Plan** | **Individual** | **Family** | **Individual** | **Family** | **Individual** | **Family** |
| 13 | 001 | The Empire Plan | 60.23 | 272.67 | 80.31 | 324.22 | 63.83 | 289.34 | 85.10 | 344.02 |

144. Mental health benefits under the NYSHIP plan are subject to prior authorization.

---

[72] *Id.* at 15.

[73] *Id.* at 5.

[74] NYSHIP Rates and Deadlines for 2025, 4, https://www.cs.ny.gov/employee-benefits/nyship/shared/publications/rates/2025/ny-active-rates-2025.pdf.

145.   The "At a Glance Booklet" states: "To receive the highest level of benefits you must call the Mental Health and Substance Use (MHSU) Program before seeking services from a mental health or substance use care provider. This includes treatment for alcoholism and services that require precertification to confirm medical necessity before starting treatment (see list on page 14)."[75]

146.   The booklet goes on to say: "The Program Administrator must certify all covered services as medically necessary, regardless of whether you are using Network or Non-Network coverage. If the Program Administrator does not certify your inpatient or outpatient treatment as medically necessary, you will not receive any Empire Plan benefits and you will be responsible for the full cost of care."[76] It then lists more than a dozen mental health treatments that require prior authorization.

147.   The NYSHIP home page links to a page that includes a more detailed explanation of the "Empire Plan Providers, Pharmacies, and Services."[77] This page contains five large logos of the companies that provide the various services of the Empire Plan, and links to their respective home pages for members:

- Medical/Surgical Program: UnitedHealthcare

- Hospital Program: Anthem Blue Cross

- Mental Health and Substance Use Program: Carelon Behavioral Health

- Prescription Drug Program: CVS Caremark

---

[75] *Supra* n. 66, at 13.

[76] *Id.* at 14.

[77] NYSHIP Empire Plan Providers, Pharmacies and Services, https://www.cs.ny.gov/employee-benefits/nyship/shared/providers/index.cfm.

- Nonparticipating Providers Program: Multiplan

148.  Clicking on the Carelon link brings the user to a Carelon home page with the headline: "Find a Provider. Search our network of highly qualified and vetted providers."

149.  The Carelon home page is the page with the search engine where the Plaintiffs began their frustrating and often futile searches for providers.

**The NYS Special Report**

150.  In May 2024, the New York State Department of Civil Service, Employee Benefits Decision, published a "Special Report" explaining to members that there was "[i]nformation about [their] new NYSHIP benefits effective July 1, 2024."[78]

151.  Among the information included in the Special Report was this Q&A:

> **Q: I need a specialist and there are not any network providers in my area. What should I do?**
>
> **A:** You should call The Empire Plan (see *Contact Information*, page 10). For medical/surgical providers, press or say 1 and for mental health or substance use disorder providers, press or say 3 and choose the prompt for the Clinical Referral Line (CRL). The Empire Plan can assist you in obtaining network benefits from a medical/surgical provider if there is not a network provider within 30 miles or 30 minutes from your home address. Under the MHSU Program, if there are no network providers in your area, you have guaranteed access to network benefits if you use the CRL to help you arrange care with an appropriate provider.[79]

152.  The Special Report also notes:

> **Q: How can I make sure that a provider is in The Empire Plan network?**
>
> **A:** You can check the online directory on NYSHIP Online and select the link to the appropriate online directory (Medical/Surgical

---

[78] Empire Plan Special Report, May 2024, https://www.cs.ny.gov/employee-benefits/hba/shared/publications/empire-plan-report/2024/special-ny-actives-epr-may-2024.pdf.

[79] *Id.* at 7.

Program or MHSU Program) or call The Empire Plan and select the appropriate Program (see *Contact Information*, page 10). For mental health or substance use disorder providers, press or say 3 and choose the prompt for the Clinical Referral Line (CRL). Under the MHSU Program, you have guaranteed access to network benefits if you use the CRL to help you arrange care with an appropriate provider and they are unable to find you an in-network provider.[80]

153.    Importantly, the Special Report also states:

**Benefits on the Web** To learn more about your benefits, including finding Empire Plan providers and updated NYSHIP publications, go to NYSHIP Online at www.cs.ny.gov/employee-benefits.[81]

## The Certificate of Insurance

154.    The most recent Empire State Certificate of Insurance found online is dated January 1, 2023.[82]

155.    The NYSHIP Certificate of Insurance promises members robust mental health coverage. The January 1, 2023 Certificate has more than 100 references to mental health benefits. Section IV of the Certificate is devoted to mental health coverage and contains 25 pages of detailed explanation of benefits.

156.    The Certificate notes:

Network Benefits at a Non-Network Hospital/Facility: If You use Non-Network Hospitals and Facilities, You will receive network benefits for covered services: A. When no Network Facility is available within 30 miles of Your residence. B. When no Network Facility within 30 miles of Your residence can provide the covered services You require.[83]

---

[80] *Id.* at 6.

[81] *Id*. at 10.

[82] January 1, 2023 Empire Plan Certificate, NYSHIP, https://www.cs.ny.gov/employee-benefits/hba/shared/publications/certificate/2023/c82-certificate-2023.pdf.

[83] *Id*. at 15.

Reasonable distance from the enrollee's residence is defined by the following mileage standards:

| Primary Care | Specialist |
| --- | --- |
| Urban: 8 miles | Urban: 15 miles |
| Suburban: 15 miles | Suburban: 25 miles |
| Rural: 25 miles | Rural: 50 miles |

Within these mileage standards, network benefits are guaranteed for the following primary care
Physicians and core specialties:

| Primary Care Providers | | |
| --- | --- | --- |
| Family Practice | Internal Medicine | Pediatrics |
| General Practice | | Obstetrics/Gynecology |

| Specialties | | |
| --- | --- | --- |
| Allergy | Gastroenterology | Otolaryngology |
| Anesthesia | General Surgery | Pulmonary Medicine |
| Cardiology | Hematology/Oncology | Radiology |
| Dermatology | Neurology | Rheumatology |
| Emergency Medicine | Ophthalmology | Urology |
| | Orthopedic Surgery | |

[84]

157.  According to the NYSHIP website, Carelon "provides coverage for medically necessary inpatient and outpatient care through a network of participating providers; medically necessary non-network services are also covered."[85]

158.  The Certificate of Insurance notes:

> By using a Network Provider, You will receive Network Coverage for Medically Necessary treatment. The Program's network gives You access to a wide range of Providers when You need Mental Health Care or Substance Use Care. These Providers are in Your community and many of them have been caring for Empire Plan enrollees and their families for years.[86]

159.  Importantly, the Certificate continues:

> You are guaranteed access to Network Coverage. If You cannot locate a Network Provider in Your area, then contact the Clinical Referral Line. On a case-by-case basis, where no Network Provider is available and the Program Administrator specifically approved

---

[84] *Id.* at 55.

[85] Empire Plan Providers, Pharmacies and Services, Mental Health and Substance Use Program, https://www.cs.ny.gov/employee-benefits/nyship/shared/providers/excelsior-plan/index.cfm.

[86] *Supra* n. 82, at 111.

Your Referral to a Non-Network Provider, that Non-Network Coverage may be considered Network Coverage.[87]

**Out-of-Network Reimbursement**

160.  If a member uses an out-of-network provider, the Certificate of Insurance states:

When You use a Non-Network Provider or a Provider not referred to You by the Program Administrator, the Plan pays the following covered percentages: A. For Practitioner services: After You meet The Empire Plan Combined Annual Deductible, either 80 percent of Usual and Customary Rate for Covered Services or actual billed charges, whichever is less. You pay the balance of 20 percent (Coinsurance) and any charges above the Usual and Customary Rate.

161.  This explanation is inconsistent with the explanation given in the NYSHIP booklet, which states that out-of-network reimbursement is 275% of the Medicare rate. At the very least, it is confusing to members.

162.  Carelon's "allowance" is not discernable from its website. Thus, it is (at best) very difficult for a member to know, in advance, how much it will cost to use an out-of-network provider.

163.  And for a prospective member, it is essentially impossible to determine in advance how much that payment will be: the Defendant will not tell a prospective member what its allowance for a procedure or treatment is without a member ID number.

164.  FairHealth is an unrelated, highly respected, non-profit resource that provides consumers with extensive, accurate information about the cost of healthcare procedures. FairHealth is not a definitive price guide, but it does provide some guidance about how much a member might pay. According to FairHealth, CPT Code 90837, one hour of psychotherapy near

---

[87] *Id.* at 116.

zip code 10573 (Plaintiff Doe's zip code) would cost $583 for an out-of-network provider.[88] And $180 is the in-network (allowed) price.

165.   Minor Doe's provider charged $385, and Carelon's allowed amount was $344.81. Mrs. Doe had to pay $68.96 for each visit—rather than the $25 she would have had to pay for an in-network co-pay.

166.   Mrs. Doe has paid dozens of these co-insurance charges to get care for her daughter.

167.   Plaintiffs Landerer and Marks paid similar co-insurance charges because there were no in-network providers near where they lived.

Carelon's Responsibility to Update Its Directory

168.   Even Section 720 of the Employee Retirement Income Security Act of 1974 (which does not apply here) requires health insurers to verify and update their provider directories not less frequently than once every 90 days, remove a provider from the directory when it is unable to verify the directory information for that provider, and update the directory within two days of receiving new information from a provider.

169.   Section 9820 of the Internal Revenue Code of 1986 requires health insurers to verify and update their provider directories not less frequently than once every 90 days, remove a provider from the directory when it is unable to verify the directory information for that provider, and update the directory within two days of receiving new information from a provider.

170.   Section 4226 of the New York State Insurance Law states:

(a) No insurer authorized to do in this state the business of life, or accident and health insurance, or to make annuity contracts shall:

---

[88] FairHealth Consumer, *Consumers Estimate Your Healthcare Expenses*, https://www.fairhealthconsumer.org/.

(1) issue or circulate, or cause or permit to be issued or circulated on its behalf, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts;

…

(c) In any determination, judicial or otherwise, of the incompleteness or misleading character of any such comparison or of representation, it shall not be presumed that the insured knew or knows of any of the provisions or benefits contained in any insurance policy or contract.

## III.    The NYSHIP Contract

171.   Carelon's contract with the New York State Department of Civil Service (No. C000743, or the "Contract," attached hereto as Exhibit A), obligates Carelon to provide an adequate network.

172.   Specifically, the Contract states in Section 5.2.3 that Carelon "must have a contracted Provider network in place, that meets or exceeds the required access standards set forth in Section 5.10 of this Contract."

173.   Section 5.10 of the Contract specifies that Carelon's "proposed network within [New York State] must meet the network adequacy standards as defined by the DFS."

174.   Further, pursuant to Section 5.10.7(f), Carelon must have "adequate network management and staff to manage the network, handle Provider inquiries and ***ensure updated MHSU Provider information is entered into the Contractor's system and transmitted to the online directory***. An adequate MHSU Provider relations staff must be dedicated to New York State, where the majority of MHSU Disorder Program utilization occurs." (Emphasis added.)

175.   Further, pursuant to Section 7.2 of the Contract, Carelon's provider network must have a proper mix of professionals, and Carelon is "expected to use its best efforts to substantially maintain the composition of Network Providers included in the [Mental Health and Substance Use] Disorder Program's current Provider Network."

176.   The Contract further provides that Carelon "shall monitor network physicians to ascertain if their practices are open or closed to new patients. Provider availability must be taken into account in relation to Member accessibility." (*See* Contract Section 5.10.3.)

177.   Per paragraph 2 of Appendix B to the Contract, Carelon must warrant and represent that it will "comply with all applicable State and Federal laws, ordinances, rules and regulations and policies of any governmental entity."

178.   As it regards the provider directory, Carelon

> shall assist in developing the Empire Plan Participating Provider Directories on an annual basis as required by New York State Insurance Law §§ 3217-a(a)(17) and 4324(a)(17) and Public Health Law § 4408(r). … The Offeror must provide a web link, for the Department's website, that is accessible to the general public and does not require Member log in. … [T]his online directory must … provide Members with a user-friendly interface that allows them to search for Providers and Facilities, as indicated in the Empire Plan Certificates, Excelsior Plan and SEHP At A Glance (Attachment 20), based on geographic location, name, or specialty. The directory must detail all MHSU Provider information as required by State and federal law. Information about all types of MHSU Providers in all geographic locations shall be accessible through this single link and search functions. ***The directory shall be updated weekly or more frequently, if necessary, to ensure Members have access to the most up-to-date information. The Offeror must ensure the directory contains the most up-to-date information regarding network MHSU Providers and Facilities, including if the MHSU Provider is accepting new patients.***

*See* Contract, Request for Proposal ("RFP") Section 3.3(1)(e).

179.   New York State Insurance Law §§ 3217-a(a)(17) and 4324(a)(17) and Public Health Law § 4408(r) require a "a listing by specialty, which may be in a separate document that is updated annually, of the name, address, telephone number, and digital contact information of all participating providers, including facilities, and: (A) ***whether the provider is accepting new patients***; (B) in the case of mental health or substance use disorder services providers, any affiliations with participating facilities certified or authorized by the office of mental health or

the office of addiction services and supports, and any restrictions regarding the availability of the individual provider's services; and (C) in the case of physicians, board certification, languages spoken and any affiliations with participating hospitals. The listing shall also be posted on the insurer's website and ***the insurer shall update the website within fifteen days of the addition or termination of a provider from the insurer's network or a change in a physician's hospital affiliation***[.]" (Emphasis added.)

180.   The Contract also provides, in Sections 3.10 and 5.11 of the RFP, minimum access guarantees in urban, suburban, and rural areas; for example, in urban areas, 95% of enrollees will have at least: 1) one Psychiatrist, Psychologist, or Masters Level Clinician within three miles; and 2) one Mental Health or Substance Use Facility within five miles."

## IV.    Defendant's Ghost Network

### A.    Carelon's Provider Directory

181.   Beacon Health Options, the former name for Carelon until March 1, 2023, affirmatively told its members: "Provider Search is a Beacon Health Group (Beacon) online directory for locating providers. Provider Search offers you the ability to locate Beacon network providers and facilities throughout the country."[89]

182.   Carelon's current website tells its members that "what makes [it] different" is its "[r]obust specialty provider network."[90] Further, Carelon claims that "[t]hrough [its] deep provider network and unrivaled care management, [it] improve[s] access to behavioral health

---

[89] Carelon, *Find a Provider Search Tips*, https://plan.carelonbehavioralhealth.com/wp-content/uploads/Find-Provider-Need-Help.pdf.

[90] Carelon, Specialty Care Services, https://www.carelonbehavioralhealth.com/solutions/specialty-care.

services and help[s] deliver the right treatment, at the right time, and in the right setting so people can live their lives to the fullest."[91]

183.   At all relevant times, the Defendant published an online directory of doctors who supposedly are in-network with the Defendant. This directory is publicly available to members and non-members of the NYSHIP plan.

184.   This online directory, for members and potential members, is the definitive resource to identify which providers are in Carelon's network and are thereby covered as an in-network provider.

185.   This directory can be sorted and searched based on the criteria relevant to members: for example, the type of medical specialty, the distance from the member's home or office, and whether the provider does telehealth or provides in-person care.

186.   The Defendant's directory of mental health providers is a ghost network to a staggering extent. The Defendant's provider directory affirmatively misrepresents to current and prospective NYSHIP members that the mental health providers listed are in fact in-network and will be accessible and available for mental health services. Indeed, as described above, the Defendant's provider directory is replete with providers who do not take the NYSHIP plan and is egregiously inaccurate as to its network of mental health providers.

187.   Moreover, the Defendant's directory lists incorrect contact information for mental health providers and includes repeated entries of the same provider, making it appear that the Defendant contracts with vastly more mental health providers than it does. Accordingly, the

---

[91] Carelon, Behavioral Health Home Page, https://www.carelon.com/capabilities/behavioral-health.

Defendant's provider directory, and representations about its comprehensive mental health coverage, are inaccurate, deceptive, and misleading.

188.   The Defendant includes many incorrect or non-working telephone numbers in its directory. The Defendant's inclusion of multiple incorrect telephone numbers may, at first glance, appear to be a negligent oversight. But such errors are far from trivial for a person who needs mental health care for themselves or a loved one. The appearance of a phone number next to a provider's name conveys the promise that this provider is not only in-network, but available to the member—to make an appointment and get help. And the absence of a phone number would convey a very different message: that this provider should not be listed. The inclusion of incorrect telephone numbers artificially inflates the perceived size and adequacy of the Defendant's network and has a detrimental impact on members who invest time and energy trying to find a mental health provider—only to be repeatedly led down a blind path.

189.   Carelon's directory can also be downloaded as a customized PDF.

190.   In summary, the Defendant's provider directory includes scores of providers who are not in-network with Carelon or do not accept the NYSHIP insurance. Moreover, the Defendant's provider directory is replete with inaccuracies of all kinds, including but not limited to incorrect addresses, phone numbers, and other contact information. Finally, when a member prints out (or saves as a PDF) a directory, the search results generated for a mental health provider include multiple entries for the same provider, making it appear that Carelon has vastly more mental health providers than it does—and potentially sending a member on an even more frustrating search for an in-network provider.

## B.    Carelon's Representations

191.   In addition to publishing and maintaining an inaccurate provider directory, Carelon provides consumers with deceptive and materially misleading marketing and program materials

about the Carelon-administered part of the NYSHIP plan. These materials promise mental health benefits and a robust network of in-network providers.

192.   During every year's open enrollment period, state employees select their desired health plan. Once an employee selects a health plan, the employee must remain with that plan for the entire plan year (unless there is a "qualifying event" like getting married or losing a job) until the following year's open enrollment period.

193.   The Carelon website and the representations it has made to NYSHIP for inclusion in the various NYSHIP brochures are misleading. For example, as of March 17, 2025, Carelon represented on its website that it had "more than 115,000" in-network providers nationwide.[92]

194.   According to the American Psychological Association, there were 12,020 licensed psychologists in New York in 2014.[93] And according to the federal Bureau of Labor Statistics, there are just over 4,000 licensed psychiatrists in New York.[94]

195.   Carelon's representation of more than 115,000 in-network providers nationwide is grossly misleading not just because that 115,000 figure was (presumably) a national figure – of little use to member seeking care near where they live – but because many of them are ghosts. Its coverage is far less than what is marketed and advertised in its plans. Based on the Plaintiffs'

---

[92] *Id.*

[93] American Psychological Association, *How many psychologists are licensed in the United States?* (June 2014), https://www.apa.org/monitor/2014/06/datapoint#:~:text=An%20estimated%20106%2C500%20p sychologists%20possess%20current%20licenses%20in%20the%20United%20States.&text=Calif ornia%20(17%2C890)%20New%20York%20(,(190)%20have%20the%20fewest.

[94] U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics, 29-1223 Psychiatrists, https://www.bls.gov/oes/2023/may/oes291223.htm.

experiences and the subsequent secret shopper studies, many out-of-state providers do not accept the NYSHIP plan.

196.  The Mental Health Parity and Addiction Equity Act states, "The regulation provides that all plan standards that limit the scope or duration of benefits for services are subject to the nonquantitative treatment limitation parity requirements. This includes restrictions such as geographic limits, facility-type limits, and network adequacy."[95]

197.  Carelon's website also stated that, "By improving access to care, behavioral health and wellness concerns can be addressed before they become significant conditions." The website further stated that "Carelon Behavioral Care serves as a clinical support system that provides appropriate and timely access to the care people need."[96]

198.  However, these statements are misrepresentations and misleading because consumers spend a great deal of time searching for in-network providers of mental health, often to no avail.

199.  This statement is inaccurate and misleading because Carelon does not have a "deep" provider network on which consumers can rely, and consumers are often left struggling and wasting time searching for treatment long after they start to seek out a mental health professional.

200.  Further, Carelon represented that consumers could rely on a "broad network of licensed clinicians [who are] available to fill gaps by providing access to care with

---

[95] Ctrs. for Medicare & Medicaid Services, *The Mental Health Parity and Addiction Equity Act* (2023), https://www.cms.gov/marketplace/private-health-insurance/mental-health-parity-addiction-equity.

[96] Carelon, Behavioral Health Home Page, https://web.archive.org/web/20250221082017/https://www.carelonbehavioralhealth.com/solutions/carelon-behavioral-care.

comprehensive and vital resources."[97] That is inaccurate and misleading, as consumers often

have to seek help out of network because the Carelon network lacks adequate providers.

201.   Similarly, Carelon's Provider Handbook (last updated March 1, 2023), states that

"Carelon arranges for the provision of and access to a ***broad scope of behavioral health services***

for members through its provider networks, ***consisting of appropriately licensed and/or certified***

***practitioners, facilities, providers, and programs*** offering varying levels of service."[98] However,

Carelon misleads consumers in making them believe that they will have access to a "broad

scope" of service and appropriately licensed practitioners, when, in reality, Carelon's directories

are inaccurate and its network is sparse.

202.   Moreover, Carelon's "Provider Search" states that "Carelon makes every effort to

maintain accurate and up-to-date information."[99] This statement is inaccurate and misleading

because Carelon's provider directories are inaccurate and consumers are left wasting time and

effort in their search for help.

203.   In reality, it is nearly impossible to obtain in-network mental health care, and

consumers who relied on Carelon's misrepresentations are left to suffer the consequences of

untreated mental illness, incur significant costs to afford out-of-network treatment, and/or pay

premiums for benefits that are illusory.

---

[97] Carelon, Our Solutions,
https://web.archive.org/web/20250221172409/https://www.carelonbehavioralhealth.com/solutions.

[98] Carelon, Carelon Behavioral Health Provider Handbook, 10, (last updated Mar. 1, 2023),
https://www.carelonbehavioralhealth.com/content/dam/digital/carelon/pdf/Carelon%20Behavioral%20Health%20Provider%20Handbook.pdf.

[99] NYSHIP, Provider Search (attached hereto as Exhibit B).

204.  In conclusion, separately and together, Carelon's representations mislead consumers to believe that their mental health needs would be taken care of, that Carelon's in-network coverage is comprehensive, and that they only need to look to and rely on the provider network to find necessary mental health care.

205.  Moreover, Carelon's repeated focus on the importance of using an in-network provider, and repeated direction of members to use the provider directory to find an in-network provider, underscores the importance of the provider directory to consumers.

206.  Finally, the Defendant's attempts to have members themselves verify that a provider is in fact in-network do not replace, or otherwise absolve, Defendant's obligations to accurately represent the mental health providers available in its network.

### C.    Defendant's Omissions

207.  In addition to the affirmative misrepresentations made by the Defendant about the breadth of its provider network and comprehensiveness of Carelon's mental health care coverage, the Defendant also makes material omissions, including but not limited to failing to disclose the extent of provider directory inaccuracies; that the vast majority of in-network mental health providers are not accessible; and the limitations of Carelon's mental health coverage.

208.  Specifically, the Defendant misleadingly omits any mention that members will likely face significant difficulty in finding an in-network mental health provider through the directory, or the likelihood that members will need to either resort to an out-of-network provider, or delay or potentially forgo care altogether.

209.  Significantly, there is also complete information asymmetry between the Defendant and consumers: the Defendant has every ability to access all the relevant information to

determine whether a provider is accurately listed.[100] On the other hand, only after great difficulty and time expenditure—through trial and error, hours of calls, and extensive research—could a member become aware of the extent of the directory inaccuracies. The information is simply not readily available to the average consumer.

210.   Plaintiffs and other reasonable consumers must rely on the Defendant to accurately represent which providers are in-network for its insurance plan. The Defendant is well-aware of the inaccuracies in its directory, yet reasonable consumers would have no reason to think that the list of providers represented as being in their insurance plan's network would not be exactly that.

211.   If Plaintiffs—or any reasonable consumer—had the directory inaccuracies and deficits of Carelon's mental health care coverage disclosed to them, they would have acted differently in a variety of ways, including, but not limited to, avoiding hours of fruitless searches and calls, saving and budgeting to prepare for out-of-network mental health care costs, and exploring other health plan options.

## V.   The Defendant's Misrepresentations and Omissions about Its Mental Health Care Coverage Are Deceptive

212.   The staggering inaccuracies in the Defendant's provider directory constitute unlawful deceptive acts and practices, false advertising, and violations of statutory and regulatory requirements. Moreover, these violations are knowing, willful, and serve to unjustly enrich the Defendant.

213.   The misconduct alleged herein is simple but enormously harmful: the Defendant deceptively and misleadingly represents that the NYSHIP insurance plan has a broad network of

---

[100] This information includes their contracts and communications with providers, as well as billing information from which the Defendant could easily ascertain the providers currently in its network.

available mental health providers, when the reality is that members often cannot obtain in-network mental health treatment.

214.   The Defendant holds itself out to consumers—through the provider directory—as adequately covering mental health care. These representations are deceptive, as Carelon does not provide an adequate or a comprehensive network of mental health providers.

215.   As discussed above, the Defendant affirmatively misrepresents the breadth of its mental health provider network to a staggering extent. An overwhelming percentage of the providers listed in the provider directory do not actually participate in the NYSHIP plan. Further, a vast number of the providers listed are improperly and repeatedly listed or have incorrect contact information.

216.   In addition, during its enrollment periods and otherwise, Carelon makes numerous material misrepresentations to current and potential members about the NYSHIP plan, including, but not limited to, the size and adequacy of its mental health provider network, that all providers on the directory would be covered at an in-network rate, the ease and availability of finding in-network care, and the comprehensiveness of mental health care coverage. It is also very difficult for members or prospective members to ascertain the "allowance" that the Defendant uses to determine out-of-network reimbursement.

217.   At no time did the Defendant disclose the limited nature of its mental health provider network, the amount of time individuals could be expected to search for an available in-network mental health provider, or the number of expenditures that would likely be required to obtain mental health care.

218.   Put another way, if a member was looking to obtain mental health services from a provider on the Defendant's provider directory, the member would have no reason to believe that

said provider would be out-of-network, nor that the member would have to pay substantial costs to see an out-of-network provider.

219.   Through the Defendant's representations, omissions, and bait-and-switch tactics, a reasonable consumer would understandably believe that the NYSHIP plan included the mental health providers that the provider directory stated it would, and that Carelon's network of mental health providers was broad and accessible. A reasonable consumer would also expect that Carelon would cover charges for services at an in-network rate for the providers it affirmatively lists as in-network on its directory, and that the consumer would not be subject to out-of-network costs for obtaining mental health care from a provider listed on the directory.

220.   The Defendant represents that it regularly monitors and updates its network for accuracy. But that is not true.

221.   Indeed, the Defendant is in violation of the federal No Surprises Act and New York State's No Surprises law and network adequacy law.

222.   Moreover, the Defendant is well aware of these federal and state laws, and the Defendant's inaccurate and misleading provider directory is not only a violation of these standards, but also a willful and knowing violation of the consumer protection laws.

223.   The Defendant willfully and knowingly maintains an inaccurate and inflated provider directory to hide its non-compliance with network adequacy standards. If the Defendant were forced to produce an accurate provider directory, it would reflect that Carelon does not maintain sufficient in-network mental health providers, in violation of New York's network adequacy laws.

## VI.    The Defendant's Deceptive Representations and Omissions Are Material

224.   As countless studies have shown, provider directories and the breadth of a provider network are important to consumers' choice of health care plan and decisions about their health

care. Misrepresentations about a provider directory and network materially impact consumers'
health plan choices. Accordingly, the Defendant's misrepresentations about the NYSHIP plan's
mental health provider network and coverage are materially misleading to consumers, in
violation of New York's consumer protection laws.

225.   Consumers predominantly, and logically, rely on a health plan's provider directory
to find providers in their health plan.[101] As stated by the American Medical Association and the
Council for Affordable Quality Healthcare:

> Health plans are expected by their members and their contracted
> practices to display a provider directory to the public that represents an
> accurate reflection of their networks. It is the most public-facing data
> that health plans provide, and patients are dependent on accurate
> directories to access care.[102]

226.   Indeed, and as noted above, Carelon itself repeatedly directs its members to rely on
the provider directory to find an in-network provider.

227.   In addition, reasonable consumers look to the breadth of a provider network in
choosing a health plan.[103] Over half of consumers in one poll identified provider choice as the
most important non-financial consideration they make when selecting a health plan.[104] In another
survey, participants "were willing to pay $72 for a plan that covered 30% more doctors in their

---

[101] *See* Improving Health Plan Provider Directories, *supra* n. 56.

[102] *Id.* at 7.

[103] *See* Statista, *Most Important Considerations for Americans in Choosing a Plan from a Health Insurance Company as of 2016*, https://www.statista.com/statistics/654828/most-important-considerations-for-choosing-health-insurance-plan/.

[104] *See* Linda J. Blumberg et al., *Factors Influencing Health Plan Choice among the Marketplace Target Population on the Eve of the Health Reform*, Urban Inst., 2 (Feb. 6, 2014), https://www.urban.org/sites/default/files/2024-05/hrms_decision_factors.pdf.

area[.]"[105] And, in a Kaiser Family Foundation survey, 60 percent of non-group health insurance enrollees reported that having a choice of providers was either "very important" or "extremely important" to them.[106] Carelon is aware—or should be aware—of such consumer preferences.

228.  Given the materiality of provider directories and network breadth to consumer choice, the misrepresentations and omissions made by the Defendant constitute precisely the type of information upon which reasonable consumers would rely in choosing a health plan. Having access to an adequate number of in-network, qualified doctors is one of the fundamental criteria consumers use in choosing a health insurance plan.[107]

229.  Moreover, and as discussed above, reasonable consumers would understandably rely on the Defendant's misrepresentations and omissions. The provider directory and network information are disseminated by the insurance company, which consumers logically view as the authoritative source of information about its in-network providers, scope of coverage, and other plan policies.

230.  Any boilerplate disclaimers the Defendant might provide would be woefully insufficient. Put another way, no reasonable consumer viewing such disclaimers would understand that up to 95% of mental health providers listed in the Defendant's directory do not

---

[105] Eline M. van den Broek-Altenburg & Adam J. Atherly, *Patient Preferences for Provider Choice: A Discrete Choice Experiment*, Am. J. of Managed Care 26(7) (July 2020), https://www.ajmc.com/view/patient-preferences-for-provider-choice-a-discrete-choice-experiment.

[106] Liz Hamel et al., *Survey of Non-Group Health Insurance Enrollees, Wave 2*, Kaiser Family Foundation (2015), https://www.kff.org/health-reform/poll-finding/survey-of-non-group-health-insurance-enrollees-wave-2/ (noting that the combined statistic of those who reported choice of providers as "extremely important" (25 percent) or "very important" (35 percent) is 60 percent).

[107] *See id.*; *Most Important Considerations for Americans in Choosing a Plan from a Health Insurance Company as of 2016, supra* n. 102; Blumberg et al., *supra* n. 103; van den Broek-Altenburg, *supra* n. 104.

take NYSHIP insurance. Indeed, there is no disclaimer broad enough to absolve that level of deception.

231.   The sheer extent of inaccuracy and inadequacy of the Defendant's network is hidden, dangerous, and deceptive.

### A.   The Defendant Was Aware of Its Provider Directory Inaccuracy and Knew That Its Representations and Omissions Regarding the Provider Directory and Mental Health Care Coverage Were Deceptive

232.   At all relevant times, the Defendant knew that its representations and omissions regarding its directory of mental health providers and coverage of mental health care were grossly inaccurate, deceptive, and misleading.

233.   Among the insurance industry itself, it is well known that provider directories are notoriously inaccurate. The industry knows it has a problem. There are numerous studies

documenting the prevalence of ghost networks,[108] especially for mental health providers,[109] and companies like Carelon have been successfully sued over the issue.[110]

234.  As discussed above, the industry was recently the subject of a bipartisan congressional inquiry into ghost networks,[111] and the Senate Finance Committee held a hearing on the issue specifically in the context of mental health.[112] There are also numerous federal and state laws and regulations aimed at rectifying the problem of inaccurate provider directories, which are discussed above and further below, and of which the Defendant is well aware.

---

[108] *See, e.g.*, Butala et al., *supra* n. 29 ("In examining directory entries for more than 40% of US physicians, inconsistencies were found in 81% of entries across 5 large national health insurers."); Jack S. Resneck Jr. et al., *The Accuracy of Dermatology Network Physician Directories Posted by Medicare Advantage Health Plans in an Era of Narrow Networks*, JAMA Dermatology 150(12) (2014), https://jamanetwork.com/journals/jamadermatology/fullarticle/1919439 (finding, after making scripted telephone calls to dermatologists listed in certain directories, that 45.5% of physician listings were duplicates, and many "dermatologists listed had incorrect contact information, were deceased, retired, or had moved, were not accepting new patients, did not accept the insurance plan, or were subspecialized"; for one plan, no appointment was obtainable).

[109] *See, e.g.*, Russell Holstein & David P. Paul III, *'Phantom Networks' of Managed Behavioral Health Providers: an Empirical Study of their Existence and Effect on Patients in Two New Jersey Counties*, Hospital Topics 90(3), 68 (2012), https://pubmed.ncbi.nlm.nih.gov/22989224/ ("Aetna's network of psychologists was the most accurate of all networks, and GHI's network of psychiatrists was the most inaccurate of all networks."); Jane M. Zhu et al., *Phantom Networks: Discrepancies Between Reported And Realized Mental Health Care Access in Oregon Medicaid*, Health Affairs 41(7) (2022), https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.00052 ("Overall, 58.2 percent of network directory listings were "phantom" providers who did not see Medicaid patients, including 67.4 percent of mental health prescribers, 59.0 percent of mental health nonprescribers, and 54.0 percent of primary care providers.").

[110] *See, e.g.*, *Anthem Resolves Calif. Provider Directory Error Case*, Bloomberg Law (Aug. 17, 2016), https://news.bloomberglaw.com/health-law-and-business/anthem-resolves-calif-provider-directory-error-case.

[111] *See Brown, Colleagues, Seek Information on Ghost Networks*, The Ironton Tribune (Feb. 1, 2023), https://www.irontontribune.com/2023/02/01/brown-colleagues-seek-information-on-ghost-networks/.

[112] *See* Senate Hearings on Mental Health Care, *supra* n. 36.

235.   Put simply by a state senator, insurance companies have "known about this for a long time and they haven't done anything about it. It's difficult not to assume that this kind of barrier is intentional."[113]

236.   The sheer magnitude of providers who are not in-network or do not accept the NYSHIP plan—as many as 95 percent of the mental health providers listed—is itself powerful proof of the Defendant's knowledge of its directory inaccuracies. The staggering extent of inaccuracy of the mental health providers represented as being in-network can only be the product of knowing misconduct or willful blindness.

237.   The Defendant knew, or should have known, that members were having significant problems accessing in-network care.

238.   For all these reasons, the Defendant's misrepresentations and omissions constitute knowing and willful violations.

239.   The Defendant engaged in these knowing deceptive acts and practices to induce Plaintiffs, and all potential members and consumers, to choose the NYSHIP plan. These representations about the size and breadth of the mental health provider network, the ease of finding mental health treatment by using the allegedly accurate provider directory, the freedom to choose any listed in-network provider, the ability to control costs by seeing an in-network provider, and the comprehensive coverage of mental health care would induce a reasonable consumer—and did induce Plaintiffs—to choose the NYSHIP plan.

---

[113] Turban, *supra* n. 61.

**B.      The Defendant Reaps Significant Benefits from Misrepresenting Its Mental Health Provider Network and Coverage**

240.   Moreover, the Defendant knowingly and intentionally misleads consumers to inflate the perception, extent, and robustness of its supposed mental health provider network, which inures significant financial benefits to the Defendant and, conversely, deprives Empire members of the benefit of the bargain for the plan that they chose.

241.   Maintaining an inaccurate provider network and providing inadequate mental health care coverage significantly boost the Defendant's profits.

242.   As discussed above, the top considerations for consumers choosing a health plan are network breadth and provider choice. In addition to general representations made by insurers about their networks, the main source upon which consumers rely to determine a network's breadth is its provider directory.[114]

243.   Consumers are more likely to enroll in a particular plan if their provider is in-network and the provider list is robust. Thus, by misrepresenting the size and quality of its network, the Defendant attracts more customers.

244.   A portion of members' premiums are paid to Carelon. As such, Carelon is unjustly enriched from its misrepresentations about the breadth of its network. As noted above, the value of the Defendant's current contract with New York State to administer the mental health portion of the NYSHIP plan is over $2.7 billion.

245.   Carelon also overcharges the state and Plaintiffs (via their contribution) for its premiums because of its illusorily broad network. Every provider who is not actually in-network,

---

[114] *See* Improving Health Plan Provider Directories, *supra* n. 56.

or who is unavailable or unable to be contacted, represents coverage for which Carelon is paid, but members never receive.[115]

246.   In addition, members with greater mental health care needs are disproportionately harmed by the lack of in-network providers. These higher-needs members are more likely to have to pay for out-of-network treatment or abandon their efforts to obtain mental health care altogether, thereby saving Carelon the costs associated with their care.

247.   Simply put, inaccurate directories serve to increase a plan's membership (along with their increased premiums), and at the same time evade the costs of covering their care.

248.   The financial incentives of intentionally inaccurate directories were discussed during a recent Senate Finance Committee hearing.[116] In an exchange between United States Senator Elizabeth Warren and testifying witness Mary Giliberti (the Chief Public Policy Officer of Mental Health America), Senator Warren inquired whether the plans were "inaccurate by design," to which Ms. Giliberti responded affirmatively:

> SENATOR WARREN: Okay so it's a way to defraud consumers. To say I have this really big list of people you could go to if you had a problem, and it turns out that really big list … is actually this little tiny list.
>
> MS. GILIBERTI: Right.
>
> SENATOR WARREN: Okay so that's one way it's to their advantage …. They get paid in effect or they make more money by being inaccurate. Did you have another one?
>
> MS. GILIBERTI: Well, just, that I think it's about 60 percent of the plans [being discussed] don't have out of network coverage, so if you

---

[115] *See* Alicia Atwood & Anthony T. Lo Sasso, *The Effect of Narrow Provider Networks on Health Care Use*, J. of Health Econ. (Dec. 2016), https://doi.org/10.1016/j.jhealeco.2016.09.007.

[116] Note that this discussion focused on Medicare Advantage plans, but the incentives are the same in commercial plans.

get really frustrated and you pay on your own then they're not paying anything.

SENATOR WARREN: So the more I can frustrate you … the more you'll just go somewhere else. And that means it's not money out of their pockets.

\* \* \*

SENATOR WARREN: So, look, what we are really saying here is that it is in the financial interests of these … plans to discourage beneficiaries from accessing care …. Because here's the key that underlines this. Whatever insurers don't spend on care as a result of tactics like outdated provider directories or overly restrictive networks or inaccurate information, whatever they don't spend on care, they get to keep.[117]

249.   Finally, a significant collateral consequence of an inaccurate, inflated provider directory is that an insurance plan appears to meet federal and state network adequacy requirements, even though it does not. The Defendant is thereby unjustly enriched by avoiding the compliance costs and other expenditures associated with maintaining an accurate and adequate network of mental health providers, as required by federal and state law, discussed above and further below.

250.   As explained by a Yale Law & Policy Review article on ghost networks, the effects of the Defendant's ghost network are far-reaching and damage the very structure of our health care system:

Directory errors cost consumers money and erode regulatory consumer safeguards. They deceive consumers about the value of the coverage they are purchasing by concealing plans' actual provider networks, subjecting consumers to predatory billing practices, and breaking the link between consumer choices and plan practices that undergirds much of the American health insurance regulatory structure.[118]

---

[117] Senate Hearings on Mental Health Care, *supra* n. 36 (Testimony of Senator Elizabeth Warren, which begins at 2:23:58).

[118] *Laying Ghost Networks to Rest*, supra n. 55, at 85.

**VII.    Plaintiffs and Putative Class Members Have Been Injured Because of the Defendant's Conduct**

251.    Simply put, the Defendant's ghost network is a dangerous obstacle to critical mental health care for the hundreds of thousands of people covered by the NYSHIP plan. Plaintiffs and others similarly situated—both adults and the parents of children in desperate need of mental health care—have been grievously injured by these violations and their inability to access necessary mental health treatment for their children.

252.    Mental health care networks have been known for some time for being particularly inaccurate and causing significant harms.[119] Yet insurance companies such as the Defendant have done little to improve their accuracy.

253.    As noted in a 2014 New York Attorney General Assurance of Discontinuance, "[p]ersons with mental health and substance use disorders comprise a vulnerable population, and may be reluctant to seek care."[120]

254.    The Plaintiffs have suffered enormous injury from the Defendant's violations of law. As a result of the Defendant's ghost network, the Plaintiffs have struggled, or been wholly unable, to obtain mental health treatment for themselves or their children. Specifically, the Plaintiffs have paid exorbitant costs to get mental health treatment because they have been forced to seek out-of-network care for themselves and for their children; have faced significant, years-

---

[119] *See, e.g.*, Susan H. Busch & Kelly A. Kyanko, *Incorrect Provider Directories Associated With Out-Of-Network Mental Health Care And Outpatient Surprise Bills*, 39(6) Health Affairs (2020), https://www.healthaffairs.org/doi/10.1377/hlthaff.2019.01501 ("We conducted a national survey of privately insured patients who received specialty mental health treatment. We found that 44 percent had used a mental health provider directory and that 53 percent of these patients had encountered directory inaccuracies.").

[120] *In re Excellus Health Plan, Inc.*, Assurance No. 14-201, https://www.scribd.com/doc/259076979/Attorney-General-of-the-State-of-New-York-in-the-Matter-of-Excellus-Health-Plan.

long delays in receiving critical mental health care; have been unable to find care appropriate for their mental health needs; have made-do with less-than-appropriate providers; and, alarmingly, have been unable to obtain needed mental health treatment altogether.

255.    The provider directory's inaccuracies and misrepresentations and omissions about Carelon's mental health care coverage are the direct and proximate causes of the harms the Plaintiffs have endured. Most simply, had the provider directory been accurate, the Plaintiffs would have saved countless hours of futile searching; avoided the time, costs, and emotional toll of delaying, or failing to find, needed care; and avoided the exorbitant costs of locating, traveling to, and otherwise obtaining out-of-network mental health treatment. Had Carelon accurately represented its mental health care coverage, the Plaintiffs would have had access to the care they were promised or made other financial and health care decisions about their mental health treatment. Had Plaintiffs known in advance about the problems they would encounter trying to get in-network mental health care, they would have pursued other health care options.

256.    Moreover, Carelon's misrepresentations artificially inflated the market price of its product, causing Plaintiffs to pay more than they otherwise would have for premiums. As a direct and proximate result of the Defendant's unfair and deceptive acts and practices, Plaintiffs suffered injury by paying insurance premiums but failing to receive commensurate benefits.

## CLASS ACTION ALLEGATIONS

257.    This action is brought by Plaintiffs individually and on behalf of a class (the "Class") pursuant to Federal Rule of Civil Procedure 23(a) and (b).

258.    Plaintiffs seek certification of the following Class:

> All persons who are currently, or were previously, enrolled in the NYSHIP Plan at any point from 2019 through the date of class certification, who attempted to use Carelon's (or Beacon Health Options') directory of mental health providers.

259.   Excluded from the Class are the Defendant's officers, directors, employees, co-conspirators, and legal representatives, and any judge, justice, or judicial officer to whom the litigation is assigned.

260.   Plaintiffs reserve the right to amend or modify the class definition.

261.   **Numerosity.** The Class consists of many thousands of state and municipal employees, retired employees under 65, and their dependents that are or have been members of the NYSHIP plan, and is thus so numerous that joinder of all members is impracticable. The exact number and identity of class members is unknown to Plaintiffs at this time but can be ascertained through appropriate discovery.

262.   **Commonality and predominance.** This action is appropriate as a class action because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include, but are not limited to, the following:

a)      whether the Defendant breached its contractual obligations by failing to comply with the No Surprises Act and/or other statutes, regulations, and rules with which the Defendant is contractually obligated to comply;

b)      whether the Defendant's representations and/or omissions with respect to the NYSHIP plan were false or misleading under New York General Business Law ("GBL") §§ 349 and/or 350, New York Insurance Law § 4226(a), and/or common law;

c)      whether the Defendant's violations of law were willful and knowing;

d)      whether the Defendant's mental health provider directory was inaccurate and/or inadequate;

e)      whether the Defendant failed to disclose to members and prospective members that the provider directory was inaccurate and/or inadequate;

f)      whether a reasonable consumer would be misled by the Defendant's acts and practices;

g)      whether Plaintiffs and Class members are entitled to receive specific types of relief such as actual damages, and the methodology for calculating those damages;

h)      whether Plaintiffs and Class members conferred a benefit on Carelon through enrollment in the NYSHIP plan, payment of premiums, and not utilizing in-network providers or otherwise not obtaining mental health care; and

i)      whether equity and good conscience require restitution to Plaintiffs and Class members and/or the establishment of a constructive trust, and the amount of such restitution or constructive trust.

263.  **Typicality.** The claims asserted by the Plaintiffs are typical of the claims of the Class. At all relevant times, the Defendant's provider directory was inadequate and inaccurate, and all Class members' claims arise out of this common source of misrepresentations and omissions. Plaintiffs, like all Class members, were subject to deceptive and misleading representations and omissions found in the Defendant's provider directory, and other marketing and plan documents about the comprehensiveness of mental health coverage and the provider network. Plaintiffs' interests coincide with, and are not antagonistic to, those of the other Class members, and Plaintiffs have been damaged by the same wrongdoing set forth in this Complaint.

264.  **Adequacy of representation.** The Plaintiffs will fairly and adequately protect the interests of the Class and do not have any interests antagonistic to those of the Class members. Plaintiffs have retained counsel competent and experienced in class actions and health insurance

and consumer protection litigation, who are competent to serve as Class counsel. Plaintiffs and their counsel will fairly and adequately protect the interest of the Class members.

265. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a)    given the complexity of issues involved in this action, the expense of litigating the claims, and the money at stake for any individual Class member, few, if any, Class members could afford to seek legal redress individually for the wrongs that the Defendant has committed against them;

b)    the prosecution of thousands of separate actions by individual members would risk inconsistency in adjudication and outcomes that would establish incompatible standards of conduct for the Defendant and burden the courts;

c)    when the Defendant's liability has been adjudicated, claims of all Class members can be determined by the Court;

d)    this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

e)    without a class action, many Class members would continue to suffer injury while the Defendant retains the substantial proceeds of its wrongful conduct; and

f)    this action does not present any undue difficulties that would impede its management by the Court as a class action.

266. **Ascertainability.** The identities and addresses of Class members can be readily ascertained from business records maintained by the Defendant, and/or self-authentication. The precise number of class members, and their addresses, can be ascertained from the Defendant's

records. Plaintiffs anticipate providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to court order.

267.   Plaintiffs request that the Court afford Class members with notice and the right to opt out of any Class certified in this action.

## FIRST CAUSE OF ACTION

### Breach of Contract

268.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

269.   A contract exists between New York State and Carelon to provide mental health benefits to people eligible to receive health insurance benefits under the NYSHIP program. Prior to March 2023, the contract was with Beacon Health Services, which changed its name to Carelon in March 2023.

270.   Plaintiffs, as state and municipal employees eligible to participate in the NYSHIP plan, are intended third-party beneficiaries of a contract between the state and the Defendant. Like any insurer and insured, the Defendant and Plaintiffs also have a direct contractual relationship. The terms of that direct contractual relationship are governed by the insurance materials provided by the Defendant.

271.   The contract requires the Defendant to comply with the No Surprises Act, among other federal laws, including sections 2799A–1, 2799A–2, 2799A–3, 2799A-4, 2799A-5, 2799A–7, and 2799A–8 of the Public Health Service Act; sections 716, 717, 718, 719, 720, 722, and 723 of the Employee Retirement Income Security Act of 1974; and sections 9816, 9817, 9818, 9819, 9820, 9822, and 9823 of the Internal Revenue Code of 1986.

272.   Plan members, i.e. Plaintiffs and the Class members, are mentioned throughout the Contract.

273.   Sections 2799A-5 of the Public Health Service Act, 720 of the Employee Retirement Income Security Act of 1974, and 9820 of the Internal Revenue Code of 1986 require health insurers to verify and update their provider directories not less frequently than once every 90 days, remove a provider from the directory when they are unable to verify the directory information for that provider, and update the directory within two days of receiving new information from a provider.

274.   The Defendant's failure to maintain an accurate directory of in-network providers violates the requirements in the Employee Retirement Income Security Act and Internal Revenue Code, and was thus a breach of the contract between Carelon/Beacon Health Services and New York State.

275.   The Defendant has violated the above laws (and, by extension, its contractual obligations to Plaintiffs and the Class) by, among other things, failing to ensure mental health network adequacy and failing to consistently provide an accurate network directory.

276.   Members of the Class (including Plaintiffs) were damaged in several ways. The following is a non-exhaustive list of the types of damage incurred. First, they did not receive the benefits they were entitled to as members of the plan, and for which they paid premiums: they could not find in-network providers. Second, they used out-of-network providers and paid those providers' out-of-network fees for care. Even after the plan reimbursed them the out-of-network allowed amount, these members typically incurred hundreds of dollars in out-of-pocket cost each time they received treatment – a cost far above their expected co-pay amount. Third, they abandoned their search for care, paying a premium for a service they were supposed to receive and did not, and incurring pain and suffering due to the unsuccessful provider search and their inability to receive treatment.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

277.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

278.   The contract between New York State and the Defendant is a binding and enforceable contract, and Plaintiffs are intended third-party beneficiaries of that contract. Plaintiffs and the Defendant also have a direct contractual relationship.

279.   The contract includes an implied covenant, actionable in contract, that the Defendant will act in good faith and deal fairly with Plaintiffs.

280.   Defendant materially breached the implied covenant in several respects, including but not limited to the following:

   a)   Defendant has failed to make a good-faith effort to maintain an up-to-date network directory;

   b)   Defendant has failed to maintain, and failed to make a good-faith effort to maintain, an adequate network of providers;

   c)   Defendant has presented providers as being in-network that were not, in fact, in-network; and

   d)   Defendant has denied claims and/or failed to pay claims for providers that were listed as in-network in the directory.

281.   The Defendant's breaches were conscious and deliberate acts, which were designed to and did unfairly frustrate the agreed common purposes of the contract and which disappointed Plaintiffs' and the Class's reasonable expectations by denying Plaintiffs and the Class the benefits of the contract.

282.   As a direct and proximate cause of the Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages including, but not limited to, damages incurred for having to pay for services and claims that should have been covered by the insurance contract.

### THIRD CAUSE OF ACTION

**Deceptive acts and practices in violation of the**
**New York Deceptive Acts & Practices Act, N.Y. Gen. Bus. Law ("GBL") § 349**

283.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

284.   Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against the Defendant for violations of GBL § 349.

285.   GBL § 349 imposes liability on anyone who engages in "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service" in New York.

286.   Plaintiffs are "persons" under GBL § 349(h).

287.   The Defendant's actions as set forth herein occurred in the conduct of business, trade, or commerce under GBL § 349(a).

288.   The Defendant has engaged in consumer-oriented conduct that has misled and harmed Plaintiffs and Class members in New York. The actions and practices alleged herein were directed at consumers of health insurance and were therefore consumer-oriented.

289.   In the course of business, the Defendant made deceptive affirmative misrepresentations and omissions to Plaintiffs and the Class by publishing and disseminating misleading informational and marketing materials prior to and during the open enrollment periods. The provider directory itself, on which members and prospective members are directed

to rely, inflates and misleads consumers regarding the size of the network and the availability of mental health providers.

290.  False representations include, *inter alia*, that Carelon has an adequately sized network; that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers; and that mental health care coverage is comprehensive.

291.  Omitted and concealed from the Defendant's representations were material and relevant facts that Plaintiffs and Class members would have used in selecting their health insurance plan, including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to be made to find appropriate mental health care.

292.  These representations and omissions, when considered as a whole from the perspective of a reasonable consumer, conveyed that the Defendant's provider directory was accurate and broad, and that mental health care would be covered. A reasonable consumer would attach importance to such representations and would be induced to enroll in such a plan.

293.  The misrepresentations and omissions alleged herein were materially misleading.

294.  The acts and practices alleged herein are deceptive acts and practices covered under GBL § 349 and have caused Plaintiffs and Class members significant ascertainable monetary and non-monetary injuries. Among other injuries, the Defendant's deceptive acts and practices have caused millions of dollars in damages; forced Plaintiffs and Class members to delay and forgo crucial and necessary mental health care; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiffs and Class

members to reduce spending on necessities and other life costs; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress.

295.  The Defendant willfully and knowingly violated GBL § 349. Its effort to include affirmative misrepresentations and omissions in its marketing materials and provider directory was in its financial interests to market its plan as comprehensive, including mental health coverage, to induce individuals to choose Carelon over other plans.

### FOURTH CAUSE OF ACTION

### False advertising in violation of the
### New York False Advertising Act, N.Y. Gen. Bus. Law § 350

296.  Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

297.  Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against the Defendant for violations of the New York False Advertising Act, GBL § 350.

298.  GBL § 350 imposes liability on anyone who uses false advertising in the conduct of any business, trade, or commerce, or in the furnishing of any service in New York. "False advertising" includes "advertising, including labeling of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity … ." GBL § 350-a(1).

299.  The Defendant's actions as set forth herein occurred in the conduct of business, trade, or commerce under GBL § 350.

300.   The Defendant has engaged in consumer-oriented conduct that has misled and harmed Plaintiffs and Class members in New York. The actions and practices alleged herein were directed at consumers of health insurance and were therefore consumer-oriented.

301.   A cause of action based upon false advertising is appropriate because the Defendant utilized false advertising to mislead Plaintiffs and the Class about the nature and coverage of Carelon.

302.   In the course of business, the Defendant falsely advertised the NYSHIP plan to Plaintiffs by publishing and disseminating misleading informational and marketing materials prior to and during the open enrollment periods, including Carelon's online resource. The provider directory itself, on which members and prospective members are directed to rely, misleads consumers regarding the adequacy and size of the Defendant's network and the availability of mental health providers.

303.   False representations include that Carelon has an adequately sized network; that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers; and that the mental health care coverage is comprehensive.

304.   Omitted and concealed from the representations were material and relevant facts that Plaintiffs and Class members would have used in selecting their health insurance plan, including the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to be made to find appropriate mental health care.

305.   These representations and omissions, when considered as a whole from the perspective of a reasonable consumer, conveyed that the Defendant's provider directory was accurate and broad, and that mental health care would be covered. A reasonable consumer would attach importance to such representations and would be induced to enroll in such a plan.

306.   The false advertising alleged herein was materially misleading.

307.   The acts and practices alleged herein constitute false advertising covered under GBL § 350 and have caused millions of dollars in damages; forced Plaintiffs and Class members to delay and forgo crucial and necessary mental health care; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress.

308.   The Defendant willfully and knowingly violated GBL § 350. Its effort to include affirmative misrepresentations and omissions in its marketing materials and provider directory was in its financial interests to market the NYSHIP plan as comprehensively including mental health coverage to induce individuals to choose its plan over other plans.

## FIFTH CAUSE OF ACTION

### Violation of New York Insurance Law § 4226

309.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

310.   Insurance companies have a statutory obligation to provide accurate and complete information about their health care plans. Specifically, New York Insurance Law § 4226(a)(1) states in pertinent part: "No insurer authorized to do in this state the business of … health insurance … shall …  issue or circulate, or cause or permit to be issued or circulated on its

behalf, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts."

311.   The Defendant is liable under Section 4226 because (1) it is authorized to provide health insurance in New York; (2) it misrepresented to Plaintiffs and Class members that they would have comprehensive access to in-network mental health care, including that the mental health providers listed on the provider directory accepted its insurance plan, that these providers would be accessible and available, and more; (3) the misrepresentations were material; (4) the Defendant knew that it had misrepresented the terms, benefits, and advantages of its plan and has long been on notice of its provider directory deficiencies; (5) the Defendant knew that its online resource, and other documents containing the misrepresentations, would be communicated to the Plaintiffs and Class members, directly and indirectly; (6) Plaintiffs and Class members received such documents and learned of the misrepresentations, directly and indirectly; (7) the Defendant did not abide by its representations; and (8) Plaintiffs and Class members were thereby injured.

312.   The Defendant issued statements via its website, its "Find a Provider" online directory, and other documents that materially misrepresented—through affirmative misstatements as well as omissions—the comprehensiveness of the NYSHIP plan and mental health care coverage.

313.   These misrepresentations were material because network breadth and access to in-network mental health providers are an important feature of a health insurance plan, which influences health care enrollment decisions.

314.   Plaintiffs and Class members have suffered economic and non-economic injuries as a result of the Defendant's misconduct. Among other injuries, the Defendant's deceptive acts and practices have caused millions of dollars in damages; forced Plaintiffs and Class members to

delay and forgo crucial and necessary mental health care; caused Plaintiffs and Class members

significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiffs and

Class members to reduce spending on necessities and other life costs; prevented Plaintiffs and

Class members from making informed financial and health care decisions; and caused Plaintiffs

and Class members to suffer severe emotional and psychological distress.

315.   These violations of New York Insurance Law § 4226(a) were intentional and the

Defendant knowingly received premiums and other compensation as a result of such violations.

### SIXTH CAUSE OF ACTION

### Fraudulent Misrepresentation

316.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them

as if fully set forth herein.

317.   Insurance companies have a statutory obligation to provide accurate and complete

information about their health care plans.

318.   The Defendant made deceptive affirmative misrepresentations and omissions to

Plaintiffs and Class members by publishing and disseminating misleading informational and

marketing materials prior to and during the open enrollment periods. The Defendant's

misrepresentations were conveyed in Carelon's "Find a Doctor" online resource. The provider

directory itself, on which members and prospective members are directed to rely, inflates and

misleads consumers regarding the size of the network and the availability of mental health

providers.

319.   The omissions from these same resources were any reference to the limited number

of mental health providers who are actually in-network with Carelon and actually accepted the

NYSHIP insurance, or to the fact that members and prospective members have to utilize

out-of-network providers—and incur substantial costs—should they need mental health services.

320.   False representations include, *inter alia*, that Carelon has an adequate network; that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers; and that mental health care coverage is comprehensive.

321.   Omitted and concealed from the representations were material and relevant facts that Plaintiffs and Class members would have used in selecting their health insurance plan, including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to find appropriate mental health care.

322.   These representations and omissions were intended to, and did, induce reliance by Plaintiffs and Class members as to the services and benefits that would be delivered to them as a result of choosing Defendant's plan.

323.   Plaintiffs and Class members justifiably relied on Defendant's representations and omissions.

324.   These representations and omissions, when considered as a whole from the perspective of a reasonable consumer, conveyed that the Defendant's provider directory was accurate and broad, and that mental health care would be covered. A reasonable consumer would—and Plaintiffs and Class members did—attach importance to such representations and would be induced to enroll in such a plan.

325.   These misrepresentations and omissions alleged herein were intentional and materially misleading.

326.   These misrepresentations and omissions have caused Plaintiffs and Class members significant ascertainable monetary and non-monetary injuries. Among other injuries, the Defendant's misrepresentations and omissions have caused millions of dollars in damages; forced Plaintiffs and Class members to delay and forgo crucial and necessary mental health care; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress.

327.   The Defendant willfully and knowingly made the false representations and omissions alleged herein. Its effort to include affirmative misrepresentations and omissions in its marketing materials and provider directory was undertaken intentionally to induce individuals to choose its plan over other plans, thus increasing its profits.

## SEVENTH CAUSE OF ACTION

### Negligent Misrepresentation

328.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

329.   The contract between New York State and the Defendant is a binding and enforceable contract, and Plaintiffs are intended third-party beneficiaries of that contract. Plaintiffs and the Defendant also have a direct contractual relationship.

330.   Insurance companies have a statutory and common law duty to provide accurate and complete information about their health care plans.

331.   Nevertheless, the Defendant fails to provide accurate information with regard to the size and identities of participants in its provider network.

332.   Defendant's false representations include, *inter alia*, that it has an adequately sized network; that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers; and that mental health care coverage is comprehensive.

333.   Omitted and concealed from the Defendant's representations were material and relevant facts that Plaintiffs and Class members would have used in selecting their health insurance plan, including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to be made to find appropriate mental health care.

334.   Plaintiffs and the Class justifiably relied upon the information that the Defendant provided.

335.   The Defendant has not used reasonable care or competence in communicating an accurate list of its provider directory, or any of the information described above.

336.   As a direct and proximate cause of the Defendant's negligent misrepresentations, Plaintiffs and the Class have sustained damages, including, but not limited to, damages due to delaying and forgoing crucial and necessary mental health care; increased healthcare costs; out-of-pocket expenses for out-of-network provider payments; and severe emotional and psychological distress.

## EIGHTH CAUSE OF ACTION

### Unjust Enrichment

337.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

338.    The Defendant has been and continues to be significantly and unjustly enriched because of its inaccurate and inadequate mental health provider network. Because it portrayed its network as comprehensive, individuals selected its plan. These deceptive representations attracted increased membership, thereby increasing the Defendant's market share and profits.

339.    Plaintiffs and Class members have conferred a benefit on the Defendant by enrolling in its health insurance plan and thereby directing their medical premiums to the Defendant.

340.    Plaintiffs and Class members have further conferred a benefit on the Defendant because the Defendant's inaccurate and inadequate network forces Plaintiffs and Class members to pay a portion of the mental health care expenses that the Defendant represented would be covered. Effectively, the Defendant represents that its insurance broadly covers mental health care, yet its bait-and-switch tactics ensure that it does not pay the full costs of actually covering mental health care services.

341.    The Defendant has thus enriched itself by reaping the benefits of increased membership, while reducing or eliminating its own coverage, reimbursement, and other financial duties. This and other benefits were obtained at the expense of Plaintiffs and Class members, who did not receive the full value of what the Defendant promised.

342.    In addition, the Defendant's inflated mental health provider network makes it appear that it complies with statutory and regulatory requirements that its provider network be sufficient, adequate, and accurate, thereby saving it the costs of actual compliance with these requirements—shielding it from government investigation, and the associated costs, at the expense of its members.

343.   An unjust enrichment cause of action is appropriate because the Defendant failed to make restitution to Plaintiffs and Class members for the economic and non-economic harms, including out-of-pocket costs unjustly incurred, and more.

344.   It is inequitable and unjust for the Defendant to retain the benefits from falsely portraying its provider network in a way that increases enrollment while decreasing the Defendant's obligations to do exactly what it says it will with respect to providing coverage for mental health treatment.

345.   These expenses and inconveniences should have been borne by the Defendant.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered as follows:

a.    declaring that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing the undersigned counsel as Class Counsel;

b.    awarding all injunctive relief permitted by law or equity;

c.    awarding compensatory damages, restitution, disgorgement, and any other relief permitted by law or equity;

d.    awarding statutory damages and penalties in addition to actual damages;

e.    awarding treble damages;

f.    awarding punitive damages in an amount deemed appropriate by the Court;

g.    awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

h.    awarding Plaintiffs reasonable attorneys' fees and costs; and

i.    awarding Plaintiffs and the Class such other relief as this Court may deem just and proper under the circumstances.

\* \* \*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: April 28, 2025

**POLLOCK COHEN LLP**

By: /s/ *Steve Cohen*
Steve Cohen
Anna Menkova
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
Scohen@PollockCohen.com

**WALDEN MACHT HARAN & WILLIAMS LLP**

By: /s/ *Jacob Gardener*
Jacob Gardener
250 Vesey St., 27th Floor
New York, NY 10281
(212) 335-2965
jgardener@wmhwlaw.com

*Attorneys for Plaintiffs*