# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JANE DOE as Mother of MINOR DOE, HANNAH LANDERER, and STEVEN MARKS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CARELON BEHAVIORAL HEALTH, INC.,<br><br>Defendant. | Case No. 25-cv-3489<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jane Doe as mother of Minor Doe, Hannah Landerer, and Steven Marks bring this class action for damages, equitable relief, and injunctive relief against Carelon Behavioral Health, Inc. ("Carelon" or "Defendant"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, their own investigation, and the investigation of their counsel, and on information and belief as to all other allegations.

**NATURE OF THE ACTION**

1. There is a mental health crisis in this country and in this state. It is afflicting men and women, children and adults, and people of all income levels and backgrounds. And it is exacerbated by companies, like the Defendant, that mislead people in need of qualified mental health providers by publishing grossly inaccurate directories of doctors and therapists. These inaccurate directories are known as "ghost networks."

2. Ghost networks are directories provided by health insurers and administrators that list health care providers that purportedly are in-network with their insurance plan, but in reality, are not. These ghost networks are also replete with errors and duplications, which make them

- 1 -

inaccurate, incomplete, deceptive, and misleading. Mental health provider directories are more likely than any other medical specialty to be ghost networks.

3.   The Defendant's publication of an inaccurate provider directory is not just an inconvenience for people searching for mental health providers; it is far more insidious and costly. By publishing an inaccurate provider directory where the vast majority of doctors listed—more than 80%—either do not exist, are listed with non-working or inaccurate telephone numbers (making them virtually impossible to contact) or are not actually in-network with the Defendant, the Defendant did not just mislead people, but damaged them.

4.   These damages are not just financial, but also frequently contribute to exacerbating patients' mental health problems. The people using the Defendant's provider directory are often desperate for mental health care for themselves, their children, or their loved ones. And the inaccurate provider directory actually causes harm. Some patients, like the Plaintiffs, have had their treatment delayed. Many, like the Plaintiffs, have had to utilize out-of-network doctors and as a result have incurred thousands of dollars in mental health medical expenses.

5.   Other patients have abandoned their search for care, resulting in serious mental health consequences and complications.

6.   The Plaintiffs' insurance policies are supposed to cover mental health care, with a robust in-network community of mental health providers provided by the Defendant and administered by the Defendant. In reality, that "community" is threadbare: there are almost no mental health providers in New York who actually accept the insurance, are "in network," and accept new patients. Thus, the promised coverage is largely illusory. When there are very few—or no—doctors who are in-network with the Defendant, or when doctors are in-network but are

not within a reasonable distance, such a network violates the law, regulations, standards, and guidance regarding network adequacy.

7. The Defendant knowingly publishes an inaccurate and misleading provider directory. It does so for several reasons.

8. First, the Defendant publishes a large—albeit inaccurate—directory to attract potential customers. The Plaintiffs, and other members of the proposed class, are participants in the New York State Health Insurance Program ("NYSHIP," and sometimes referred to as the "Empire Plan"). So, like every other New York State employee (and many other New York municipal employees), they have multiple health insurance plan options. The Defendant competes against these other plans by advertising the benefits of its particular plan. By publishing a seemingly robust, if actually inaccurate, directory of participating providers, the Defendant is knowingly engaging in a deceptive advertising campaign intended to lure people (like the Plaintiffs) into choosing its plan.

9. Second, by publishing a seemingly robust—but inaccurate—directory of providers, the Defendant is deceptively trying to appear to comply with state and federal requirements that its offered services are an adequate network of providers who actually accept its insurance plan.

10. The Defendant's promise of an adequate network of qualified providers is deceptive advertising. The listings are inaccurate in numerous ways: Some are listings of doctors who don't exist. Others are listed with inaccurate or non-working telephone numbers—making them impossible to reach. Many of the doctors listed are not part of the Defendant's network. Some of the listings include incorrect specialties for the doctor. In sum, these are deceptive business practices on the part of the Defendant.

- 3 -

11. By publishing inaccurate telephone numbers, the Defendant sent patients on a wild-goose chase searching for doctors supposedly covered by its plan. The time spent reaching wrong numbers or encountering non-working numbers is not just valuable time wasted, it is discouraging, delays care, and often contributes to patients abandoning their search for care. For people seeking mental health care for themselves, their children, or loved ones, this wild-goose chase for in-network doctors is not small potatoes; it is a time-consuming, exhausting, and frustrating experience that is detrimental to their mental health.

12. Grossly inaccurate listings in a directory—a directory essential for directing patients to needed medical care—violate the federal No Surprises Act, the federal Mental Health Parity and Addiction Equity Act, the Defendant's third-party contractual obligations to Plaintiffs, New York's consumer protection laws (General Business Law §§ 349 and 350), New York Insurance Law § 4226, and the New York State Department of Financial Services' standards and guidance.

13. The Plaintiffs—and other members of the proposed class—have suffered real injury and damages. The Plaintiffs have paid premiums for an insurance plan and, in exchange, the Defendant is responsible for providing coverage. In reality, however, that coverage never existed or was grossly inadequate. The Defendant has failed to provide an adequate network of mental health providers who actually accept the insurance or offer appropriate care.

14. The Plaintiffs also suffered significant financial damage by having to pay thousands of dollars for out-of-network providers because there were no qualified in-network providers within a reasonable travel radius. Moreover, the Plaintiffs wasted time and were frustrated by having to spend countless hours calling providers who the Defendant represented as being qualified and participating in the Defendant's network, only to find out that the phone

numbers listed by the Defendant were wrong, or that the providers did not offer the services listed in the Defendant's provider directory, were not qualified, or did not participate in the Defendant's network.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

16. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy, exclusive of interests and costs, exceeds the sum or value of $5,000,000 and at least one member of the proposed class is a citizen of a state other than Massachusetts, which is the Defendant's state of citizenship.

17. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because there is diversity between the Plaintiffs and the Defendant. The amount in controversy, exclusive of interests and costs, exceeds the sum or value of $75,000. The citizenship of the Plaintiffs and the Defendant is diverse and further detailed below.

18. This Court has personal jurisdiction over the Defendant because it is registered to do and transacts business in New York State, and it regularly conducts business in New York County.

19. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District. Venue is also proper under 18 U.S.C. § 1965(a) because the Defendant transacts substantial business in this Judicial District.

**THE PARTIES**

**I.    Plaintiffs**

20.    Plaintiff Jane Doe is the mother of 16-year-old Minor Doe. Jane Doe and Minor Doe are residents of Westchester County, New York. Jane Doe is a member of the NYSHIP Empire Plan through her husband, who is an employee of the Metropolitan Transportation Authority (MTA). She has been a member of the NYSHIP plan since 2022. NYSHIP contracts with Carelon to provide the mental health portion of the NYSHIP plan.

21.    Plaintiff Hannah Landerer is a resident of Nassau County, New York. She is an employee of the New York State Department of Education and has been a member of the NYSHIP plan since 2019.

22.    Plaintiff Steven Marks is a resident of Rockland County, New York. He is an employee of the State University of New York and has been a member of NYSHIP plan since 2023.

**II.    Defendant**

23.    Defendant Carelon Behavioral Health, Inc. is the entity that administers the Empire Plan Mental Health and Substance Use Program of the NYSHIP plan. Prior to March 2023, Carelon was known as Beacon Health Options.[1]

24.    Carelon is a Massachusetts-based company registered to do business in New York.

25.    Carelon's state of incorporation is Massachusetts and its principal place of business is 200 State Street Suite 302, Boston, Massachusetts, 02109.

---

[1] Laura Lovett, Elevance Health's Beacon Health Options Rebrands to Carelon Behavioral Health, to Consolidate Payer's Portfolio of Services, BEHAVIORAL HEALTH BUSINESS (March 2, 2023), https://bhbusiness.com/2023/03/02/elevances-beacon-health-options-rebrands-to-carelon-behavioral-health-to-consolidate-payers-portfolio-of-services/; Carelon Behavioral Health Home Page, https://www.carelonbehavioralhealth.com.

## BACKGROUND & CONTEXT

**I.    The Mental Health Crisis in America**

**A.    The Adult Mental Health Crisis**

26.    There is a mental health crisis in the United States. According to the National Survey on Drug Use and Health by the Substance Abuse and Mental Health Service Administration, in 2022, there were an estimated 59.3 million adults in the U.S. with a mental illness. That is 23.1% of U.S. adults.[2]

27.    Younger adults reported a higher prevalence of mental health problems:

- ages 18–25: 36.2% of adults reported having a mental illness.

- ages 26–49: 29.4% of adults reported having a mental illness.

- ages 50+: 13.9% of adults reported having a mental illness.

28.    Some 49.4% of the 59.3 million adults with any mental illness did not receive mental health services within the previous year.[3]

29.    Treatment rates for adults aged 18–25 were lower than for all other adults: approximately 50.9% of the age group went without treatment.[4]

30.    In 2022, an estimated 15.4 million adults in the U.S. had a *serious* mental illness, some 6% of the population.[5] The National Institute of Mental Health defines serious mental illness as "a mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities," and it notes that

---

[2] National Institute of Mental Health, *Mental Illness Statistics*, https://www.nimh.nih.gov/health/statistics/mental-illness.

[3] *Id.*

[4] *Id.*

[5] *Id.*

"[t]he burden of mental illnesses is particularly concentrated among those who experience disability due to [serious mental illness]."[6]

31. In total, 33.3% of those with serious mental illness did not receive mental health services.[7]

32. In New York City, the disparate impact among adults of different races and ethnicities is great, with only approximately 38.2 percent of Asian American and Pacific Islander residents, 30.3 percent of Black residents, and 39.3 percent of Latinx residents, reporting being connected to mental health care.[8] There is also a disparity in availability of care among high- and low-income neighborhoods.[9]

**B. The Child Mental Health Crisis**

33. According to the Centers for Disease Control and Prevention ("CDC"), among adolescents aged 12 to 17 years old:[10]

- 15.1% have had a major depressive episode.

- 36.7% have had persistent feelings of sadness or hopelessness.

---

[6] *Id.*

[7] *Id.*

[8] *Mental Health Data Dashboard*, NYC Mayor's Off. of Cmty. Mental Health, https://mentalhealth.cityofnewyork.us/dashboard/.

[9] *See* Janet Cummings et al., *Geographic Access to Specialty Mental Health Care Across High- and Low-Income US Communities*, JAMA PSYCHIATRY (May 2017), https://pubmed.ncbi.nlm.nih.gov/28384733/ ("When examining the distribution of mental health professionals, 25.3% of the communities (2014 of 7959) in the highest income quartile had a mental health specialist physician practice vs 8.0% (637 of 7959) of those in the lowest income quartile … .").

[10] Rebecca H. Bitsko *et. al.*, *Mental Health Surveillance Among Children – United States, 2013– 2019*, Ctrs. for Disease Control and Prevention (2022), https://www.cdc.gov/mmwr/volumes/71/su/su7102a1.htm (citations omitted).

- 4.1% have had a substance use disorder.

- 1.6% have had an alcohol use disorder.

- 3.2% have had an illicit drug use disorder.

- 18.8% seriously considered attempting suicide.

- 15.7% made a suicide plan.

- 8.9% attempted suicide.

- 2.5% made a suicide attempt requiring medical treatment.

34.    The situation is so acute that the Surgeon General of the United States has described mental health as "the defining public health crisis of our time," and warned of the "devastating effects" of mental health challenges on young people.[11] This came as the suicide rate for young Americans jumped by 57 percent from 2009 to 2019, and pediatric visits for self-harm rose by 329 percent from 2007 to 2016.[12] The Surgeon General released a rare Advisory[13] titled *Protecting Youth Mental Health*, urging that "every child ha[ve] access to high-quality, affordable, and culturally competent mental health care."[14]

---

[11] Matt Richtel, *The Surgeon General's New Mission: Adolescent Mental Health*, N.Y. TIMES, (Mar. 21, 2023), https://www.nytimes.com/2023/03/21/health/surgeon-general-adolescents-mental-health.html.

[12] Bommersbach et al., *National Trends in Mental Health-Related Emergency Department Visits Among Youth, 2011-2020*, J. of the Am. Med. Ass'n (May 2, 2023), https://pubmed.ncbi.nlm.nih.gov/37129655/.

[13] "A Surgeon General's Advisory is a public statement that calls the American people's attention to an urgent public health issue … . Advisories are reserved for significant public health challenges that need the nation's immediate awareness and action." *Protecting Youth Mental Health: The U.S. Surgeon General's Advisory*, Off. of the Surgeon Gen. at 12 (2021), https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf.

[14] *Id.*

35.     Compounding this crisis are serious barriers to accessing needed mental health treatment. The CDC estimates that of the one in five children who have a mental, emotional, or behavioral disorder, only approximately 20 percent receive care from a mental health provider.[15]

36.     "The consequences of untreated mental illness in children and adolescents are profound and are associated with school failure, teenage pregnancy, unstable employment, substance use, violence including suicide and homicide, and poor medical outcomes."[16]

### C.     The Mental Health Crisis in New York

37.     According to Mental Health America, in 2024, an estimated 21.11% of adults in New York, approximately 3,273,000 people, suffered from a mental illness.[17]

38.     According to the Kaiser Family Fund mental health survey of 2023:

- 28.8% of New York adults reported symptoms of anxiety disorder.

- 19.4% of New York adults reported symptoms of depressive disorder.

- 31.4% of New York adults reported symptoms of anxiety or depressive disorder.[18]

---

[15] Ctrs. for Disease Control and Prevention, *Improving Access to Care, Children's Mental Health Care*,
https://archive.cdc.gov/#/details?q=mproving%20Access%20to%20Care,%20Children%E2%80%99s%20Mental%20Health%22&start=0&rows=10&url=https://www.cdc.gov/childrensmentalhealth/access.html.

[16] *School-Based Mental Health: Pediatric Mental Health Minute Series*, Am. Academy of Pediatrics, https://www.aap.org/en/patient-care/mental-health-minute/school-based-mental-health/.

[17] The State of Mental Health in America, *2024 Edition*, 15, https://mhanational.org/wp-content/uploads/2024/12/2024-State-of-Mental-Health-in-America-Report.pdf.

[18] Kaiser Family Fund, *Adults Reporting Symptoms of Anxiety or Depressive Disorder During COVID-19 Pandemic*, https://www.kff.org/other/state-indicator/adults-reporting-symptoms-of-anxiety-or-depressive-disorder-during-covid-19-pandemic/?currentTimeframe=0&selectedRows=%7B%22states%22:%7B%22new-york%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

## II.     Federal and State Requirements for Health Insurers

### A.     Federal and New York State Law Impose Additional Obligations on Health Plans to Ensure Accuracy of Provider Directories

39.     As discussed above, the federal government has expressed serious concern about the prevalence of ghost networks and the significant barriers they create to mental health care. In addition to the congressional inquiries and hearings, federal and state laws and regulations have been promulgated in an effort to protect consumers from the harms of ghost networks.

40.     In 2022, Congress passed the federal "No Surprises Act," which includes a section entitled "Protecting Patients and Improving the Accuracy of Provider Directory Information," establishing requirements for provider directories to help protect consumers from surprise bills from out-of-network providers.[19]

41.     The No Surprises Act requires health plans to publish and maintain accurate provider directories; specifically, insurance companies must update and verify their plans' provider directories at least every 90 days.[20] Where plans are unable to verify provider data, they must establish a procedure to remove providers from their directories.[21] Health plans must also update provider information within two business days of receiving an update from a provider.[22]

42.     The law also imposes obligations on health insurers directly in relation to their members. When a member requests information about whether a provider is in-network, the plan

---

[19] Pub. L. No. 116-260, 134 Stat. 1182, Division BB, (2020), https://www.congress.gov/bill/116th-congress/house-bill/133/text (adding 42 U.S.C. § 300gg, 29 U.S.C. § 1185i, and 26 U.S.C. § 9820).

[20] 42 U.S.C. § 300gg-115(a)(2)(A).

[21] 42 U.S.C. § 300gg-115(a)(2)(B). In addition, the terms of the contract between provider and plan may require the plan to remove the provider if the contract terminates.

[22] 42 U.S.C. § 300gg-115(a)(2)(C).

must respond within one business day of the request.[23] And where a member relies on inaccurate provider directory information and mistakenly receives services from an out-of-network provider, the member will not be responsible for cost sharing greater than in-network cost sharing.[24]

43.     New York State passed its own no surprises law in 2015, which also requires health plans to ensure that their provider directories are accurate. Under New York law, health insurers are required to update their provider directories within an even shorter time period—within 15 days of the "addition or termination of a provider from the insurer's network or a change in a physician's hospital affiliation"—and otherwise update their plans' directories annually.[25] State law also requires health plans to include in their directories whether a provider is accepting new patients and any restrictions on a provider's availability.[26]

44.     Since state laws are not preempted by the No Surprises Act,[27] and as made clear by New York's Department of Financial Services, health plans in New York are still required to update their directories within 15 days of a provider change.[28]

---

[23] 42 U.S.C. § 300gg-115(a)(3).

[24] 42 U.S.C. § 300gg-115(b)(1)(A).

[25] N.Y. Ins. Law § 3217-A(a)(17).

[26] *Id.*

[27] "Nothing in this section shall be construed to preempt any provision of State law relating to health care provider directories." 42 U.S.C. § 300gg-139(e).

[28] NYS Dept. Fin, Ins. Circ. Ltr, No. 12 (Dec. 29, 2021), https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2021_12 ("[T]he [No Surprises Act] does not preempt any provision of state law relating to health care provider directories. Insurance Law §§ 3217-a(a)(17) and 4324(a)(17) and Public Health Law § 4408(1)(r) require an issuer to annually update its provider directory, with certain updates to the provider directory on the issuer's website completed within 15 days as described above. The Insurance Law and Public Health Law requirements for provider directory content and updates within 15 days continue to

(continued…)

45. These federal and state laws reflect that governments recognize the harmful consequences of inaccurate provider directories. Despite these legislative efforts to shield consumers from ghost networks, surprise bills, and inadequate in-network care, insurance companies in general, and the Defendant in particular, continue to violate these laws.[29]

**B. Federal and New York State Law Require Health Plans to Ensure Sufficient In-Network Mental Health Providers**

46. There is an additional set of federal and state laws implicated by inaccurate provider directories: "network adequacy" laws require that health plans offer a network that includes a "sufficient" number of in-network providers.

47. The Affordable Care Act first established this network adequacy framework, requiring that all qualified health plans[30] ensure the provision of a network that is "sufficient in number and types of providers, including providers that specialize in mental health and substance use disorder services, to ensure that all services will be accessible without unreasonable delay."[31]

48. New York State adopted this standard and applied it broadly to a majority of health plans offered in the state. New York law requires health plans to "ensure that the network is

---

apply at this time.").

[29] *See, e.g.*, Neel M. Butala et al., *Research Letter: Consistency of Physician Data Across Health Insurer Directories*, JAMA 329(10), 842 (Mar. 14, 2023), https://jamanetwork.com/journals/jama/article-abstract/2802329 (finding even after passage of No Surprises Act that "[i]n examining directory entries for more than 40% of US physicians, inconsistencies were found in 81% of entries across 5 large national health insurers").

[30] "Qualified health plans" are plans sold on a state or federal exchange. *See* 42 U.S.C. § 18021 (defining term).

[31] 45 C.F.R. § 156.230(a)(1).

adequate to meet the health and mental health needs of insureds and provide an appropriate choice of providers sufficient to render the services covered under the policy or contract."[32]

49.    Specifically, New York guidance provides "preferred time and distance standards," advising that mental health providers should be accessible within 30 minutes by public transportation in metropolitan areas and/or 30 minutes or 30 miles by public transportation or by car in non-metropolitan areas.[33] The guidance also states that, "to be considered accessible, the network should contain a sufficient number and array of providers to meet the diverse needs of the insured population and to ensure that all services will be accessible without undue delay. This includes being geographically accessible (i.e., meeting time/distance standards) and being accessible for people with disabilities."[34]

50.    The Defendant is in violation of federal and state law requiring network adequacy.

51.    As discussed below, a significant collateral consequence of an inaccurate, inflated provider directory is that an insurance plan appears to meet federal and state network adequacy requirements, when it does not.

52.    This was highlighted during a recent Senate Finance Committee hearing:[35]

> SENATOR WARREN: Do these ... plans stand to gain anything from having inaccurate information? In other words, is it inaccurate because you just haven't spent enough money to make it accurate, or is it inaccurate by design?

---

[32] N.Y. Ins. Law § 3241(a)(1).

[33] *See Network Adequacy Standards and Guidance*, N.Y. State Dep't of Fin. Servs., https://www.dfs.ny.gov/apps_and_licensing/health_insurers/network_adequacy_reqs_standards_submission_instructions.

[34] *Id.*

[35] This exchange focused on Medicare Advantage plans in particular, but it would apply to many other health plans.

- 14 -

> MS. GILIBERTI (the Chief Public Policy Officer of Mental Health America): Well, I think there are advantages that they have when their directories unfortunately are inaccurate. They use those directories for network adequacy standards.[36]

## III. Ghost Networks

### A. The United States Senate Finance Committee Ghost Networks Hearings

53. In May 2023, the United States Senate Finance Committee held a hearing on this exact topic, titled "Barriers to Mental Health Care: Improving Provider Directory Accuracy to Reduce the Prevalence of Ghost Networks."[37] One testifying witness, a former official in the Obama Administration, summarized her Sisyphean experience trying to find a mental health provider through her insurance plan's directory:

> I was left to navigate the … provider directory to find a psychiatrist. Calling psychiatrists within D.C. and Maryland, selected out of what was like a digital white-pages phone book, turned into one rejection after another. Call after call resulted in the following types of responses:
>
>> "Who? Hmm, s/he doesn't work here. No, I don't know where s/he works now."
>>
>> "Who? I don't know who that is, not sure they ever worked here. Hold please ... . [dial tone]."
>>
>> Recorded message: "Dr _____ is no longer accepting new patients. If this is an emergency, hang up and call 911."
>
> I spent countless days and hours scouring the network, despite working long hours in a high-level management position. When was there time to find a psychiatrist? I had to make the time, though, as my job, and more importantly my life, depended on it. Continued

---

[36] *Barriers to Mental Health Care: Improving Provider Directory Accuracy to Reduce the Prevalence of Ghost Networks*, U.S. Senate Fin. Comm. (May 3, 2023), https://www.finance.senate.gov/hearings/barriers-to-mental-health-care-improving-provider-directory-accuracy-to-reduce-the-prevalence-of-ghost-networks [hereinafter Senate Hearings on Mental Health Care] (testimony of Senator Elizabeth Warren, which begins at 2:23:18).

[37] *See id.*

attempts finally led me to a psychiatrist who was taking new patients. Success, though, was short-lived. In our phone conversation to set up an initial in-person appointment, I was asked about my diagnosis. I had no worry or fear; this doctor, this psychiatrist, was taking new patients. I respond without hesitation—schizophrenia. A pause, a long silence ... and then the response:

> "Oh....I do not take patients with a schizophrenia diagnosis."

I ask if they have any suggestions or referrals to help me find a doctor who does. The answer is:

> "Check the provider directory."[38]

54. The prevalence, and degree, of ghost networks of mental health providers is nothing short of astonishing. The Senate Finance Committee majority staff recently conducted a study where they reviewed 12 different directories across six states but were only able to make appointments with 18 percent of the mental health providers contacted[39]—that is, over 80 percent of the listed in-network providers were in reality "either unreachable, not accepting new patients, or not in-network."[40] For one state, no successful appointments could be made.[41] Another study from 2015 resulted in an appointment with a psychiatrist only 26 percent of the time.[42]

---

[38] *Id.* (Testimony of Keris Jän Myrick at 2–3).

[39] *Majority Study Findings: Medicare Advantage Plan Directories Haunted by Ghost Networks*, Senate Comm. on Fin. at 1 (May 3, 2023), https://www.finance.senate.gov/imo/media/doc/050323 Ghost Network Hearing - Secret Shopper Study Report.pdf [*hereinafter* Secret Shopper Study Report].

[40] *Id.* at 1.

[41] *Id.* at 7.

[42] Malowney et al., *Availability of Outpatient Care From Psychiatrists: A Simulated-Patient Study in Three U.S. Cities*, Psychiatry Online (2015), https://ps.psychiatryonline.org/doi/full/10.1176/appi.ps.201400051.

55.     Almost all people seeking a mental health provider on a ghost network spend countless, difficult hours searching for care.[43] This is dangerously exacerbated by the fact that the person may be experiencing a mental health emergency. As explained by Dr. Robert Trestman, representing the American Psychiatric Association, at the Senate Finance Committee hearing:

> For those who are healthy and well educated, going through an inaccurate provider list and being told repeatedly that "we are not taking new patients," "this provider has retired," "we no longer accept your insurance," or leaving a message with no one returning the call is at best frustrating. For people who are experiencing significant mental illness or substance use disorders, the process of going through an inaccurate provider directory to find an appointment with someone who can help them is at best demoralizing and at worst set up to precipitate clinical deterioration and a preventable crisis. Many are already experiencing profound feelings of worthlessness, fear, grief from loss and trauma, and/or the impact of substance use; some are in crisis and suicidal. Patients have told me that they felt rejected repeatedly or that somehow they themselves were at fault. Even when they make the effort to reach out to find help, something that can be very difficult anyway, their efforts to cull through an inaccurate provider list results in more rejection and failure, exacerbating these feelings. Some give up looking for care. Others delay care.[44]

56.     At the same hearing, Senator Thom Tillis spoke of his own personal experience seeking care when suffering from mental illness:

> Back in 2007, I was diagnosed with an illness that required me to take medications that caused me to have pharmacologically induced mania followed by clinical depression, so I got a window into mental health that I consider to be a blessing … . When I'm in mania[,] ... I simply would not have sought a health care or a behavioral health professional. And when I was in depression, if I went to a website and went through [the provider directory], I'd have said what's the use. So we need to

---

[43] In the study conducted by the Senate Finance Committee majority staff, "[c]all times ranged from 1-3 hours to contact 10 listings per plan." *See* Secret Shopper Study Report at 4, *supra* n. 39.

[44] Senate Hearings on Mental Health Care, *supra* n. 36 (Testimony of Robert L. Trestman, PhD, MD at 3).

understand this has real life consequences. And you're in the worst possible state to have the complexity, and maybe even have, in the middle of depression, finding out that you have to pay out of network costs, so now you've got financial stressors, you've got whatever the underlying condition is, the insurers and providers, everybody needs to understand that.[45]

57.    The government's findings described above are disturbing, and the barriers to mental health care caused by ghost networks are devastating. Obstructions to treatment manifest in several ways. Because people in need are unable to find a mental health provider covered by their insurance on their plan's provider directory, urgent mental health treatment is often delayed and, at worst, abandoned completely. Others seeking care rely on the directory to find a provider, only to find out later that the provider is not covered by their plan, and so they are subject to significant, unexpected costs. And, in other cases, people urgently seeking care knowingly settle for seeing an out-of-network provider because they desperately need help, and it is their only option. They are left to figure out how to shoulder the often exorbitant costs that follow.

58.    Yet another consequence of a ghost network is that individuals selecting an insurance plan in the first place incorrectly choose that plan either because the provider they already see is listed on the plan's directory or because there appears to be a robust network of potential providers. The plan's ghost network is the enticement: but for a plan's ghost network, consumers would have made different health care and financial decisions.

59.    Though the effects of ghost networks are far-reaching and complex, the wrongful conduct at issue is simple: insurance companies' ghost networks mislead consumers to buy health plans that purport to include a network of providers when they do not. As Senator and Chairman of the Senate Finance Committee Ron Wyden stated in his opening remarks at the

---

[45] *Id.* (Testimony of Senator Thom Tillis, which begins at 1:17:13).

Senate's hearing on ghost networks, insurance companies are at fault and their wrongdoing is

clear:

> [W]hen insurance companies host ghost networks, they are selling health coverage under false pretenses, because the mental health providers advertised in their plan directories aren't picking up the phone or taking new patients. In any other business, if a product or service doesn't meet expectations, consumers can ask for a refund….
>
> In a moment of national crisis about mental health, with the problem growing exponentially during the pandemic, the widespread existence of ghost networks is unacceptable. When someone who's worried about their mental health or the mental health of a loved one finally works up the courage to pick up the phone and try and get help, the last thing they need is a symphony of "please hold" music, non-working numbers, and rejection.
>
> Just take a moment and think about the impact that might have on an individual who's already in a challenging situation. It's not hard to imagine how many Americans simply give up and go on struggling without the help they need….
>
> I want to conclude by talking about accountability. My view is that insurance companies have gotten a free pass for too long letting ghost networks run rampant. If a student were writing an essay and 80 percent of their citations were incorrect or made up, they'd receive an "F." If a business gave the SEC false or incorrect information, it would face extremely severe consequences. So in my view insurance companies should face strict consequences if their products don't live up to the billing. That's the least that should be done….[46]

### B.  The New York Attorney General's Study

60.  In December 2023, the New York State Office of the Attorney General ("OAG")

issued a report entitled, "Inaccurate and Inadequate: Health plans' mental health provider

---

[46] *Wyden Calls for Action to Get Rid of Ghost Networks, Releases Secret Shopper Study*, U.S. Senate Fin. Comm., Chairman Ron Wyden (May 3, 2023), https://www.finance.senate.gov/imo/media/doc/Wyden%20Ghost%20Networks%20Hearing%20Remarks%205.3.23.pdf.

network directories." This report was an overview of the provider directories provided by the health insurance companies operating in New York, including the Defendant.[47]

61. According to the report, the OAG "surveyed nearly 400 mental health providers listed on health plans' networks and found that the overwhelming majority, 86 percent, were 'ghosts,' meaning they were unreachable, not-in-network, or not accepting new patients. Inaccurate network directories are worsening the statewide mental health crisis and disproportionately impact marginalized communities, leading to adverse health outcomes, and increasing costs for patients."[48]

62. The OAG stated:

> New Yorkers struggling with mental health conditions rely on health plan provider directories to access affordable, quality health care services. However, when provider directories contain inaccurate listings or unavailable providers—known as ghost networks— patients may be unable to access treatment using their health insurance benefits. As a result, they are forced to choose between paying out-of-pocket, which is not possible for many, or forgoing treatment altogether.[49]

**C. The OAG's Secret Shopper Survey**

63. The Attorney General's secret shopper study investigated UnitedHealthcare ("UHC") among 13 health providers. Carelon administers the mental health services and directory for most UHC plans in New York.

---

[47] Office of the New York State Attorney General Letitia James, *Inaccurate and Inadequate: Health Plans' Mental Health Provider Network Directories* (2023), https://ag.ny.gov/sites/default/files/reports/mental-health-report_0.pdf.

[48] Press Release, *Attorney General James Uncovers Major Problems Accessing Mental Health Care through Insurance Companies* (Dec. 7, 2023), https://ag.ny.gov/press-release/2023/attorney-general-james-uncovers-major-problems-accessing-mental-health-care.

[49] *Id.*

64.     UHC provides the NYSHIP program's medical and surgical elements, while Carelon administers the mental health portion.

65.     Many people, when searching for care and trying to determine whether the provider is in-network, refer to the plan as the NYSHIP/UHC plan.

66.     The OAG found that "[a] study of UnitedHealthcare's New York directory found that only three percent of calls to psychiatrists in New York City resulted in being offered an appointment."[50]

67.     The OAG study did not distinguish between those plans—like NYSHIP—where the mental health portion is subcontracted to Carelon, and those UHC plans which use UHC's own Optum network.

68.     The OAG tried to reach 60 mental health providers throughout the state who are supposedly in the UHC network, but found that only half were actually in-network. And of those, only 13 would offer any type of appointment, and only six offered an in-person appointment. The OAG calculated the UnitedHealthcare ghost listing percentage at 78 percent.[51]

69.     The OAG's finding for providers who treated children was even worse. In two out of the three locations the OAG conducted secret shopper studies—New York City and Buffalo—they were able to make appointments zero times. (In Albany, they were able to get an appointment for a child 57 percent of the time.)[52]

70.     Significantly, this is not a new situation. The OAG previously brought enforcement actions against UHC/Carelon to remedy inaccurate provider directories and network inadequacy.

---

[50] *Supra* n. 47, at 17.

[51] *Id*. at 34.

[52] *Id.*

In 2006 and 2011, the OAG entered into settlement agreements with affiliates of UHC regarding its inaccurate directory listings, including for behavioral health providers. The settlements required UHC to verify the accuracy of its provider directories in New York by conducting outreach to confirm participation and to reimburse consumers who paid more than they should have after they went to providers who were erroneously listed as in-network. In 2015, the OAG executed a settlement with Carelon, which administers behavioral health benefits for several New York health plans, in which the company agreed to ensure network adequacy and the accuracy of its online provider directory.

### D.    Additional Investigations of Ghost Networks

71.    On a national scale, the issue of ghost networks and their attendant harms to consumers at large has been reported by *The New York Times*,[53] *The Washington Post*,[54] and many other significant publications.[55]

72.    The American Medical Association co-authored a white paper on some of the financial and non-financial injuries from ghost networks:

> When directory information is inaccurate, patients experience inconvenience (non-working phone numbers, longer time to find the right practitioner), and financial consequences (unplanned out of pocket expenses). Directory errors may also result in a patient selecting a health

---

[53] Jay Hancock, *Insurers' Flawed Directories Leave Patients Scrambling for In-Network Doctors*, N.Y. TIMES (Dec. 3, 2016), https://www.nytimes.com/2016/12/03/us/inaccurate-doctor-directories-insurance-enrollment.html.

[54] Katherine Ellison, *73 doctors and none available: How ghost networks hamper mental health care*, WASH. POST (Feb. 19, 2022), https://www.washingtonpost.com/health/2022/02/19/mental-health-ghost-network/.

[55] *See, e.g.*, Abigail Burman, *Laying Ghost Networks to Rest: Combatting Deceptive Health Plan Provider Directories*, 40 YALE L. & POL'Y REV. 78 (2021) [hereinafter "Laying Ghost Networks to Rest"].

plan based on inaccurate information about which clinicians are in-network.[56]

73.     A March 2022 report by the United States Government Accountability Office corroborated the findings outlined above, concluding that "consumers with coverage for mental health care experience challenges finding in-network providers,"[57] and that "[i]naccurate or out-of-date information on which mental health providers are in a health plan's network contributes to ongoing access issues for consumers and may lead consumers to obtain out-of-network care at higher costs to find a provider."[58]

74.     The federal Centers for Medicare & Medicaid Services similarly identified network directory inaccuracies, including those "with the highest likelihood of preventing access to care[.]"[59]

75.     In a study of adolescent psychiatrists in particular, researchers posing as parents seeking care for a child with depression were only able to obtain an appointment 17 percent of the time.[60]

---

[56] *Improving Health Plan Provider Directories*, CAQH & AM. MED. ASS'N., 3, https://www.caqh.org/sites/default/files/other/CAQH-AMA_Improving%20Health%20Plan%20Provider%20Directories%20Whitepaper.pdf ("Among the more common resources that patients use are health plan provider directories which, according to two surveys conducted in 2020, more than half of patients use to select a physician.") (citations omitted) [hereinafter "Improving Health Plan Provider Directories"].

[57] *Mental Health Care Access Challenges for Covered Consumers and Relevant Federal Efforts*, U.S. Gov't Accountability Office, Report to the Chairman, Comm. on Fin., U.S. Senate, 2, (Mar. 2022), https://www.gao.gov/assets/gao-22-104597.pdf.

[58] *Id.* at 12.

[59] *Online Provider Directory Review Report*, Ctrs. for Medicare & Medicaid Servs., 1, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/Provider_Directory_Review_Industry_Report_Round_3_11-28-2018.pdf.

[60] Shireen Cama et al., *Availability of Outpatient Mental Health Care by Pediatricians and Child Psychiatrists in Five U.S. Cities*, INT'L J. HEALTH SERV. 47(4) (2017),

(continued…)

76. The crisis in access to mental health treatment is exacerbated by barriers to care imposed by health insurance companies, including the prevalence of ghost networks.[61]

### E. Plaintiffs' "Secret Shopper" Studies

77. Between November 2024 and February 2025, counsel for the Plaintiffs conducted multiple simulated patient "secret shopper" surveys. These secret shopper studies were designed and conducted to recreate the Plaintiffs' experiences. The Plaintiffs' counsel used the same criteria each Plaintiff used when searching for mental health care: whether a psychologist, a therapist, or a psychiatrist. Based on the Plaintiffs' actual experiences, counsel also designated the distances they were willing to travel for an in-person appointment. If they were willing to use telehealth services, this too was noted. This information was then entered into the Defendant's online search engine, which generated a list of supposedly in-network providers for each Plaintiff.

78. Plaintiffs' counsel then called each of the listed providers. If an answering machine picked up the call, Plaintiffs' counsel left messages asking for a return call and made sure to call three times. For every completed call, Plaintiffs' counsel recorded the provider's response: whether they were indeed the type of provider listed in the directory; whether they accepted the NYSHIP plan (and the descriptors "NYSHIP," "Empire Plan," and "Carelon" were used in each

---

https://pubmed.ncbi.nlm.nih.gov/28474997/ (studying availability of outpatient pediatrician and child psychiatry availability and finding that "[a]ppointments were obtained with 40% of the pediatricians and 17% of the child psychiatrists. The mean wait time for psychiatry appointments was 30 days longer than for pediatric appointments. Providers were less likely to have available appointments for children on Medicaid[.]").

[61] *See, e.g.*, Ellison, supra n. 54; Jack Turban, *Ghost networks of psychiatrists make money for insurance companies but hinder patients' access to care*, Stat News (June 17, 2019), https://www.statnews.com/2019/06/17/ghost-networks-psychiatrists-hinder-patient-care/ ("The numbers, however, never seem as bad for other specialties as they do for psychiatry.").

call); whether the provider was accepting new patients; and if they were accepting new patients, how long the wait was for an appointment.

79. These secret shopper studies were similar in design to those conducted by the New York OAG and Senate Finance Committee but were more extensive: the number of providers contacted (or attempted) was larger. And the number of attempts to contact these supposed providers if they did not receive a response after the first call, was greater.

80. The details of each secret shopper study are below.

<div align="center"><strong>FACTUAL ALLEGATIONS</strong></div>

**I. Plaintiffs' Needs for Mental Health Care**

**A. Jane and Minor Doe**

81. Plaintiff Jane Doe is a resident of Westchester County, New York and is the mother of 16-year-old Minor Doe. Both Jane Doe and Minor Doe have been enrolled in the NYSHIP program for more than five years.

82. Minor Doe was 14 years of age when she began getting bullied at school. Beginning in approximately 2023, both Jane Doe and her husband used the Defendant's directory to try to find mental health care for their daughter. They wanted someone who had experience working with teenage girls, and they were willing to travel up to 25 miles to get in-person therapy. Minor Doe's parents spent hours a night for several weeks calling providers listed in the Defendant's directory as accepting their insurance—to no avail. The Does estimate they called over 100 providers. The vast majority were not actually in-network; and the rest were not accepting new patients.

83. The Does finally sought care from out-of-network providers beginning in or around September 2024.

84.     The Does pay approximately $62.28 every two weeks for their portion of the NYSHIP premium.

85.     The Does relied on the NYSHIP booklet, the Carelon website, and the Certificate of Insurance to understand their benefits.

**Secret Shopper Study on Behalf of Plaintiff Minor Doe**

86.     Between January and February 2025, the Plaintiffs' counsel conducted a secret shopper study that attempted to replicate the Does' experience when they sought mental health care for their daughter.

87.     Counsel used the Defendant's online directory to search for an in-network therapist with experience serving adolescent girls within 25 miles of Port Chester, New York. From the 293 names generated by the Defendant's provider directory search tool, Counsel called the first 100 names. Counsel made three attempts (over several days) to call each provider who did not pick up the phone.

88.     Out of 100 supposedly in-network providers, it was possible to make 6 appointments.



89.   Of the 100 providers listed in the Defendant's directory, 18 were unreachable.

"Unreachable" was defined as a disconnected phone, an incorrect phone number, or three

voicemail messages left with no return phone call.

90.   Among the 82 connected calls:

- **18** were not accepting the insurance plan
- **17** provided the wrong type of service
- **14** providers were not at the listed location[62]
- **2** providers accepted the insurance but did not have an appointment available within a month
- **1** provider accepted the insurance but was not accepting new patients
- **1** number had no provider there by the listed name
- **23** listings required the patient to jump through additional hoops: they did not allow for booking of appointments on the phone—only online—and they required submitting a registration form and insurance card details online[63]

---

[62] The Carelon directory lists providers' addresses. If, after making an appointment, a member goes to the listed address and the provider is not there, it makes little difference if the doctor moved across the street or across the state: the doctor would not be at the listed location. And the member would incur potentially serious treatment delays, frustration, and cost.

[63] The Carelon directory lists providers' telephone numbers, not their website addresses.

> ➢ **6 appointments could be made**

91. That is a 94 percent ghost rate for all calls.

**B.  Plaintiff Hannah Landerer**

92. Plaintiff Hannah Landerer is a resident of Nassau County, New York. She works for the New York State Department of Education.

93. Ms. Landerer has been a member of the NYSHIP program since 2019. Beginning in 2019 and continuing thereafter, she tried to find an in-network mental healthcare provider without success.

94. Ms. Landerer was willing to see various types of providers: therapist, social worker, psychiatrist, psychologist, or licensed clinical social worker (LCSW).

95. Ms. Landerer used the Carelon directory to call providers who supposedly accepted her insurance. She called nearly a dozen providers who supposedly accepted the insurance but soon found that the directories were grossly inaccurate: most of the listed providers did not accept the NYSHIP plan and the few who did were not accepting new patients.

96. Occasionally, Ms. Landerer found a provider who said they accepted the insurance, only to find out after she saw the provider that they really did not. Another provider who did accept the insurance treated Ms. Landerer for approximately five months, and then told Ms. Landerer she was no longer accepting the insurance.

97. The inaccurate provider directory delayed Plaintiff's treatment and left her with two options: forgoing essential medical care or paying out of pocket for treatment. She needed the care, and beginning in 2023, she had to resort to paying out of pocket for out-of-network providers because she had difficulty finding in-network providers after the ones she had seen had gone out of network. Ms. Landerer had to spend thousands of dollars on out-of-network providers. And Carelon reimbursed only a tiny fraction of her out-of-pocket costs.

98. Ms. Landerer began seeing her out-of-network therapist in July of 2023.

99. Ms. Landerer finds the Carelon website to be very difficult to navigate and unreliable, and its customer service people to be unhelpful.

100. She also feels she is forced to rely on paper copies to ensure proper documentation and reimbursement, as electronic submissions to the Carelon website often do not work.

101. Mr. Landerer relied on the Carelon website and the NYSHIP booklet to understand her benefits.

102. Ms. Landerer paid $165 a session for eight sessions to meet her deductible. She also paid a $33 copay for each session, and $360 for couples' therapy.

103. Because of the significant out-of-pocket expense of being treated by an out-of-network provider, Ms. Landerer repeatedly tried to use the Defendant's directory to find in-network providers, to no avail. Throughout the period from 2019 through the present, the Plaintiff found the Defendant's provider directory to be grossly inaccurate.

104. Ms. Landerer pays approximately $362 every two weeks for her portion of the NYSHIP premium.

**Secret Shopper Study on Behalf of Plaintiff Hannah Landerer**

105. Between January and February 2025, Plaintiffs' counsel conducted a secret shopper study that attempted to replicate Ms. Landerer's experience when she sought mental health care.

106. Counsel used the Defendant's online directory to search for an in-network therapist with experience serving adults within 25 miles of Levittown, New York. From the hundreds of names generated by the Defendant's provider directory search tool, Counsel called the first 100 names. Counsel made three attempts (over several days) to call each provider.

107. Out of 100 supposed in-network providers, it was possible to make 27 appointments.



108. Of the 100 providers listed in the defendant's directory, **26** were unreachable. Unreachable was defined as a disconnected phone, and incorrect phone number, no answer, or three voicemail messages left with no return phone call.

109. Among the 74 connected calls:

- **25** were not accepting the insurance plan
- **22** were not accepting new patients
- **5** providers were not at the listed location
- **4** providers accepted the insurance but did not have an appointment available within a month
- **2** providers were offering hospital in-patient services only
- **1** provider offered the wrong type of service

> ➢ **27 appointments could be made**

110. That is a 73 percent ghost rate for all calls.

### C.  Plaintiff Steven Marks

111.  Plaintiff Steven Marks is a resident of Rockland County, New York. He works for the State University of New York.

112.  Mr. Marks has been a member of the NYSHIP program since 2023. In late spring of 2023, Mr. Marks sought out a mental health provider. He used the Defendant's directory and chose someone listed as in-network.

113.  Mr. Marks saw that provider in July 2023. The provider charged Mr. Marks a $25 co-pay. Soon after, he received an Explanation of Benefits from the Defendant showing that the total billed amount was $1,017 from the provider. The Defendant only covered $537.

114.  Concerned about the surprise bill, Mr. Marks called the Defendant, which told him the provider had dropped out of the network a month earlier and that Mr. Marks was responsible for the remaining balance.

115.  Mr. Marks then used the Defendant's directory to try to find a provider who actually accepted the insurance. He called approximately 15 different providers. Although approximately half said they were technically in-network, none were accepting new patients covered by the Defendant's insurance plan.

116.  Mr. Marks has found the online search tool filters that are part of the Defendant's directory to be grossly inaccurate. For example, when Mr. Marks searches for a psychiatrist, the Directory yields hospice care—for dying people.

117.  Mr. Marks continues to use the Defendant's directory to try to find an in-network provider for his mental health needs. The closest in-network provider that would see him in-person was over 50 miles away.

118.  When Mr. Marks actually found a facility which was listed as in-network—and which he confirmed by phone was in-network—he saw that provider.

119. This in-network provider was listed with an incorrect address: the provider was, in fact, only 5 miles of Mr. Marks' location. But if it were not for Mr. Marks' extra research, he would never have learned that from the Defendant's directory.

120. The Defendant's directory is grossly inaccurate.

121. Mr. Marks has wasted scores of hours using the Defendant's inaccurate directory and has incurred hundreds of dollars in unexpected out-of-network costs.

122. Mr. Marks pays approximately $102.43 every two weeks for his portion of the NYSHIP premium.

123. Mr. Marks relied on the NYSHIP booklet, the Carelon website, and the Certificate of Insurance to understand his benefits.

124. Mr. Marks continues to try to rely on the Carelon directory to find an in-network therapist, to no avail. In the last three months he has called dozens of providers listed in the Carelon directory. Again, just as with his experience seeking a psychiatrist, the directory includes wrong telephone numbers, non-working telephone numbers, providers who supposedly – but in reality do not – accept the NYSHIP Plan insurance, wrong specialties and providers who are not accepting new patients.

**Secret Shopper Study on Behalf of Plaintiff Steven Marks**

125. Between January and February 2025, the Plaintiffs' counsel conducted a secret shopper study that attempted to replicate Mr. Marks' experience when he sought mental health care.

126. Counsel used the Defendant's online directory to search for an in-network therapist with experience serving adults within 25 miles of Suffern, New York. From the hundreds of

names generated by the Defendant's provider directory search tool, Counsel called the first 100

names. Counsel made three attempts (over several days) to call each provider.

127.  Out of 100 supposed in-network providers, it was possible to make 14

appointments.



128.  Of the 100 providers listed in the Defendant's directory, 17 were unreachable.

Unreachable was defined as a disconnected phone, an incorrect phone number, or three

voicemail messages left with no return phone call.

129.  Among the 83 connected calls:

- **67** were not accepting the insurance plan
- **4** providers were not at the listed location
- **3** providers were not accepting new patients (despite accepting the insurance)
- **3** providers were only offering hospital in-patient services
- **3** providers offered the wrong type of service
- **1** provider did not have an appointment available within one month (despite accepting the insurance)

> ➢ **14 appointments could be made**

130.  That is an 86 percent ghost rate for all calls.

## II.  The NYSHIP Plan and Mental Health Coverage

### A.  Plan Options

131.  As state/agency employees eligible for the NYSHIP plan, the Plaintiffs have a choice of health plans. Employees can choose a preferred provider organization (PPO) plan administered by UHC (for the medical and surgical parts of the plan) and Defendant Carelon (for the mental health portion) or a plan from one of the various regional health maintenance organizations (HMOs).

132.  New York State had, and still has, a contract with Carelon to provide the mental health services portion of the NYSHIP plan. Contract number C000625 between the New York State Department of Civil Service and Carelon was effective between February 26, 2016 and December 31, 2023, for $2,465,000,000. [64] A successor contract, number C000743, effective between January 1, 2024 and December 31, 2028, is for $2,785,391,306.[65]

133.  NYSHIP publishes an annual booklet, available online, called "At a Glance." The cover of the booklet says: "This guide briefly describes Empire Plan benefits. It is not a complete description and is subject to change. For a complete description of your benefits and responsibilities, refer to your Empire Plan Certificate and Certificate Amendments."[66]

134.  Members and prospective members are told that all plans have both inpatient and outpatient mental health coverage.[67]

---

[64] Office of the State Comptroller, Open Book New York, Contracts for Carelon Behavioral Health, Inc., https://wwe2.osc.state.ny.us/transparency/contracts/contractresults.cfm?ID=5024.

[65] *Id*.

[66] The Empire Plan, At a Glance January 2024, https://www.cs.ny.gov/employee-benefits/pa-market/shared/publications/at-a-glance/2024/paep-aag-jan-2024.pdf.

[67] NYSHIP Mental Health Choices for 2025, 9, https://www.cs.ny.gov/employee-benefits/nyship/shared/publications/choices/2025/active-choices-2025.pdf.

135.   Members and prospective members are told: "The Mental Health and Substance Use (MHSU) Program offers both network and non-network benefits."[68]

136.   When a member uses an in-network provider, there is a $25 co-pay.[69]

137.   If there are no in-network provers, the NYSHIP booklet states:

> Even if there are no network providers in your area, you are guaranteed access to network benefits within the United States and its territories for the following services if you call The Empire Plan at 1-877-769-7447 beforehand to arrange care:
> • Mental Health and Substance Use (MHSU) Program services

138.   If a member uses an out-of-network provider, the NYSHIP booklet states: "**If you use a nonparticipating provider or non-network facility**, benefits for covered services are payable under the **Basic Medical Program** and are subject to a deductible and/or coinsurance." (Emphasis in the original.)

139.   The NYSHIP plan also includes caps on out-of-pocket expenses when members use in-network providers. The caps vary slightly depending on the bargaining unit or position the member is affiliated with and are different for individuals and families. In 2025, the out-of-pocket cap for individuals ranges from $2,600 to $2,670 for medical, surgical, and mental health combined; and for individuals from $5,200 to $5,350.[70]

140.   If a member uses an out-of-network provider, the member will be reimbursed at "80% of allowed amount; after applicable coinsurance max, 100% of allowed amount[.]"[71]

141.   The allowed amount is:

---

[68] *Id.* at 14.

[69] *Id.* at 15.

[70] *Id.* at 18.

[71] *Id.* at 21.

The Empire Plan considers 80 percent of the allowed amount, which is based on 275 percent of the Medicare rates published by the Centers for Medicare & Medicaid Services (CMS), for the Basic Medical Program and non-network practitioner services for the MHSU Program, 50 percent of the network allowance for covered services for non-network HCAP or MPMP services and 90 percent of the billed charges for covered services for non-network approved facility services for the MHSU Program. You are responsible for the remaining 20 percent coinsurance and all charges in excess of the allowed amount for Basic Medical Program and non-network practitioner services, 10 percent for non-network MHSU-approved facility services and the remaining 50 percent of the network allowance for covered, non-network HCAP or MPMP services.[72]

142. Members pay a portion of the monthly health insurance premium for themselves and for their dependents. The amount differs depending on the member's pay grade.[73]

| ENROLLEE PAY GRADE | INDIVIDUAL COVERAGE | | DEPENDENT COVERAGE | |
|---|---|---|---|---|
| | State Share | Employee Share | State Share | Employee Share |
| Grade 9 and below* | 88% | 12% | 73% | 27% |
| Grade 10 and above* | 84% | 16% | 69% | 31% |

143. The individual and family contribution to the Empire Plan premium for 2025 is[74]:

**NEW YORK STATE HEALTH INSURANCE PROGRAM 2025 RATES**

| Page in Choices | Code | Plan | Biweekly Costs Schedule for employees of the State of New York who are Management/Confidential; represented by C-82, CSEA, DC-37, NYSCOPBA, PBANYS, PEF or UUP; justices, judges and nonjudicial employees of the Unified Court System (UCS); and Legislature | | | | Biweekly Costs Schedule for employees of the State of New York who are represented by PBA or PIA | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | For Employees in the groups listed above and in titles allocated or equated to Salary Grade 9 and below* | | For Employees in the groups listed above and in titles allocated or equated to Salary Grade 10 and above* | | For Employees in the groups listed above and in titles allocated or equated to Salary Grade 9 and below | | For Employees in the groups listed above and in titles allocated or equated to Salary Grade 10 and above | |
| | | | Individual | Family | Individual | Family | Individual | Family | Individual | Family |
| 13 | 001 | The Empire Plan | 60.23 | 272.67 | 80.31 | 324.22 | 63.83 | 289.34 | 85.10 | 344.02 |

**ENROLLEE CONTRIBUTIONS FOR EMPLOYEES OF NEW YORK STATE**

Note: To enroll in an HMO, you must live or work in the HMO's service area. If you no longer live or work in the NYSHIP service area of the HMO in which you are enrolled, you must change to another option. Service areas may change from year to year. Please check pages 6–7 for NYSHIP service area information.

144. Mental health benefits under the NYSHIP plan are subject to prior authorization.

---

[72] *Id.* at 15.

[73] *Id.* at 5.

[74] NYSHIP Rates and Deadlines for 2025, 4, https://www.cs.ny.gov/employee-benefits/nyship/shared/publications/rates/2025/ny-active-rates-2025.pdf.

145.   The "At a Glance Booklet" states: "To receive the highest level of benefits you must call the Mental Health and Substance Use (MHSU) Program before seeking services from a mental health or substance use care provider. This includes treatment for alcoholism and services that require precertification to confirm medical necessity before starting treatment (see list on page 14)."[75]

146.   The booklet goes on to say: "The Program Administrator must certify all covered services as medically necessary, regardless of whether you are using Network or Non-Network coverage. If the Program Administrator does not certify your inpatient or outpatient treatment as medically necessary, you will not receive any Empire Plan benefits and you will be responsible for the full cost of care."[76] It then lists more than a dozen mental health treatments that require prior authorization.

147.   The NYSHIP home page links to a page that includes a more detailed explanation of the "Empire Plan Providers, Pharmacies, and Services."[77] This page contains five large logos of the companies that provide the various services of the Empire Plan, and links to their respective home pages for members:

- Medical/Surgical Program: UnitedHealthcare

- Hospital Program: Anthem Blue Cross

- Mental Health and Substance Use Program: Carelon Behavioral Health

- Prescription Drug Program: CVS Caremark

---

[75] *Supra* n. 66, at 13.

[76] *Id.* at 14.

[77] NYSHIP Empire Plan Providers, Pharmacies and Services, https://www.cs.ny.gov/employee-benefits/nyship/shared/providers/index.cfm.

- Nonparticipating Providers Program: Multiplan

148. Clicking on the Carelon link brings the user to a Carelon home page with the headline: "Find a Provider. Search our network of highly qualified and vetted providers."

149. The Carelon home page is the page with the search engine where the Plaintiffs began their frustrating and often futile searches for providers.

**The NYS Special Report**

150. In May 2024, the New York State Department of Civil Service, Employee Benefits Decision, published a "Special Report" explaining to members that there was "[i]nformation about [their] new NYSHIP benefits effective July 1, 2024."[78]

151. Among the information included in the Special Report was this Q&A:

> **Q: I need a specialist and there are not any network providers in my area. What should I do?**
>
> **A:** You should call The Empire Plan (see *Contact Information*, page 10). For medical/surgical providers, press or say 1 and for mental health or substance use disorder providers, press or say 3 and choose the prompt for the Clinical Referral Line (CRL). The Empire Plan can assist you in obtaining network benefits from a medical/surgical provider if there is not a network provider within 30 miles or 30 minutes from your home address. Under the MHSU Program, if there are no network providers in your area, you have guaranteed access to network benefits if you use the CRL to help you arrange care with an appropriate provider.[79]

152. The Special Report also notes:

> **Q: How can I make sure that a provider is in The Empire Plan network?**
>
> **A:** You can check the online directory on NYSHIP Online and select the link to the appropriate online directory (Medical/Surgical

---

[78] Empire Plan Special Report, May 2024, https://www.cs.ny.gov/employee-benefits/hba/shared/publications/empire-plan-report/2024/special-ny-actives-epr-may-2024.pdf.

[79] *Id.* at 7.

Program or MHSU Program) or call The Empire Plan and select the appropriate Program (see *Contact Information*, page 10). For mental health or substance use disorder providers, press or say 3 and choose the prompt for the Clinical Referral Line (CRL). Under the MHSU Program, you have guaranteed access to network benefits if you use the CRL to help you arrange care with an appropriate provider and they are unable to find you an in-network provider.[80]

153. Importantly, the Special Report also states:

> **Benefits on the Web** To learn more about your benefits, including finding Empire Plan providers and updated NYSHIP publications, go to NYSHIP Online at www.cs.ny.gov/employee-benefits.[81]

## The Certificate of Insurance

154. The most recent Empire State Certificate of Insurance found online is dated January 1, 2023.[82]

155. The NYSHIP Certificate of Insurance promises members robust mental health coverage. The January 1, 2023 Certificate has more than 100 references to mental health benefits. Section IV of the Certificate is devoted to mental health coverage and contains 25 pages of detailed explanation of benefits.

156. The Certificate notes:

> Network Benefits at a Non-Network Hospital/Facility: If You use Non-Network Hospitals and Facilities, You will receive network benefits for covered services: A. When no Network Facility is available within 30 miles of Your residence. B. When no Network Facility within 30 miles of Your residence can provide the covered services You require.[83]

---

[80] *Id.* at 6.

[81] *Id*. at 10.

[82] January 1, 2023 Empire Plan Certificate, NYSHIP, https://www.cs.ny.gov/employee-benefits/hba/shared/publications/certificate/2023/c82-certificate-2023.pdf.

[83] *Id*. at 15.



Reasonable distance from the enrollee's residence is defined by the following mileage standards:

| Primary Care | Specialist |
| --- | --- |
| Urban: 8 miles | Urban: 15 miles |
| Suburban: 15 miles | Suburban: 25 miles |
| Rural: 25 miles | Rural: 50 miles |

Within these mileage standards, network benefits are guaranteed for the following primary care Physicians and core specialties:

**Primary Care Providers**

| | | |
| --- | --- | --- |
| Family Practice | Internal Medicine | Pediatrics |
| General Practice | | Obstetrics/Gynecology |

**Specialties**

| | | |
| --- | --- | --- |
| Allergy | Gastroenterology | Otolaryngology |
| Anesthesia | General Surgery | Pulmonary Medicine |
| Cardiology | Hematology/Oncology | Radiology |
| Dermatology | Neurology | Rheumatology |
| Emergency Medicine | Ophthalmology | Urology |
| | Orthopedic Surgery | |

[84]

157.   According to the NYSHIP website, Carelon "provides coverage for medically necessary inpatient and outpatient care through a network of participating providers; medically necessary non-network services are also covered."[85]

158.   The Certificate of Insurance notes:

> By using a Network Provider, You will receive Network Coverage for Medically Necessary treatment. The Program's network gives You access to a wide range of Providers when You need Mental Health Care or Substance Use Care. These Providers are in Your community and many of them have been caring for Empire Plan enrollees and their families for years.[86]

159.   Importantly, the Certificate continues:

> You are guaranteed access to Network Coverage. If You cannot locate a Network Provider in Your area, then contact the Clinical Referral Line. On a case-by-case basis, where no Network Provider is available and the Program Administrator specifically approved

---

[84] *Id.* at 55.

[85] Empire Plan Providers, Pharmacies and Services, Mental Health and Substance Use Program, https://www.cs.ny.gov/employee-benefits/nyship/shared/providers/excelsior-plan/index.cfm.

[86] *Supra* n. 82, at 111.

> Your Referral to a Non-Network Provider, that Non-Network Coverage may be considered Network Coverage.[87]

**Out-of-Network Reimbursement**

160.  If a member uses an out-of-network provider, the Certificate of Insurance states:

> When You use a Non-Network Provider or a Provider not referred to You by the Program Administrator, the Plan pays the following covered percentages: A. For Practitioner services: After You meet The Empire Plan Combined Annual Deductible, either 80 percent of Usual and Customary Rate for Covered Services or actual billed charges, whichever is less. You pay the balance of 20 percent (Coinsurance) and any charges above the Usual and Customary Rate.

161.  This explanation is inconsistent with the explanation given in the NYSHIP booklet, which states that out-of-network reimbursement is 275% of the Medicare rate. At the very least, it is confusing to members.

162.  Carelon's "allowance" is not discernable from its website. Thus, it is (at best) very difficult for a member to know, in advance, how much it will cost to use an out-of-network provider.

163.  And for a prospective member, it is essentially impossible to determine in advance how much that payment will be: the Defendant will not tell a prospective member what its allowance for a procedure or treatment is without a member ID number.

164.  FairHealth is an unrelated, highly respected, non-profit resource that provides consumers with extensive, accurate information about the cost of healthcare procedures. FairHealth is not a definitive price guide, but it does provide some guidance about how much a member might pay. According to FairHealth, CPT Code 90837, one hour of psychotherapy near

---

[87] *Id.* at 116.

zip code 10573 (Plaintiff Doe's zip code) would cost $583 for an out-of-network provider.[88] And $180 is the in-network (allowed) price.

165. Minor Doe's provider charged $385, and Carelon's allowed amount was $344.81. Mrs. Doe had to pay $68.96 for each visit—rather than the $25 she would have had to pay for an in-network co-pay.

166. Mrs. Doe has paid dozens of these co-insurance charges to get care for her daughter.

167. Plaintiffs Landerer and Marks paid similar co-insurance charges because there were no in-network providers near where they lived.

<u>Carelon's Responsibility to Update Its Directory</u>

168. Even Section 720 of the Employee Retirement Income Security Act of 1974 (which does not apply here) requires health insurers to verify and update their provider directories not less frequently than once every 90 days, remove a provider from the directory when it is unable to verify the directory information for that provider, and update the directory within two days of receiving new information from a provider.

169. Section 9820 of the Internal Revenue Code of 1986 requires health insurers to verify and update their provider directories not less frequently than once every 90 days, remove a provider from the directory when it is unable to verify the directory information for that provider, and update the directory within two days of receiving new information from a provider.

170. Section 4226 of the New York State Insurance Law states:

> (a) No insurer authorized to do in this state the business of life, or accident and health insurance, or to make annuity contracts shall:

---

[88] FairHealth Consumer, *Consumers Estimate Your Healthcare Expenses*, https://www.fairhealthconsumer.org/.

(1) issue or circulate, or cause or permit to be issued or circulated on its behalf, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts;

…

(c) In any determination, judicial or otherwise, of the incompleteness or misleading character of any such comparison or of representation, it shall not be presumed that the insured knew or knows of any of the provisions or benefits contained in any insurance policy or contract.

## III.    The NYSHIP Contract

171. Carelon's contract with the New York State Department of Civil Service (No. C000743, or the "Contract," attached hereto as Exhibit A), obligates Carelon to provide an adequate network.

172. Specifically, the Contract states in Section 5.2.3 that Carelon "must have a contracted Provider network in place, that meets or exceeds the required access standards set forth in Section 5.10 of this Contract."

173. Section 5.10 of the Contract specifies that Carelon's "proposed network within [New York State] must meet the network adequacy standards as defined by the DFS."

174. Further, pursuant to Section 5.10.7(f), Carelon must have "adequate network management and staff to manage the network, handle Provider inquiries and *ensure updated MHSU Provider information is entered into the Contractor's system and transmitted to the online directory*. An adequate MHSU Provider relations staff must be dedicated to New York State, where the majority of MHSU Disorder Program utilization occurs." (Emphasis added.)

175. Further, pursuant to Section 7.2 of the Contract, Carelon's provider network must have a proper mix of professionals, and Carelon is "expected to use its best efforts to substantially maintain the composition of Network Providers included in the [Mental Health and Substance Use] Disorder Program's current Provider Network."

176.   The Contract further provides that Carelon "shall monitor network physicians to ascertain if their practices are open or closed to new patients. Provider availability must be taken into account in relation to Member accessibility." (*See* Contract Section 5.10.3.)

177.   Per paragraph 2 of Appendix B to the Contract, Carelon must warrant and represent that it will "comply with all applicable State and Federal laws, ordinances, rules and regulations and policies of any governmental entity."

178.   As it regards the provider directory, Carelon

> shall assist in developing the Empire Plan Participating Provider Directories on an annual basis as required by New York State Insurance Law §§ 3217-a(a)(17) and 4324(a)(17) and Public Health Law § 4408(r). … The Offeror must provide a web link, for the Department's website, that is accessible to the general public and does not require Member log in. … [T]his online directory must … provide Members with a user-friendly interface that allows them to search for Providers and Facilities, as indicated in the Empire Plan Certificates, Excelsior Plan and SEHP At A Glance (Attachment 20), based on geographic location, name, or specialty. The directory must detail all MHSU Provider information as required by State and federal law. Information about all types of MHSU Providers in all geographic locations shall be accessible through this single link and search functions. ***The directory shall be updated weekly or more frequently, if necessary, to ensure Members have access to the most up-to-date information. The Offeror must ensure the directory contains the most up-to-date information regarding network MHSU Providers and Facilities, including if the MHSU Provider is accepting new patients.***

*See* Contract, Request for Proposal ("RFP") Section 3.3(1)(e).

179.   New York State Insurance Law §§ 3217-a(a)(17) and 4324(a)(17) and Public Health Law § 4408(r) require a "a listing by specialty, which may be in a separate document that is updated annually, of the name, address, telephone number, and digital contact information of all participating providers, including facilities, and: (A) ***whether the provider is accepting new patients***; (B) in the case of mental health or substance use disorder services providers, any affiliations with participating facilities certified or authorized by the office of mental health or

the office of addiction services and supports, and any restrictions regarding the availability of the individual provider's services; and (C) in the case of physicians, board certification, languages spoken and any affiliations with participating hospitals. The listing shall also be posted on the insurer's website and *the insurer shall update the website within fifteen days of the addition or termination of a provider from the insurer's network or a change in a physician's hospital affiliation*[.]" (Emphasis added.)

180. The Contract also provides, in Sections 3.10 and 5.11 of the RFP, minimum access guarantees in urban, suburban, and rural areas; for example, in urban areas, 95% of enrollees will have at least: 1) one Psychiatrist, Psychologist, or Masters Level Clinician within three miles; and 2) one Mental Health or Substance Use Facility within five miles."

## IV.  Defendant's Ghost Network

### A.  Carelon's Provider Directory

181. Beacon Health Options, the former name for Carelon until March 1, 2023, affirmatively told its members: "Provider Search is a Beacon Health Group (Beacon) online directory for locating providers. Provider Search offers you the ability to locate Beacon network providers and facilities throughout the country."[89]

182. Carelon's current website tells its members that "what makes [it] different" is its "[r]obust specialty provider network."[90] Further, Carelon claims that "[t]hrough [its] deep provider network and unrivaled care management, [it] improve[s] access to behavioral health

---

[89] Carelon, *Find a Provider Search Tips*, https://plan.carelonbehavioralhealth.com/wp-content/uploads/Find-Provider-Need-Help.pdf.

[90] Carelon, Specialty Care Services, https://www.carelonbehavioralhealth.com/solutions/specialty-care.

- 45 -

services and help[s] deliver the right treatment, at the right time, and in the right setting so people can live their lives to the fullest."[91]

183. At all relevant times, the Defendant published an online directory of doctors who supposedly are in-network with the Defendant. This directory is publicly available to members and non-members of the NYSHIP plan.

184. This online directory, for members and potential members, is the definitive resource to identify which providers are in Carelon's network and are thereby covered as an in-network provider.

185. This directory can be sorted and searched based on the criteria relevant to members: for example, the type of medical specialty, the distance from the member's home or office, and whether the provider does telehealth or provides in-person care.

186. The Defendant's directory of mental health providers is a ghost network to a staggering extent. The Defendant's provider directory affirmatively misrepresents to current and prospective NYSHIP members that the mental health providers listed are in fact in-network and will be accessible and available for mental health services. Indeed, as described above, the Defendant's provider directory is replete with providers who do not take the NYSHIP plan and is egregiously inaccurate as to its network of mental health providers.

187. Moreover, the Defendant's directory lists incorrect contact information for mental health providers and includes repeated entries of the same provider, making it appear that the Defendant contracts with vastly more mental health providers than it does. Accordingly, the

---

[91] Carelon, Behavioral Health Home Page, https://www.carelon.com/capabilities/behavioral-health.

Defendant's provider directory, and representations about its comprehensive mental health coverage, are inaccurate, deceptive, and misleading.

188. The Defendant includes many incorrect or non-working telephone numbers in its directory. The Defendant's inclusion of multiple incorrect telephone numbers may, at first glance, appear to be a negligent oversight. But such errors are far from trivial for a person who needs mental health care for themselves or a loved one. The appearance of a phone number next to a provider's name conveys the promise that this provider is not only in-network, but available to the member—to make an appointment and get help. And the absence of a phone number would convey a very different message: that this provider should not be listed. The inclusion of incorrect telephone numbers artificially inflates the perceived size and adequacy of the Defendant's network and has a detrimental impact on members who invest time and energy trying to find a mental health provider—only to be repeatedly led down a blind path.

189. Carelon's directory can also be downloaded as a customized PDF.

190. In summary, the Defendant's provider directory includes scores of providers who are not in-network with Carelon or do not accept the NYSHIP insurance. Moreover, the Defendant's provider directory is replete with inaccuracies of all kinds, including but not limited to incorrect addresses, phone numbers, and other contact information. Finally, when a member prints out (or saves as a PDF) a directory, the search results generated for a mental health provider include multiple entries for the same provider, making it appear that Carelon has vastly more mental health providers than it does—and potentially sending a member on an even more frustrating search for an in-network provider.

**B.     Carelon's Representations**

191. In addition to publishing and maintaining an inaccurate provider directory, Carelon provides consumers with deceptive and materially misleading marketing and program materials

about the Carelon-administered part of the NYSHIP plan. These materials promise mental health benefits and a robust network of in-network providers.

192.   During every year's open enrollment period, state employees select their desired health plan. Once an employee selects a health plan, the employee must remain with that plan for the entire plan year (unless there is a "qualifying event" like getting married or losing a job) until the following year's open enrollment period.

193.   The Carelon website and the representations it has made to NYSHIP for inclusion in the various NYSHIP brochures are misleading. For example, as of March 17, 2025, Carelon represented on its website that it had "more than 115,000" in-network providers nationwide.[92]

194.   According to the American Psychological Association, there were 12,020 licensed psychologists in New York in 2014.[93] And according to the federal Bureau of Labor Statistics, there are just over 4,000 licensed psychiatrists in New York.[94]

195.   Carelon's representation of more than 115,000 in-network providers nationwide is grossly misleading not just because that 115,000 figure was (presumably) a national figure – of little use to member seeking care near where they live – but because many of them are ghosts. Its coverage is far less than what is marketed and advertised in its plans. Based on the Plaintiffs'

---

[92] *Id.*

[93] American Psychological Association, *How many psychologists are licensed in the United States?* (June 2014), https://www.apa.org/monitor/2014/06/datapoint#:~:text=An%20estimated%20106%2C500%20psychologists%20possess%20current%20licenses%20in%20the%20United%20States.&text=California%20(17%2C890)%20New%20York%20(,(190)%20have%20the%20fewest.

[94] U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics, 29-1223 Psychiatrists, https://www.bls.gov/oes/2023/may/oes291223.htm.

experiences and the subsequent secret shopper studies, many out-of-state providers do not accept the NYSHIP plan.

196.   The Mental Health Parity and Addiction Equity Act states, "The regulation provides that all plan standards that limit the scope or duration of benefits for services are subject to the nonquantitative treatment limitation parity requirements. This includes restrictions such as geographic limits, facility-type limits, and network adequacy."[95]

197.   Carelon's website also stated that, "By improving access to care, behavioral health and wellness concerns can be addressed before they become significant conditions." The website further stated that "Carelon Behavioral Care serves as a clinical support system that provides appropriate and timely access to the care people need."[96]

198.   However, these statements are misrepresentations and misleading because consumers spend a great deal of time searching for in-network providers of mental health, often to no avail.

199.   This statement is inaccurate and misleading because Carelon does not have a "deep" provider network on which consumers can rely, and consumers are often left struggling and wasting time searching for treatment long after they start to seek out a mental health professional.

200.   Further, Carelon represented that consumers could rely on a "broad network of licensed clinicians [who are] available to fill gaps by providing access to care with

---

[95] Ctrs. for Medicare & Medicaid Services, *The Mental Health Parity and Addiction Equity Act* (2023), https://www.cms.gov/marketplace/private-health-insurance/mental-health-parity-addiction-equity.

[96] Carelon, Behavioral Health Home Page, https://web.archive.org/web/20250221082017/https://www.carelonbehavioralhealth.com/solutions/carelon-behavioral-care.

comprehensive and vital resources."[97] That is inaccurate and misleading, as consumers often have to seek help out of network because the Carelon network lacks adequate providers.

201.   Similarly, Carelon's Provider Handbook (last updated March 1, 2023), states that "Carelon arranges for the provision of and access to a ***broad scope of behavioral health services*** for members through its provider networks, ***consisting of appropriately licensed and/or certified practitioners, facilities, providers, and programs*** offering varying levels of service."[98] However, Carelon misleads consumers in making them believe that they will have access to a "broad scope" of service and appropriately licensed practitioners, when, in reality, Carelon's directories are inaccurate and its network is sparse.

202.   Moreover, Carelon's "Provider Search" states that "Carelon makes every effort to maintain accurate and up-to-date information."[99] This statement is inaccurate and misleading because Carelon's provider directories are inaccurate and consumers are left wasting time and effort in their search for help.

203.   In reality, it is nearly impossible to obtain in-network mental health care, and consumers who relied on Carelon's misrepresentations are left to suffer the consequences of untreated mental illness, incur significant costs to afford out-of-network treatment, and/or pay premiums for benefits that are illusory.

---

[97] Carelon, Our Solutions, https://web.archive.org/web/20250221172409/https://www.carelonbehavioralhealth.com/solutions.

[98] Carelon, Carelon Behavioral Health Provider Handbook, 10, (last updated Mar. 1, 2023), https://www.carelonbehavioralhealth.com/content/dam/digital/carelon/pdf/Carelon%20Behavioral%20Health%20Provider%20Handbook.pdf.

[99] NYSHIP, Provider Search (attached hereto as Exhibit B).

204. In conclusion, separately and together, Carelon's representations mislead consumers to believe that their mental health needs would be taken care of, that Carelon's in-network coverage is comprehensive, and that they only need to look to and rely on the provider network to find necessary mental health care.

205. Moreover, Carelon's repeated focus on the importance of using an in-network provider, and repeated direction of members to use the provider directory to find an in-network provider, underscores the importance of the provider directory to consumers.

206. Finally, the Defendant's attempts to have members themselves verify that a provider is in fact in-network do not replace, or otherwise absolve, Defendant's obligations to accurately represent the mental health providers available in its network.

### C. Defendant's Omissions

207. In addition to the affirmative misrepresentations made by the Defendant about the breadth of its provider network and comprehensiveness of Carelon's mental health care coverage, the Defendant also makes material omissions, including but not limited to failing to disclose the extent of provider directory inaccuracies; that the vast majority of in-network mental health providers are not accessible; and the limitations of Carelon's mental health coverage.

208. Specifically, the Defendant misleadingly omits any mention that members will likely face significant difficulty in finding an in-network mental health provider through the directory, or the likelihood that members will need to either resort to an out-of-network provider, or delay or potentially forgo care altogether.

209. Significantly, there is also complete information asymmetry between the Defendant and consumers: the Defendant has every ability to access all the relevant information to

determine whether a provider is accurately listed.[100] On the other hand, only after great difficulty and time expenditure—through trial and error, hours of calls, and extensive research—could a member become aware of the extent of the directory inaccuracies. The information is simply not readily available to the average consumer.

210. Plaintiffs and other reasonable consumers must rely on the Defendant to accurately represent which providers are in-network for its insurance plan. The Defendant is well-aware of the inaccuracies in its directory, yet reasonable consumers would have no reason to think that the list of providers represented as being in their insurance plan's network would not be exactly that.

211. If Plaintiffs—or any reasonable consumer—had the directory inaccuracies and deficits of Carelon's mental health care coverage disclosed to them, they would have acted differently in a variety of ways, including, but not limited to, avoiding hours of fruitless searches and calls, saving and budgeting to prepare for out-of-network mental health care costs, and exploring other health plan options.

## V. The Defendant's Misrepresentations and Omissions about Its Mental Health Care Coverage Are Deceptive

212. The staggering inaccuracies in the Defendant's provider directory constitute unlawful deceptive acts and practices, false advertising, and violations of statutory and regulatory requirements. Moreover, these violations are knowing, willful, and serve to unjustly enrich the Defendant.

213. The misconduct alleged herein is simple but enormously harmful: the Defendant deceptively and misleadingly represents that the NYSHIP insurance plan has a broad network of

---

[100] This information includes their contracts and communications with providers, as well as billing information from which the Defendant could easily ascertain the providers currently in its network.

available mental health providers, when the reality is that members often cannot obtain in-network mental health treatment.

214. The Defendant holds itself out to consumers—through the provider directory—as adequately covering mental health care. These representations are deceptive, as Carelon does not provide an adequate or a comprehensive network of mental health providers.

215. As discussed above, the Defendant affirmatively misrepresents the breadth of its mental health provider network to a staggering extent. An overwhelming percentage of the providers listed in the provider directory do not actually participate in the NYSHIP plan. Further, a vast number of the providers listed are improperly and repeatedly listed or have incorrect contact information.

216. In addition, during its enrollment periods and otherwise, Carelon makes numerous material misrepresentations to current and potential members about the NYSHIP plan, including, but not limited to, the size and adequacy of its mental health provider network, that all providers on the directory would be covered at an in-network rate, the ease and availability of finding in-network care, and the comprehensiveness of mental health care coverage. It is also very difficult for members or prospective members to ascertain the "allowance" that the Defendant uses to determine out-of-network reimbursement.

217. At no time did the Defendant disclose the limited nature of its mental health provider network, the amount of time individuals could be expected to search for an available in-network mental health provider, or the number of expenditures that would likely be required to obtain mental health care.

218. Put another way, if a member was looking to obtain mental health services from a provider on the Defendant's provider directory, the member would have no reason to believe that

said provider would be out-of-network, nor that the member would have to pay substantial costs to see an out-of-network provider.

219. Through the Defendant's representations, omissions, and bait-and-switch tactics, a reasonable consumer would understandably believe that the NYSHIP plan included the mental health providers that the provider directory stated it would, and that Carelon's network of mental health providers was broad and accessible. A reasonable consumer would also expect that Carelon would cover charges for services at an in-network rate for the providers it affirmatively lists as in-network on its directory, and that the consumer would not be subject to out-of-network costs for obtaining mental health care from a provider listed on the directory.

220. The Defendant represents that it regularly monitors and updates its network for accuracy. But that is not true.

221. Indeed, the Defendant is in violation of the federal No Surprises Act and New York State's No Surprises law and network adequacy law.

222. Moreover, the Defendant is well aware of these federal and state laws, and the Defendant's inaccurate and misleading provider directory is not only a violation of these standards, but also a willful and knowing violation of the consumer protection laws.

223. The Defendant willfully and knowingly maintains an inaccurate and inflated provider directory to hide its non-compliance with network adequacy standards. If the Defendant were forced to produce an accurate provider directory, it would reflect that Carelon does not maintain sufficient in-network mental health providers, in violation of New York's network adequacy laws.

## VI.     The Defendant's Deceptive Representations and Omissions Are Material

224. As countless studies have shown, provider directories and the breadth of a provider network are important to consumers' choice of health care plan and decisions about their health

care. Misrepresentations about a provider directory and network materially impact consumers'

health plan choices. Accordingly, the Defendant's misrepresentations about the NYSHIP plan's

mental health provider network and coverage are materially misleading to consumers, in

violation of New York's consumer protection laws.

225.    Consumers predominantly, and logically, rely on a health plan's provider directory

to find providers in their health plan.[101] As stated by the American Medical Association and the

Council for Affordable Quality Healthcare:

> Health plans are expected by their members and their contracted
> practices to display a provider directory to the public that represents an
> accurate reflection of their networks. It is the most public-facing data
> that health plans provide, and patients are dependent on accurate
> directories to access care.[102]

226.    Indeed, and as noted above, Carelon itself repeatedly directs its members to rely on

the provider directory to find an in-network provider.

227.    In addition, reasonable consumers look to the breadth of a provider network in

choosing a health plan.[103] Over half of consumers in one poll identified provider choice as the

most important non-financial consideration they make when selecting a health plan.[104] In another

survey, participants "were willing to pay $72 for a plan that covered 30% more doctors in their

---

[101] *See* Improving Health Plan Provider Directories, *supra* n. 56.

[102] *Id.* at 7.

[103] *See* Statista, *Most Important Considerations for Americans in Choosing a Plan from a Health Insurance Company as of 2016*, https://www.statista.com/statistics/654828/most-important-considerations-for-choosing-health-insurance-plan/.

[104] *See* Linda J. Blumberg et al., *Factors Influencing Health Plan Choice among the Marketplace Target Population on the Eve of the Health Reform*, Urban Inst., 2 (Feb. 6, 2014), https://www.urban.org/sites/default/files/2024-05/hrms_decision_factors.pdf.

area[.]"[105] And, in a Kaiser Family Foundation survey, 60 percent of non-group health insurance enrollees reported that having a choice of providers was either "very important" or "extremely important" to them.[106] Carelon is aware—or should be aware—of such consumer preferences.

228.   Given the materiality of provider directories and network breadth to consumer choice, the misrepresentations and omissions made by the Defendant constitute precisely the type of information upon which reasonable consumers would rely in choosing a health plan. Having access to an adequate number of in-network, qualified doctors is one of the fundamental criteria consumers use in choosing a health insurance plan.[107]

229.   Moreover, and as discussed above, reasonable consumers would understandably rely on the Defendant's misrepresentations and omissions. The provider directory and network information are disseminated by the insurance company, which consumers logically view as the authoritative source of information about its in-network providers, scope of coverage, and other plan policies.

230.   Any boilerplate disclaimers the Defendant might provide would be woefully insufficient. Put another way, no reasonable consumer viewing such disclaimers would understand that up to 95% of mental health providers listed in the Defendant's directory do not

---

[105] Eline M. van den Broek-Altenburg & Adam J. Atherly, *Patient Preferences for Provider Choice: A Discrete Choice Experiment*, Am. J. of Managed Care 26(7) (July 2020), https://www.ajmc.com/view/patient-preferences-for-provider-choice-a-discrete-choice-experiment.

[106] Liz Hamel et al., *Survey of Non-Group Health Insurance Enrollees, Wave 2*, Kaiser Family Foundation (2015), https://www.kff.org/health-reform/poll-finding/survey-of-non-group-health-insurance-enrollees-wave-2/ (noting that the combined statistic of those who reported choice of providers as "extremely important" (25 percent) or "very important" (35 percent) is 60 percent).

[107] *See id.*; *Most Important Considerations for Americans in Choosing a Plan from a Health Insurance Company as of 2016, supra* n. 102; Blumberg et al., *supra* n. 103; van den Broek-Altenburg, *supra* n. 104.

take NYSHIP insurance. Indeed, there is no disclaimer broad enough to absolve that level of deception.

231. The sheer extent of inaccuracy and inadequacy of the Defendant's network is hidden, dangerous, and deceptive.

### A. The Defendant Was Aware of Its Provider Directory Inaccuracy and Knew That Its Representations and Omissions Regarding the Provider Directory and Mental Health Care Coverage Were Deceptive

232. At all relevant times, the Defendant knew that its representations and omissions regarding its directory of mental health providers and coverage of mental health care were grossly inaccurate, deceptive, and misleading.

233. Among the insurance industry itself, it is well known that provider directories are notoriously inaccurate. The industry knows it has a problem. There are numerous studies

documenting the prevalence of ghost networks,[108] especially for mental health providers,[109] and companies like Carelon have been successfully sued over the issue.[110]

234. As discussed above, the industry was recently the subject of a bipartisan congressional inquiry into ghost networks,[111] and the Senate Finance Committee held a hearing on the issue specifically in the context of mental health.[112] There are also numerous federal and state laws and regulations aimed at rectifying the problem of inaccurate provider directories, which are discussed above and further below, and of which the Defendant is well aware.

---

[108] *See, e.g.*, Butala et al., *supra* n. 29 ("In examining directory entries for more than 40% of US physicians, inconsistencies were found in 81% of entries across 5 large national health insurers."); Jack S. Resneck Jr. et al., *The Accuracy of Dermatology Network Physician Directories Posted by Medicare Advantage Health Plans in an Era of Narrow Networks*, JAMA Dermatology 150(12) (2014), https://jamanetwork.com/journals/jamadermatology/fullarticle/1919439 (finding, after making scripted telephone calls to dermatologists listed in certain directories, that 45.5% of physician listings were duplicates, and many "dermatologists listed had incorrect contact information, were deceased, retired, or had moved, were not accepting new patients, did not accept the insurance plan, or were subspecialized"; for one plan, no appointment was obtainable).

[109] *See, e.g.*, Russell Holstein & David P. Paul III, *'Phantom Networks' of Managed Behavioral Health Providers: an Empirical Study of their Existence and Effect on Patients in Two New Jersey Counties*, Hospital Topics 90(3), 68 (2012), https://pubmed.ncbi.nlm.nih.gov/22989224/ ("Aetna's network of psychologists was the most accurate of all networks, and GHI's network of psychiatrists was the most inaccurate of all networks."); Jane M. Zhu et al., *Phantom Networks: Discrepancies Between Reported And Realized Mental Health Care Access in Oregon Medicaid*, Health Affairs 41(7) (2022), https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.00052 ("Overall, 58.2 percent of network directory listings were "phantom" providers who did not see Medicaid patients, including 67.4 percent of mental health prescribers, 59.0 percent of mental health nonprescribers, and 54.0 percent of primary care providers.").

[110] *See, e.g.*, *Anthem Resolves Calif. Provider Directory Error Case*, Bloomberg Law (Aug. 17, 2016), https://news.bloomberglaw.com/health-law-and-business/anthem-resolves-calif-provider-directory-error-case.

[111] *See Brown, Colleagues, Seek Information on Ghost Networks*, The Ironton Tribune (Feb. 1, 2023), https://www.irontontribune.com/2023/02/01/brown-colleagues-seek-information-on-ghost-networks/.

[112] *See* Senate Hearings on Mental Health Care, *supra* n. 36.

235.   Put simply by a state senator, insurance companies have "known about this for a long time and they haven't done anything about it. It's difficult not to assume that this kind of barrier is intentional."[113]

236.   The sheer magnitude of providers who are not in-network or do not accept the NYSHIP plan—as many as 95 percent of the mental health providers listed—is itself powerful proof of the Defendant's knowledge of its directory inaccuracies. The staggering extent of inaccuracy of the mental health providers represented as being in-network can only be the product of knowing misconduct or willful blindness.

237.   The Defendant knew, or should have known, that members were having significant problems accessing in-network care.

238.   For all these reasons, the Defendant's misrepresentations and omissions constitute knowing and willful violations.

239.   The Defendant engaged in these knowing deceptive acts and practices to induce Plaintiffs, and all potential members and consumers, to choose the NYSHIP plan. These representations about the size and breadth of the mental health provider network, the ease of finding mental health treatment by using the allegedly accurate provider directory, the freedom to choose any listed in-network provider, the ability to control costs by seeing an in-network provider, and the comprehensive coverage of mental health care would induce a reasonable consumer—and did induce Plaintiffs—to choose the NYSHIP plan.

---

[113] Turban, *supra* n. 61.

**B.** **The Defendant Reaps Significant Benefits from Misrepresenting Its Mental Health Provider Network and Coverage**

240. Moreover, the Defendant knowingly and intentionally misleads consumers to inflate the perception, extent, and robustness of its supposed mental health provider network, which inures significant financial benefits to the Defendant and, conversely, deprives Empire members of the benefit of the bargain for the plan that they chose.

241. Maintaining an inaccurate provider network and providing inadequate mental health care coverage significantly boost the Defendant's profits.

242. As discussed above, the top considerations for consumers choosing a health plan are network breadth and provider choice. In addition to general representations made by insurers about their networks, the main source upon which consumers rely to determine a network's breadth is its provider directory.[114]

243. Consumers are more likely to enroll in a particular plan if their provider is in-network and the provider list is robust. Thus, by misrepresenting the size and quality of its network, the Defendant attracts more customers.

244. A portion of members' premiums are paid to Carelon. As such, Carelon is unjustly enriched from its misrepresentations about the breadth of its network. As noted above, the value of the Defendant's current contract with New York State to administer the mental health portion of the NYSHIP plan is over $2.7 billion.

245. Carelon also overcharges the state and Plaintiffs (via their contribution) for its premiums because of its illusorily broad network. Every provider who is not actually in-network,

---

[114] *See* Improving Health Plan Provider Directories, *supra* n. 56.

or who is unavailable or unable to be contacted, represents coverage for which Carelon is paid, but members never receive.[115]

246. In addition, members with greater mental health care needs are disproportionately harmed by the lack of in-network providers. These higher-needs members are more likely to have to pay for out-of-network treatment or abandon their efforts to obtain mental health care altogether, thereby saving Carelon the costs associated with their care.

247. Simply put, inaccurate directories serve to increase a plan's membership (along with their increased premiums), and at the same time evade the costs of covering their care.

248. The financial incentives of intentionally inaccurate directories were discussed during a recent Senate Finance Committee hearing.[116] In an exchange between United States Senator Elizabeth Warren and testifying witness Mary Giliberti (the Chief Public Policy Officer of Mental Health America), Senator Warren inquired whether the plans were "inaccurate by design," to which Ms. Giliberti responded affirmatively:

> SENATOR WARREN: Okay so it's a way to defraud consumers. To say I have this really big list of people you could go to if you had a problem, and it turns out that really big list … is actually this little tiny list.
>
> MS. GILIBERTI: Right.
>
> SENATOR WARREN: Okay so that's one way it's to their advantage …. They get paid in effect or they make more money by being inaccurate. Did you have another one?
>
> MS. GILIBERTI: Well, just, that I think it's about 60 percent of the plans [being discussed] don't have out of network coverage, so if you

---

[115] *See* Alicia Atwood & Anthony T. Lo Sasso, *The Effect of Narrow Provider Networks on Health Care Use*, J. of Health Econ. (Dec. 2016), https://doi.org/10.1016/j.jhealeco.2016.09.007.

[116] Note that this discussion focused on Medicare Advantage plans, but the incentives are the same in commercial plans.

get really frustrated and you pay on your own then they're not paying anything.

SENATOR WARREN: So the more I can frustrate you … the more you'll just go somewhere else. And that means it's not money out of their pockets.

\* \* \*

SENATOR WARREN: So, look, what we are really saying here is that it is in the financial interests of these … plans to discourage beneficiaries from accessing care …. Because here's the key that underlines this. Whatever insurers don't spend on care as a result of tactics like outdated provider directories or overly restrictive networks or inaccurate information, whatever they don't spend on care, they get to keep.[117]

249.   Finally, a significant collateral consequence of an inaccurate, inflated provider directory is that an insurance plan appears to meet federal and state network adequacy requirements, even though it does not. The Defendant is thereby unjustly enriched by avoiding the compliance costs and other expenditures associated with maintaining an accurate and adequate network of mental health providers, as required by federal and state law, discussed above and further below.

250.   As explained by a Yale Law & Policy Review article on ghost networks, the effects of the Defendant's ghost network are far-reaching and damage the very structure of our health care system:

Directory errors cost consumers money and erode regulatory consumer safeguards. They deceive consumers about the value of the coverage they are purchasing by concealing plans' actual provider networks, subjecting consumers to predatory billing practices, and breaking the link between consumer choices and plan practices that undergirds much of the American health insurance regulatory structure.[118]

---

[117] Senate Hearings on Mental Health Care, *supra* n. 36 (Testimony of Senator Elizabeth Warren, which begins at 2:23:58).

[118] *Laying Ghost Networks to Rest*, supra n. 55, at 85.

## VII.    Plaintiffs and Putative Class Members Have Been Injured Because of the Defendant's Conduct

251.    Simply put, the Defendant's ghost network is a dangerous obstacle to critical mental health care for the hundreds of thousands of people covered by the NYSHIP plan. Plaintiffs and others similarly situated—both adults and the parents of children in desperate need of mental health care—have been grievously injured by these violations and their inability to access necessary mental health treatment for their children.

252.    Mental health care networks have been known for some time for being particularly inaccurate and causing significant harms.[119] Yet insurance companies such as the Defendant have done little to improve their accuracy.

253.    As noted in a 2014 New York Attorney General Assurance of Discontinuance, "[p]ersons with mental health and substance use disorders comprise a vulnerable population, and may be reluctant to seek care."[120]

254.    The Plaintiffs have suffered enormous injury from the Defendant's violations of law. As a result of the Defendant's ghost network, the Plaintiffs have struggled, or been wholly unable, to obtain mental health treatment for themselves or their children. Specifically, the Plaintiffs have paid exorbitant costs to get mental health treatment because they have been forced to seek out-of-network care for themselves and for their children; have faced significant, years-

---

[119] *See, e.g.*, Susan H. Busch & Kelly A. Kyanko, *Incorrect Provider Directories Associated With Out-Of-Network Mental Health Care And Outpatient Surprise Bills*, 39(6) Health Affairs (2020), https://www.healthaffairs.org/doi/10.1377/hlthaff.2019.01501 ("We conducted a national survey of privately insured patients who received specialty mental health treatment. We found that 44 percent had used a mental health provider directory and that 53 percent of these patients had encountered directory inaccuracies.").

[120] *In re Excellus Health Plan, Inc.*, Assurance No. 14-201, https://www.scribd.com/doc/259076979/Attorney-General-of-the-State-of-New-York-in-the-Matter-of-Excellus-Health-Plan.

long delays in receiving critical mental health care; have been unable to find care appropriate for their mental health needs; have made-do with less-than-appropriate providers; and, alarmingly, have been unable to obtain needed mental health treatment altogether.

255.   The provider directory's inaccuracies and misrepresentations and omissions about Carelon's mental health care coverage are the direct and proximate causes of the harms the Plaintiffs have endured. Most simply, had the provider directory been accurate, the Plaintiffs would have saved countless hours of futile searching; avoided the time, costs, and emotional toll of delaying, or failing to find, needed care; and avoided the exorbitant costs of locating, traveling to, and otherwise obtaining out-of-network mental health treatment. Had Carelon accurately represented its mental health care coverage, the Plaintiffs would have had access to the care they were promised or made other financial and health care decisions about their mental health treatment. Had Plaintiffs known in advance about the problems they would encounter trying to get in-network mental health care, they would have pursued other health care options.

256.   Moreover, Carelon's misrepresentations artificially inflated the market price of its product, causing Plaintiffs to pay more than they otherwise would have for premiums. As a direct and proximate result of the Defendant's unfair and deceptive acts and practices, Plaintiffs suffered injury by paying insurance premiums but failing to receive commensurate benefits.

## CLASS ACTION ALLEGATIONS

257.   This action is brought by Plaintiffs individually and on behalf of a class (the "Class") pursuant to Federal Rule of Civil Procedure 23(a) and (b).

258.   Plaintiffs seek certification of the following Class:

> All persons who are currently, or were previously, enrolled in the NYSHIP Plan at any point from 2019 through the date of class certification, who attempted to use Carelon's (or Beacon Health Options') directory of mental health providers.

259. Excluded from the Class are the Defendant's officers, directors, employees, co-conspirators, and legal representatives, and any judge, justice, or judicial officer to whom the litigation is assigned.

260. Plaintiffs reserve the right to amend or modify the class definition.

261. **Numerosity.** The Class consists of many thousands of state and municipal employees, retired employees under 65, and their dependents that are or have been members of the NYSHIP plan, and is thus so numerous that joinder of all members is impracticable. The exact number and identity of class members is unknown to Plaintiffs at this time but can be ascertained through appropriate discovery.

262. **Commonality and predominance.** This action is appropriate as a class action because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include, but are not limited to, the following:

a) whether the Defendant breached its contractual obligations by failing to comply with the No Surprises Act and/or other statutes, regulations, and rules with which the Defendant is contractually obligated to comply;

b) whether the Defendant's representations and/or omissions with respect to the NYSHIP plan were false or misleading under New York General Business Law ("GBL") §§ 349 and/or 350, New York Insurance Law § 4226(a), and/or common law;

c) whether the Defendant's violations of law were willful and knowing;

d) whether the Defendant's mental health provider directory was inaccurate and/or inadequate;

e)      whether the Defendant failed to disclose to members and prospective members that the provider directory was inaccurate and/or inadequate;

f)      whether a reasonable consumer would be misled by the Defendant's acts and practices;

g)      whether Plaintiffs and Class members are entitled to receive specific types of relief such as actual damages, and the methodology for calculating those damages;

h)      whether Plaintiffs and Class members conferred a benefit on Carelon through enrollment in the NYSHIP plan, payment of premiums, and not utilizing in-network providers or otherwise not obtaining mental health care; and

i)      whether equity and good conscience require restitution to Plaintiffs and Class members and/or the establishment of a constructive trust, and the amount of such restitution or constructive trust.

263.   **Typicality.** The claims asserted by the Plaintiffs are typical of the claims of the Class. At all relevant times, the Defendant's provider directory was inadequate and inaccurate, and all Class members' claims arise out of this common source of misrepresentations and omissions. Plaintiffs, like all Class members, were subject to deceptive and misleading representations and omissions found in the Defendant's provider directory, and other marketing and plan documents about the comprehensiveness of mental health coverage and the provider network. Plaintiffs' interests coincide with, and are not antagonistic to, those of the other Class members, and Plaintiffs have been damaged by the same wrongdoing set forth in this Complaint.

264.   **Adequacy of representation.** The Plaintiffs will fairly and adequately protect the interests of the Class and do not have any interests antagonistic to those of the Class members. Plaintiffs have retained counsel competent and experienced in class actions and health insurance

and consumer protection litigation, who are competent to serve as Class counsel. Plaintiffs and their counsel will fairly and adequately protect the interest of the Class members.

265. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a) given the complexity of issues involved in this action, the expense of litigating the claims, and the money at stake for any individual Class member, few, if any, Class members could afford to seek legal redress individually for the wrongs that the Defendant has committed against them;

b) the prosecution of thousands of separate actions by individual members would risk inconsistency in adjudication and outcomes that would establish incompatible standards of conduct for the Defendant and burden the courts;

c) when the Defendant's liability has been adjudicated, claims of all Class members can be determined by the Court;

d) this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

e) without a class action, many Class members would continue to suffer injury while the Defendant retains the substantial proceeds of its wrongful conduct; and

f) this action does not present any undue difficulties that would impede its management by the Court as a class action.

266. **Ascertainability.** The identities and addresses of Class members can be readily ascertained from business records maintained by the Defendant, and/or self-authentication. The precise number of class members, and their addresses, can be ascertained from the Defendant's

records. Plaintiffs anticipate providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to court order.

267. Plaintiffs request that the Court afford Class members with notice and the right to opt out of any Class certified in this action.

## FIRST CAUSE OF ACTION

### Breach of Contract

268. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

269. A contract exists between New York State and Carelon to provide mental health benefits to people eligible to receive health insurance benefits under the NYSHIP program. Prior to March 2023, the contract was with Beacon Health Services, which changed its name to Carelon in March 2023.

270. Plaintiffs, as state and municipal employees eligible to participate in the NYSHIP plan, are intended third-party beneficiaries of a contract between the state and the Defendant. Like any insurer and insured, the Defendant and Plaintiffs also have a direct contractual relationship. The terms of that direct contractual relationship are governed by the insurance materials provided by the Defendant.

271. The contract requires the Defendant to comply with the No Surprises Act, among other federal laws, including sections 2799A–1, 2799A–2, 2799A–3, 2799A-4, 2799A-5, 2799A–7, and 2799A–8 of the Public Health Service Act; sections 716, 717, 718, 719, 720, 722, and 723 of the Employee Retirement Income Security Act of 1974; and sections 9816, 9817, 9818, 9819, 9820, 9822, and 9823 of the Internal Revenue Code of 1986.

272. Plan members, i.e. Plaintiffs and the Class members, are mentioned throughout the Contract.

- 68 -

273.    Sections 2799A-5 of the Public Health Service Act, 720 of the Employee Retirement Income Security Act of 1974, and 9820 of the Internal Revenue Code of 1986 require health insurers to verify and update their provider directories not less frequently than once every 90 days, remove a provider from the directory when they are unable to verify the directory information for that provider, and update the directory within two days of receiving new information from a provider.

274.    The Defendant's failure to maintain an accurate directory of in-network providers violates the requirements in the Employee Retirement Income Security Act and Internal Revenue Code, and was thus a breach of the contract between Carelon/Beacon Health Services and New York State.

275.    The Defendant has violated the above laws (and, by extension, its contractual obligations to Plaintiffs and the Class) by, among other things, failing to ensure mental health network adequacy and failing to consistently provide an accurate network directory.

276.    Members of the Class (including Plaintiffs) were damaged in several ways. The following is a non-exhaustive list of the types of damage incurred. First, they did not receive the benefits they were entitled to as members of the plan, and for which they paid premiums: they could not find in-network providers. Second, they used out-of-network providers and paid those providers' out-of-network fees for care. Even after the plan reimbursed them the out-of-network allowed amount, these members typically incurred hundreds of dollars in out-of-pocket cost each time they received treatment – a cost far above their expected co-pay amount. Third, they abandoned their search for care, paying a premium for a service they were supposed to receive and did not, and incurring pain and suffering due to the unsuccessful provider search and their inability to receive treatment.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

277.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

278.   The contract between New York State and the Defendant is a binding and enforceable contract, and Plaintiffs are intended third-party beneficiaries of that contract. Plaintiffs and the Defendant also have a direct contractual relationship.

279.   The contract includes an implied covenant, actionable in contract, that the Defendant will act in good faith and deal fairly with Plaintiffs.

280.   Defendant materially breached the implied covenant in several respects, including but not limited to the following:

  a)  Defendant has failed to make a good-faith effort to maintain an up-to-date network directory;

  b)  Defendant has failed to maintain, and failed to make a good-faith effort to maintain, an adequate network of providers;

  c)  Defendant has presented providers as being in-network that were not, in fact, in-network; and

  d)  Defendant has denied claims and/or failed to pay claims for providers that were listed as in-network in the directory.

281.   The Defendant's breaches were conscious and deliberate acts, which were designed to and did unfairly frustrate the agreed common purposes of the contract and which disappointed Plaintiffs' and the Class's reasonable expectations by denying Plaintiffs and the Class the benefits of the contract.

282. As a direct and proximate cause of the Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages including, but not limited to, damages incurred for having to pay for services and claims that should have been covered by the insurance contract.

### THIRD CAUSE OF ACTION

**Deceptive acts and practices in violation of the
New York Deceptive Acts & Practices Act, N.Y. Gen. Bus. Law ("GBL") § 349**

283. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

284. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against the Defendant for violations of GBL § 349.

285. GBL § 349 imposes liability on anyone who engages in "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service" in New York.

286. Plaintiffs are "persons" under GBL § 349(h).

287. The Defendant's actions as set forth herein occurred in the conduct of business, trade, or commerce under GBL § 349(a).

288. The Defendant has engaged in consumer-oriented conduct that has misled and harmed Plaintiffs and Class members in New York. The actions and practices alleged herein were directed at consumers of health insurance and were therefore consumer-oriented.

289. In the course of business, the Defendant made deceptive affirmative misrepresentations and omissions to Plaintiffs and the Class by publishing and disseminating misleading informational and marketing materials prior to and during the open enrollment periods. The provider directory itself, on which members and prospective members are directed

to rely, inflates and misleads consumers regarding the size of the network and the availability of mental health providers.

290. False representations include, *inter alia*, that Carelon has an adequately sized network; that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers; and that mental health care coverage is comprehensive.

291. Omitted and concealed from the Defendant's representations were material and relevant facts that Plaintiffs and Class members would have used in selecting their health insurance plan, including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to be made to find appropriate mental health care.

292. These representations and omissions, when considered as a whole from the perspective of a reasonable consumer, conveyed that the Defendant's provider directory was accurate and broad, and that mental health care would be covered. A reasonable consumer would attach importance to such representations and would be induced to enroll in such a plan.

293. The misrepresentations and omissions alleged herein were materially misleading.

294. The acts and practices alleged herein are deceptive acts and practices covered under GBL § 349 and have caused Plaintiffs and Class members significant ascertainable monetary and non-monetary injuries. Among other injuries, the Defendant's deceptive acts and practices have caused millions of dollars in damages; forced Plaintiffs and Class members to delay and forgo crucial and necessary mental health care; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiffs and Class

members to reduce spending on necessities and other life costs; prevented Plaintiffs and Class

members from making informed financial and health care decisions; and caused Plaintiffs and

Class members to suffer severe emotional and psychological distress.

295.  The Defendant willfully and knowingly violated GBL § 349. Its effort to include

affirmative misrepresentations and omissions in its marketing materials and provider directory

was in its financial interests to market its plan as comprehensive, including mental health

coverage, to induce individuals to choose Carelon over other plans.

## FOURTH CAUSE OF ACTION

### False advertising in violation of the
### New York False Advertising Act, N.Y. Gen. Bus. Law § 350

296.  Plaintiffs incorporate by reference all allegations in this Complaint and restate them

as if fully set forth herein.

297.  Plaintiffs bring this claim individually and on behalf of the members of the

proposed Class against the Defendant for violations of the New York False Advertising Act,

GBL § 350.

298.  GBL § 350 imposes liability on anyone who uses false advertising in the conduct of

any business, trade, or commerce, or in the furnishing of any service in New York. "False

advertising" includes "advertising, including labeling of a commodity … if such advertising is

misleading in a material respect," taking into account "the extent to which the advertising fails to

reveal facts material in light of … representations [made] with respect to the commodity … ."

GBL § 350-a(1).

299.  The Defendant's actions as set forth herein occurred in the conduct of business,

trade, or commerce under GBL § 350.

300. The Defendant has engaged in consumer-oriented conduct that has misled and harmed Plaintiffs and Class members in New York. The actions and practices alleged herein were directed at consumers of health insurance and were therefore consumer-oriented.

301. A cause of action based upon false advertising is appropriate because the Defendant utilized false advertising to mislead Plaintiffs and the Class about the nature and coverage of Carelon.

302. In the course of business, the Defendant falsely advertised the NYSHIP plan to Plaintiffs by publishing and disseminating misleading informational and marketing materials prior to and during the open enrollment periods, including Carelon's online resource. The provider directory itself, on which members and prospective members are directed to rely, misleads consumers regarding the adequacy and size of the Defendant's network and the availability of mental health providers.

303. False representations include that Carelon has an adequately sized network; that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers; and that the mental health care coverage is comprehensive.

304. Omitted and concealed from the representations were material and relevant facts that Plaintiffs and Class members would have used in selecting their health insurance plan, including the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to be made to find appropriate mental health care.

305. These representations and omissions, when considered as a whole from the perspective of a reasonable consumer, conveyed that the Defendant's provider directory was accurate and broad, and that mental health care would be covered. A reasonable consumer would attach importance to such representations and would be induced to enroll in such a plan.

306. The false advertising alleged herein was materially misleading.

307. The acts and practices alleged herein constitute false advertising covered under GBL § 350 and have caused millions of dollars in damages; forced Plaintiffs and Class members to delay and forgo crucial and necessary mental health care; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress.

308. The Defendant willfully and knowingly violated GBL § 350. Its effort to include affirmative misrepresentations and omissions in its marketing materials and provider directory was in its financial interests to market the NYSHIP plan as comprehensively including mental health coverage to induce individuals to choose its plan over other plans.

## FIFTH CAUSE OF ACTION

### Violation of New York Insurance Law § 4226

309. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

310. Insurance companies have a statutory obligation to provide accurate and complete information about their health care plans. Specifically, New York Insurance Law § 4226(a)(1) states in pertinent part: "No insurer authorized to do in this state the business of … health insurance … shall … issue or circulate, or cause or permit to be issued or circulated on its

behalf, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts."

311. The Defendant is liable under Section 4226 because (1) it is authorized to provide health insurance in New York; (2) it misrepresented to Plaintiffs and Class members that they would have comprehensive access to in-network mental health care, including that the mental health providers listed on the provider directory accepted its insurance plan, that these providers would be accessible and available, and more; (3) the misrepresentations were material; (4) the Defendant knew that it had misrepresented the terms, benefits, and advantages of its plan and has long been on notice of its provider directory deficiencies; (5) the Defendant knew that its online resource, and other documents containing the misrepresentations, would be communicated to the Plaintiffs and Class members, directly and indirectly; (6) Plaintiffs and Class members received such documents and learned of the misrepresentations, directly and indirectly; (7) the Defendant did not abide by its representations; and (8) Plaintiffs and Class members were thereby injured.

312. The Defendant issued statements via its website, its "Find a Provider" online directory, and other documents that materially misrepresented—through affirmative misstatements as well as omissions—the comprehensiveness of the NYSHIP plan and mental health care coverage.

313. These misrepresentations were material because network breadth and access to in-network mental health providers are an important feature of a health insurance plan, which influences health care enrollment decisions.

314. Plaintiffs and Class members have suffered economic and non-economic injuries as a result of the Defendant's misconduct. Among other injuries, the Defendant's deceptive acts and practices have caused millions of dollars in damages; forced Plaintiffs and Class members to

delay and forgo crucial and necessary mental health care; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress.

315.   These violations of New York Insurance Law § 4226(a) were intentional and the Defendant knowingly received premiums and other compensation as a result of such violations.

## SIXTH CAUSE OF ACTION

### Fraudulent Misrepresentation

316.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

317.   Insurance companies have a statutory obligation to provide accurate and complete information about their health care plans.

318.   The Defendant made deceptive affirmative misrepresentations and omissions to Plaintiffs and Class members by publishing and disseminating misleading informational and marketing materials prior to and during the open enrollment periods. The Defendant's misrepresentations were conveyed in Carelon's "Find a Doctor" online resource. The provider directory itself, on which members and prospective members are directed to rely, inflates and misleads consumers regarding the size of the network and the availability of mental health providers.

319.   The omissions from these same resources were any reference to the limited number of mental health providers who are actually in-network with Carelon and actually accepted the NYSHIP insurance, or to the fact that members and prospective members have to utilize out-of-network providers—and incur substantial costs—should they need mental health services.

- 77 -

320. False representations include, *inter alia*, that Carelon has an adequate network; that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers; and that mental health care coverage is comprehensive.

321. Omitted and concealed from the representations were material and relevant facts that Plaintiffs and Class members would have used in selecting their health insurance plan, including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to find appropriate mental health care.

322. These representations and omissions were intended to, and did, induce reliance by Plaintiffs and Class members as to the services and benefits that would be delivered to them as a result of choosing Defendant's plan.

323. Plaintiffs and Class members justifiably relied on Defendant's representations and omissions.

324. These representations and omissions, when considered as a whole from the perspective of a reasonable consumer, conveyed that the Defendant's provider directory was accurate and broad, and that mental health care would be covered. A reasonable consumer would—and Plaintiffs and Class members did—attach importance to such representations and would be induced to enroll in such a plan.

325. These misrepresentations and omissions alleged herein were intentional and materially misleading.

326. These misrepresentations and omissions have caused Plaintiffs and Class members significant ascertainable monetary and non-monetary injuries. Among other injuries, the Defendant's misrepresentations and omissions have caused millions of dollars in damages; forced Plaintiffs and Class members to delay and forgo crucial and necessary mental health care; caused Plaintiffs and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress.

327. The Defendant willfully and knowingly made the false representations and omissions alleged herein. Its effort to include affirmative misrepresentations and omissions in its marketing materials and provider directory was undertaken intentionally to induce individuals to choose its plan over other plans, thus increasing its profits.

<div align="center">

**SEVENTH CAUSE OF ACTION**

**Negligent Misrepresentation**

</div>

328. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

329. The contract between New York State and the Defendant is a binding and enforceable contract, and Plaintiffs are intended third-party beneficiaries of that contract. Plaintiffs and the Defendant also have a direct contractual relationship.

330. Insurance companies have a statutory and common law duty to provide accurate and complete information about their health care plans.

331. Nevertheless, the Defendant fails to provide accurate information with regard to the size and identities of participants in its provider network.

332.   Defendant's false representations include, *inter alia*, that it has an adequately sized network; that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers; and that mental health care coverage is comprehensive.

333.   Omitted and concealed from the Defendant's representations were material and relevant facts that Plaintiffs and Class members would have used in selecting their health insurance plan, including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to be made to find appropriate mental health care.

334.   Plaintiffs and the Class justifiably relied upon the information that the Defendant provided.

335.   The Defendant has not used reasonable care or competence in communicating an accurate list of its provider directory, or any of the information described above.

336.   As a direct and proximate cause of the Defendant's negligent misrepresentations, Plaintiffs and the Class have sustained damages, including, but not limited to, damages due to delaying and forgoing crucial and necessary mental health care; increased healthcare costs; out-of-pocket expenses for out-of-network provider payments; and severe emotional and psychological distress.

## EIGHTH CAUSE OF ACTION

### Unjust Enrichment

337.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

338.   The Defendant has been and continues to be significantly and unjustly enriched because of its inaccurate and inadequate mental health provider network. Because it portrayed its network as comprehensive, individuals selected its plan. These deceptive representations attracted increased membership, thereby increasing the Defendant's market share and profits.

339.   Plaintiffs and Class members have conferred a benefit on the Defendant by enrolling in its health insurance plan and thereby directing their medical premiums to the Defendant.

340.   Plaintiffs and Class members have further conferred a benefit on the Defendant because the Defendant's inaccurate and inadequate network forces Plaintiffs and Class members to pay a portion of the mental health care expenses that the Defendant represented would be covered. Effectively, the Defendant represents that its insurance broadly covers mental health care, yet its bait-and-switch tactics ensure that it does not pay the full costs of actually covering mental health care services.

341.   The Defendant has thus enriched itself by reaping the benefits of increased membership, while reducing or eliminating its own coverage, reimbursement, and other financial duties. This and other benefits were obtained at the expense of Plaintiffs and Class members, who did not receive the full value of what the Defendant promised.

342.   In addition, the Defendant's inflated mental health provider network makes it appear that it complies with statutory and regulatory requirements that its provider network be sufficient, adequate, and accurate, thereby saving it the costs of actual compliance with these requirements—shielding it from government investigation, and the associated costs, at the expense of its members.

343. An unjust enrichment cause of action is appropriate because the Defendant failed to make restitution to Plaintiffs and Class members for the economic and non-economic harms, including out-of-pocket costs unjustly incurred, and more.

344. It is inequitable and unjust for the Defendant to retain the benefits from falsely portraying its provider network in a way that increases enrollment while decreasing the Defendant's obligations to do exactly what it says it will with respect to providing coverage for mental health treatment.

345. These expenses and inconveniences should have been borne by the Defendant.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered as follows:

a.  declaring that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing the undersigned counsel as Class Counsel;

b.  awarding all injunctive relief permitted by law or equity;

c.  awarding compensatory damages, restitution, disgorgement, and any other relief permitted by law or equity;

d.  awarding statutory damages and penalties in addition to actual damages;

e.  awarding treble damages;

f.  awarding punitive damages in an amount deemed appropriate by the Court;

g.  awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

h.  awarding Plaintiffs reasonable attorneys' fees and costs; and

i.  awarding Plaintiffs and the Class such other relief as this Court may deem just and proper under the circumstances.

* * *

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: April 28, 2025

**POLLOCK COHEN LLP**

By: /s/ *Steve Cohen*
Steve Cohen
Anna Menkova
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
Scohen@PollockCohen.com

**WALDEN MACHT HARAN & WILLIAMS LLP**

By: /s/ *Jacob Gardener*
Jacob Gardener
250 Vesey St., 27th Floor
New York, NY 10281
(212) 335-2965
jgardener@wmhwlaw.com

*Attorneys for Plaintiffs*

# Exhibit A-1

**NEW YORK STATE DEPARTMENT OF CIVIL SERVICE**

**and**

**CARELON BEHAVIORAL HEALTH, INC.**

**AGREEMENT NO**. **C000743**

This Agreement ("Agreement" or "Contract") is entered into by and between New York State Department of Civil Service ("Department" or "DCS"), having its principal office at the Empire State Plaza, Albany, NY, 12239 and Carelon Behavioral Health, Inc. ("Contractor"), a corporation authorized to do business in the State of New York with a principal place of business located at 200 State Street, Suite 302, Boston, MA 02109. The foregoing are collectively referred to as "the Parties".

**WITNESSETH**

**WHEREAS,** Civil Service Law Article XI authorizes and directs the President of the Civil Service Commission and New State Department of Civil Service ("President") to establish a health benefit plan for the benefit of State Employees, Retirees, and their Dependents, and for the benefit of Participating Employers' Employees, Retirees, and their Dependents; and

**WHEREAS**, New York State, through DCS, administers the New York State Health Insurance Program (NYSHIP) to provide essential behavioral health insurance protection to eligible New York State (NYS) employees, retirees, and their Eligible Dependents enrolled in the Empire Plan, Excelsior Plan, and Student Employee Health Plan; and

**WHEREAS,** the Department issued a Request for Proposal ("RFP") entitled "Mental Health and Substance Use (MHSU) Disorder Program" on March 1, 2023, which was amended on April 24, 2023, to secure the services of a qualified organization to administer the Mental Health and Substance Use (MHSU) Disorder Program; and

**WHEREAS**, the Contractor submitted a proposal in response to the RFP; and

**WHEREAS,** after thorough review and evaluation by NYS of proposals received in response to the RFP, the Contractor's Proposal was selected as representing the best value to the State; and

**WHEREAS,** the Department, in reliance upon the expertise of the Contractor, desires to engage the Contractor to deliver the MHSU Disorder Program Administration Services, pursuant to the terms and conditions set forth in this Agreement.

**NOW THEREFORE,** in consideration of the mutual covenants and provisions contained herein, the Parties agree as follows:



## SECTION I:    TERM

The Contract will take effect and commence upon approval of the Contract by the New York State Office of the State Comptroller (OSC) (Effective Date).  The term of the Contract is five years which shall begin on the: "Full MHSU Project Services Start Date" or "Project Services Start Date" and end on December 31, 2028 (End Date).  [Note: The "Full MHSU Project Services Start Date" or "Project Services Start Date" is January 1, 2024.]

In accordance with New York State policy and New York State Finance Law section 112(2), the resulting contract is deemed executory until it has been approved by the New York State Attorney General's Office (AG) and approved and filed by the New York State Office of the State Comptroller (OSC).

## SECTION II:    INTEGRATION, MERGER AND ORDER OF PRECEDENCE

2.1    The Agreement shall be composed solely of the following documents which, in the event of an inconsistency or conflicting terms, shall be given precedence in the order indicated:

    2.1.1    Appendix A (Standard Clauses for All New York State Contracts), dated June 2023, attached hereto, is hereby expressly made a part of this Contract as fully as if set forth at length herein;

    2.1.2    Any Amendments to the body of the Agreement;

    2.1.3    The body of the Agreement (that portion preceding signatures);

    2.1.4    Appendix B (Standard Clauses for all Department Contracts), dated April 2022, attached hereto, is hereby expressly made a part of this Contract as if fully set forth herein;

    2.1.5    Appendix C (New York State Department of Civil Service Information Security Requirements), dated April 2022, attached hereto, is hereby expressly made a part of this Contract as if fully set forth herein;

    2.1.6    The following Attachments are incorporated by reference to the body of the Agreement:

        a.    Attachment 1: Department's Official Responses to Contractors' Questions raised concerning the RFP, dated April 12, 2023;

        b.    Attachment 2: the Amended Request for Proposal, released on March 1, 2023, entitled, "Mental Health and Substance Use (MHSU) Disorder Program", as amended on April 12,2023, except for Appendix A (Standard Clauses for all New York State Contracts), which incorporates any appendices, attachments, exhibits, amendments, and updates to said RFP;

     c. Attachment 3: "Contract Fees", which consists of the Contractor's Fees for Project Services and the Non-Network Reimbursement Schedule; and

     d. Attachment 4, which consists of:

        i. Contractor's Technical Proposal dated May 3, 2023; and

        ii. Contractor's Response to Questions from the Technical Management Interview, dated May 30, 2023, including Contractor's submission of Additional Network Provider Report.

2.2    Only documents expressly enumerated above shall be deemed a part of the Agreement, and references contained in those documents to additional Contractor documents not enumerated above shall be of no force and effect.

2.3    All prior agreements, representations, statements, negotiations, and undertakings are superseded.  All statements made by the Department shall be deemed to be representations and not warranties.

2.4    The Department rejects all bid deviations or extraneous terms submitted by the Contractor not expressly accepted herein.

2.5    Nothing contained in this Agreement, expressed, or implied, is intended to confer upon any person, corporation, or other entity, other than the Parties hereto and their successors in interest and assigns any rights or remedies under or by reason of the Agreement.

2.6    The terms, provisions, representations, and warranties contained in the Agreement shall survive performance hereunder.

## SECTION III:    MODIFICATIONS AND CLARIFICATIONS

3.1    Section 5.4, Reporting Services has been modified from the original RFP requirement to clarify the ad hoc reporting process.

3.2    Section 5.5.1(c)(ii)(1) has been modified from the original RFP requirement to clarify that the Contractor is ultimately responsible for <u>working with the Network Provider</u> to ensure  that a Member receive the network level of benefits and obtaining all necessary authorizations.

3.3    Section 5.5.1(c)(ii)(2) has been modified from the original RFP requirement to clarify that the Contractor is responsible for ensuring that its Network Providers take responsibility for assisting the Member in obtaining an appropriate provider.

3.4    Section 5.13.1(a) has been modified from the original RFP requirement to add the ICD-10 codes.

3.5    Section 5.15 (a) has been modified from the original RFP requirement to clarify that the case will typically be reviewed against Medicare guidelines.

3.6     Section 11.2 (Information Classification) has been modified from the original RFP requirement to reflect the rescission of NYS Office Of Information Technology Standard (NYS-S14-003).

3.7     A new section 11.5, Substance Use Disorder Records, has been added below.

## SECTION IV:    LEGAL AUTHORITY TO PERFORM

4.1     The Contractor represents that it possesses the legal authority to perform Project Services in accordance with the terms and conditions of the Agreement.

4.2     The Contractor shall maintain appropriate corporate and/or legal authority, which shall include, but is not limited to, the maintenance of an administrative organization capable of delivering Project Services in accordance with the Agreement and the authority to do business in the State of New York or any other governmental jurisdiction in which the Project Services are to be delivered.

4.3     The Contractor shall provide the Department with prompt notice in writing of the initiation of any legal action or suit which relates in any way to the Agreement, or which may affect performance of the Contractor's duties under the Agreement.

## SECTION V:    PROJECT SERVICES

The Contractor will provide comprehensive administration of the MHSU Disorder Program which includes the following services (Project Services) being procured under this Contract:

5.1     Account Team

The Contractor must provide a knowledgeable, experienced account leader and team dedicated solely to the MHSU Disorder Program who have the responsibility and authority to command the appropriate resources necessary to implement and deliver Project Services (hereinafter "Account Team").

5.1.1   The Account Team must respond to any and all administrative and clinical concerns and inquiries posed by the Department, other staff on behalf of the Council on Employee Health Insurance, or union representatives regarding Member-specific claims issues within two Business Days to the satisfaction of the Department.

5.1.2   The Contractor must guarantee that the MHSU Disorder Program complies with all legislative and statutory requirements. In the event the Contractor is unable to comply with any legislative or statutory requirements, the Department must be notified in writing immediately.

5.1.3   The Contractor must ensure that its Account Team immediately notifies the Department of actual or anticipated events impacting MHSU Disorder Program costs and delivery of services to Enrollees and their dependents, including proposed legislative or statutory requirements. Enrollee, for purposes of this Contract, is defined as the policyholder.

5.1.4   The Contractor will have a process for the Account Team to gain immediate access to corporate resources and senior management necessary to meet all MHSU Disorder Program requirements and deal immediately with any issues that may arise.

5.2     Implementation Plan

5.2.1   The Contractor must deliver an overall Implementation Plan and designate an Implementation Team composed of individuals who have completed an implementation for a least one large client.  A large client is considered any Employer with at least 50,000 covered lives.  Implementation activities must be completed prior to the Project Services Start Date, so that MHSU Disorder Project Services can commence on the Project Services Start Date.

5.2.2   The Implementation Plan must include evaluation and assessment activities and development of a project plan to achieve Contract requirements and deliver the Project Services.

5.2.3   The Contractor must, by the Project Services Start Date, be operationally ready as described by, but not limited to, the following:

  a.  The Contractor must have a contracted Provider network in place, that meets or exceeds the required access standards set forth in Section 5.10 of this Contract.

  b.  The Contractor must have a fully operational, dedicated Call Center, including a Clinical Referral Line, available for the use of Members and health benefits administrators.  As detailed in Section 5.5.1(b), the dedicated Call Center must be open and operational a minimum of 30 Calendar Days prior to the commencement of Full MHSU Disorder Project Services.  Members, for purposes of this Contract, are defined as all policyholders and their dependents.

  c.  The Contractor must accurately process all claims, as submitted.

  d.  The Contractor must have Clinical Management programs, as described in Section 5.12, operational and ready to support the MHSU Disorder Program as set forth in this Contract.

  e.  The Contractor must have a fully functioning, customized MHSU Disorder Program website available for a minimum of 30 calendar Days prior to the MHSU Project Services Start Date.

5.2.4   The Contractor must provide, subject to Department final approval, an Implementation Plan that results in the implementation of all services by the required timeframes, indicating estimated timeframes for individual task completion, testing dates and objectives, and areas where complications may be expected.  The Implementation Plan must include key activities such as training of call center staff, website development, network development, transition of

benefits, eligibility feeds and testing claims processing.  Also, it must identify and describe areas where complications may be expected and what steps Contractor will take to ensure timely implementation.

5.2.5   The Contractor shall provide a comprehensive Implementation Plan, at least 90 calendar Days prior to the MHSU Project Services Start Date, which will allow the Department to review the Contractor's readiness in the areas outlined in Section 5.3.1.

5.2.6   Implementation Guarantee: The Contractor must guarantee that all the tasks identified in the Department approved Implementation Plan identified above will be in place on or before the MHSU Project Services Start Date following completion of the Implementation Period, with the exception of opening the dedicated Call Center and completing work on the customized website. The dedicated Call Center must be opened, live and operational at least thirty calendar Days prior to the Full MHSU Project Services Start Date.  This guarantee is not subject to the limitation of liability provisions of the Contract.

5.3   Member Communication Support

5.3.1   The Department regularly provides information regarding Program benefits to Members through publications, the Department's website, media, and attendance at various meetings.  The Contractor is required to assist the Department with the creation, review, and presentation of MHSU Disorder Program materials that will enhance a Member's understanding of the MHSU Disorder Program benefits.

5.3.2   All Member communications developed by the Contractor are subject to the Department's review and prior written approval, including but not limited to any regular standardized direct communication with Members or their Physicians in connection with Member utilization or the processing of Member claims, either through mail, e-mail, fax, or telephone.  The Department in its sole discretion reserves the right to require any change it deems necessary.

5.3.3   The Contractor is responsible for providing Member communication services to the Department including, but not limited to:

   a. Developing language describing the MHSU Disorder Program for inclusion in the Empire Plan Certificate of Insurance, NYSHIP General Information Book, and any other form of communication, subject to the Department's review and approval;

   b. Developing articles for inclusion in Empire Plan Reports and other MHSU Disorder Program publications on an "as needed" basis;

   c. Timely reviewing and commenting on proposed MHSU Disorder Program communication material developed by the Department;

   d. Developing timely and accurate Summaries of Benefits Coverage (SBC), which will be consolidated with coverage information from other Program

administrators for the Empire Plan, the Excelsior Plan and the SEHP. Presently, the Department posts the SBCs on NYSHIP Online. Upon Member request, the Contractor must direct Members to the Department's website to view the SBC or distribute a copy of the SBC to the Member within the federally required period; and

    e.  Distributing MHSU Disorder Program materials to Members; including but not limited to annual mailings of summary plan documents. A Contractor shall have the ability to send member communication materials through both U.S. mail and email.

5.3.4   The Contractor must develop appropriate customized forms and letters for the MHSU Disorder Program, including but not limited to Member claim forms, Explanation of Benefits, Certification letters and appeal letters. The Department reserves the right to review and approve these communications prior to distribution.

5.3.5



5.3.6   The Contractor shall assist in developing the Empire Plan Participating Provider Directories on an annual basis as required by New York State Insurance Law §§ 3217-a(a)(17) and 4324(a)(17) and Public Health Law § 4408(r). Printed directories are provided for each State, except Florida which has two regional directories, as well as a separate directory for four different regions of New York State; Upstate, Long Island, Mid-Hudson, and New York City. The Contractor must provide a MHSU Disorder Program specific online directory that is functional and available 24 hours a Day, 7 Days a week, except for scheduled maintenance. The Contractor must provide a web link, for the Department's website, that is accessible to the general public and does not require Member log in. In addition to complying with the requirement of the Standard Clauses for All Department Contracts (Appendix B) and Information Security Requirements (Appendix C), this online directory must be branded consistent with all New York State branding protocols and provide Members with a user-friendly interface that allows them to search for Providers and Facilities, as indicated in the Empire Plan Certificates, Excelsior Plan and SEHP At A Glance (RFP Attachment 20), based on geographic location, name, or specialty. The directory must detail all MHSU Provider information as required by State and federal law. Information about all types of MHSU Providers in all geographic locations shall be accessible through this single link and search functions. The directory shall be updated weekly or more frequently, if necessary, to ensure Members have access to the most up- to-date information. The Contractor must ensure the directory contains the most up-to-date information regarding network MHSU Providers and Facilities, including if the MHSU Provider is accepting new patients. Presently, MHSU Providers can be found by accessing the Department's website at

Case 1:25-cv-03348-ER   Document 15-1   Filed 04/28/25   Page 93 of 890

http://www.cs.ny.gov (under Benefit Programs -NYSHIP online- choose a group, choose Empire Plan Enrollee, and then Find a Provider).

5.3.7   The Contractor is required to provide Member Program Benefit information through a link on the Department's website.  Content accessible through this link shall be strictly limited to information that pertains to the Program.  No other links or content are permitted on the Contractor's Program Benefits website without the written approval of the Department.  The Department shall be notified of all regularly scheduled maintenance or material modifications to the site no later than one Business Day prior to such maintenance being performed.



5.3.8   The fully functioning, customized MHSU Disorder Program Benefits website, approved and accepted by the Department, must be available a minimum of 30 calendar Days prior to the MHSU Project Services Start Date with a secure dedicated link from the Department's website with the ability to provide Members with online access to the specific website requirements as set forth in Section 5.3(1)(e) of this contract.  The website must conform to the New York State website style provided by the Department of Civil Service and meet all NYS Web Accessibility requirements.

5.3.9   The Contractor must include a web-based user interface compatible with:

a.   Google Chrome current version for Windows,

b.   Mozilla Firefox current version,

c.   Safari current version, and

d.   Microsoft Edge current version.

5.3.10 The websites must be mobile friendly, fully functional, and display correctly on devices such as:

    a.  Smartphones;

    b.  iPhones;

    c.  iPads;

    d.  Tablets; and

    e.  Laptops.

## 5.4    Reporting Services

The Contractor must provide the Department with regular, periodic reports that are designed to document that Member, network, and account management service levels are being maintained and that claims are being paid in accordance with the Contract.

The Contractor may on occasion be requested to provide ad-hoc reporting and analysis. The turnaround time will be based on complexity of the request and the need of the Department (i.e., urgency) as determined by the Department as follows:

1. Any re-runs to existing ad-hoc reports will be provided within one business day of the request.

2. A new ad hoc report request that has a low urgency, regardless of the effort, will be provided within five business days.

3. A new ad hoc report request with a high level of urgency, regardless of the effort, the Contractor will make best efforts to provide the report within one business day but no more than three business days.

4. For purposes of determining when the time begins to run on a request, the first business day is the day after the request by the Department is made, regardless of the time of the request. The report is required to be delivered by 5 PM EST on the pre-determined delivery date.

In order to fulfill its obligations to Members and ensure Contract compliance, the Contractor must provide accurate claims data information on a claim processing cycle basis as well as summary reports concerning the MHSU Disorder Program and its administration.

All electronic files must be in a format acceptable to the Department. The Department will initially review and approve the proposed file format during the Implementation Period, but this file format may be adjusted during the term of the Contract at the discretion of the Department. Upon receipt by the Department, all electronic files are first validated for compliance with the agreed-upon format. Files that fail to adhere to this structure are rejected in their entirety and must be re-submitted.

5.4.1 The Contractor is responsible for reporting services including, but not limited to:

a. Developing and delivering accurate and timely management, financial, and utilization reports as specified in Program Reporting (RFP Attachment 16). These reports will be delivered to the Department no later than their respective due dates and are required by the Department for its use in the review, management, monitoring, and analysis of the MHSU Disorder Program. The exact format (paper and/or electronic Microsoft Access, Excel, Word), frequency, and due dates for such reports will be specified by the Department;

b. Ensuring that all financial reports including claim reports are generated from amounts billed to each component of the MHSU Disorder Program and reconciled to amounts reported in quarterly and annual financial experience reports;

c. Reporting of all performance guarantees as specified within the Contract and for any occurrence when a performance guarantee is not met, Contractor will provide a root cause analysis and detail corrective action;

d. ███████████████████████████████████ The exact format, frequency, and due dates for such reports shall be specified by the Department. Any ad hoc report generated for the Department must be reflective of the Program's actual claims experience and Member population. Information required in the ad hoc reports may include, but is not limited to:

    i. Forecasting and trend analysis data;

    ii. Utilization data;

    iii. Utilization review savings;

    iv. Benefit design modeling analysis;

    v. Reports to meet clinical Program review needs;

    vi. Reports segregating claims experience for specific populations including Department assigned Benefit Programs (see Benefit Programs chart (RFP Attachment 18)); and

    vii. Reports to monitor Contract compliance.

e. Assisting and supporting the Department with all aspects of the premium rate development including, but not limited to:

    i. Providing a team of qualified and experienced individuals who are acceptable to the Department and who will assist and support the Department in developing premium rates consistent with the financial interests and goals of the MHSU Program and the State;

    ii. Developing projected aggregate claim, trend, and Administrative Fee amounts for each MHSU Program Year. Analysis of all MHSU Program components impacting the MHSU Program cost shall be performed including, but not limited to claims, trend factors, Administrative Fees, and changes in enrollment; and

    iii. Working with the Department and its contracted actuarial consultant through the annual premium renewal process to further document and explain any premium rate recommendation. This process includes presenting the premium rate recommendation to staff of the Department, Division of the Budget and OER.

## 5.5 Customer Service

The Plan requires that the Contractor provide quality customer service to Members. The Plan provides access to customer service representatives through the Empire Plan Consolidated Toll-Free Number. Through this Empire Plan Consolidated Toll-Free Number, Members and Providers access representatives who respond to questions, complaints, and inquiries regarding Plan benefits, Network Providers, clinical management programs, claim status and appeals.

    5.5.1 The Contractor will be responsible for all customer support and services including, but not limited to:

    a. Providing Members access to information on all MHSU benefits and services 24 hours a Day, 7 Days a week, 365 Days a year, through the Empire Plan Consolidated Toll-Free Number, which currently is 1-877-769-7447 (1-877-7NYSHIP).

    b. Maintaining a fully operational dedicated Call Center, including a MHSU Clinical Referral Line, providing all aspects of customer support and clinical services as set forth in Section 5.5 of this Contract. The dedicated Call Center must be open and operational a minimum of 30 calendar Days prior to the MHSU Project Services Start Date to assist Members with questions concerning transition. The Call Center line shall have the additional capability to transfer calls internally to the appropriate areas of the MHSU Disorder Program. The Call Center shall be staffed by trained customer service representatives (CSRs) available during the required customer service hours of operation.

    i. The Contractor must maintain a dedicated Call Center staffed by fully trained CSRs and supervisors providing direct access to trained Clinicians who direct Members to appropriate Network Providers who are accepting new patients, provide clinical MHSU information and if requested by the caller, assist in scheduling appointments on behalf of the Member 24 hours a Day, 7 Days a week, 365 Days a year.

    ii. CSRs must be able to identify calls requiring transfer to a Clinician and they must be trained and capable of responding to a wide range of questions, complaints, and inquiries, including but not

limited to: Transition of Care; MHSU Disorder Program benefits levels; status of Pre-certification requests; eligibility and claim status.

iii. The Contractor must provide access to a teletypewriter (TTY) number for callers utilizing a TTY device because of a hearing or speech disability. The TTY number must provide the same level of access to the Call Center as the non-TTY number.

iv. In accordance with federal and State law, the Contractor must provide access to a translation line or interpretation service to Members who do not read, speak, write, or understand English as their primary language in order to remove potential barriers to accessing services.

v. Customer service representative(s) must use an integrated system to log and track all Member calls. The system must track the total number of calls entering the Empire Plan Consolidated Toll-Free Number and the date, time, duration, and reason for all calls. The system must create a record of the Member contacting the call center, the call type, and all customer service actions and resolutions.

vi. The Contractor must maintain designated backup customer service staff with MHSU Disorder Program specific training to handle any overflow when the dedicated customer service center is unable to meet the Contractor's proposed customer service performance guarantees. This backup system would also be utilized in the event the primary customer service center becomes unavailable.

vii. The Contractor must prepare and enter into a shared service agreement with the toll-free vendor and the Empire Plan's medical carrier/third party administrator (currently UnitedHealthcare) to address billing and maintenance issues with the provision of the Empire Plan Consolidated Toll-Free Number.

viii. The Contractor must establish a process through which Providers can verify eligibility of Enrollees and Members during Call Center hours.

c. Members are strongly encouraged to seek clinical referrals prior to receiving MHSU services. This is accomplished through the use of a Clinical Referral Line (CRL), which must be operational and available to Members 24 hours a Day, 7 Days a week, 365 Days a year. The CRL is staffed by clinicians, 24 hours a Day, 7 Days a week, 365 Days a year, who determine the medical appropriateness of MHSU care and direct Members to the most appropriate Network Provider and level of care. The CRL is a menu option within the Contractor's telephone line. For purposes of the MHSU Disorder Program, a Clinician is a: Psychiatrist; Psychologist; licensed and registered clinical social worker; Licensed Marriage and Family Therapists; Licensed Mental Health Counselor;

Physician Assistant; Registered Nurse Clinical Specialist; Psychiatric Nurse/Clinical Specialist; Registered Nurse Practitioner; Applied Behavioral Analysis provider; Certified Behavioral Analyst; and Master Level Clinician.  To ensure that the resources available to Members are utilized for appropriate, medically necessary care, the Contractor is required to perform Pre- certification of care which includes, at a minimum:

i.  Use of a voluntary CRL to evaluate Member MHSU care needs and direct the Member to the most appropriate, cost-effective MHSU Providers and levels of care.  The CRL must be structured to facilitate a Clinician's assessment of the callers' MHSU treatment needs and provide suitable, timely referrals especially in emergency or urgent situations or for care that requires inpatient admission;

ii.  Use of alternate procedures to pre-certify care when the Member fails to call the CRL, as follows:

1)  When a Member contacts a Network Provider directly for treatment without calling the CRL, the Contractor is ultimately responsible for working with the Network Provider to ensure that a Member receive the network level of benefits and obtaining all necessary authorizations.

2)  When a Member contacts a Network Provider directly and the Network Provider is not the appropriate Provider to treat that Member, the Contractor is responsible for ensuring that its Network Providers take responsibility for assisting the Member in obtaining an appropriate provider.

3)  When a Member contacts an Out-of-Network Facility for treatment and the Contractor is notified in advance of the admission, the Contractor must provide the Member, or other HIPAA authorized representative of the Member, with a written determination of medical necessity of care in advance of the inpatient admission, where feasible.

iii.  Timely written notification to the Member, or other HIPAA authorized representative of the Member, of the potential financial consequence of remaining in an Out-of-Network Facility when the initial determination of medical necessity occurs;

iv.  Preparing and sending communications to notify Members and/or their MHSU Providers of the outcome of their Pre-certification or prior authorization request and notifying them in writing of the date through which MHSU Services are approved;

v.  Promptly loading into the clinical management and/or claims processing system approved authorizations determined by the Contractor;

vi. Pre-certifying inpatient hospital admissions for alcohol detox for facilities outside of New York State as permissible under DFS Circular No.14 (2017), advising the Facility to send the claim to the MHSU Program vendor and managing the Member's care if transferred to rehabilitative care;

vii. Upon denial of Pre-certification for Inpatient care, providing the Member with Facility options where the Member may receive the pre-certified lower level of care.  If the Member confirms with the Contractor which Facility is chosen, the Contractor is required to promptly notify the Facility of the Pre-certification of the lower level of care. The Contractor must follow-up with the Member and selected Facility within twenty-four hours to confirm that the lower level of care has commenced; and

viii. Loading into the Contractor's clinical management and/or claims processing system one or more files of Pre-certification approved-through dates from the incumbent contractor, prior to the Implementation Date once acceptable files are received.

## 5.6    Enrollment Management

Loading into the Contractor's clinical management and/or claims processing system one or more files of Pre-certification approved- through dates from the incumbent contractor, prior to the Implementation Date, once acceptable files are received; Enrollment Management

The Department currently utilizes a web-based enrollment system for the administration of employee benefits known as the New York Benefits Eligibility and Accounting System (NYBEAS).  NYBEAS is the source of eligibility information for all Empire Plan,  Excelsior Plan, and SEHP Members.  Enrollment information is outlined in Enrollment by Month (RFP Attachment 27), Total Empire Plan, SEHP, and Excelsior Enrollment by Age (RFP Attachment 28) and Covered Lives by Bargaining Unit or Other Group (RFP Attachment 29).

5.6.1   The Contractor must maintain accurate, complete, and up-to-date enrollment files, based on information provided by the Department.  In the case of conflict, the Contractor must agree that the Department-provided enrollment system information governs.  These enrollment files shall be used by the Contractor to process claims, provide customer service, identify individuals in the enrollment file for whom Medicare is primary, and produce management reports and data files.  The Contractor must provide enrollment management services including but not limited to:

a. Performing an initial enrollment load to commence upon receipt of the enrollment file from the Department during the Implementation Period. The file must be EDI Benefit Enrollment and Maintenance Transaction set 834 (ANSI x.12 834 standard) and be either 834 (4010x095A1) or 834 (005010x220), fixed- length ASCII text file, or a custom file format. The determination made by the Department;

b. Testing to determine if the initial enrollment file and daily enrollment transaction loaded correctly, and that the enrollment system interfaces with the claims processing system to accurately adjudicate claims. The Contractor shall submit enrollment test files to the Department for auditing, provide the Department with secure, online access required to ensure accurate loading of the MHSU Disorder Program enrollment data, and promptly correct any identified issues to the satisfaction of the Department;

c. Developing and maintaining an enrollment system capable of receiving, reading, interpreting, and storing secure enrollment transactions (Monday through Friday) and having all transactions loaded to the claims processing system within twenty-four hours of the release of a retrievable file by the Department. The Contractor shall, on a daily basis, manually review and load any transactions which did not process correctly from the daily ANSI x.12 834 standard 005010x220 file by reviewing the correct enrollment date maintained in the NYBEAS. The Contractor shall immediately notify the Department of each transaction that did not process correctly and any delay in loading enrollment transactions. In the event the Contractor experiences a delay due to the quality of the data supplied by the Department, the Contractor shall immediately load all records received (that meet the quality standards for loading) within twenty-four hours of their release, as required. The Department will release enrollment changes to the Contractor in an electronic format daily (Monday through Friday). On occasion, the Department will release more than one enrollment file within a twenty-four-hour period. The Contractor must be capable of loading all enrollment files within the twenty-four-hour performance standard. The format of these transactions will be in an EDI Benefit Enrollment and Maintenance transaction set, utilizing an ANSI x.12 834 standard 005010x220 transaction set in the format specified by the Department. The latest transaction format is contained in NYBEAS Enrollment Record Layout - Transaction Set Header (RFP Attachment 19). The Contractor must also have the capability to receive alternate identification numbers and any special update files from the Department containing eligibility additions and deletions, including emergency updates if required;

   i. Ensuring the security of all enrollment information, as well as the security of a HIPAA compliant computer system, in order to protect the confidentiality of data contained in the enrollment file. Any transfers of enrollment data within the Contractor's system or to external parties must be completed via a secured process, compliant with the information security requirements set forth in *Information Security Requirements* (Appendix C);

   ii. Providing a back-up system or have a process in place where, if enrollment information is unavailable, Members can obtain CRL services without interruption;

   iii. Cooperating fully with the Department or third parties on behalf of

the Department on any Department or State initiatives to use new technologies, processes, and methods to improve the efficiencies of maintaining enrollment data including any enrollment file conformance testing requested during the course of the Contract;

iv.   Maintaining a read-only connection to the Department-provided enrollment system for the purpose of providing the Contractor's staff with access to current MHSU Disorder Program enrollment information.  Contractor's staff must be available to access enrollment information through the Department-provided enrollment system, Monday through Friday, from 8:00 a.m. to 5:00 p.m., with the exception of holidays observed by the State as indicated on the Department's website;

v.   Meeting the administrative requirements for National Medical Support Notices.  A child covered by a Qualified Medical Child Support Order (QMCSO), (For eligibility requirements for a QMCSO see General Information Books referenced in RFP Section 1.3) or the child's custodial parent, legal guardian, or the provider of services to the child, or a New York State agency to the extent assigned the child's rights, may file claims and the Contractor must make payment for covered benefits or reimbursement directly to such party.  The Contractor will be required to store this information in its system(s) so that any claim payments or any other plan communication distributed by the Contractor, including access to information on the Contractor's Program Benefits website would go to the person designated in the QMCSO;

vi.   Sharing data with entities to be determined by New York State including, but not limited to, health benefits administrators for New York State agencies, PEs, and PAs;

vii.   Agreeing to the State-defined eligibility periods as they relate to waiting periods and duration of coverage as a member (See General Information Books referenced in RFP Section 1.3 for additional information on State-defined eligibility periods);

viii.   Administering insurance coverage for any employee and their Eligible Dependents whom the Department determines is eligible for coverage;

ix.   Adhering to the Option Transfer Period which shall be the period announced by the State to allow eligible Enrollees to join the plan, change coverage, or add eligible dependents;

x.   Providing the State with online access to their enrollment information in real-time;

xi.   Using the Department's enrollment and accounting system as the controlling system for Member enrollment and demographic

information;

 xii. Updating enrollment and eligibility information solely based on the 834 transaction file for the NYSHIP population;

 xiii. Agreeing to complete a full reconciliation between the Department's enrollment system and the Contractor's eligibility system monthly;

 xiv. Maintaining a dedicated team to manually review enrollment and eligibility transactions that do not upload to the Contractor's system and report transactions that did not process in a format acceptable to the Department within one Business Day of discovery;

 xv. Reporting to the Department data changes of name, date of birth, gender, or Medicare Beneficiary Identifier (MBI) from the federal Centers for Medicare and Medicaid Services (CMS) so that the Department can update its system as appropriate to report these changes on the eligibility enrollment file; and

 xvi. Reporting address changes made to the Contractor to the Department via a file. The Department will update its system as appropriate and report these changes on the 834 transaction file.

## 5.7 Claims Processing

The Contractor must process all Network Provider claims and out-of-network claims submitted under the MHSU Disorder Program, including but not limited to claims submitted manually, foreign claims, and Medicare primary claims, Medicaid, and Veterans Administration. The Contractor shall have the ability to process claims for the Empire Plan, the Excelsior Plan, and the SEHP, which have different benefit designs and different out-of-network payment methodologies. The claims processing system shall include controls to identify questionable claims, prevent inappropriate payments, and ensure accurate reimbursement of claims in accordance with the benefit design, MHSU Disorder Program provisions and negotiated agreements with MHSU Providers. The Contractor must coordinate benefits in order to prevent an overpayment and to avoid duplicate benefit payments so that total payment under the MHSU Disorder Program is not more than the MHSU Disorder Program's liability. For a detailed description of coordination of benefits under the Empire Plan, please see the Certificate included as Empire Plan Certificates, Excelsior Plan and SEHP At A Glance (RFP Attachment 20).

To be covered, Member submitted claims are required to be submitted to the Contractor no later than one hundred twenty Days after the end of the calendar year in which the service was rendered, or one hundred twenty Days after another plan processes the claim, unless it was not reasonably possible for the Member to meet this deadline. The Plan service counts, and net payments can be found in Empire Plan Historical Claims File (RFP Attachment 26).

5.7.1  The Contractor must provide all aspects of claims processing.  Such responsibility shall include but not be limited to:

    a.  Maintaining a claims processing center located in the Continental United States staffed by fully trained claims processors and supervisors;

    b.  Verifying that the MHSU Disorder Program's benefit design has been loaded into the system appropriately to adjudicate and calculate Cost-Sharing and other edits correctly.  The claims processing system must be capable of integrating and enforcing the various clinical management and utilization review components of the Plan including Pre-certification, concurrent review, and benefit maximums;

    c.  Assuming the costs for all customizations made by the Contractor to their claims processing system during the term of the Contract to accurately process claims for the MHSU Disorder Program;

    d.  Paying claims based on a definition of medical necessity, as defined in the Empire Plan Certificates, Excelsior Plan and SEHP At A Glance (RFP Attachment 20);

    e.  Developing and maintaining claim payment procedures, guidelines, and system edits (i.e., control measures to prevent unauthorized payments) that guarantee the accuracy of claim payments for covered expenses only, utilizing all edits as approved by the Department.  The Contractor's system must ensure that payments are made only for authorized services;

    f.  Maintaining claims histories for twenty-four months online and archiving older claim histories for a minimum of six years and the balance of the calendar year in which they were made with procedures to retrieve and load claim records easily;

    g.  Reversing all attributes of claim records processed in error;

    h.  Agreeing that all claims data is the sole property of the State. Upon the request of the Department, the Contractor shall share appropriate claims data with other Plan carriers and consultants for various programs (e.g., Other Clinical Management Programs) and the Department's Decision Support System (DSS) ████████████████████ The Contractor cannot share, release, or make the data available to third parties in any manner without the prior written consent of the Department;

    i.  Maintaining a backup system and disaster recovery plan for processing claims, compliant with the information security requirements set forth in *Information Security Requirements* (Appendix C), in the event that the primary claims payment system fails or is not available or accessible;

    j.  Analyzing and monitoring claim submissions to promptly identify errors, fraud, and/or abuse and reporting to the State, and appropriate

authorities. Such information shall be provided in a timely fashion in accordance with a State-approved process. The Plan shall be charged only for accurate (i.e., the correct dollar amount) claims payments for covered expenses. The Contractor will credit the MHSU Disorder Program the amount of any overpayments that Contractor agrees resulted from Contractor's (including subcontractors) error or fraud in the performance of Project Services. ███████████████████████ ███████████████████████████████████████████████ ███████████████████ The Contractor shall report fraud and abuse to the appropriate authorities. In cases of overpayments resulting from errors only found to be the responsibility of the State, or as a result of fraud and abuse by Members and/or Providers, the Contractor shall use reasonable efforts to recover any overpayments and credit 100% of any recoveries to the MHSU Disorder Program upon receipt;

k. Updating the claims adjudication system, twice a year, with FAIR Health, Inc.'s database of Reasonable and Customary amounts;

l. Providing Members with hardcopy Explanation of Benefits (EOBs) in accordance with New York State Insurance Law §3234 and §3235. An EOB is a statement received by the Member either by mail or electronically that provides claim payment detail. The Contractor shall also provide Members with access to electronic EOBs for network and Non-network claims via the Contractor's Program Benefits website. At a minimum, EOBs will include the following information:

   i. Type of service;

   ii. Enrollee's Name;

   iii. Provider of Service;

   iv. Date of service;

   v. Amount billed;

   vi. Amount plan paid;

   vii. Amount Enrollee owes;

   viii. Copayment, Deductible and Coinsurance responsibility;

   ix. Summary of In-Network Out-of-Pocket Limit;

   x. Summary of Out-of-Network Combined Annual Deductible;

   xi. Summary of Out-of-Network Combined Coinsurance Maximum;

   xii. Information about claims for Emergency Services and

Surprise Bills;

    xiii.   Information about the appeal process, including external appeal; and

    xiv.   Telephone number to call if Member has questions about claims.

m.  When the Plan is secondary to any other plan, reducing payment under the Empire Plan so that the total of all payments or benefits payable under the Empire Plan and the other plan is not more than the reasonable and customary charge for services received;

n.  Providing direct, secure access to the Contractor's claims system at Department offices, and any online web-based reporting tools, to authorized Department representatives;

o.  Developing and securely routing a MHSU daily claims file that reports claims incurred to date which have been applied to the Shared Accumulators between the Empire Plan Hospital Program, Medical Program and MHSU Disorder Program, using the Shared Accumulator File Layout (RFP Attachment 24) template;

p.  Loading a daily claims file from the Empire Plan medical carrier/third party administrator and hospital carrier that reports Shared Accumulators, using the Shared Accumulator File Layout (RFP Attachment 24) template;

q.  Participating in Medicare Crossover by entering into an agreement with the Empire Plan administrator to accept electronic claims data record files from the administrator for Empire Plan Members who have Medicare as their primary coverage. Claims data will only be sent to the Contractor for possible Empire Plan mental health and substance use outpatient claims which also involve Medicare coverage. The claims information sent from the administrator will include claims filed with CMS that should be considered by the Contractor for secondary coverage. The Empire Plan administrator will sort out any claims for benefits that are for mental health or substance use services and electronically forward the claim to the Contractor for consideration;

r.  Pursuing collection of up-to-date coordination of benefit information that is integrated into the claims processing system through a pursue and pay methodology and pursuing collection of any money due the MHSU Disorder Program from other payers or Members who have primary MHSU coverage through another carrier;

s.  Processing claims pursuant to Enrollees covered under the Disabled Lives Benefit. Disabled Lives Benefit means the benefits provided to an Enrollee who is Totally Disabled on the date coverage ends. The benefits are provided on the same basis as if coverage had continued with no change until the Day the Enrollee is no longer Totally Disabled or for ninety Days after the date the coverage ended, whichever is earlier.

> Totally Disabled means that because of a mental health/substance use disorder condition, the Enrollee, cannot perform his/her job or the Dependent cannot perform the normal activities of a person that age;

> t. Submitting a file including all processed claims to the Department's DSS vendor no later than twelve calendar Days following the end of each calendar month; and

> u. Integrating appeal decisions into the claims processing system.

5.8     Plan Audit and Fraud Protection

The protection of the MHSU Disorder Program assets must be a top priority of the Contractor. The Contractor must have a strong audit presence throughout its organization. Article 4 of New York State Insurance Law provides a framework and sets forth certain requirements related to fraud and fraud prevention. Throughout the term of the Contract, the Contractor shall provide fraud and abuse detection and prevention services at least at the same level and using the same tools, software, and techniques as used for its health insurance plans that are regulated by the New York State Department of Financial Services (DFS). If the Contractor has no such health insurance plans, the Contractor shall provide fraud and abuse detection and prevention services at least at the same level and using the same tools, software, and techniques as used for its health insurance plans that are regulated by the insurance department of another state. The Contractor is responsible for the recovery of benefit payments resulting from fraud and/or abuse to the extent possible.

5.8.1   The Contractor must conduct routine and targeted audits of Providers, including Facilities. Providers that deviate significantly from normal patterns in terms of cost, Current Procedural Terminology (CPT) coding or utilization are to be identified and targeted for on-site and desk audits in accordance with established selection and screening criteria. On-site audits must also be conducted upon request by the Department and/or OSC, or when information is received by the Contractor that indicates a pattern of conduct by a Provider that is not consistent with the MHSU Disorder Program's design and objectives. Any modifications to the proposed audit program must receive written prior approval by the State.

5.8.2   The Contractor must utilize payment integrity algorithms and software to monitor waste, fraud, and abuse in the Plan at no extra cost to the Department.

5.8.3   The Contractor must inform the Department in writing of any allegation or other indication of potential fraud and/or abuse identified within seven Business Days of receipt of such allegations or identification of such potential fraud and/or abuse. The Department must be fully informed of all fraud and/or abuse investigations impacting the Plan upon commencement, regardless of whether the individual fraud and/or abuse investigation has a material financial impact to the State.

5.8.4   The Contractor shall cooperate with all Department and/or OSC audits whether conducted by State staff or by a third party on the Department's or OSC's behalf.

Cooperation shall be consistent with the requirements of *Standard Clauses for New York State Contracts* (Appendix A), *Standard Clauses for All Department Contracts* (Appendix B), and *Information Security Requirements* (Appendix C), including the provision of access to protected health information and all other confidential information when required for audit purposes as determined by the Department and/or OSC as appropriate.  The Contractor must respond to all State (including OSC) audit requests for information and/or clarification within fifteen Business Days. The Contractor must perform timely reviews and respond within a period specified by the Department to preliminary findings submitted by the Department or the OSC audit unit in accordance with the contractual requirements.   Use of statistical sampling of claims and extrapolation of findings resulting from such samples shall be acceptable techniques for identifying claims errors.  The Contractor shall facilitate audits, including on-site audits, as requested by the Department or OSC.

5.8.5

5.8.6 The Contractor must agree that audit activity may include, but not necessarily be limited to, the following activities:

   a. Review of the Contractor's activities and records relating to the documentation of its performance under the Contract in areas such as determination of Enrollee or Dependent eligibility and application of various Department program administrative features (e.g., dependent survivor benefits, and reasonable adjudication of disabled dependent status);

   b. Comparison of the information in the Contractor's enrollment file to that on the enrollment reports issued to the Contractor by the Department; and

   c. Assessment of the Contractor's information, utilization, and demographic systems to the extent necessary to verify accuracy of data on the reports provided to the Department in accordance with Section 5.4 of this Contract.

5.8.7 The Contractor shall maintain and make available documentary evidence necessary to perform the reviews.  Documentation maintained and made available by the Contractor may include, but is not limited to, source documents, books of account, subsidiary records and supporting work papers, claim documentation, pertinent contracts, key subcontracts, provider agreements, and correspondence.

5.8.8 The Contractor shall make available for audit all data in its computerized files

that is relevant to and subject to the Contract. Such data may, at the Department's discretion, be submitted to the Department in machine-readable format, or the data may be extracted by the Department, or by the Contractor under the direction of the Department.

5.8.9 The Contractor shall, at the Department's request, and in a time period specified by the Department, search its files, retrieve information and records, and provide to the auditors such documentary evidence as they require. The Contractor shall make sufficient resources available for the efficient performance of audit procedures.

5.8.10 The Contractor shall comment on the contents of any audit report prepared by the Department and transmit such comments in writing to the Department within thirty Days of receiving any audit report. The response will specifically address each audit recommendation. If the Contractor agrees with the recommendation, the response will include a work plan and timetable to implement the recommendation. If the Contractor disagrees with an audit recommendation, the response will give all details and reasons for such disagreement. Resolution of any disagreement as to the resolution of an audit recommendation shall be subject to the Dispute Resolution provision set forth in Standard Clauses for All Department Contracts (Appendix B).

5.8.11 If the Contractor has an independent audit performed of the records relating to this Contract, a Certified copy of the audit report shall be provided to the Department within ten Business Days after receipt of such audit report by the Contractor.

5.9 Appeal Process

When claim benefits, requests for Pre-certification, or a utilization review results in a denial, Members or their Providers may appeal to the Contractor. The MHSU Disorder Program provides Members with two internal appeal levels and an external appeal process. The Contractor must also have a process in place to review out-of- network referrals and refer denials to external review. The Contractor shall comply with the requirements of the appeal process as prescribed by Article 49 of the New York State Insurance Law.

5.9.1 The Contractor must establish a formal appeals resolution procedure which includes the responsibility for notifying Members of their rights to appeal and the steps necessary for filing an appeal.

5.9.2 The Contractor must establish an expedited appeals resolution procedure to be followed if a Member or someone on behalf of a Member requests an urgent appeal review, where a delay in treatment could significantly increase risk to health, the ability to regain maximum function, or cause severe pain. Such appeals, by New York State Law, will be decided within no more than 72 hours upon receipt of appeal.

5.9.3 The Contractor's internal appeals processes must be consistent with New York State Insurance Law and DFS model language: https://www.dfs.ny.gov/apps_and_licensing/health_insurers/model_language.

5.9.4 The Contractor must respond to all External Appeals on behalf of the Department as requested by DFS through a process that provides an opportunity for Members to appeal when denied coverage on the basis that a service is not medically necessary or is an experimental or investigational service.

5.10 Provider Network

Provider Network means the Contractor's credentialed and contracted network of MHSU Providers. The Department expects the Contractor to maintain industry standards in the MHSU care delivery system to make quality care available while providing cost containment measures. NYSHIP currently monitors key quality and utilization metrics, supports value-based contracting, and participates in regional healthcare initiatives.

5.10.1 The Contractor's proposed network within NYS must meet the network adequacy standards as defined by the DFS. The Contractor must also provide 24 hours a Day, 7 Days a week, 365 Days a year access to a telemedicine service for behavioral health visits that Members can utilize online. The telemedicine portal must be accessible to members 24/7 for treatment, or referral to higher level of care when members have urgent or crisis-related episodes that cannot be addressed through the telemedicine portal.

5.10.2 In developing its proposed MHSU Provider Network, the Contractor is expected to use its best efforts to substantially maintain the composition of Network Providers included in the MHSU Disorder Program's current Provider Network. The Contractor's proposed MHSU Provider Network must be composed of a mix of the following professionals to meet the Members' needs: licensed and/or Certified psychiatrists and psychologists, licensed Masters Level Clinicians, Licensed Clinical Social Workers, Licensed Mental Health Counselors, Licensed Marriage and Family Therapists, Physician Assistants, Registered Nurse Clinical Specialists, psychiatric nurse/clinical specialists and registered nurse practitioners, Licensed Marriage and Family Therapists (LMFTs), Licensed Mental Health Counselors (LMHCs), Certified Behavioral Analysts, Applied Behavioral Analysis (ABA) Agencies, Structured Outpatient Programs and Partial Hospitalization Programs including: residential treatment centers, group homes, hospitals and alternative treatment programs such as day/night centers, halfway houses and treatment programs for dually diagnosed individuals (e.g., mental health diagnosis and substance use diagnosis). Programs Certified by the New York State Office of Addiction Services and Supports (OASAS) must be included in the MHSU Provider Network. The MHSU Provider Network must include Providers throughout New York State and in areas with high concentrations of active and/or retired employees living outside of New York State such that the network access guarantees established by the terms of the Contract are fully satisfied.

5.10.3 The Contractor shall monitor network physicians to ascertain if their practices are open or closed to new patients. Provider availability must be taken into account in relation to Member accessibility.

5.10.4 The Contractor must utilize value-based contracting strategies to enhance MHSU Provider performance and clinical outcomes.

5.10.5 The Contractor shall offer participation in its MHSU Provider Network to any Provider who meets the Contractor's credentialing criteria if the MHSU Provider is a high-volume provider or upon the Department's request where such inclusion is deemed necessary by the Department to meet the needs of Members, even if not otherwise necessary to meet the minimum access guarantees.

5.10.6 The Contractor may choose to enter into MHSU Disorder Program specific contracts that are contingent on award and/or utilize existing agreements that can be made applicable to the MHSU Disorder Program to meet the requirement that the Contractor has executed contracts with all the MHSU Providers included in the Contractor's proposed MHSU Provider Network on the Full MHSU Services Start Date.

5.10.7 The Contractor will be responsible for contracting with MHSU Providers as defined by the Empire Plan Certificates, Excelsior Plan and SEHP At A Glance (RFP Attachment 20) and credentialing according to Contractor guidelines and all applicable State and federal law, rules, and regulations. Contracts with MHSU Providers must be written to obtain competitive reimbursement rates while ensuring that MHSU Disorder Program access and quality guarantees are met. Such contracting services must include, but are not limited to:

  a. Ensuring that all MHSU Network Providers contractually agree to and comply with all of the MHSU Disorder Program's requirements and benefit design specifications;

  b. Ensuring that MHSU Network Providers accept as payment-in- full, the Contractor's contractual reimbursement for all claims for Covered Services, subject to the applicable MHSU Disorder Program Copayments;

  c. Negotiating Single Case Agreements with Out-of-Network MHSU Providers when the Contractor determines that it is clinically appropriate or to address guaranteed access issues;

  d. Contracting with MHSU Network Providers and negotiating pricing arrangements that optimize discounts, including the promotion of the value of care over volume;

  e. Notifying the Department, in writing, within one Business Day from the time Contractor received notice, if there is a substantial change to either the number, composition or terms of the Provider contracts utilized by the MHSU Disorder Program, even if access standards are still met; and

  f. Having adequate network management and staff to manage the network, handle Provider inquiries and ensure updated MHSU Provider information is entered into the Contractor's system and transmitted to the online directory. An adequate MHSU Provider relations staff must be

dedicated to New York State, where the majority of MHSU Disorder Program utilization occurs.

5.10.8 The Contractor shall negotiate agreements on a case-by-case basis with mental health practitioners licensed under Article 163 of the New York Education Law, when such MHSU Provider possesses a particular subspecialty that is clinically appropriate or to address access issues.

5.10.9 The Contractor must ensure that MHSU Providers are credentialed promptly, meet the licensing and quality standards required by the state in which they operate. The Contractor's credentialing organization must maintain NCQA or URAC Certification for credentials verification. Credentials shall be provided to the Department upon request.

5.10.10 The Contractor must have an effective process by which to confirm MHSU Providers continuing compliance with credentialing standards.

5.10.11 The Contractor must conduct a comprehensive quality assurance program which includes, but is not limited to:

    a. Monitoring the quality of care provided by MHSU Network Providers;

    b. Monitoring technical competency and customer service skills of MHSU network Provider staff;

    c. MHSU Network Provider profiling;

    d. Peer review procedures;

    e. Outcome and Quality Measurement analysis; and

    f. Maintaining an ongoing training and education program that will be offered to MHSU Network Providers.

5.11





5.13  Pre-Certification and Concurrent Review for Mental Health and Substance Use Disorder Services

The following services require Pre-certification under the MHSU Disorder Program:

    a.  Intensive Outpatient Program for mental health.

    b.  Structured Outpatient Program for substance use.

    c.  23-hour bed mental health/substance use disorder.

    d.  72-hour bed mental health/substance use disorder.

    e.  Outpatient detoxification.

    f.  Transcranial Magnetic Stimulation (TMS).

    g.  Applied Behavior Analysis (ABA).

    h.  Group home.

    i.  Halfway house.

j.   Residential treatment center mental health.

k.   Residential treatment center substance use.

l.   Partial hospitalization mental health.

m.  Partial hospitalization substance use.

Precertification is not required for OASAS-Certified Network Facilities located within New York State.

Mental health inpatient services for Children under 18 at a NYS Office of Mental Health facility does not require prior authorization, in accordance with DFS Circular No. 13 of 2019 https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2019_13.

The Concurrent Utilization Review process assists the Provider in identifying inpatient or outpatient care that is medically necessary and cost-effective, without compromise to the quality of care.  The Empire Plan Certificates, Excelsior Plan and SEHP At A Glance (RFP Attachment 20) includes information relative to Concurrent Review.

5.13.1  To safeguard Member health and ensure adherence with the MHSU Disorder Program's benefit design and requirements of Mental Health Parity and New York State regulations, the Contractor must administer a concurrent utilization review program in the Continental United States which:

a.   Uses Clinicians to review Provider treatment plans which must detail, at a minimum: past clinical and treatment history; current symptoms, functional impairment; and Diagnostic and Statistical Manual of Mental Disorders (DSM–V/ICD-10) diagnosis;

b.   Is conducted in a manner that is parity compliant as required by the federal Mental Health Parity and Addiction Equity Act (the "Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008", as set forth at 29 USC section 1185a), as amended from time to time;

c.   Is performed by the Contractor for outpatient and inpatient care rendered by Non-Network Providers when requested by the Member or Non-Network Provider;

d.   For inpatient admissions, recognizes when to utilize more appropriate and less restrictive levels of care, when medically appropriate.  The Contractor must have procedures to identify when transfer to an alternate inpatient or outpatient setting is appropriate and arrange such transfers; and

e.   Renders Pre-certification decisions on a timely basis and requires that Peer Advisors render non-certification decisions. Peer Advisor means a psychiatrist or Ph.D. psychologist with a minimum of five years of clinical experience who renders medical necessity decisions.

5.13.2 For Members admitted to Out-of-network Facilities, the Contractor must have procedures to either arrange to transfer the Member to a Network Facility as soon as medically appropriate or manage the care as if it was a Network Facility, including negotiating discounts with the Facility.

5.14



### 5.16   Transition and Termination of Contract

To ensure that the transition to a successor entity provides Members with uninterrupted access to all MHSU Disorder Program benefits and associated customer services, the Contractor is required to provide Contractor-related obligations and deliverables (Transition Services) to the MHSU Disorder Program until the final Program Claim (as defined in Section 6.1(1) of the RFP) incurred during the Contract term is submitted to the Department for payment.  The Department anticipates that certain claims incurred during the Contract term will not have been settled before the end date (Open Claims). Transition Services are organized into two phases: Phase One and Phase Two.  Phase One consists of those Transition Services that are provided prior to the Contract termination or expiration (End Date).  Phase Two consists of those Transition Services that are required after the End Date until the Contractor invoices the Department for the final Program Claim incurred during the Contract term and payment submitted by the Department.  Collectively, Phase One and Phase Two comprise the Transition Period. The obligations and responsibilities of the Contractor with regard to this Section, Transition and Termination of Contract, shall survive termination of the Contract and will remain in effect until all Open Claims have been settled to the satisfaction of the Department.

5.16.1 The transition process shall be governed as follows:

   a.  Length of Transition Period:

   i.  Phase One - Phase One of the Transition Period shall commence six months prior to the End Date or immediately if the Contract is terminated on notice pursuant to Appendix B section 30 (Termination).  Phase One is concluded at midnight on the End Date.

   ii.  Phase Two - Phase Two of the Transition Period will commence at 12:01 a.m. on the first Day after the End Date and will continue until all claims incurred as of the End Date have been settled (i.e., closed and payment submitted by Department to the Contractor).

   iii.  The Department reserves the right to amend the length of Phase One or Two Transition Period upon thirty Days prior written notice to the Contractor.

b. No Interruption in Service:

    i. At all times during Phase One of the Transition Period and unless directed otherwise in writing by the Department, the Contractor shall continue all contractual obligations set forth in the Contract in addition to those set forth in the section. The Contractor shall be required to meet its contractual obligations notwithstanding the issuance of a termination notice by the State.

    ii. During Phase Two of the Transition Period, the Contractor shall continue all activities necessary to complete the processing and settlement of all Open Claims as set forth below.

c. Transition Plan:

    i. Within thirty calendar Days of receipt of a notice of termination of the Contract or six months prior to the expiration of the Contract, whichever event occurs first, the Contractor shall provide to the Department a detailed written plan for transition (Transition Plan) for review and approval. The Transition Plan shall outline the Contractor's plan to transition the tasks, milestones and deliverables associated with the Project Services to the Department, a third party or the successor entity. The Transition Plan shall detail the Phase One and Phase Two activities. Contractor agrees to amend the Transition Plan to include all other information deemed reasonable and necessary by the Department. There will be no additional charge to the Department for the development or implementation of the Transition Plan.

    ii. Within fifteen Business Days from receipt of the Contractor's proposed Transition Plan, the Department shall either approve the Transition Plan or notify the Contractor, in writing, of the changes required to the Transition Plan to make it acceptable to the Department.

    iii. Within fifteen Business Days from the Contractor's receipt of the required changes, the Contractor shall incorporate said changes into the Transition Plan and submit such revised Transition Plan to the Department for approval.

    iv. The Transition Plan, at a minimum, shall describe the tasks, timeframes, milestones, and deliverables by Phase associated with:

        1) Transitioning of the MHSU Disorder Project Services' data. All such data transfers must be approved by the Department and provided in a format acceptable to the Department. This requirement includes, but is not limited to, providing a minimum of one year of historical Member claim data. Members' claim data shall consist of:

   (a) Providers' names, types, addresses, zip codes, telephone numbers and tax identification numbers;

   (b) Detailed coordination of benefits (COB) data;

   (c) High-volume Provider data;

   (j) Report formats;

   (k) Pre-certification/prior authorization approved-through dates;

   (l) Disability determination approved-through dates;

   (m) Any exceptions that have been entered into the adjudication system on behalf of the Member such as a Single Case Agreement; and

   (n) Any other data the successor entity may need.

2) The transitioning of the MHSU Disorder Program data shall at a minimum include:

   (a) Providing a test file to the Department or a successor entity at least twenty weeks in advance of the End Date or within four weeks after notice of Termination is provided by the Department, to allow the Department, a third party or successor entity to address any formatting issues. Contractor will cooperate and coordinate with the Department, a third party or successor entity to address any issues in the test file.

   (b) Providing one or more pre-production files at least twelve weeks prior to the End Date. The file will contain the above-described Members' claim data or additional data elements as specified by the Department. Contractor will cooperate and coordinate with the Department, a third party or successor entity to address any issues in the data files.

   (c) Providing a production file six weeks prior to the successor entity's Implementation Date. The Department will notify the Contractor of the successor entity's Implementation Date.

   (d) Providing a second production file to the successor entity by the close of business three Days prior to the End Date.

3) Transferring of information necessary to ensure continuity of a Member's on-going treatment or future treatment.

4) Incorporating a written plan for Knowledge Transfer. A Knowledge Transfer (KT) plan shall be developed by the Contractor for approval by the Department as part of the Transition Plan.  This KT Plan will be incorporated into the overall Transition Plan's methods and timeframes and will outline mechanisms for transferring knowledge of Contractor's personnel to Department employees, a third party or the successor entity.  As part of the KT, Contractor shall document relevant processes, procedures, methods, tools, and techniques of its personnel with special skills or responsibilities performed during the Contract.

5) A description of how the Contractor will implement the Transition Services for Phase One and Phase Two.  Such description shall address how the Contractor will perform the tasks and services set forth in section 4 below.

d. Transition Services:

i. "Transition Services" shall be deemed to include Contractor's responsibility for performing all tasks and services outlined in the Contract, and for transferring in a planned manner as specified in the approved Transition Plan all tasks and services to the State, a third party or successor entity.  It is expressly agreed between the Parties that the level of service during Phase One of the Transition Period shall be maintained in accordance with all the terms and conditions of the Contract.

ii. During Phase One and Phase Two, the Department shall continue to have access to key personnel of the Contractor's dedicated Account Team, maintain access to online systems and receipt of data/reports and other information regarding the MHSU Disorder Program as necessary to ensure Members are provided with uninterrupted access to benefits and associated customer services.

iii. Phase One of the Transition Services shall include:

1) All Project Services associated with processing of claims incurred on or before the End Date.  This obligation includes but is not limited to:

(a) Paying claims, including but not limited to: Medicaid, out-of-network claims, foreign claims, COB claims, and Medicare claims and In-network claims.  "In-network" refers to Providers or Facilities that are part of a health plan's network of Providers with which

the Contractor has negotiated a discount;

    (b) Reimbursing late-filed claims if warranted;

    (c) Repaying or recovering monies on behalf of the MHSU Disorder Program for Medicare claims;

    (d) Retaining NYBEAS access; and

    (e) Continuing to provide updates on pending litigation and settlements that the Contractor or the AG has/may file on behalf of the MHSU Disorder Program.

2) Providing the Department access to any online claims processing data and history and online reporting systems until the Contractor invoices the Department for the final Program Claim incurred during the Contract term and payment submitted by the Department unless the Department notifies the Contractor that access may be ended at an earlier date;

3) Completing all reports required under Section 5.4 of this Contract;

4) Providing sufficient staff resources to address State audit requests and reports in a timely manner;

5) Agreeing to fully cooperate with all Department and/or OSC audits consistent with the requirements of the Contract;

6) Performing timely reviews and responses to audit findings submitted by the Department and the OSC in accordance with the requirements set forth in the Contract;

7) Remitting reimbursement due to the Department upon final audit determination consistent with the process specified in the Contract;

8) Receiving and applying enrollment updates and verifying enrollment;

9) Keeping dedicated telephone lines open with adequate available staffing to provide customer service at the levels required in the Contract and adjust phone scripts, and transfer calls to the successor entity's lines during the Transition Period;

10) Preparing, on a case-by-case basis, a plan to extend and manage the care of high-risk Members who are nearing the

end of a course of treatment beyond the Transition Period;

11) Developing a strategy for addressing those Members in treatment with Providers that are not in the successor entity's network; and

12) Notifying Members currently in care with a Network Provider, per New York State guidelines, of their rights to continue to receive a network level of benefits if their Provider is not in the Contractor's network. In addition, for the first year of the Contract, the Contractor will commit to sending Provider disruption letters based on information received from the incumbent.

iv. Phase Two of the Transition Services shall include, but not be limited to the following activities:

1) Process all Open Claims to final settlement:

(a) Paying claims, including but not limited to: Medicaid, out-of-network claims, foreign claims, COB claims, and Medicare claims and In-network claims. "In-network" refers to Providers or Facilities that are part of a health plan's network with which the Contractor has negotiated a discount;

(b) Reimbursing late-filed claims if warranted;

(c) Repaying or recovering monies on behalf of the Plan for Medicare claims;

(d) Retaining NYBEAS access; and

(e) Continuing to provide updates on pending litigation and settlements that the Contractor or the New York State Attorney General's Office has/may file on behalf of the Plan.

2) Continuing to provide the Department access to any online claims processing data and history and online reporting systems until the Contractor invoices the Department for the Final Program Claim incurred during the Contract term and payment is submitted by the Department, unless the Department notifies the Contractor that access may be ended at an earlier date;

3) Completing of all reports required under Section 5.4 of this Contract;

4) Providing sufficient staff resources to address State audit requests and reports in a timely manner;

5) Agreeing to fully cooperate with all Department and/or OSC audits consistent with the requirements set forth in the Contract;

6) Performing timely reviews and responses to audit findings submitted by the Department and OSC's audit unit in accordance with the requirements set forth in the Contract;

7) Remitting reimbursement due the Plan upon final audit determination consistent with the process specified in the Contract;

8) Receiving and applying enrollment updates;

9) Keeping dedicated telephone lines open for a minimum of six months (unless otherwise agreed to in writing by the Department and Contractor), with adequate available staffing to provide customer service at the same levels provided prior to the End Date, adjusting phone scripts;

10) Transferring calls to the successor Contractor's lines during this period;

11) Preparing, on a case-by-case basis, a plan to extend and manage the care of high-risk Members who are nearing the end of a course of treatment; and

12) Providing sufficient staffing to ensure Members continue to receive appropriate customer service and clinical management service after the End Date.

e. Compensation for Transition Services

    i. Phase One:



    ii. Phase Two:

1)

2)

f.  Department Responsibilities for Transition

The Department shall assume responsibility for the project management activities for the Transition.  The Department shall appoint a project manager to be responsible for coordinating Transition activities, maintaining the transition task schedule, and approving transition deliverables.  Weekly project review meetings shall be held with representatives of the Contractor, Department, and the third party or the successor entity.  The Department shall also ensure that all Departmental and third-party resources (e.g., technical, administrative) deemed necessary by the Transition Plan are available to carry out tasks and functions defined in the Transition Plan and in accordance with the defined timelines specified in the Transition Plan.

g.  Cooperation

Contractor shall cooperate with the Department to facilitate a smooth and orderly transition.  Periodic project review meetings shall be held with representatives of the Contractor, the Department, and the successor entity.







in which this guarantee is not met.







## SECTION VII:   PAYMENT FOR SERVICES

7.1     Throughout the term of the Contract, the Contractor will be paid for In-Network and Out-of-Network MHSU Disorder Program claim charges on a monthly basis.

7.2	Participating Provider Network: In accordance with Section 3.10 of the RFP, the Contractor is expected to use its best efforts to substantially maintain the composition of Network Providers included in the MHSU Disorder Program's current Provider Network. The amount charged to the Program for Covered Services shall be the contracted Network Provider fee agreed to between the Contractor and the servicing Provider, less any applicable copayment and payments from other insurance coverage.  This fee must be equal to or less than the contracted Network Provider fee for the Contractor's other contracted clients that are similar in size or scope to the Department.

7.3	Empire Plan Non-Network Practitioners, the Contractor will process Empire Plan Non-Network Practitioner claims, as follows:

7.3.1	80 percent of the Usual and Customary Rate (UCR).  The Empire Plan pays 100 percent of the UCR once each combined Coinsurance amount exceeds the maximum for the calendar year.  The Empire Plan generally utilizes the 90th percentile of FAIR Health to determine the UCR.  The UCR means the lowest of:

a.	The actual charge for services; or

b.	The usual charge for services by the Provider for the same or similar service; or

c.	The usual charge for services of other Providers in the same or similar geographic area for the same or similar service.

7.3.2	Effective July 1, 2023, for certain unions: 275 percent of Centers for Medicare and Medicaid Services (CMS) rates, and will be subject to Deductible, Coinsurance and calendar year and lifetime maximums.

7.4	Excelsior Plan Non-Network Practitioner Benefits: 80 percent of the UCR. The UCR is the lower of billed charges or 110 percent of the Medicare allowance.

7.5	SEHP Non-Network Practitioner Benefits: the Plan pays 80 percent of the allowable amount, the lower of billed charges or 110 percent of Medicare, for covered services after the Deductible is met.

7.6	Non-Network Facility Benefits, the Contractor will process Non-Network Facilities claims, as follows:

7.6.1	For the Empire Plan: 90 percent of billed charges. After the combined annual Coinsurance Maximum is met, the Empire Plan pays 100 percent of billed charges.

7.6.2	The Excelsior Plan does not provide coverage for services provided in a Non-Network facility except in an emergency or if a Network Facility is not available.

7.6.3	For SEHP: A $200 Copayment is applied per person per admission. The Plan pays 80 percent of the allowable amount, the lower of billed charges or 110 percent of Medicare, after the copayment is met.  The member is responsible for the balance.

Where a Network Provider is not available because of clinical or access considerations, the Contractor must negotiate a Single Case Agreement with a Non-Network Provider in a manner consistent with what is typically allowed for a Network Provider in the same discipline for the same service.  Members will not be responsible for any payments above what they would pay for a network claim.







## 7.9   Assessments

Assessments are defined as surcharges or taxes charged by federal, state, and local government entities based on claims or membership.  The State will be responsible for all Assessments imposed on health insurers.  The Contractor will be responsible for any future Assessments that are chargeable to the Program.  The State is currently responsible for the following Assessments, which are chargeable to the health insurer as of June 2020:

1. New York Health Care Reform Act Covered Lives Assessment

2. New York Health Care Reform Act Bad, Debt and Charity Assessment

3. Massachusetts Health Safety Network Assessment

4. Massachusetts Pediatric Immunization Assessment

5. Massachusetts Child Psychiatry Access Program Assessment

6. Massachusetts Health Policy Commission Assessment

7. Michigan Health Insurance Claims Assessment

8. Maine Vaccine Assessment

9. Maine Guaranteed Access Reinsurance Association Assessment

10. New Hampshire Vaccine Assessment

11. New Hampshire Health Plan Assessment

12. Vermont Immunization Assessment

13. Connecticut Immunization Assessment

14. Connecticut DPH Assessment

15. Vermont Health Care Claims Tax

16. New Mexico Vaccine Assessment

17. Rhode Island Children's Health Account Assessment

18. Alaska Vaccine Assessment

7.10 The Contractor shall invoice the Department each month for MHSU Disorder claims and MHSU Program Administrative Fee payment in accordance with the provisions set forth herein, for Project Services rendered, together with full supporting detail(s) to the State's satisfaction. Such invoice (s) shall be submitted on a monthly basis to accountspayable@ogs.ny.gov. The subject line should include the Invoice Number and the term "Department of Civil Service. The invoice must include:

- Name of the NYS Agency being billed;

- Name of the vendor and NYS Statewide Financial System (SFS) Vendor Number; and

- Contract number.

7.11   After review and approval of the Contractor's invoice, the Department shall submit it to OSC for payment.  OSC shall render payment for invoices under the Agreement in accordance with ordinary State procedures and practices.  The Department will make best efforts to process all acceptable invoices within thirty (30) days of their receipt; however, failure to make payment within said timeframe shall not be considered a breach of contract.  The Contractor acknowledges that timeliness of payment and any interest to be paid to Contractor for late payment shall be governed by Article XI-A of the State Finance Law.  Submission of an invoice and payment thereof shall not preclude the Department, as applicable, from reimbursement or demanding a price adjustment in any case where Project Services as delivered are found to deviate from the terms and conditions of the Agreement.

## SECTION VIII:   INSURANCE REQUIREMENTS

8.1   Amended RFP Section 4.6 sets forth the applicable insurance requirements that must be maintained by the Contractor during the Contract term and is hereby expressly made a part of this Contract as if fully set forth herein.

## SECTION IX:   DATA OWNERSHIP AND USE

9.1   In addition to the requirements specified in Appendix B Standard Clauses for all Department Contracts to this Agreement, Contractor agrees that all claims, enrollment, and other data (i.e., materials) provided to the Contractor by the Department or the Department's Data Providers is being provided to the Contractor solely for the purposes of allowing the Contractor to fulfill its duties and responsibilities under the Contract and said materials are the sole property of the State.  Except as directed by a court of competent jurisdiction, or as necessary to comply with applicable New York State or federal law, the Contractor shall not share, sell, release, or make the materials available to third parties in any manner without the prior consent of the Department. This provision shall survive the expiration or termination of the Contract.

## SECTION X:   NOTICES

10.1   The Contractor shall immediately notify the Department upon learning of any situation that can reasonably be expected to adversely affect the rendition of Project Services.

10.2   All notices permitted or required hereunder shall be in writing and shall be transmitted via certified or registered United States mail, return receipt requested; by hand delivery; by expedited delivery service; or by e-mail. Such notification must be sent to:

State of New York Department of Civil Service

| | |
|---|---|
| Name: | Dan Yanulavich |
| Title: | Director, Employee Benefits Division |
| Address: | Swan Street Building, Core 1, Albany, NY 12239 |
| Telephone Number: | 518-402-4709 |
| E-Mail Address: | Daniel.Yanulavich@cs.ny.gov |



10.3   Any such notice shall be deemed to have been given either at the time of personal delivery or, in the case of expedited delivery service or certified or registered United States mail, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of email, upon receipt.

10.4   The Parties may, from time to time, specify any new or different address in the United States as their address for purpose of receiving notice under this Agreement by giving fifteen (15) days written notice to the other party sent in accordance herewith.  The Parties agree to mutually designate individuals as their respective representatives for the purposes of receiving notices under this Agreement.  Additional individuals may be designated in writing by the Parties for purposes of implementation and administration/billing, resolving issues and problems and/or for dispute resolution.


## SECTION XI:   ADDITIONAL PROVISIONS

11.1   Work in The Continental United States of America:

All work performed by Contractor personnel under this Contract must be performed within the Continental United States of America.

11.2   Information Classification:

The Department has determined that the State information which the Contractor will either host, maintain, or have access to has an impact level of: Confidentiality = High, Integrity = High, and Availability = High; and requires the Contractor, pursuant to IT Standard: Information Classification (NYS-S14-002) (see https://its.ny.gov/information-classification ), to have the associated baseline security controls implemented to uniformly protect the confidentiality, integrity, and availability of the information entrusted to the Contractor.

11.3   Continued Data Access:

The Department has determined that the period of time that the Contractor must provide the Department continued access to Data beyond the expiration or termination of the Agreement is no less than 365 Calendar days.  All Contract provisions related to the protection and security of the Data will survive termination of the Contract.  This provision does not limit or lessen the time period or Contractor's obligations pursuant to Standard Clauses for New York State Contracts (Appendix A) to establish and maintain Records.

11.4    Use and Disclosure of Protected Health Information

a.    The Contractor acknowledges that it is a "Business Associate" as that term is defined in the HIPAA implementing regulations at 45 CFR 160.103. of the Department as a consequence of the Contractor's provision of Project Services on behalf of the Department within the context of the Contractor's performance under the resulting Contract and that the Contractor's provision of Project Services will involve the disclosure to the Contractor of individually identifiable health information from the Department or other service providers on behalf of the Department, as well as the Contractor's disclosure to the Department of individually identifiable health information as a consequence of the Project Services performed under the resulting Contract.  As such, the Contractor, as a Business Associate, will be required to comply with the provisions of this Section.

b.    For purposes of this Section, the term "Protected Health Information" (PHI) means  any information, including demographic information collected from an individual, that relates to the past, present, or future physical or mental health or condition of an individual, to the provision of health care to an individual, or to the past, present, or future payment for the provision of health care to an individual, that identifies the individual, or with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.  Within the context of the resulting Contract, PHI may be received by the Contractor from the Department or may be created or received by the Contractor on behalf of the Department in the Contractor's capacity as a Business Associate.  All PHI received or created by the Contractor in its capacity as a Business Associate and as a consequence of its performance under the resulting Contract is referred to herein collectively as "Department's PHI."

c.    The Contractor acknowledges that the Department administers on behalf of New York State several group health plans as that term is defined in HIPAA's implementing regulations at 45 CFR Parts 160 and 164, and that each of those group health plans consequently is a "covered entity" under HIPAA.  These group health plans include NYSHIP, which encompasses the Empire Plan as well as participating health maintenance organizations; the Dental Plan, and the Vision Plan. In this capacity, the Department is responsible for the administration of these "covered entities" under HIPAA.  The Contractor further acknowledges that the Department has designated NYSHIP and the Empire Plan as an Organized Health Care Arrangement (OHCA), respectively. The Contractor further acknowledges that:

   i.    The Contractor is a HIPAA "Business Associate" of the group health plans identified herein as "covered entities" as a consequence of the Contractor's provision of certain services to and/or on behalf of the Department as administrator of the "covered entities" within the context of the Contractor's performance under the resulting Contract, and that the Contractor's provision of such services may involve the disclosure to the Contractor of individually identifiable health information from the Department or from other parties on behalf of the Department, and also may involve the Contractor's disclosure to the Department of individually

identifiable health information as a consequence of the services performed under the resulting Contract; and

    ii.  Contactor is a "covered entity" under HIPAA in connection with its provision of certain services under the resulting Contract. To the extent Contractor acts as a HIPAA "Business Associate" of the group health plans identified as "covered entities", the Contractor shall adhere to the requirements as set forth herein. Contractor is responsible to obtain from Members and Enrollees all consents and/or authorizations, if any, required for Contractor to perform the services hereunder and for the use and disclosure of information, including the Department's PHI, as permitted under the resulting Contract.

d.    Permitted Uses and Disclosures of the Department's PHI: The Contractor may create, receive, maintain, access, transmit, use, and/or disclose the Department's PHI solely in accordance with the terms of the Contract. In addition, the Contractor may use and/or disclose the Department's PHI to provide data aggregation services relating to the health care operations of the Department. Further, the Contractor may use and disclose the Department's PHI for the proper management and administration of the Contract if such use is necessary for the Contractor's proper management and administration or to carry out the Contractor's legal responsibilities, or if such disclosure is required by law or the Contractor obtains reasonable assurances from the person to whom the information is disclosed that it shall be held confidentially and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies the Contractor of any instances of which it is aware in which the confidentiality of the information has been breached. Additionally, the Contractor may use and/or disclose the Department's PHI, as appropriate:

    i.  For treatment, payment and health care operations as described in 45 CFR Section 164.506(c)(2), (3) or (4); and

    ii.  To de-identify the information or create a limited data set in accordance with 45 CFR §164.514, which de-identified information or limited data set may, consistent with this section, be used and disclosed by Contractor only as agreed to in writing by the Department and permitted by law.

e.    Nondisclosure of the Department's PHI: The Contractor shall not create, receive, maintain, access, transmit, use, or further disclose the Department's PHI otherwise than as permitted or required by the resulting Contract or as otherwise required by law. The Contractor shall limit its uses and disclosures of PHI when practicable to the information comprising a Limited Data Set, and in all other cases to the minimum necessary to accomplish the intended purpose of the PHI's access, use, or disclosure.

f.    Safeguards: The Contractor shall use appropriate, documented safeguards to prevent the use or disclosure of the Department's PHI otherwise than as provided for in the resulting Contract. The Contractor shall maintain a comprehensive written information security program that includes administrative,

technical, and physical safeguards that satisfy the standards set forth in the HIPPA Security Rule at 45 CFR §§ 164.308, 164.310, and 164.312, along with corresponding policies and procedures, as required by 45 CFR § 164.316, appropriate to the size and complexity of the Contractor's operations and the nature and scope of its activities, to reasonably and appropriately protect the confidentiality, integrity, and availability of any electronic PHI that it creates, receives, maintains, accesses, or that it transmits on behalf of the Department pursuant to the resulting Contract to the same extent that such electronic PHI would have to be safeguarded if created, received, maintained, accessed, or transmitted by a group health plan identified herein.

g.   Breach Notification: In addition to the Disclosure of Breach requirements specified in Standard Clauses for All Department Contracts (Appendix B), the following provisions shall apply:

   i.   Reporting: The Contractor shall report to the Department any breach of unsecured PHI, including any use or disclosure of the Department's PHI otherwise than as provided for by the Contract, of which the Contractor becomes aware. An acquisition, access, transmission, use or disclosure of the Department's PHI that is unsecured in a manner not permitted by HIPAA or the resulting Contract is presumed to be a breach unless the Contractor demonstrates that there is a low probability that Department's PHI has been compromised based on the Contractor's risk assessment of at least the following factors:

      1)   The nature and extent of Department's PHI involved, including the types of identifiers and the likelihood of re-identification;

      2)   The unauthorized person who used Department's PHI or to whom the disclosure was made;

      3)   Whether Department's PHI was actually acquired or viewed; and

      4)   The extent to which the risk to Department's PHI has been mitigated.

   ii.   Required Information: In addition to the information required in Standard Clauses for All Department Contracts (Appendix B), Disclosure of Breach, the Contractor shall provide the following information to the Department within the time period identified in Standard Clauses for All Department Contracts (Appendix B), Disclosure of Breach, except when, despite all reasonable efforts by the Contractor to obtain the information required, circumstances beyond the control of the Contractor necessitate additional time. Under such circumstances, the Contractor shall provide to the Department the following information as soon as possible and without unreasonable delay, but in no event later than thirty Calendar Days from the date of discovery:

      1)   the date of the breach incident;

2) the date of the discovery of the breach;

3) a brief description of what happened;

4) a description of the types of unsecured PHI that were involved;

5) identification of each individual whose unsecured PHI has been, or is reasonably believed to have been, accessed, acquired, or disclosed during the breach;

6) a brief description of what the Contractor is doing to investigate the breach, to mitigate harm to individuals, and to protect against any further breaches; and

7) any other details necessary to complete an assessment of the risk of harm to the individual.

iii. The Contractor will be responsible to provide notification to individuals whose unsecured PHI has been or is reasonably believed to have been accessed, acquired, or disclosed as a result of a breach, as well as the Secretary of the United States Department of Health and Human Services and the media, as required by 45 CFR Part 164.

iv. The Contractor shall maintain procedures to sufficiently investigate the breach, mitigate losses, and protect against any future breaches, and to provide a description of these procedures and the specific findings of the investigation to the Department upon request.

v. The Contractor shall mitigate, to the extent practicable, any harmful effects from any use or disclosure of PHI by the Contractor not permitted by the Contract.

h. Associate's Agents: The Contractor shall require all of its agents or Subcontractors to whom it provides the Department's PHI, whether received from the Department or created or received by the Contractor on behalf of the Department, to agree, by way of written contract or other written arrangement, to the same restrictions and conditions on the access, use, and disclosure of PHI that apply to the Contractor with respect to the Department's PHI under the Contract.

i. Availability of Information to the Department: The Contractor shall make available to the Department such information and documentation as the Department may require regarding any disclosures of PHI by the Contractor to fulfill the Department's obligations to provide access to, provide a copy of, and to account for disclosures of the Department's PHI in accordance with HIPAA and its implementing regulations. The Contractor shall provide such information and documentation within a reasonable amount of time of its receipt of the request from the Department. The Contractor must provide the Department with access to the Department's PHI in the form and format requested, if it is readily

producible in such form and format; or if not, in a readable hard copy form or such other form and format as agreed to by the Parties, provided, however, that if the Department's PHI that is the subject of the request for access is maintained in one or more designated record sets electronically and if requested by the Department, the Contractor must provide the Department with access to the requested PHI in a readable electronic form and format.

j.      Amendment of the Department's PHI: The Contractor shall make the Department's PHI available to the Department as the Department may require to fulfill the Department's obligations to amend individuals' PHI pursuant to HIPAA and its implementing regulations.  The Contractor shall, as directed by the Department, incorporate any amendments to the Department PHI into copies of such Department PHI maintained by the Contractor.

k.      Internal Practices: The Contractor shall make its internal practices, policies and procedures, books, records, and agreements relating to the use and disclosure of the Department's PHI, whether received from the Department or created or received by the Contractor on behalf of the Department, available to Department and/or the Secretary of the U.S. Department of Health and Human Services in a time and manner designated by the Department and/or the Secretary for purposes of determining the Department's compliance with HIPAA and its implementing regulations.

l.      Termination: This Contract may be terminated by the Department at the Department's discretion if the Department determines that the Contractor, as a Business Associate, has violated a material term of this Section.  Data return and destruction upon contract termination is governed by Information Security Requirements, Appendix C.

m.      Indemnification: Notwithstanding the provisions in Standard Clauses for All Department Contracts (Appendix B), the Contractor agrees to indemnify, defend and hold harmless the State and the Department and its respective employees, officers, agents, or other members of its workforce (each of the foregoing hereinafter referred to as "Indemnified Party") against all actual and direct losses suffered by the Indemnified Party and all liability to third parties arising from or in connection with any breach of this section, Use and Disclosure of Protected Health Information, or from any acts or omissions related to this section by the Contractor or its employees, officers, subcontractors, agents, or other members of its workforce,  without limitations.  Accordingly, the Contractor shall reimburse any Indemnified Party for any and all actual and direct losses, liabilities, lost profits, fines, penalties, costs, or expenses (including reasonable attorneys' fees) which may for any reason be imposed upon any Indemnified Party by reason of any suit, claim, action, proceeding, or demand by any third party which results from the Contractor's acts or omissions hereunder.  The Contractor's obligation to indemnify any Indemnified Party shall survive the expiration or termination of this Contract.  This section is not subject to the limitation of liability provisions of the Contract.

n.  Miscellaneous:

  i.  Survival: The respective rights and obligations of Business Associate and the "covered entities" identified herein under HIPAA and as set forth in this Section, USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION shall survive termination of the resulting Contract.

  ii.  Regulatory References: Any reference herein to a federal regulatory section within the Code of Federal Regulations shall be a reference to such section as it may be subsequently updated, amended, or modified, as of their respective compliance dates.

  iii.  Interpretation: Any ambiguity in the resulting Contract shall be resolved to permit covered entities to comply with HIPAA.

11.5  Substance Use Disorder Records.  To the extent that PHI exchanged between the parties includes information on an individual's Substance Use Disorder, the parties agree to comply with the applicable requirements of 42 C.F.R. Part 2 ("Confidentiality of Substance Use Disorder Patient Records") including its provisions on disclosure and redisclosure of said information.

## SECTION XII:    ENTIRE AGREEMENT

The Contract, including all appendices and attachments, constitutes the entire agreement between the Parties hereto and no statement, promise, condition, understanding, inducement, or representation, oral or written, expressed or implied, which is not contained herein shall be binding or valid and the Contract shall not be changed, modified, or altered in any manner except by an instrument in writing executed by both Parties hereto, except as otherwise provided herein. The Contract is subject to amendment(s) only upon mutual consent of the Parties, reduced to writing and approved by the Office of the State Comptroller of the State of New York and subject to the termination provisions contained herein.

**(Remainder of this page intentionally left blank)**

Contract Number: <u>C000743</u>

IN WITNESS WHEREOF, the Parties hereto have hereunto signed this AGREEMENT on the day and year appearing opposite their respective signatures.

Agency Certification: "In addition to the acceptance of this Agreement, I also certify that original copies of this signature page will be attached to all exact copies of this Agreement."

Contractor Certification: By signing I certify my express authority to sign on behalf of myself, my company, or other entity and full knowledge and acceptance of this Agreement and all appendices. By signing, I affirm my understanding of and agreement to comply with the Department's procedures relative to the Procurement Lobbying Law as required by State Finance Law §139-j and §139-k.

**NEW YORK STATE
DEPARTMENT OF CIVIL SERVICE**

Name: *Rebecca A. Corso*

Title: *Executive Deputy Commissioner*

By: *Rebecca A. Corso*

Date: 10/25/23

**Carelon Behavioral Health, Inc.**

FEIN: 541414194

████████████████████████

Date: 10/5/23

Approved as to form:

Letitia James
ATTORNEY GENERAL

By: _____

Date: _____

Approved:

Thomas P. DiNapoli
STATE COMPTROLLER

By: _____

Date: _____

| APPROVED |
| DEPT. OF AUDIT & CONTROL |
| Dec 28 2023 |
| Brian Fuller |
| FOR THE STATE COMPTROLLER |

## CORPORATION ACKNOWLEDGMENT

STATE OF <u>Massachusetts</u> }

COUNTY OF <u>Suffolk</u> }                SS.:

On the <u>5th</u> day of <u>October</u> in the year 2023, before me



instrument; that, by authority of the Board of Directors of said corporation, he/she/they is (are) authorized to execute the foregoing instrument on behalf of the corporation for purposes set forth therein; and that, pursuant to that authority, he/she/they executed the foregoing instrument in the name of and on behalf of said corporation as the act and deed of said corporation.

**Notary Public:** _____



SHIREEN AMMAR MARKS
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
April 14, 2028

<u>APPENDIX A</u>

STANDARD CLAUSES FOR NEW YORK STATE CONTRACTS

PLEASE RETAIN THIS DOCUMENT
FOR FUTURE REFERENCE.

June 2023

# TABLE OF CONTENTS

|     |                                                                                                                          | **Page** |
|-----|--------------------------------------------------------------------------------------------------------------------------|----------|
| 1.  | **Executory Clause**                                                                                                     | 3        |
| 2.  | **Non-Assignment Clause**                                                                                                | 3        |
| 3.  | **Comptroller's Approval**                                                                                               | 3        |
| 4.  | **Workers' Compensation Benefits**                                                                                       | 3        |
| 5.  | **Non-Discrimination Requirements**                                                                                      | 3        |
| 6.  | **Wage and Hours Provisions**                                                                                            | 3-4      |
| 7.  | **Non-Collusive Bidding Certification**                                                                                  | 4        |
| 8.  | **International Boycott Prohibition**                                                                                     | 4        |
| 9.  | **Set-Off Rights**                                                                                                       | 4        |
| 10. | **Records**                                                                                                              | 4        |
| 11. | **Identifying Information and Privacy Notification**                                                                     | 4        |
| 12. | **Equal Employment Opportunities For Minorities and Women**                                                              | 5        |
| 13. | **Conflicting Terms**                                                                                                    | 5        |
| 14. | **Governing Law**                                                                                                        | 5        |
| 15. | **Late Payment**                                                                                                         | 5        |
| 16. | **No Arbitration**                                                                                                       | 5        |
| 17. | **Service of Process**                                                                                                   | 5        |
| 18. | **Prohibition on Purchase of Tropical Hardwoods**                                                                        | 5-6      |
| 19. | **MacBride Fair Employment Principles**                                                                                  | 6        |
| 20. | **Omnibus Procurement Act of 1992**                                                                                      | 6        |
| 21. | **Reciprocity and Sanctions Provisions**                                                                                 | 6        |
| 22. | **Compliance with Breach Notification and Data Security Laws**                                                           | 6        |
| 23. | **Compliance with Consultant Disclosure Law**                                                                            | 6        |
| 24. | **Procurement Lobbying**                                                                                                 | 7        |
| 25. | **Certification of Registration to Collect Sales and Compensating Use Tax by Certain State Contractors, Affiliates and Subcontractors** | 7        |
| 26. | **Iran Divestment Act**                                                                                                  | 7        |
| 27. | **Admissibility of Contract**                                                                                            | 7        |

## STANDARD CLAUSES FOR NYS CONTRACTS

The parties to the attached contract, license, lease, amendment or other agreement of any kind (hereinafter, "the contract" or "this contract") agree to be bound by the following clauses which are hereby made a part of the contract (the word "Contractor" herein refers to any party other than the State, whether a contractor, licenser, licensee, lessor, lessee or any other party):

**1. EXECUTORY CLAUSE.** In accordance with Section 41 of the State Finance Law, the State shall have no liability under this contract to the Contractor or to anyone else beyond funds appropriated and available for this contract.

**2. NON-ASSIGNMENT CLAUSE.** In accordance with Section 138 of the State Finance Law, this contract may not be assigned by the Contractor or its right, title or interest therein assigned, transferred, conveyed, sublet or otherwise disposed of without the State's previous written consent, and attempts to do so are null and void. Notwithstanding the foregoing, such prior written consent of an assignment of a contract let pursuant to Article XI of the State Finance Law may be waived at the discretion of the contracting agency and with the concurrence of the State Comptroller where the original contract was subject to the State Comptroller's approval, where the assignment is due to a reorganization, merger or consolidation of the Contractor's business entity or enterprise. The State retains its right to approve an assignment and to require that any Contractor demonstrate its responsibility to do business with the State. The Contractor may, however, assign its right to receive payments without the State's prior written consent unless this contract concerns Certificates of Participation pursuant to Article 5-A of the State Finance Law.

**3. COMPTROLLER'S APPROVAL.** In accordance with Section 112 of the State Finance Law, if this contract exceeds $50,000 (or $75,000 for State University of New York or City University of New York contracts for goods, services, construction and printing, and $150,000 for State University Health Care Facilities) or if this is an amendment for any amount to a contract which, as so amended, exceeds said statutory amount, or if, by this contract, the State agrees to give something other than money when the value or reasonably estimated value of such consideration exceeds $25,000, it shall not be valid, effective or binding upon the State until it has been approved by the State Comptroller and filed in his office. Comptroller's approval of contracts let by the Office of General Services, either for itself or its customer agencies by the Office of General Services Business Services Center, is required when such contracts exceed $85,000. Comptroller's approval of contracts established as centralized contracts through the Office of General Services is required when such contracts exceed $125,000, and when a purchase order or other procurement transaction issued under such centralized contract exceeds $200,000.

**4. WORKERS' COMPENSATION BENEFITS.** In accordance with Section 142 of the State Finance Law, this contract shall be void and of no force and effect unless the Contractor shall provide and maintain coverage during the life of this contract for the benefit of such employees as are required to be covered by the provisions of the Workers' Compensation Law.

**5. NON-DISCRIMINATION REQUIREMENTS.** To the extent required by Article 15 of the Executive Law (also known as the Human Rights Law) and all other State and Federal statutory and constitutional non-discrimination provisions, the Contractor will not discriminate against any employee or applicant for employment, nor subject any individual to harassment, because of age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status or because the individual has opposed any practices forbidden under the Human Rights Law or has filed a complaint, testified, or assisted in any proceeding under the Human Rights Law. Furthermore, in accordance with Section 220-e of the Labor Law, if this is a contract for the construction, alteration or repair of any public building or public work or for the manufacture, sale or distribution of materials, equipment or supplies, and to the extent that this contract shall be performed within the State of New York, Contractor agrees that neither it nor its subcontractors shall, by reason of race, creed, color, disability, sex, or national origin: (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b) discriminate against or intimidate any employee hired for the performance of work under this contract. If this is a building service contract as defined in Section 230 of the Labor Law, then, in accordance with Section 239 thereof, Contractor agrees that neither it nor its subcontractors shall by reason of race, creed, color, national origin, age, sex or disability: (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b) discriminate against or intimidate any employee hired for the performance of work under this contract. Contractor is subject to fines of $50.00 per person per day for any violation of Section 220-e or Section 239 as well as possible termination of this contract and forfeiture of all moneys due hereunder for a second or subsequent violation.

**6. WAGE AND HOURS PROVISIONS.** If this is a public work contract covered by Article 8 of the Labor Law or a building service contract covered by Article 9 thereof, neither Contractor's employees nor the employees of its subcontractors may be required or permitted to work more than the number of hours or days stated in said statutes, except as otherwise provided in the Labor Law and as set forth in prevailing wage and supplement schedules issued by the State Labor Department. Furthermore, Contractor and its subcontractors must pay at least the prevailing wage rate and pay or provide the prevailing supplements, including the premium rates for overtime pay, as determined by the State Labor Department in

accordance with the Labor Law. Additionally, effective April 28, 2008, if this is a public work contract covered by Article 8 of the Labor Law, the Contractor understands and agrees that the filing of payrolls in a manner consistent with Subdivision 3-a of Section 220 of the Labor Law shall be a condition precedent to payment by the State of any State approved sums due and owing for work done upon the project.

**7. NON-COLLUSIVE BIDDING CERTIFICATION.** In accordance with Section 139-d of the State Finance Law, if this contract was awarded based upon the submission of bids, Contractor affirms, under penalty of perjury, that its bid was arrived at independently and without collusion aimed at restricting competition. Contractor further affirms that, at the time Contractor submitted its bid, an authorized and responsible person executed and delivered to the State a non-collusive bidding certification on Contractor's behalf.

**8. INTERNATIONAL BOYCOTT PROHIBITION.** In accordance with Section 220-f of the Labor Law and Section 139-h of the State Finance Law, if this contract exceeds $5,000, the Contractor agrees, as a material condition of the contract, that neither the Contractor nor any substantially owned or affiliated person, firm, partnership or corporation has participated, is participating, or shall participate in an international boycott in violation of the federal Export Administration Act of 1979 (50 USC App. Sections 2401 et seq.) or regulations thereunder. If such Contractor, or any of the aforesaid affiliates of Contractor, is convicted or is otherwise found to have violated said laws or regulations upon the final determination of the United States Commerce Department or any other appropriate agency of the United States subsequent to the contract's execution, such contract, amendment or modification thereto shall be rendered forfeit and void. The Contractor shall so notify the State Comptroller within five (5) business days of such conviction, determination or disposition of appeal (2 NYCRR § 105.4).

**9. SET-OFF RIGHTS.** The State shall have all of its common law, equitable and statutory rights of set-off. These rights shall include, but not be limited to, the State's option to withhold for the purposes of set-off any moneys due to the Contractor under this contract up to any amounts due and owing to the State with regard to this contract, any other contract with any State department or agency, including any contract for a term commencing prior to the term of this contract, plus any amounts due and owing to the State for any other reason including, without limitation, tax delinquencies, fee delinquencies or monetary penalties relative thereto. The State shall exercise its set-off rights in accordance with normal State practices including, in cases of set-off pursuant to an audit, the finalization of such audit by the State agency, its representatives, or the State Comptroller.

**10. RECORDS.** The Contractor shall establish and maintain complete and accurate books, records, documents, accounts and other evidence directly pertinent to performance under this contract (hereinafter, collectively, the "Records"). The Records

must be kept for the balance of the calendar year in which they were made and for six (6) additional years thereafter. The State Comptroller, the Attorney General and any other person or entity authorized to conduct an examination, as well as the agency or agencies involved in this contract, shall have access to the Records during normal business hours at an office of the Contractor within the State of New York or, if no such office is available, at a mutually agreeable and reasonable venue within the State, for the term specified above for the purposes of inspection, auditing and copying. The State shall take reasonable steps to protect from public disclosure any of the Records which are exempt from disclosure under Section 87 of the Public Officers Law (the "Statute") provided that: (i) the Contractor shall timely inform an appropriate State official, in writing, that said records should not be disclosed; and (ii) said records shall be sufficiently identified; and (iii) designation of said records as exempt under the Statute is reasonable. Nothing contained herein shall diminish, or in any way adversely affect, the State's right to discovery in any pending or future litigation.

**11. IDENTIFYING INFORMATION AND PRIVACY NOTIFICATION.** (a) Identification Number(s). Every invoice or New York State Claim for Payment submitted to a New York State agency by a payee, for payment for the sale of goods or services or for transactions (e.g., leases, easements, licenses, etc.) related to real or personal property must include the payee's identification number. The number is any or all of the following: (i) the payee's Federal employer identification number, (ii) the payee's Federal social security number, and/or (iii) the payee's Vendor Identification Number assigned by the Statewide Financial System. Failure to include such number or numbers may delay payment. Where the payee does not have such number or numbers, the payee, on its invoice or Claim for Payment, must give the reason or reasons why the payee does not have such number or numbers.

(b) Privacy Notification. (1) The authority to request the above personal information from a seller of goods or services or a lessor of real or personal property, and the authority to maintain such information, is found in Section 5 of the State Tax Law. Disclosure of this information by the seller or lessor to the State is mandatory. The principal purpose for which the information is collected is to enable the State to identify individuals, businesses and others who have been delinquent in filing tax returns or may have understated their tax liabilities and to generally identify persons affected by the taxes administered by the Commissioner of Taxation and Finance. The information will be used for tax administration purposes and for any other purpose authorized by law. (2) The personal information is requested by the purchasing unit of the agency contracting to purchase the goods or services or lease the real or personal property covered by this contract or lease. The information is maintained in the Statewide Financial System by the Vendor Management Unit within the Bureau of State Expenditures, Office of the State Comptroller, 110 State Street, Albany, New York 12236.

**12.  EQUAL EMPLOYMENT OPPORTUNITIES FOR MINORITIES AND WOMEN.**  In accordance with Section 312 of the Executive Law and 5 NYCRR Part 143, if this contract is:  (i) a written agreement or purchase order instrument, providing for a total expenditure in excess of $25,000.00, whereby a contracting agency is committed to expend or does expend funds in return for labor, services, supplies, equipment, materials or any combination of the foregoing, to be performed for, or rendered or furnished to the contracting agency; or (ii) a written agreement in excess of $100,000.00 whereby a contracting agency is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon; or (iii) a written agreement in excess of $100,000.00 whereby the owner of a State assisted housing project is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon for such project, then the following shall apply and by signing this agreement the Contractor certifies and affirms that it is Contractor's equal employment opportunity policy that:

(a)  The Contractor will not discriminate against employees or applicants for employment because of race, creed, color, national origin, sex, age, disability or marital status, shall make and document its conscientious and active efforts to employ and utilize minority group members and women in its work force on State contracts and will undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities without discrimination.  Affirmative action shall mean recruitment, employment, job assignment, promotion, upgradings, demotion, transfer, layoff, or termination and rates of pay or other forms of compensation;

(b)  at the request of the contracting agency, the Contractor shall request each employment agency, labor union, or authorized representative of workers with which it has a collective bargaining or other agreement or understanding, to furnish a written statement that such employment agency, labor union or representative will not discriminate on the basis of race, creed, color, national origin, sex, age, disability or marital status and that such union or representative will affirmatively cooperate in the implementation of the Contractor's obligations herein; and

(c)  the Contractor shall state, in all solicitations or advertisements for employees, that, in the performance of the State contract, all qualified applicants will be afforded equal employment opportunities without discrimination because of race, creed, color, national origin, sex, age, disability or marital status.

Contractor will include the provisions of "(a), (b) and (c)" above, in every subcontract over $25,000.00 for the construction, demolition, replacement, major repair, renovation, planning or design of real property and improvements thereon (the "Work") except where the Work is for the beneficial use of the Contractor.  Section 312 does not

apply to:  (i) work, goods or services unrelated to this contract; or (ii) employment outside New York State.  The State shall consider compliance by a contractor or subcontractor with the requirements of any federal law concerning equal employment opportunity which effectuates the purpose of this clause.  The contracting agency shall determine whether the imposition of the requirements of the provisions hereof duplicate or conflict with any such federal law and if such duplication or conflict exists, the contracting agency shall waive the applicability of Section 312 to the extent of such duplication or conflict. Contractor will comply with all duly promulgated and lawful rules and regulations of the Department of Economic Development's Division of Minority and Women's Business Development pertaining hereto.

**13.  CONFLICTING TERMS.**  In the event of a conflict between the terms of the contract (including any and all attachments thereto and amendments thereof) and the terms of this Appendix A, the terms of this Appendix A shall control.

**14.  GOVERNING LAW.**  This contract shall be governed by the laws of the State of New York except where the Federal supremacy clause requires otherwise.

**15.  LATE PAYMENT.**  Timeliness of payment and any interest to be paid to Contractor for late payment shall be governed by Article 11-A of the State Finance Law to the extent required by law.

**16.  NO ARBITRATION.**  Disputes involving this contract, including the breach or alleged breach thereof, may not be submitted to binding arbitration (except where statutorily authorized), but must, instead, be heard in a court of competent jurisdiction of the State of New York.

**17.  SERVICE OF PROCESS.**  In addition to the methods of service allowed by the State Civil Practice Law & Rules ("CPLR"), Contractor hereby consents to service of process upon it by registered or certified mail, return receipt requested. Service hereunder shall be complete upon Contractor's actual receipt of process or upon the State's receipt of the return thereof by the United States Postal Service as refused or undeliverable.  Contractor must promptly notify the State, in writing, of each and every change of address to which service of process can be made.  Service by the State to the last known address shall be sufficient.  Contractor will have thirty (30) calendar days after service hereunder is complete in which to respond.

**18.  PROHIBITION ON PURCHASE OF TROPICAL HARDWOODS.**  The Contractor certifies and warrants that all wood products to be used under this contract award will be in accordance with, but not limited to, the specifications and provisions of Section 165 of the State Finance Law, (Use of Tropical Hardwoods) which prohibits purchase and use of tropical hardwoods, unless specifically exempted, by the State or any governmental agency or political subdivision or public benefit corporation. Qualification for an exemption under this

law will be the responsibility of the contractor to establish to meet with the approval of the State.

In addition, when any portion of this contract involving the use of woods, whether supply or installation, is to be performed by any subcontractor, the prime Contractor will indicate and certify in the submitted bid proposal that the subcontractor has been informed and is in compliance with specifications and provisions regarding use of tropical hardwoods as detailed in § 165 State Finance Law. Any such use must meet with the approval of the State; otherwise, the bid may not be considered responsive. Under bidder certifications, proof of qualification for exemption will be the responsibility of the Contractor to meet with the approval of the State.

**19. MACBRIDE FAIR EMPLOYMENT PRINCIPLES.** In accordance with the MacBride Fair Employment Principles (Chapter 807 of the Laws of 1992), the Contractor hereby stipulates that the Contractor either (a) has no business operations in Northern Ireland, or (b) shall take lawful steps in good faith to conduct any business operations in Northern Ireland in accordance with the MacBride Fair Employment Principles (as described in Section 165 of the New York State Finance Law), and shall permit independent monitoring of compliance with such principles.

**20. OMNIBUS PROCUREMENT ACT OF 1992.** It is the policy of New York State to maximize opportunities for the participation of New York State business enterprises, including minority- and women-owned business enterprises as bidders, subcontractors and suppliers on its procurement contracts.

Information on the availability of New York State subcontractors and suppliers is available from:

> NYS Department of Economic Development
> Division for Small Business and Technology Development
> 625 Broadway
> Albany, New York 12245
> Telephone: 518-292-5100

A directory of certified minority- and women-owned business enterprises is available from:

> NYS Department of Economic Development
> Division of Minority and Women's Business Development
> 633 Third Avenue 33rd Floor
> New York, NY 10017
> 646-846-7364
> email: mwbebusinessdev@esd.ny.gov
> https://ny.newnycontracts.com/FrontEnd/searchcertifieddir ectory.asp

The Omnibus Procurement Act of 1992 (Chapter 844 of the Laws of 1992, codified in State Finance Law § 139-i and Public Authorities Law § 2879(3)(n)–(p)) requires that by signing this bid proposal or contract, as applicable, Contractors certify that whenever the total bid amount is greater than $1 million:

(a) The Contractor has made reasonable efforts to encourage the participation of New York State Business Enterprises as suppliers and subcontractors, including certified minority- and women-owned business enterprises, on this project, and has retained the documentation of these efforts to be provided upon request to the State;

(b) The Contractor has complied with the Federal Equal Opportunity Act of 1972 (P.L. 92-261), as amended;

(c) The Contractor agrees to make reasonable efforts to provide notification to New York State residents of employment opportunities on this project through listing any such positions with the Job Service Division of the New York State Department of Labor, or providing such notification in such manner as is consistent with existing collective bargaining contracts or agreements. The Contractor agrees to document these efforts and to provide said documentation to the State upon request; and

(d) The Contractor acknowledges notice that the State may seek to obtain offset credits from foreign countries as a result of this contract and agrees to cooperate with the State in these efforts.

**21. RECIPROCITY AND SANCTIONS PROVISIONS.** Bidders are hereby notified that if their principal place of business is located in a country, nation, province, state or political subdivision that penalizes New York State vendors, and if the goods or services they offer will be substantially produced or performed outside New York State, the Omnibus Procurement Act 1994 and 2000 amendments (Chapter 684 and Chapter 383, respectively, codified in State Finance Law § 165(6) and Public Authorities Law § 2879(5)) require that they be denied contracts which they would otherwise obtain. NOTE: As of May 2023, the list of discriminatory jurisdictions subject to this provision includes the states of South Carolina, Alaska, West Virginia, Wyoming, Louisiana and Hawaii.

**22. COMPLIANCE WITH BREACH NOTIFICATION AND DATA SECURITY LAWS.** Contractor shall comply with the provisions of the New York State Information Security Breach and Notification Act (General Business Law §§ 899-aa and 899-bb and State Technology Law § 208).

**23. COMPLIANCE WITH CONSULTANT DISCLOSURE LAW.** If this is a contract for consulting services, defined for purposes of this requirement to include analysis, evaluation, research, training, data processing, computer programming, engineering, environmental, health, and mental health services, accounting, auditing, paralegal, legal or similar services, then, in accordance with Section 163 (4)(g) of the State Finance Law (as amended by Chapter 10 of the Laws of 2006), the Contractor shall timely, accurately and properly comply with the requirement to submit an annual employment report for the contract to the agency that awarded the contract, the Department of Civil Service and the State Comptroller.

**24. PROCUREMENT LOBBYING.** To the extent this agreement is a "procurement contract" as defined by State Finance Law §§ 139-j and 139-k, by signing this agreement the contractor certifies and affirms that all disclosures made in accordance with State Finance Law §§ 139-j and 139-k are complete, true and accurate. In the event such certification is found to be intentionally false or intentionally incomplete, the State may terminate the agreement by providing written notification to the Contractor in accordance with the terms of the agreement.

**25. CERTIFICATION OF REGISTRATION TO COLLECT SALES AND COMPENSATING USE TAX BY CERTAIN STATE CONTRACTORS, AFFILIATES AND SUBCONTRACTORS.**
To the extent this agreement is a contract as defined by Tax Law § 5-a, if the contractor fails to make the certification required by Tax Law § 5-a or if during the term of the contract, the Department of Taxation and Finance or the covered agency, as defined by Tax Law § 5-a, discovers that the certification, made under penalty of perjury, is false, then such failure to file or false certification shall be a material breach of this contract and this contract may be terminated, by providing written notification to the Contractor in accordance with the terms of the agreement, if the covered agency determines that such action is in the best interest of the State.

**26. IRAN DIVESTMENT ACT.** By entering into this Agreement, Contractor certifies in accordance with State Finance Law § 165-a that it is not on the "Entities Determined to be Non-Responsive Bidders/Offerers pursuant to the New York State Iran Divestment Act of 2012" ("Prohibited Entities List") posted at: https://ogs.ny.gov/iran-divestment-act-2012

Contractor further certifies that it will not utilize on this Contract any subcontractor that is identified on the Prohibited Entities List. Contractor agrees that should it seek to renew or extend this Contract, it must provide the same certification at the time the Contract is renewed or extended. Contractor also agrees that any proposed Assignee of this Contract will be required to certify that it is not on the Prohibited Entities List before the contract assignment will be approved by the State.

During the term of the Contract, should the state agency receive information that a person (as defined in State Finance Law § 165-a) is in violation of the above-referenced certifications, the state agency will review such information and offer the person an opportunity to respond. If the person fails to demonstrate that it has ceased its engagement in the investment activity which is in violation of the Act within 90 days after the determination of such violation, then the state agency shall take such action as may be appropriate and provided for by law, rule, or contract, including, but not limited to, imposing sanctions, seeking compliance, recovering damages, or declaring the Contractor in default.

The state agency reserves the right to reject any bid, request for assignment, renewal or extension for an entity that appears on the Prohibited Entities List prior to the award, assignment, renewal or extension of a contract, and to pursue a responsibility review with respect to any entity that is awarded a contract and appears on the Prohibited Entities list after contract award.

**27. ADMISSIBILITY OF REPRODUCTION OF CONTRACT.** Notwithstanding the best evidence rule or any other legal principle or rule of evidence to the contrary, the Contractor acknowledges and agrees that it waives any and all objections to the admissibility into evidence at any court proceeding or to the use at any examination before trial of an electronic reproduction of this contract, in the form approved by the State Comptroller, if such approval was required, regardless of whether the original of said contract is in existence.

**New York State Department of Civil Service
April 2022**

APPENDIX B - STANDARD CLAUSES FOR ALL DEPARTMENT CONTRACTS

## Contents

1. Headings and Captions...................................................................................3

2. Compliance with Laws ...................................................................................3

3. Jurisdiction or Venue .....................................................................................3

4. Summary of Policy and Prohibitions on Procurement Lobbying .................3

5. Notice of Substantial Change in Contractor Status.......................................4

6. Notice of Circumstances Expected to Adversely Affect Contractor's Performance............................4

7. Severability.....................................................................................................4

8. Waiver of Breach............................................................................................5

9. Force Majeure .................................................................................................5

10. Modification of Contract...............................................................................5

11. Change Request ............................................................................................5

12. Piggybacking.................................................................................................6

13. No Third-Party Beneficiaries .......................................................................6

14. Work Outside of Scope of the Contract .......................................................6

15. Contract Payments .......................................................................................6

16. Liability for Taxes .......................................................................................6

17. State's Authority to Conduct Financial and Performance Audits ...............7

18. Independent Contractor ...............................................................................7

19. Subcontracting .............................................................................................8

20.     Contractor Staff ..................................................................................................................9

21.     Onboarding and Suitability Determinations .................................................................10

22.     Separation of Duties ........................................................................................................10

23.     Dispute Resolution ...........................................................................................................11

24.     Indemnification and Limitation of Liability ...................................................................11

25.     Insurance Requirements ..................................................................................................12

26.     Warranties and Guarantees ............................................................................................13

27.     Ownership of and Title to Contract Deliverables .........................................................14

28.     Confidentiality and Non-Disclosure ...............................................................................15

29.     Freedom of Information Law ...........................................................................................17

30.     Data Ownership and Use .................................................................................................18

31.     Termination .......................................................................................................................18

32.     Continuing Obligation to Remain Responsible .............................................................20

33.     Suspension of Work ..........................................................................................................20

34.     Default ...............................................................................................................................21

35.     General Provisions as to Remedies ................................................................................21

36.     Cooperation with Third Parties .......................................................................................21

37.     Publicity and Communications ........................................................................................22

38.     Accessibility .......................................................................................................................22

39.     Branding and Universal Web Navigation .......................................................................22

40.     Migration ...........................................................................................................................23

41.     Disclosure of Breach .........................................................................................................23

5. Notice of Substantial Change in Contractor Status

In addition to the requirements of New York State Finance Law §138 (requiring the State's approval of subcontractors and assignments and/or conveyances), the Contractor shall notify the Department of any substantial change in the ownership or financial viability of the Contractor, its Affiliates, subsidiaries or divisions, or partners, in writing immediately upon occurrence. "Substantial change" means: (i) sales, acquisitions, mergers or takeovers of the Contractor, its Affiliates, subsidiaries, divisions, or partners that result in a change in the controlling ownership or assets of such entity after the submission of the Bid or execution of Contract; (ii) entry of an order for relief under Title 11 of the United States Code; (iii) the making of a general assignment for the benefit of creditors; (iv) the appointment of a receiver of Contractor's business or property or that of its Affiliates, subsidiaries or divisions, or partners; or action by Contractor, its Affiliates, subsidiaries or divisions, or partners under any State insolvency or similar law for the purposes of its bankruptcy, reorganization, or liquidation; or (v) court ordered liquidation of Contractor, its Affiliates, subsidiaries or divisions, or partners.

Upon the Department's receipt of such notice, the Department shall have thirty (30) business days from the date of notice to review the information. The Contractor may not transfer the Contract to or among Affiliates, subsidiaries or divisions, or partners, or to any other person or entity, without the express written consent of the Department. In addition to any other remedies available at law or equity, the Department shall have the right to terminate the Contract, in whole or in part, for cause, if it finds, in its sole judgment, that such substantial change adversely affects the delivery of Services or is otherwise not in the best interests of the State.

6. Notice of Circumstances Expected to Adversely Affect Contractor's Performance

The Contractor shall immediately notify Department upon learning of any situation that can reasonably be expected to adversely affect the delivery of Project Services under the Contract. If such notification is verbal, the Contractor shall follow such initial verbal notice with a written notice to Department within three (3) calendar days of Contractor's becoming aware of the situation.  The written notification shall include a description of the situation and a recommendation of a resolution.

7. Severability

In the event that one or more of the provisions of the Contract shall for any reason be declared unenforceable by a court of competent jurisdiction under the laws or regulations in force, such provision(s) shall have no effect on the validity of the

remainder of the Contract, which shall then be construed as if such unenforceable provision(s) was never contained in the Contract.

8. Waiver of Breach

No term or provision of the Contract shall be deemed waived, and no breach excused, unless such waiver or consent shall be in writing and signed by the Party claimed to have waived or consented. No consent by a Party to, or waiver of, a breach under the Contract shall constitute consent to, a waiver of, or excuse for any other, different or subsequent breach. The rights, duties and remedies set forth in the Contract shall be in addition to, and not in limitation of, rights and obligations otherwise available at law or equity.  No delay or omission to exercise any right, power or remedy accruing to either party upon breach or default by the other under this Contract shall impair any such right, power or remedy.

9. Force Majeure

Neither Party to the Contract shall be liable or deemed to be in default for any delay or failure in performance under the Contract resulting directly or indirectly from acts of God, civil or military authority, acts of public enemy, wars, riots, civil disturbances, insurrections, accident, fire, explosions, earthquakes, floods, the elements, acts or omissions of public utilities or strikes, work stoppages, slowdowns or other labor interruptions due to labor/management disputes involving entities other than the Parties to the Contract, or any other causes not reasonably foreseeable or beyond the control of a Party.  Each Party is required to use best efforts to eliminate or minimize the effect of such events during performance of the Contract and to resume performance of the Contract upon termination or cessation of such events.

10. Modification of Contract

The Contract may be amended only by mutual written consent of the Parties and approved by the New York State Attorney General and Office of the State Comptroller, if required.

11. Change Request

At any time during the term of this Contract, the Department may make changes, subtractions or additions in any of the equipment, software, documentation, Project Services and/or other Deliverables within the general scope of work set forth in the Contract, consistent with pricing established under the terms of the Contract. All such changes shall be made using a mutually agreed upon form executed by the Parties and shall otherwise be in accordance with the terms and conditions of the Contract.  If any such change causes an increase or decrease in pricing or the time required for the

performance of the Contract, an equitable adjustment of the Contract amount and/or time of performance will be made on mutual agreement of the Parties, subject to the approval of the New York State Office of the State Comptroller and any applicable control agency, if required.

12. Piggybacking

Contractor acknowledges and agrees that, pursuant to State Finance Law § 163(10)(e), the New York State Office of General Services may authorize and approve purchases from contracts between Contractor and Department to other New York State agencies, authorities, the United States Government or any other state, with the concurrence of the Office of the State Comptroller and under appropriate circumstances.

13. No Third-Party Beneficiaries

Nothing contained in the Contract, expressed or implied, is intended to confer upon any person or corporation, other than the Parties hereto and their successors in interest and assigns, any rights or remedies under or by reason of the Contract.

14. Work Outside of Scope of the Contract

The Contractor must not perform work outside the scope of the Contract unless such work is authorized by a properly executed written amendment to the Contract, and if applicable, approved by the Office of the State Comptroller.  Work not so authorized shall not be compensated.

15. Contract Payments

Payments for commodities received or Services rendered shall be in accordance with the Contract.  The State's payment obligations shall be governed by the provisions of the New York State Finance Law ("SFL") Article 11-A.

16. Liability for Taxes

a) The Department represents that the purchases on behalf of the State of New York are not subject to any state or local sales or use taxes, or to  federal excise taxes.

b) Contractor remains liable and solely responsible without exemption for social security, unemployment insurance, workers' compensation and other taxes and obligations to which Contractor may be subject to by law.

### 17. State's Authority to Conduct Financial and Performance Audits

The Contractor acknowledges that the Department and the Office of the State Comptroller have the authority to conduct financial and performance audits of the Contractor's delivery of Project Services and any applicable State and federal statutory and regulatory authorities.  The audit activity may include, but is not limited to, the review of documentary evidence to determine the accuracy and fairness of all items on the Contractor's submission of claims for payment under the Contract, and the review of any and all activities relating to the Contractor's performance and administration of the Contract.

In addition to any requirements set forth in the Contract, the Contractor shall make available any documentation necessary to perform such reviews including the copying of the documentation.  Documentation made available by the Contractor may include, but is not limited to, source documents, books of account, subsidiary records and supporting work papers, claim documentation and pertinent contracts and correspondence.

The audit provisions contained herein shall in no way be construed to limit the audit authority or audit scope of the Office of the State Comptroller as set forth in Appendix A of the Contract, Standards Clauses for All New York State Contracts, or any audit requirements related to the security of the Contractor's systems.
Further, upon request by the State, the Contractor shall cooperate with the State, including the Office of the State Comptroller, in any investigation, audit, or other inquiry related to the Solicitation or the resulting Contract or any related litigation, at no cost to the State. This provision shall survive the termination of the Contract.

### 18. Independent Contractor

The Parties agree that the Contractor is an independent contractor, and the Contractor, its officers, employees, agents, consultants, contractors and/or subcontractors in the performance of the Contract shall act in an independent capacity and not as agents, officers or employees of the State or the Department.  Neither the Contractor nor any subcontractor shall thereby be deemed an agent, officer, or employee of the State. The Contractor agrees, during the term of the Contract, to maintain at the Contractor's expense those benefits to which its employees would otherwise be entitled by law, including health benefits, and all necessary insurance for its employees, including workers' compensation, disability and unemployment insurance, and to provide the Department with certification of such insurance upon request.  The Contractor remains responsible for all applicable federal, State, and local taxes, and all Federal Insurance Contributions Act payments.

19. Subcontracting

If allowed in the solicitation, the Contractor may arrange for specified portions of its responsibilities to be subcontracted.  The Contractor shall not in any way be relieved of any responsibility under the Contract by any subcontract. The Contractor shall be solely responsible to the Department for the acts or defaults of its Subcontractor(s) and of such Subcontractors' officers, agents, and employees, each of whom shall for this purpose, be deemed to be the agent or employee of the Contractor to the extent of its subcontract. Any Deliverable provided or furnished by a Subcontractor shall be deemed for purposes of the Contract to be provided or furnished by the Contractor.
The Contractor shall inform each Subcontractor fully and completely of all provisions and requirements established by the Contract and enter into a written subcontract. Such subcontract shall include the functional equivalent of the Contract, and include such clauses:

- That the work performed by the Subcontractor must be in accordance with the terms and conditions of this Contract.
- That nothing contained in such subcontract shall impair the rights of the Department or the State.
- That nothing contained in the subcontract shall create any contractual relationship between the Subcontractor and the Department or the State.
- That the State and Department shall have the same authority to audit the records of all Subcontractors as it does those of the Contractor.
- That Subcontractor shall cooperate with any investigation, audit, litigation or other inquiry related to the Solicitation or the resulting Contract.
- That Subcontractor shall maintain and protect against any unauthorized disclosure of records with respect to work performed under the subcontract in the same manner as required of the Contractor
- The Contractor shall require that the Subcontractor must pass through all terms and conditions of the Contract, including but not limited to Appendix A, to any lower tier subcontractors.
- Unless waived by the Department, each subcontract shall expressly name the State of New York through the Department as the sole intended third party beneficiary of such subcontract.

The Department reserves the right to review and approve or reject any subcontract with a Subcontractor, as well as any amendments to said subcontract(s).  This right shall not make the Department or the State a party to any subcontract or create any right, claim, or interest in the Subcontractor or proposed Subcontractor against the Department.

The Department reserves the right, at any time during the term of the Contract, to verify that the written subcontract between the Contractor and Subcontractor(s) is in compliance with all of the provisions of this Contract.  In addition to other remedies

allowed by law, the Department reserves the right to terminate the Contract for cause if an executed subcontract does not contain all of the required provisions.

The Contractor shall give the Department immediate notice in writing of the initiation of any legal action or suit which relates in any way to a subcontract with a Subcontractor or which may affect the performance of the Contractor's duties under the Contract. Failure to disclose the identity of any and all Subcontractor(s) used by the Contractor as required hereunder may, at the sole discretion of the Department, result in a disqualification of the Subcontractor, if not immediately cured, or may result in termination of the Contract for cause.  The Contractor shall pay all Subcontractors for and on account of Project Services and/or Deliverables provided by such Subcontractors in accordance with the terms of their respective subcontracts. If and when required by the Department, the Contractor shall submit satisfactory evidence that it has made such payment.  The Contractor shall, within five (5) Business Days of the Department's written request, file promptly with the Department a copy of any subcontract providing Services for the Contract.

20.  Contractor Staff

All Contractor Staff performing work under the Contract must: meet or exceed the technical and training qualifications set forth in the Contract; comply with all security and administrative requirements of the Department; possess the necessary qualifications, training, licenses, and permits as may be required within the jurisdiction where the work will  be provided or performed; and be legally entitled to work in such jurisdiction. All persons, corporations, or other legal entities that perform Project Services under the Contract on behalf of Contractor shall, in performing the Project Services, comply with all applicable Federal and State laws concerning employment in the United States. Contractor Staff may be required to execute a Department Nondisclosure Agreement, either before or upon arrival for work at a State facility or, if in Department's sole discretion, the Contractor's Staff will otherwise have access to critical State Networks, equipment or data.

The Department, in its sole discretion, may require the Contractor to remove from interaction with the State, or may refuse access to State systems and facilities or require removal from any State facility any Contractor Staff performing work under this Contract that the Department determines poses a security risk, has a work performance that the Department finds inadequate or unacceptable, or otherwise fails to meet the Department's business requirements or expectations. The Contractor shall not assign such removed person to any aspect of the Contract without the State's written consent. Such action by the Department shall not relieve the Contractor of the obligation to perform all work in compliance with the Contract terms.

For reasons of safety and public policy, the use of illegal drugs and/or alcoholic beverages by the Contractor Staff shall not be permitted while performing any phase of Contract work.

The State shall not be liable for any expense incurred by the Contractor Staff for any parking or towing fees or as a consequence of any traffic infraction or parking violations attributable to Contractor Staff.

21. Onboarding and Suitability Determinations

The Contractor, including all Contractor Staff who work on the Contract, must comply with all State and Federal onboarding and security clearance requirements, at its own expense.

Contractor is responsible, at its own expense, for making suitability determinations on its Contractor Staff prior to the staff member performing any work in connection with this Contract.  For purposes of this provision, a "suitability determination" is a determination that there are reasonable grounds to believe that an individual will likely be able to perform the Contract requirements without undue risk to the interests of the State. Upon request of the State, the Contractor shall certify to the State that the suitability determinations required by this provision have been completed for all Contractor Staff performing work in connection with this Contract.

Failure of a security clearance or non-compliance with this provision will disqualify any Contractor Staff from performing any Services under the Contract. All expenses, including travel and lodging, associated with the onboarding and security clearance process, including fingerprinting of Contractor Staff, if required, are the responsibility of the Contractor and are not reimbursable.

If Contractor Staff have any lapse in work under the Contract, such individuals may be subject to all onboarding and security clearance requirements if they are returned to performing Project Services under the Contract.

The State also reserves the right to: (a)conduct a background check or otherwise approve any Contractor Staff performing work on this Contract or having access to Data; and (b) refuse access to, eject or require replacement of any personnel at the Department's discretion for any reason.

22. Separation of Duties

The Department requires the Contractor to follow security best practices by adhering to separation of job duties and limiting Contractor Staff access to Data to the minimum necessary to accomplish the intended purpose (i.e., job duties).

10

23. Dispute Resolution

Unless otherwise agreed to in writing by the Parties, any dispute raised by the Contractor concerning any question of fact or law arising under the Contract which is not disposed of by mutual agreement of the Parties shall be decided initially by the designee of the Commissioner ("Commissioner").  A copy of the written decision shall be furnished to the Contractor.  The Parties shall proceed diligently with the performance of the Contract and shall comply with the provisions of such decision and continue to comply pending further resolution of any such dispute as provided herein.  The decision of the designee of the Commissioner shall be final and conclusive unless, within ten (10) Days from the receipt of such decision, the Contractor furnishes the Commissioner a written appeal.  In the event of an appeal, the Commissioner shall promptly review the initial decision, and confirm, annul, or modify it.  The decision of the Commissioner shall be final and conclusive unless, as determined by a court of competent jurisdiction, it violates one of the provisions of section 7803 of the Civil Practice Law and Rules ("Article 78").  Pending final decision of any Article 78 proceeding, the Parties shall diligently perform the Contract in accordance with the Commissioner's decision.

24. Indemnification and Limitation of Liability

a.      Indemnification:
Contractor shall be fully liable for the actions of its agents, officers, employees, partners, or subcontractors, and shall fully indemnify and save harmless the State, without limitation, from suits, actions, damages, and costs of every name and description relating to personal injury and damage to real or personal property caused by Contractor, its agents, officers, employees, partners, or subcontractors, if any, without limitation; provided however, that the Contractor shall not indemnify for that portion of any claim, loss, or damage arising hereunder due to the negligent act or negligent failure to act of the State.

Contractor shall indemnify, defend and hold the State harmless, without limitation, from any loss or damage to the State resulting from suits, actions, damages, and costs of every name and description resulting from any criminal acts committed by Contractor's officers, agents, employees, and subcontractors while providing Project Services under the Contract.

b.      Indemnification for Intellectual Property Infringement:
Contractor shall indemnify, defend, and hold the State harmless, without limitation, from and against any and all damages, expenses (including reasonable attorneys' fees and legal fees), claims, judgments, liabilities, and costs which may be assessed against the State in any action for infringement of a United States Letter Patent, or of any copyright,

11

trademark, trade secret, or other third-party proprietary right in relation to the Services, products, documentation or Deliverables furnished or utilized by Contractor under this Contract, provided that the State shall give Contractor: (i) prompt written notice of any action, claim, or threat of infringement suit, or other suit; (ii) the opportunity to take over, settle or defend such action, claim or suit at Contractor's sole expense; and (iii) assistance in the defense of any such action at the expense of Contractor. Where a dispute or claim arises relative to a real or anticipated infringement, the State may require Contractor, at is sole expense, to submit such information and documentation, including formal patent attorney opinions, as the State shall require. This paragraph shall not apply to that portion of any infringement claim which results from a material modification by the State, without Contractor's approval, of any products, documentation or Deliverables furnished or utilized by Contractor pursuant to this Contract. Notwithstanding the foregoing, the State reserves the right to join such action, at its sole expense, when it determines that there is an issue involving a significant public interest.

c.      Limitation of Liability

For all other claims against the Contractor where liability is not otherwise set forth in the Contract as being "without limitation" or not subject to the limitation of liability provisions, and regardless of the basis on which the claim is made, Contractor's liability under the Contract for direct damages shall be limited to the greater of the following: (i) $500,000 (Five Hundred Thousand Dollars); or (ii) two (2) times the amounts paid to the Contractor for Project Services under the Contract during the twelve (12) months of the Contract term which precedes the giving of notice of the claim by the State. For this purpose, amounts paid shall include, but not be limited to, payments made electronically, by check, by offset, or by the application of credits from the Contractor to the State. Unless otherwise specifically enumerated herein, neither party shall be liable for any incidental, punitive, consequential, indirect or special damages of any kind which may result directly or indirectly from the performance of this Contract, including, without limitation, damages resulting from loss of use or loss of profit by the State, the Contractor, or by others, however caused and regardless of the theory of liability even if such party has been informed of the possibility of such damages.

d.      No Indemnification by the State:

The State does not agree to any indemnification provisions that requires the State to indemnify or save harmless Contractor or third parties.

25.  Insurance Requirements

Prior to the commencement of work, Contractor shall file with the Department Certificates of Insurance evidencing compliance with all the requirements contained in the Solicitation. Acceptance and/or approval by the Department does not and shall not be construed to relieve Contractor of any obligations, responsibilities or liabilities under the Contract.

Contractor shall cause all required insurance to be in full force and effect as of the commencement date of the Contract and to remain in full force and effect throughout the term of the Contract and as required by the Contract. Contractor shall not take any action or omit to take any action that would suspend or invalidate any of the required coverages during the period of time such coverages are required to be in effect.

26.  Warranties and Guarantees

a.  Contract Deliverables: Contractor warrants and represents that the  Services required by the solicitation and the Contract shall be performed or provided in accordance with all the terms and conditions, covenants, statements, and representations contained in the Contract. Contractor's failure to meet pre-defined service levels or service level guarantees may result in a credit or chargeback in an amount pre- determined by the Parties.

b.  Product Performance:  Contractor hereby warrants and represents that Products acquired by the State under this Contract conform to the manufacturer's specifications, performance standards and documentation and that the documentation fully describes the proper procedure for using the Products.

c.  Title and Ownership:  Contractor warrants and represents that it has: (i) full ownership, clear title free of all liens; or (ii) the right to transfer or deliver specified license rights to any Products acquired by the State under the Contract. Contractor shall be solely liable for any costs of acquisition associated therewith. Contractor shall indemnify the State and hold the State harmless from any damages and liabilities (including reasonable attorneys' fees and costs) arising from any breach of Contractor's warranties as set forth herein.

d.  Workmanship Warranty:  Contractor warrants and represents that all Services and Deliverables shall meet the completion criteria set forth in the Contract, and that Services will be provided in a professional and workmanlike manner in accordance with the highest applicable industry standards.

e.  Personnel Eligible for Employment:  Contractor warrants and represents that all personnel performing Services under this Contract are qualified to provide Services and eligible for employment in the United States and shall remain so throughout the term of the Contract. Contractor shall provide such proof of compliance as is required by Department.

f.  Virus Warranty:  The Contractor represents and warrants that any Product acquired by the Department does not contain any known viruses. Contractor is not responsible for viruses introduced at the Department's site by third parties who are not Contractor Staff.

g.  Date/Time Warranty: Contractor warrants that Product furnished pursuant to this Contract shall, when used in accordance with the product documentation, be able to accurately process date/time data (including, but not limited to, calculating, comparing, and sequencing) transitions, including leap year calculations. Where a Contractor proposes, or an acquisition requires that specific Products must perform as a package or system, this warranty shall apply to the Products as a system.

Where Contractor is providing ongoing Services, including but not limited to:

i.   consulting, integration, code or data conversion;
ii.  maintenance or support Services;
iii. data entry or processing; or
iv.  contract administration Services (e.g., billing, invoicing, claim processing), Contractor warrants that Services shall be provided in an accurate and timely manner without interruption, failure or error due to the inaccuracy of Contractor's business operations in processing date/time data (including, but not limited to, calculating, comparing, and sequencing) various date/time transitions, including leap year calculations. Contractor shall be responsible for damages resulting from any delays, errors or untimely performance resulting therefrom, including but not limited to the failure or untimely performance of such Services.

h.  Additional Warranties:  Where Contractor generally offers additional or more advantageous warranties than those set forth herein, Contractor shall offer or pass through any such warranties to the State.

i.   No Limitation of Rights:  The rights and remedies of the State provided in this clause are in addition to and do not limit any rights afforded to the State by any other clause of the Contract.

j.   Survival of Warranties:  All warranties contained in the Contract shall survive termination of the Contract.

k.  No Implied Warranties:  To the extent permitted by law, these warranties are exclusive and there are no other express or implied warranties or conditions, including warranties or conditions of merchantability and fitness for a particular purpose.

27. Ownership of and Title to Contract Deliverables

a. Contractor acknowledges that it is commissioned by the State to perform the Project Services detailed in the Contract which may include the development of intellectual property by Contractor, its Subcontractors, partners, employees or agents for the State ("Custom Products"). Unless otherwise specified in writing in the Contract, upon the creation of such Custom Products, Contractor hereby conveys, assigns and transfers to the State the sole and exclusive rights, title and interest in the Custom Products, whether preliminary, final or otherwise, including all trademark and copyrights. Contractor hereby agrees to take all necessary and appropriate steps to ensure that the Custom Products are protected against unauthorized copying, reproduction and marketing by or through Contractor, its agents, employees, or Subcontractors. Nothing herein shall preclude the Contractor from otherwise using the related or underlying general knowledge, skills, ideas, concepts, techniques and experience developed in performing Services under the Contract in the course of Contractor's business. The State may, by providing written notice thereof to the Contractor, elect in the alternative to take a non- exclusive perpetual license to Custom Products in lieu of taking exclusive ownership and title to such Products. In such case, the State shall be granted a non-exclusive perpetual license to use, execute, reproduce, display, perform, adapt and distribute Custom Product as necessary to fully effect the general business purpose(s) as stated in the Contract.

b. Ownership of and Title to Existing Software

Title and ownership to existing software delivered by Contractor under the Contract that is normally commercially distributed by the Contractor or a third-party proprietary owner, whether or not embedded in, delivered or operating in conjunction with hardware or Custom Products shall remain with Contractor or the third party. Effective upon acceptance, such existing software shall be licensed to the State and must, at a minimum, grant the State a non-exclusive, perpetual license to use, execute, reproduce, display, perform, adapt (unless Contractor advises the State as part of Contractor's proposal that adaptation will violate existing agreements or statutes and Contractor demonstrates such to the State's satisfaction) and distribute existing software to the State up to the license capacity stated in the Contract with all license rights necessary to fully effect the general business purposes stated in the Solicitation. With regards to third party software, the Contractor shall be responsible for obtaining these rights at its sole cost and expense.

28. Confidentiality and Non-Disclosure

a. Confidentiality
Except as may be required by applicable law or a court of competent jurisdiction, the Contractor, its officers, agents, employees, and subcontractors, if any, shall maintain strict confidence with respect to any "Confidential Information" to which the Contractor, its officers, agents, employees, and subcontractors, if any, have access. This

15

requirement shall survive termination of the Contract. Contractor agrees that all officers, agents, employees and subcontractors, if any, shall be made aware of and shall agree to the terms of this Contract. Upon the request of the State or Department, all of Contractor's officers, agents, employees and subcontractors with access to Data shall cooperate in executing a written confidentiality/nondisclosure agreement and/or security addendum under applicable confidentiality and privacy laws, rules, and regulations or policies.  If the State or Department does not request the execution of a written confidentiality/nondisclosure agreement and/or security addendum then Contractor shall ensure all officers, agents, employees and subcontractors with access to Data are bound by a confidentiality/nondisclosure agreement and/or security addendum requirements consistent with applicable confidentiality and privacy laws, rules and regulations or policies.

For purposes of the Contract, all data from the State of which Contractor, its officers, agents, employees, and subcontractors, if any, becomes aware during the Contract performance shall be deemed to be Confidential Information (whether oral, visual or written).  Notwithstanding the foregoing, data that falls into any of the following categories shall not be considered Confidential Information:

- i. information that is previously rightfully known to the receiving party without restriction on disclosure;
- ii. information that becomes, from no act or failure to act on the part of the receiving party, generally known in the relevant industry or is in the public domain; and
- iii. information that is independently developed by Contractor without use of Confidential Information of the State.

In the event that it is necessary for Contractor to receive Confidential Information, which Federal or State statute or regulation prohibits from disclosure, Contractor hereby agrees it shall not retain a copy of such Confidential Information and shall either return or destroy, in accordance with the provisions of this Contract, all such Confidential Information when the purpose that necessitated its receipt by Contractor has been completed.

Notwithstanding the foregoing, if the return or destruction of the Confidential Information is not feasible, Contractor agrees to extend the contractual protections for as long as necessary to protect the Confidential Information and to limit any further use or disclosure of that Confidential Information.

Contractor agrees that it shall use all appropriate safeguards to prevent any unauthorized use or unauthorized disclosure of Confidential Information, which Federal or State statute or regulation prohibits from disclosure.

Contractor agrees that it shall immediately report to the Department the discovery of any unauthorized use or unauthorized disclosure of such Confidential Information in accordance with the Contract notification provisions.  The Parties agree that a violation of this section shall be deemed a material breach of contract.

b.      Non-disclosure:   Except as otherwise required by law, Contractor shall not disclose Data to a third party. Except where expressly prohibited by law, Contractor shall promptly notify the Department of any subpoena, warrant, judicial, administrative or arbitral order of an executive or administrative agency or other governmental authority of competent jurisdiction (a "Demand") that it receives and which relates to or requires production of the information or data Contractor is processing or storing on the State's behalf where the State is the object of the underlying subpoena, warrant, judicial, administrative or arbitral order. If Contractor is required to produce information or data in response to such Demand, Contractor will provide the Department with the information or data in its possession that it plans to produce in response to the Demand prior to production of such information or data. Except as otherwise required by law, Contractor shall provide the Department with reasonable time to assert its rights with respect to the withholding of such information or Data from production. If the State is required to produce information or data in response to a Demand, Contractor will, at the State's request and unless expressly prohibited by law, produce to the State any information or data in its possession that may be responsive to the Demand and shall provide assistance as is reasonably required for the State to respond to the Demand in a timely manner. The State acknowledges that Contractor has no responsibility to interact directly with the entity making the Demand. The Parties agree that the State's execution of this Contract, does not constitute consent to the release or production of Data or information.

Contractor agrees that access to and use of sensitive and Confidential Information is limited to authorized employees and legally designated agents, for authorized purposes only.

To the extent that Contractor, or Contractor Staff have access to Federal, State or local government Regulated Data pursuant to their responsibilities under the Contract, Contractor agrees that it will abide by the requirements of those Federal and State laws and regulations.

29. Freedom of Information Law

Disclosure of information related to this solicitation and the resulting Contract shall be permitted consistent with New York State laws, specifically the Freedom of Information Law (FOIL). The Department shall take reasonable steps to protect from public disclosure any records or portions thereof relating to this solicitation that are exempt from disclosure under FOIL.  Information constituting trade secrets or critical infrastructure information for purposes of FOIL must be clearly marked and identified as

17

such by the Contractor upon submission in accordance with the solicitation provisions. If the Contractor intends to request an exemption from disclosure under FOIL, the Contractor shall at the time of submission, request the exemption in writing and provide an explanation of why the information should be exempted from disclosure pursuant to Public Officers Law § 87(2) of FOIL. Acceptance of the identified information by the Department does not constitute a determination that the information is exempt from disclosure under FOIL. Determinations as to whether the materials or information may be withheld from disclosure will be made in accordance with FOIL at the time a request for such information is received by the Department.

30. Data Ownership and Use

All Data is owned exclusively by the Department and will remain the property of   the Department. Contractor is permitted to use Data solely for the purposes set forth in the Solicitation and resulting Contract, and for no other purpose. At no time shall the Contractor access, use, or disclose any Confidential Information (including personal, financial, health, or criminal history record information) for any other purpose. The Contractor is strictly prohibited from releasing or using Data or information for any purposes other than those purposes specifically authorized by the Department. Contractor agrees that Data shall not be distributed, used, repurposed, transmitted, exchanged or shared across other applications, environments, or business units of the Contractor or otherwise passed to other contractors, agents, subcontractors or any other interested parties, except as expressly and specifically agreed to in writing by the Department. This provision shall survive the termination of the Contract.

31. Termination

I.   In addition to the provisions set forth in Appendix A or elsewhere in this Contract, this Contract may be terminated as follows:

a. For Convenience:
By written notice, this Contract may be terminated at any time by the State for convenience upon sixty (60) calendar days written notice without penalty or other early termination charges due. If the Contract is terminated pursuant to this paragraph, the State shall remain liable for all accrued but unpaid charges incurred through the date of the termination.

b. For Cause:
The Contract may be terminated by the Department for cause upon the failure of the Contractor to comply with the terms and conditions of the Contract, provided that the Department shall give the Contractor written notice. Such written notice will specify the Contractor's failure and the termination of the Contract.  Termination shall be effective no earlier than

18

thirty (30) Calendar Days after receipt of such notice unless the Contractor, in the opinion of the Department, has cured such failure. Such cure period may be extended by the Department in writing. The Contractor agrees to incur no new obligations nor to claim for any expenses made after receipt of the notification of termination without the prior written approval of the Department.  Upon termination for cause, the Department shall have the right to award a new contract to another contractor. Termination for cause shall create a liability upon the Contractor for actual damages incurred and for all reasonable additional costs incurred in reassigning the Contract.

c. For Suspension or Delisting of Contractor's Securities:
The State, in its sole discretion, may terminate the Contract or exercise such other remedies as shall be available under the Contract, at law or in equity if:  the Contractor's securities are suspended or delisted by the New York Stock Exchange, the American Stock Exchange, or the NASDAQ, as applicable: the Contractor ceases conducting business in the normal course, becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets; or avails itself of or becomes subject to any proceeding under the Federal Bankruptcy Act or any statute of any state relating to insolvency or the protection of rights of creditors.

d. For Vendor Responsibility Related Findings:
The Department may, in its sole discretion, terminate the Contract if it finds at any time during the Contract term that the Contractor is non-responsible, or that any information provided in the Vendor Responsibility Questionnaire submitted with Contractor's Bid was materially false or incomplete, or if the Contractor fails to timely or truthfully comply with Department's request to update its Vendor Responsibility Questionnaire.

e. Termination for Non-Responsibility:
Upon written notice to the Contractor, and after a reasonable opportunity to be heard with the appropriate Department officials, the Contract may be terminated by the Commissioner at the Contractor's expense where the Contractor is determined to be non-responsible.  In such an event, the Commissioner may complete the contractual requirements in any manner s/he may deem advisable and pursue legal or equitable remedies for the Contractor's breach.

f. For Lack of Funds:
The Contract may be terminated immediately in the event the Department determines that funds are unavailable.  The Department agrees to provide

notice to the Contractor as soon as it becomes aware that funds are unavailable in the event of termination under this paragraph.  If the initial notice is via oral notification, the Department shall provide written notice immediately thereafter.  The Department shall be obligated to pay the Contractor only for the expenditures made and obligations incurred by the Contractor until such time as notice of termination is received, in writing, by the Contractor from the Department.

II.    Mitigation of Costs:
The Contractor shall not undertake any additional or new obligations under this Contract on or after the receipt of notice of termination without the prior written approval of the State. On or after the receipt of a notice of termination and during the termination notice period, the Contractor shall take all commercially reasonable and prudent actions to mitigate additional costs to the State and close out any unnecessary State obligations or expenses which do not impact the level of service required by the Contractor under the Agreement.

32.  Continuing Obligation to Remain Responsible

The Contractor shall at all times during the Contract term remain responsible.  The Contractor agrees, if requested by the Commissioner or his or her designee, to present evidence of its continuing legal authority to do business in New York State, integrity, experience, ability, prior performance, and organizational and financial capacity, including the submission of an updated Vendor Responsibility Questionnaire.
The Contractor is required to promptly report to the Department any material changes in the information reported in its initial Vendor Responsibility Questionnaire.

33.  Suspension of Work

The Department reserves the right to suspend any or all activities under the Contract, at any time, in the best interests of the State. In the event of such suspension, the Contractor will be given a formal written notice outlining the particulars of such suspension. Examples of the reasons for such suspension include but are not limited to, a budget freeze on State spending or declaration of emergency. Upon issuance of such notice, the Contractor shall comply with the suspension order. Contractor shall be paid for Services performed prior to suspension in accordance with the Contract. Such suspension will be lifted upon written notice to Contractor.
Nothing in this paragraph shall diminish the State's right to terminate the Contract as provided in the Contract.

34.  Default

a.  If either party breaches a material provision of this Contract and such breach remains uncured for a period of thirty (30) days after written notice thereof from the other party specifying the breach, then the other party may, at its option, terminate this Contract in accordance with the provisions of the Contract and exercise such other remedies as shall be available under the Contract, at law and/or equity.

b.  If, due to default that remains uncured for the period provided herein, a third party shall commence to perform Contractor's obligations under this Contract, the State shall thereafter be released from all obligations to Contractor hereunder, including any obligation to make payment to Contractor, provided however that the State shall continue to be obliged to pay for any and all Services provided prior to any such date, and if any lump-sum payment has been made, the State shall be entitled to a pro-rata refund of such payment.

35.  General Provisions as to Remedies

a.  Except as otherwise set forth in the Agreement, the Parties may exercise their respective rights and remedies at any time, in any order, to any extent, and as often as deemed advisable, without regard to whether the exercise of one right or remedy precedes, concurs with or succeeds the exercise of another. A single or partial exercise of a remedy shall not preclude a further exercise of the right or remedy or the exercise of another right or remedy from time to time. No delay or omission in exercising a right or remedy, or delay, inaction, or acquiescence to, an event otherwise constituting a breach or default under the Contract.

b.  In addition to any other remedies available to the State under the Contract and state and federal law for Contractor's default, the State may choose to exercise some or all of the following:

i.    Suspend, in whole or in part, payments due to Contractor under this Contract;
ii.   Pursue equitable remedies to compel Contractor to perform;
iii.  Apply Service Credits against amounts due and owing by the State under the Contract; or
iv.   Require Contractor to cure deficient performance or perform the requirements of the solicitation at no charge to the State.

36. Cooperation with Third Parties

Upon request by the State, the Contractor shall reasonably cooperate with any third party designated by the State such as, but not limited to, other contractors or Subcontractors, including successor Contractors, retained by the State.

37. Publicity and Communications

The Contractor shall ensure that all requests for the Contractor's participation in events where the Contractor will be participating on behalf of the Department receive prior written authorization from the Department.

No public discussion or news releases relating to the Contract shall be made or authorized by the Contractor or the Contractor's agent without the prior written approval of the Department, which written approval shall not be unreasonably withheld or delayed.  Contractor shall be authorized to provide copies of the Contract and answer any questions relating thereto to any State or federal regulators or, in connection with its financial activities, to financial institutions for any private or public offering.

38.  Accessibility

a.  Web Accessibility:
Any network-based information and applications development, or programming delivered to or by the State pursuant to this contract or procurement, will comply with Section 508 of the Rehabilitation Act of 1973, as amended, and be consistent with New York State Enterprise IT Policy NYS-P08-005, Accessibility of Information Communication Technology, as such policy may be amended, modified or superseded (the "Accessibility Policy"). The Accessibility Policy requires that the Department's Information Communication Technology shall be accessible to persons with disabilities as determined by accessibility compliance testing. Such accessibility compliance testing will be conducted by Contractor and any report on the results of such testing must be satisfactory to the Department.

b.  Language Access for Individuals with Limited English Proficiency:
Executive Order 26 (EO 26), directs executive state agencies that provide direct public services to offer language assistance services (translation and interpretation) to people of Limited English Proficiency (LEP). If applicable, any solution being procured which is deemed to provide a "direct public service" must comply with EO 26.

39.  Branding and Universal Web Navigation

Any public facing web-based information and applications development, or programming delivered pursuant to the Contract shall comply with New York State Information Technology Standard, NYS-S16-001- New York Universal Web Navigation and New York State Branding Guidelines as such policy and standard may be amended, modified or superseded.

40. Migration

Contractor's services performed under this Contract will ensure easy migration of the Data including Confidential Information under this Contract by providing its solution in a manner designed to do so. This may include maintaining that information in a format that allows Department to easily transfer it to an alternative application platform. Contractor will make its Application Programming Interfaces (APIs) available to Department.

41.  Disclosure of Breach

Notwithstanding on any other provision of this Contract or requirements of law or regulation, the Contractor shall provide notice to the Department as soon as possible following the Contractor's discovery or reasonable belief that there has been unauthorized disclosure or loss of sensitive or Confidential Information ("Security Incident").

a.  Within twenty-four (24) hours of the discovery or reasonable belief of a Security Incident, the Contractor shall provide a written report to the Department detailing the circumstances of the incident, which includes at a minimum:

   i.   A description of the nature of the Security Incident;
   ii.  The type of Department information involved including the categories of data;
   iii. Who may have obtained the Department information;
   iv.  What steps the Contractor has taken or shall take to investigate the Security Incident;
   v.   What steps the Contractor has taken or shall take to mitigate any negative effect of the Security Incident; and
   vi.  A point of contact for additional information.

b.  Each day, or as otherwise mutually agreed to in writing by the Department and Contractor, thereafter until the Contractor's investigation is complete or otherwise directed by the Department, the Contractor shall provide the Department with a written report regarding the status of the investigation and the following additional information as it becomes available:

   i.   Who is known or suspected to have gained unauthorized access to the Department's information;
   ii.  Whether there is any knowledge if the Department information has been used in an unauthorized fashion or compromised;
   iii. What additional steps the Contractor has taken or shall take to investigate the Security Incident;

23

    iv.    What steps the Contractor has taken or shall take to mitigate any negative effect of the Security Incident; and

    v.    What corrective action the Contractor has taken or shall take to prevent future similar unauthorized use or disclosure.

c.  Contractor shall also take immediate and necessary steps needed to restore the information security system to prevent further breaches.

d.  The Contractor shall confer with the Department regarding the proper course for the investigation and risk mitigation. The Department reserves the right to conduct an independent investigation of any Security Incident, and should the Department choose to do so, the Contractor shall reasonably cooperate by making resources, personnel, and systems access available to the Department and the Department's authorized representative(s) who may include the New York State Chief Information Security Office.

e.  Subject to review and approval of the Department, the Contractor shall, at its own cost, without limitation, provide notice that satisfies the requirements of applicable law or regulation to individuals whose personal, confidential, or privileged data were compromised or likely compromised as a result of the Security Incident as well as notice to any regulatory authority as required under the Contract or applicable law or regulation. If the Department, in its sole discretion, elects to send its own separate notice, then all costs associated with preparing and providing notice shall be reimbursed to the Department by the Contractor. If the Contractor does not reimburse such costs within thirty (30) calendar days of the Department's written request, the Department shall have the right to collect such costs including as a set-off against moneys due the Contractor.

f.  The Department reserves the right to require the Contractor to provide commercially standard credit monitoring for any and all individuals affected by the data breach at the sole expense, without limitation, of the Contractor for a period not to exceed 12 months, which shall begin 30 days following the notice of offer from the Contractor of such credit monitoring to those affected individuals, which shall be within a reasonable time following the identification of such affected individuals. The Department reserves the right to require notice by regular or electronic mail.

**APPENDIX C - INFORMATION SECURITY REQUIREMENTS**

New York State Department of Civil Service
April 2022

The following requirements shall be effective as of the date the Contractor or Contractor Staff first receives, maintains, transmits, accesses or otherwise comes into contact with Confidential Information. These requirements are intended to describe the minimum standard for physical, technical and administrative controls affecting Confidential Information in relation to the Services being provided under the Agreement.

The Department may suspend access to Department Systems or Data at any time if the Department, in its sole discretion, believes Contractor is not complying with any of its obligations herein.

**Definitions**
All capitalized terms herein shall have the meaning as set forth in this Appendix. If not defined herein will have the meaning as set forth in the resulting Contract including the Appendices and Attachments thereto, or if not defined therein will have the meaning as defined in 45 C.F.R. Parts 160-164.

  1.     **Compliance**

Contractor agrees to preserve the confidentiality, integrity and accessibility of Data with administrative, technical and physical measures that conform to federal, State and Department mandates, and the security controls as stated herein, based upon the nature of the Project Services provided, the Data involved, and/or the location where such Project Services are provided. Accordingly, Contractor warrants, covenants and represents that it shall fully comply with all New York State Information Technology Security Policies, Standards and Procedures published by the New York State Chief Information Security Office at https://its.ny.gov/eiso/policies/security, as amended from time to time, that are applicable to the Project Services being provided by Contractor. Contractor is responsible for understanding which policies and state or federal laws apply to the Project Services and the Data in scope for the Agreement. The Department is required to provide a minimum of thirty (30) days written notice to the Contractor of changes to policies or rules under this section. If the requirements set forth herein are not the same as the New York State enterprise security policy, standard or procedures, then the more restrictive requirement applies. Contractor is responsible for assessing and monitoring Subcontractor control environments for compliance with the standards as documented herein. The Department reserves the right to immediately revoke system or access privileges where such privileges pose an undue risk to the State.

## 2. Acceptable Use of Information Technology Resources

Contractor, including all Contractor Staff, accessing the State's Information Technology Resources in the course of their work for the Department are required to comply with New York State Information Technology Policy NYS-P14001 – Acceptable Use of Information Technology Resources, as amended from time to time, prior to accessing any New York State Information Technology resources.

Access to the State's Networks, Systems, Data, or Facilities is provided to support the official business of the Department. Any use inconsistent with the Department's business activities and administrative objectives is considered unacceptable or inappropriate use.

The Department reserves the right to change its policies and rules at any time, with regard to the acceptable use of Department Networks, Systems, Data or Facilities. Non-compliance with these provisions or unacceptable use of Department Networks, Systems or Facilities may result in the revocation of system privileges, termination of the Agreement with Department, and/or criminal and/or civil penalties.

## 3. Information Security Program

3.1. Contractor must maintain a written Information Security Program ("WISP") including documented policies, standards, and operational practices that meet or exceed the requirements and controls set forth herein to the extent applicable to the Project Services and identify an individual within the organization responsible for its enforcement. Contractor's WISP shall address, at a minimum, all security requirements as listed in these requirements, as amended from time to time, and comply with all state and federal data security and privacy laws applicable to the Department. This documentation will be reviewed by Contractor's security official, or its designee, at least annually and shall be updated periodically with changes to organization, technology, or Services. When implementing security controls Contractor shall take a risk-based approach. Any control exceptions which represent risk will be formally documented, monitored, and periodically reviewed.

3.2. Upon request by the Department, Contractor's WISP shall be made available to and reviewed by the Department or the Department's representative. At the Department's request and at no cost to the Department, Contractor shall make mutually agreed upon, commercially reasonable modifications to its WISP or to its data security controls in

order to conform to the requirements set forth herein. The Department reserves the right, in its sole discretion, to terminate Contractor's access to Confidential Information until such time as Contractor has made such modifications to its WISP or data security controls. Contractor shall notify the Department in writing of any changes to systems, facilities or WISP controls affecting Confidential Information. This notification should set forth in detail how such changes will impact the Confidential Information.

3.3.   Contractor shall apply appropriate sanctions against Contractor Staff who fail to comply with security policies and procedures.

3.4.   Contractor shall have processes and procedures in place so that Security Incidents will be reported through appropriate communications channels as quickly as possible. Contractor shall periodically test, review, and update such processes and procedures. All Contractor Staff shall be made aware of their responsibility to report any Events prior to being granted access to any Confidential Information. If at any time during the Agreement, Contractor becomes aware of an Event or that it or any of its Subcontractors will or do not meet the obligations described within these requirements, Contractor will immediately notify the Department.

3.5.   Contractor shall periodically conduct an accurate and thorough assessment of the potential risks and vulnerabilities to the confidentiality, integrity, and Availability of Confidential Information. The assessment must be reviewed by Contractor's security official and used to inform the Contractor's information security program.

3.6.   Upon request, the Contractor shall identify to the Department the security official who is responsible for the development and implementation of the Contractor's policies and procedures.

**4.     Right to Assess, Audit and Certify**

4.1.   The Department, or its designated agents, may assess or audit the effectiveness of Contractor's compliance with requirements herein. The Department shall provide advanced notice of any assessment or audit. The Parties shall mutually agree in writing to the timing of the assessment or audit.

4.2.   Upon request, Contractor shall complete a security controls assessment conducted by the Department or its designated agent ("Security Assessment"). To the extent that the security controls assessment identifies any risks or deficiencies for which remediation is required,

**Page 3 of 14**

such remediation requirements or compensating controls (and the timeframes within which the remediation requirement or compensating control must be successfully implemented) will be provided in writing to the Contractor. The Department and Contractor agree to negotiate in good faith a mutually agreeable timeframe within which the remediation requirements or compensation controls must be successfully implemented.   If an agreement cannot be had, the Department will make the final determination regarding the timeframe. Contractor's failure to complete any remediation requirements within the required timeframe shall be deemed to be a material breach of the Agreement.

Where the Contractor is a Business Associate, or hosts, maintains or has access to Department Protected Health Information, certification in the HITRUST Common Security Framework (CSF) is required. The Department, in its discretion, may accept a comparable industry accepted security assessment certification in lieu of a HITRUST Common Security Framework (CSF) certification. (For purposes of these requirements a SOC 2 attestation report is deemed a comparable industry accepted assessment.) If an alternative security assessment certification is accepted, then such alternative certification shall replace the following references to HITRUST.

4.2.1. If the Contractor has a HITRUST CSF Certification applicable to the Project Services and/or applications in scope for the Agreement as of the Effective Date of the Agreement and maintains it throughout the Agreement, then that HITRUST CSF certification, at the discretion of the Department, will be accepted in lieu of a security controls assessment identified in Section 4.2. Documentary evidence for HITRUST CSF certification must be provided to Department upon request and include, at a minimum, sections of the HITRUST CSF report that demonstrate Contractor's scoring across all domains and any corrective action plans required as a condition of certification. Upon Contractor's written request, the Department shall return all such documentary evidence to Contractor. The Department may ask questions related to the protection of Confidential Information after review of documentation supporting the HITRUST CSF Certification. The Contractor's HITRUST CSF Certification does not waive Department's rights to assess under Section 4.1 herein or other audit rights, including rights to onsite facility inspection, provided elsewhere in the Agreement.

**Page 4 of 14**

4.2.2. If the Contractor is without a HITRUST CSF certification or an approved alternative security assessment certification as of the Effective Date of the Agreement, Contractor shall:

- Complete and provide to the Department a HITRUST CSF Self-Assessment Report no later than 90 days after the Effective Date of the Agreement; and

- Obtain and provide to the Department a HITRUST CSF Validated Report no later than 18 months after the Effective Date of the Agreement; and

- Obtain and provide to the Department a HITRUST CSF certification and associated documentation, including but not limited to complete validated reports and corrective action plans, no later than 24 months after the Effective Date of the Agreement.

4.2.3. If Contractor has begun the process of obtaining a HITRUST CSF Certification before the Effective Date of the Agreement, then Contractor represents and warrants to the Department that all corrective action plans that are necessary to obtain a HITRUST CSF Validated Report and/or HITRUST CSF Certification and that have been identified to Contractor prior to the Effective Date shall be communicated to the Department and documented in writing to the Department.

4.2.4. Within 30 days of identification, the Contractor shall report to the Department any findings through the HITRUST engagement that materially impacts Confidential Information. In addition, the Contractor will provide the associated corrective action plans identified during any self-assessment or third-party assessment, including any assessment related to Contractor's independent certification/attestation. Contractor will provide the Department with any further Information associated with such findings, as reasonably requested by the Department. Upon Contractor's written request, the Department shall return all such documentary evidence to Contractor.

4.2.5. If at any time during the Agreement, the CSF Certification is withdrawn for any reason, Contractor will contact the Department within 24 hours of learning of the issue to

**Page 5 of 14**

provide information and remediation plans regarding the withdrawal.

4.3. From time-to-time Contractor may be requested to respond to, inform and provide updates regarding specific high-risk security gaps or exposures that exist for new or emerging security vulnerabilities that are made publicly known for systems, applications, hardware devices, etc. In all instances Contractor will provide a response to any Department inquiry within five business days and will provide specific details as to the questions asked to ensure that the Department can appropriately evaluate the risk or exposure to the Confidential Information while still protecting the systems, applications, hardware devices etc. from further vulnerabilities.

## 5. Encryption

5.1. Contractor shall apply encryption methodology that, at minimum, conforms to the Federal Information Processing Standards Publication 140-3 Security Requirements for Cryptographic Modules and applicable state and federal regulations ("Approved Encryption").

5.2. Cryptographic key management procedures must be documented and include references to key lifecycle management (including provisioning, distribution, and revocation) and key expiration dates.

5.3. Access to encryption keys must be restricted to named administrators. Encryption keys must be protected in storage. For example, methods of acceptable key storage include encrypting keys or storing encryption keys within a hardware security module (HSM). Data-encrypting keys should not be stored on the same systems that perform encryption/decryption operations.

5.4. Except as otherwise agreed to in writing by the Contractor and Department, Confidential Information must be encrypted while in transit and at rest across at least the following types of assets:
- Public shared Networks
- Non-wired Networks
- Cloud Services
- Desktop and portable computing devices
- Mobile devices
- Portable media
- Back-ups
- Application or Network servers

**Page 6 of 14**

- 'Plug & play' storage devices

## 6.   Network and Systems Security

6.1.   Contractor shall utilize and maintain a commercially available, industry standard malware detection program which includes an automatic update function to ensure detection of new malware threats.

6.2.   Contractor shall maintain an intrusion detection or prevention system that detects and/or prevents unauthorized activity traversing the Network.

6.3.   Contractor shall have technical controls to detect, alert, and prevent the unauthorized movement of Data from Contractor's control (commonly referred to as Data Loss Prevention).

6.4.   Networks or applications that contain Confidential Information must be separated from public Networks by a firewall to prevent unauthorized access from the public Network.

6.5.   At managed interfaces, Network traffic is denied by default and allowed by exception (i.e., deny all, permit by exception).

6.6.   Contractor shall establish security and hardening standards for Network devices, including Firewalls, Switches, Routers, Servers, and Wireless Access Points (baseline configuration, patching, passwords, and access control).

6.7.   Web content filtering must be in place to restrict external webmail, instant messaging, file sharing and other Data leak vectors for any Contractor Staff with direct or indirect access to Confidential Information.

6.8.   Quarterly (unless the System has an Impact Risk rating of High* in which case monthly) vulnerability scans must be performed, and intrusion detection and identity management systems must be installed and monitored on all systems and components that handle, process, or store Confidential Information. Upon request, report summaries must be provided to the Department, including confirmation of remediation for vulnerabilities identified as high- or medium-risk (or equivalent classifications). * See NYS-S15-002 Vulnerability Management Standard.

6.9.   At a minimum, Contractor shall engage a qualified third party to perform annual penetration testing of Contractor's Networks containing

**Page 7 of 14**

Confidential Information. The scope of the penetration testing must, at a minimum, include all internal/external systems, devices and applications that are used to process, store, or transmit Confidential Data. Contractor must provide the Department with summary results and a remediation plan at the Department's request.

6.10. If Contractor provides products or Services related to the Agreement through a Department portal or mobile applications, especially those which are internet-facing, or use Department domains, the Department's portal, mobile applications and domain are subject to Department scanning and assessments. Contractor agrees to remediate vulnerabilities identified during this process in a manner and timeline acceptable to the Department.

6.11. Contractor shall ensure that no unencrypted Confidential Information is stored in any system that is internet facing.

6.12. Contractor shall use secure means (i.e., HTTPS, FTPS) for all electronic transmission or exchange of System, user and application information with the Department.

## 7. Mobile Device Security Controls

7.1. Contractor must have a documented mobile device policy that includes a documented definition for mobile devices and the acceptable usage and security requirements for all mobile devices.

7.2. Where Contractor permits Bring Your Own Device (BYOD), Contractor must have a BYOD policy that defines the device and eligibility requirements for BYOD usage in the event that Confidential Information will be viewed or stored on devices that are not Contractor-issued mobile devices.

7.3. Contractor must post and communicate the mobile device policy and requirements through Contractor's security awareness and training program.

7.4. Contractor must have a centralized mobile device management solution (MDM) deployed to all mobile devices that are permitted to store, transmit, or process Confidential Information.

7.5. Contractor's mobile device policy must require the use of encryption for either the entire device or for Confidential Information and must be enforceable through Contractor's MDM solution or other technical controls.

**Page 8 of 14**

7.6. Contractor must enforce password policies for Contractor-issued mobile devices and/or BYOD mobile devices using Contractor's MDM solution or other technical controls.

7.7. Contractor's Information Technology department must provide remote wipe or corporate Data wipe for all mobile devices in the event that Confidential Information will be viewed or stored on mobile devices.

## 8. System and Application Controls

8.1. All Confidential Information must be securely stored at all times to prevent loss and unauthorized access or disclosure.

8.2. Laptop and workstation systems that access Confidential Information remotely must utilize endpoint protection which includes a personal firewall and anti-malware protection.

8.3. Operating systems and application software used must be currently supported by the manufacturer.

8.4. Current versions of operating system and application software must be maintained, and patches applied in a timely manner for all systems and applications that receive, maintain, process, or otherwise access Confidential Information.

8.5. Confidential Information must not be used in any non-production environment such as testing or quality assurance unless de-identification of the Data has been performed. In the event that de-identification is not practical or feasible, compensating controls must be in place protecting the Data to the same level of protection as afforded to the production environment. Confidential Information must not be placed into a nonproduction cloud computing environment unless deidentified or compensating controls are in place protecting the Data to the same level of protection as afforded to the production environment.

8.6. Confidential Information must be segmented from non-Department Information so that appropriate controls are in place to identify the Data as Department's in all instances, including backup and removable media, and to appropriately restrict access only to users authorized to view the Data. Logical separation must allow Data to be deleted when it is no longer required.

8.7. Logical controls, virtual machine zoning, virtualization security and segregation must be in place to help prevent attacks and exposure in multi-tenancy environments containing Confidential Information.

8.8. Contractor shall maintain an asset management system which records the movement of hardware and electronic media and any persons responsible therefore.

## 9. Software Development Lifecycle

9.1. Contractor must use industry standards such as BSIMM, NIST, OWASP, etc. to build in security for its Systems Development Lifecycle (SDLC). See also NYS-S13-001 for further information on the SDLC requirements at its.ny.gov/document/secure-systemdevelopment-life-cycle-ssdlc-standard.

9.2. Contractor must use both an automated and manual source code analysis tool to detect and remediate security defects in code prior to production deployment.

9.3. Contractor must have policies and procedures in place to triage and remedy reported bugs and security vulnerabilities for the Project Services it provides to Department.

9.4. Contractor must have controls in place to prevent unauthorized access to its or Department's application, program, or object source code and ensure that access is restricted to authorized personnel only.

9.5. National identifiers or Social Security Numbers must not be utilized as User IDs for logon to applications.

## 10. Physical Controls for the Protection of Confidential Information

10.1. All Confidential Information received or created in paper form must be protected from viewing by unauthorized persons.

10.2. A clean desk policy will be enforced to ensure proper safeguarding of all hard copy Confidential Information.

10.3. Visitor logs documenting all individuals who are not Contractor Staff who gain access to the facility where Confidential Information is processed will be maintained.

10.4. Confidential Information shall not leave control of the Contractor without the written approval of Department.

10.5. Servers, enterprise data storage devices, backup tapes and media, and other computing devices that contain Confidential Information used to support Network communications must be located in a secure and restricted access location.

10.6. Monitoring cameras (e.g., CCTVs) must monitor ingress and egress to sensitive areas within the facility. The monitoring equipment (e.g., CCTV) feed must be monitored either internally or externally by a qualified team. Alerting procedures must be defined and notification performed to qualified Contractor personnel. Processes for retention and review of security logs (e.g., access and visitor logs, CCTV) must be in place. Cameras must be positioned in a way that Confidential Information is not readable on screens and/or on CCTV recordings or screen captures.

10.7. When investigation of an incident or Breach is required, summary reports related to the incident or Breach and all audit trails and CCTV recordings shall be made available to Department upon request and in a timely manner.  Upon Contractor's written request, the Department shall return all such documentary evidence to Contractor.

## 11.   Access Control

11.1. Prior to gaining access to Confidential Information, Contractor Staff will have appropriate background checks completed in compliance with state and federal law. See Standard Clauses for All Department Contracts (Appendix B), Onboarding and Suitability Determinations.

11.2. Security awareness training will be completed by Contractor Staff prior to access being granted to Confidential Information, and then completed on an annual basis going forward so long as access to Confidential Information continues. This training should include, at a minimum, guidance on defending against malware, protecting passwords, monitoring and reporting system notifications, social engineering, and handling sensitive Data. The Department may require Contractor Staff to complete Department specific security training at no additional cost to the Department.

11.3. Physical and logical access will be granted to the minimum Confidential Information necessary to meet the requirements of the user's scope of responsibilities.

11.4. Access reviews will be performed at least quarterly for privileged user accounts and at least annually for non- privileged user accounts.  The Department reserves the right to request the Contractor to perform an additional access review for non-privileged user accounts if there is evidence of inappropriate access.

11.5. Only those individuals providing Project Services to the Department, or those who are responsible for administering or managing systems that contain Confidential Information, shall be authorized to access systems containing Confidential Information.

11.6. All Contractor Staff that are no longer required or authorized to access Confidential Information or systems that contain Confidential Information must have access promptly disabled.

11.7. Access to Confidential Information and systems that contain Confidential Information must be access controlled through the use of individual user IDs and passwords that substantially meet the NYS Authentication Tokens Standard NYS-S14-006 standard complexity rules and password lifetimes.

11.8. If it is suspected that a password has been compromised, the password must be immediately changed or reset.

11.9. Processes must be in place to create audit trails capable of determining who has accessed Confidential Information and/or systems that contain Confidential Information.

11.10. Remote access to systems or Networks that contain Confidential Information must use multi-factor authentication and a connection with Approved Encryption as defined in Section 5 above.

11.11. The Department reserves the right to immediately terminate remote access connections to Department or State Networks and Systems.

11.12. Upon request, Contractor shall provide reports within 48 hours for:

11.12.1.    List of all individuals with access to Confidential Information and/or systems that contain Confidential Information and the level of access granted;

11.12.2.    List of activity associated with any user ID who has access to Confidential Information; and

11.12.3.    Account management capabilities, such as account lockouts for unsuccessful logon attempts, defined inactivity

**Page 12 of 14**

times, remote access allowances, specific success and failure events, and management of elevated privilege accounts must be enforced.

11.13. All identity credentialing, authentication, Authorization, and access control events must be logged, and those logs are subject to periodic audit by the Department. At a minimum, the logs of all specified success and failure events associated with identity and access management in the computing environment it manages must be produced. These logs must then be archived for at least twelve months. These archived logs must be searchable and or discoverable. Contractor may redact information regarding those individuals who do not have access to the Department's data.

## 12. Data Protection

Contractor must protect Confidential Information from unauthorized access, use, alternation, disclosure, or dissemination. The Contractor must, in accordance with applicable law and the instructions of the Department, maintain such Data for the time period required by applicable law, exercise due care for the protection of Data, and maintain appropriate data integrity safeguards against the deletion or alteration of such Data. If any Data is lost or destroyed because of any act or omission of the Contractor or any non-compliance with the obligations of this Contract, then Contractor shall, at its own expense, use its best efforts to reconstruct such Data as soon as feasible. In such event, Contractor shall reimburse the Department for any costs incurred by the Department in correcting, recreating, restoring or reprocessing such Data or in providing assistance therewith.

## 13. Physical Data Transport

The Contractor shall use, if applicable, reputable means to physically transport Data. Deliveries must be made either via hand delivery by an employee of the Contractor or by restricted delivery via courier (e.g., FedEx, United Parcel Service, United States Postal Service) with shipment tracking and receipt confirmation. This requirement applies to transport between the Contractor's offices, to and from Subcontractors, and to the Department.

## 14. Data Return and Destruction

At the expiration or termination of the Agreement, at the Department's option, the Contractor must provide the Department with a copy of the Data, including metadata and attachments, in a mutually agreed upon, commercially standard format. The Contractor must provide the Department continued access to the Data beyond the expiration or termination of the Agreement for the period designated in the Contract.

Thereafter, except for Data required to be maintained by law or this Agreement, Contractor shall destroy Data from its systems and wipe all its data storage devices to eliminate any and all Data from Contractor's systems. The sanitization process must comply with New York State Security Policy NYS-S13-003. If immediate purging of all data storage components is not possible, the Contractor will certify that any Data remaining in any storage component will be safeguarded to prevent unauthorized disclosures. Contractor must then certify to the Department, in writing, that it has complied with the provisions of this paragraph.

## 15.    Offshore Security Requirement

Confidential Information, including Protected Health Information, is not permitted to be hosted, maintained, stored, processed or otherwise accessed outside CONUS ("offshore").

## 16.    Contingency Planning

Contractor will have documented Business Continuity and Disaster Recovery plans in place that include Information security controls. Such plans will be tested at least annually.

## 17.    Incident Response

17.1. Contractor will have a documented Incident Response Plan. Such plan will be tested at least annually.

17.2. Incident response roles and responsibilities must be clearly outlined between Contractor and Department as appropriate.

## 18.    Payment Card Industry Data Security Standard

If, in performing Project Services to or on behalf of Department, Contractor acts as a Merchant or payment card processor as defined by the Payment Card Industry Data Security (PCI DSS) standard, then Contractor agrees to comply with the applicable PCI DSS requirements.

## 19.    Litigation Holds

The Contractor must provide a detailed mechanism for how litigation holds will be implemented. This description shall include how metadata will be created, accessed, and stored in a cloud environment.

**Page 14 of 14**

# 2023 REQUEST FOR PROPOSAL

ENTITLED:

## "Mental Health and Substance Use (MHSU) Disorder Program"

Official Responses to Offerors' Questions

| Question Number | RFP Page # | Section Reference | Question | Response |
|---|---|---|---|---|
| 1 | N/A | General Question | Will there be a Shared Communication Expenses in the new five-year contract? | No. |
| 2 | N/A | General Question | Will the Offeror share in the expense of Medicare Crossover Claims and NYSHIP Telephone Call transfers from the medical carrier for this new contract term? | No; all expenses related to the Medicare Crossover Claims and NYSHIP Telephone Call transfers from the medical carrier are the responsibility of the Contractor. |
| 3 | N/A | General Question | Please describe if the current vendor implemented the New York State Office of Mental Health Best Practices Manual for Utilization Review for Adult and Child Mental Health Services(https://omh.ny.gov/omhweb/bho/docs/best-practices-manual-utilization- review-adult-and-child-mh-services.pdf) and, if yes, could you provide a detailed description on the implementation including utilization management process triggers and applicable levels of care? | The current vendor has implemented InterQual clinical review criteria for adult and child mental health services. Information regarding implementation should be obtained from OMH. |
| 4 | 12 | 1.5 Timeline of Key Events | We see that Technical Management interviews are planned for May 30. Does the Department intend to hold these in-person or virtually? | The Department intends to conduct all Technical Management Interviews using a virtual platform. |
| 5 | 16 | 2.1.6 Submission of Proposal | May we print our proposal response and Attachments double-sided? | Yes. |
| 6 | 17 | 2.1.6(a)(iv) Submission of Proposal | Please confirm the total number of USB drives required that should contain our Administrative and Technical | See Amended RFP Section 2.1.6(a)(iv), in addition to a master electronic submission containing all sections of the |

| | | | | Proposal (The instructions are conflicting, with reference to fifteen USBs in one spot and sixteen USBs in another.) | Bidder's proposal, the Offeror must submit fifteen USB drives which each contain an electronic copy of the Administrative and Technical Proposal only. |
|---|---|---|---|---|---|
| 7 | 17 | 6 Submission of Proposal, iv | | The RFP asks for 15 copies of the USB, then subsequently references 16. Do we need to submit 15 or 16 USBs of the Technical and Administrative Proposals only? Is the 16th copy the redacted USB or the Master Electronic Submission? | See the response to Question 6 above. |
| 8 | 17 | 2.1.6(a)(iv) Submission of Proposal | | The RFP asks for each of the electronic copies to be "uniquely designated a number." Should that number appear in the file name on the USB, on a label on the outside of the USB, or both? | The uniquely identified number should appear externally on the USB label as well as being part of the electronic file name. |
| 9 | 17 | 2.1.6(b) Submission of Proposal | | Will the Financial proposal need to be submitted on its own Financial proposal USB(s), separate from the Master Electronic Submission? | The RFP does not require submission of a separate USB storage drive containing the Offeror's Financial Proposal. However, the Master Electronic Submission should be inserted in the Financial Proposal box. |
| 10 | 26 | 2.2.1(b) Disclosure of Proposal Contents, Requested Redactions | | For our hard copy redacted Proposal, should we bind all three sections (Administrative, Technical, and Financial) in one binder or in three separate binders? | The Offeror must provide a separately bound hardcopy of each of the three proposal sections (Administrative, Technical, and Financial). |
| 11 | 26 | 2.2.1(b) Disclosure of Proposal Contents, Requested Redactions | | Should we place all three sections (Administrative, Technical, and Financial) of our redacted Proposal on one USB, or would the Department like three separate USBs? | The Offeror must provide the redacted electronic versions of their Administrative, Technical, and Financial Proposal on one separate USB storage drive. |
| 12 | 26 | 2.2.1(b) Disclosure of Proposal Contents, Requested Redactions | | Should the Redacted hard copies and USB be shipped in a separate box/sealed envelope marked "Requested Redactions" or should the Redacted hard copies and USB be shipped in the Administrative, Technical, or Financial boxes/sealed envelopes? | The USB storage drive and hard copy documents containing the vendors "Requested Redactions" should be packaged together and included in the sealed boxes/envelopes that contain the Administrative and Technical Proposals. |

| 13 | 27 | 2.4 New York Subcontractors and Suppliers | In which proposal would the Department like to see the Attachment 12, New York State Subcontractors and Suppliers table? The Administrative Proposal or the Technical? | Attachment 12, New York State Subcontractors and Suppliers form should be submitted with/in the Offeror's Administrative Proposal. |
|----|----|----|----|----|
| 14 | 58 | 3.11 Center of Excellence for Substance Use Disorders | Will you provide estimated volume for travel to SUD COE? Can you provide any language governing benefit limitations or restrictions (e.g., dollar amounts, milage, treatment duration, etc.)? | The Department does not have the travel data for the Centers of Excellence Program for Substance Use Disorders. The program is scheduled to go live no later than 7/1/2023. Travel reimbursement for participants is as follows without any lifetime limitations:<br><br>• Travel, lodging, and meal allowances for individuals, including travel to and from in-patient programs, travel from one level of treatment to another level of treatment, and during participation in in-person partial hospitalization or intensive outpatient programs.<br><br>• Travel expenses for up to two companions to accompany the individual to and from in-patient programs and from one level of treatment to another level of treatment.<br><br>• Travel expenses for family members to attend family support programs as specified by the COE. |
| 15 | 72 | 4.4 New York State Standard Vendor Responsibility Questionnaire | In section 4.4 of the RFP, in regard to the VendRep Responsibility Questionnaire, the RFP states "By submitting a Proposal, the Offeror agrees to fully and accurately complete the Questionnaire. The Offeror acknowledges that the State's execution of the Contract will be contingent upon the State's determination that the Offeror is responsible, and that the State will rely on the Offeror's responses to the Questionnaire when making its responsibility determination." Can you please confirm that the Responsibility Questionnaire needs to be completed | Confirmed. |

| | | | and included with submission of our RFP? | |
|---|---|---|---|---|
| 16 | 74, 76 | 4.6.1(b)(iv) Insurance Requirements | Are we allowed to make an exception on the additional insured protection and waiver of subrogation for our Professional Liability/Errors and Omissions, Cyber Liability and Worker's Compensation policies? | Insufficient information is provided to respond. The Department has a separate process for the consideration of non-material deviations. If an Offeror wishes to propose a modification to Section 4.6, it should provide the information as part of the justification for the non-material deviation using the Non-Material Deviations Template (Attachment 8). |
| 17 | 74, 80 | 4.6.1 Insurance Requirements, General Conditions | Can our Professional Liability/Errors and Omission Insurance and Data Breach/Cyber Liability Insurance be claims-based policies? | With regard to Professional Errors and Omissions Insurance coverage can written on be a claims-based policy subject to the following requirements noted in RFP section 4.6:<br><br>If coverage is written on a claims-made policy, the Contractor warrants that any applicable retroactive date precedes the start of work; and that continuous coverage will be maintained, or an extended discovery period exercised, throughout the performance of the services and for a period of not less than three years from the time work under this Contract is completed. Written proof of this extended reporting period must be provided to the Department prior to the policy's expiration or cancellation.<br><br>With regard to Data Breach/Cyber Liability Insurance coverage can be a claims-based policy subject to the following requirements noted in RFP section 4.6:<br><br>If the policy is written on a claims-made basis, Contractor must submit to the Department an Endorsement providing proof that the policy provides the option to purchase an Extended Reporting Period ("tail coverage") providing coverage for no less than one year after work is completed in the event that coverage is cancelled or not renewed. This requirement applies to both primary and excess liability policies, as applicable. |

| 18 | 85 | 5.4 Member Communication Support | What are the Department's requirements for printed directories, including quantity, frequency of printing, distribution requirements, and languages and accessibility requirements needed? | Offerors will not be required to print and mail physical directories. However,  on an annual basis the Offeror will provide the Department with a Network file consisting of the following fields:<br><br>• Name<br>• Phone Number<br>• Address<br>• Languages spoken in the office<br>• Affiliated Hospitals<br>• Digital contact (web site or email address) |
|---|---|---|---|---|
| 19 | 94-95 | 5.11.1(a) Provider Network | With regard to the Proposed Provider Network Files, we will provide in response to Attachment 23, should the two separate files be placed on separate USBs? | Offerors should submit Attachment 23 *Offeror's Proposed Provider Network Files* as two separate files on one (1) USB. One file should consist of MHSU Practitioners, and the other file should consist of MHSU Facilities. |
| 20 | 97-98 | 5.11.2(e)  Provider Network Guarantees | The language here states:<br>"The amount quoted by the Offeror shall be applied only once per quarter if the Offeror fails to maintain required access for any MHSU Provider type in Rural Areas."<br><br>Please clarify what "**any** MHSU Provider type" refers to, as it goes on to state that the "quoted standard will be an aggregate of the listed Provider types and shall apply to the combined Provider access in Rural Areas." | The referenced language in Section 5.11.2.e has been amended as follows:<br><br>"The amount quoted by the Offeror shall be applied only once per quarter if the Offeror fails to maintain required access for ~~any~~ MHSU Providers ~~type~~ in Rural Areas. The Offeror's quoted standard will be an aggregate of the listed Provider types and shall apply to the combined Provider access in Rural Areas." |
| 21 | 101 | 5.17.2 Transition and Termination Guarantee | In item 2, please confirm that it should reference the Transition Plan requirements outlined in Section 3.16 of the RFP. | The referenced language in RFP Section 5.17.2 has been amended as follows:<br>"<u>Transition and Termination Guarantee</u>: In this part of its Technical Proposal, the Offeror must state its agreement and guarantee <u>that</u> all Transition Plan requirements outlined in Section ~~3.15~~ <u>3.16</u> of this RFP will be completed in the required time frames to the satisfaction of the Department." |

| 22 | 115-121 | Section 8: Additional Provisions | Would there be an objection to adding the below language (or similar) to the contract provisions?<br><br>*Substance Use Disorder Records. To the extent that PHI exchanged between the parties includes information on an individual's Substance Use Disorder, the parties agree to comply with the applicable requirements of 42 C.F.R. Part 2 ("Confidentiality of Substance Use Disorder Patient Records") including its provisions on disclosure and re-disclosure of said information.* | The Department has a separate process for the consideration of non-material deviations. If an Offeror wishes to propose a modification to Section 8, it should provide the information as part of the justification for the non-material deviation using the template set forth in Non-Material Deviations Template (Attachment 8). |
| --- | --- | --- | --- | --- |
| 23 | Appendix C | Information Security Requirements April 2022 | Appendix C contains an embedded link that is not functioning. Can you please confirm where this information is posted? | The following link provides the State's ITS policies related to Cyber Security: Policies | Office of Information Technology Services (ny.gov). |
| 24 | Attachment 6 | Performance Guarantees | With regard to the Performance Guarantees for MHSU Facility Network Access, how will the Department differentiate between natural deficiencies (i.e., a facility doesn't exist in an area) vs. an actual deficiency that should have a PG penalty? | The Department will not distinguish between "natural" and "actual" deficiencies as presented in the question. The Performance Guarantee is based upon an aggregate of access to the various facility types: Inpatient Facilities, Alternate Levels of Care (ALOC) and Outpatient Clinic Groups. |
| 25 | Attachment 22 | Enrollment by Zip Code and Geo Access Network Report File | During the 2022 RFP, membership data was provided to offerors with the following fields: DOB, Benefit Program, Benefit Plan, State, County, Company, and Relationship. Can Empire provide updated member eligibility information? | The Department will provide this data in Excel format titled "Membership Data", upon written request, through a secure transmission, to any Offeror who has previously submitted a completed Attachment 11 Confidentiality and Non-Disclosure Agreement. |
| 26 | Attachment 25 | Guaranteed Average Unit Cost and Administrative Fee Quote Form | With regard to the Network Pricing Guarantee, is there a list of codes to be considered in the calculation? | There are no lists of codes to be considered in the calculation. As cited in RFP Section 6.1.6, Program Claims, all service codes for Network Services will be taken into consideration. An Amended Attachment 26, Empire Plan Historical Claims File, which provides in-network codes billed under the program from 2019 through 2022, will be provided to all Offers who have submitted a completed Confidentiality and Non-Disclosure Agreement (Attachment 11). |

| 27 | Attachment 25 | Guaranteed Average Unit Cost and Administrative Fee Quote Form | With regard to the Network Pricing Guarantee, with VBP & Alternate Contract Pricing models, the reimbursement is not a Fee for Service (per unit) model, so how would those be expected to be included in the GAUC calculation? | Value-Based Purchasing and Alternate Contract Pricing arrangements with providers should be considered by Offerors when developing the Guaranteed Average Unit Cost. As outlined in Section 6.1.6, Program Claims, "The Contractor is required to guarantee that the Actual Average Unit Cost (AAUC) for Network Outpatient Services and Network Inpatient/ALOC Services shall not exceed the proposed GAUC. The AAUC is defined as the sum of the allowed amounts for all service codes for Network Services divided by the sum of all service units for all services codes for Network Services." |
|---|---|---|---|---|
| 28 | Attachment 25 | Guaranteed Average Unit Cost and Administrative Fee Quote Form | Attachment 25 requests a GAUC by Inpatient and Outpatient. In order to price the program accurately, we need the Department to provide definitions for how these Levels of Care should be defined. For example, claims with a revenue code in the range of (0100 – 0289) are Inpatient and all other claims are Outpatient. | The Department will provide this data in Excel format, titled "Levels of Care Crosswalk", upon written request, through a secure transmission, to any Offeror who has previously submitted a completed Attachment 11 Confidentiality and Non-Disclosure Agreement. |
| 29 | Attachment 26 | Empire Plan Historical Claims Files | Claim status is not included in the data in Attachment 26. Are all claims in the dataset approved/paid (no denied claims are included)? | All claims provided in Amended Attachment 26, Empire Plan Historical Claims File should be deemed paid and no denied claims are included. |
| 30 | Attachment 26 | Empire Plan Historical Claims Files | Claim Number and Claim Line Number seem to be condensed in the Attachment 26 dataset. It appears the last 3 digits of the field Claim Line Number refer to claim line number while the rest of the characters refer to Claim Number. Can Empire confirm this is accurate or provide alternative logic to determine Claim Line Number? | Correct. |
| 31 | Attachment 34 | Utilized Provider File | In Attachment 34, there are records which indicate MD (Non- Psychiatrist). Please clarify which services these non-psychiatrists deliver for MH/SA. | These records are almost always services performed in an Emergency Room or Inpatient setting. Facilities will use a Non-Psych MD for Evaluation and Medication management. |
| 32 | Attachment 34 | Utilized Provider File | In Attachment 34, there are records which indicate Ambulance or Independent Lab. Please clarify which lab services are covered for MH/SA versus the Medical benefit. | The MHSU Program administrator is only financially responsible for patient drug screenings provided by a free-standing treatment facility after discharge from an inpatient |

| | | | | stay. |
|---|---|---|---|---|
| 33 | Attachment 34 | Utilized Provider File | Can Empire append a network status indicator in Attachment 34 (In Network vs Non-Network)? | No. |
| 34 | Attachment 34 | Utilized Provider File | In Network Fee per Service rates will vary by provider and location. In order to accurately complete Attachment 25, the bidder will need to quantify utilization by code, by provider, and provider location to ascertain its In Network Fee on Empire's mix of providers/services. During the 2022 RFP, claims data was provided to bidders with additional details, particularly National Provider Identifier.  In order to appropriately underwrite the GUAC as required by the RFP, we request Empire provide utilization data for calendar years 2019, 2020, 2021 and 2022 with the following additional fields: Claim Status, Member Identifier, National Provider Identifier, and Modifier Code. | An Amended Attachment 26, Empire Plan Historical Claims File, will be provided with the following additional fields for years 2019 through 2022: Member Identifier, National Provider Identifier, and Modifier Code. All claims provided are paid, as explained in the answer to Question 29. The file will be provided to all Offerors who have submitted a completed Confidentiality and Non-Disclosure Agreement (Attachment 11). |

*Please Note: In consideration of additional information provided, the Proposal Due Date has been extended one week to May 3, 2023.  Please refer to Amended Proposal Due Date under Section 1.5 of the RFP.



# REQUEST FOR PROPOSALS

ENTITLED:

## "Mental Health and Substance Use (MHSU) Disorder Program"

RELEASE DATE:

## March 1, 2023

**AMENDED** PROPOSAL DUE DATE:

## ~~April 26~~ May 3, 2023

**IMPORTANT NOTICE**:  A Restricted Period under the Procurement Lobbying Law is currently in effect for this Procurement, and it will remain in effect until State Comptroller approval of the resultant Contract.  During the Restricted Period for this Procurement ALL communications must be directed, in writing, solely to the Designated Contact as listed in Section 2.1(1) of this RFP and shall be in compliance with the Procurement Lobbying Law and the New York State Department of Civil Service "*Rules Governing Conduct of Competitive Procurement Process*" (refer to RFP, Section 2: Procurement Protocol and Process).

**All inquiries, questions, filings, and submission of
Proposals must be directed in writing to:**

New York State Department of Civil Service
Attn: Carole Blanchard
Office of Financial Administration, Floor 17
Agency Building 1, Empire State Plaza
Albany, New York 12239
**DCSprocurement@cs.ny.gov**

Timothy Hogues
Commissioner
New York State Department of Civil Service

Daniel Yanulavich
Director
Employee Benefits Division

# TABLE OF CONTENTS

**SECTION 1: INTRODUCTION**............................................................................ 5
    1.1     Purpose
    1.2     Period of Performance
    1.3     Overview of the Mental Health and Substance Use Disorder Program
    1.4     Offeror Eligibility
    1.5     Timeline of Key Events

**SECTION 2: PROCUREMENT PROTOCOL AND PROCESS**........................... 13
    2.1     Rules Governing Conduct of Competitive Procurement Process
    2.2     Compliance with Applicable Laws, Rules and Regulations, and Executive Orders

**SECTION 3: PROJECT SERVICES**.................................................................. 28
    3.1     Account Team
    3.2     Implementation Plan
    3.3     Member Communication Support
    3.4     Reporting Services
    3.5     Customer Service
    3.6     Enrollment Management
    3.7     Claims Processing
    3.8     Plan Audit and Fraud Protection
    3.9     Appeal Process
    3.10   Provider Network
    3.11   Center of Excellence for Substance Use Disorders
    3.12   Other Clinical Management Programs
    3.13   Pre-Certification and Concurrent Review for Mental Health and Substance Use Disorder Services
    3.14   Consolidated Appropriations Act
    3.15   Disabled Dependent Determinations
    3.16   Transition and Termination of Contract

**SECTION 4: ADMINISTRATIVE PROPOSAL**.................................................. 71
    4.1     Formal Offer Letter
    4.2     Offeror Attestation Form
    4.3     Subcontractors or Affiliates
    4.4     New York State Standard Vendor Responsibility Questionnaire
    4.5     New York State Tax Law Section 5-a
    4.6     Compliance with New York State Workers Compensation Law

**SECTION 5: TECHNICAL PROPOSAL**............................................................ 83
    5.1     Executive Summary
    5.2     Account Team
    5.3     Implementation Plan

| 5.4 | Member Communication Support |
| 5.5 | Reporting Services |
| 5.6 | Customer Service |
| 5.7 | Enrollment Management |
| 5.8 | Claims Processing |
| 5.9 | Plan Audit and Fraud Protection |
| 5.10 | Appeal Process |
| 5.11 | Provider Network |
| 5.12 | Center of Excellence for Substance Use Disorders |
| 5.13 | Other Clinical Management Programs |
| 5.14 | Pre-Certification and Concurrent Review for Mental Health and Substance Use Disorder Services |
| 5.15 | Consolidated Appropriations Act |
| 5.16 | Disabled Dependent Determinations |
| 5.17 | Transition and Termination of Contract |

**SECTION 6: FINANCIAL PROPOSAL**............................................................ **100**
| 6.1 | Program Claims |
| 6.2 | Administrative Fees |
| 6.3 | Assessments |

**SECTION 7: EVALUATION AND SELECTION CRITERIA**............................... **109**
| 7.1 | Administrative Proposal Evaluation |
| 7.2 | Technical Proposal Evaluation |
| 7.3 | Financial Proposal Evaluation |
| 7.4 | Total Combined Score |
| 7.5 | Best Value Determination |

**SECTION 8: ADDITIONAL PROVISIONS**............................................... **115**

| APPENDIX A | Standard Clauses for New York State Contracts, dated October 2019 |
| APPENDIX B | Standard Clauses for All Department Contracts, dated April 2022 |
| APPENDIX C | Information Security Requirements, dated April 2022 |

| ATTACHMENT 1 | Offeror Affirmation of Understanding and Agreement |
| ATTACHMENT 2 | Procurement Lobbying Policy |
| ATTACHMENT 3 | Formal Offer Letter |
| ATTACHMENT 4 | Questions Template |
| ATTACHMENT 5 | NYS Department of Civil Service Debriefing Guidelines |
| ATTACHMENT 6 | Performance Guarantees |
| ATTACHMENT 7 | New York State Required Certifications |
| ATTACHMENT 8 | Non-Material Deviations Template |
| ATTACHMENT 9 | Subcontractors or Affiliates |
| ATTACHMENT 10 | Freedom of Information Law Request for Redaction Chart |
| ATTACHMENT 11 | Confidentiality and Non-Disclosure Agreement |
| ATTACHMENT 12 | New York State Subcontractors and Suppliers |

ATTACHMENT 13   Offeror Attestations Form
ATTACHMENT 14   Biographical Sketch Form
ATTACHMENT 15   Glossary of Defined Terms
ATTACHMENT 16   Program Reporting
ATTACHMENT 17   Call Center Statistics
ATTACHMENT 18   Benefit Programs
ATTACHMENT 19   NYBEAS Enrollment Record Layout - Transaction Set Header
ATTACHMENT 20   Empire Plan Certificates, Excelsior Plan and SEHP At A Glance
ATTACHMENT 21   PS-451 Statement of Disability
ATTACHMENT 22   Enrollment by ZIP Code & Geo Access Network Report File
ATTACHMENT 23   Offeror's Proposed Provider Network Files
ATTACHMENT 24   Shared Accumulator File Layout
ATTACHMENT 25   Guaranteed Average Unit Cost and Administrative Fee Quote Form
ATTACHMENT 26   Empire Plan Historical Claims File  **Amended**
ATTACHMENT 27   Enrollment by Month
ATTACHMENT 28   Total Empire Plan, SEHP, and Excelsior Enrollment by Age
ATTACHMENT 29   Covered Lives by Bargaining Unit or Other Group
ATTACHMENT 30   Benefits by Bargaining Unit
ATTACHMENT 31   Health Fairs
ATTACHMENT 32   Offeror's Proposed Network Summary Worksheet
ATTACHMENT 33   Comparison of Utilized Provider File and the Offeror's Proposed Provider Network
ATTACHMENT 34   Utilized Provider Files
ATTACHMENT 35   Offeror's Participating Provider Quest Analytics Report

## SECTION 1:  INTRODUCTION

### 1.1     Purpose

The New York State Department of Civil Service (Department or DCS) has issued this Request for Proposal (RFP) to secure the services of a vendor to administer the Mental Health and Substance Use (MHSU) Disorder Program.  This RFP defines minimum contract requirements, details response requirements, and outlines the Department's process for evaluating responses and selecting a qualified organization (Offeror). Project Services are set forth in detail in Section 3 of this RFP.  Capitalized terms used herein shall have the meanings specified in the *Glossary of Defined Terms* (Attachment 15) or in the body of this RFP.  If there is a conflict in a definition the body of the RFP will control.

The Department will only contract with a single Offeror, which will be the sole contact regarding all provisions of the Contract.  Contract is defined as the agreement, resultant from this RFP, entered into between the Department and the single Offeror.

This RFP and other relevant information may be reviewed at:
https://www.cs.ny.gov/2023MHSURFP/.


### 1.2     Period of Performance

It is the Department's intent to execute a Contract for a term beginning with an Implementation Period of a minimum of 90 calendar Days followed by an additional five years of service which shall begin on the Full MHSU Project Services Start Date and end December 31, 2028.  In accordance with New York State policy and New York State Finance Law section 112(2), the resulting contract is deemed executory until it has been approved by the New York State Attorney General's Office (AG) and approved and filed by the New York State Office of the State Comptroller (OSC).  [Note: The "Full MHSU Project Services Start Date" or "Project Services Start Date" is January 1, 2024, or 90 Days after OSC approves the Contract, whichever is later.]


### 1.3     Overview of the Mental Health and Substance Use Disorder Program

The New York State Health Insurance Program (NYSHIP) was established by the New York State Legislature in 1957 to provide essential health insurance protection to eligible New York State (NYS) employees, retirees, and their Eligible Dependents[1].

---

[1] Eligible Dependents means the spouse, domestic partner, and children under twenty-six (26) years of age of an Enrollee (defined as the policyholder).  Young adult dependent children aged twenty-six (26) or over are also eligible if they are incapable of supporting themselves due to a mental or physical disability acquired before termination of their eligibility for coverage under NYSHIP.  For additional details on eligible dependents and requirements, please see the following links to the NYSHIP General Information Books for State, PE, and PA enrollees below:
2021 General Information Book NYS Active Employees

NYSHIP is sponsored by the Council on Employee Health Insurance (Council), which is composed of the President of the Civil Service Commission, the Director of the Office of Employee Relations (OER), and the Director of the Division of the Budget (DOB).

NYSHIP is currently comprised of the following programs, the first three of which are within the scope of this procurement:

.

1. The Empire Plan provides health insurance benefits to eligible employees and their enrolled dependents and consists of four main components: hospital program benefits, medical program benefits, mental health and substance use program benefits, and prescription drug program benefits.

2. The Excelsior Plan is a variation of the Empire Plan available to New York State local government units that choose to participate in NYSHIP.  The Excelsior Plan offers many of the same features of the Empire Plan with a higher degree of Cost-Sharing between the Employer and plan participants.

3. The Student Employee Health Plan (SEHP) is a health insurance plan for graduate student employees of the State University of New York system that provides benefits through the various Empire Plan insurance contracts.  Like the Empire Plan, the SEHP includes hospital, medical, managed mental health and substance use benefits, and prescription drug benefits.

4. The NYSHIP Health Maintenance Organizations (HMOs) options are available to State employees and Participating Employers (PEs) of NYSHIP such as public authorities, public benefit corporations, and other quasi-public entities.

Program coverage for MHSU services has been part of the Empire Plan since its inception in 1986.  In 1992, the Empire Plan was redesigned to provide coverage for MHSU services separate from hospital and medical benefits and, since that time, the MHSU benefit has been administered as a separate program within the Empire Plan which provides both network and out-of-network benefits.

The majority of the active workforce is represented by various unions, and union participation in the design and oversight of NYSHIP is active and ongoing. The benefit design of The Empire Plan is the result of collective bargaining between NYS and the various unions representing its employees.  Therefore, the benefit design is subject to change from time to time as the result of those negotiations.  In addition, there are variations in the Empire Plan's benefit design among the bargaining units. The benefit

---

 (https://www.cs.ny.gov/employee-benefits/nyship/shared/publications/general-information-book/2021/ny-gib-2021.pdf
2021 General Information Book NYS Retirees
https://www.cs.ny.gov/employee-benefits/nyship/shared/publications/general-information-book/2021/ny-retiree-gib-2021.pdf
2019 General Information Book Participating Agencies
https://www.cs.ny.gov/employee-benefits/nyship/shared/publications/general-information-book/2019/pa-gib-2019.pdf
2020 General Information Book Participating Employers (link)
https://www.cs.ny.gov/employee-benefits/nyship/shared/publications/general-information-book/2020/pe-gib-2020.pdf

design cannot deviate from that which has been collectively bargained.  Benefits are administratively extended to non-represented NYS employees, employees of PAs and PEs, and retirees.

A primary component of the network benefit is a stable and adequate panel of quality behavioral health providers.  The MHSU Disorder Program network is currently composed of a mix of licensed psychiatrists, psychologists, licensed and registered clinical social workers, psychiatric nurses and nurse practitioners, Licensed Marriage and Family Therapists (LMFTs), Licensed Mental Health Counselors (LMHCs), physician assistants Certified Structured Outpatient Rehabilitation Programs, residential treatment centers, group homes, Partial Hospitalization Programs, hospitals, group practices, licensed Certified Behavioral Analysts (CBA), and Applied Behavioral Analysis (ABA) Agencies.  To assure there is the opportunity to supplement clinical care with community programs, the network also includes alternative treatment programs such as halfway houses and treatment programs for dually diagnosed individuals and programs Certified by the New York State Office of Addiction Services and Supports (OASAS).

Since the MHSU Disorder Program guarantees access to the network level of benefit, if an appropriate Network Provider is not available for an appointment within a time frame which meets the Member's clinical needs, the Contractor (defined as the successful Offeror to whom a contract has been awarded) must make a Single Case Agreement with a Non-Network Provider[2] for services at the network level of benefits.

Recognizing the importance of providing individualized, appropriate treatment in the least restrictive option possible, the MHSU Disorder Program utilizes a Clinical Referral Line and Clinical Management:

a.  The Clinical Referral Line must be staffed by licensed clinicians experienced in the assessment and treatment of mental health and substance use disorders and maintained by the Contractor as a Program-dedicated telephone line available twenty-four hours a Day, seven Days a week from anywhere in the United States.  Callers can reach the Clinical Referral Line through the NYSHIP toll-free number.  The Clinical Referral Line gives callers a thorough clinical assessment which, in turn, helps the Contractor identify the most appropriate treatment setting and provider for referral.  Once a referral is received, the caller is guaranteed the network

---

[2] Network Provider means either a Network Practitioner or a Network Facility. Network Practitioner means a practitioner who has entered into a network agreement with the Contractor. Network Facility means an Approved Facility that has entered into a network agreement with the Contractor. Approved Facility means a general acute care or psychiatric hospital or clinic under the supervision of a physician. If the hospital or clinic is located in New York State, it must be certified by the NYS OASAS or according to the Mental Hygiene Law of New York State. If located outside New York State, it must be accredited by the Joint Commission on Accreditation of Health Care Organizations for the provision of mental health, alcoholism or drug use treatment or accredited by the appropriate State agency for the level of care received.  Single Case Agreement means a unique agreement that the Contractor negotiates with a Non-Network Provider to provide Program Network-level services for a specific Member (policyholder and their dependents) when there is insufficient access to a Network Provider within a certain geographic area or a Non-Network Provider possesses a unique specialty that is not currently possessed by a Network Provider within that geographic area. A Non-Network Provider means a practitioner or facility that has not entered into an agreement with the Offeror as an independent contractor to provide Covered Services.

# Exhibit A-2

level of benefits even if the provider is not in the network.

b. Clinical Management assesses the medical necessity of the proposed care so as to best meet the treatment needs of the Member and evaluate whether appropriate care is rendered at the least restrictive level.  Clinical Management is especially important where the case is complex and continuing review is necessary to determine if treatment goals are being met.  Clinical Managers coordinate care with the Member's family, primary care provider, treating facility, and provider to follow the Member through their treatment plan.  Facility means a general acute care or psychiatric hospital or clinic under the supervision of a physician.  For inpatient services other than emergencies, including alternate levels of care such as halfway houses and residential treatment centers, network care should be pre-certified to ensure the highest level of benefits and in accordance with New York State regulations.  If the Member is referred to inpatient treatment from the Clinical Referral Line, the Network Provider is responsible for contacting the Contractor to begin the Pre-certification process.  During this process, Clinical Managers apply the Contractor's clinical and medical necessity criteria as well as utilization management techniques.  Thereafter, the Clinical Manager discusses the proposed treatment with staff at the facility which includes either the facility attending provider or an internal utilization review nurse.  The Clinical Manager determines medical necessity by reviewing the symptoms, diagnosis, history, treatment goals, and planned interventions against the Contractor's clinical criteria.  If the Clinical Manager cannot determine the medical necessity of an inpatient admission, the case is automatically reviewed by the Contractor's Peer Reviewers.  Peer Reviewers must be either psychiatrists or Ph.D. psychologists, with a minimum of five years of clinical experience.  Clinical Management also includes concurrent inpatient reviews that occur with variable frequency depending on the level of care and the complexity of the case.  Clinical Managers closely monitor the Member's transition from inpatient to outpatient care with appropriate discharge planning to make certain that appointments are kept, and the Member is compliant with medications.

The following services are covered under the MHSU Disorder Program, subject to applicable Cost-Sharing such as Copays, Coinsurance, and Deductible.  [**Note**: Additional information on these services, including definitions, can be found at *Excelsior Plan and SEHP At A Glance* (Attachment 20)]

1. Outpatient Services

    a. Emergency Care at a hospital for treatment of MHSU Disorder when there is no inpatient admission following the care;

    b. Office Visits;

    c.  Psychiatric Second Opinion;

    d.  Substance Use-Structured Outpatient Rehabilitation Program;

    e.  Twenty Family Sessions per year when Enrollee is in a Structured Outpatient Substance Use Rehabilitation Program and, if the Enrollee is not in active treatment and the family member is covered under the same Empire Plan enrollment, twenty Family Sessions per year;

    f.  Psychological Testing and Evaluations;

    g.  Medically Necessary Ambulance Services for MHSU Disorder care;

    h.  Electro-Convulsive Therapy;

    i.  Crisis Intervention (Copays waived for up to three (3) visits per crisis);

    j.  Home-Based Counseling;

    k.  Registered Nurse Practitioners;

    l.  Telephone Counseling;

    m.  Applied Behavioral Analysis for the treatment of Autism;

    n.  Medication Management; and

    o.  Transcranial Magnetic Stimulation (TMS)

2. Inpatient and Alternate Levels of Care

    a.  Hospital Services;

    b.  Residential Treatment Facilities; Halfway Houses and Group Homes (Limited coverage only for SEHP);

    c.  Partial Hospitalization and other Hospital-Based Alternate Levels of Care such as Intensive Outpatient; Day Treatment 23 Hour Extended Bed and 72 Hour Crisis Bed;

    d.  Psychiatric Treatment or Consultation while a MHSU Disorder Inpatient;

    e.  Psychiatric Consultations on a Medical Unit; and

   f.  Prescription Drugs when dispensed by an Approved Facility, residential or Day treatment program.

*Benefits by Bargaining Unit* (Attachment 30) of this RFP provides the applicable Copayments by plan and Employee group. Also, for informational purposes, the Department's current Empire Plan Certificate of Insurance, SEHP Summary Plan Description and the NYSHIP Benefit Plan Comparison are included as *Empire Plan Certificates, Excelsior Plan and SEHP At A Glance* (Attachment 20).

The MHSU Disorder Program does not have an Employee Assistance Program (EAP) component.  There is a Statewide EAP for New York State employees staffed by New York State employees who participate as volunteers; however, EAPs do not have a formal role in the MHSU Disorder Program.  They are permitted to make referrals; however, the Contractor may not accept clinical information from the EAP unless the Contractor has a Health Insurance Portability and Accountability Act (HIPAA) release form on file for the EAP or the Enrollee is included in the conversation (i.e., either physically present or on a conference call).  Some EAP volunteers have professional degrees in mental health fields, some are Certified EAP counselors, and others have various levels of training.  EAP volunteers have been provided the opportunity to receive training regarding the MHSU Disorder Program and are encouraged to assist employees in accessing MHSU Disorder services through the MHSU Disorder Program.  PEs and PAs may have no EAP, some have internal EAPs, and others have contracted, professional EAPs.

Finally, Enrollees use the Empire Plan identification card, the Excelsior identification card and the SEHP identification card to access MHSU Disorder network services.  The Offeror is not responsible for the production and distribution of identification cards, nor will a MHSU Disorder Program-specific identification card be accepted as part of the MHSU Disorder Program benefit design.

The Offeror must provide a voluntary opt-in program for Attention Deficit Hyperactivity Disorder (ADHD), depression management, and eating disorders.  The Offeror may propose other voluntary opt-in programs which are available at no additional cost.  The Department reserves the right to not participate in any program offered and the right to opt-out of any program at any time.

### 1.4    Offeror Eligibility

Offeror means any responsible and eligible entity submitting a responsive Proposal to this RFP.  It shall be understood that references in the RFP to "Offeror" shall include an entity's proposed Subcontractors or Affiliates (as defined in Section 4.3 of this RFP), if any.  The Department requests Proposals only from qualified Offerors, as specified below.

   1.  The Offeror must, at time of Proposal submission and throughout the term of the

Contract, possesses the legal capacity to enter into a Contract with the Department.

2.  The Offeror, at time of Proposal submission and throughout the term of the Contract, must be authorized to conduct business in New York State, or, if the Offeror is not so authorized at time of Proposal Due Date (as specified in Section 1.5 of this RFP), then the Offeror must, at the time of Proposal Due Date, have filed an application for authority to do business in New York State with the New York State Secretary of State.  Such application must be approved prior to Contract Award.  (For details concerning this requirement, refer to: https://dos.ny.gov/form-corporation-or-business.  To register with the Secretary of State, contact:  https://www.dos.ny.gov/corps/index.html).  The Offeror shall notify the Department immediately in the event that there is any change in the above corporate status.

3.  The Offeror must represent and warrant that, at time of Proposal submission, it has completed, obtained, or performed all registrations, filings, approvals, authorizations, consents, and examinations required by any governmental authority for the provision of the delivery of Project Services (as detailed in Section 3 of this RFP) and agree that it will, during the term of the Contract, comply with any requirements imposed upon it by law or regulation.

4.  As of the Proposal Due Date, the Offeror must have experience providing behavioral management and associated claims adjudication services for, in aggregate, a minimum of 3.6 million total covered lives in its full book of business.

5.  The Offeror must represent and warrant that, at time of Proposal submission, it possesses adequate staffing resources, financial resources, and organizational capacity to perform the type, magnitude, and quality of work specified in the RFP.

6.  The selected Offeror must agree to contractual provisions to maintain and make available, as required by the State, a complete and accurate set of records for review by the State. Contractual provisions are set forth in the RFP and *Standard Clauses for New York State Contracts* (Appendix A), *Standard Clauses for All Department Contracts* (Appendix B), and *Information Security Requirements* (Appendix C).  Such records shall include any and all financial records deemed necessary by the State to discharge its fiduciary responsibilities to MHSU Disorder Program participants and to ensure that public dollars are spent appropriately.

7.  At least thirty calendar Days prior to the commencement of Full MHSU Disorder Project Services, and throughout the term of the Contract, the Offeror must possess a Participating Provider/Facility network that meets or exceeds the accessibility standards specified in Section 3.10 of this RFP.

8. The Offeror must understand and indicate its agreement to comply with all specific duties and responsibilities set forth in Section 3.2. of this RFP, entitled "Implementation Plan," including Section 3.2(1)(e) requiring the Offeror to propose a financial guarantee supporting its commitment to satisfy all implementation requirements.

9. As of the Proposal Due Date, the Offeror must have current Utilization Review Accreditation Commission (URAC)-case management, Joint Commission (TJC), Accreditation Commission for Health Care (ACHC), National Committee for Quality assurance (NCQA) or Commission on Accreditation of Rehabilitation Facilities (CARF) full accreditation at the proposed primary worksite where case management will be performed for the Project Services.

## 1.5   Timeline of Key Events

| EVENT | DATE |
|---|---|
| RFP Release Date | March 1, 2023 |
| Deadline for Submission of *Offeror Affirmation of Understanding and Agreement* (Attachment 1) | See below* |
| Pre-Proposal Conference | March 8, 2023 |
| Deadline for Submission of Offeror Questions | March 22, 2023 |
| Release Date of Official Responses to Offeror Questions | April 12, 2023 |
| Proposal Due Date | ~~April 26~~ May 3, 2023 |
| Anticipated Technical Management Interviews | May 30, 2023 |
| Anticipated Tentative Contract Award | July 18, 2023 |
| Anticipated OSC Approval of Contract Award and Commencement of Implementation Period | On or about October 12, 2023, subject to required approvals |
| Full MHSU Disorder Project Services Start Date | January 1, 2024, subject to required approvals |

*Prior to the Offeror's initial contact with the Department, the Offeror must complete and submit *Offeror Affirmation of Understanding and Agreement* (Attachment 1) to the Designated Contact identified in Section 2.1(1) of this RFP.

## SECTION 2:  PROCUREMENT PROTOCOL AND PROCESS

## 2.1 Rules Governing Conduct of Competitive Procurement Process

All inquiries, questions, filings, and submission of Proposals regarding the RFP must be directed in writing to the Designated Contact listed below.  Proposals may not be submitted by e-mail or facsimile.  Any inquiries, questions, filings, or submission of Proposals that are submitted to any other contact or physical address shall not be considered as official, binding or as having been received by the Department.

### 1. Designated Contact

In accordance with New York State Finance Law § 139-j(2)(a) (Procurement Lobbying Law (PLL)), the following individual is the Designated Contact for this Solicitation.  All questions relating to this Solicitation must be addressed to the following Designated Contact or their designee:

<div align="center">

Carole Blanchard
New York State Department of Civil Service
Attn: Office of Financial Administration, Floor 17
Agency Building 1, Empire State Plaza
Albany, New York 12239
DCSprocurement@cs.ny.gov

</div>

### 2. Restrictions on Contacts Between Offerors and State Staff During the Procurement Process

a. Pursuant to New York State Finance Law sections 139-j and 139-k, this Procurement imposes certain restrictions on communications between the Department and an Offeror during the procurement process.  An Offeror is restricted from making contacts from the earliest posting, on the Department's website, in a newspaper of general circulation, or in the procurement opportunities newsletter in accordance with Article 4-C of the Economic Development Law, of written notice, advertisement or solicitation of a request for Proposal, invitation for bids, or solicitation of proposals, or any other method provided for by law or regulation for soliciting a response from Offerors intending to result in a Contract with the Department through final award and approval of the Contract by the Department and, if applicable, the Office of the State Comptroller to other than the Designated Contact (unless it is a Contact that is included among certain statutory exceptions set forth in State Finance Law §139-j(3)(a)).  This time period is defined as the Restricted Period.  The Designated Contact for this procurement is set forth in section 2.1(1) of this RFP. Staff is required to obtain certain information from an Offeror whenever contacted about the procurement during the Restricted Period and is required to make a determination of the Offeror's responsibility that

addresses the Offeror's compliance with the statutory requirements. Certain findings of non-responsibility can result in rejection for contract award and in the event of two findings within a 4-year period, the Offeror is debarred from obtaining governmental procurement contracts. The Department's policy and procedures can be found in the *Procurement Lobbying Policy* (Attachment 2).  Further information about these requirements can be found at: https://www.ogs.ny.gov/ACPL/.

b.  The Department strictly controls communications between any Offeror and participants in the procurement process. "Offeror" means the individual or entity, or any employee, agent or consultant or person acting on behalf of such individual or entity, who contacts the Department about a governmental procurement during the Restricted Period of such governmental procurement whether or not the caller has a financial interest in the outcome of the procurement; provided, however, that a governmental agency or its employees that communicate with the Department regarding a governmental procurement in the exercise of its oversight duties shall not be considered an Offeror.  "Offeror" includes prospective Offerors prior to the due date for the submission of offers/bids in response to the solicitation document.

## 3.  Pre-Proposal Conference

A Pre-Proposal Conference will be held a minimum of 7 Calendar Days after the RFP Release Date using a virtual platform.  Attendance is not mandatory but is strongly encouraged for Offerors intending to submit a Proposal.  If Offeror's organization plans to attend the Pre-Proposal Conference, please notify the Designated Contact identified in Section 2.1(1) of this RFP via e-mail at the address noted in Section 2.1(1) at least 24 hours before the conference with the name, email address, and affiliation of each person attending.

## 4.  Submission of Errors or Omissions in this RFP Document

By participating in activities related to this RFP, and/or by submitting a Proposal in response to this RFP, an Offeror agrees to be bound by its terms, including, but not limited to, this process by which an Offeror may submit errors or omissions for consideration. If an Offeror believes there is an error or omission in this RFP, the Offeror may raise such issue as follows:

a.  **Process for Submitting Assertions of Errors or Omissions in RFP Document**

i.  *Time Frame:* The Department must receive assertions of errors or omissions in the RFP process which are or should have been apparent prior to the Proposal Due Date, in writing, five Business Days after the Release Date of Official Responses to Questions specified in Section 1.5 of this RFP.

ii. *Content:* The submission alleging the error or omission must clearly and fully state the legal and/or factual grounds for the assertion and must include all relevant documentation.

iii. *Format of Submission:* All submissions asserting an error or omission must be in writing and submitted to the Designated Contact in hard copy at the address provided in Section 2 of this RFP.

The envelope or package must clearly and prominently display the following statement:

**"Submission of Errors or Omissions for the
Mental Health and Substance Use (MHSU)
Disorder Program
Request for Proposals"**

Any assertion of an error or omission which does not conform to the requirements set forth in this section shall be deemed waived by the Offeror and the Offeror shall have no further recourse.

b. **The Review Process for Assertions of Errors or Omissions in RFP**

The Department shall conduct the review process for submission of errors or omissions.  The Commissioner may appoint a designee who will review the submission and make a recommendation to the Commissioner as to the disposition of the matter.  At the discretion of the Commissioner, or the Commissioner's designee, the Offeror may be given the opportunity to meet with the Commissioner or the Commissioner's designee to support its submission.  The Offeror may, but need not, be represented by counsel at such a meeting.  Any and all issues concerning the manner in which the review process is conducted shall be determined solely by the Commissioner or designee.

The Commissioner or designee shall review the matter, and the Commissioner shall issue a written decision within twenty Business Days after the close of the review process.  If additional time for the issuance of the decision is necessary, the prospective Offeror shall be advised of the delay and of the time frame within which a decision may be reasonably expected.  The Commissioner's decision will be communicated to the party in writing and shall constitute the agency's final determination in the matter.

The Department reserves the right to determine and act in the best interests of the State in resolving any assertion of error or omission in this RFP document.  The Department may elect to extend the Proposal Due Date as may be appropriate.  Notice of any such extension will be provided

to all organizations who provided an email address on the submitted *Offeror Affirmation of Understanding and Agreement* (Attachment 1). Notice of any extension will also be posted to: https://www.cs.ny.gov/2023MHSURFP/.

## 5. <u>Submission of Questions</u>

Using the *Questions Template* (Attachment 4), a prospective Offeror may submit questions concerning the content of this RFP via email to the Designated Contact's address specified in Section 2 of this RFP. Only those questions received prior to the Questions Due Date specified in Section 1 of this RFP, will be accepted. After the Questions Due Date, the Department will provide an email notification of the posting of all questions and the Department's official answers to all those individuals who provided an email address on the submitted *Offeror Affirmation of Understanding and Agreement* (Attachment 1) and the *Questions Template* (Attachment 4). The questions and answers will also be posted to: https://www.cs.ny.gov/2023MHSURFP/.

[**Note**: See Bid Deviations section below, specifically 6(b) with regard to submission of questions.]

## 6. <u>Submission of Proposal</u>

a. The Offeror's Proposal must be organized and separated into three separate sections: Administrative Proposal; Technical Proposal; and Financial Proposal. To facilitate the evaluation process, an Offeror must follow the submission requirements described below:

　　i. One ORIGINAL hard copy and five additional hard copy versions of each of the three sections of the RFP, separated into Administrative, Technical and Financial sections.

　　ii. Each ORIGINAL hard copy of each section must be marked "ORIGINAL," contain original signatures of an official(s) authorized to bind the Offeror to its provisions on all forms submitted that require the Offeror's signature. The remaining hard copies of each section may contain a copy of the official's signature on all forms submitted that require the Offeror's signature and should be numbered sequentially (i.e., Copy #1, Copy #2).

　　iii. A master electronic submission containing all the ORIGINAL hard copy sections of the proposal must be provided on electronic media. Electronic media shall be included on unprotected Microsoft Windows formatted USB 2.0 or higher storage drive and must be clearly labeled by proposal section

and identified as the master electronic submission.  In situations where proposal content differs between the ORIGINAL bound hard copies and the master electronic submission, the master electronic submission is deemed controlling.  The master electronic submission should be inserted in the Financial Proposal box.

iv.     The Offeror must submit fifteen additional USB drives, which each contain an electronic copy of the Administrative and Technical Proposal ONLY.  The USB drives must conform to the technical specifications outlined in Section 2 of this RFP.  Each of the sixteen electronic copies should be labeled by section and uniquely designated with a number (e.g., "TECHNICAL & ADMINISTRATIVE COPY 1", "TECHNICAL & ADMINISTRATIVE COPY 2, etc.").  The ~~sixteen~~ fifteen USB drives that contain only the Administrative and Technical Proposals should be packaged in the sealed box/envelope labeled Administrative Proposal.

v.      Each Proposal must include a table of contents.

vi.     Each major section of the Proposal, including attachments, must be labeled with an index tab that completely identifies the title of the section, subsection or attachment as named in the table of contents.

vii.    Each page of the Proposal (both the hard copies and the USB), including attachments, must be dated, and numbered consecutively.

b.  Proposals should be placed and packaged together, by section, in sealed boxes/envelopes (i.e., all Administrative Proposals in one box, all Technical Proposals in a second box, and all Financial Proposals in a third box).  Each sealed box/envelope should contain a label on the outside, which contains the information below.  Each sealed box/envelope should be submitted to the Designated Contact at the address provided in Section 2.1(1) of this RFP.

---

**New York State Department of Civil Service**
**Request for Proposals**
**"Mental Health and Substance Use (MHSU) Disorder Program"**

**OFFEROR NAME**
**OFFEROR ADDRESS**

Indicate content, as applicable

---

<div style="border: 1px solid black; text-align: center;">

**ADMINISTRATIVE, TECHNICAL, or FINANCIAL PROPOSAL**
**There must be no Financial/cost information included in the Offeror's Administrative Proposal or Technical Proposal, except for proposed performance guarantees.**

</div>

c. All Proposals must be mailed or hand-delivered to the address provided in Section 2.1(1) of this RFP.  To make arrangements for hand-delivery, the Offeror must notify the Designated Contact twenty-four hours prior to delivery.  All Proposals must be received by 3:00 p.m. ET on the Proposal Due Date as set forth in Section 1.5 of the RFP.

d. Any proposal received after 3:00 p.m. ET on the Proposal Due Date, as specified in Section 1.5, shall not be accepted by the Department, and may be returned to the submitting entity at the Department's discretion. All Proposals submitted become the property of the Department.

e. The Department will accept amendments and/or additions to an Offeror's Proposal if the amendment and/or addition is received by the Proposal Due Date.  All amendments to an Offeror's Proposal must be submitted in accordance with the format set forth in Section 2.1(6) of this RFP and will be included as part of the Offeror's Proposal.

f. An Offeror is solely responsible for timely delivery of the Proposal to the Department prior to the Proposal Due Date stated in Section 1.5 of this RFP.  Delays in United States mail deliveries or any other carrier, including couriers or agents of New York State, shall not excuse late bid submissions.  If the Proposal is delivered by mail or courier, the Department recommends that it be sent "Return Receipt Requested", so the Offeror obtains proof of timely delivery.  No phone, facsimile or e-mail submission of Proposals will be accepted for this RFP.  In addition, it is the sole responsibility of the Offeror to verify that all elements of the proposal submission are complete, correct and without error.

7. **Bid Deviations**

a. The Department will not entertain bid deviations to *Standard Clauses for New York State Contracts* (Appendix A).  The Department will also not entertain material and substantive bid deviations to the solicitation to *Standard Clauses for All Department Contracts* (Appendix B), and the *Information Security Requirements* (Appendix C).  NYS law precludes awarding a contract based on material deviation(s) from the specifications, terms, and/or conditions set forth in the solicitation.  Therefore, Proposals containing a bid deviation (including additional, inconsistent, conflicting, or alternative terms) that are a material and substantive change from the specifications, terms, and conditions set forth in the solicitation may render the Proposal non-responsive and may result in rejection of the Proposal.

b. If Offeror has an issue or concern regarding provisions in the solicitation and is considering submission of a proposal containing a bid deviation, Offeror is strongly advised to raise such issues and/or concerns during the question-and-answer period so that the Department may give due consideration to the issue prior to the submission of Proposals.  Failure to use the question-and-answer period and instead submitting a Proposal containing a bid deviation could render the entire Proposal non-responsive and rejected in its entirety.

c. In general, a material and substantive bid deviation is one that would:

    i. Impair the interests of New York State;

    ii. Place the successful Offeror in a position of unfair economic advantage;

    iii. Place other Offerors at a competitive disadvantage; or

    iv. Which, if it had been included in the original solicitation, could have formed a reasonable basis for an otherwise qualified Offeror to change its determination concerning the submission of a Proposal. For example, a deviation that would substantially shift liability (risk) or financial responsibility from the Offeror to New York State would be considered material.

d. Unless specifically required by the solicitation to be submitted as part of an Offeror's proposal, an Offeror is further advised that its standard, pre-printed material (including but not limited to product literature, order forms, manufacturer's license agreements, standard contracts or other pre-printed documents), which are physically attached or summarily referenced in the Offeror's Proposal are not considered as having been submitted with or intended to be incorporated as part of the official offer contained in the Proposal.  Rather, such material shall be deemed by the Department to have been included by Offeror for informational or promotional purposes only.  If such materials are requested by the solicitation, an Offeror must ensure that the materials are properly referenced.

e. To submit a non-material bid deviation, an Offeror must complete and submit the proposed deviation(s) using the *Non-Material Deviations Template* (Attachment 8), as part of the Administrative Proposal.  If a non-material bid deviation does not meet these requirements, it shall not be considered by the State and shall be rejected.

f.  An Offeror who does not submit the *Non-Material Deviations Template* (Attachment 8), as part of the Administrative Proposal is presumed to have no bid deviations.

8.  **Notification of Tentative Contract Award**

A tentative award letter will be sent to the selected Offeror indicating a tentative award subject to successful contract negotiations.  The remaining Offerors will be notified of the tentative award and the possibility that failed negotiations could result in an alternative award.

9.  **Debriefing**

Unsuccessful Offerors will be advised of the opportunity to request a Debriefing and the timeframe by which such requests must be made. Debriefings are subject to the *NYS Department of Civil Service Debriefing Guidelines* (Attachment 5).  An unsuccessful Offeror's written request for a debriefing shall be submitted to the Designated Contact at the address provided in Section 2.1(1) of this RFP.

10. **Submission of a Protest**

By participating in activities related to this Procurement, and/or by submitting a Proposal in response to this RFP, an Offeror agrees to be bound by its terms including, but not limited to, the process by which an Offeror may submit a protest of a non-responsive determination or the selection award for consideration.  In the event the Offeror elects to submit a protest of a non-responsive determination, the Offeror agrees it shall not be permitted to also submit a protest on the selection decision.  In the event that an Offeror decides to submit a protest, the Offeror may raise such issue according to the following provisions.

a.  **Process for Submitting a Protest of a Non-Responsive Determination or a Selection Decision**

   i.  <u>Time Frame</u>: Any protest must be received no later than 5:00 p.m. ET on the tenth Business Day after an Offeror's receipt of written notification by the Department of a non-responsive determination or tentative award.

   ii. <u>Content</u>: The protest must fully state the legal and factual grounds for the protest and must include all relevant documentation.

iii.    <u>Format of Submission</u>: The protest must be in writing and submitted to the Designated Contact at the address provided in Section 2 of this RFP.

iv.    A protest of either a non-responsive determination or a selection decision must have one of the following statements clearly and prominently displayed on the envelope or package:

**"Submission of Non-Responsive Determination Protest for Request for Proposals
Actuarial and Benefits Management Consulting Services"**

**OR**

**"Submission of Tentative Award Protest for Request for Proposals
Actuarial and Benefits Management Consulting Services"**

v.    Any assertion of protest which does not conform to the requirements set forth in this section shall be deemed waived by the Offeror, and the Offeror shall have no further recourse.

b.  **<u>Review of Submitted Protests</u>**

i.    The Department shall conduct the review process of submitted protests.  The Department's Commissioner may appoint a designee to review the submission and to make a recommendation to the Commissioner as to the disposition of the matter.  The Commissioner's designee may be an employee of the Department but, in any event, shall be someone who has not participated in the preparation of this RFP, the evaluation of Proposals, the determination of non-responsiveness, or the selection decision.  At the discretion of the Commissioner, or the Commissioner's designee, the Offeror may be given the opportunity to meet with the Commissioner or the Commissioner's designee, to support its submission. The Offeror may, but need not, be represented by counsel at such a meeting.  The Department shall be represented by counsel at such meeting.  Any issues concerning the way the review process is conducted shall be determined solely by the Commissioner, or the Commissioner's designee.

ii.    The Commissioner, or the Commissioner's designee, shall review the matter, and shall issue a written decision within twenty Business Days after the close of the review process. If additional time is necessary for the issuance of the decision, the

Offeror shall be advised of the time frame within which a decision may be reasonably expected. The Commissioner's decision will be communicated to the party in writing and shall constitute the Department's final determination in the matter.

iii. If an Offeror protests the selection decision or a non-responsive determination, the Department shall continue contract negotiations regarding the terms and conditions of the Contract with the selected Offeror.

## 11. Department of Civil Service Reservation of Rights

In addition to any rights articulated elsewhere in this RFP, the Department reserves the right to:

a. Make or not make an award under the RFP, either in whole or in part;

b. Prior to the bid opening, amend the RFP. If the Department elects to amend any part of this RFP, such amendments will also be posted to: https://www.cs.ny.gov/2023MHSURFP/;

c. Prior to the bid opening, direct Offerors to submit Proposal modifications addressing subsequent RFP amendments;

d. Withdraw this RFP, at any time, in whole or in part, prior to OSC approval of award of the Contract;

e. Waive any requirements that are not material;

f. Disqualify any Offeror whose conduct and/or Proposal fails to conform to any of the mandatory requirements of this RFP;

g. Require clarification at any time during the Procurement process and/or require correction of apparent errors for the purpose of assuring a full and complete understanding of an Offeror's Proposal and/or to determine an Offeror's compliance with the requirements of this RFP;

h. Reject any or all Proposals received in response to this RFP;

i. Change any of the scheduled dates stated in this RFP;

j. Seek clarifications and revisions of Proposals;

k. Establish programmatic and legal requirements to meet the Department's needs, and to modify, correct, and/or clarify such requirements at any time during the Procurement, provided that any such modifications would not

materially benefit or disadvantage any particular Offeror;

l.  Eliminate any mandatory, non-material specifications that cannot be complied with by all the Offerors;

m.  For the purposes of ensuring completeness and comparability of the Proposals, analyze submissions and make adjustments or normalize submissions in the Proposal(s), including the Offeror's technical assumptions, and underlying calculations and assumptions used to support the Offeror's computation of costs, or to apply such other methods it deems necessary to make level comparisons across Proposals;

n.  Use the Proposal, information obtained through any site visits, and the Department's own investigation of an Offeror's qualifications, experience, ability or financial standing, and any other material or information submitted by the Offeror in response to the Department's request for clarifying information, if any, in the course of evaluation and selection under this RFP;

o.  Negotiate with the successful Offeror within the scope of this RFP in the best interests of the Department;

p.  Utilize any and all ideas submitted in the Proposal(s) received except to the extent such information/ideas are protected under the New York State Freedom of Information Law, Article 6 of the Public Officers Law as critical infrastructure information or trade secrets;

q.  If the Department determines that contract negotiations between the Department and the selected Offeror are unsuccessful, the Department may invite the Offeror with the next highest Total Combined Score to enter into negotiations for purposes of executing a Contract. Prior to negotiating with the Offeror with the next highest Total Combined Score, the Department will notify the Offeror originally selected and provide the date when negotiations shall cease should an agreement not be reached. Scores will not be recalculated for any remaining Offerors should contract negotiations between the Department and the selected Offeror be unsuccessful because of material differences in key provision(s);

r.  Unless otherwise specified in this RFP, every offer is firm and not revocable for a minimum period of one hundred and eighty Days from the Proposal Due Date as set forth in the RFP; and

s.  Any Offeror whose Proposal might become eligible for a tentative award may be asked to extend the time for which its Proposal shall remain valid if the original award is withdrawn.

**12. <u>Disclaimer</u>**

The Department is not liable for any costs incurred by any Offeror prior to approval of the Contract by OSC. Additionally, no costs will be incurred by the Department for any prospective Offeror or Offeror's participation in any Procurement-related activities. Further, the Department shall not be liable for any costs incurred prior to the Implementation Period performing activities set forth in Section 3 of this RFP. The Department has taken care in preparing the data accompanying this RFP (hard copy attachments, website attachments, and sample document attachments). However, the Department does not warrant the accuracy of the data. The numbers or statistics which appear in hardcopy attachments, website attachments, and sample document attachments referenced throughout this RFP are for informational purposes only and should not be used or viewed by prospective Offerors as guarantees or representations of any levels of past or future performance or participation. Accordingly, prospective Offerors should rely upon and use such numbers or statistics in preparing their Proposal at their own discretion.

## 2.2    <u>Compliance with Applicable Laws, Rules and Regulations, and Executive Orders</u>

This Procurement is subject to the New York State competitive bidding laws and also governed by, at a minimum, the legal authorities referenced below. An Offeror must fully comply with the provisions set forth in this section of the RFP, as well as the provisions of the *Standard Clauses for New York State Contracts* (Appendix A), the *Standard Clauses for All Department Contracts* (Appendix B) and *Information Security Requirements* (Appendix C), which will become a part of the resulting Contract. The Department will consider for evaluation and selection purposes only those Offerors who agree to comply with these provisions and whose proposal contains the submission required hereunder.

1. **<u>Disclosure of Proposal Contents – Freedom of Information Law (FOIL)</u>**

   a. NOTICE TO OFFEROR AND ITS LEGAL COUNSEL

   All materials submitted by an Offeror in response to this RFP shall become the property of the Department and may be returned to the Offeror at the sole discretion of the Department. Proposals may be reviewed or evaluated by any person, other than one associated with a competing Offeror, designated by the Department. Offerors may anticipate that Proposals will be evaluated by staff and consultants retained by the Department and may also be evaluated by staff of other New York State agencies interested in the provision of the subject services including, but not limited to, the Office of Employee Relations (OER), and the Division of the Budget (DOB), unless otherwise expressly indicated in this RFP. The Department has the right to adopt, modify, or reject any or all ideas

presented in any material submitted in response to this RFP.

The Department shall take reasonable steps to protect from public disclosure any records or portions thereof relating to this solicitation that are exempt from disclosure under FOIL. Information constituting trade secrets or critical infrastructure information for purposes of FOIL must be clearly marked and identified as such by the Offeror upon submission. To request that materials be protected from FOIL disclosure, the Offeror must follow the procedures below regarding FOIL. If an Offeror believes that any information in its Proposal or supplemental submission(s) constitutes proprietary and/or trade secret or critical infrastructure information and desires that such information not be disclosed pursuant to the New York State Freedom of Information Law, Article 6 of the Public Officers Law, the Offeror must make that assertion by completing a *Freedom of Information Law Request for Redaction Chart* (Attachment 10). The Offeror must complete the form specifically identifying by page number, line, or other appropriate designation, the specific information requested to be protected from FOIL disclosure and the specific reason why such information should not be disclosed. Page 2 of *Freedom of Information Law Request for Redaction Chart* (Attachment 10) contains information regarding appropriate justification for protection from FOIL disclosure. Vague, non-specific, or summary assertions that material is proprietary, or trade-secret are inadequate and will not result in protection from FOIL disclosure.

The completed *Freedom of Information Law Request for Redaction Chart* (Attachment 10) must be submitted to the Department at the time of its Proposal submission; it should be included with the Requested Redactions (USB storage drive and Hard Copy) described below. It should not be included in the Offeror's Proposal. If the Offeror chooses not to assert that any Proposal material and/or supplemental submission should be protected from FOIL disclosure, the Offeror should so advise the Department by checking the applicable box on *Freedom of Information Law Request for Redaction Chart* (Attachment 10) and submitting it to the Department at the time of its Proposal submission, but separately from its Proposal. If a completed *Freedom of Information Law Request for Redaction Chart* (Attachment 10) form is not submitted, the Department will assume that the Offeror chooses not to assert that any proposal material or supplemental submission, as applicable, should be protected from FOIL disclosure.

The FOIL-related materials described herein are not considered part of the Offeror's Proposal and shall not be reviewed as a part of the Procurement's evaluation process.

Acceptance of the identified information by the Department does not constitute a determination that the information is exempt from disclosure

under FOIL.  Determinations as to whether the materials or information may be withheld from disclosure will be made in accordance with FOIL at the time a request for such information is received by the Department.

b. Requested Redactions (USB Storage Drive and Hard Copy):

At the time of Proposal submission, the Offeror is required to identify the portions of its Proposal that it is requesting to be redacted in the event that its Proposal is the subject of a FOIL request as follows.

The Offeror must provide an electronic copy of the Administrative Proposal, the Technical Proposal, and the Financial Proposal on a separate USB storage drive of the type outlined in RFP Section 2, which reflect the Offeror's requested redactions.  Additionally, the Offeror must provide a separately bound hardcopy of each of the three Proposal documents with redactions marked, but not applied, that are included on the USB storage drives.  The electronic documents must be prepared in PDF format. Each specific portion of the Proposal documents requested to be protected from FOIL disclosure must be identified using the Adobe "Mark for Redaction" function; do not use the "Apply Redactions" function; or by highlighting such portions in yellow.  The resulting documents must show the Offeror's requested redactions as outlined, while the content remains visible.  This will allow the Department to either apply or remove requested redactions when responding to FOIL requests.  The documents included on the USB storage drives and in hard copy must be complete Proposals, including all Attachments.  No section may be omitted from the USB storage drive or hard copy even if the entire section is requested to be redacted; such sections should be marked for redaction, not removed. For forms, attachments, and charts, please mark for redaction only those cells/fields/entries that meet the criteria for protection from FOIL, not the entire page.  Do not request redaction of Department-supplied materials or information.

During the Proposal evaluation process, the Department may request additional information through clarifying letters. Any requested redactions for additional written material provided by the Offeror in response to the Department's requests also must be submitted following the instructions, above.

## 2. **Public Officers Law**

All Offerors and Offerors' employees and agents must be aware of and comply with the requirements of the New York State Public Officers Law (POL), particularly POL sections 73 and 74, as well as all other provisions of NYS law, rules and regulations, and policy establishing ethical standards for current and former State employees. Failure to comply with these provisions may result in disqualification from the Procurement process, termination, suspension or

cancelation of the Contract and criminal proceedings as may be required by law. An Offeror must submit an affirmative statement as to the existence of, absence of, or potential for conflict of interest on the part of the Offeror because of prior, current, or proposed contracts, engagements, or affiliations, by submitting a completed *New York State Required Certifications* (Attachment 7), in the Offeror's Administrative Proposal.

3. **New York State Required Certifications**

An Offeror is required to submit the signed *New York State Required Certifications* (Attachment 7) with its Administrative Proposal. This attachment sets forth the Offeror's required Certification on the following:

   a. MacBride Fair Employment Principles;

   b. Non-Collusive Bidding;

   c. Executive Order No. 177 regarding discrimination and harassment;

   d. Sexual Harassment Prevention;

   e. Public Officer Law Requirements and Conflict of Interest Disclosure; and

   f. Executive Order No. 16 regarding business operations in Russia.

4. **New York Subcontractors and Suppliers**

An Offeror is required to complete *New York State Subcontractors and Suppliers* (Attachment 12). New York State businesses have a substantial presence in State contracts and strongly contribute to the economies of the State and the nation. In recognition of their economic activity and leadership in doing business in NYS, an Offeror for this RFP is strongly encouraged and expected to consider NYS businesses in the fulfillment of the requirements of the Contract. Such partnering may be as subcontractors, suppliers, protégés, or other supporting roles. *New York State Subcontractors and Suppliers* (Attachment 12) must be submitted with the Offeror's Administrative Proposal.

## **SECTION 3: PROJECT SERVICES**

The Department is seeking a qualified Offeror to provide comprehensive administration of the MHSU Disorder Program.  Delivery of Project Services will impact over 1.2 million covered lives.

For the purpose of submitting a Proposal, an Offeror must provide:

1. Mental health and substance use disorder services through a contracted nationwide Provider network;

2. Comprehensive administration services including customer service, claims processing and reporting; and

3. A Clinical Referral Line for the MHSU Disorder Program which must be operational 24 hours a Day, seven Days a week, 365 Days a year.


## **3.1    Account Team**

The Offeror must provide a knowledgeable, experienced account leader and team dedicated solely to the MHSU Disorder Program who have the responsibility and authority to command the appropriate resources necessary to implement and deliver Project Services (hereinafter "Account Team").

### **1. Duties and Responsibilities**

a. The Account Team must respond to any and all administrative and clinical concerns and inquiries posed by the Department, other staff on behalf of the Council on Employee Health Insurance, or union representatives regarding Member-specific claims issues within two Business Days to the satisfaction of the Department.

b. The proposed Account Team must guarantee that the MHSU Disorder Program complies with all legislative and statutory requirements.  In the event the Offeror is unable to comply with any legislative or statutory requirements, the Department must be notified in writing immediately.

c. The Offeror must ensure that its Account Team immediately notifies the Department of actual or anticipated events impacting MHSU Disorder Program costs and delivery of services to Enrollees and their dependents, including proposed legislative or statutory requirements.  Enrollee, for purposes of this RFP, is defined as the policyholder.

d. The Offeror will have a process for the Account Team to gain immediate access to corporate resources and senior management necessary to meet

all MHSU Disorder Program requirements and deal immediately with any issues that may arise.

## 3.2    Implementation Plan

The Offeror must deliver an overall Implementation Plan and designate an Implementation Team composed of individuals who have completed an implementation for a least one large client.  A large client is considered any Employer with at least 50,000 covered lives.  Implementation activities must be completed prior to the Project Services Start Date, so that MHSU Disorder Project Services can commence on the Project Services Start Date.

### 1.    Duties and Responsibilities

a.    The Implementation Plan must include evaluation and assessment activities and development of a project plan to achieve Contract requirements and deliver the Project Services.

b.    The Offeror must, by the Project Services Start Date, be operationally ready as described by, but not limited to, the following:

    i.    The Offeror must have a contracted Provider network in place, that meets or exceeds the required access standards set forth in Section 3.10 of this RFP.

    ii.    The Offeror must have a fully operational, dedicated Call Center, including a Clinical Referral Line, available for the use of Members and health benefits administrators.  As detailed in Section 3.5(1)(b), the dedicated Call Center must be open and operational a minimum of 30 Calendar Days prior to the commencement of Full MHSU Disorder Project Services. Members, for purposes of this RFP, are defined as all policyholders and their dependents.

    iii.    The Offeror must accurately process all claims, as submitted.

    iv.    The Offeror must have Clinical Management programs, as described in Section 3.11, operational and ready to support the MHSU Disorder Program as set forth in Section 3 of this RFP.

    v.    The Offeror must have a fully functioning, customized MHSU Disorder Program website available for a minimum of 30 calendar Days prior to the MHSU Project Services Start Date.

c.    The Offeror must provide, subject to Department final approval, an

Implementation Plan that results in the implementation of all services by the required timeframes, indicating estimated timeframes for individual task completion, testing dates and objectives, and areas where complications may be expected. The Implementation Plan must include key activities such as training of call center staff, website development, network development, transition of benefits, eligibility feeds and testing claims processing. Also, it must identify and describe areas where complications may be expected and what steps Offeror will take to ensure timely implementation.

d.  The Offeror shall provide a comprehensive Implementation Plan, at least 90 calendar Days prior to the MHSU Project Services Start Date, which will allow the Department to review the Offeror's readiness in the areas outlined in Section 5.3.1.

e.  Implementation Guarantee: The Offeror must guarantee that all the tasks identified in the Department approved Implementation Plan identified above will be in place on or before the MHSU Project Services Start Date following completion of the Implementation Period, with the exception of opening the dedicated Call Center and completing work on the customized website. The dedicated Call Center must be opened at least thirty calendar Days prior to the MHSU Project Services Start Date. The customized website must be live and operational at least 30 calendar Days prior to the Full MHSU Project Services Start Date. This guarantee is not subject to the limitation of liability provisions of the Contract.

## 3.3    Member Communication Support

The Department regularly provides information regarding Program benefits to Members through publications, the Department's website, media, and attendance at various meetings. The successful Offeror will be required to assist the Department with the creation, review, and presentation of MHSU Disorder Program materials that will enhance a Member's understanding of the MHSU Disorder Program benefits.

1.  **Duties and Responsibilities**

    a.  All Member communications developed by the Offeror are subject to the Department's review and prior written approval, including but not limited to any regular standardized direct communication with Members or their Physicians in connection with Member utilization or the processing of Member claims, either through mail, e-mail, fax, or telephone. The Department in its sole discretion reserves the right to require any change it deems necessary.

    b.  The Offeror will be responsible for providing Member communication

services to the Department including, but not limited to:

    i.    Developing language describing the MHSU Disorder Program for inclusion in the Empire Plan Certificate of Insurance, NYSHIP General Information Book, and any other form of communication, subject to the Department's review and approval;

    ii.    Developing articles for inclusion in Empire Plan Reports and other MHSU Disorder Program publications on an "as needed" basis;

    iii.    Timely reviewing and commenting on proposed MHSU Disorder Program communication material developed by the Department;

    iv.    Developing timely and accurate Summaries of Benefits Coverage (SBC), which will be consolidated with coverage information from other Program administrators for the Empire Plan, the Excelsior Plan and the SEHP.  Presently, the Department posts the SBCs on NYSHIP Online.  Upon Member request, the Offeror must direct Members to the Department's website to view the SBC or distribute a copy of the SBC to the Member within the federally required period; and

    v.    Distributing MHSU Disorder Program materials to Members; including but not limited to annual mailings of summary plan documents.  An Offeror shall have the ability to send member communication materials through both U.S. mail and email.

c.    The Offeror must develop appropriate customized forms and letters for the MHSU Disorder Program, including but not limited to Member claim forms, Explanation of Benefits, Certification letters and appeal letters. The Department reserves the right to review and approve these communications prior to distribution.

d.    Upon the Department's request, on an "as needed" basis, the Offeror agrees to provide staff to participate in health fairs, select conferences, benefit design information sessions and Union events in New York State and elsewhere in the United States.  A calendar year summary of health fairs is available in *Health Fairs* (Attachment 31).  The Offeror agrees that the costs associated with these services, including all fees associated with travel, meals and lodging to attend the events, are included in the Offeror's Administrative Fee.

e.    The Offeror shall assist in developing the Empire Plan Participating Provider Directories on an annual basis as required by New York State Insurance

Law §§ 3217-a(a)(17) and 4324(a)(17) and Public Health Law § 4408(r). Printed directories are provided for each State, except Florida which has two regional directories, as well as a separate directory for four different regions of New York State; Upstate, Long Island, Mid-Hudson, and New York City.  The Offeror must provide a MHSU Disorder Program specific online directory that is functional and available 24 hours a Day, 7 Days a week, except for scheduled maintenance.  The Offeror must provide a web link, for the Department's website, that is accessible to the general public and does not require Member log in.  In addition to complying with the requirement of the *Standard Clauses for All Department Contracts* (Appendix B) and *Information Security Requirements* (Appendix C), this online directory must be branded consistent with all New York State branding protocols and provide Members with a user-friendly interface that allows them to search for Providers and Facilities, as indicated in the *Empire Plan Certificates, Excelsior Plan and SEHP At A Glance (*Attachment 20*),* based on geographic location, name, or specialty.  The directory must detail all MHSU Provider information as required by State and federal law.  Information about all types of MHSU Providers in all geographic locations shall be accessible through this single link and search functions.  The directory shall be updated weekly or more frequently, if necessary, to ensure Members have access to the most up-to-date information.  The Offeror must ensure the directory contains the most up-to-date information regarding network MHSU Providers and Facilities, including if the MHSU Provider is accepting new patients.  Presently, MHSU Providers can be found by accessing the Department's website at http://www.cs.ny.gov (under Benefit Programs -NYSHIP online - choose a group, choose Empire Plan Enrollee, and then Find a Provider).

f.  The selected Offeror is required to provide Member Program Benefit information through a link on the Department's website.  Content accessible through this link shall be strictly limited to information that pertains to the Program.  No other links or content are permitted on the Offeror's Program Benefits website without the written approval of the Department.  The Department shall be notified of all regularly scheduled maintenance or material modifications to the site no later than one Business Day prior to such maintenance being performed.  Any and all costs associated with the Program Benefits website including development, maintenance, hosting customization or establishing a dedicated link for the MHSU Disorder Program shall be included in the Administrative Fee charged by the Offeror.  Information provided through this link shall include, but not be limited to:

   i.  Program Benefits;

   ii.  Eligibility;

  iii. Copayment and Cost-Sharing information;

  iv. Year-to-date combined annual Deductible and Coinsurance amounts;

  v. Claim status and submission information;

  vi. Explanation of Benefits Statements;

  vii. Access to the customized Empire Plan Provider Directories; and

  viii. Clinically-based educational information for Members based upon medical issues.

g. The fully functioning, customized MHSU Disorder Program Benefits website, approved and accepted by the Department, must be available a minimum of 30 calendar Days prior to the MHSU Project Services Start Date with a secure dedicated link from the Department's website with the ability to provide Members with online access to the specific website requirements as set forth in Section 3.3(1)(e) of this RFP.  The website must conform to the New York State website style provided by the Department of Civil Service and meet all NYS Web Accessibility requirements

h. The Offeror must include a web-based user interface compatible with:

  i. Google Chrome current version for Windows, and

  ii. Mozilla Firefox current version, and

  iii. Safari current version, and

  iv. Microsoft Edge current version

i. The websites must be mobile friendly, fully functional, and display correctly on devices such as:

  i. Smartphones;

  ii. iPhones;

  iii. iPads;

  iv. Tablets; and

1.  Headings and Captions

The headings or captions contained within the Contract are intended solely for convenience and reference purposes and shall in no way be deemed to define, limit or describe the scope or intent of the Contract or any provisions thereof.

2.  Compliance with Laws

Contractor warrants and represents that, throughout the term of the Contract, in the performance of its obligations under the Contract, it will: (i) comply with all applicable State and Federal laws, ordinances, rules and regulations and policies of any governmental entity; (ii) pay, at its sole expense, all applicable permits, licenses, tariffs, tolls and fees; and (iii) give all notices required by any laws, ordinances, rules, and regulations of any governmental entity.

3.  Jurisdiction or Venue

Any action, suit or proceeding to enforce any provision of, or based on any matter arising out of or in connection with this Contract shall be brought in any New York state court located in Albany County or any federal court located in the Northern District of the State of New York.

4.  Summary of Policy and Prohibitions on Procurement Lobbying

State Finance Law §§139-j and 139-k impose certain restrictions on communications between the Department and Offerors during the procurement process. Offerors are restricted from making contact, from the earliest posting, on the Department's website, in a newspaper of general circulation, or in the procurement opportunities newsletter in accordance with Article four-C of the Economic Development Law, of written notice, advertisement or solicitation of a Request for Proposal, invitation for bids, or solicitation of proposals, or any other method provided for by law or regulation to solicit offers/bids through final award and approval of the procurement contract by the Department and, if applicable, the Office of the State Comptroller ("restricted period"), to other than designated staff unless it is a contact that is included among certain statutory exceptions set forth in State Finance Law §139-j(3)(a). A finding of non-responsibility can result in rejection for contract award and in the event of two findings within a four-year period, the Offeror shall be debarred from obtaining governmental Procurement Contracts. Further information about these requirements can be found on the OGS website: https://ogs.ny.gov/acpl.

     v.  Laptops

## 3.4    Reporting Services

The Offeror must provide the Department with regular, periodic reports that are designed to document that Member, network, and account management service levels are being maintained and that claims are being paid in accordance with the Contract. The Offeror may on occasion be requested to provide ad-hoc reporting and analysis within twenty-four hours.

In order to fulfill its obligations to Members and ensure Contract compliance, the Offeror must provide accurate claims data information on a claim processing cycle basis as well as summary reports concerning the MHSU Disorder Program and its administration.

All electronic files must be in a format acceptable to the Department.  The Department will initially review and approve the proposed file format during the Implementation Period, but this file format may be adjusted during the term of the Contract at the discretion of the Department.  Upon receipt by the Department, all electronic files are first validated for compliance with the agreed-upon format.  Files that fail to adhere to this structure are rejected in their entirety and must be re-submitted.

### 1.  Duties and Responsibilities

    a.  The Offeror must be responsible for reporting services including, but not limited to:

        i.  Developing and delivering accurate and timely management, financial, and utilization reports as specified in *Program Reporting* (Attachment 16).  These reports will be delivered to the Department no later than their respective due dates and are required by the Department for its use in the review, management, monitoring, and analysis of the MHSU Disorder Program.  The exact format (paper and/or electronic Microsoft Access, Excel, Word), frequency, and due dates for such reports will be specified by the Department;

        ii.  Ensuring that all financial reports including claim reports are generated from amounts billed to each component of the MHSU Disorder Program and reconciled to amounts reported in quarterly and annual financial experience reports;

        iii.  Reporting of all performance guarantees as specified within the Contract and for any occurrence when a performance guarantee is not met, Contractor will provide a root cause analysis and detail corrective action;

iv. Providing ad hoc reports and other data analysis at no additional fee to the Department.  The exact format, frequency, and due dates for such reports shall be specified by the Department.  Any ad hoc report generated for the Department must be reflective of the Program's actual claims experience and Member population.  Information required in the ad hoc reports may include, but is not limited to:

1) Forecasting and trend analysis data;

2) Utilization data;

3) Utilization review savings;

4) Benefit design modeling analysis;

5) Reports to meet clinical Program review needs;

6) Reports segregating claims experience for specific populations including Department assigned Benefit Programs (see *Benefit Programs* chart (Attachment 18)); and

7) Reports to monitor Contract compliance.

v. Assisting and supporting the Department with all aspects of the premium rate development including, but not limited to:

1) Providing a team of qualified and experienced individuals who are acceptable to the Department and who will assist and support the Department in developing premium rates consistent with the financial interests and goals of the MHSU Program and the State;

2) Developing projected aggregate claim, trend, and Administrative Fee amounts for each MHSU Program Year.  Analysis of all MHSU Program components impacting the MHSU Program cost shall be performed including, but not limited to claims, trend factors, Administrative Fees, and changes in enrollment; and

3) Working with the Department and its contracted actuarial consultant through the annual premium renewal process to further document and explain any premium rate recommendation.  This process includes presenting the premium rate recommendation to staff of the Department,

Division of the Budget and OER.

b. <u>Reporting Services Guarantee</u>: The MHSU Disorder Program's service level standard requires that management reports and claim files listed in *Program Reporting* (Attachment 16), will be accurate and delivered to the Department no later than their respective due dates.  The Offeror shall propose the forfeiture of a specific dollar amount of the Offeror's Administrative Fee.


## 3.5    Customer Service

The Plan requires that the Offeror provide quality customer service to Members.  The Plan provides access to customer service representatives through the Empire Plan Consolidated Toll-Free Number.  Through this Empire Plan Consolidated Toll-Free Number, Members and Providers access representatives who respond to questions, complaints, and inquiries regarding Plan benefits, Network Providers, clinical management programs, claim status and appeals.  The average number of calls received per month in 2021 by the MHSU Disorder Program was approximately 28,364.  Detailed call center statistics can be found in *Call Center Statistics* (Attachment 17).  The Offeror is required to agree to customer service performance guarantees that reflect strong commitments to quality customer service.

1. **Duties and Responsibilities**

    The Offeror will be responsible for all customer support and services including, but not limited to:

    a. Providing Members access to information on all MHSU benefits and services 24 hours a Day, 7 Days a week, 365 Days a year, through the Empire Plan Consolidated Toll-Free Number, which currently is 1-877-769-7447 (1-877-7NYSHIP).

    b. Maintaining a fully operational dedicated Call Center, including a MHSU Clinical Referral Line, providing all aspects of customer support and clinical services as set forth in Section 3 of this RFP.  The dedicated Call Center must be open and operational a minimum of 30 calendar Days prior to the MHSU Project Services Start Date to assist Members with questions concerning transition.  The Call Center line shall have the additional capability to transfer calls internally to the appropriate areas of the MHSU Disorder Program.  The Call Center shall be staffed by trained customer service representatives (CSRs) available during the required customer service hours of operation.

        i.  The Offeror must maintain a dedicated Call Center staffed by fully trained CSRs and supervisors providing direct access to trained Clinicians who direct Members to appropriate Network

Providers who are accepting new patients, provide clinical MHSU information and if requested by the caller, assist in scheduling appointments on behalf of the Member 24 hours a Day, 7 Days a week, 365 Days a year.

ii. CSRs must be able to identify calls requiring transfer to a Clinician and they must be trained and capable of responding to a wide range of questions, complaints, and inquiries, including but not limited to: Transition of Care; MHSU Disorder Program benefits levels; status of Pre-certification requests; eligibility and claim status.

iii. The Offeror must provide access to a teletypewriter (TTY) number for callers utilizing a TTY device because of a hearing or speech disability.  The TTY number must provide the same level of access to the Call Center as the non-TTY number.

iv. In accordance with federal and State law, the Offeror must provide access to a translation line or interpretation service to Members who do not read, speak, write, or understand English as their primary language in order to remove potential barriers to accessing services.

v. Customer service representative(s) must use an integrated system to log and track all Member calls.  The system must track the total number of calls entering the Empire Plan Consolidated Toll-Free Number and the date, time, duration, and reason for all calls. The system must create a record of the Member contacting the call center, the call type, and all customer service actions and resolutions.

vi. The Offeror must maintain designated backup customer service staff with MHSU Disorder Program specific training to handle any overflow when the dedicated customer service center is unable to meet the Offeror's proposed customer service performance guarantees.  This backup system would also be utilized in the event the primary customer service center becomes unavailable.

vii. The Offeror must prepare and enter into a shared service agreement with the toll-free vendor and the Empire Plan's medical carrier/third party administrator (currently UnitedHealthcare) to address billing and maintenance issues with the provision of the Empire Plan Consolidated Toll-Free Number.

      viii.    The Offeror must establish a process through which Providers can verify eligibility of Enrollees and Members during Call Center hours.

c. Call Center Telephone Guarantees: The Offeror must provide guarantees for the following four measures of service:

    i.    <u>Call Center Response Time Guarantee</u>: The MHSU Disorder Program's service level standard requires that, at a minimum, 90% of incoming calls to the Contractor's telephone line will be answered by a CSR within thirty seconds.  Response time is defined as the time it takes incoming calls to the Offeror's telephone line to be answered by a customer service representative.  The call center telephone response time shall be reported to the Department on a weekly basis for the first month of the Contract, and then reported monthly for the remainder of the Contract and calculated quarterly.  [**Note**: this guarantee is separate from the Clinical Referral Line guarantees in Section 3.5(1)(e) of this RFP].

    ii.    <u>Availability Guarantee</u>: The MHSU Disorder Program's service level standard requires that the Offeror's telephone line will be operational and available to Members and Providers equal to or better than 99.5% of the Offeror's required up-time (24 hours a Day, 7 Days a week, 365 Days a year).  The telephone line availability shall be reported monthly and calculated quarterly.

    iii.    <u>Telephone Abandonment Rate Guarantee</u>: The MHSU Disorder Program's service level standard requires that the percentage of incoming calls to the Offeror's telephone line in which the caller disconnects prior to the call being answered by a call center representative will not exceed 3%.  The telephone abandonment rate shall be reported weekly for the first month of the Contract, and then reported monthly for the remainder of the Contract and calculated quarterly.

    iv.    <u>Telephone Blockage Rate Guarantee</u>: The MHSU Disorder Program's service level standard requires that not more than 0% of incoming calls to the Offeror's telephone line will be blocked by a busy signal.  The telephone blockage rate shall be reported weekly for the first month of the Contract, and then reported monthly for the remainder of the Contract and calculated quarterly.

d. Members are strongly encouraged to seek clinical referrals prior to receiving MHSU services.  This is accomplished through the use of a Clinical Referral

Line (CRL), which must be operational and available to Members 24 hours a Day, 7 Days a week, 365 Days a year. The CRL is staffed by clinicians, 24 hours a Day, 7 Days a week, 365 Days a year, who determine the medical appropriateness of MHSU care and direct Members to the most appropriate Network Provider and level of care. The CRL is a menu option within the Offeror's telephone line. For purposes of the MHSU Disorder Program, a Clinician is a: Psychiatrist; Psychologist; licensed and registered clinical social worker; Licensed Marriage and Family Therapists; Licensed Mental Health Counselor; Physician Assistant; Registered Nurse Clinical Specialist; Psychiatric Nurse/Clinical Specialist; Registered Nurse Practitioner; Applied Behavioral Analysis provider; Certified Behavioral Analyst; and Master Level Clinician. To ensure that the resources available to Members are utilized for appropriate, medically necessary care, the Offeror is required to perform Pre-certification of care which includes, at a minimum:

i.  Use of a voluntary CRL to evaluate Member MHSU care needs and direct the Member to the most appropriate, cost-effective MHSU Providers and levels of care. The CRL must be structured to facilitate a Clinician's assessment of the callers' MHSU treatment needs and provide suitable, timely referrals especially in emergency or urgent situations or for care that requires inpatient admission;

ii.  Use of alternate procedures to pre-certify care when the Member fails to call the CRL, as follows:

1)  When a Member contacts a Network Provider directly for treatment without calling the CRL, the Offeror is ultimately responsible for ensuring that a Member receives the network level of benefits and obtaining all necessary authorizations.

2)  When a Member contacts a Network Provider directly and the Network Provider is not the appropriate Provider to treat that Member, the Offeror is responsible for ensuring that its Network Providers take responsibility for assisting the Member in obtaining an appropriate referral.

3)  When a Member contacts an Out-of-Network Facility for treatment and the Offeror is notified in advance of the admission, the Offeror must provide the Member, or other HIPAA authorized representative of the Member, with a written determination of medical necessity of care in advance of the inpatient admission, where feasible.

iii.　Timely written notification to the Member, or other HIPAA authorized representative of the Member, of the potential financial consequence of remaining in an Out-of-Network Facility when the initial determination of medical necessity occurs;

iv.　Preparing and sending communications to notify Members and/or their MHSU Providers of the outcome of their Pre-certification or prior authorization request and notifying them in writing of the date through which MHSU Services are approved;

v.　Promptly loading into the clinical management and/or claims processing system approved authorizations determined by the Offeror;

vi.　Pre-certifying inpatient hospital admissions for alcohol detox for facilities outside of New York State as permissible under DFS Circular No. 14 (2017), advising the Facility to send the claim to the MHSU Program vendor and managing the Member's care if transferred to rehabilitative care;

vii.　Upon denial of Pre-certification for Inpatient care, providing the Member with Facility options where the Member may receive the pre-certified lower level of care.  If the Member confirms with the Offeror which Facility is chosen, the Offeror is required to promptly notify the Facility of the Pre-certification of the lower level of care. The Offeror must follow-up with the Member and selected Facility within twenty-four hours to confirm that the lower level of care has commenced;

viii.　Loading into the Offeror's clinical management and/or claims processing system one or more files of Pre-certification approved-through dates from the incumbent contractor, prior to the Implementation Date, once acceptable files are received; and

e.　The CRL must meet or exceed the following three performance standards, which will be calculated annually:

i.　<u>Out-of-Network CRL Guarantee</u>: When a Member calls the CRL for a non-emergency, or non-urgent referral and a network MHSU Provider is not available for an appointment within a time frame that meets the Member's clinical needs, a referral will be made to an appropriate MHSU Out-of-Network MHSU Provider or program within two Business Days of the call in a minimum of at least 90% of the cases.

ii. <u>Emergency CRL Guarantee</u>: 100% of Members who call the CRL in need of life-threatening emergency care will be referred to the nearest emergency room and be contacted within thirty minutes to assure their safety.  Additionally, 100% of Members in need of non-life-threatening emergency care shall be contacted by telephone, by an MHSU clinical care manager within thirty minutes of the Member's call to the CRL to ensure the member was scheduled for and attended the urgent appointment.  If the MHSU Administrator is unable to reach the Member and/or MHSU Provider to confirm that the Member received treatment, then multiple attempts must be made over several days to recontact by telephone either the MHSU Provider or the Member for confirmation.

iii. <u>Urgent Care CRL Guarantee</u>: At least 99% of Members in need of urgent care will be contacted by the Offeror to ensure that the network MHSU Provider contacted the Member within forty-eight hours of the Member's call to the CRL.

## 3.6    Enrollment Management

The Department currently utilizes a web-based enrollment system for the administration of employee benefits known as the New York Benefits Eligibility and Accounting System (NYBEAS).  NYBEAS is the source of eligibility information for all Empire Plan, Excelsior Plan, and SEHP Members.  Enrollment information is outlined in *Enrollment by Month* (Attachment 27), *Total Empire Plan, SEHP, and Excelsior Enrollment by Age* (Attachment 28) and *Covered Lives by Bargaining Unit or Other Group* (Attachment 29).

1. **Duties and Responsibilities**

   a. The selected Offeror must maintain accurate, complete, and up-to-date enrollment files, based on information provided by the Department.  In the case of conflict, the Offeror must agree that the Department-provided enrollment system information governs.  These enrollment files shall be used by the Offeror to process claims, provide customer service, identify individuals in the enrollment file for whom Medicare is primary, and produce management reports and data files.  The Offeror must provide enrollment management services including but not limited to:

      i. Performing an initial enrollment load to commence upon receipt of the enrollment file from the Department during the Implementation Period.  The file must be EDI Benefit Enrollment and Maintenance Transaction set 834 (ANSI x.12 834 standard) and be either 834 (4010x095A1) or 834 (005010x220), fixed-length ASCII text file, or a custom file format.  The determination will be made by the Department;

ii.  Testing to determine if the initial enrollment file and daily enrollment transaction loaded correctly and that the enrollment system interfaces with the claims processing system to accurately adjudicate claims.  The selected Offeror shall submit enrollment test files to the Department for auditing, provide the Department with secure, online access required to ensure accurate loading of the MHSU Disorder Program enrollment data, and promptly correct any identified issues to the satisfaction of the Department;

iii.  Developing and maintaining an enrollment system capable of receiving, reading, interpreting, and storing secure enrollment transactions (Monday through Friday) and having all transactions loaded to the claims processing system within twenty-four hours of the release of a retrievable file by the Department.  The Offeror shall, on a daily basis, manually review and load any transactions which did not process correctly from the daily ANSI x.12 834 standard 005010x220 file by reviewing the correct enrollment date maintained in the NYBEAS.  The Offeror shall immediately notify the Department of each transaction that did not process correctly and any delay in loading enrollment transactions.  In the event the Offeror experiences a delay due to the quality of the data supplied by the Department, the Offeror shall immediately load all records received (that meet the quality standards for loading) within twenty-four hours of their release, as required.  The Department will release enrollment changes to the Offeror in an electronic format daily (Monday through Friday).  On occasion, the Department will release more than one enrollment file within a twenty-four-hour period.  The Offeror must be capable of loading all enrollment files within the twenty-four-hour performance standard.  The format of these transactions will be in an EDI Benefit Enrollment and Maintenance transaction set, utilizing an ANSI x.12 834 standard 005010x220 transaction set in the format specified by the Department.  The latest transaction format is contained in *NYBEAS Enrollment Record Layout - Transaction Set Header* (Attachment 19).  The Offeror must also have the capability to receive alternate identification numbers and any special update files from the Department containing eligibility additions and deletions, including emergency updates if required;

iv.  Ensuring the security of all enrollment information, as well as the security of a HIPAA compliant computer system, in order to protect the confidentiality of data contained in the enrollment

file.  Any transfers of enrollment data within the Offeror's system or to external parties must be completed via a secured process, compliant with the information security requirements set forth in *Information Security Requirements* (Appendix C);

v.  Providing a back-up system or have a process in place where, if enrollment information is unavailable, Members can obtain CRL services without interruption;

vi.  Cooperating fully with the Department or third parties on behalf of the Department on any Department or State initiatives to use new technologies, processes, and methods to improve the efficiencies of maintaining enrollment data including any enrollment file conformance testing requested during the course of the Contract;

vii.  Maintaining a read-only connection to the Department-provided enrollment system for the purpose of providing the Offeror's staff with access to current MHSU Disorder Program enrollment information.  Offeror's staff must be available to access enrollment information through the Department-provided enrollment system, Monday through Friday, from 8:00 a.m. to 5:00 p.m., with the exception of holidays observed by the State as indicated on the Department's website;

viii.  Meeting the administrative requirements for National Medical Support Notices.  A child covered by a Qualified Medical Child Support Order (QMCSO), (For eligibility requirements for a QMCSO see General Information Books referenced in Section 1.3 above) or the child's custodial parent, legal guardian, or the provider of services to the child, or a New York State agency to the extent assigned the child's rights, may file claims and the Offeror must make payment for covered benefits or reimbursement directly to such party.  The Offeror will be required to store this information in its system(s) so that any claim payments or any other plan communication distributed by the Offeror, including access to information on the Offeror's Program Benefits website would go to the person designated in the QMCSO;

ix.  Sharing data with entities to be determined by New York State including, but not limited to, health benefits administrators for New York State agencies, PEs, and PAs;

x.  Agreeing to the State-defined eligibility periods as they relate to waiting periods and duration of coverage as a member (See

General Information Books referenced in Section 1.3 above for additional information on State-defined eligibility periods);

xi. Administering insurance coverage for any employee and their Eligible Dependents whom the Department determines is eligible for coverage;

xii. Adhering to the Option Transfer Period which shall be the period announced by the State to allow eligible Enrollees to join the plan, change coverage, or add eligible dependents;

xiii. Providing the State with online access to their enrollment information in real-time;

xiv. Using the Department's enrollment and accounting system as the controlling system for Member enrollment and demographic information;

xv. Updating enrollment and eligibility information solely based on the 834 transaction file for the NYSHIP population;

xvi. Agreeing to complete a full reconciliation between the Department's enrollment system and the Offeror's eligibility system monthly;

xvii. Maintaining a dedicated team to manually review enrollment and eligibility transactions that do not upload to the Offeror's system and report transactions that did not process in a format acceptable to the Department within one Business Day of discovery;

xviii. Reporting to the Department data changes of name, date of birth, gender, or Medicare Beneficiary Identifier (MBI) from the federal Centers for Medicare and Medicaid Services (CMS) so that the Department can update its system as appropriate to report these changes on the eligibility enrollment file; and

xix. Reporting address changes made to the Offeror to the Department via a file. The Department will update its system as appropriate and report these changes on the 834 transaction file.

b. <u>Enrollment Management Guarantee</u>: The Offeror must guarantee 100% of all MHSU Disorder Program enrollment records that meet the quality standard for loading will be loaded into the Offeror's enrollment system within twenty-four hours of release by the Department.

### 3.7    Claims Processing

The Offeror must process all Network Provider claims and out-of-network claims submitted under the MHSU Disorder Program, including but not limited to claims submitted manually, foreign claims, and Medicare primary claims, Medicaid, and Veterans Administration.  The Offeror shall have the ability to process claims for the Empire Plan, the Excelsior Plan, and the SEHP, which have different benefit designs and different out-of-network payment methodologies.  The claims processing system shall include controls to identify questionable claims, prevent inappropriate payments, and ensure accurate reimbursement of claims in accordance with the benefit design, MHSU Disorder Program provisions and negotiated agreements with MHSU Providers. The Offeror must coordinate benefits in order to prevent an overpayment and to avoid duplicate benefit payments so that total payment under the MHSU Disorder Program is not more than the MHSU Disorder Program's liability.  For a detailed description of coordination of benefits under the Empire Plan, please see the Certificate included as *Empire Plan Certificates, Excelsior Plan and SEHP At A Glance* (Attachment 20).

To be covered, Member submitted claims are required to be submitted to the Offeror no later than one hundred twenty Days after the end of the calendar year in which the service was rendered, or one hundred twenty Days after another plan processes the claim, unless it was not reasonably possible for the Member to meet this deadline.  The Plan service counts and net payments can be found in *Empire Plan Historical Claims File* (Amended Attachment 26) of this RFP.  Upon receipt of a completed, notarized *Confidentiality and Non-Disclosure Agreement* (Attachment 11), the Department shall provide the Offeror with *Empire Plan Historical Claims File* (Amended Attachment 26). The *Confidentiality and Non-Disclosure Agreement* (Attachment 11) is required to be submitted by an Offeror requiring access to the *Empire Plan Historical Claims File* (Amended Attachment 26).

1. **Duties and Responsibilities**

    a. The Offeror must provide all aspects of claims processing.  Such responsibility shall include but not be limited to:

        i.   Maintaining a claims processing center located in the Continental United States staffed by fully trained claims processors and supervisors;

        ii.  Verifying that the MHSU Disorder Program's benefit design has been loaded into the system appropriately to adjudicate and calculate Cost-Sharing and other edits correctly.  The claims processing system must be capable of integrating and enforcing the various clinical management and utilization review components of the Plan including Pre-certification, concurrent review, and benefit maximums;

iii. Assuming the costs for all customizations made by the Offeror to their claims processing system during the term of the Contract to accurately process claims for the MHSU Disorder Program;

iv. Paying claims based on a definition of medical necessity, as defined in the *Empire Plan Certificates, Excelsior Plan and SEHP At A Glance* (Attachment 20);

v. Developing and maintaining claim payment procedures, guidelines, and system edits (i.e., control measures to prevent unauthorized payments) that guarantee the accuracy of claim payments for covered expenses only, utilizing all edits as approved by the Department.  The Offeror's system must ensure that payments are made only for authorized services;

vi. Maintaining claims histories for twenty-four months online and archiving older claim histories for a minimum of six years and the balance of the calendar year in which they were made with procedures to retrieve and load claim records easily;

vii. Reversing all attributes of claim records processed in error;

viii. Agreeing that all claims data is the sole property of the State. Upon the request of the Department, the Offeror shall share appropriate claims data with other Plan carriers and consultants for various programs (e.g., Other Clinical Management Programs) and the Department's Decision Support System (DSS) vendor at no additional cost.  The Offeror cannot share, release, or make the data available to third parties in any manner without the prior written consent of the Department;

ix. Maintaining a backup system and disaster recovery plan for processing claims, compliant with the information security requirements set forth in *Information Security Requirements* (Appendix C), in the event that the primary claims payment system fails or is not available or accessible;

x. Analyzing and monitoring claim submissions to promptly identify errors, fraud, and/or abuse and reporting to the State, and appropriate authorities.  Such information shall be provided in a timely fashion in accordance with a State-approved process. The Plan shall be charged only for accurate (i.e., the correct dollar amount) claims payments for covered expenses.  The Offeror will credit the MHSU Disorder Program the amount of

any overpayments that Offeror agrees resulted from Offeror's (including subcontractors) error or fraud in the performance of Project Services. These credits will be made without additional administrative charge to the MHSU Disorder Program and regardless of whether any overpayments are recovered from the Provider and/or Member. The Offeror shall report fraud and abuse to the appropriate authorities. In cases of overpayments resulting from errors only found to be the responsibility of the State, or as a result of fraud and abuse by Members and/or Providers, the Offeror shall use reasonable efforts to recover any overpayments and credit 100% of any recoveries to the MHSU Disorder Program upon receipt;

xi. Updating the claims adjudication system, twice a year, with FAIR Health, Inc.'s database of Reasonable and Customary amounts;

xii. Providing Members with hardcopy Explanation of Benefits (EOBs) in accordance with New York State Insurance Law §3234 and §3235. An EOB is a statement received by the Member either by mail or electronically that provides claim payment detail. The Offeror shall also provide Members with access to electronic EOBs for network and Non-network claims via the Offeror's Program Benefits website. At a minimum, EOBs will include the following information:

1) Type of service;

2) Enrollee's Name;

3) Provider of Service;

4) Date of service;

5) Amount billed;

6) Amount plan paid;

7) Amount Enrollee owes;

8) Copayment, Deductible and Coinsurance responsibility;

9) Summary of In-Network Out-of-Pocket Limit;

10) Summary of Out-of-Network Combined Annual Deductible;

11) Summary of Out-of-Network Combined Coinsurance Maximum;

12) Information about claims for Emergency Services and Surprise Bills;

13) Information about the appeal process, including external appeal; and

14) Telephone number to call if Member has questions about claims.

xiii. When the Plan is secondary to any other plan, reducing payment under the Empire Plan so that the total of all payments or benefits payable under the Empire Plan and the other plan is not more than the reasonable and customary charge for services received;

xiv. Providing direct, secure access to the Offeror's claims system at Department offices, and any online web-based reporting tools, to authorized Department representatives;

xv. Developing and securely routing a MHSU daily claims file that reports claims incurred to date which have been applied to the Shared Accumulators between the Empire Plan Hospital Program, Medical Program and MHSU Disorder Program, using the *Shared Accumulator File Layout* (Attachment 24) template;

xvi. Loading a daily claims file from the Empire Plan medical carrier/third party administrator and hospital carrier that reports Shared Accumulators, using the *Shared Accumulator File Layout* (Attachment 24) template;

xvii. Participating in Medicare Crossover by entering into an agreement with the Empire Plan administrator to accept electronic claims data record files from the administrator for Empire Plan Members who have Medicare as their primary coverage. Claims data will only be sent to the Contractor for possible Empire Plan mental health and substance use outpatient claims which also involve Medicare coverage. The claims information sent from the administrator will include claims filed with CMS that should be considered by the Contractor for secondary coverage. The Empire Plan administrator will sort out any claims for benefits that are for mental health or substance use services and electronically forward the claim to

the Contractor for consideration;

xviii.    Pursuing collection of up-to-date coordination of benefit information that is integrated into the claims processing system through a pursue and pay methodology and pursuing collection of any money due the MHSU Disorder Program from other payers or Members who have primary MHSU coverage through another carrier;

xix.    Processing claims pursuant to Enrollees covered under the Disabled Lives Benefit.  Disabled Lives Benefit means the benefits provided to an Enrollee who is Totally Disabled on the date coverage ends.  The benefits are provided on the same basis as if coverage had continued with no change until the Day the Enrollee is no longer Totally Disabled or for ninety Days after the date the coverage ended, whichever is earlier.  Totally Disabled means that because of a mental health/substance use disorder condition, the Enrollee, cannot perform his/her job or the Dependent cannot perform the normal activities of a person that age;

xx.    Submitting a file including all processed claims to the Department's DSS vendor no later than twelve calendar Days following the end of each calendar month; and

xxi.    Integrating appeal decisions into the claims processing system.

b.  Claims Processing Guarantees: The Offeror must provide for the following two program service level standards:

i.    Claims Payment Accuracy Guarantee: The MHSU Disorder Program's service level standard requires that claims payment accuracy is achieved for a minimum of 99% of all claims processed and paid each calendar year on an annual basis. Claims payment accuracy shall be measured by dividing the number of claims paid correctly by the total number of claims reviewed.  Results shall be determined based on a periodic audit conducted by the Department using statistical estimate techniques at the 95% confidence level with precision of +/- 3%.

ii.    Claims Processing Guarantee – Twenty-Four Calendar Days Turnaround Time: The MHSU Disorder Program's service level standard requires that a minimum of 99.5% of submitted claims that require no additional information in order to be properly adjudicated that are received by the Offeror are processed within twenty-four calendar Days from the date the claim is

received electronically or in the Offeror's designated post office box to the date of Claim Adjudication.  Claim Adjudication is defined as when the Offeror has processed the claim and the claim has been finalized for payment or denial.

## 3.8 Plan Audit and Fraud Protection

The protection of the MHSU Disorder Program assets must be a top priority of the selected Offeror.  The selected Offeror must have a strong audit presence throughout its organization.  Article 4 of New York State Insurance Law provides a framework and sets forth certain requirements related to fraud and fraud prevention.  Throughout the term of the Contract, the selected Offeror shall provide fraud and abuse detection and prevention services at least at the same level and using the same tools, software, and techniques as used for its health insurance plans that are regulated by the New York State Department of Financial Services (DFS).  If the Offeror has no such health insurance plans, the selected Offeror shall provide fraud and abuse detection and prevention services at least at the same level and using the same tools, software, and techniques as used for its health insurance plans that are regulated by the insurance department of another state. The Offeror is responsible for the recovery of benefit payments resulting from fraud and/or abuse to the extent possible.

### 1. Duties and Responsibilities

a. The Offeror must conduct routine and targeted audits of Providers, including Facilities.  Providers that deviate significantly from normal patterns in terms of cost, Current Procedural Terminology (CPT) coding or utilization are to be identified and targeted for on-site and desk audits in accordance with established selection and screening criteria.  On-site audits must also be conducted upon request by the Department and/or OSC, or when information is received by the Offeror that indicates a pattern of conduct by a Provider that is not consistent with the MHSU Disorder Program's design and objectives.  Any modifications to the proposed audit program must receive written prior approval by the State.

b. The Offeror must utilize payment integrity algorithms and software to monitor waste, fraud, and abuse in the Plan at no extra cost to the Department.

c. The Offeror must inform the Department in writing of any allegation or other indication of potential fraud and/or abuse identified within seven Business Days of receipt of such allegations or identification of such potential fraud and/or abuse.  The Department must be fully informed of all fraud and/or abuse investigations impacting the Plan upon commencement, regardless of whether the individual fraud and/or abuse investigation has a material financial impact to the State.

d.  The Offeror shall cooperate with all Department and/or OSC audits whether conducted by State staff or by a third party on the Department's or OSC's behalf.  Cooperation shall be consistent with the requirements of *Standard Clauses for New York State Contracts* (Appendix A), *Standard Clauses for All Department Contracts* (Appendix B), and *Information Security Requirements* (Appendix C), including the provision of access to protected health information and all other confidential information when required for audit purposes as determined by the Department and/or OSC as appropriate.  The Offeror must respond to all State (including OSC) audit requests for information and/or clarification within fifteen Business Days.  The Offeror must perform timely reviews and respond within a period specified by the Department to preliminary findings submitted by the Department or the OSC audit unit in accordance with the contractual requirements.  Use of statistical sampling of claims and extrapolation of findings resulting from such samples shall be acceptable techniques for identifying claims errors.  The selected Offeror shall facilitate audits, including on-site audits, as requested by the Department or OSC.

e.  The Offeror shall remit to the Department 100% of audit findings that are agreed by the Offeror to be the result of Offeror (including subcontractors) error or Offeror (including subcontractors) fraud in the performance of Project Services within thirty Days of the issuance of the final audit report including the response from the Offeror.  Additionally, the Offeror shall remit 100% of any other Provider and Member audit recoveries to the Department as applicable within thirty Days of receipt.  Remittances shall be credited to the subsequent Administrative Fee invoice.

f.  The Offeror must agree that audit activity may include, but not necessarily be limited to, the following activities:

   i.   Review of the selected Offeror's activities and records relating to the documentation of its performance under the Contract in areas such as determination of Enrollee or Dependent eligibility and application of various Department program administrative features (e.g., dependent survivor benefits, and reasonable adjudication of disabled dependent status);

   ii.  Comparison of the information in the selected Offeror's enrollment file to that on the enrollment reports issued to the selected Offeror by the Department; and

   iii. Assessment of the selected Offeror's information, utilization, and demographic systems to the extent necessary to verify accuracy of data on the reports provided to the Department in accordance with Section 3.4 of this RFP.

g. The selected Offeror shall maintain and make available documentary evidence necessary to perform the reviews. Documentation maintained and made available by the Offeror may include, but is not limited to, source documents, books of account, subsidiary records and supporting work papers, claim documentation, pertinent contracts, key subcontracts, provider agreements, and correspondence.

h. The selected Offeror shall make available for audit all data in its computerized files that is relevant to and subject to the Contract. Such data may, at the Department's discretion, be submitted to the Department in machine-readable format, or the data may be extracted by the Department, or by the Offeror under the direction of the Department.

i. The selected Offeror shall, at the Department's request, and in a time period specified by the Department, search its files, retrieve information and records, and provide to the auditors such documentary evidence as they require. The Offeror shall make sufficient resources available for the efficient performance of audit procedures.

j. The selected Offeror shall comment on the contents of any audit report prepared by the Department and transmit such comments in writing to the Department within thirty Days of receiving any audit report. The response will specifically address each audit recommendation. If the Offeror agrees with the recommendation, the response will include a work plan and timetable to implement the recommendation. If the Offeror disagrees with an audit recommendation, the response will give all details and reasons for such disagreement. Resolution of any disagreement as to the resolution of an audit recommendation shall be subject to the Dispute Resolution provision set forth in *Standard Clauses for All Department Contracts* (Appendix B).

k. If the selected Offeror has an independent audit performed of the records relating to this Contract, a Certified copy of the audit report shall be provided to the Department within ten Business Days after receipt of such audit report by the Offeror.

### 3.9 Appeal Process

When claim benefits, requests for Pre-certification, or a utilization review results in a denial, Members or their Providers may appeal to the Offeror. The MHSU Disorder Program provides Members with two internal appeal levels and an external appeal process. In 2021, the MHSU Disorder Program had 894 internal appeals and 19 external appeals. The Offeror must also have a process in place to review out-of-network referrals and refer denials to external review. The Offeror shall comply with the requirements of the appeal process as prescribed by Article 49 of the New York State

Insurance Law.  For detailed information regarding the MHSU Disorder Program's appeal process, see information found within the *Empire Plan Certificates, Excelsior Plan and SEHP At A Glance* (Attachment 20).

1. **Duties and Responsibilities**

   a. The Offeror must establish a formal appeals resolution procedure which includes the responsibility for notifying Members of their rights to appeal and the steps necessary for filing an appeal.

   b. The Offeror must establish an expedited appeals resolution procedure to be followed if a Member or someone on behalf of a Member requests an urgent appeal review, where a delay in treatment could significantly increase risk to health, the ability to regain maximum function, or cause severe pain.  Such appeals, by New York State Law, will be decided within no more than 72 hours upon receipt of appeal.

   c. The Offeror's internal appeals processes must be consistent with New York State Insurance Law and DFS model language: https://www.dfs.ny.gov/apps_and_licensing/health_insurers/model_language.

   d. The Offeror must respond to all External Appeals on behalf of the Department as requested by DFS through a process that provides an opportunity for Members to appeal when denied coverage on the basis that a service is not medically necessary or is an experimental or investigational service.

## 3.10   Provider Network

Provider Network means the Offeror's credentialed and contracted network of MHSU Providers.  The Department expects the Offeror to maintain industry standards in the MHSU care delivery system to make quality care available while providing cost containment measures.  NYSHIP currently monitors key quality and utilization metrics, supports value-based contracting, and participates in regional healthcare initiatives.

1. **Duties and Responsibilities**

   a. The Offeror's proposed network within NYS must meet the network adequacy standards as defined by the DFS.  The Offeror must also provide 24 hours a Day, 7 Days a week, 365 Days a year access to a telemedicine service for behavioral health visits that Members can utilize online.  The telemedicine portal must be accessible to members 24/7 for treatment, or referral to higher level of care when members have urgent or

crisis-related episodes that cannot be addressed through the telemedicine portal.

b.  In developing its proposed MHSU Provider Network, the Offeror is expected to use its best efforts to substantially maintain the composition of Network Providers included in the MHSU Disorder Program's current Provider Network.  The Offeror's proposed MHSU Provider Network must be composed of a mix of the following professionals to meet the Members' needs: licensed and/or Certified psychiatrists and psychologists, licensed Masters Level Clinicians, Licensed Clinical Social Workers, Licensed Mental Health Counselors, Licensed Marriage and Family Therapists, Physician Assistants, Registered Nurse Clinical Specialists, psychiatric nurse/clinical specialists and registered nurse practitioners, Licensed Marriage and Family Therapists (LMFTs), Licensed Mental Health Counselors (LMHCs), Certified Behavioral Analysts, Applied Behavioral Analysis (ABA) Agencies, Structured Outpatient Programs and Partial Hospitalization Programs including: residential treatment centers, group homes, hospitals and alternative treatment programs such as day/night centers, halfway houses and treatment programs for dually diagnosed individuals (e.g., mental health diagnosis and substance use diagnosis). Programs Certified by the New York State Office of Addiction Services and Supports (OASAS) must be included in the MHSU Provider Network. The MHSU Provider Network must include Providers throughout New York State and in areas with high concentrations of active and/or retired employees living outside of New York State such that the network access guarantees established by the terms of the Contract are fully satisfied.

c.  The Offeror shall monitor network physicians to ascertain if their practices are open or closed to new patients.  Provider availability must be taken into account in relation to Member accessibility.

d.  The Offeror must utilize value-based contracting strategies to enhance MHSU Provider performance and clinical outcomes.

e.  The Offeror shall offer participation in its MHSU Provider Network to any Provider who meets the Offeror's credentialing criteria if the MHSU Provider is a high-volume provider or upon the Department's request where such inclusion is deemed necessary by the Department to meet the needs of Members, even if not otherwise necessary to meet the minimum access guarantees.

f.  The Offeror may choose to enter into MHSU Disorder Program specific contracts that are contingent on award and/or utilize existing agreements that can be made applicable to the MHSU Disorder Program to meet the requirement that the Offeror has executed contracts with all the MHSU

Providers included in the Offeror's proposed MHSU Provider Network on the Full MHSU Services Start Date.

g.  The Offeror will be responsible for contracting with MHSU Providers as defined by the *Empire Plan Certificates, Excelsior Plan and SEHP At A Glance* (Attachment 20) and credentialing according to Offeror guidelines and all applicable State and federal law, rules, and regulations.  Contracts with MHSU Providers must be written to obtain competitive reimbursement rates while ensuring that MHSU Disorder Program access and quality guarantees are met.  Such contracting services must include, but are not limited to:

   i.  Ensuring that all MHSU Network Providers contractually agree to and comply with all of the MHSU Disorder Program's requirements and benefit design specifications;

   ii.  Ensuring that MHSU Network Providers accept as payment-in-full, the Offeror's contractual reimbursement for all claims for Covered Services, subject to the applicable MHSU Disorder Program Copayments;

   iii.  Negotiating Single Case Agreements with Out-of-Network MHSU Providers when the Offeror determines that it is clinically appropriate or to address guaranteed access issues;

   iv.  Contracting with MHSU Network Providers and negotiating pricing arrangements that optimize discounts, including the promotion of the value of care over volume;

   v.  Notifying the Department, in writing, within one Business Day from the time Offeror received notice, if there is a substantial change to either the number, composition or terms of the Provider contracts utilized by the MHSU Disorder Program, even if access standards are still met; and

   vi.  Having adequate network management and staff to manage the network, handle Provider inquiries and ensure updated MHSU Provider information is entered into the Offeror's system and transmitted to the online directory.  An adequate MHSU Provider relations staff must be dedicated to New York State, where the majority of MHSU Disorder Program utilization occurs.

h.  The Offeror shall negotiate agreements on a case-by-case basis with mental health practitioners licensed under Article 163 of the New York Education Law, when such MHSU Provider possesses a particular subspecialty that is clinically appropriate or to address access issues.

i. The Offeror must ensure that MHSU Providers are credentialed promptly, and that Providers meet the licensing and quality standards required by the state in which they operate. The Offeror's credentialing organization must maintain NCQA or URAC Certification for credentials verification. Credentials shall be provided to the Department upon request.

j. The Offeror must have an effective process by which to confirm MHSU Providers continuing compliance with credentialing standards.

k. The Offeror must conduct a comprehensive quality assurance program which includes, but is not limited to:

    i. Monitoring the quality of care provided by MHSU Network Providers;

    ii. Monitoring technical competency and customer service skills of MHSU network Provider staff;

    iii. MHSU Network Provider profiling;

    iv. Peer review procedures;

    v. Outcome and Quality Measurement analysis; and

    vi. Maintaining an ongoing training and education program that will be offered to MHSU Network Providers.

l. <u>Network Access Guarantees</u>: Upon the Full MHSU Services Start Date and throughout the term of the Contract, the Offeror's MHSU Provider Network must meet or exceed the Department's minimum access standards as follows. MHSU Providers must be contracted for participation to commence with the Full MHSU Services Start Date. Urban, Suburban and Rural classifications are based on United States Census Department classifications. The access standards must be provided in terms of actual distance from Enrollees' residences. [**Note:** In calculating whether the Offeror meets the minimum access guarantees, all Enrollees must be counted; no Enrollee may be excluded even if an MHSU Provider is not located within the minimum access area.]

    i. **<u>URBAN AREAS</u>:** 95% of Enrollees will have at least:

        1) One Psychiatrist, Psychologist, or Masters Level Clinician within three miles; and

        2) One Mental Health or Substance Use Facility within five miles. Mental Health or Substance Use Facility for

purposes of this requirement means Inpatient Facilities, Alternate Levels of Care (ALOC), and Outpatient Clinic Groups.

    ii.   **SUBURBAN AREAS:** 95% of Enrollees will have at least:

        1) One Psychiatrist, Psychologist, or Masters Level Clinician within fifteen miles; and

        2) One Mental Health or Substance Use Facility – Inpatient Facilities, ALOC, or Outpatient Clinic Group within fifteen miles.

    iii.   **RURAL AREAS:** 95% of Enrollees will have at least:

        1) One Psychiatrist, Psychologist, or Masters Level Clinician within forty miles; and

        2) One Mental Health or Substance Use Facility – Inpatient Facilities, ALOC, or Outpatient Clinic Group within forty miles.

m. <u>Network Composition Guarantee</u>: Upon the Full MHSU Services Start Date and throughout the term of the Contract, the Offeror's MHSU Program's service level standard requires that at the least 90% of the Providers in each of the eleven Facility or Practitioner Licensure type categories (Mental Health Facility, Substance Use Facility, Mental Health and Substance Use Facility, Mental Health Outpatient Clinic Group, Substance Use Outpatient Clinic Group, Psychiatrist, Psychologist, Licensed Masters Level Clinician (MLC) or a MLC with highest licensure in other states, Certified Behavior Analyst Provider, Applied Behavioral Analysis Agency, Mental Health/Substance Use Practitioner – Other Prescriber), listed on *Offeror's Proposed Provider Network Files* (Attachment 23), will be maintained throughout the term of the Contract. Providers who are retired, deceased, or no longer actively practicing will be excluded from the annual calculation and guarantee. The Offeror must provide a target number for each of the eleven network composition categories for which they are required to maintain at least 90% of providers in each of those categories.

## 3.11   Center of Excellence for Substance Use Disorders

The MHSU Disorder Program includes a Center of Excellence for Substance Use Disorders. The Offeror must provide a Center of Excellence for Substance Use Disorders which must minimally include:

    i.   Providing members with an all-inclusive, in-network continuum of care;

    ii.   Telephonic assessment prior to treatment placement;

    iii.   Managing the care of members for the first 90 Days of treatment including any relapse or readmission needs;

    iv.   Detoxification, Residential Treatment Center, Partial Hospitalization Program, Intensive Outpatient Program, room and board, care coordination for transfer back to the community and family, virtual family program and digital supports; and

    v.   Travel, lodging and meals allowance.

## 3.12   Other Clinical Management Programs

The MHSU Disorder Program includes treatment of Attention Deficit Hyperactivity Disorder (ADHD), depression, and eating disorders.  The Offeror must provide a voluntary opt-in program for Attention Deficit Hyperactivity Disorder (ADHD), depression management, and eating disorders.  The selected Offeror may receive a data feed from the Empire Plan's Prescription Drug Program to be used as a method to identify members with ADHD, depression, and eating disorders.  The voluntary opt-in programs must minimally include:

a.   A method to identify Members with ADHD, depression, and eating disorders using screening tools, both on-line and by mail;

b.   Methods to educate Members about the symptoms, effects and treatment of ADHD, depression, and eating disorders;

c.   Accepting referrals to Network Providers;

d.   Telephonic support, coordination with treating providers and referrals to community services; and

e.   A method to establish contact with Empire Plan primary care physicians, and other medical specialists likely to have patients that present with symptoms of ADHD, depression, and eating disorders in order to educate medical Providers about the availability of the ADHD, depression, and eating disorder programs.

## 3.13   Pre-Certification and Concurrent Review for Mental Health and Substance Use Disorder Services

The following services require Pre-certification under the MHSU Disorder Program:

   a.  Intensive Outpatient Program for mental health

   b.  Structured Outpatient Program for substance use

   c.  23-hour bed mental health/substance use disorder

   d.  72-hour bed mental health/substance use disorder

   e.  Outpatient detoxification

   f.  Transcranial Magnetic Stimulation (TMS)

   g.  Applied Behavior Analysis (ABA)

   h.  Group home

   i.  Halfway house

   j.  Residential treatment center mental health

   k.  Residential treatment center substance use

   l.  Partial hospitalization mental health

   m.  Partial hospitalization substance use

Precertification is not required for OASAS-Certified Network Facilities located within New York State.

Mental health inpatient services for Children under 18 at a NYS Office of Mental Health facility does not require prior authorization, in accordance with DFS Circular No. 13 of 2019 https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2019_13

The Concurrent Utilization Review process assists the Provider in identifying inpatient or outpatient care that is medically necessary and cost-effective, without compromise to the quality of care. The *Empire Plan Certificates, Excelsior Plan and SEHP At A Glance* (Attachment 20) includes information relative to Concurrent Review.

   1. **Duties and Responsibilities**

   a.  To safeguard Member health and ensure adherence with the MHSU Disorder Program's benefit design and requirements of Mental Health Parity and New York State regulations, the Offeror must administer a concurrent utilization review program in the Continental United States which:

    i.    Uses Clinicians to review Provider treatment plans which must detail, at a minimum: past clinical and treatment history; current symptoms, functional impairment; and Diagnostic and Statistical Manual of Mental Disorders (DSM–V) diagnosis;

    ii.    Is conducted in a manner that is parity compliant as required by the federal Mental Health Parity and Addiction Equity Act (the "Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008", as set forth at 29 USC section 1185a), as amended from time to time;

    iii.    Is performed by the Offeror for outpatient and inpatient care rendered by Non-Network Providers when requested by the Member or Non-Network Provider;

    iv.    For inpatient admissions, recognizes when to utilize more appropriate and less restrictive levels of care, when medically appropriate.  The Offeror must have procedures to identify when transfer to an alternate inpatient or outpatient setting is appropriate and arrange such transfers; and

    v.    Renders Pre-certification decisions on a timely basis and requires that Peer Advisors render non-certification decisions. Peer Advisor means a psychiatrist or Ph.D. psychologist with a minimum of five years of clinical experience who renders medical necessity decisions.

b.    For Members admitted to Out-of-network Facilities, the Offeror must have procedures to either arrange to transfer the Member to a Network Facility as soon as medically appropriate or manage the care as if it was a Network Facility, including negotiating discounts with the Facility.

c.    <u>Inpatient Treatment Utilization Review Guarantee</u>: The Offeror must guarantee that at least 90% of requests for Pre-certification of inpatient MHSU care, when applicable under New York State regulations, be reviewed within twenty-four hours from the receipt of the request and the Member and MHSU Provider notified within one Business Day of the determination as reported and calculated on an annual basis.

## 3.14   Consolidated Appropriations Act

The Consolidated Appropriations Act (CAA) requires all applicable health plans conduct and document a Non-Quantitative Treatment Limitation (NQTL) comparative analysis. To comply with this requirement, the selected Offeror, at a minimum, must:

    a. Conduct and document a Non-Quantitative Treatment Limitation (NQTL) comparative analysis and provide that analysis in response to federal and state audits, as well in response to enrollee requests.  [**Note**:  The Department's third-party consultant will perform the Quantitative Treatment Limitation (QTL) comparative analysis; it is not the responsibility of the Offeror].

    b. Ensure it is in compliance with all other provisions of the CAA.

## 3.15   Disabled Dependent Determinations

The Offeror shall be responsible for making Disabled Dependent Determinations for dependents with a mental health and substance use-related disability in accordance with Insurance Law section 4305(c)(1)(A)(ii) and 4 NYCRR section 73.1(h).  Disabled dependents of NYSHIP Enrollees are entitled to be covered under the Enrollee's family coverage beyond the normal age limits if those dependents are incapable of self-/support.  From time to time, the Offeror will be asked to make a determination of disability for a Dependent of an individual not currently enrolled in the Plan, but enrolled in other NYSHIP benefit programs, such as the Dental or Vision Plan.  The Offeror should expect to receive approximately sixty applications per month.  However, the number will vary.  An application form, *PS-451 Statement of Disability* (Attachment 21) is completed by the Enrollee, the Dependent's Physician, the Enrollee's Employer and then evaluated by the Offeror to determine if the Dependent is disabled.  All determinations are subject to review by the Offeror on a periodic basis.  Permanent disability determinations are not allowed.  The following guidelines are used for all disabled dependent reviews:

If a Dependent is currently disabled and improvement of the Dependent's condition is:

    a) "Expected" - the case will typically be reviewed again within six to eighteen months unless the Offeror determines a need for a more frequent review.

    b) "Possible" - the case will typically be reviewed again no sooner than three years unless the Offeror determines a need for more frequent review.

    c) "Not expected" - the case will typically be reviewed again in no sooner than seven years unless the Offeror determines a need for more frequent review.

## 1. Duties and Responsibilities

    a. The Offeror must establish a process to review the medical documentation of the PS-451 Form and if needed, request additional information from the Enrollee.  The review must be completed by staff located in the Continental United States and the clinical determination completed within seven Business Days of receipt of a completed form.

b. The Offeror must transmit a determination of the length of disability (for example, three years) to the Department, within three Business Days of the clinical determination, advising of the recommendation.  The Department will formally advise the Enrollee of the determination in writing.

## 3.16   Transition and Termination of Contract

To ensure that the transition to a successor entity provides Members with uninterrupted access to all MHSU Disorder Program benefits and associated customer services, the Contractor is required to provide Contractor-related obligations and deliverables (Transition Services) to the MHSU Disorder Program until the final Program Claim (as defined in Section 6.1(1) of this RFP) incurred during the Contract term is submitted to the Department for payment.  The Department anticipates that certain claims incurred during the Contract term will not have been settled before the end date (Open Claims).  Transition Services are organized into two phases: Phase One and Phase Two.  Phase One consists of those Transition Services that are provided prior to the Contract termination or expiration (End Date).  Phase Two consists of those Transition Services that are required after the End Date until the Contractor invoices the Department for the final Program Claim incurred during the Contract term and payment submitted by the Department.  Collectively, Phase One and Phase Two comprise the Transition Period.  The obligations and responsibilities of the Offeror with regard to this Section 3.15, Transition and Termination of Contract, shall survive termination of the Contract and will remain in effect until all Open Claims have been settled to the satisfaction of the Department.

1. **Duties and Responsibilities**

   The transition process shall be governed as follows:

   a. Length of Transition Period:

      i. Phase One - Phase One of the Transition Period shall commence six months prior to the End Date or immediately if the Contract is terminated on notice pursuant to Appendix B section 30 (Termination).  Phase One is concluded at midnight on the End Date.

      ii. Phase Two - Phase Two of the Transition Period will commence at 12:01 a.m. on the first Day after the End Date and will continue until all claims incurred as of the End Date have been settled (i.e., closed and payment submitted by Department to the Contractor).

      iii.    The Department reserves the right to amend the length of Phase One or Two Transition Period upon thirty Days prior written notice to the Contractor.

b.  No Interruption in Service:

      i.    At all times during Phase One of the Transition Period and unless directed otherwise in writing by the Department, the Contractor shall continue all contractual obligations set forth in the Contract in addition to those set forth in the section. The Contractor shall be required to meet its contractual obligations notwithstanding the issuance of a termination notice by the State.

      ii.    During Phase Two of the Transition Period, the Contractor shall continue all activities necessary to complete the processing and settlement of all Open Claims as set forth below.

c.  Transition Plan

      i.    Within thirty calendar Days of receipt of a notice of termination of the Contract or six months prior to the expiration of the Contract, whichever event occurs first, the Contractor shall provide to the Department a detailed written plan for transition (Transition Plan) for review and approval. The Transition Plan shall outline the Contractor's plan to transition the tasks, milestones and deliverables associated with the Project Services to the Department, a third party or the successor entity. The Transition Plan shall detail the Phase One and Phase Two activities. Contractor agrees to amend the Transition Plan to include all other information deemed reasonable and necessary by the Department. There will be no additional charge to the Department for the development or implementation of the Transition Plan.

      ii.    Within fifteen Business Days from receipt of the Contractor's proposed Transition Plan, the Department shall either approve the Transition Plan or notify the Contractor, in writing, of the changes required to the Transition Plan to make it acceptable to the Department.

      iii.    Within fifteen Business Days from the Offeror's receipt of the required changes, the Contractor shall incorporate said changes into the Transition Plan and submit such revised Transition Plan to the Department for approval.

iv.   The Transition Plan, at a minimum, shall describe the tasks, timeframes, milestones, and deliverables by Phase associated with:

1)   Transitioning of the MHSU Disorder Project Services' data.  All such data transfers must be approved by the Department and provided in a format acceptable to the Department.  This requirement includes, but is not limited to, providing a minimum of one year of historical Member claim data.  Members' claim data shall consist of:

(a) Providers' names, types, addresses, zip codes, telephone numbers and tax identification numbers;

(b) Detailed coordination of benefits (COB) data;

(c) High-volume Provider data;

(d) Report formats;

(e) Pre-certification/prior authorization approved-through dates;

(f) Disability determination approved-through dates;

(g) Any exceptions that have been entered into the adjudication system on behalf of the Member such as a Single Case Agreement; and

(h) Any other data the successor entity may need.

2)   The transitioning of the MHSU Disorder Program data shall at a minimum include:

(a) Providing a test file to the Department or a successor entity at least twenty weeks in advance of the End Date or within four weeks after notice of Termination is provided by the Department, to allow the Department, a third party or successor entity to address any formatting issues.  Offeror will cooperate and coordinate with the Department, a third party or successor entity to address any issues in the test file.

(b) Providing one or more pre-production files at least twelve weeks prior to the End Date.  The file will contain the above-described Members' claim data or additional data elements as specified by the Department.  Contractor will cooperate and coordinate with the Department, a third party or successor entity to address any issues in the data files.

(c) Providing a production file six weeks prior to the successor entity's Implementation Date. The Department will notify the Contractor of the successor entity's Implementation Date.

(d) Providing a second production file to the successor entity by the close of business three Days prior to the End Date.

3) Transferring of information necessary to ensure continuity of a Member's on-going treatment or future treatment.

4) Incorporating a written plan for Knowledge Transfer.  A Knowledge Transfer (KT) plan shall be developed by the Contractor for approval by the Department as part of the Transition Plan.  This KT Plan will be incorporated into the overall Transition Plan's methods and timeframes and will outline mechanisms for transferring knowledge of Contractor's personnel to Department employees, a third party or the successor entity.  As part of the KT, Contractor shall document relevant processes, procedures, methods, tools, and techniques of its personnel with special skills or responsibilities performed during the Contract.

5) A description of how the Contractor will implement the Transition Services for Phase One and Phase Two. Such description shall address how the Contractor will perform the tasks and services set forth in section 4 below.

d. Transition Services

   i.   "Transition Services" shall be deemed to include Offeror's responsibility for performing all tasks and services outlined in

the Contract, and for transferring in a planned manner as specified in the approved Transition Plan all tasks and services to the State, a third party or successor entity.  It is expressly agreed between the Parties that the level of service during Phase One of the Transition Period shall be maintained in accordance with all the terms and conditions of the Contract.

ii.     During Phase One and Phase Two, the Department shall continue to have access to key personnel of the Contractor's dedicated Account Team, maintain access to online systems and receipt of data/reports and other information regarding the MHSU Disorder Program as necessary to ensure Members are provided with uninterrupted access to benefits and associated customer services.

iii.    Phase One of the Transition Services shall include:

1) All Project Services associated with processing of claims incurred on or before the End Date.  This obligation includes but is not limited to:

(a) Paying claims, including but not limited to: Medicaid, out-of-network claims, foreign claims, COB claims, and Medicare claims and In-network claims.  "In-network" refers to Providers or Facilities that are part of a health plan's network of Providers with which the Contractor has negotiated a discount;

(b) Reimbursing late-filed claims if warranted;

(c) Repaying or recovering monies on behalf of the MHSU Disorder Program for Medicare claims;

(d) Retaining NYBEAS access; and

(e) Continuing to provide updates on pending litigation and settlements that the Offeror or the AG has/may file on behalf of the MHSU Disorder Program.

2) Providing the Department access to any online claims processing data and history and online reporting systems until the Contractor invoices the Department for the final Program Claim incurred during the Contract term and

payment submitted by the Department unless the Department notifies the Offeror that access may be ended at an earlier date;

3) Completing all reports required under Section 3.4 of this RFP;

4) Providing sufficient staff resources to address State audit requests and reports in a timely manner;

5) Agreeing to fully cooperate with all Department and/or OSC audits consistent with the requirements of the Contract;

6) Performing timely reviews and responses to audit findings submitted by the Department and the OSC in accordance with the requirements set forth in the Contract;

7) Remitting reimbursement due to the Department upon final audit determination consistent with the process specified in the Contract;

8) Receiving and applying enrollment updates and verifying enrollment;

9) Keeping dedicated telephone lines open with adequate available staffing to provide customer service at the levels required in the Contract and adjust phone scripts, and transfer calls to the successor entity's lines during the Transition Period;

10) Preparing, on a case-by-case basis, a plan to extend and manage the care of high-risk Members who are nearing the end of a course of treatment beyond the Transition Period;

11) Developing a strategy for addressing those Members in treatment with Providers that are not in the successor entity's network; and

12) Notifying Members currently in care with a Network Provider, per New York State guidelines, of their rights to continue to receive a network level of benefits if their Provider is not in the Offeror's network.  In addition, for the first year of the Contract, the Contractor will commit

to sending Provider disruption letters based on information received from the incumbent.

iv.   Phase Two of the Transition Services shall include, but not be limited to the following activities.

1) Process all Open Claims to final settlement;

(a) Paying claims, including but not limited to: Medicaid, out-of-network claims, foreign claims, COB claims, and Medicare claims and In-network claims.  "In- network" refers to Providers or Facilities that are part of a health plan's network with which the Contractor has negotiated a discount;

(b) Reimbursing late-filed claims if warranted;

(c) Repaying or recovering monies on behalf of the Plan for Medicare claims;

(d) Retaining NYBEAS access; and

(e) Continuing to provide updates on pending litigation and settlements that the Offeror or the New York State Attorney General's Office has/may file on behalf of the Plan.

2) Continuing to provide the Department access to any online claims processing data and history and online reporting systems until the Contractor invoices the Department for the Final Program Claim incurred during the Contract term and payment is submitted by the Department, unless the Department notifies the Offeror that access may be ended at an earlier date;

3) Completing of all reports required under Section 3.4 of this RFP;

4) Providing sufficient staff resources to address State audit requests and reports in a timely manner;

5) Agreeing to fully cooperate with all Department and/or OSC audits consistent with the requirements set forth in the Contract;

6) Performing timely reviews and responses to audit findings submitted by the Department and OSC's audit unit in accordance with the requirements set forth in the Contract;

7) Remitting reimbursement due the Plan upon final audit determination consistent with the process specified in the Contract;

8) Receiving and applying enrollment updates;

9) Keeping dedicated telephone lines open for a minimum of six months (unless otherwise agreed to in writing by the Department and Contractor), with adequate available staffing to provide customer service at the same levels provided prior to the End Date, adjusting phone scripts;

10) Transferring calls to the successor Contractor's lines during this period;

11) Preparing, on a case-by-case basis, a plan to extend and manage the care of high-risk Members who are nearing the end of a course of treatment; and

12) Providing sufficient staffing to ensure Members continue to receive appropriate customer service and clinical management service after the End Date.

    e.  Compensation for Transition Services

        i.  Phase One:

No additional compensation outside the monthly Administrative Fee will be paid to the Contractor for the performance of the Phase One Transition Services.  The Department shall retain the final monthly Administrative Fees payment from the Contractor until completion of all Transition Plan requirements.

        ii.  Phase Two:

1) Offeror will receive no Administrative Fees but will be reimbursed for all claims settled (i.e., closed) per section 6.1.

2) Reimbursement for claims will be made on a monthly basis upon the Department's receipt of an accurate invoice.

f.  Department Responsibilities for Transition

The Department shall assume responsibility for the project management activities for the Transition.  The Department shall appoint a project manager to be responsible for coordinating Transition activities, maintaining the transition task schedule, and approving transition deliverables.  Weekly project review meetings shall be held with representatives of the Offeror, Department, and the third party or the successor entity.  The Department shall also ensure that all Departmental and third-party resources (e.g., technical, administrative) deemed necessary by the Transition Plan are available to carry out tasks and functions defined in the Transition Plan and in accordance with the defined timelines specified in the Transition Plan.

g.  Cooperation

Offeror shall cooperate with the Department to facilitate a smooth and orderly transition.  Periodic project review meetings shall be held with representatives of the Contractor, the Department, and the successor entity.

h.  <u>Transition and Termination Guarantee</u>:  The Offeror must guarantee that the Offeror will complete the Transition Plan requirements in the time frames stated above, to the satisfaction of the Department.

## SECTION 4: ADMINISTRATIVE PROPOSAL

This section of the RFP sets forth the requirements for the Offeror's Administrative Proposal.  The Department will consider for evaluation and selection purposes only those Proposals the Department determines to be in compliance with the requirements set forth in this section of the RFP.  Any Offeror which fails to satisfy any of these requirements shall be eliminated from further consideration.

The Offeror's *Administrative Proposal* must respond to all of the following items as set forth below in the order and format specified and using the forms set forth in this RFP. Additional details pertaining to the required forms are found in Section 2 of this RFP.

### 4.1    Formal Offer Letter

The Offeror must submit a formal offer in the form of the *Formal Offer Letter* (Attachment 3). The formal offer must be signed and executed by an individual with the capacity and legal authority to bind the Offeror in its offer to the State. The copy of the Offeror's Administrative Proposal marked "ORIGINAL" requires a letter with an original signature; the remaining copies of the Offeror's Administrative Proposal may contain photocopies of the signature. Except as otherwise permitted under section 2.1(6), Bid Deviations, the Offeror must accept the terms and conditions as set forth in this RFP, *Standard Clauses for New York State Contracts* (Appendix A), *Standard Clauses for All Department Contracts* (Appendix B), *Information Security Requirements* (Appendix C) and *Glossary of Defined Terms* (Attachment 15), and agree to enter into a Contractual Agreement with the Department containing, at a minimum, the terms and conditions identified in this RFP and appendices as cited herein. If an Offeror proposes to include the services of a Subcontractor(s) or Affiliate(s), the Offeror must be required to assume responsibility for those services as "Prime Contractor."  The Department will consider the Prime Contractor solely responsible for Contractual matters.

### 4.2    Offeror Attestation Form

The Offeror must complete and submit an executed copy of the *Offeror Attestations Form* (Attachment 13) attesting that it meets or exceeds the criteria for eligibility to bid as set forth in Section 1 of this RFP.  A person legally authorized to represent the Offeror must execute this Certification.

### 4.3    Subcontractors or Affiliates

The Offeror must complete the *Subcontractors or Affiliates* form (Attachment 9) to identify all Subcontractors or Affiliates with whom the Offeror subcontracts to provide Project Services. For purposes of reporting in the *Subcontractors or Affiliates* form (Attachment 9), Subcontractors include:

1. All vendors who will provide $100,000 or more in Project Services over the term of the Contract that results from this RFP; or

2. Any vendor who will provide Project Services in an amount lower than the $100,000 threshold, and who is a part of the Offeror's Account Team (described in section 3.1, Account Team).

For each Subcontractor identified, the Offeror must complete and submit the *Subcontractors or Affiliates* form (Attachment 9) and indicate whether or not, as of the date of the Offeror's Proposal, a subcontract has been executed between the Offeror and the Subcontractor for services to be provided by such subcontractor relating to the RFP.  On the *Subcontractors or Affiliates* form (Attachment 9), the Offeror must:

1. Mark the applicable box if the Offeror will not be subcontracting with any Subcontractor(s) or Affiliate(s) to provide Project Services.

2. Indicate whether or not, as of the date of the Offeror's Proposal, a subcontract (or shared services agreement) has been executed between the Offeror and the Subcontractor or Affiliate for services to be provided by the Subcontractor or Affiliate relating to this RFP.

3. Provide a brief description of the services to be provided by the Subcontractor or Affiliate.

4. Provide a description of any current relationships with such Subcontractor or Affiliate and the clients/projects that the Offeror and Subcontractor or Affiliate are currently servicing under a formal legal agreement or arrangement, the date when such services began and the status of the project.

## 4.4   New York State Standard Vendor Responsibility Questionnaire

The Offeror must complete and submit an executed copy of the New York State Vendor Responsibility Questionnaire.  A person legally authorized to represent the Offeror must execute the questionnaire.  The questionnaire must be completed by all Subcontractors as defined above.

The Department recommends each Offeror file the required Questionnaire online via the New York State VendRep System.  To use the VendRep System, please refer to: https://www.osc.state.ny.us/state-vendors/vendrep/vendrep-system .

By submitting a Proposal, the Offeror agrees to fully and accurately complete the Questionnaire.  The Offeror acknowledges that the State's execution of the Contract will be contingent upon the State's determination that the Offeror is responsible, and that the State will rely on the Offeror's responses to the Questionnaire when making its responsibility determination.  The Offeror agrees that if it is found by the State that the

Offeror's responses to the Questionnaire were intentionally false or intentionally incomplete, on such finding, the Department may terminate the Contract.  In no case shall such termination of the Contract by the State be deemed a breach thereof, nor shall the State be liable for any damages for lost profits or otherwise, which may be sustained by the Contractor as a result of such termination.

## 4.5    New York State Tax Law Section 5-a

Tax Law § 5-a requires certain Offerors awarded state Contracts for commodities, services and technology valued at more than $100,000 to certify to NYS Department of Taxation and Finance (DTF) that they are registered to collect New York State and local sales and compensating use taxes.  The law applies to Contracts where the total amount of such Offeror's sales delivered into NYS is in excess of $300,000 for the four quarterly periods immediately preceding the quarterly period in which the Certification is made, and with respect to any Affiliates and subcontractors whose sales delivered into NYS exceeded $300,000 for the four quarterly periods immediately preceding the quarterly period in which the Certification is made.

An Offeror is required to file the completed and notarized Form ST-220-CA with the Department certifying that the Offeror filed the ST-220-TD with DTF.  If the forms are not completed and returned with bid submission, the Offeror should complete and return the Certification forms within five Business Days from the date of request.  Failure to make either of these filings may render an Offeror non-responsive and non-responsible.  The Offeror must take the necessary steps to provide properly Certified forms within a timely manner to ensure compliance with the law.

Website links to the Offeror Certification forms and instructions are provided below.

1.  Form ST-220-TD must be filed with and returned directly to DTF and can be found at: http://www.tax.ny.gov/pdf/current_forms/st/st220td_fill_in.pdf. Unless the information upon which the ST-220-TD is based changes, this form only needs to be filed once with DTF.  If the information changes for the Offeror, its Affiliate(s), or its subcontractor(s), a new Form ST-220-TD must be filed with DTF.

2.  Form ST-220-CA must be submitted to the Department.  This form provides the required Certification that the Offeror filed the ST-220-TD with DTF.  This form can be found at: http://www.tax.ny.gov/pdf/current_forms/st/st220ca_fill_in.pdf

## 4.6    Insurance Requirements

Prior to the start of work the Offeror shall procure, at its sole cost and expense, and shall maintain in force at all times during the term of any Contract resulting from this RFP, policies of insurance as required by this section, written by companies that have

an A.M. Best Company rating of "A-," Class "VII" or better. In addition, companies writing insurance intended to comply with the requirements of this Section should be licensed or authorized by DFS to issue insurance in the State of New York. The Department may, in its sole discretion, accept policies of insurance written by a non-authorized carrier or carriers when certificates and/or other policy documents are accompanied by a completed Excess Lines Association of New York (ELANY) affidavit or other documents demonstrating the company's strong financial rating. If, during the term of a policy, the carrier's A.M. Best rating falls below "A-," Class "VII," the insurance must be replaced, on or before the renewal date of the policy, with insurance that meets the requirements above. These policies must be written in accordance with the requirements of the paragraphs below, as applicable.

Policies must be written in accordance with the requirements of the paragraphs below, as applicable. While acceptance of insurance documentation shall not be unreasonably withheld, conditioned, or delayed, acceptance and/or approval by the Department does not, and shall not be construed to, relieve an Offeror of any obligations, responsibilities or liabilities under this RFP or any Contract resulting from this RFP. The Offeror shall not take any action or omit to take any action that would suspend or invalidate any of the required coverages during the term of any Contract resulting from this RFP.

1. **General Conditions**

      a. All policies of insurance required by this Solicitation or any Contract resulting from this RFP shall comply with the following requirements:

            i. Coverage Types and Policy Limits. The types of coverage and policy limits required from the selected Offeror are specified in Section 4.6(2) of this RFP.

            ii. Policy Forms. Except as may be otherwise specifically provided herein or agreed to in any Contract resulting from this RFP, all policies of insurance shall be written on an occurrence basis.

            iii. Certificates of Insurance/Notices. The selected Offeror shall provide the Department with a Certificate or Certificates of Insurance, in a form satisfactory to the Department, as detailed below, and pursuant to the timelines set forth in Section 4.6(1)(m) of this RFP. Certificates should reference the Solicitation or award number and shall name the New York State Department of Civil Service, Agency Building 1, Empire State Plaza, Albany, NY 12239, as the certificate holder.

            iv. Document Submissions. An Offeror shall deliver to the Department evidence of the insurance required by this RFP and any Contract resulting from this RFP upon notification of tentative award.

b.  Certificates of Insurance shall:

    i.  Be in the form acceptable to the Department and in accordance with the New York State Insurance Law (e.g., an ACORD certificate);

    ii.  Disclose any deductible, self-insured retention, aggregate limit, or any exclusion to the policy that materially changes the coverage required by this Solicitation or any Contract resulting from this Solicitation;

    iii.  Be signed by an authorized representative of the insurance carrier of the referenced insurance carriers; and

    iv.  Contain the following language in the Description of Operations / Locations / Vehicles section of the Certificate or on a submitted endorsement as applicable:  Additional insured protection afforded is on a primary and non-contributory basis.  A waiver of subrogation is granted in favor of the additional insureds.

c.  Only original documents (Certificates of Insurance and any endorsements and other attachments) or electronic versions of the same that can be directly traced back to the insurer, agent or broker via e-mail distribution or similar means will be accepted.  The Department generally requires an Offeror to submit only certificates of insurance and additional insured endorsements, although the Department reserves the right to request other proof of insurance.  An Offeror should refrain from submitting entire insurance policies, unless specifically requested by the Department.  If an entire insurance policy is submitted but not requested, the Department shall not be obligated to review and shall not be chargeable with knowledge of its contents.  In addition, submission of an entire insurance policy not requested by the Department does not constitute proof of compliance with the insurance requirements and does not discharge an Offeror from submitting the requested insurance documentation.

d.  Primary Coverage:  For the Commercial General Liability and Business Automobile Liability policies where the Department is required to be included as an additional insured, required coverage shall be primary and non-contributory to other insurance available to the Department and their officers, agents, and employees. Any other insurance maintained by the Department and their officers, agents, and employees shall be in excess of and shall not contribute with the Offeror's insurance.

e.  Breach for Lack of Proof of Coverage:  The failure to comply with the requirements of this RFP at any time during the term of any Contract

resulting from this Solicitation shall be considered a breach of the terms of any Contract resulting from this Solicitation and shall allow the Department and their officers, agents, and employees to avail themselves of all remedies available under any Contract resulting from this Solicitation, at law or in equity.

f.  Self-Insured Retention/Deductibles:  Certificates of Insurance must indicate the applicable deductibles/self-insured retentions for each listed policy.  Deductibles or self-insured retentions above $100,000.00 are subject to approval from the Department.  Such approval shall not be unreasonably withheld, conditioned, or delayed. An Offeror shall be solely responsible for all claim expenses and loss payments within the deductibles or self-insured retentions.  If the Offeror is providing the required insurance through self-insurance, evidence of the financial capacity to support the self-insurance program along with a description of that program, including, but not limited to, information regarding the use of a third-party administrator shall be provided upon request.

g.  Subcontractors:  Prior to the commencement of any work by a Subcontractor, the Offeror shall require such Subcontractor to procure policies of insurance as required by this section and maintain the same in force during the term of any work performed by that Subcontractor.  An Additional Insured Endorsement (ISO coverage form CG 20 38 04 13), or the equivalent, evidencing such coverage shall be provided to the Offeror prior to the commencement of any work by a subcontractor and pursuant to the timelines set forth in Section 4.6(1)(m) of this RFP, as applicable, and shall be provided to the Department upon request.  For subcontractors that are self-insured, the subcontractor shall be obligated to defend and indemnify the above-named additional insureds with respect to Commercial General Liability and Business Automobile Liability, in the same manner that the subcontractor would have been required to pursuant to this section had the subcontractor obtained such insurance policies.

h.  Waiver of Subrogation:  For the Commercial General Liability and Business Automobile Liability, the Offeror shall cause to be included in its policies insuring against loss, damage or destruction by fire or other insured casualty a waiver of the insurer's right of subrogation against the Department and their officers, agents, and employees, or, if such waiver is unobtainable:

>     i.  An express agreement that such policy shall not be invalidated if the Offeror waives or has waived before the casualty, the right of recovery against the Department and their officers, agents, and employees; or

ii. Any other form of permission for the release of the Department or any entity authorized by law or regulation to use any Contract resulting from this Solicitation and their officers, agents, and employees.

A Waiver of Subrogation Endorsement shall be provided upon request. A blanket Waiver of Subrogation Endorsement evidencing such coverage is also acceptable.

i. Additional Insured:  The Offeror shall cause to be included in its Commercial General Liability and Business Automobile Liability policies required below coverage for on-going work and operations naming as additional insureds (via ISO coverage forms CG 20 10 04 13 or 20 38 04 13 and form CA 20 48 10 13, or a form or forms that provide equivalent coverage) the Department and their officers, agents, and employees.  An Additional Insured Endorsement evidencing such coverage shall be provided to the Department pursuant to the timelines set forth in Section 4.6(1)(m) of this RFP.  A blanket Additional Insured Endorsement evidencing such coverage is also acceptable.  For Offerors who are self-insured, the Offeror shall be obligated to defend and indemnify the above-named additional insureds with respect to Commercial General Liability and Business Automobile Liability, in the same manner that the Offeror would have been required to pursuant to this RFP had the Contractor obtained such insurance policies.

j. Excess/Umbrella Liability Policies:  Required insurance coverage limits may be provided through a combination of primary and excess/umbrella liability policies.  If coverage limits are provided through excess/umbrella liability policies, then a schedule of underlying insurance listing policy information for all underlying insurance policies (insurer, policy number, policy term, coverage, and limits of insurance), including proof that the excess/umbrella insurance follows form, must be provided upon request. Unrelated underlying policies included in the schedule that are not required to meet the insurance requirements may be redacted from the Schedule.

k. Notice of Cancellation or Non-Renewal:  Policies shall be written so as to include the requirements for notice of cancellation or non-renewal in accordance with the New York State Insurance Law.  Within five Business Days of receipt of any notice of cancellation or nonrenewal of insurance, the Offeror shall provide the Department with a copy of any such notice received from an insurer together with proof of replacement coverage that complies with the insurance requirements of this Solicitation and any Contract resulting from this Solicitation.

l. Policy Renewal/Expiration:  Upon policy renewal/expiration, evidence of renewal or replacement of coverage that complies with the insurance requirements set forth in this Solicitation and any Contract resulting from this Solicitation shall be delivered to the Department.  If, at any time during the term of any Contract resulting from this Solicitation, the coverage provisions and limits of the policies required herein do not meet the provisions and limits set forth in this Solicitation or any Solicitation and any Contract resulting from this Solicitation, or proof thereof is not provided to the Department, the Offeror shall immediately cease work.  The Offeror shall not resume work until authorized to do so by the Department.

m. Deadlines for Providing Insurance Documents after Renewal or Upon Request:  As set forth herein, certain insurance documents must be provided to the Department contact identified in the Contract Award Notice after renewal or upon request.  This requirement means that the Offeror shall provide the applicable insurance document to the Department as soon as possible but in no event later than the following time periods:

   i. For certificates of insurance: 5 Business Days from request or renewal, whichever is later;

   ii. For information on self-insurance or self-retention programs: 15 Calendar Days from request or renewal, whichever is later;

   iii. For other requested documentation evidencing coverage: 15 Calendar Days from request or renewal, whichever is later;

   iv. For additional insured and waiver of subrogation endorsements: 30 Calendar Days from request or renewal, whichever is later; and

   v. For notice of cancellation or non-renewal and proof of replacement coverage that complies with the requirements of this section: 5 Business Days from request or renewal, whichever is later.

   Notwithstanding the foregoing, if the Offeror shall have promptly requested the insurance documents from its broker or insurer and shall have thereafter diligently taken all steps necessary to obtain such documents from its insurer and submit them to the Department, the Department shall extend the time period for a reasonable period under the circumstances, but in no event shall the extension exceed 30 Calendar Days.

## 2. <u>Specific Coverage and Limits</u>

a. Commercial General Liability:  Commercial General Liability Insurance, (CGL) shall be written on the current edition of ISO occurrence form CG 00 01, or a substitute form providing equivalent coverage and shall cover liability arising from premises operations, independent contractors, broad form property damage, personal & advertising injury, cross liability coverage, and liability assumed in a contract (including the tort liability of another assumed in a contract).  Insurance policies that remove or restrict blanket contractual liability located in the "insured contract" definition (as stated in Section V, Number 9, Item f in the Insurance Services Offices (ISO) Commercial General Liability (CGL) policy) so as to limit coverage against Claims that arise out of the work, or that remove or modify the "insured contract" exception to the Employers' liability exclusion, or that do not cover the Additional Insured for Claims involving injury to employees of the Named Insured or subcontractors, are not acceptable.  Policy shall include bodily injury, property damage, and broad form contractual liability coverage.  The limits under such policy shall not be less than the following:

    i.   Each Occurrence – $1,000,000

    ii.   General Aggregate – $2,000,000

    iii.  Personal Advertising Injury – $1,000,000

Coverage shall include, but not be limited to, the following:

    i.   Premises liability;

    ii.   Independent contractors/subcontractors;

    iii.  Blanket contractual liability, including tort liability of another assumed in a contract;

    iv.  Defense and/or indemnification obligations, including obligations assumed under any Contract resulting from this Solicitation; and

    v.   Cross liability for additional insureds.

b. Business Automobile Liability Insurance:  The Offeror shall maintain Business Automobile Liability Insurance in the amount of at least $1,000,000 each accident, covering liability arising out of automobiles used in connection with performance under any Contract resulting from this RFP, including owned, leased, hired and non-owned automobiles bearing or, under the circumstances under which they are being used,

required by the Motor Vehicles Laws of the State of New York to bear, license plates.

c. Professional Errors and Omissions Insurance:  The Offeror shall maintain Professional Errors and Omissions (Professional Liability) in the amount of at least $5,000,000 each occurrence, for claims arising out of but not limited to delay or failure in diagnosing a disease or condition and alleged wrongful acts, including breach of contract, bad faith, and negligence. Such insurance shall apply to professional errors, acts, or omissions arising out of the scope of services.  The policy shall cover professional misconduct or lack of ordinary skill for those positions defined in the Scope of Services of this Contract.

If coverage is written on a claims-made policy, the Contractor warrants that any applicable retroactive date precedes the start of work; and that continuous coverage will be maintained, or an extended discovery period exercised, throughout the performance of the services and for a period of not less than three years from the time work under this Contract is completed.  Written proof of this extended reporting period must be provided to the Department prior to the policy's expiration or cancellation.

d. Data Breach/Cyber Liability Insurance:  An Offeror is required to maintain during the term of any Contract and as otherwise required herein, Data Breach and Privacy/Cyber Liability Insurance in the amount of at least $5,000,000 each claim, including coverage for failure to protect confidential information and failure of the security of the Offeror's computer systems or the Department systems due to the actions of the Offeror which results in unauthorized access to the Department or their data.  Coverage may be satisfied through alternative insurance policies. Said insurance shall provide coverage for damages arising from, but not limited to the following:

   i. Breach of duty to protect the security and confidentiality of nonpublic proprietary corporate information;

   ii. Personally, identifiable nonpublic information (e.g., medical, financial, or personal in nature in electronic or non-electronic form);

   iii. Privacy notification costs;

   iv. Regulatory defense and penalties;

   v. Website media liability; and

vi. Cybertheft of customer's property, including but not limited to money and securities.

If the policy is written on a claims-made basis, Contractor must submit to the Department an Endorsement providing proof that the policy provides the option to purchase an Extended Reporting Period ("tail coverage") providing coverage for no less than one year after work is completed in the event that coverage is cancelled or not renewed.  This requirement applies to both primary and excess liability policies, as applicable.

e. Workers' Compensation Insurance:  To comply with coverage provisions of Workers Compensation Law (WCL) Section 57, businesses must be legally exempt from obtaining workers' compensation insurance coverage; or obtain such coverage from insurance carriers; or be a Board-approved self-insured Employer or participate in an authorized group self-insurance plan.  An Offeror must provide one of the following forms:

   i. Form CE-200, Certificate of Attestation for New York Entities With No Employees and Certain Out of State Entities, That New York State Workers' Compensation and/or Disability Benefits Insurance Coverage is Not Required, which is available on the Workers' Compensation Board's website (www.businessexpress.ny.gov); or

   ii. Form C-105.2 (9/15), Certificate of Workers' Compensation Insurance, sent to the Department by the Contractor's insurance carrier upon request, or if coverage is provided by the New York State Insurance Fund, they will provide Form U-26.3 to the Department upon request from the Contractor; or

   iii. Form SI-12, Certificate of Workers' Compensation Self-Insurance, available from the New York State Workers' Compensation Board's Self-Insurance Office, or

   iv. Form GSI-105.2, Certificate of Participation in Workers' Compensation Group Self-Insurance, available from the Contractor's Group Self-Insurance Administrator.

f. Disability Benefits Insurance:  To comply with coverage provisions of WCL Section 220(8), regarding disability benefits, businesses must be legally exempt from obtaining disability benefits insurance coverage; or obtain such coverage from insurance carriers; or be a Board-approved self-insured Employer.  An Offeror must provide one of the following forms:

   i. Form CE-200, Certificate of Attestation for New York Entities With No Employees and Certain Out of State Entities, That New

York State Workers' Compensation and/or Disability Benefits Insurance Coverage is Not Required, which is available on the Workers' Compensation Board's website (www.businessexpress.ny.gov); or

ii.  Form DB-120.1, Certificate of Disability Benefits Insurance, sent to the Department by the Contractor's insurance carrier upon request; or

Form DB-155, Certificate of Disability Benefits Self-Insurance, available from the New York State Workers' Compensation Board's Self-Insurance Office.

## **SECTION 5: TECHNICAL PROPOSAL REQUIREMENTS**

The purpose of Section 5 of the RFP is to set forth the submissions required of the Offeror. The Offeror's Technical Proposal must contain responses to all required submissions from the Offeror in the format requested. Each Offeror may submit only one Technical Proposal. Each Offeror's Technical Proposal will be evaluated based on the responses to the required submissions contained in Section 5 of this RFP. An Offeror must not include any cost information in the Technical Proposal, including attachments. Specific savings estimates (dollars or percentages) must not be quoted in the Technical Proposal or in any attachments submitted with the Technical Proposal.

### **5.1    Executive Summary**

In an Executive Summary, the Offeror must describe its capacity and proposed approach to administering the MHSU Disorder Program, which covers over 1.2 million lives and incurs claims costs of approximately $400 million annually. The Offeror must have the ability, experience, reliability, and integrity to fulfill the requirements of this RFP. The Executive Summary must include a list of client organizations to clearly demonstrate and support that it meets the minimum requirement of 3.6 million total covered lives in its full book of business. In determining covered lives, the Offeror should count all lives (i.e., an employee, a spouse, and two eligible dependents counts as four covered lives).

### **5.2    Account Team**

The Offeror must complete the *Biographical Sketch Form* (Attachment 14) for all key personnel including Subcontractor key staff, if any, of the proposed Account Team. Where individuals are not named, include qualifications of the individuals that will fill the positions. The Offeror must provide:

1. The name and address of the Offeror's main and branch offices, and the name of the senior officer(s) who will be responsible for this account;

2. An organizational and staffing plan that includes the roles and responsibilities of key personnel involved in administering the MHSU Disorder Program, their planned level of effort, their anticipated duration of involvement, and their daily level of availability. An organizational chart must be included in the proposal which identifies the Offeror's staff and staff from any Subcontractor, including their name and title, to be used in delivering the Project Services;

3. Reporting relationships and the responsibilities of key personnel on the Account Team; and how the team will interact with other departments such as the call center, clinical services, reporting, auditing, and network management within Offeror's organization. Describe how the Account Team interfaces with

senior management and ultimate decision-makers within Offeror's organization; and

4. Identification of where Offeror's account services, enrollment, claims processing, clinical management, Clinical Referral Line, and customer service staff will be located and approximately how many staff will work in each functional area.

## 5.3    Implementation Plan

The Offeror must provide a detailed Implementation Plan in narrative, diagram, and timeline formats, designed to meet the implementation by the specified completion dates.

1. The Implementation Plan must include estimated timeframes for individual task completion, testing dates and objectives, and areas where complications may be expected.  It must include key activities such as:

   a. Training of call center staff;

   b. Website development;

   c. Network development;

   d. Transition of benefits; and

   e. Eligibility feeds and testing claims processing.

2. <u>Implementation Guarantee</u>: In this part of its Technical Proposal, the Offeror must state its agreement and guarantee that all of the Implementation requirements listed in Section 3.2 will be in place on or before the Project Services Start Date, following completion of the Implementation Period, with the exception of opening the Dedicated Call Center and completing work on the customized website.  The Dedicated Call Center must be opened at least 30 calendar Days prior to the MHSU Project Services Start Date.  The customized website must be live and operational at least 30 calendar Days prior to the MHSU Project Services Start Date.  This guarantee is not subject to the limitation of liability provisions of the Contract.

   Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a forfeiture amount for each calendar Day or part thereof, that all Implementation requirements are not met.  The forfeited amount (Standard Credit Amount) is $10,000.00 a day for each calendar Day the guarantee is not met.  However, an Offeror may propose higher amounts.

### 5.4    Member Communication Support

The Offeror must provide a narrative describing in detail the proposed processes that will be utilized to develop Member communications specified in Section 3.3 of this RFP, including the following:

1. Describe the role of the Offeror's legal department.

2. Provide two examples of communications the Offeror has developed for other clients.

3. Describe the Offeror's approach to developing appropriate customized forms, letters, and SBCs for the MHSU Disorder Program, and incorporating the Department's feedback.

4. Provide information about how the Offeror has worked with other large clients to produce customized communications.  A large client is defined as an entity with over 50,000 or more covered lives.

5. Describe the resources that will be available to the Department to support the Department's development of various Enrollee communications and the ability to provide input into such communications quickly.

6. Confirm the commitment to work with the Department to develop appropriate customized forms and letters for the Programs.  Provide examples of how the Offeror has worked with other large clients to produce customized communications.

7. Confirm that staff will be available to attend Health Benefit Fairs, select conferences, and benefit design information sessions, in New York State and elsewhere in the United States.  Describe the experience and qualifications of staff that will be attending these events.

8. Describe how the Offeror proposes to maintain an updated file of nationwide MHSU Provider information for purposes of printed directories understanding the Department requires that a printed provider directory be available for each state, except New York and Florida which have greater requirements.  Specify whether the Offeror proposes to use the same file source for print directories and the online directory.

9. Describe how the online directory will be available to Members 24 hours a Day, 7 Days a week, 365 Days a year and the anticipated protocol for updating the site for regular maintenance; the amount of time it will take Offeror to add or remove MHSU Providers and Facilities from the directory upon joining or leaving the network; and what controls will be in place to ensure the listed information is accurate and up to date.

10. Detail the Offeror's experience in working with large clients who have required customized websites or web portals for benefits information.

11. Complete a second *Biographical Sketch Form* (Attachment 14), for all staff proposed for involvement in Member Communication Support.

## 5.5    Reporting Services

The Offeror must provide a narrative describing in detail the proposed processes that will be utilized in the Reporting Services as specified in Section 3.4 of this RFP, including the following:

1. The Offeror must submit examples of the financial and utilization reports that have been listed without a specified format in the reporting requirements above as well as any other reports that the Offeror is proposing to produce for the Department to be able to analyze and manage the MHSU Disorder Program. Provide an overview of the reporting capabilities with the value it is believed the reporting capabilities will bring to the MHSU Disorder Program;

   a. Confirm that reports will be provided in the specified format (paper and/or electronic Microsoft Access, Excel, Word), as determined by the Department;

   b. Confirm that direct, secure access will be provided to the claims system and any online and web-based reporting tools to the Department's offices. Include a copy of the data sharing agreement proposed for Department staff to execute in order to obtain systems access; and

   c. Confirm that the ability and willingness to provide ad hoc Reports and other data analysis.  Provide examples of ad hoc reporting that have been performed for other clients.

2. Reporting Services Guarantee: In this part of its Technical Proposal, the Offeror must state its agreement and guarantee that all MHSU Disorder Program management reports and claim files listed in *Program Reporting* (Attachment 16) will be accurate and delivered to the Department no later than their respective due dates.  The Offeror shall propose the forfeiture of a specific dollar amount of the Offeror's Administrative Fee.

   Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a forfeiture amount (Standard Credit Amount) for each calendar Day the Department has not received the MHSU Disorder Program management report and claims file by their respective due date.  The forfeited amount (Standard Credit Amount) for each management report or claim file that is not received by

its respective due date is $100 per calendar Day per report.  However, an Offeror may propose a higher amount.

## 5.6    Customer Service

1. The Offeror must provide a narrative describing in detail the proposed processes that will be utilized to develop Customer Service specified in Section 3.5 of this RFP, including the following:

   a. Summarize how Offeror will comply with federal and State law to assist Members who need translation services.

   b. Summarize how Offeror will track calls for reporting and change phone prompts and voice recordings as needed, without an additional charge to the State.

   c. Indicate the hours CSRs will be available; the requirement is between the hours of 8:00 a.m. and 5:00 p.m., ET, Monday through Friday, except for legal holidays observed by the State.

   d. Describe the Call Center technology that will be utilized for the MHSU Disorder Program, and a description of customizable options, if any, Offeror proposes for the MHSU Disorder Program.

   e. Provide a narrative on the Call Center which describes the information and resources that will be available to CSRs to assist them in addressing and resolving inquiries; the internal controls and reviews that will be performed to ensure quality service is being provided to Members; including outlining if there is a Quality Assurance team of representatives to monitor and develop the CSR staff; the first call resolution rate for the proposed call center; Offeror's company-wide average staff and turnover rate for call center employees; the proposed staffing levels; and how Offeror will ensure adequate staffing during call volume peaks.  Explain the logic used to arrive at the proposed staffing levels, including the ratio of management to CSR staff.

   f. Describe the back-up systems for Offeror's primary telephone system which would be used in the event the primary telephone system fails, is unavailable or at maximum capacity.  If a backup system is activated, explain how and in what order calls from Members will be handled.  Confirm whether backup staff will have MHSU Disorder Program specific training.  Indicate the number of times a backup system has been utilized over the past two years.  Confirm that calls will be handled exclusively by Offeror's Call Center and that the backup call center would only be used in case of system failure or call overflow.

g. Define how frequently Offeror conducts customer satisfaction surveys for large clients as defined above.  Include whether the Offeror conducts a customer satisfaction survey or if surveys are performed by an independent third party; and provide a sample of a survey Offeror used for a large client and advise of the typical response rate for a large client.

h. Detailed information about the location(s) where call center and customer service work shall be performed.  [**Note:** In accordance with New York State Labor Law section 773, the head of each State agency is required to use reasonable best efforts to ensure that all state-business-related contracts for call centers and customer service work be performed by contractors, agents, or subcontractors entirely within the State of New York.]

2. Call Center Telephone Guarantees: In this part of its Technical Proposal, the Offeror must state its agreement and guarantee for the following four program service level standards:

   a. <u>Call Center Response Time Guarantee</u>: 90% of incoming calls to the Offeror's telephone line must be answered by a CSR within thirty seconds.

      Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a forfeiture amount for each quarter in which the number of phone calls answered within thirty seconds falls below 90% of all incoming calls.  The forfeited amount (Standard Credit Amount) is $60,000.00 a quarter for each quarter in which this guarantee is not met.  However, an Offeror may propose higher amounts.

   b. <u>Availability Guarantee</u>: The Offeror's telephone line must be operational and available to Members and Providers equal to or better than 99.5% percent of the Offeror's required up-time (24 hours a Day, 7 Days a week).

      Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a forfeiture amount for each quarter in which the Offeror's telephone line is not operational and available to Members and Providers 99.5% percent of the time.  The forfeited amount (Standard Credit Amount) is $60,000.00 a quarter for each quarter in which this guarantee is not met.  However, an Offeror may propose higher amounts.

   c. <u>Telephone Abandonment Rate Guarantee</u>: No more than 3% of callers to the Offeror's telephone line will disconnect a call prior to the call being answered by a CSR.

      Utilizing the *Performance Guarantees form* (Attachment 6), the Offeror must propose a forfeiture amount (Standard Credit Amount) for each quarter in which more than 3% of callers disconnect a call prior to the call

being answered by a CSR.  The forfeited amount (Standard Credit Amount) is $60,000.00 a quarter for each quarter in which this guarantee is not met.  However, an Offeror may propose higher amounts.

d. <u>Telephone Blockage Rate Guarantee</u>: No more than 0% of incoming calls to the Offeror's telephone line shall be blocked by a busy signal.

Utilizing the *Performance Guarantees form* (Attachment 6), the Offeror must propose a forfeiture amount (Standard Credit Amount) for each quarter in which more than 0% of incoming calls to the Offeror's telephone line are blocked by a busy signal.  The forfeited amount (Standard Credit Amount) is $60,000.00 a quarter for each quarter in which this guarantee is not met.  However, an Offeror may propose higher amounts.

3. Clinical Referral Line Guarantees: In this part of its Technical Proposal, the Offeror must state its agreement and guarantee for the following three program service level standards:

a. <u>Out-of-Network CRL Guarantee</u>: When a Member calls the CRL for a non-emergency or non-urgent referral and a Network Provider is not available for an appointment within a time frame that meets the Member's clinical needs, a referral shall be made to an appropriate Non-Network MHSU Provider within two Business Days of the call in at least 90% of cases.

Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a forfeiture amount for each quarter in which less than 90% of cases where Members are referred to Out-of-network MHSU Providers within two Business Days (in non-emergency or non-urgent situations) because a Network Provider is not available.  The forfeited amount (Standard Credit amount) is $60,000.00 a quarter for each quarter in which this guarantee is not met.  However, an Offeror may propose higher amounts.

b. <u>Emergency CRL Guarantee</u>: 100% of Members who call the CRL in need of life-threatening emergency care shall be referred to the nearest emergency room and be contacted within thirty minutes to assure their safety.  Additionally, 100% of Members in need of non-life-threatening emergency care shall be contacted within thirty minutes by a network MHSU Provider or the CRL.  There must be at least three attempts at outreach which must be documented.

Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a forfeiture amount for each quarter in which less than 100% of Members who call the CRL in need of life-threatening emergency care are referred to the nearest emergency room and contacted within thirty minutes by a network MHSU Provider or the CRL to assure their

safety.  Additionally, the Offeror must propose a forfeiture amount for each quarter in which less than 100% of Members in need of non-life-threatening emergency care are contacted within thirty minutes by a Network Provider or the CRL.  The forfeited amount (Standard Credit amount) is $60,000.00 a quarter for each quarter in which this guarantee is not met.  However, an Offeror may propose higher amounts.

    c. <u>Urgent Care CRL Guarantee</u>: At least 99% of Members who call the CRL in need of urgent care shall be contacted by the Offeror to ensure that the network MHSU Provider contacted the Member within forty-eight hours of the call to the CRL.

Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a forfeiture amount for each quarter in which less than 99% of Members in need of urgent care were contacted by the Offeror to ensure that the network MHSU Provider contacted the Member within forty-eight hours of the Member's call to the CRL.  The forfeited amount (Standard Credit amount) is $60,000.00 a quarter for each quarter in which this guarantee is not met.  However, an Offeror may propose higher amounts.

## 5.7    Enrollment Management

1. The Offeror must provide a narrative describing in detail the proposed processes that will be utilized to manage enrollment data as specified in Section 3.6 of this RFP, including the following:

    a. Offeror's testing plan to ensure that the initial enrollment load and daily enrollment transition files for the Plan are accurately updated to Offeror's system and that such files interface correctly with Offeror's claims system. The testing plan must include:

        i. The quality controls that are performed before the initial and ongoing enrollment transactions are loaded into the claims adjudication system.

        ii. How the Offeror's system identifies transactions that will not load into Offeror's enrollment system.  How exceptions are identified that will cause enrollment transactions to fail to load into Offeror's enrollment system.  What steps are taken to resolve the exceptions, and the turnaround time for the exception records to be added to Offeror's enrollment file.

        iii. How the Offeror will ensure that enrollment and eligibility transactions that do not load into the Offeror's system will be

manually reviewed and reported back to the Department within one Business Day.

b. Offeror's system capabilities for retrieving and maintaining enrollment information within twenty-four hours of its release by the Department as well as:

  i. How Offeror's system maintains a history of enrollment transactions and how long enrollment history is kept online. Identify any limits to the number of historical transactions that can be kept online;

  ii. How Offeror's system handles retroactive changes and corrections to enrollment data;

  iii. How Offeror's enrollment system captures the information necessary to produce the reports entitled "Claims and Credits Paid by Agency" and "Quarterly Participating Agency Claims" required in the Reporting Section of this RFP; and

  iv. How Dependents are linked to the Enrollee in the Offeror's enrollment system and claims processing system, including a description on how Offeror's enrollment and claims processing system can administer a social security number, Employee identification number, and an alternate identification number assigned by the Department; and any special requirements to accommodate these three identification numbers.

c. How Offeror's enrollment system, data transfers, and procedure for handling enrollment data are HIPAA compliant.

d. Offeror's ability to meet the administrative requirements for National Medical Support Orders and dependents covered by a QMCSO, including storing this information in Offeror's system, so that information about the Dependent is only released to the individual named in the QMCSO.

2. <u>Enrollment Management Guarantee</u>: In this part of its Technical Proposal, the Offeror must state its agreement and guarantee that 100% of all MHSU Disorder Program enrollment records that meet the quality standards for loading will be loaded into the Offeror's enrollment system within twenty-four hours of release by the Department.

Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a forfeiture amount for each twenty-four-hour period or part thereof in which enrollment records that meet the quality standards for loading are not loaded in the Offeror's enrollment system after such enrollment records have

been released by the Department.  The forfeited amount (Standard Credit Amount) is $1,000.00 for each twenty-four-hour period or part thereof in which this guarantee is not met.  However, an Offeror may propose higher amounts.

## 5.8    Claims Processing

1. The Offeror must provide a narrative describing in detail the proposed processes that will be utilized in claims processing as specified in Section 3.7 of this RFP, including the following:

   a. Describe whether, with regards to Claims Processing, it owns the adjudication system, licenses the software from a third-party, or contracts out this service.

   b. Describe how any changes to the benefit design would be monitored, verified, and tested for the MHSU Disorder Program, and the quality assurance program to guarantee that changes to other client benefit programs do not impact the MHSU Disorder Program.

   c. Describe how Offeror's claims processing system collects overpayments from Offeror's MHSU Provider network.

   d. Describe how the Offeror will analyze and monitor claim submissions to promptly identify errors, fraud, and abuse, and report such information in a timely fashion to the State in accordance with a State-approved process. Confirm the MHSU Disorder Program shall be charged only for accurate (i.e., the correct dollar amount) claims payments of covered expenses.

   e. Include a copy of the data-sharing agreement Offeror proposes for Department staff to execute in order to obtain secure systems access to Offeror's claims system and any online and web-based reporting tools.

2. Claims Processing Guarantees: In this part of its Technical Proposal, the Offeror must state its agreement and guarantee for the following two program service level standards:

   a. <u>Claims Payment Accuracy Guarantee</u>: Claims payment accuracy must be achieved for a minimum of 99% of all claims processed and paid each calendar year.

      Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a forfeiture amount for each year in which 99% of claims payment accuracy is not achieved as determined based on an annual audit conducted by the Department.  The forfeited amount (Standard Credit Amount) is $250,000.00 for each year this guarantee is not met. However, an Offeror may propose higher amounts.

b. <u>Claims Processing Guarantee – Twenty-Four Calendar Days Turnaround Time</u>: No less than 99.5% of submitted claims received by the Offeror that require no additional information in order to be correctly processed shall be processed within twenty-four calendar Days from the date the claim is received electronically or in the Offeror's designated post office box to the date of Claim Adjudication.

Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a forfeiture amount for each quarter in which less than 99.5% of claims that require no additional information in order to be correctly processed, are not processed within twenty-four calendar Days from either the date the claim is received electronically or in the Offeror's designated post office box to the date the payment is transmitted to the Provider or mailed to the Member as calculated on a quarterly basis.  The forfeited amount (Standard Credit Amount) is $60,000.00 a quarter for each quarter in which this guarantee is not met.  However, an Offeror may propose higher amounts.

## 5.9    Plan Audit and Fraud Protection

1. The Offeror must provide a narrative describing in detail the proposed processes that will be utilized in plan audit and fraud protection as specified in Section 3.8 of this RFP, including the following:

    a. Describe the audit program Offeror would conduct for the MHSU Disorder Program including a description of the criteria Offeror uses to select MHSU Providers/Facilities to audit and a description of the policy that Offeror follows when an audit detects possible fraudulent activity by a MHSU Provider, Facility or Member.  Include all types of audits performed and offered by Offeror's organization.

    b. Provide examples of how Offeror's payment integrity algorithms and software have prevented or detected major cases of fraud, waste, and abuse for other large clients.

    c. Describe the corrective action, monitoring, and recovery efforts that take place when Offeror finds that a MHSU Provider or Facility is billing incorrectly or otherwise acting against the interests of Offeror's clients.  Please indicate whether Offeror has a fraud and abuse unit within Offeror's organization and describe its role.  In the extreme case of potentially illegal activity, identify procedures that the Offeror has in place to address illegal or criminal activities by a MHSU Provider or Facility and confirm Offeror will pursue litigation on the Department's behalf when necessary.

### 5.10   Appeal Process

1. The Offeror must provide a narrative describing in detail the proposed processes that will be utilized in the appeal process as specified in Section 3.9 of this RFP, including the following:

   a. Describe in detail how the Offeror proposes to notify Members of their right to appeal and the steps to file an appeal.  Specify the process for administrative and clinical appeals for level 1 and 2 for each program under this RFP.

   b. Specify the turnaround time for non-urgent administrative and clinical level 1 and 2 appeals for each program.

   c. Specify the turnaround time for urgent administrative and clinical level 1 and 2 appeals for each program under this RFP.

### 5.11   Provider Network

At least thirty calendar Days prior to the commencement of Full MHSU Disorder Project Services, and throughout the term of the Contract, the Offeror must possess a Participating MHSU Provider/Facility network that meets or exceeds the accessibility standards set forth in Section 3.10 of this RFP.  To demonstrate satisfaction of this requirement, the Offeror must submit all information required below based on the Geo-Coded Census file provided by the Department in *Enrollment by ZIP Code & Geo Access Network Report File* (Attachment 22), containing the NYBEAS enrollment file that will ensure all Offerors perform their analyses consistently.

An Offeror will need to obtain sensitive information from the Department.  Upon receipt of a completed, notarized *Confidentiality and Non-Disclosure Agreement* (Attachment 11), the Department shall provide the Offeror with *Enrollment by ZIP Code and Geo Access Network Report File* (Attachment 22) and *Utilized Provider File* (Attachment 34). The confidentiality and non-disclosure agreement is required to be submitted by an Offeror requiring access to *Enrollment by ZIP Code and Geo Access Network Report File* (Attachment 22) and *Utilized Provider File* (Attachment 34).

The Offeror may execute custom MHSU Provider contracts contingent on award or existing agreements that can be made applicable to the Plan, or a combination thereof. All Providers in the file must be credentialed by the Offeror.  The Offeror must agree to provide documentation, including unredacted MHSU Provider contracts, to the Department upon request to demonstrate satisfaction of this requirement.  No Enrollee may be excluded from the Offeror's Geo network analysis, even if no Provider is located within the pre-defined access standards.

1. To fulfill the requirements of this Section and Section 3.10 of the RFP, the Offeror

must:

a. Submit their proposed Provider network using the *Offeror's Proposed Provider Network Files* form (Attachment 23). An Offeror is required to submit its proposed MHSU Provider network in two separate files: one for MHSU Facilities; and one for MHSU Practitioners. Additionally, Offerors must provide the *Offeror's Proposed Network Summary Worksheet* (Attachment 32) detailing the percentage of enrollees that will have network access to the required Provider and Facility types outlined in Section 3.10.l.

b. Perform a GeoAccess analysis, per MHSU Provider type, based on the Access Standards as referenced in Section 3.10 of this RFP. The Offeror should submit the complete Geo network reports in electronic searchable PDF only and the GeoAccess Accessibility Summaries in both searchable PDF and hard copy. These analyses should include every ZIP Code that is in the demographic file; even ZIP Codes with no access should be included. The Offeror should use Estimated Driving Distance from the employee's home ZIP Code for calculating distance. The most current version of Quest Analytics software must be used to create these reports. See *Offeror's Participating Provider Quest Analytics Report* (Attachment 35) for instructions.

c. Submit the *Offeror's Proposed Provider Network Summary Worksheet* (Attachment 32), which indicates fulfillment of Urban, Suburban and Rural network Access requirements as outlined in 3.10 of this RFP.

d. Carefully read the instructions in *Comparison of Utilized Provider File and the Offeror's Proposed Provider Network* (Attachment 33) and complete the Attachment. To do this, identify whether each of the Plan's current utilized Providers from the *Utilized Provider File* (Attachment 34) will or will not participate in the Offeror's proposed MHSU Provider network. Please submit a match and match criteria for every provider listed in Attachment 34.

e. Describe how Offeror monitors whether network MHSU Providers are accepting new patients into their practices, including how the Offeror's proposed access standards consider MHSU Provider availability.

f. Detail Offeror's current approach to value-based payment contracting, including approximately what percentage of Offeror's contracts are value-based, what type of risk level the Provider engages in, if any, and how Offeror plans to incorporate the Plan into Offeror's value-based contracting strategy. [**Note**: Specific cost information should not be included].

g. Detail those areas, if any, within New York State and outside of New York State where the Offeror's network does not meet or exceed the access guarantees as detailed in Section 3.10 of this RFP.

h. Describe how the Offeror proposes to provide Members with 24 hours a Day, 7 Days a week, 365 Days a year access to a telemedicine service for behavioral health visits. The Offeror must provide the services on a virtual visit platform with no copay.

2. Provider Network Guarantees: In this part of its Technical Proposal, the Offeror must state its agreement and guarantee for the following three program service level standards:

a. Network Access Urban Area Providers Guarantee: The Offeror's network cannot provide less than 95% of urban Enrollees with access to one Psychiatrist, Psychologist, or Masters Level Clinician within three miles per Section 3.10(1)(I)(i).

Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a single forfeiture amount for each quarter in which less than 95% of urban Enrollees do not have MHSU Provider access that meets the network Access-Urban Area requirement. The amount quoted by the Offeror shall be applied only once per quarter if the Offeror fails to maintain required access for MHSU Providers in Urban Areas. The Offeror's quoted standard will be an aggregate of the listed Provider types and shall apply to the combined Provider access in Urban Areas. The forfeited amount (Standard Credit Amount) is $60,000.00 for not meeting the aggregate MHSU Provider access standard. An Offeror may propose a higher amount.

b. Network Access Urban Area Facility Guarantee: The Offeror's network cannot provide less than 95% of urban Enrollees with access to one Mental Health or Substance Use Facility within five miles. Mental Health and Substance Use Facility for purposes of this guarantee means Inpatient Facilities, Alternate Levels of Care (ALOC), and Outpatient Clinic Groups per Section 3.10(1)(I)(i).

Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a single forfeiture amount for each quarter in which less than 95% of urban Enrollees do not have MHSU Facility access that meets the network Access-Urban Area requirement. The amount quoted by the Offeror shall be applied only once per quarter if the Offeror fails to maintain required access for MHSU Facilities in Urban Areas. The Offeror's quoted standard will be an aggregate of Mental Health and Substance Use Facility access and shall apply to the combined Facility access in Urban Areas. The forfeited amount (Standard Credit Amount) is

$60,000.00 for not meeting the aggregate Facility access standard.  An Offeror may propose a higher amount.

c.  Network Access Suburban Area Provider Guarantee: The Offeror's network cannot provide less than 95% of suburban Enrollees with access to one Psychiatrist, Psychologist, or Masters Level Clinician within fifteen miles per Section 3.10(1)(l)(ii).

Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a single forfeiture amount for each quarter in which less than 95% of suburban Enrollees do not have MHSU Provider access that meets the network Access-Suburban Area requirement.  The amount quoted by the Offeror shall be applied only once per quarter if the Offeror fails to maintain required access for MHSU Providers in Suburban Areas.  The Offeror's quoted standard will be an aggregate of the listed Provider types and shall apply to the combined Provider access in Suburban Areas. The forfeited amount (Standard Credit Amount) is $60,000.00 for not meeting the aggregate MHSU Provider access standard.  An Offeror may propose a higher amount.

d.  Network Access Suburban Area Facility Guarantee: The Offeror's network cannot provide less than 95% of suburban Enrollees with access to one Mental Health or Substance Use Facility within fifteen miles. Mental Health and Substance Use Facility for purposes of this guarantee means Inpatient Facilities, Alternate Levels of Care (ALOC) and Outpatient Clinic Groups per Section 3.10(1)(l)(ii).

Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a single forfeiture amount for each quarter in which less than 95% of suburban Enrollees do not have MHSU Facility access that meets the network Access-Suburban Area requirement.  The amount quoted by the Offeror shall be applied only once per quarter if the Offeror fails to maintain required access for MHSU Facilities in Suburban Areas. The Offeror's quoted standard will be an aggregate of Mental Health and Substance Use Facility access and shall apply to the combined Facility access in Suburban Areas. The forfeited amount (Standard Credit Amount) is $60,000.00 for not meeting the aggregate Facility access standard.  An Offeror may propose a higher amount.

e.  Network Access Rural Area Provider Guarantee: The Offeror's network cannot provide less than 95% of rural Enrollees with access to one Psychiatrist, Psychologist, or Masters Level Clinician within forty miles per 3.10(1)(l)(iii).

Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a single forfeiture amount for each quarter in which less than 95% of rural Enrollees do not have MHSU Provider access that

meets the network Access-Rural Area requirement.  The amount quoted by the Offeror shall be applied only once per quarter if the Offeror fails to maintain required access for ~~any~~ MHSU Provider**s** ~~type~~ in Rural Areas. The Offeror's quoted standard will be an aggregate of the listed Provider types and shall apply to the combined Provider access in Rural Areas. The forfeited amount (Standard Credit Amount) is $60,000.00 for not meeting the aggregate MHSU Provider access standard.  An Offeror may propose a higher amount.

f. <u>Network Access Rural Area Facility Guarantee</u>: The Offeror's network cannot provide less than 95% of rural Enrollees with access to one Mental Health or Substance Use Facility within forty miles.  Mental Health and Substance Use Facility for purposes of this guarantee means Inpatient Facilities, Alternate Levels of Care (ALOC) and Outpatient Clinic Groups per Section 3.10(1)(l)(iii).

Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a single forfeiture amount for each quarter in which less than 95% of rural Enrollees do not have MHSU Provider access that meets any network Access-Rural Area requirement.  The amount quoted by the Offeror shall be applied only once per quarter if the Offeror fails to maintain required access for MHSU Facilities in Rural Areas.  The Offeror's quoted standard will be an aggregate of Mental Health and Substance Use Facility access and shall apply to the combined Facility access in Rural Areas. The forfeited amount (Standard Credit Amount) is $60,000.00 for not meeting the aggregate Facility access standard.  An Offeror may propose a higher amount.

3. <u>Network Composition Guarantee</u>:

In this part of its Technical Proposal, the Offeror must state its agreement and guarantee that at least 90% of the Providers in each of the eleven Facility or Practitioner Licensure type categories (Mental Health Facility, Substance Use Facility, Mental Health and Substance Use Facility, Mental Health Outpatient Clinic Group, Substance Use Outpatient Clinic Group, Psychiatrist, Psychologist, Licensed Masters Level Clinician (MLC) or a MLC with highest licensure in other states, Certified Behavior Analyst Provider, Applied Behavioral Analysis Agency, Mental Health/Substance Use Practitioner – Other Prescriber), listed on *Offeror's Proposed Provider Network Files* (Attachment 23), will be maintained throughout the term of the Contract.  Providers who are retired, deceased, or no longer actively practicing will be excluded from the annual calculation and guarantee.

Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a single forfeiture amount for each quarter in which it does not meet 90% of the targeted number of Providers in each of the eleven Facility or Practitioner Licensure type categories.  The Offeror must provide a target number for each of the eleven network composition categories for which they are

required to maintain at least 90% of providers in each of those categories.  The amount quoted by the Offeror shall be applied for each MHSU Provider type per quarter if the Offeror fails to maintain required network composition.  The forfeited amount (Standard Credit Amount) is $60,000.00 for any MHSU Provider type, calculated quarterly.  An Offeror may propose a higher amount.


## 5.12   Center of Excellence for Substance Use Disorders

The Offeror must provide a narrative describing, in detail, the proposed Center of Excellence for Substance Use Disorders the Offeror is proposing to administer as specified in Section 3.11 of this RFP, including a detailed description of how the program operates.


## 5.13   Other Clinical Management Programs

The Offeror must provide a narrative describing in detail the proposed processes that will be utilized in other clinical management programs as specified in Section 3.12 of this RFP, including the following:

a.  Describe the ADHD management program the Offeror is proposing to administer for the MHSU Disorder Program.  Include a detailed description of how the program operates and its benefit to the MHSU Disorder Program and Members.  Provide samples of communication material that are proposed for use in the MHSU Disorder Program.

b.  Describe the depression management program the Offeror is proposing to administer for the MHSU Disorder Program.  Include a detailed description of how the program operates and its benefit to the MHSU Disorder Program and Members.  Provide samples of communication material that are proposed for use in the MHSU Disorder Program.

c.  Describe the eating disorder management program the Offeror is proposing to administer for the MHSU Disorder Program.  Include a detailed description of how the program operates and its benefit to the MHSU Disorder Program and Members.  Provide samples of communication material that are proposed for use in the MHSU Disorder Program.

d.  Please describe any other voluntary clinical management or utilization review programs the Offeror is proposing to administer for the MHSU Disorder Program.  Include a detailed description of how the program operates and its benefit to the MHSU Disorder Program and Members.

## 5.14 Pre-Certification and Concurrent Review for Mental Health and Substance Use Disorder Services

1. The Offeror must provide a narrative describing in detail the proposed processes that will be utilized in for Pre-certification of benefits and concurrent review for MHSU services in accordance with New York State regulations as specified in Section 3.13 of this RFP, including the following:

   a. Describe the process and procedure the Offeror proposes to use for Pre-certification of benefits.  Explain the proposed staffing levels and qualifications of staff responsible for Pre-certification including whether some or all of the same staff will be utilized for predetermination of benefits and Pre-certification of benefits, or if these will be separate functioning units.  Describe how the Medical Director of the MHSU Disorder Program will be involved in the predetermination and Pre-certification process.

   b. Detail the full scope of the concurrent Utilization Review (UR) program that Offeror is proposing to utilize for MHSU services, including:

      i. The qualifications of the staff responsible for oversight of Offeror's concurrent UR program;

      ii. Review of outpatient care;

      iii. Review of inpatient care;

      iv. Discharge planning and follow-up care; and

      v. Intensive case management of High-Risk Members.

   c. Describe the methods Offeror utilizes to measure effectiveness for MHSU services.  Do not include any reference to specific monetary savings.

2. Inpatient Treatment Utilization Review Guarantee: In this part of its Technical Proposal the Offeror must state its agreement and guarantee that at least 90% of requests for Pre-certification of inpatient MHSU care, when applicable under New York State regulations, be reviewed within twenty-four hours from the receipt of the request and the Member and MHSU Provider notified within one Business Day of the determination as calculated on a quarterly basis.

   Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a forfeiture amount (Standard Credit Amount) for each quarter in which less than 90% of requests for Pre-certification of inpatient MHSU care are reviewed within twenty-four hours from the receipt of the request and/or the Member and MHSU Provider are not notified within one Business Day of the

determination.  The forfeited amount (Standard Credit Amount) is $60,000.00 a quarter for each quarter in which this guarantee is not met.  However, an Offeror may propose higher amounts.

## 5.15    Consolidated Appropriations Act (CAA)

1. The Offeror must provide a narrative describing how it will conduct and document a NQTL comparative analysis and confirm the analysis will be provided upon request.  This narrative should also include a summary of its planned activities to ensure compliance with other provisions of the CAA, including, but not limited to, posting machine-readable files related to claims payments, provider directory requirements, and enrollee transparency tools.

## 5.16    Disabled Dependent Determinations

1. The Offeror must provide a narrative describing in detail the proposed processes that will be utilized in disabled dependent determinations as specified in Section 3.15 of this RFP, including the following:

   a. Explanation as to whether the Offeror provides this service or a similar service for clients presently, including an example.

   b. Summary on how the Offeror plans to provide disabled dependent determinations to the Department and what qualifications staff will have who perform the review.

## 5.17    Transition and Termination of Contract

The Offeror must provide a narrative describing in detail:

1. The process and level of customer service and clinical management that Offeror will provide in Phase One and Phase Two of the Transition Services, as specified in Section 3.16 of the RFP.

2. Transition and Termination Guarantee: In this part of its Technical Proposal, the Offeror must state its agreement and guarantee that all Transition Plan requirements outlined in Section 3.15 3.16 of this RFP will be completed in the required time frames to the satisfaction of the Department.

   Utilizing the *Performance Guarantees* form (Attachment 6), the Offeror must propose a forfeiture amount (Standard Credit Amount) for each Day or part thereof that the Transition Plan requirements are not met.  The forfeited amount

(Standard Credit Amount) is $1,000.00 for each Day this guarantee is not met. However, an Offeror may propose higher amounts.

## SECTION 6: FINANCIAL PROPOSAL

This section of the RFP sets forth the requirements for the Offeror's Financial Proposal submission and the cost structure required by the Department for Offerors to use in developing their submission. The Offeror's Financial Proposal must respond to all the following mandatory sections as set forth below in the formats as specified.

The sole compensation for the Contractor under the Contract will be payments based on the provisions set forth in this section of the RFP. During the term of the Contract, amounts paid for which it is subsequently determined that the Contractor was not entitled, if any, must be refunded to the Department. Submission of an invoice and payment thereof shall not preclude the Department from recovery or offset of payment in any case where Project Services as delivered are found to deviate from the terms and conditions of the Contract.

Evaluation of Financial Proposals will be performed in accordance with the provisions presented in Section 7.3 of the RFP.

The Financial Proposal must consist of a completed *Guaranteed Average Unit Cost and Administrative Fee Quote Form* (Attachment 25), which is described in further detail in Sections 6.1 and 6.2 of this RFP.

## 6.1 Program Claims

Throughout the term of the Contract, the Offeror will be paid for In-Network and Out-of-Network MHSU Disorder Program claim charges on a monthly basis. Claim utilization data for Participating MHSU Providers can be found in *Empire Plan Historical Claims File* (Amended Attachment 26). The following paragraph summarizes the benefit design for the Empire Plan, Excelsior, and SEHP. Please refer to *Empire Plan Certificates, Excelsior Plan and SEHP At A Glance* (Attachment 20) for further details.

1. Participating Provider Network: In accordance with Section 3.10 of the RFP, the Offeror is expected to use its best efforts to substantially maintain the composition of Network Providers included in the MHSU Disorder Program's current Provider Network. The amount charged to the Program for Covered Services shall be the contracted Network Provider fee agreed to between the Offeror and the servicing Provider, less any applicable copayment and payments from other insurance coverage. This fee must be equal to or less than the contracted Network Provider fee for the Offeror's other contracted clients that are similar in size or scope to the Department.

2. Empire Plan Non-Network Practitioners, the Contractor will process Empire Plan Non-Network Practitioner claims, as follows:

   a. 80 percent of the Usual and Customary Rate (UCR). The Empire Plan pays 100 percent of the UCR once each combined Coinsurance amount

exceeds the maximum for the calendar year.  The Empire Plan generally utilizes the 90th percentile of FAIR Health to determine the UCR.  The UCR means the lowest of:

  i.   The actual charge for services; or

  ii.  The usual charge for services by the Provider for the same or similar service; or

  iii. The usual charge for services of other Providers in the same or similar geographic area for the same or similar service.

  b.  Effective July 1, 2023, for certain unions: 275 percent of Centers for Medicare and Medicaid Services (CMS) rates, and will be subject to Deductible, Coinsurance and calendar year and lifetime maximums.

Please refer to Attachment 30, *Benefits by Bargaining Unit* for a listing of how the Empire Plan Non-Network Practitioner benefit is administered for each group.

3.  Excelsior Plan Non-Network Practitioner Benefits: 80 percent of the UCR. The UCR is the lower of billed charges or 110 percent of the Medicare allowance.

4.  SEHP Non-Network Practitioner Benefits: the Plan pays 80 percent of the allowable amount, the lower of billed charges or 110 percent of Medicare, for covered services after the Deductible is met.

5.  Non-Network Facility Benefits, the Contractor will process Non-Network Facilities claims, as follows:

  a.  For the Empire Plan: 90 percent of billed charges. After the combined annual Coinsurance Maximum is met, the Empire Plan pays 100 percent of billed charges.

  b.  The Excelsior Plan does not provide coverage for services provided in a Non-Network facility except in an emergency or if a Network Facility is not available.

  c.  For SEHP: A $200 Copayment is applied per person per admission. The Plan pays 80 percent of the allowable amount, the lower of billed charges or 110 percent of Medicare, after the copayment is met.  The member is responsible for the balance.

Where a Network Provider is not available because of clinical or access considerations, the Contractor must negotiate a Single Case Agreement with a Non-Network Provider in a manner consistent with what is typically allowed for a

Network Provider in the same discipline for the same service.  Members will not be responsible for any payments above what they would pay for a network claim.

6. <u>Network Pricing Guarantee</u>: The Offeror must develop and propose one Guaranteed Average Unit Cost (GAUC) for all Network Outpatient Services and one GAUC for all Network Inpatient/Alternative Level of Care (ALOC) Services presented in the *Guaranteed Average Unit Cost and Administrative Fee Quote Form (*Attachment 25). The Contractor is required to guarantee that the Actual Average Unit Cost (AAUC) for Network Outpatient Services and Network Inpatient/ALOC Services shall not exceed the proposed GAUC. The AAUC is defined as the sum of the allowed amounts for all service codes for Network Services divided by the sum of all service units for all services codes for Network Services. The calculation of the AAUC shall be equal to the amounts that would be paid by the Contractor to Network Providers for Network Outpatient Services and Network Inpatient/ALOC Services for Plan primary claims only and prior to the application of Copayment and Bad Debt and Charity assessments. The Offeror must develop and propose a GAUC for Network Outpatient Services and Network Inpatient/ALOC Services, as follows:

    a. Based on incurred claims for each Plan Year that are paid as of June 30th of the following year, the Contractor shall calculate the AAUC for the Network Inpatient Services and Outpatient Services categories.  Such Network Services shall include all services/days paid at the Network benefit level including services/days rendered by Non-Network Providers when the Contractor determines that it is appropriate for either access or clinical reasons.  Network Services shall not include non-network services where the Contractor had no opportunity to direct the care or Transition of Care services.  The calculation of the AAUC shall be equal to the amounts that would be paid by the Contractor to the Network Provider for Plan primary claims only and prior to the application of the Copayment and Bad Debt and Charity assessments.

    b. The Contractor acknowledges that the GAUC for the Inpatient Services set forth in the *Guaranteed Average Unit Cost and Administrative Fee Quote Form* (Attachment 25) may incorporate the inpatient professional service component pertaining to global reimbursement arrangements. Amounts actually paid and reported to the Department for Inpatient Services will include the inpatient professional service component of global arrangements.  Any adjustments in the calculation of the AAUC shall be at the sole discretion of the Department.

    c. If the AAUC for each category exceeds the GAUC, the Contractor shall forfeit a portion of the Administrative Fee for failure to meet this guarantee, as follows: For each 1.0% the AAUC exceeds the Outpatient Services GAUC proposed in the *Guaranteed Average Unit Cost and Administrative Fee Quote Form* (Attachment 25), the Contractor shall pay the

Department a performance credit equal to 1.5% of the Administrative Fee charged for the applicable Plan Year.  Any amounts due from the Contractor to the Department for failure to meet the performance guarantee shall be applied as a credit against the Administration Fee charged to the MHSU Program within thirty (30) days after the Contractor is notified in writing that the calculated performance credit was approved by the Department.  The performance credit for the Outpatient Services GAUC shall not exceed 50% of the total Administrative charged for the applicable Plan Year.  For each 1.0% the AAUC exceeds the Inpatient and ALOC Services GAUC proposed in the *Guaranteed Average Unit Cost and Administrative Fee Quote Form (*Attachment 25), the Contractor shall pay the Department a performance credit equal to 1.5% of the Administrative Fee charged for the applicable Plan Year.  Any amounts due from the Contractor to the Department for failure to meet the performance guarantee shall be applied as a credit against the Administration Fee charge to the MHSU Program within thirty (30) days after the Contractor is notified in writing that the calculated performance credit was approved by the Department.  The performance credit for the Inpatient and ALOC Services GAUC shall not exceed 50% of the total Administrative charged for the applicable Plan Year.

d. Offerors may propose a different Inpatient and Outpatient GAUC for each of the five years of the Contract.  However, these amounts should be fixed and cannot be tied to any index or variable inflation rate.  Any changes requested by the Offeror throughout the term of agreement are at the sole discretion of the Department and are subject to approval by the Office of the Attorney General and the Office of the State Comptroller.

e. For purposes of both the development of the GAUC and AAUC, claims processed as secondary to the Plan shall be excluded from the calculations and network pricing guarantees.  In addition, the GAUC and AAUC shall not include any fees or assessments.

## 6.2    Administrative Fees

1. The Offeror must submit a completed *Guaranteed Average Unit Cost and Administrative Fee Quote Form* (Attachment 25) which must include the Offeror's proposed per Enrollee per month fee for Administrative Fees charged to the MHSU Disorder Program.  An Offeror's quoted Administrative Fee must include all direct and indirect costs, overhead, travel expenses, fees, and profit.

2. The Offeror will be bound by its quoted Administrative Fee, as proposed in the Offeror's Financial Proposal for the entire term of the Contract, unless amended in writing.

3. Each month, the Offeror shall calculate the Administrative Fee payable to the Offeror by multiplying the per Enrollee per month fee by the average number Enrollees in force for the assessed month as reported by the Offeror.  The average number Enrollees for the assessed month reported by the Offeror shall be based on the enrollment files and enrollment updates the Department transmits to the Offeror as set forth in Section 3.6 of this RFP.

4. The Department reserves the right to adjust the Administrative Fee charged by the Offeror based on a reconciliation of the Enrollee counts reported from the Department's NYBEAS by the Enrollee counts utilized by the Offeror to calculate the monthly Administrative Fee.  The reconciliation will be performed by the Department on an annual basis using the average Enrollee count for the respective MHSU Disorder Program Year.  However, the Department may perform additional reconciliations throughout a given year if the average monthly Enrollee counts utilized by the Offeror differ significantly from the Department's Enrollee counts, as reflected in NYBEAS.  In addition, the Administrative Fee due shall be adjusted on an annual basis based on penalties due to the Department or payments due from the Offeror in accordance with the *Performance Guarantees* form (Attachment 6).

## 6.3    Assessments

Assessments are defined as surcharges or taxes charged by federal, state, and local government entities based on claims or membership.  The State will be responsible for all Assessments imposed on health insurers.  The Contractor will be responsible for any future Assessments that are chargeable to the Program.  The State is currently responsible for the following Assessments, which are chargeable to the health insurer as of June 2020:

1. New York Health Care Reform Act Covered Lives Assessment

2. New York Health Care Reform Act Bad, Debt and Charity Assessment

3. Massachusetts Health Safety Network Assessment

4. Massachusetts Pediatric Immunization Assessment

5. Massachusetts Child Psychiatry Access Program Assessment

6. Massachusetts Health Policy Commission Assessment

7. Michigan Health Insurance Claims Assessment

8. Maine Vaccine Assessment

9. Maine Guaranteed Access Reinsurance Association Assessment

10. New Hampshire Vaccine Assessment

11. New Hampshire Health Plan Assessment

12. Vermont Immunization Assessment

13. Connecticut Immunization Assessment

14. Connecticut DPH Assessment

15. Vermont Health Care Claims Tax

16. New Mexico Vaccine Assessment

17. Rhode Island Children's Health Account Assessment

18. Alaska Vaccine Assessment

## SECTION 7:  EVALUATION AND SELECTION CRITERIA

The Department seeks to contract with a single Offeror to provide and administer MHSU benefits.  To this end, the Department intends to select the responsive and responsible Offeror whose Proposal offers the "Best Value" to the State, as defined in Section 7.5 of this RFP.

[**Note**: Access to technical proposals will be made available to representatives of NYS employee unions for review. Representatives of NYS employee unions may participate in Management Interviews and Site visits, if applicable.].

### 7.1    Administrative Proposal Evaluation

Proposals determined by the Department to satisfy the submission requirements set forth in Section 4 of this RFP will be evaluated by an evaluation team composed of staff from the Department.  An Offeror's Proposal shall not be considered for award until the Offeror submits a *Formal Offer Letter* (Attachment 3) and an *Offeror Attestations Form* (Attachment 13).

### 7.2    Technical Proposal Evaluation

The evaluation of the Offeror's Technical Proposal will be based on that Offeror's written Technical Proposal and responses to clarifying questions (if any) and, as deemed necessary by the Department, Technical Management Interviews conducted to amplify and/or clarify information in the Offeror's Technical Proposal.

1. **Technical Score Ratings**

   The Technical Proposal of any Offeror meeting the requirements set forth in Section 7.1 of this RFP will be evaluated by the Department and representatives from other State agencies.  Each Offeror's Technical Proposal will be evaluated based on the following rating scale and criteria as applied to each response as required in Section 5 of this RFP.  A rating of "excellent" equates to a score of 5 for each evaluated response.  Each reduction in the ratings results in a one-point reduction in the score such that a rating of "poor" equates to a score of 1.

   a. Excellent (5)

      The Offeror far exceeds the criteria.  The services described indicate that the Offeror will provide high-quality services and is proactive and innovative.

   b. Good (4)

The Offeror exceeds the criteria.  The services described indicate that the Offeror will exceed the requirements of the RFP.  The Offeror demonstrates some innovative features not shown in typical proposals.

c.  Meets Criteria (3)

The Offeror meets but does not exceed the criteria.  The services described indicate that the Offeror will meet the requirements of the RFP.

d.  Fair (2)

The Offeror's answer is minimal; or the answer is very general and does not fully address the question; or the Offeror meets only some of the criteria.

e.  Poor (1)

The Offeror misinterpreted or misunderstood the question; or the Offeror does not answer the question/criteria in a clear manner, or the Offeror does not answer the question; or the Offeror does not meet the criteria.

2.  **<u>Performance Guarantee Ratings</u>**

The Offeror's commitment to meet the levels of standards it outlines in its proposal will be verified by reviewing responses to related Performance Guarantee questions and reviewing the Offeror's proposed credit to the Administrative Fee (credit amount) for its failure to meet each of its proposed performance guarantees.

A rating of "excellent" equates to a score of 4 for each evaluated service level standard.  Each reduction in the ratings results in a reduction in the score such that a rating of "poor" equates to a score of 1.  An Offeror may propose performance guarantees that exceed the MHSU Disorder Program's service level standards presented in this RFP.  Proposed Performance Guarantees are contained within the *Performance Guarantees* form (Attachment 6) and will be evaluated using the following criteria:

a.  Excellent (4)

i.  The Offeror's proposed performance guarantee exceeds the MHSU Disorder Program's service level standard contained within this RFP; and

ii.  The Offeror's proposed credit amount is 125% or more of the Standard Credit Amount stated within this RFP.

b. Good (3)

 i. The Offeror's proposed performance guarantee equals the MHSU Disorder Program's service level standard contained within this RFP, and the Offeror's proposed credit amount is 125% or more of the Standard Credit Amount stated within this RFP; or

 ii. The Offeror's proposed performance guarantee exceeds the MHSU Disorder Program's service level standard contained within this RFP; and the Offeror's proposed credit amount is greater than 100% but less than 125% of the Standard Credit Amount stated within this RFP.

c. Meets Criteria (2)

 i. The Offeror's proposed performance guarantee equals or exceeds the MHSU Disorder Program's service level standard contained within this RFP; and

 ii. The Offeror's proposed credit amount equals the Standard Credit Amount stated within this RFP.

d. Poor (1)

 i. The Offeror's proposed performance guarantee is below the MHSU Disorder Program's service level standard contained within this RFP regardless of the credit amount proposed by the Offeror; or

 ii. The Offeror's proposed credit amount is less than 100% or less of the Standard Credit Amount stated within this RFP regardless of the level of performance the Offeror pledges.

### 3. __Allocation of Technical Score Points__

The scores referenced above shall be applied to weighted point values associated with each evaluated Submission response. The relative point value for each section of the Technical Proposal is as follows:

| Section | Title | % of Technical Score |
|---|---|---|
| 5.3 | Implementation Plan | 2% |
| 5.4 | Member Communication Support | 2% |
| 5.5 | Reporting Services | 1% |
| 5.6 | Customer Service | 15% |

| 5.7 | Enrollment Management | 10% |
|------|------------------------|------|
| 5.8 | Claims Processing | 10% |
| 5.9 | Plan Audit and Fraud Protection | 2% |
| 5.10 | Appeal Process | 1% |
| 5.11 | Provider Network | 50% |
| 5.12 | Centers of Excellence for Substance Use Disorders | 1% |
| 5.13 | Other Clinical Management Programs | 2% |
| 5.14 | Pre-Certification and Concurrent Review for Mental Health and Substance Use Disorder Services | 1% |
| 5.15 | Consolidated Appropriations Act | 1% |
| 5.16 | Disabled Dependent Determinations | 1% |
| 5.17 | Transition and Termination of Contract | 1% |
| **Total** | | **100.0%** |

## 4. Technical Proposal Scoring

The Technical Proposal evaluation will be based on 700 total available points. The average score of all evaluators for each section of the Technical Proposal will be applied against the weights depicted in the chart above.

## 7.3    Financial Proposal Evaluation

The Financial Proposal of any Offeror meeting requirements set forth in Section 4 of this RFP will be evaluated by the Department.  [**Note:** Aggregate utilization is available in *Empire Plan Historical Claims File* (Amended Attachment 26).

## 1. Financial Proposal Scoring

a. The Department will calculate a Total Projected Cost for each Offeror as the sum of (i); and (ii) as follows:

   i. The Total Projected Participating Provider Network Claims Cost, which shall be calculated by the Department by:

      1) Multiplying the Inpatient and Outpatients GAUCs proposed by the Offeror in the *Guaranteed Average*

*Unit Cost and Administrative Fee Quote Form* (Attachment 25) by projected network utilization over the five-year period. Network utilization will be projected by utilizing historical claims data trended forward for each of the five years of the contract; and

    2) Utilizing Offerors responses to *Utilized Provider Files* (Attachment 34) to determine Network utilization.

  ii. The Total Projected Non-Network Claims Cost, which shall be calculated by the Department by:

    1) Using the *Utilized Provider Files* (Attachment 34) to identify the Offeror's proposed Non-Network Practitioners and Facilities; and

    2) For each identified Non-Network Practitioner, the Department will multiply projected Non-Network utilization by a pre-determined average allowed amount for Non-Network Practitioner claims. The Department will apply the same average allowed amount for Non-Network Practitioner claims against all Offerors' projected Non-Network Practitioner utilization, based on the respective Offerors' responses to Attachment 34.

    3) For each identified Non-Network Facility, the Department will multiply projected Non-Network utilization by a pre-determined average allowed amount for Non-Network Facility claims. The Department will apply the same average allowed amount for Non-Network Facility claims against all Offerors' projected Non-Network Practitioner utilization based on the respective Offerors' responses to Attachment 34.

  iii. The Total Projected Administrative Costs, which shall be calculated by the Department by multiplying the Monthly Administrative Fee quoted by the Offeror on the *Guaranteed Average Unit Cost and Administrative Fee Quote Form* (Attachment 25) by the projected MHSU Disorder Program enrollment.

b. The Offeror's Proposal with the lowest Total Projected Cost will be awarded 300 points. A Financial Proposal score for each remaining Offeror will be determined based on the following formula:

<u>Cost Score of Evaluated Proposal</u> =

300 * Lowest Evaluated Cost

divided by

Total Cost of Proposal being evaluated

## 7.4    Total Combined Score

The Total Combined Score assigned to each Offeror will be the sum of the Offeror's Technical Score and Financial Score.

## 7.5    Best Value Determination

Best Value means that the proposal that optimizes quality, cost, and efficiency among responsive and responsible bidders shall be selected for award (State Finance Law, Article 11, Section 163).  Best Value will be determined by a weighted point system, with 70 percent allocated to the Technical Proposal and 30 percent allocated to the Financial Proposal.  The Department shall select and enter into negotiations for the purpose of executing a Contract with the responsive and responsible Offeror that has obtained the highest Total Combined Score, inclusive of both cost and technical.  If two offers' Total Combined Scores are tied, the award shall go to the bidder with the highest cost score (lowest price), as calculated pursuant to Section 7.3 of this RFP.

## SECTION 8:  ADDITIONAL PROVISIONS

The Offeror that is determined to provide the Best Value to the Department shall be notified of its conditional award of Contract subject to the successful development of a Contract.  The resulting Contract shall incorporate the requirements set forth in the RFP.  Additional terms and conditions not already addressed in the RFP are set forth below.

1. **Work in The Continental United States of America**

   All work performed by Contractor personnel under this Contract must be performed within the Continental United States of America.

2. **Information Classification**

   The Department has determined that the State information which the Contractor will either host, maintain, or have access to has an impact level of: Confidentiality = High, Integrity = High, and Availability = High; and requires the Contractor, pursuant to IT Standard: Information Security Controls (NYS-S14-003) (see https://its.ny.gov/document/information-security-controls), to have the associated baseline security controls implemented to uniformly protect the confidentiality, integrity, and availability of the information entrusted to the Contractor.

3. **Continued Data Access**

   The Department has determined that the period of time that the Contractor must provide the Department continued access to Data beyond the expiration or termination of the Agreement is no less than 365 Calendar days.  All Contract provisions related to the protection and security of the Data will survive termination of the Contract. This provision does not limit or lessen the time period or Contractor's obligations pursuant to *Standard Clauses for New York State Contracts* (Appendix A) to establish and maintain Records.

4. **Use and Disclosure of Protected Health Information**

   a. The Offeror acknowledges that the Offeror is a "Business Associate" as that term is defined in the HIPAA implementing regulations at 45 CFR 160.103, of the Department as a consequence of the Offeror's provision of Project Services on behalf of the Department within the context of the Offeror's performance under the resulting Contract and that the Offeror's provision of Project Services will involve the disclosure to the Offeror of individually identifiable health information from the Department or other service providers on behalf of the Department, as well as the Offeror's disclosure to the Department of individually identifiable health information as a consequence of the Project Services performed under the resulting

Contract.  As such, the Offeror, as a Business Associate, will be required to comply with the provisions of this Section.

b.  For purposes of this Section, the term "Protected Health Information" (PHI) means any information, including demographic information collected from an individual, that relates to the past, present, or future physical or mental health or condition of an individual, to the provision of health care to an individual, or to the past, present, or future payment for the provision of health care to an individual, that identifies the individual, or with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.  Within the context of the resulting Contract, PHI may be received by the Offeror from the Department or may be created or received by the Offeror on behalf of the Department in the Offeror's capacity as a Business Associate.  All PHI received or created by the Offeror in the Offeror's capacity as a Business Associate and as a consequence of its performance under the resulting Contract is referred to herein collectively as "Department's PHI".

c.  The Offeror acknowledges that the Department administers on behalf of NYS, several group health plans as that term is defined in HIPAA's implementing regulations at 45 CFR Parts 160 and 164, and that each of those group health plans consequently is a "covered entity" under HIPAA. These group health plans include NYSHIP, which encompasses the Empire Plan as well as participating health maintenance organizations; the Dental Plan, and the Vision Plan.  In this capacity, the Department is responsible for the administration of these "covered entities" under HIPAA. The Offeror further acknowledges that the Department has designated NYSHIP and the Empire Plan as an Organized Health Care Arrangement (OHCA), respectively.  The Offeror further acknowledges that

  i.  The Offeror is a HIPAA "Business Associate" of the group health plans identified herein as "covered entities" as a consequence of the Offeror's provision of certain services to and/or on behalf of the Department as administrator of the "covered entities" within the context of the Offeror's performance under the resulting Contract, and that the Offeror's provision of such services may involve the disclosure to the Offeror of individually identifiable health information from the Department or from other parties on behalf of the Department, and also may involve the Offeror's disclosure to the Department of individually identifiable health information as a consequence of the services performed under the resulting Contract; and

  ii.  Contactor is a "covered entity" under HIPAA in connection with its provision of certain services under the resulting Contract.  To the extent Offeror acts as a HIPAA "Business Associate" of the group

health plans identified as "covered entities", the Offeror shall adhere to the requirements as set forth herein.  Offeror is responsible to obtain from Members and Enrollees all consents and/or authorizations, if any, required for Offeror to perform the services hereunder and for the use and disclosure of information, including the Department's PHI, as permitted under the resulting Contract.

d. Permitted Uses and Disclosures of the Department's PHI: The Offeror may create, receive, maintain, access, transmit, use, and/or disclose the Department's PHI solely in accordance with the terms of the resulting Contract.  In addition, the Offeror may use and/or disclose the Department's PHI to provide data aggregation services relating to the health care operations of the Department.  Further, the Offeror may use and disclose the Department's PHI for the proper management and administration of the Offeror if such use is necessary for the Offeror's proper management and administration or to carry out the Offeror's legal responsibilities, or if such disclosure is required by law or the Offeror obtains reasonable assurances from the person to whom the information is disclosed that it shall be held confidentially and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies the Offeror of any instances of which it is aware in which the confidentiality of the information has been breached.  Additionally, the Offeror may use and/or disclose the Department's PHI, as appropriate:

  i. For treatment, payment and health care operations as described in 45 CFR Section 164.506(c)(2), (3) or (4); and

  ii. To de-identify the information or create a limited data set in accordance with 45 CFR §164.514, which de-identified information or limited data set may, consistent with this section, be used and disclosed by Offeror only as agreed to in writing by the Department and permitted by law.

e. Nondisclosure of the Department's PHI: The Offeror shall not create, receive, maintain, access, transmit, use, or further disclose the Department's PHI otherwise than as permitted or required by the resulting Contract or as otherwise required by law.  The Offeror shall limit its uses and disclosures of PHI when practicable to the information comprising a Limited Data Set, and in all other cases to the minimum necessary to accomplish the intended purpose of the PHI's access, use, or disclosure.

f. Safeguards: The Offeror shall use appropriate, documented safeguards to prevent the use or disclosure of the Department's PHI otherwise than as provided for in the resulting Contract.  The Offeror shall maintain a

comprehensive written information security program that includes administrative, technical, and physical safeguards that satisfy the standards set forth in the HIPPA Security Rule at 45 CFR §§ 164.308, 164.310, and 164.312, along with corresponding policies and procedures, as required by 45 CFR § 164.316, appropriate to the size and complexity of the Offeror's operations and the nature and scope of its activities, to reasonably and appropriately protect the confidentiality, integrity, and availability of any electronic PHI that it creates, receives, maintains, accesses, or that it transmits on behalf of the Department pursuant to the resulting Contract to the same extent that such electronic PHI would have to be safeguarded if created, received, maintained, accessed, or transmitted by a group health plan identified herein.

g.  Breach Notification:  In addition to the Disclosure of Breach requirements specified in *Standard Clauses for All Department Contracts* (Appendix B), the following provisions shall apply:

   i.  Reporting: The Offeror shall report to the Department any breach of unsecured PHI, including any use or disclosure of the Department's PHI otherwise than as provided for by the resulting Contract, of which the Offeror becomes aware.  An acquisition, access, transmission, use, or disclosure of the Department's PHI that is unsecured in a manner not permitted by HIPAA or the resulting Contract is presumed to be a breach unless the Offeror demonstrates that there is a low probability that Department's PHI has been compromised based on the Offeror's risk assessment of at least the following factors:

      1)  The nature and extent of Department's PHI involved, including the types of identifiers and the likelihood of re-identification;

      2)  The unauthorized person who used Department's PHI or to whom the disclosure was made;

      3)  Whether Department's PHI was actually acquired or viewed; and

      4)  The extent to which the risk to Department's PHI has been mitigated.

   ii.  Required Information:  In addition to the information required in *Standard Clauses for All Department Contracts* (Appendix B), Disclosure of Breach, the Offeror shall provide the following information to the Department within the time period identified in *Standard Clauses for All Department Contracts* (Appendix B),

Disclosure of Breach, except when, despite all reasonable efforts by the Offeror to obtain the information required, circumstances beyond the control of the Offeror necessitate additional time.  Under such circumstances, the Offeror shall provide to the Department the following information as soon as possible and without unreasonable delay, but in no event later than thirty Calendar Days from the date of discovery:

1) the date of the breach incident;

2) the date of the discovery of the breach;

3) a brief description of what happened;

4) a description of the types of unsecured PHI that were involved;

5) identification of each individual whose unsecured PHI has been, or is reasonably believed to have been, accessed, acquired, or disclosed during the breach;

6) a brief description of what the Offeror is doing to investigate the breach, to mitigate harm to individuals, and to protect against any further breaches; and

7) any other details necessary to complete an assessment of the risk of harm to the individual.

iii. The Offeror will be responsible to provide notification to individuals whose unsecured PHI has been or is reasonably believed to have been accessed, acquired, or disclosed as a result of a breach, as well as the Secretary of the United States Department of Health and Human Services and the media, as required by 45 CFR Part 164.

iv. The Offeror shall maintain procedures to sufficiently investigate the breach, mitigate losses, and protect against any future breaches, and to provide a description of these procedures and the specific findings of the investigation to the Department upon request.

v. The Offeror shall mitigate, to the extent practicable, any harmful effects from any use or disclosure of PHI by the Offeror not permitted by the resulting Contract.

h. Associate's Agents:  The Offeror shall require all of its agents or Subcontractors to whom it provides the Department's PHI, whether received from the Department or created or received by the Offeror on behalf of the Department, to agree, by way of written contract or other written arrangement, to the same restrictions and conditions on the access, use, and disclosure of PHI that apply to the Offeror with respect to the Department's PHI under the resulting Contract.

i. Availability of Information to the Department:  The Offeror shall make available to the Department such information and documentation as the Department may require regarding any disclosures of PHI by the Offeror to fulfill the Department's obligations to provide access to, provide a copy of, and to account for disclosures of the Department's PHI in accordance with HIPAA and its implementing regulations.  The Offeror shall provide such information and documentation within a reasonable amount of time of its receipt of the request from the Department.  The Offeror must provide the Department with access to the Department's PHI in the form and format requested, if it is readily producible in such form and format; or if not, in a readable hard copy form or such other form and format as agreed to by the Parties, provided, however, that if the Department's PHI that is the subject of the request for access is maintained in one or more designated record sets electronically and if requested by the Department, the Offeror must provide the Department with access to the requested PHI in a readable electronic form and format.

j. Amendment of the Department's PHI: The Offeror shall make the Department's PHI available to the Department as the Department may require to fulfill the Department's obligations to amend individuals' PHI pursuant to HIPAA and its implementing regulations.  The Offeror shall, as directed by the Department, incorporate any amendments to the Department PHI into copies of such Department PHI maintained by the Offeror.

k. Internal Practices: The Offeror shall make its internal practices, policies and procedures, books, records, and agreements relating to the use and disclosure of the Department's PHI, whether received from the Department or created or received by the Offeror on behalf of the Department, available to Department and/or the Secretary of the U.S. Department of Health and Human Services in a time and manner designated by the Department and/or the Secretary of the U.S. Department of Health and Human Services for purposes of determining the Department's compliance with HIPAA and its implementing regulations.

l. Termination: This Contract may be terminated by the Department at the Department's discretion if the Department determines that the Offeror, as

a Business Associate, has violated a material term of this Section.  Data return and destruction upon contract termination is governed by *Information Security Requirements* (Appendix C).

m.  Indemnification: Notwithstanding the provisions in *Standard Clauses for All Department Contracts* (Appendix B), the Offeror agrees to indemnify, defend and hold harmless the State and the Department and its respective employees, officers, agents, or other members of its workforce (each of the foregoing hereinafter referred to as "Indemnified Party") against all actual and direct losses suffered by the Indemnified Party and all liability to third parties arising from or in connection with any breach of this section, Use and Disclosure of Protected Health Information, or from any acts or omissions related to this section by the Offeror or its employees, officers, subcontractors, agents, or other members of its workforce, without limitations.  Accordingly, the Offeror shall reimburse any Indemnified Party for any and all actual and direct losses, liabilities, lost profits, fines, penalties, costs, or expenses (including reasonable attorneys' fees) which may for any reason be imposed upon any Indemnified Party by reason of any suit, claim, action, proceeding, or demand by any third party which results from the Offeror's acts or omissions hereunder.  The Offeror's obligation to indemnify any Indemnified Party shall survive the expiration or termination of this Contract.  This section is not subject to the limitation of liability provisions of the Contract.

n.  Miscellaneous:

   i.  Survival: The respective rights and obligations of Business Associate and the "covered entities" identified herein under HIPAA and as set forth in this Section, USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION, shall survive termination of the resulting Contract.

   ii.  Regulatory References: Any reference herein to a federal regulatory section within the Code of Federal Regulations shall be a reference to such section as it may be subsequently updated, amended, or modified, as of their respective compliance dates.

   iii.  Interpretation: Any ambiguity in the resulting Contract shall be resolved to permit covered entities to comply with HIPAA.

## 5. <u>Entire Contract</u>

The resulting Contract, including all appendices, constitutes the entire Contract between the parties hereto and no statement, promise, condition, understanding, inducement, or representation, oral or written, expressed or implied, which is not

# Exhibit A-3A

contained herein shall be binding or valid and the Contract shall not be changed, modified, or altered in any manner except by an instrument in writing executed by both parties hereto, except as otherwise provided herein.  The Contract is subject to amendment(s) only upon mutual consent of the Parties, reduced to writing and approved by OSC and subject to the termination provisions contained herein.



| | | | | | | |
|---|---|---|---|---|---|---|
| | █ | █ | █ | █ | | █ |
| █ | █ | █ | █ | █ | █ | █ |
| █ | █ | █ | █ | █ | █ | █ |

**"Contract Fees"**
**Mental Health and Substance Use**
**Disorder Program Contract C000743**



"Contractor's Technical Proposal", Mental Health and Substance Use Disorder Program Contract C000743



**A Carelon Behavioral Health Response to:**

# New York State Department of Civil Service Request for Proposals for Mental Health and Substance Use (MHSU) Disorder Program

Technical Proposal

May 3, 2023

Master (USB)



# Section 5: Technical Proposal

## Table of Contents

| | | |
|---|---|---|
| 5.1 | Executive Summary | 3 |
| 5.2 | Account Team | 10 |
| 5.3 | Implementation Plan | 31 |
| 5.4 | Member Communication Support | 46 |
| 5.5 | Reporting Services | 60 |
| 5.6 | Customer Service | 65 |
| 5.7 | Enrollment Management | 76 |
| 5.8 | Claims Processing | 83 |
| 5.9 | Plan Audit and Fraud Protection | 91 |
| 5.10 | Appeal Process | 100 |
| 5.11 | Provider Network | 111 |
| 5.12 | Center of Excellence for Substance Use Disorders | 144 |
| 5.13 | Other Clinical Management Programs | 147 |
| 5.14 | Pre-Certification and Concurrent Review for Mental Health and Substance Use Disorder Services | 164 |
| 5.15 | Consolidated Appropriations Act | 191 |
| 5.16 | Disabled Dependent Determinations | 193 |
| 5.17 | Transition and Termination of Contract | 195 |

| | |
|---|---|
| Exhibits | |
| Exhibit 1 – Performance Guarantees (RFP Att. N) | 196 |
| Exhibit 2 – Biographical Sketch Form for Account Team (RFP Att. 14) | 205 |
| Exhibit 3 – Sample Implementation Plan | 244 |
| Exhibit 4 – Communication Samples | 246 |

Exhibit 5 – Biographical Search form for Member Communication Support (RFP Att 14) ... 246

Exhibit 6 – Sample Financial Reports ... 273

Exhibit 7 – Sample Utilization Reports ... 299

Exhibit 8 – Data Sharing Agreement ... 470

Exhibit 9 – Sample Ad Hoc Reports ... 482

Exhibit 10 – Survey Sample ... 490

Exhibit 11a – Provider Listing - Facilities (RFP Att 31) (USB only) ... 530
Exhibit 11b – Provider Listing - Practitioners (RFP Att 31) (USB only)

Exhibit 12 – Provider Network Summary Worksheet (RFP Att 32) ... 530

Exhibit 13a – GeoAccess Summaries ... 532
Exhibit 13b – GeoAccess Complete Reports (USB only)

Exhibit 14 – Provider Comparison (RFP Att 33 and 34) (USB only) ... 536

Exhibit 15 – Sample Communication Materials for ADHD Program ... 539

Exhibit 16 – Sample Communication Materials for Depression Management Program ... 541

Exhibit 17 – Sample Communication Materials for Eating Disorders Program ... 543

Exhibit 18 – Sample Provider Quality Report ... 545

# 5.1 Executive Summary

In the Executive Summary, the Offeror must describe its approach and proposed approach to administering the Mental Health and Substance Use Disorder Program, which covers over 1.2 million lives and incurs claims costs of approximately $400 million annually. The Offeror must have the ability, experience, capability, and integrity to fulfill the requirements of this RFP. The Executive Summary must include a list of client organizations to clearly demonstrate and support that it meets the minimum requirement of 3.0 million total covered lives in its U.S. book of business. In determining covered lives, the Offeror should count all lives (e.g., an employee, a spouse, and two (2) children are counted as four covered lives).

## Commitment to Service and Partnership

Carelon Behavioral Health, Inc. (Carelon), formerly known as Beacon Health Options, Inc., is poised to be the Empire Plan's long term partner for behavioral health. Carelon's combination of scale and experience administering the Mental Health and Substance Use Disorder (MHSUD) Program, has generated fiscal certainty and operational excellence, while providing a comprehensive portfolio of innovative behavioral health programs and services for Empire Plan enrollees and their dependents (members). Carelon has served the Empire Plan, Excelsior Plan, and the Student Employee Health Plan (The Empire Plan) beginning in 1972 and now under the current contract since 2014. Our commitment to behavioral health, superior service, and to creating jobs in New York State and specifically the Capital District is resolute.

## Approach and Proposed Direction

Carelon is committed to continuing our partnership with the Department and key stakeholders to advance recovery focused behavioral health access, continuity, quality improvement, and evidence based treatment as we have done for a total of 25 years for the Empire Plan. Our collaboration with the Department and the Office of Employee Relations as well as our employment commitment on approving in the Capital Region to support the Department is evident as we support a wide range of efforts aimed at improving behavioral health in New York.

By issuing this request for proposal, The New York State Department of Civil Service (Department) has signaled that continued investment in a behavioral health relationship that provides effective benefits management for their employees and their dependents. Carelon's proposal describes how we will facilitate the local delivery of person and family centered coordinated behavioral health services that promote recovery and resiliency and foster independence within the MHSUD Program. In this next chapter of our relationship, we will focus on identifying and driving integration opportunities with physical health, pharmacy, and hospitals systems to increase whole health and wellness dimensions of members, by collaborating with providers, and furthering alignment across fiscal incentives aimed at whole health outcomes, we will engage stakeholders to continuously innovate to improve service delivery through proactive program management, data analytics, and outcomes based reporting.

Unparalleled Industry Experience. Behavioral health is all we do, and we understand the deep connection between the mind, the body, and the environment our members live in. For more than 35 years, Carelon has provided behavioral health care management services that offer the full spectrum of behavioral health care our value resides in an unmatched ability to integrate all available services as a single source provider. Our programs include direct contracts with federal, state, or local governments and subcontracts



With health plans we have a broad network of providers available to members, with services available to those with short term or situational needs and would benefit from outpatient services to case management services for persons facing complex behavioral health challenges. We are clinical leaders with a purpose, connecting people to the right care to help them achieve long-lasting results because of the workforce model, a reputation for providing outstanding, clinically-led, customized services and quantifiable outcomes.

Today, Optum serves more than 45 million members across the country. Our mission is to help people live their lives to the fullest potential. We are a specialty, managed care organization that is singularly focused on behavioral health care, employee well-being and recovery. We offer a nationwide specialty behavioral health network of more than 160,000 providers and facilities, as well as a large virtual care provider pathway across the country. Whether someone is coping with everyday stress, recovering from a life crisis such as illness, loss or a substance use disorder, or longer term mental health illness, our work aimed at providing makes a meaningful difference in their lives.

National Thought Leader with Tenured Experience with the Empire Plan. The Department plays a vital role in the lives of the enrollee population they serve. Within the scope of the responsibility that the Department has to its public more significantly than the behavioral health needs of enrollees and their dependents. Along with the breadth of national experience that we bring, Optum's 20+ years of experience has offered leading fiscal performance, quality customer services to enrollees and care of managed care. Our operations and local unit at a Service Center in the Capitol Region close to the Department. As such we have drawn from real time knowledge and have developed relationships at both the state and local level that assist us in seamless program operations. Our experienced Empire Plan leadership team will provide the seamless quality resources required for the Department and your members and we will be able to improve access and availability of behavioral health services in New York to improve overall health outcomes for all members.

Enhanced Support for Provider and Stakeholder Community. COVID-19 and the result of an immediate sudden shutdown has made a lasting impact. The pandemic has affected many aspects of people's lives: employment, schooling, living situations, homeschooling, working from home, socialization, increase in domestic and child care violence, increasing rates of anxiety, depression — affecting our physical, mental, and emotional wellbeing. The long-lasting impact has caused the demand for behavioral health services to escalate, making connecting members to care even more important.

In keeping with our values, Optum recognizes this as a national priority and an opportunity to lead by drawing upon our provider and stakeholder support offerings with the members in mention, the behavioral health services, especially for substance use disorder, SUD, anxiety, depression, risk, and suicide prevention. Our members who need the highest risk receive priority by contacting and launching support services from Optum's clinicians via our Network team, a specialized provider with on-going virtual consultation and behavioral health services at virtual formats.

The Optum Provider Quality Management (PQM) team that oversees everything makes a difference and provides a series of telehealth training sessions for providers, including behavioral health, behavioral health and medical subject matter experts trained to deliver several trainings that focus on topics of interest, including in the following topics:

-  Compassion resiliency and staff's how to keep reports to treatment stress

-  Integrating harm reduction strategies into addiction treatment practice





- Equitable Value structure realignment
- An overview of which positions land in each year/bucket

The tool that provided in 2023 reached more than 1,640 providers, and was also very well received. With a 92 percent satisfaction rate and a net score of providers reporting they would recommend the plan to their fellow providers.

Improved Provider Network Adequacy and Access. A robust provider network is foundational to ensuring that members can receive the right care at the right time in the right place. In New York and across the country, Carelon strives to make more than 40,000 providers available across our network of specialized facilities. Carelon's continued integration with Beacon Health has resulted in network growth for Empire Plan members. Moving quickly as the increasing demand for behavioral health services exacerbated by the pandemic, Carelon continues expanding our network to meet demand. Just as important, we focus on making sure that covered provider locations are actually available to members. This includes specialty services focusing on population-specific expertise such as services for individuals with autism, substance use disorders and opioid use disorders, and children's services.

Carelon has made developing and implementing strategies to expand access through telehealth a priority. This strategy addresses capacity gaps then improves timeliness of care, while our continued work to recruit and retain a diverse workforce to meet the diverse needs of members and integrating clinical services within the state, while fiscally prudent.

Carelon is also committed to improving New York network access, availability and quality for Empire Plan members and we will continue to expand our network growth based on identified member need, improved provider quality through data analytics and recruiting, and improved health outcomes for members through value-based care delivery models. We are focused on building value-based payment models for providers to help achieve triple aim outcomes of cost effectiveness, high quality access, and improved member and care team experiences.

In 2025 we have added approximately 4,500 providers to our national commercial network and 1,000 providers to our New York network for Empire Plan members, collectively this is a 12 percent increase and for New York there is a 22 percent increase in the total of the plan. We will be growing our national network by an additional 10,000 within the plan's reach of members.

## Carelon's Commitment to the Empire Plan
Under the new contract, Carelon commits to the following areas:

Local Program Management. In support of the Empire Plan, Carelon will continue to deliver core administrative, clinical, peer support, claims, customer service and provider relations functions locally. Our local office will remain in New York and work close to the state workforce, enabling local, convenient, and integration of services. Carelon's dedicated account team will be the single point of contact and hold accountability for day-to-day operations.

Transparency, Collaboration, and Partnership. Our dedicated and local team is ready to support the needs of the state, plan members, providers, and other stakeholders. We will engage key communication and transparency through reduced data analytics and reporting. We will partner with your organization to drive improved processes, collaboration, and ensure members have access to high quality services.





**Commitment to Recovery and Wellness.** Carelon develops systems of care that promote recovery and resilience, weaving this approach through our behavioral health programs from prevention and rehabilitation support to intensive care management approaches for members and their families. Therefore, our commitment as champions of hope and recovery goes beyond monoclinical culture. We recognize that people with mental illness or substance use disorders benefit from working with others who have had similar experiences and reached a high level of recovery. Our Peer Specialists will engage and assist members and their families to connect them to services needed in the community. Our enhanced member website will offer additional member resources focused on wellness and support.

**Person-Centered, Whole-Person Care.** We developed our Clinical Model of Care to operationalize whole-person management. Our clinical programs are anchored around care integration and engagement, creating high-quality care for members who otherwise have an ordinary experience. Our Model of Care seamlessly integrates with medical carriers and pharmacy benefit centers to support all members based on their intensity of need. We have the expertise to send members along the spectrum, including those with complex and complex care needs. Carelon uses advanced predictive analytics to identify at-risk sub-populations for clinical intervention. Our local, clinical-based management teams working relationships with the Empire Plan medical and hospital carriers and other providers as necessary, and we address each individual's needs holistically, developing a personalized care plan reflecting their goals for recovery. We will support members by connecting them with peers with lived experiences who can help them toward complete spectrum of care. Our clinical programs coordinate health care by and integrate services across behavioral health, medical, pharmacy, and social determinants of health needs.

**Evidence-Based Member Engagement and Approach to Care.** Carelon delivers tailored behavioral health services to members wherever and whenever they need them. We provide high touch and lighter services through our clinical referral line to encourage members, listen to and understand their needs, and connect them to the most appropriate services. By doing so, we more effectively and successfully transition individuals from unnecessary high-cost care to more evidence-based and appropriate community-based services. Our approach to care and utilization management is to help members receive the right care they need and connect them to the right resources to promote recovery and wellbeing.



**Multimodal Access to Services.** Today's behavioral health issues are far from simple. With increased demand to address a broad range of conditions, people need access to relevant quality care, and they want it quickly and in a way that makes it convenient to them. In addition to our current telephonic member engagement service, Carelon will implement a new member engagement website accessible through web browser or phone. In 2024, it will comply with all accessibility guidelines, and it will feature the ability to translate the website into languages other than English.

Our new innovative unified digital member website will offer a proactive, multichannel experience with access to clinical experts, providers, self-guided resources, digital content, and other information needed by members to improve their care journey. It will also enhance a member's ability to search and connect to services, including through our new telehealth platform and expanding our telehealth virtual provider network.



**Customized Behavioral Health Technology.** We built our information technology platform from the ground up to serve the specialized needs of the behavioral health management business. Our platform integrates all core business functions, and we have continued to build a robust infrastructure fully capable of ongoing support of the contract and meeting all security requirements and service-level agreements. Carelon's enhanced capabilities support all necessary inbound and outbound file feeds, such as 834 eligibility files, accumulator, and claims files. As the incumbent, we can ensure the continued quick and accurate flow of data that reflects the customized process in place to the benefit of the Department. Carelon's IT staff offers the Department experienced professionals who are well versed in implementing and maintaining data interfaces with your systems and are accustomed to the level of service and IT capabilities required by the Department.

**Carelon knows every call is important.** The Carelon Telephony infrastructure has been upgraded to ensure call center efficiency and availability to meet all performance guarantees, while providing superior member service experience. Carelon has strong duplication and replication at every step, and in the event of failure of either of our telephony carriers, we can switch to a backup plan promptly. This capability ensures that Carelon can keep call center operations running whether an issue arises within Carelon or externally with a carrier.



American Red Cross
Eastern New York
Region Chapter
Sound the Alarm

**Active involvement with community organizations.** Carelon is actively involved in the local community, partnering with, and supporting local organizations. We support a wide range of efforts aimed at improving behavioral health in New York and the quality of life in the community we share. We strive to be a strong partner working to give back and improve our communities.

As an example, Carelon works closely with the National Association on Mental Illness NYS (NAMI-NYS) as sponsors and participants in many of their local initiatives. We also work with the Alzheimer's Association of Northeastern NY, sponsoring their Annual Caregivers Conference.

Many of our employees live and work in the Capital Region and volunteer with local organizations as well as donate to many important causes including the Homeless and Traveler's Aid Society (HATAS) & Young Women's Christian Association (YWCA) clothing collection; the Read Across America Day Book Drive; and the Back to School Drive where ( employees donated school supplies for local teachers and children.

Lastly, to better support the communities we serve, Carelon sponsors a Social Determinants of Health outreach vehicle to serve residents of the state of New York. We use this vehicle to support behavioral health awareness campaigns and local events and to bring resources directly to the community where our members live, work, and play. Examples of outreach efforts include hosting food and coat drives, sponsorship for a local NAMI chapter walk, participation at local community sporting events, and delivering crisis response after a potentially traumatic event. In May 2023, Carelon will be hosting Mental Health Awareness weekend at Citi Field. The van will be on the plaza with several activation activities, and May 6 will be Mental Health Awareness Night at the ballpark.



## Why Carelon

Carelon is a trusted partner with a long, successful history serving Empire Plan members. Carelon has served the Empire Plan, Excelsior Plan, and the Student Employee Health Plan beginning in 1992 and now under the current contract since 2014. Our commitment to behavioral health, superior service, proven outcomes, and to keeping jobs in New York State and specifically the Capital District has not changed. We still believe we are the best partner to manage the complexities of a rapidly evolving care delivery marketplace, address ongoing regulatory change, and support the Department in providing effective and affordable care without any member disruption. We strive to improve the wellbeing of your membership through an integrated approach to meet members' needs and we are eager to continue our partnership with the Department to deliver innovative and member-focused behavioral health programs to serve Empire Plan members.

We are passionate about behavioral health services and are committed to improving the health outcomes of members. Carelon offers a focused, mature, well-managed organization in every aspect, one that enjoys high satisfaction ratings year after year from clients, providers, and members. Carelon's combination of scale and experience administering the NYSHIP Program and our commitment to innovation and operational excellence provide a comprehensive portfolio of behavioral health programs and services for Empire Plan members. Our vision, our clinical expertise, and our business and technology investments have all been directed toward one goal: helping people live their lives to the fullest potential.

We are excited and grateful for the opportunity to continue our collaboration and positively impact the health and wellbeing of Empire Plan members.





## 5.7 Account Team

Carelon's appointment of our Account Team, who currently manages the Department's MHSU Disorder Program, will continue to meet or exceed the requirements of Section 5.7 Account Team.

Along with the wealth of national experience that we bring, Carelon has been supporting members in the Empire Plan for a total of over 25 years. Our operations are local, with a Service Center in the Capital Region, in close proximity to the Department. As such, we have deep local market knowledge and have developed relationships at both the state and local level that assist in successful program operation. Our long-tenured Empire Plan leadership team will provide this same high-quality, responsive services for the Department and your members, and we will continue to improve access and availability of behavioral health services in New York to ultimately improve whole health outcomes for all members.

> The Offeror must complete the Biographical Sketch Form (Attachment 14) for all key personnel, including Subcontractor key staff, if any, of the proposed Account Team. Where individuals are not named, include qualifications of the individuals that will fill the positions. The Offeror must provide:

Carelon will continue to provide a highly qualified Account Team based in and from New York. Carelon has completed the Biographical Sketch Form for all key personnel and provided this information as Exhibit 2 – Biographical Sketch Form for Account Team (RFP Att. 14).

> b. The name and address of the Offeror's main and branch offices, and the name of the senior officer(s) who will be responsible for this account.

## Carelon's Main and Branch Offices

Carelon's headquarters (main office) is located at 1000 State Street, Suite 302, Boston, MA 01940. We will continue to service the Department's MHSU Disorder Program from our Carelon Service Center located at 15 Pine West Location, NY 12110, in close proximity to the Department for your convenience.

In addition to our Latham Service Center, Carelon operates Shared Service offices in Miami, Florida, Santa Clara, California, Woburn, Massachusetts, Winston-Salem, NC and a national call center in Ashburn, Virginia.

## Senior Officers



> 37. An organizational and staffing plan that includes the roles and responsibilities of key personnel involved in administering the VHSU Disorder Program, their planned level of effort, anticipated duration of involvement, and their daily level of availability, which is generic and must be included in the proposal. When listing the Director's Staff and Staff from any Subcontractor, that and their names and titles, to be used in delivering the project services.

## Organizational and Staffing Plan

Below, we provide our organizational and staffing plan with the roles and responsibilities of key personnel outlined as well as their planned level of effort, anticipated duration of involvement, and their daily level of availability. This team will administer the VHSU Disorder Program.





Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023





























## Organizational Charts

We provide our organizational charts on the next two pages detailing responsibility for functional areas necessary for the continued support of the Department's MHSU Disorder Program. The first organizational chart shows the staff and functional areas that support the current Empire Plan program. The second chart depicts the relationships between the Empire Account Team and Carelon's overall corporate structure. This structure provides direct access to and oversight by Carelon's most senior executives across all functional areas of the organization.





Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



Section 5 Technical Proposal
Evidence of Item

- Reporting relationships and the responsibilities of key personnel on the Account Team and how the team will interact with other departments such as the call center, clinical services, reporting, auditing, and network management within Offeror's organization. Describe how the Account Team interfaces with senior management and ultimate decision-makers within Offeror's organization; and

### Reporting Relationships







## 3.5 Implementation Plan

Corelogic's implementation approach will meet all requirements of Section 3.5 Implementation Plan. A successful program rollout and implementation of any new services selected by the Department is to documented in maintaining the confidence of the Emotional Care enrollees and their dependents (members) and encouraging adherence and use of MHSUD program services.

The Offeror must provide a detailed Implementation Plan in narrative, diagram, and timeline formats, designed to meet the implementation by the specified completion dates.

## Implementation Plan Narrative

We are providing a description of our implementation approach and a sample plan reflective of tasks and activities for implementation. The January 1, 2024 fundamentally, and by requirement, the implementation is a much less complicated one, many of the key deliverables/milestones that a new vendor would be required to complete have already been completed, tested, and implemented.

However, we have proposed some new and refreshed innovations, programs, and platforms for the new contract and provided an implementation plan that ensures service are completed quickly with no interruptions in service.

Corelogic follows a disciplined phased lifecycle for our implementations that clearly defines all of the key activities, deliverables, and milestones and provides transparency of status and traceable control. The phases are outlined below. Please note the implementation life cycle narrative below is reflective of Corelogic's standard implementation approach and methodology. Some steps and deliverables may not be applicable to this case.

### Initiation Phase

Before our actual implementation process, we have several core implementation activities that we will perform to guarantee success. During the initiation phase, we will derive and finalize our data retention agreement, define the implementation governance, schedule the implementation kick-off meeting, and assign resource resources. This phase will require the engagement and input of leadership and management level staff from the client with knowledge of the entire scope of the implementation.

### Planning Phase

The planning phase is where we will focus on the design of the program and begins with detailed joint discovery meetings where we confirm all contract requirements, assumptions with the client and assign a group of all key program requirements. Traditionally during this phase we require decision making that is quickly and are knowledgeable in the overall account structure, benefit plan offerings, eligibility requirements, letter requirements, call center requirements, claims requirements, financial reporting, and network development.

### Execution Phase

The execution phase encompasses the bulk of our implementation activity. This is where we develop our workflows, build out our application as well as perform benefit configuration, reporting, and data exchange activities. The stoplight system is used to monitor progress and notify the leadership of issues should they arise.



### Testing and Training Phase

This vital stage in our process enables troubleshooting of any problem areas with a Model Office/End to End testing period to test in a "real world" environment and remediate any disruptions. Rigorous testing is key to successful efforts with critical data exchange updates, enabling a smooth transition as we move into standard operations. Staff, provider, and other key stakeholder training is also completed during this phase.

### Go-live and Monitoring

During this phase, we monitor all aspects of the new operation for a minimum of 90 days to ensure success. This will include post go-live reports measuring key metrics and progress against performance standards. We will also perform a thorough audit of all contract requirements to confirm we delivered against the agreed upon standards.

Using this definition, Carelon will work with the Department to create an implementation plan to meet both current requirements as well as any new requirements and capabilities specified in the agreement.

### Transition into Phased-in Services

Carelon will ensure a smooth transition from implementation to a day to day operations state. We do not view implementation as an isolated set of activities, but rather as a continuum from program development and onward through post service start date operations. SME continuity is maintained throughout the individuals that contribute to program design both participate in the implementation and support day to day operations, including the later implementation of phased-in services. While there is no formal transition milestone, it is a natural transition to a steady state with a consistent team.

On the following page, we provide a diagram outlining the phases of our implementation process.



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



# Standard Implementation Life Cycle

| Initiation & Planning | Execution | Readiness & Testing | Go Live & Monitoring | Transition and Closing |
|---|---|---|---|---|
| Establish project governance | Manage workgroups & outputs | Conduct systems and end-to-end testing | Monitor key metrics to ensure Payment is operating as designed | Confirm SOP's for BAU |
| Formally kick-off implementation | Manage project governance & escalation | Oversee operational readiness activities | Facilitate internal and external go live meetings | Close out workstreams with area leads |
| Align resources | Mitigate risks | Staff onboarding and training | Issues tracking until resolution | Document mitigation plans for remaining open items |
| Establish & kick-off ongoing meeting cadence | Distribute status reports | Prepare for go-live | Transition to day to day operations | Transition to Business as Usual Operations |
| Confirm required deliverables and validate key assumptions | | | | Solicit feedback and conduct lessons learned |
| Finalize implementation plan & Timeline | | | | |

Please note that the implementation life cycle diagram is reflective of Carelon's standard implementation approach and methodology. Some steps and deliverables may not be applicable in this case (dependent on additional scope items that may be required for 1/1/24.)

Section 5: Technical Proposal
5.3 Implementation Plan

33



a. [text illegible due to degradation]

b. [illegible]

c. [illegible]

d. [illegible]

e. [illegible]

We have provided a sample Implementation Plan as Exhibit X. The document includes timeframes for task completion, testing, and go-live. Any new requirements and capabilities have been consolidated and integrated into the Empire-specific Implementation plan.

Please note that the Implementation Plan is reflective of Carelon's standard Implementation approach and methodology for a new client. Some tasks and deliverables may not be applicable or may depend on additional special items required for NYS. Below, we describe our key activities, many of which have already been completed or are ongoing today, which enable the smooth operation of the Empire Plan Mental Health and Substance Use Disorder Program.

## Training of Call Center Staff

Carelon's call center staff, consisting of Customer Service Representatives and Intake/Line clinicians, directly interface with members and providers on the Empire Plan's program details, and they will require training in order to continue to support the Department's program. Our call center staff are educated on the Empire Plan, and we work to ensure that our well-trained staff provides each member with high-quality service.

We are committed to providing the training, tools, and infrastructure our employees need to provide productive and efficient service that meets Empire Plan member expectations. Our customer service philosophy lies in our commitment to provide members and providers with the most accurate and informed benefit, eligibility, claims, and authorization information in the most effective, efficient, and compassionate manner. We understand the need for and importance of the services we provide and place the customer experience at the heart of our customer service philosophy.

### Our Hiring and Training Process

We are systematic and demanding in our interview process to ensure that we select competent and caring individuals. We recruit and thoroughly train our dedicated call center staff, as well as all service experience staff, to appropriately assess the needs of a member and provide training that provides the necessary shaping and improvement of all call center staff. We provide a variety of learning opportunities to support employee professional growth and development. This includes effective training that provides the skills necessary to provide quick resolution for members needing information that will prepare them to serve each customer effectively and practice to have a wide scope of call/service requests received.

All customer service staff attend General and Health Sensitivity training, which provides the groundwork for recognizing and identifying the characteristics of our members and behavioral health customer service.





site. This training provides our staff with key phrases and statements which signal when a referral transfer to a dedicated Clinical Care Manager is required.

Specialized Carelon staff deliver customer service focused on program integrity, compliance, and regulatory requirements. This focused training reinforces to staff that all inquiries are handled ethically and consistent with all applicable contractual, State, Federal, and regulatory requirements.

Customer Service Representatives undergo an intensive training program of four to six weeks that covers all phases of the Empire plan program prior to taking live calls. The Empire plan-specific training includes extensive information on benefits and program design. New Customer Service Representatives will also receive training that provides them with an overall understanding of Carelon's operations, including care management, provider relations, and claims. New staff training includes a robust review of detailed procedures including applicable confidentiality requirements. Customer Service Representatives are educated on the sensitivity of the information available and State, Federal, and HIPAA confidentiality requirements. Procedures clearly define what types of information may be released, and to whom. Specialized staff receive training on NCQA requirements and applicable State regulations such as/risk-prompting protocols, grievances, and pre- or non-payment of claims. In addition, new staff also receive training on how to use and access online reference tools and workflows.

An experienced trainer and experienced dedicated Empire plan staff facilitate the training. Our remote training consists of online and instructor-led sessions via Teams, web-based training modules, and shadowing experienced representatives through service observation and practical application. This remote training mirrors the live call center and each new hire has a fully equipped desktop and Avaya soft phone to enhance the training experience and best prepare employees to serve your members.

We take a phased-in approach to releasing trainees to the call center during the formal training phases they begin to handle live calls within a team one mentoring to ensure the quality of members' experience. Trainees are only released to the call center when they successfully completed class-core training and each new quality assurance expectations. Call center management, quality, and training staff emphasize dedicated on-the-job mentoring for six weeks. We provide ongoing training on internal clinical policy standard changes, network updates, and customer-focused workgroups. We provide additional training based on needs identified through quality or inquiry data workgroups or resulting from national procedural or client operational change requests or updates.

New Customer Service Representative training consists of the following topics:

### New Customer Service Representative Orientation Topics

- Empire Plan Benefit Design, Culture and Service Expectations
- Handling Crisis Calls
- Performance Standards
- Explanation of Benefits
- Coordination of Benefits and Network Access
- Confidentiality and HIPAA
- Certificate of Insurance
- System Security
- Member and Provider Web Portals
- Release of Minor PHI and Age of Majority
- Billing Codes and Fee Schedules
- Levels of Care
- Provider Licensure
- Facility Overview and Facility Accreditation
- Behavioral Health Conditions
- Department Overview
- Code of Conduct and Integrity
- Inquiry Documentation and Management
- Sexual Harassment
- Information Systems



- Fraud and Abuse
- Policies and Procedures
- Claims Processing Overview
- Medicare
- Appeals
- Behavioral Health Sensitivity

- Quality Audit Process
- Prompt Payment Regulations
- Single Case Agreement Process
- Complaints and Grievances
- Customer Experience and Superior Service Telephonic Skills

## Referral Line Clinical Training

All Referral Line clinicians are licensed behavioral health clinicians with at least three years of clinical experience in a mental health or substance use disorder setting. Upon hire, Carelon provides comprehensive, focused training and orientation programs for all Referral Line Clinicians to ensure that they are prepared to provide high quality assessments clinically and professionally, referrals, care management and medical necessity reviews of treatment provided at all levels of care. All full- and part-time clinicians must participate in each phase of the training or orientation process. This training includes supervisory and subject matter expert presentations to staff, reading and discussion of relevant articles, review of all clinical policies and procedures, clinical criteria, guidelines, protocols, and phone and computer system training. Key topics include:

- Carelon's Clinical Philosophy and values
- Carelon's Medical Necessity Criteria
- The Expression MH/SU Disorder Diagnosis
- The Clinical Assessment and Referral Process
- The handling of urgent situations and crisis calls, to include:
  - Suicidal ideation
  - Safety Planning
  - Clinical techniques for crisis calls
  - Non-suicidal self injury
  - Handling Difficult Callers
  - Risk Rating procedures
- Engagement and Sensitivity
- Quality of Care and Complaints

## Website Development

Empire Plan members will continue to have access to the customized Empire Plan website that is fully implemented today. Members can seamlessly navigate from the NYSHIP Online website to the Achieve Solutions website for the Empire Plan or can access it directly at https://www.achievesolutions.net/empireplan.

Our customized member website offers members a rich and diverse selection of articles, tips and information about behavioral health issues and other life events. Members can learn about healthy living skills, disease prevention, and early intervention to make positive life decisions and improve their health.

We are also excited to share that, under the new contract, Carelon will update our member engagement website for Empire Plan members to provide an enhanced experience. Our new member engagement website for Empire Plan members will contain a sophisticated online suite of behavioral health tools to enhance member convenience and optimize wellness. We will work with the Department to customize the platform, which will create one entry point to all behavioral health services including updated access to educational content, self-help tools, and a 24/7 telehealth platform with access to virtual visits. It will include online intake and triage to help direct members to appropriate care and emergency services if needed, self-help tools and digital health solutions for care, linkages to a provider, and tailored resources based on prevalent member behavioral health concerns.

The new website can be customized to meet the needs of Empire Plan members and branded for the Empire Plan. The timeframe for implementation, testing, and finalization of the new member engagement website will be completed by the active date of January 1, 2026. In the interim, Empire Plan members will continue to have access to their customized Achieve Solutions website.

## Network Development

Carelon has an extensive network of providers in New York and across the country. Members have access to more than 160,000 providers and facilities across the country that span all levels of care and specialties. As the current carrier and vendor, Carelon consistently meets GeoAccess guidelines for members. However, due to the increasing demand for behavioral health services only exacerbated by the pandemic, Carelon is committed to improving local New York network access, availability, and quality for Empire Plan members. We will continue to explore network growth based on identified member needs, improve provider quality through data analysis and reporting, and improve quality outcomes for members through value-based contracting models.

While we already have a robust network of providers throughout New York, we are committed to continuing to add providers to our network to ensure adequate access and availability to all provider types and specialties for your members.

Sources for provider recruitment include, but are not limited to:

* Access analyses that review of out-of-plan requests for cultural and ethnic needs, referrals for emergency or urgent services to ensure member access in line with established standards, out-of-network utilization.

* Referrals from providers who are already under contract with Carelon. Network referrals ensure the recruitment of providers who will bring not only their individual talents, but who will work productively with their peers to provide clinically sound, cost-effective behavioral health care services.



- Recommendations from our New York-based Empire medical directors and clinical care managers, proactively done working off our Clinical Referral List based on each member's needs.
- Recommendations from the Department and Governor's Office of Employee Relations, which would be prioritized and implemented already.



**Implementation of Additional Telehealth Services**

To enhance access to services in a multimodal fashion and provide the best member experience, Carelon believes offering a telehealth ecosystem with multiple provider options is critical. We have also taken a role in the process of recruiting several national telehealth providers to enhance access and availability of services to members. This includes specialty services focusing on population-specific expertise such as services for individuals with eating disorders, substance and opioid use disorders, and children's services. Our experience shows that by creating this ecosystem we ensure there is sufficient supply to support our members for appointments. More detail on these new providers is provided in Section 3.0 Provider Network.

As Empire moves, Carelon will also be implementing a new custom-built member website for Empire Plan members. This website will include a 24/7 telehealth platform that links to all available telehealth providers in the network. Members can choose the solution based on their needs to register (which will include a verification of benefits) and schedule a session with the network provider of their choice in real time.

As the incumbent Mental Health and Substance Use Disorder Program administrator, to be clear there will be no interruption or conflict. This means there is no potential for disruption in care.

Should the Department require any new data feeds, the timeframe for implementation, testing, and finalization of any new data feeds would be dependent on specifications such as whether Carelon standard layouts or custom layouts are required and which workable layouts. We will work with the Department to determine requirements and the overall timeframe for implementation should any changes be required.



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



## 5.4 Member Communication Support

Davison's member communication support will continue to meet or exceed the requirements of Section 5.4 Member Communication Support. Davison takes a holistic, multi-modal approach to communicate with members. We help members become active participants in their health care decisions. Our goal is to make members aware of the programs and services available to them, assist them in taking the necessary steps to achieve their goals, and support them in preventing and maintaining good their health. We provide outreach and tools to enhance a member's ability to prevent the onset or worsening of behavioral health issues.

> The Offeror must provide a narrative describing in detail the proposed processes that will be utilized to develop Member communications specified in Section 5.4 of this RFP, including the following:

> 1.  Describe the role of the Offeror's legal department.

The Davison legal department is available to the Empire Plan Account Team for consultation at any time necessary. They are reviewed during the creation of any communications related to a regulatory requirement. The Consolidated Appropriations Act (CAA) or Parity Continuity legal team also reviews and consults on any recommended changes to the Member Certificate of Coverage and RFP model language requirements. Davison's Senior Corporate Counsel, Sharon Volman, is based out of our Latham, New York office and will be the designated staff member available to support this account with any legal question that may arise.

> 2.  Provide two examples of communications the Offeror has developed for other clients.

We provide two examples of communications developed for other clients as Exhibit 4 – Communication Samples.

> 3.  Describe the Offeror's approach to developing appropriate, customized forms, letters, and SBCs for the MHSU Disorder Program, and incorporating the Department's feedback.

Davison will continue to work with the Department to develop appropriate, customized forms and letters, and to draft behavioral health content that can be used in SBCs for the MHSU Disorder Program. We will use our current process to incorporate any of the Department's feedback into the final versions. We are committed to providing the resources and expertise needed for superior decision making.

Our Account Team will work with our Marketing and Communications department, led by Deanna Penn, during program implementation and throughout the life of the contract, to assist the Department with the development of communication materials.



the location, behavioral touchpoint works closely with our dedicated Vendor Team to customize collateral — including letters, tip sheets and brochures — and behavioral nudges or concepts that can be used in space.

- We have in-house designers and fulfillment staff responsible for collateral concept utilization and execution. This team works with our Account Executive during the ideas phase or piloting phase.

- We consider the Department's employees and unions/bargaining as well as WHSU business program goals when developing collateral.

- We deliver collateral in varying media format to complement the Department's existing program.

- Our team of specialists and people designers develop compelling collateral that creatively describe the benefits and encourage program participation.

- The Account Executive acts as the liaison to share concepts until the Department is satisfied with the customized solution.

> 4. Provide information about how the Offeror has worked with other large clients to produce customized communications. A large client is defined as an entity with over 50,000 or more covered lives.

## Process for Working with Our Clients to Develop Customized Communications

Zelis has nearly 40 years of experience working with large clients to produce customized communications. As part of our standard process, materials are branded with the client's legacy program name as well as the unique program phone number and program website URL.

### Client Example

For a specific client, Zelis has worked with the client to educate all residents about the effective use benefits (HSA versus HDP). Our Zelis Marketing and Communications team developed an integrated and customized media campaign using traditional and digital media channels to drive awareness of these regional trusts. Used traditional in conveying what they offer and how to access them. An eight-week multi-channel pilot program campaign reached over 100,000 people and served over 6.5 million ad impressions. Call volumes across the trusts increased in several geographic areas over the campaign.

We also have experience working with our clients to tailor communications to different employee populations, such as regional or remote employees in the field, employees at different office locations, or working from home, and more.

We provide our examples of communications developed for other clients in Exhibit 3 – Communication Samples.

### Our Work with the Empire Plan

For the Empire Plan, our Consumer Account Team acts as a central point available to review and provide feedback on member communications developed by the Department. Prior communications prepared by



b) Describe how the Offeror proposes to maintain an updated file of nationwide MHSU Provider information for purposes of printed directories, understanding the Department requires the to printed provider directory be available for each state except New York and Florida which have greater requirements. Specify whether the Offeror proposes to use the same file source for print directories and the online directory.

Corelan's Account Team works closely with our Provider Data team to ensure the integrity of our provider data is accurate and complete. Both our online and printed directories use the same data source allowing Corelan to easily produce files of our New York Network and our National Provider Network. Through an existing process which includes coordination with the Department's Communications staff we are able to produce files for the printed directory with ease and accuracy. Any updates to the layout for the printed directory including additional data fields are easily implemented without impact to the delivery date.





## Directory Update Protocol for Regular Maintenance



## Adding and Removing Providers and Facilities to the Directory

The directory is linked to our information system, which houses the provider information files. As changes are made to the provider file, the Provider Search application is refreshed nightly.

## Directory Audits to Ensure Accurate Information

Carelon has contracted with an outside vendor to perform directory accuracy audits. These audits include a statistically significant sample from our directories. Carelon uses a vendor, SPH Analytics or SPH (formerly Interpace Health), to complete provider directory accuracy audits. The audit frequency is scheduled bi-monthly. During each audit, at least 400 unique providers (facilities and practitioners) are audited, and all locations for the selected vendor are audited. This sample size provides a 95 percent confidence level in Carelon's audits.

Data elements audited include:

- Practice/group name
- Active participation status
- Gender
- Language spoken
- Practice address
- Telephone number
- Email address
- Website address
- Ages seen by the practice
- Office hours
- Accreditation status
- Board certification

- California NPI and California License Number
- Accepting new patients
- Programs/services offered
- Provider type, discipline, and specialty
- Cultural Competency training
- Telehealth capability
- Hospital affiliations
- Facility type and facility program/services offered
- Handicap accessibility
- Public transportation access

In addition, to allow users to report any provider directory inaccuracies, the online provider directory prominently displays the dedicated toll-free number, electronic form, email address, and a hyperlink to easily report inaccuracies. Carelon documents the receipt, investigation, and outcome of each reported issue or directory inaccuracy.

We are also collaborating with a vendor on a Secret Shopper initiative. This will alert us to data on topics such as accuracy of directory contact information, whether the provider and/or provider location is accepting new patients, availability of first appointment, and types of appointments offered.

> 32. Describe the Offeror's experience developing, implementing, and hosting custom branded websites and/or web portals for benefits information.

Carelon has experience working with the Department and hundreds of other Carelon clients to create custom branded websites and web portals for benefits information. For example, Carelon has experience with developing custom home pages and configuring links to related resources for mental health and emotional wellbeing and other areas of importance to our clients, other vendor partners. We too have experience co-branding your website.

While we stay on the new Carelon website, Empire Plan members will continue to have access to the co-branded Achieve Solutions website that is fully implemented today. Members can seamlessly navigate from the NYSHIP Online website or the Achieve Solutions website for the Empire Plan or can access it directly at https://www.achievesolutions.net/empireplan.

With one click on the custom website, members have access to our secure member self-service Web portals that provide members with access to Empire Plan benefit-specific information, including the ability to:

- Check program benefits
- View a provider
- Check out a provider
- Check claim status
- Check claims history and claims payments
- Download claim forms
- View individual or family out-of-pocket expenses

## New Member Website

Carelon will design, update our member engagement website to all State Plan members to provide an integrated experience. Our new member engagement website for Empire Plan members will contain a comprehensive online suite of behavioral health tools to enhance member convenience and advance wellness.

We will work with the Department to customize the platform. Carelon will create one system for all behavioral health services including customized access to educational content, self-help tools, and digital health programs with access to live coaches. It will include online intake and triage to help direct members to appropriate care and emergency services if needed, self-help tools and digital health solutions, options to connect to a provider, and tailored educational content on common behavioral health concerns. Mockups of the new member engagement website are provided below.

Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



The home page will feature a prominent provider search feature, an online intake and assessment, and the ability to connect to a telehealth provider.

Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



Members can find recommended content, benefits information, and featured resources.

The new website can be customized to meet the needs of Empire Plan members and branded for the Empire Plan. We can partner with you to develop a customized home page and to add links to resources, as well as provide clear reference to the NYSHIP toll free number.

It will comply with all accessibility guidelines and it will feature the ability to translate the website into languages other than English. The timeframe for implementation, testing, and finalization of the new member engagement website will be completed by the go live date of January 1, 2024. In the interim, Empire Plan members will continue to have access to their customized Achieve Solutions member website to ensure no disruption.

> 11.  Complete a second Biographical Sketch Form (Attachment 14), for all staff proposed for involvement in Member Communication Support.

We have provided the requested Exhibit 5 – Biographical Sketch Forms (or PAR-14) for all staff proposed for involvement in Member Communication Support.



Our decision support system contains a comprehensive suite of standardized reports that we use for operational management (for example, behavioral health utilization) as well as client deliverables.

Our reports are categorized by functional area, including:

- Authorization – clinical utilization, cluster management, and appeals
- Paid Claims – utilization, fraud, and abuse, claim logs, and claims processing
- Membership – reports detailing enrollment, including demographic data
- Inquiry Tracking – reports detailing customer inquiries, including complaints
- Call Center – reports detailing call center's telephone statistics
- Provider – reports tracking information on our provider networks

Our reporting suite provides essential information to enable Carelon to monitor business operations. This effort translates into improved service to our clients, a better understanding of the program, and the ability to provide interventions should problems arise.

## Reporting Format

We confirm that we provide reports in the specified format (paper and/or electronic: Microsoft Access, Excel, Word) or any format requested, as determined by the Department.





### Ad Hoc Reports

Our standard reporting package routinely meets expectations and most of your reporting requirements; however, we will continue to provide ad hoc reports and other data analysis as requested. Please see Exhibit 9 - Sample Ad Hoc Reports for the following ad hoc reports we prepared for the Empire Plan:

- MHSUD Claim and Provider Data: The Department of Civil Service requested a historical claim file with data pertaining to all claims processed, beginning January 1, 2019 through October 31, 2022, which was to include in-network and out-of-network claims, as well as claims where Carelon paid as Medicare Primary. In addition to that, there was also a request for data regarding MHSUD providers. The report was to include a listing of all providers treating members during the past twelve months, with provider network status to be included. The file was segmented by Practitioners and Facilities.






# Exhibit A-34

## 5.6 Customer Service

Carelon's customer service will continue to meet or exceed the requirements in Section 4.4 Customer Service. Below, we summarize our customer service efforts on behalf of the Empire Plan and then respond directly to the RFP questions of Section 4.6 Customer Service on the following pages.

In keeping with Carelon's commitment to help people live their lives to the fullest potential, our business service philosophy lies in our commitment to provide Empire Plan enrollees and their dependents (members) and providers with a strong customer service experience. We believe this includes the most accurate and informed benefit, eligibility, claims, access, and authorization information in the most effective, efficient, and compassionate manner. We understand the need for and importance of the services we provide and place the customer experience foundation at the heart of our customer service philosophy. In fact, our member satisfaction survey results illustrate our success:

* 94 percent of respondents said they were satisfied with the services they got from Carelon
* 72 percent of respondents reported overall satisfaction with our initial contact tier
* 92 percent of respondents said Carelon staff members were polite, courteous, and respectful
* 100 percent of respondents reported satisfaction with language assistance, and 98 percent of respondents said counseling/treatment met language needs

Ensuring the quality of the member and provider experience through good customer service is important in every industry, but is more true than behavioral health care. Individuals seek out behavioral health services, often reluctantly, when they are in their most vulnerable states. How a Customer Service Representative treats or interacts with a member can have a profound impact on their experience and willingness to continue to seek out care. Carelon is keenly aware of the critical importance of high-quality customer service and has devoted considerable time and resources to assessing and improving our customer service model. For example, we are in the process of rolling out a training for call center staff on best practices for providing Gender Affirming Care and we are revising our call scripts to incorporate gender affirming language.

We know that improved customer service in behavioral health care is linked to higher member engagement, better member care, and a reduction in preventable high-cost episodes. The primary aim of our customer service process is to deliver high and consistent quality service both in terms of the duration of the member's journey through our articles and in the communication they receive during that journey. Member satisfaction is at the heart of our strong commitment to customer service. This philosophy informs our training practices, employee development departments, and our adherence to benefit and coverage.

As detailed in the following sections, Carelon will continue to provide the strong core services we have provided to date, including access to all information needed for best-in-class customer service, including management of the Empire Plan Consolidated Toll-Free number where members and providers receive representatives who respond to questions, complaints, and inquiries regarding Plan benefits, Network Providers, clinical management programs, claim status, and appeals.



Carelon will also continue to provide members with access to information on all MHSU benefits and services 24 hours a day, 7 days a week, 365 days a year. We will continue to maintain a fully operational dedicated Call Center, including a MHSU Clinical Referral Line, providing all aspects of customer support with warm transfer of calls when appropriate to the MHSU Disorder Program. The Call Center will continue to be staffed by trained Customer Service Representatives (CSRs) who will use an integrated system for management of member calls. We will also continue operation of a Clinical Referral Line (CRL) available to Members 24 hours a day, 7 days a week, 365 days a year.

Currently, members can access member services such as the ability to check authorizations and view claims status via the customized Achieve Solutions website. Moving forward, Carelon will move to a new and enhanced member engagement website, for Empire Plan members, in 2023. This new member engagement website, a "front door" will provide an all contact access point to Carelon services, including telehealth, be accessible by mobile devices, and offer educational and self-help resources that promote self-management and navigation.

1.   The Offeror must provide a narrative describing in detail the proposed processes that will be utilized to develop Customer Service specified in Section 3.5 of this RFP, including the following:















TTY/TDD only relay services for members who are deaf or hard of hearing. This relay line is a confidential service that is available 24 hours a day, seven days a week. All call center staff are thoroughly trained in the use of TTY/TDD services that allow a member who is deaf, hard of hearing or speech impaired to reach us without an interpreter.



Corelan tracks the Empire Plan's call history through our Avaya telephone system. Avaya has a suite of real-time and historical reports we use for trending to ensure we consistently meet telephone responsiveness performance requirements. These reports include calls received, calls handled, abandonment rate, average speed to answer, and service level hold/AG time. This information is available by half-hour intervals, day, month, quarter, and year to date.

Avaya provides a comprehensive suite of reports including historical data for trending and real-time data to ensure we consistently meet telephone responsiveness requirements. The customer service module of our proprietary information system electronically captures all call data, and it provides our staff with secure and easy access to all member and provider information. The customer service module provides immediate access to the necessary information to respond to benefit, eligibility, provider, claims, authorization, and certification related calls. Customer service staff has immediate access to all requests submitted (or a limited list of) support area within Corelan, including the date the request was sent, the operating area it was sent to, as well as the request type (i.e., what assistance the caller was requesting). The system module also provides our staff with real-time data regarding the status of the inquiry/request throughout the life of the inquiry.

Corelan provides the Empire Plan with customized phone prompts and voice recordings. When necessary, Corelan can easily adjust phone prompts and recordings in partnership with or at the direction of the Department, as we have done historically. This is accomplished by informing your account lead of the prompt or voice recording modification needed so that a service ticket can be entered to make the alterations in the system.

These services are all provided without additional charge to the State.



Corelan proposes that the Empire Plan Customer Service phone lines be open and staffed from the hours of 8:00 am to 6:00 pm EST Monday through Friday. In our experience the majority of these types of calls are received during these hours. After hours, weekend, and holiday calls are answered by our Centralized Night Service staff, who receive the same scripts and training as the daytime staff. Our CSRs respond to inquiries regarding eligibility, benefits, claims, and for gathering and documenting demographic information.

In addition, our Clinical Intake Line staff are available 24 hours a day, seven days a week, 365 days a year to handle all clinical calls and provider referrals.








## NICE Workforce Management (WFM) System

Another benefit of the Empire Plan and individuals and families served is Carelon's NICE Workforce Management System. This technology allows Carelon to enter individual call center agent information such as work hours, phone queue priorities, and Carelon's internal Avaya agent ID for each agent. This ensures call history is collected for each agent to find trends in the average number of calls they take in a day, their average call handle time, as well as which phone queues they receive most frequently among other data collection points.

In addition to agent history, the NICE WFM system also allows Carelon to build out the phone queues and expectations. For example, the Empire Plan's RFP is requesting a Service Level Agreement (SLA) of 90 percent of all calls answered within 30 seconds. Carelon can build this into its queues and apply the SLA to the local calendar year.

Once call history is collected in the NICE system, such as call volume, average handle time of calls, and SLA, Carelon can more accurately predict incoming call trends and handle time trends throughout a work day. The algorithms in the system will allow Carelon to be able to see how many agents are required to handle the incoming volume at each interval. We also will develop operational dashboards to provide real time visibility into the Empire Plan Call Center operations to adjust staffing as needed to meet all program requirements.

## Customizable Options

As described above in response to part b, our phone prompts and voice recordings are currently customized for the Empire Plan.



We are committed to creating the training, tools, resources, and infrastructure our employees need to provide accessible and efficient service that meets Empire Plan member and Department expectations. Today, the Empire Plan team accesses all information necessary to address inquiries, including eligibility, benefits, authorizations, provider status, and claims via our CONNECTS platform. Customer service, clinical, referral, care management, reporting, and outsource data are all managed within this system.

Call CSRs are thoroughly trained to appropriately triage all types of inquiries. All newly hired call center personnel undergo extensive training of six to ten weeks on all aspects of the Empire Plan program before they "go live" on the phones.

Highly qualified, experienced training personnel, call center management, and support staff are responsible for the initial training of new staff members. We take a phased-in approach to releasing trainees to the call center. During formal training, they begin to handle live calls with one c   one mentoring to ensure the quality of the member experience. Call center management, quality auditors, and senior level CSRs continue dedicated on-the-job mentoring until the trainee successfully passes their quality ramp-up period.

> "Received a call from a member who wanted to compliment Lilas. The member indicated that she was "so helpful, patient, and a fabulous customer service representative." The member continued to say that Lilas took her time with her and gave her the information that she needed as she gets confused sometimes when calling the insurance companies."

In addition to training on our customer service procedures, CSRs are taught how to recognize urgent, or crisis calls, and to implement Carelon's standard protocol for clinical and/or crisis intervention. CSRs have real time access to Empire Plan specific benefit plan information through our central repository of all client information; this includes plan benefits, eligibility information, and additional client specific information.

We recognize the complex nature of the inquiries received from individuals with serious behavioral health conditions. All CSRs go through clinical sensitivity training, which provides the groundwork for recognizing and identifying the diverse types of calls generated to a behavioral health line. This training provides our staff with key phrases and indicators which signal when a warm or no hold transfer to a dedicated Clinical Care Manager is required.

Additional training is provided based on needs identified through quality or inquiry audits, workgroups, or resulting from national, procedural, or client specific change requests or updates. Our internal quality monitoring processes are described in further detail below.

## Internal Controls and Reviews Ensuring Quality Service



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



Empire Plan Mental Health and Substance Use Disorder Program

Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023







## Back-up System for Primary Telephone System

The Consular Telephony Infrastructure uses two data centers in Las Vegas, Nevada and Ashburn, Virginia. The Avaya cores are duplicated in each of these centers. Ashburn is the primary core and Las Vegas is the secondary.

All inbound and outbound calls route through the Avaya core in Ashburn. We use two carriers, Lumen and Verizon, to route inbound and outbound calls. These calls are routed over Session Initiated Protocol (SIP) trunking. Each Data Center has redundant circuits from each carrier. If a carrier circuit fails in Ashburn, it will failover to the other carrier circuit in Ashburn. If both circuits for a given carrier fail in Ashburn, it will failover to Las Vegas. If all circuits for a given carrier fail, we can move calls to the other carrier through a voip panel to ensure no disruption. This is seamless and calls are not dropped.

In addition to the carrier strategy, our Avaya cores also have failover capabilities. If the Ashburn Avaya core fails, it will automatically failover to the Las Vegas core. All these failover strategies are automatic and require no intervention from the carrier or the telecom support team.

The Command Center can route traffic from an inbound call to any agent skill. As stated, all calls route through the core and has direct to any given call center. As an example, a call destined to Latham will route over the Ashburn core and take the Consular internal network route to an agent in Latham. If Latham is unavailable, the Command Center can route that call to another center or group of agents with a similar skill and/or re-assign another group of agents that skill.

### Telecommunications Disaster Recovery

Every call is important, with duplication and replication at every point to eliminate missed calls. Our consular Avaya architecture is designed to ensure resumption of call handling if the primary central Avaya telephony system is suddenly and unexpectedly out of service.

Consular maintains core infrastructure in two geographically diverse data centers. We have deployed a mirror image of our Avaya phone system, including peripheral services such as member messaging and NICE Call Recording, in a hosted, premier data center in Ashburn, Virginia. This system is kept in hot-standby mode and with all system configurations automatically synchronized to the system in Las Vegas, Nevada. In the event of a catastrophic problem in Ashburn, Las Vegas can be handling all telephony requirements within 30 minutes.

### Staff Training

We confirm that staff members based out of Latham, New York, and Wixom, Michigan locations are trained on the Empire Plan program, and have access through our SOM/SCIS platform to member and provide information.

This provides a seamless service experience, with no loss of data or quality degradation. Back-up procedures are completely transparent to members and providers, who continue receiving service delivery whatever the emergency outage.

Our Business Continuity Plan reinforces essential telephone service recovery for all Service Centers. A temporary Business Recovery Plan (BRP) can be invoked if a call center is not able to continue to provide call handling service as normal. Every service center has its own unique BRP plan. These BRP plans are managed 24 hours a day by our National Telecommunications Group. Our geographically dispersed call centers provide backup call management services for each other. This ensures the level of service employees will receive even when a site may be operating under BRP conditions, meets our standards and client service level.





Exceptional care is delivered by service centers when needed. To activate protocols within a new service, a service center simply calls or e-mails the Technology Call Center and requests support that cannot be put in place out of business hours. This process can be accommodated within minutes of notification, 24 hours, seven days a week, 365 days a year.

The activation of the Business Recovery Plan will not impact the existing protocols for delivering and maintaining necessary services to employees in the event of a disaster that affects the service center that serves our client. Our telephony system allows for back-up and routing and rerouting of service calls to different service centers without inhibiting business recovery. All Care Coordinators — regardless of the service center location — are licensed clinicians trained to quickly assess the caller's needs and assist in getting the member into the appropriate facility and/or appropriate level of care in a safe and timely manner. Further, Clinical Operations, through coordination with our Account Management team, is made aware of client situations so that they can develop a plan for may be an additional protocol which determines level of care for members' categories.



## Feedback via Post-Call Surveys

We are committed to exceptional performance and service to your members every calling the toll-free member. Consequently, we conduct post-call surveys at the conclusion of the call to collect a real-time customer feedback that provides an all-encompassing view of the customer's experience.

Our telecommunications system utilizes flexible and intelligent survey flow capabilities that drill via additional relevant questions within the survey based on the caller's responses. The NICE Customer Feedback Solution provides a direct link between the post-call survey and recorded customer interaction. The system design provides the tools for evaluating the customer experience, scoring in-depth by reviewing the recording of specific interactions, and conducting root cause analysis.

These results provide insight into caller interactions and what an employee takes satisfactory case dissatisfaction. They guide us in ensuring that our business processes are compatible with members' expectations. We also use them to ensure continuous improvement by providing our member engagement customer service and clinical staff with the most current information about call trends.

## Annual Member Survey

Satisfaction or experience surveys of members who have accessed behavioral health and other services managed by Carelon are conducted by an external vendor and received at least annually by the line of business using a valid methodology for Employee Plan members at least a month of one methodology for determining outreach based on utilization. Our goal is to be at no more than a 10 percent margin of error. Based on the Employee Plan utilization, the target response is 420, which was achieved during the most recent survey process. We provide a sample member survey as Exhibit 10 – Survey Sample.

The surveys measure member experience and satisfaction with important aspects of service, care and outcomes including, but not limited to:



- Overall satisfaction experience with Carelon services
- Access and availability of providers and services
- Acceptability of providers and services
- Experience with utilization management and case management processes
- Perception of quality of clinical care services
- Quality of customer service
- Provider sensitivity to cultural, ethnic, gender, and linguistic needs
- Coordination of care between behavioral health providers and between behavioral health and medical care providers
- Perceptions of the outcome of care

Our most recent survey results include:

- 100 percent of respondents reported satisfaction with language assistance and 90 percent of respondents said counseling met cultural and language needs
- 92 percent of respondents reported overall satisfaction with counseling/treatment
- 90 percent of respondents said they were satisfied with the services they got from Carelon
- 93 percent of respondents said Carelon staff members were polite, courteous, and respectful



We will continue to service the Department's MHSU Discount Program from our Latham Service Center at 6 Plaza Drive, Latham, NY 12110, close to the Department for your convenience.











# 5.7 Enrollment Management

As the current MHSU Disorder vendor for the Department, Carelon's enrollment management services will continue to meet or exceed the requirements in Section 3.6 Enrollment Management.

> 1. The Offeror must provide a narrative describing in detail the proposed processes that will be utilized to manage enrollment data as specified in Section 3.6 of this RFP, including the following:



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



a. Offeror's testing plan to ensure that the initial enrollment load and daily enrollment transition files for the Plan are accurately updated to Offeror's system and that such files interface correctly with Offeror's claims system. The testing plan must include:

  i.   The quality controls that are performed before the initial and ongoing enrollment transactions are loaded into the claims adjudication system.

  ii.  How the Offeror's system identifies transactions that will not load into Offeror's enrollment system. How exceptions are identified that will cause enrollment transactions to fail to load into Offeror's enrollment system. What steps are taken to resolve the exceptions, and the turnaround time for the exception records to be added to Offeror's enrollment file.

  iii. How the Offeror will ensure that enrollment and eligibility transactions that do not load into the Offeror's system will be manually reviewed and reported back to the Department within one Business Day.



b. Offeror's system capabilities for retrieving and maintaining enrollment information within twenty-four hours of its release by the Department as well as:

  ii.  How Offeror's system handles retroactive changes and corrections to enrollment data;

  iii. How Offeror's enrollment system captures the information necessary to produce the reports entitled "Claims and Credits Paid by Agency" and "Quarterly Participating Agency Claims" required in the Reporting Section of this RFP; and

  iv.  How Dependents are linked to the Enrollee in the Offeror's enrollment system and claims processing system, including a description on how Offeror's enrollment and claims processing system can administer a social security number, Employee identification number, and an alternate identification number assigned by the Department; and any special requirements to accommodate these three identification numbers.



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



c.  How Offeror's enrollment system, data transfers, and procedure for handling enrollment data are HIPAA compliant.



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



d. Offeror's ability to meet the administrative requirements for National Medical Support Orders and dependents covered by a QMCSO, including storing this information in Offeror's system, so that information about the Dependent is only released to the individual named in the QMCSO.



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023









Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



c.  Describe how Offeror's claims processing system collects overpayments from Offeror's MHSU Provider network.

d.  Describe how the Offeror will analyze and monitor claim submissions to promptly identify errors, fraud, and abuse, and report such information in a timely fashion to the State in accordance with a State-approved process. Confirm the MHSU Disorder Program shall be charged only for accurate (i.e., the correct dollar amount) claims payments of covered expenses.

Section 5: Technical Proposal
5.8 Claims Processing

Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023









Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



Empire Plan Mental Health and Substance Use Disorder Program

Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023

We describe the Detection, Investigation, and Resolution components of our program in detail below in *part a*.

> a. Describe the audit program Offeror would conduct for the MHSU Disorder Program including a description of the criteria Offeror uses to select MHSU Providers/Facilities to audit and a description of the policy that Offeror follows when an audit detects possible fraudulent activity by a MHSU Provider, Facility or Member. Include all types of audits performed and offered by Offeror's organization.



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023





> b. Provide examples of how Offeror's payment integrity algorithms and software have prevented or detected major cases of fraud, waste, and abuse for other large clients.

Below we provide examples of how our payment integrity algorithms and software have detected major cases of potential fraud, waste, and abuse affecting Empire Plan members.

## Example One





## Example Two

## Example Three



monitoring the provider group's

481k to resolve the

c.  Describe the corrective action, monitoring, and recovery efforts that take place when Offeror finds that a MHSU Provider or Facility is billing incorrectly or otherwise acting against the interests of Offeror's clients. Please indicate whether Offeror has a fraud and abuse unit within Offeror's organization and describe its role. In the extreme case of potentially illegal activity, identify procedures that the Offeror has in place to address illegal or criminal activities by a MHSU Provider or Facility and confirm Offeror will pursue litigation on the Department's behalf when necessary.

Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



## 5.10 Appeal Process

Carelon's appeal process will continue to meet or exceed the requirements of *Section 3.9 Appeal Process*.

1. The Offeror must provide a narrative describing in detail the proposed processes that will be utilized in the appeal process as specified in Section 3.9 of this RFP, including the following:





Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023





For both legal (non-UM) appeals, members and/or their authorized representatives may submit an administrative or clinical appeal within 180 days of an adverse benefit determination.

## Notification to Members of Right to Appeal

A request for appeal is not considered complete until Carelon has received, at a minimum, the name of the patient for whom a denial of authorization is being appealed, and a valid member number for the patient, and the services for which a denial is being authorized that is being appealed. Requests for an appeal and all decisions, and all necessary information must be received by Carelon within 60 days of the date of the adverse benefit determination. The member, provider, or member representative may submit any applicable information they wish for Carelon to consider in arriving at their appeal.

Carelon also notifies members of their right to appeal via a notice on every explanation of benefits (EOB). EOBs include appeal filing procedures, including where to send the appeal and what information to include in the EOB notice also includes the name, address, and toll free telephone numbers of the Member regulatory body and/or applicable governmental agency, as required to investigate complaints. In addition, this notice includes the procedure for filing an expedited appeal, including where to send the appeal and what information to include in the appeal, the timeframe for filing an expedited appeal, and the organization's timeframe for deciding the expedited appeal. Members are advised of their right to designate any person they choose, including an attorney, to be their authorized representative.

## Notification of Results of Review and Appeal Decisions

Carelon has policies and procedures for communicating results of review and appeal decisions to members, practitioners, and facilities within applicable state and federal regulations and/or regulatory timeframes. This includes:

A. Carelon will provide notice of all determinations, favorable or adverse, to the member or member's designee and the member's treating care provider verbally and in writing within the required professional federal and/or state/program timeframes.

B. Verbal notification to the member or his/her representative may occur by both Carelon or by the provider upon notification by Carelon.

C. For all other levels of care that do not require prior authorization, the service that occurs (i.e., ER), Carelon will notify the member, designee, and provider verbally no later than the next workday.

D. Verbal notification to the member, designee, and provider will be documented in the member records.

E. If Carelon does not have and cannot obtain a telephone number for the member/designee, documentation will be made in the member record.

F. When an adverse determination is rendered, written notification to the member or member's designee and the member's health care provider will include:

1. A detailed denial explanation of the member's medical condition, the medical service, treatment or procedure in question, the basis or reason on which the determination of the service, treatment or procedure is not medically necessary or is an exclusion/is not a covered benefit is based;



1. terms) was made which shall specifically state the reason for specific clinical information was considered.

2. Any additional necessary information needed by CareCore to render a decision upon appeal.

3. A statement that the criteria, guidelines, protocols, administrative rules or any other information relating to the adverse determination will be provided in writing upon request free of charge, and instructions for requesting such.

4. A statement that the medical necessity criteria can be found at www.carecorenational.com.

5. A written list of available alternative providers for the recommended level of care, if the member's request was a specialist/specialist from the member's home.

6. The next level of appeal rights.

Members, providers, or member representatives have the right to appeal adverse determinations. There is one internal appeal process available to the member's providers or member representatives through CareCore. Members can find out more about their appeal rights by calling the CareCore Customer Service Department. An appeal can be requested in any of the following ways:

a. They can send a written request to CareCore at a specified mailing address.

b. They can send a fax with attention to the appeals department.

c. They can call customer service to request an appeal via a toll-free number currently between 8 a.m. and 5 p.m. ET, Monday through Friday.

CareCore will notify the requestor of any information it which needs to decide the appeal.

## Administrative Appeal Determination Process

The Director of Appeals, or designee, assumes responsibility for the processing of administrative appeals. Appeals are assigned to an appropriate subject matter person or committee based on the appeal and contractual requirements.

Administrative and Clinical Appeals are subject to the same standards. However, if an administrative denial is in place, it must be resolved before the clinical request can be processed. The result of this process can include three scenarios:

1. The administrative denial is upheld and the clinical request is not processed.

2. The administrative denial is overturned, however, a clinical review is not necessary but processed through a benefit examination of benefits (provider liberated).

3. The administrative denial is overturned and the claims request is processed and a clinical determination is made.

If the administrative appeal upholds the previous denial, the appropriate appeal determination letter is sent. If an administrative appeal overturns the previous denial, a medical necessity review must be completed by the applying practice clinical care Manager within the appeal timeframe — there is not provided to appeal at the time frame in this situation.





## Clinical Appeal Determination Process





facilitates an appeal peer review and assignment of decision to the Utilization Management Unit in accordance and according to Service Center standards, which includes at a minimum:

1. Timeliness information and date stay of review
2. Clinical evidence supporting the decision
3. Clinical rationale to support the decision
4. Identification of setting and time
5. Description of diagnosis for the specialization
6. Name and credentials of the clinical peer reviewer

For each appeal case completed the reviewer signs an attestation regarding their scope of licensure or certification to complete the review, and current, relevant experience and/or knowledge to render a determination for the case under review.

When the appeal review is completed, the following actions are informed of the decision:

1. If the original Adverse Determination is overturned, the [ ] notifies the member/member's authorized representative (AR) and/or provider on the day of the decision by phone and sends a letter stating that a review of the information has been completed and the initial decision has been overturned.

2. If the original Adverse Determination (authorization/action or payment) is upheld, the Appeals case manager notifies the member/member's authorized representative (AR) and/or provider on the day of the decision and sends a letter (final adverse determination) stating that a review of the information has been completed and the initial decision has been upheld.

Written or electronic notification is provided to the member or member's authorized representative in easy to understand language and includes the following:

1. Detail(s) of service in question
2. Claim number (if applicable and available)
3. Dates of service in question
4. Member name and identifier
5. Attending provider name
6. Title, qualifications and specialty of individuals participating in the appeal review
7. The specific information upon which the appeal decision was based
8. The clinical reason for the appeal decision including the member's presenting information, diagnosis, and treatment interventions including why such information does not meet the medical review criteria
9. Description of any additional basis in denying the request, if applicable and available
10. Reference and inclusion of the benefit provision, guideline, protocol or criterion on which the appeal decision was based





11. Notification that the minutes is within the scope of a decision are subject to and copies of all documents present to the appeal upon request.

12. Notification that the member's appeal representative and/or provider may participate in the appeal and can submit written comments, documents or any other information relevant to the appeal.

13. Appeal rights.

14. External appeal instructions and application form.

If a member's appeal for a Level II appeal is denied, the written or telephonic notification of the Level I appeal determination also informs the member and provider of their right to file a Level II appeal with Careton.



Our most recent results indicate that 99.5 percent of the non-urgent administrative and clinical Level 1 and 2 appeal decisions for all programs are made within the timeframes stated below, which exceeds contractual performance guarantee standard of 95.1 percent.

## Level One

For non-urgent Standard Clinical and Administrative Appeals, Careton processes the appeal as fast as the member's health requires and within 15 calendar days of receipt of the request (respective Appeal requests of a processed) within 30 calendar days. Where plan contracts mandate, members are eligible for a standard appeal with Careton after an unfavorable expedited appeal determination.

## Level Two

For non-urgent Standard Clinical and Administrative Appeals, Careton processes the appeal as fast as the member's health requires and within 15 calendar days of receipt of the request (respective Appeal requests are processed) within 30 calendar days. Where plan contracts mandate, members are eligible for a standard appeal with Careton after an unfavorable expedited appeal determination.



Our most recent results indicate that 99 percent of urgent administrative and clinical Level 1 and 2 appeal decisions for all programs are made within the timeframes stated below, which exceeds contractual performance guarantee standard of 95.1 percent.

## Level One

Resolution and notification for expedited clinical and administrative internal appeals are completed as expeditiously as the member's condition requires, within one business day of receipt of necessary information to conduct the appeal, and no later than 72 hours from receipt of the appeal request. For



Expedited Inpatient Substance Use Disorder (SUD) Discharge Appeals where the appeal request is received more than 24 hours prior to discharge, resolution and notification are completed within 24 hours.

## Level Two

Resolution and notification for Expedited Clinical Internal Appeals are completed as expeditiously as the member's condition requires, within two business days of receipt of necessary information to conduct the appeal, and no later than 72 hours from receipt of the appeal request. For Expedited Inpatient SUD Discharge Appeals where the appeal request is received more than 24 hours prior to discharge, resolution and notification are completed within 24 hours.



Proposal to New York State Department of Civil Service

## 5.11 Provider Network

Carelon confirms that we have a participating MH/SUD provider and facility network in place today that will meet or exceed the requirements of Section 5.10 Provider Network. Below, we provide a summary of our current and future Provider Network efforts on behalf of the Empire Plan, and then respond directly to the RFP questions of Section 5.11 Provider Network starting on page 124.





# Exhibit A-4

Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023











Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023







Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



Case 1:25-cv-03348-ER   Document 11-5   Filed 04/28/25   Page 144 of 390

Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023





At least thirty calendar Days prior to the commencement of Full MHSU Disorder Project Services, and throughout the term of the Contract, the Offeror must possess a Participating MHSU Provider/Facility network that meets or exceeds the accessibility standards set forth in Section 3.10 of this RFP. To demonstrate satisfaction of this requirement, the Offeror must submit all information required below based on the Geo-Coded Census file provided by the Department in *Enrollment by ZIP Code & Geo Access Network Report File* (Attachment 22), containing the NYBEAS enrollment file that will ensure all Offerors perform their analyses consistently.

An Offeror will need to obtain sensitive information from the Department. Upon receipt of a completed, notarized *Confidentiality and Non-Disclosure Agreement* (Attachment 11), the Department shall provide the Offeror with *Enrollment by ZIP Code and Geo Access Network Report File* (Attachment 22) and *Utilized Provider File* (Attachment 34). The confidentiality and non-disclosure agreement must be submitted by an Offeror requiring access to Enrollment by ZIP Code and Geo Access Network Report File (Attachment 22) and Utilized Provider File (Attachment 34).

The Offeror may execute custom MHSU Provider contracts contingent on award or existing agreements that can be made applicable to the Plan, or a combination thereof. All Providers in the file must be credentialed by the Offeror. The Offeror must agree to provide documentation, including unredacted MHSU Provider contracts, to the Department upon request to demonstrate satisfaction of this requirement. No Enrollee may be excluded from the Offeror's Geo network analysis, even if no Provider is within the pre-defined access standards.

1. To fulfill the requirements of this Section and Section 3.10 of the RFP, the Offeror must:

Carelon has completed the requested analyses as detailed below in part a to d.

In addition, Carelon's continued integration with Elevance Health will result in additional network growth for Empire Plan members. Our partnership with Elevance Health will help create additional capacity of clinicians/facilities to enhance member access across the United States.





We provide the requested MHSU Facilities file as Exhibit 11a – Provider Listing - Facilities (RFP Att. 23), and the requested MHSU Practitioners file as Exhibit 11b – Provider Listing – Practitioners (RFP Att. 23) on USB.

We provide the requested Exhibit 12 - Provider Network Summary Worksheet (RFP Att. 32).



We provide as Exhibit 13a – GeoAccess Summaries, in both searchable PDF on USB and in hard copy, as well as Exhibit 13b – GeoAccess Complete Reports, our complete Geo network reports in a searchable PDF format as requested on a clearly labelled USB drive.



We provide the requested information as Exhibit 12 - Provider Network Summary Worksheet (RFP Att. 32).



We provide the requested Exhibit 14 - Provider Comparison (RFP Att. 33 and 34) on a clearly labeled USB







Access to an available provider network of behavioral health providers and facilities with a variety of clinical specialties and intensity is critical when assessing the success of a behavioral health system of care. A foundation to establishing whole-person focused care, Carelon understands that access-stripped barriers to care. Provider availability, especially as the COVID-19 pandemic has provided mental health concerns, and has resulted in increased demand for services.

Carelon strives to ensure which access is sought, access is achieved. Carelon makes every effort to maintain accurate and up-to-date information, however that provider availability is ever-changing, is fluid, operates at capacity, and changes can occur at any time. As such, Carelon uses multiple methods to validate and keep provider data:

- Carelon assures provider availability is known to members via the mental health and substance use disorder online provider directory for the Empire Plan. Carelon ensures information is current, accurate, and consistent with the data collected during the credentialing/recredentialing process, including the provider's name, gender, education, training, board certification (as applicable), specialty, accepting new patients, languages spoken by the practitioner, race and ethnicity, location, and facility organizational status (as applicable).

- Providers are able to self-report changes to their provider profile through the Council for Affordable Quality Healthcare (CAQH), Carelon's web portal, or by directly contacting Carelon.

- Network providers are also prompted on a quarterly to update their practice data, including notification if they are or not accepting new patients via an ongoing relationship with the Network Partners team for strategic providers.

- Carelon also collects data from multiple other sources to ensure the availability of providers is accurately depicted. Feedback is captured by Carelon via daily, more formal provider network management processes, such as seeking feedback from members and clinical care and utilization managers.

To improve the overall experience in taking their initial appointment, Carelon is launching a digital adoption focus on Directory Optimization and Accuracy in New York. In the quarter (winter) 2021, Providers will have the opportunity to correct new Carelon member's in-network services based on communication they received during the initial survey, in particular if they are looking to grow their practice at a given location.

We are also contracting with a vendor on a secret shopper initiative. This will collect data on topics such as how to verify a listing's contact information, whether the provider and/or provider location is accepting new patients and availability of first appointments, and types of appointments offered.

Carelon expects an expectation to notify its network provider no longer accepts over its accepting new patients. This includes a contractual obligation with providers that does not allow providers to limit the cases they accept, rather, we notify a provider of their practice to new referrals for a limited time if the provider believes they are at capacity. This limitation is made when the request is received by written notice and the provider is then monitored to ensure duration is limited and the provider is returned to their network as soon as possible.







Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023













Carelon maintains a robust network that ensures access to quality behavioral health care. Our continued integration with Elevance Health will enhance our existing network and help fortify access for the Empire Plan membership in New York State and nationwide.



We are committed to continuously improving access to quality behavioral health care for the Empire Plan members we serve. Along with continued recruitment of more licensed services, the availability of in-person services, we will offer access to additional national telehealth provider groups under the new ConnectLive, allows members who want telehealth services or the ability to message a Evident to do so while also ensuring the availability of our "brick and mortar" providers, many of whom are currently offering both in-person and telehealth services.

Carelon is also seeking to enhance our applications with collaboration from CAQH to capture the service modalities with extraordinary filter. As the ability to report on this information becomes available, we will enhance search capabilities in our online provider directory to improve members' search experience as they seek telehealth or in-person opportunities.

Expanding member choices allows members seeking access to behavioral health services to choose a treatment modality that meets their needs in a manner that ensures access to a wide array of services that member where they are in. Accordingly, our Carelon ecosystem offers a range of treatment modalities and delivery options, including self-navigated digital tools, medication management, and psychotherapy delivered both synchronously and asynchronously for a wide range of conditions including mental health and substance use. In doing so, we are removing certain barriers to access to care by improving convenience, alleviating the cost and burden of travel to get care, and bypassing stigma barriers and confidentiality concerns that may discourage members from seeking in-person care.

## Telehealth Platform

Carelon is creating a customized member portal with a telehealth platform for Empire Plan members. This portal will include all important resources for behavioral health. Within the platform, there will be a button for telehealth services. When the member taps this button, they will be taken to a telehealth homepage which will prominently display and provide content regarding the national carve-out telehealth solutions and "preferred provider network for telehealth services." It will describe that this preferred network is a top priority for program Empire Plan members and choose the solution that best fits their needs based on services or provider. For telehealth, they will then be able to schedule a session with the network provider of their choice.

Below, we show a mockup of what this landing page will look like for Empire Plan members:



## Building a Telehealth Ecosystem

Along with the telehealth platform described above, to meet access needs and provide the best member experience, Carelon believes having a telehealth ecosystem with multiple provider groups is critical. We have added and are in the process of adding several national telehealth groups to our network. Our experience shows that by creating this ecosystem, it allows us to ensure there is a sufficient supply of providers resulting in shorter wait times for appointments.

To provide more choices for Empire Plan members, our Medical Director and Clinical team are working closely with Carelon's Digital Product Development team to evaluate additional telehealth provider groups who treat subspecialties such as substance use, eating disorders, Obsessive Compulsive Disorders, and

others. Some of those national telehealth groups are listed below, along with a description of any specialized services they offer.







Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023













Case 1:25-cv-01934-JER Document 115-1 Filed 04/28/25 Page 466 of 890

Case 25-cv-09384 ER   Document 15-1   Filed 04/28/25   Page 470 of 890

Case 25-cv-09348-BR   Document 15-1   Filed 04/28/25   Page 847 of 890

Case 25-0894, Document 115-1, Filed 04/28/25, Page 473 of 890

Case 25-0894, Document 115-1, Filed 04/28/2025, Page 475 of 890

Case 25-09094-BER    Document 15-1    Filed 04/28/25    Page 476 of 890

Case 25-cv-09384 EJR    Document 15-1   Filed 04/28/25   Page 479 of 890







Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



## 3.14 Pre-Certification and Concurrent Review for Mental Health and Substance Use Disorder Services



Carelon's pre-certification and concurrent review for MH/SU Disorder services will continue to meet or exceed the requirements of Section 3.14 Pre-Certification and Concurrent Review for Mental Health and Substance Use Disorder Services. Carelon closely monitors all state and federal regulations and mandates to ensure full compliance.

Our local team of dedicated clinical and medical director professionals will continue to ensure that Empire Plan enrollees and their dependents (members) connect to the right treatment at the right time enabling them to live their life to the fullest potential. We have a population management clinical philosophy and approach, basing our view on the "big picture," and directing outcomes efficiencies, and applying our resources for maximum impact.

We achieve outstanding results by focusing on promoting evidence-based care to your members by working closely with trusted, high-performance facilities identified through ongoing performance and outcomes management. We partner with our providers to offer training and education on new treatment modalities that are supported by clinical thought leaders, through network design and reimbursement strategies, and incentivize providers who deliver evidence-based care, empower reporting actionable clinical and social measures of member health, and continue to appropriate availability for members identified as needing urgent behavioral health care. We aim to reduce the administrative burden on providers by focusing on facility management and the intensive medical and care management of our top members.

> 2. The Offeror must provide a narrative describing in detail the proposed processes that will be utilized in for pre-certification of benefits and concurrent review for MH/SU services in accordance with New York State regulations as specified in Section 3.14 of this RFP, including the following:

Our commitment to high quality, affordable health care for members is demonstrated through our accreditation status. NCQA has awarded Carelon Full Accreditation under the Managed Behavioral Health Organization (MBHO) standards. Accreditation is granted for three years for those plans that have excellent programs for continuous quality improvement and that meet NCQA's rigorous standards. NCQA MBHO Accreditation standards are intended to help organizations achieve the highest level of performance possible, reduce patient risk for unwanted outcomes, and create an environment of continuous improvement. Carelon is a quality-driven organization, with the framework in place to continually assess and improve the clinical care and services we provide.

Qualified, trained, and appropriately licensed staff conduct all clinical reviews. The UM process ensures that necessary care is delivered to members according to individual criteria, the NYS Guiding Principles (LOCADTR) or ASAM criteria (for children) or primarily presenting diagnosis in the context of an individualized treatment plan. When a request for services is received, the Care Manager evaluates the clinical needs of the member with the person requesting services.

Carelon will continue to use processes for pre-certification of benefits and concurrent review for MH/SU services in accordance with New York State regulations as specified in Section 3.14 of this RFP.

Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023

a. Describe the process and procedure the Offeror proposes to use for Pre- certification of benefits. Explain the proposed staffing levels and qualifications of staff responsible for Pre-certification including whether some or all of the same staff will be utilized for predetermination of benefits and Pre-certification of benefits, or if these will be separate functioning units. Describe how the Medical Director of the MHSU Disorder Program will be involved in the predetermination and Pre- certification process.



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023







Case 25-1394    Document 115-1    Filed 04/28/2025    Page 614 of 890

Case 25-cv-09394-ER   Document 15-1   Filed 04/28/25   Page 440 of 890

Case 1:25-cv-03914-ER, Document 115-1, Filed 04/28/25, Page 660 of 890

## Intensive Case Management on High-Risk Members

Data shows in 2023 that members engaged in ICM services were 12 percent less likely to readmit to substance use treatment within 90 days of discharge from substance use treatment than those not engaged in ICM.

Carelon's Case Management program, also known as Intensive Case Management (ICM) and/or Complex Case Management, serves members with the most complex care needs. These members are assessed to be at the highest risk within the population for negative clinical outcomes related to mental health, substance use disorder, and co-occurring medical issues. The primary goals of the Case Management program are to help the individual maintain or improve community tenure, regain or retain health, improve life functioning, and promote resiliency and recovery. Carelon's Case Management program works closely with medical and/or health plan staff to ensure an integrated model, which meets the member's whole-health needs. Currently, Carelon does not have access to a member's complete medical and pharmacy claims data. The Department's approval for states to complete medical and pharmacy claims data exchanges would enable Carelon to be better by identifying, stratifying, and proactively outreaching to members—amplifying the impact of our ICM services.

Carelon provides comprehensive case management programs and services to address a broad range of member needs. Carelon is committed to offering clinical expertise, operational excellence, and innovation within all programs. Carelon's Case Management program offers a clinically appropriate and cost-effective solution, advocating healthy behaviors and proactively managing wellness and disease for members most in need.

In looking at our predictive modeling data, of those predicted to utilize higher levels of care, there were no inpatient admissions for those engaged in ICM. This shows the positive impact that engaging in ICM can have on members and improving their quality of life and reducing the utilization of inpatient, higher levels of care.

Carelon case management programs align with industry leading definitions and criteria. For example, the Case Management Society of America's 2016 definition: "Case Management is a collaborative process of assessment, planning, facilitation, care coordination, evaluation and advocacy for options and services to meet an individual's and family's comprehensive health needs through communication and available resources to promote patient safety, quality of care and cost-effective outcomes".



Interventions include assessments, referrals, appointment reminders, care coordination, wellness education, and overall monitoring of treatment engagement. Intensive Case Managers assist members in linking to community resources and supports such as Alcoholics Anonymous / Narcotics Anonymous, National Alliance on Mental Illness (NAMI), Depression and Bipolar Support Alliance, Project Hope, findhelp.org to address social determinants of health resource needs, PRIDE Center, domestic violence resources, Single Point of Access (SPOA), On Track and educational support resources.

Where applicable, Carelon's case management programs meet the National Committee for Quality Assurance (NCQA) definition for Complex Case Management: "the coordination of care and services provided to members who have experienced a critical event or diagnosis that requires the extensive use of



would benefit from ongoing intensive case management once the clinician compiles the member's identified required coordination and outreach, the CM, although can offer patient and/or education, support and referrals as needed. During the initial contact, ongoing support would be provided by ICM. ICM will then follow up with members on a mutually agreed-to schedule via phone and work on goals and address any barriers to reaching adherence.

Another integrated process when a member is admitted to a currently managed facility once care and a medical facility location an access for authorization request for a medical necessity process is met, prior to an authorization if not generated. A unique case is entered into the authorization to indicate CareDx does not pay the authorization authorization because of this case characteristics of a stay restricting being rendered. Daily, a report is run from a program run and reviewed for accuracy and then sent via a password-protected email to select local facility leads notifying them of the authorizations entered the prior day.

Clinical indications based on evaluation for case management services. The Case Manager ensures integrated service delivery through ongoing communication with the providers involved in the case including linkages to family service agencies, community service organizations, the court system, schools, legal systems, external case management providers, and other appropriate resources.

## Access, Referral, and Case Finding

### CM Referral Sources

Case recognition relative to identify a referral to the CM program consistent with established referral criteria and processes from any of the following sources:

- The clinical/counseling processes retrospective chart reviews or other reviews
- Medical/health plan staff through coordinated care programs or other activities including through the developed identification from a population health assessment and stratification
- Internal CareDx referral sources including clinical management and reviewing cases with providers formal discharge and discharge planning
- Direct requests from providers or state agencies
- Claims data, including behavioral health authorization, pharmacy data, as well as medical data (Should the Dx connect to have access to medical and pharmacy claims data, we would be able to employ our stratification to members to ensure population health management)
- Member or family self-referral
- Predictive modeling or other internal data mining
- Hospital discharge coordinators

### CM Program Inclusion Criteria

Clinicians identify provides referral criteria for all clinical teams accounting for any local member-based needs and regulatory, accreditation, or contract/specific requirements. CareDx's Dx analytics team provides clinical levels of program data and outcomes to further inform the care. CM external sources of care the identification of potential referrals via data mining, predictive modeling and identification of members for case management across service lines.



- Members with high-acuity physical health and/or combined medical and behavioral health inpatient stays

- Member has a newly diagnosed and/or unstable high risk behavioral health condition as evidenced by a recent hospitalization or admission to treatment at a higher level of care or a new diagnosis and the indication of ongoing treatment or supportive services after the discharge or the indication of a new diagnosis

- Multiple family members are receiving or have a behavioral health inpatient or residential stay

- Medical case coordination/integrated care – a member with significant health issues including chronic pain and/or a co-existing disorder with possible behavioral health concerns and a referral for screening and services coordination is needed

Consconsidering the impact of having a child in a behavioral health treatment and the impact it can have on parents and the family, we specifically support within our Intensive Care Management program, an Parent/Family Caregiver peer support services and are able to provide additional support to parents and caregivers when a child is in treatment. Through this support system, a behavioral health clinician from our Intensive Care Management team will contact parents/guardians within 48 hours of their child's admission to help them understand what lies ahead, including:

- While their child is in treatment:
  - What is involved in a mental health diagnosis (i.e. disorder, diagnosis) of a loved one
  - Why it is important to go to and take part in family therapy
  - Encouraging parents to communicate with their child's doctor throughout the hospital stay
  - Planning for discharge

- Doctor to Doctor peer review and decision on denials:
  - How the peer to peer process works
  - Medical necessity criteria for care appeals
  - What the term adverse determination means
  - When care is approved for longer than a few days
  - Appeal rights and how to file for an appeal

- Family peers:
  - Scheduling outpatient appointments
  - Connecting with resources nearby
  - Knowing what to do in case of a relapse
  - What to expect and ask about in family therapy



[faded watermark text]

### Referral Screening

Referrals are screened by the case management team or other designated staff to evaluate the member's needs and appropriateness for the program. CM staff completing clinical assessments must be licensed clinicians practicing within the scope of their licensure or certification and with at least three years of relevant clinical experience. Information considered in the screening assessment includes:

- Case records in the utilization management or medical management system

- Program criteria qualifications

- Coordination with medical and behavioral Case Managers/providers familiar with the member's condition

- Any other available data

### Engagement

If the member meets criteria and is an appropriate candidate for the Case Management program, the Case Manager or designee:

- Contacts the member to establish the program, obtain member agreement for involvement in the program, and secure appropriate HIPAA releases.

- If applicable, arranges to speak to the member while the member is receiving care on an inpatient or another care setting, and, if possible, facilitate appropriate sharing of information to all appropriate providers to ensure coordination and communication. If that is not possible, the Case Manager will make every effort to verify contact/continuity with the facility to best coordinate member post-discharge.

- Mails a description of the program to the member.

- Contacts providers who are actively involved with member care as appropriate, explains the program, and solicits the provider's active participation.

### Assessment

The Case Manager will complete a comprehensive clinical assessment on all members who meet criteria and agree to participate in the Case Management program. This assessment may include, but is not limited to the following:

- Evidence-based assessment tools, including evaluation for co-occurring conditions (mental health, medical, SUD)

- Psychosocial strengths and needs

- Member's stated goals and preferences

- Member's health status

- Safety and risk issues

- Condition-specific issues related to a member's health



- Clinical history and medications (including the safety of current medications)
- Current treatment plan and participation
- Activities of daily living
- Mental health status and cognitive functioning
- Social determinants of health
- Life planning activities
- Cultural and linguistic needs
- Visual and hearing needs
- Caregiver resources and involvement
- Available benefits
- Availability of community resources and use of resources

Case Managers gather the above information to determine the member's needs and the best available resources to assist them. The purpose of the assessment is to:

- Identify problems that place the member at risk for poor health outcomes
- Identify barriers to adherence with prescribed treatment regimens
- Assess the level of risk based upon history and current clinical data
- Determine realistic, achievable, and individualized goals
- Promote applicable screening programs and tools as available
- Develop a member-centric care plan consistent with risk and identified goals
- Identify and coordinate appropriate resources in support of the care plan

## Stratification

Cases are prioritized and stratified for the intensity of intervention. Stratification is based on the total risk acuity score determined from the assessment considering the clinical issues and host needs. The assessment incorporates a review of clinical records and allows the case manager to focus outreach with the members associated care providers and Case Managers as needed. Scoring and thresholds match the program needs to ensure members who meet established criteria obtain case management services.

Clinical Review and initial placement in tiers occurs for all groups to determine the most appropriate level of care and intervention and re-scheduled is individual assessments upon during care/placement management purposes, the assigned tier at both is reviewed and re-certified. The frequency of visits and typical intervention are generally based on risk level but are decided per a member's needs.

| Tier | Description | Activities |
|------|-------------|------------|
| Tier 1 | Tier 1 – Integrated Care/Medication Utilization (lowest level of integration) | • Aimed at ensuring behavioral health needs are addressed as part of an overall treatment plan <br> • Provided by licensed care managers <br> • One to three contacts within 30 days on average. May include provider resources, and follow-up as needed to confirm status <br> • A formalized care plan is not required for Tier 1 members <br> • Primary objectives for Tier 1 are service continuity, education, and efficient coordination of medical and behavioral health services |
| Tier 2 | Tier 2 – Intensive Case Management (moderate) (medium-level intervention) | • Short-term care management that addresses barriers and assists care treatment adherence <br> • Goals achieved within 90 days on average <br> • Weekly or biweekly in the first month and then monthly until care plan is met. Activities include assessment, education, care planning, monitoring, and coordination of all medical and behavioral health services |
| Tier 3 | Tier 3 – Intensive Case Management (most intense level of intervention) | • For those members with complex needs, significant risks, or multiple psychosocial stressors <br> • Early intervention to prevent hospitalization and/or exacerbation of symptoms <br> • Tier 3 objectives are often aligned with National Committee for Quality Assurance (NCQA) standards <br> • Goals achieved in 180 days on average <br> • Multiple contacts per week or weekly as needed in highest level of engagement <br> • Active management period may last up to 180-360 days to stabilize and engage members in ongoing treatment <br> • Members are re-evaluated for a transition to Tier 3 ongoing care management when acute care plan goals are met |

## Care Planning and Progress Monitoring

After completing the assessment goals, the Case Manager—in collaboration with the members, caregivers, and providers—creates an individualized member-centric plan of care/recovery plan. The care plan considers the member and caregivers' goals, preferences and desired level of involvement as well as identifying barriers to meeting goals or adhering with the plan.

The care plan identifies measurable short- and long term goals, barriers to meeting them, the resources needed for the member to achieve them, and clear objectives and timeline for completion. Goals will address acute and immediate needs and identify what is needed for the member to maintain optimal functioning. When possible, the Case Manager engages the member, family, and natural support to ensure goals are realistic and achievable. To that end, the Case Manager regularly evaluates the goals for ongoing effectiveness. This process allows the Case Manager to determine whether the care plan is appropriate for the member's needs or if it requires modification and updates. The Case Manager revises the care plan with member input to reflect treatment progress, barriers, new priorities, and changing health status.

> "I don't think I could honestly put into words the amazing job Carly did. She was soothing, reassuring, and I thank God she called because she was a light in the forest."

> c  Describe the methods Offeror utilizes to measure effectiveness for MHSU services. Do not include any reference to specific monetary savings.

We will continue to ensure that Empire Plan members receive the most appropriate, least restrictive treatments and support to meet their identified clinical needs and increase community tenure. We are attentive to each member's holistic life situation, including medical illness, social needs, strengths/weaknesses, and resources available for promoting recovery. Our objective is to efficiently ensure access to all medically necessary care and support transitions to less restrictive services as clinically appropriate.

## Measuring Member Satisfaction

In keeping with Carelon's commitment to help people live their lives to the fullest potential, Carelon is committed to a member experience that includes access to effective, efficient, and compassionate Customer Service and Clinical experts. We measure the quality of the member experience through:

- **Member Satisfaction Survey Results**: Carelon conducts a member experience survey to identify areas for improvement as a key component of our Quality Management Program. We will use the results of our surveys to improve service delivery. Carelon's Quality Management Department contracts with an independent research and survey firm to objectively measure client, member, and provider experiences and attitudes towards Carelon's services each year.

This survey provides Carelon with information regarding many aspects of the member's experience with Carelon as well as with our provider network. The survey asks about the Clinical Referral Line referral process and the member's experience with scheduling an appointment with a participating provider. We use the information received from the survey to educate providers about helping them continuously improve their performance in meeting the treatment needs of members. In 2022, 95 percent of respondents said Carelon staff members were polite, courteous, and respectful and 96 percent of



## Measuring Network Quality





- Prescription types of medications
- Utilization management
- Appeals
- Claims processing and payments
- Fraud and abuse
- Service utilization statistics

**Provider Quality Performance Data:** Carelon maintains an automated database that tracks quality-based performance data on all contracted network providers with members in important specialties. A key responsibility was the storage of performance data over three years. We also designed it to capture relevant events between recredentialing cycles. As a quality improvement tool, key performance indicators identify components of care. We designed this to allow care to align to national and regional comparison analyses. We perform analyses on individual providers or in aggregate across provider and/or member groups. This system allows providers Carelon with monitored data that enables quality services with positive clinical outcomes. We have the data to evaluate the successes and weaknesses of care delivery, determine the need for training, and examine the need for new clinical protocols. It also satisfies national accreditation and quality assurance reporting requirements for provider credentialing, utilization management, and quality of care activities.

As part of our continuous quality improvement process, this measurement system allows Carelon to assess objectively the outcomes of care and to identify best practices for targeted populations. The database includes a wealth of information. Measures currently reported track cost, utilization and quality of care services. Each performance indicator reported has a specific measure, a performance standard, and a junior service/management strategy.

**Tracking and Investigating Complaints:** Carelon measures the effectiveness of MHSU service providers and facilities by tracking and investigating any grievance service or quality of care complaints initiated by members, providers, or Carelon clinical staff.

**Provider Quality/Member interactions with providers:** Our Provider Quality Managers (PQMs) work in a targeted set of high-volume, strategic providers, sharing their performance data and providers' performance over time, and in comparison by similar providers in their state. See exhibit 16 – Sample Provider Quality report for a sample report shared with providers. PQMs share utilization and quality metrics for inpatient and higher levels of care including readmission rates, length of stay, timely and successful transition to a lower quality of service levels, transfers to lower levels and/or transitions to lower levels of care, such as step-downs.

Carelon employs PQMs who excel at building collaborative relationships with providers to once periodically review each year, year-over-year through data review. A PQM is a licensed clinical responsible for monitoring provider performance, helping to ensure continuous improvements in clinical quality and efficiency outcomes.

The goal of our Provider Quality Management Program is to drive improved quality of care and cost-effectiveness through targeted consultation and education of our provider approved by aggregated data. In New York, our PQM team helped strategic inpatient providers improve key performance indicators, increasing follow-up rates by as much as 25 percent.





- **Facility Readmission Tracking:** Carelon tracks facility readmissions, looking to assess the effectiveness of appropriate level of care placement, and medical discharge planning, from time to time working to reduce unnecessary return to a higher level of care. Our dedicated provider team focuses on arranging member specialized outpatient follow-up care hospital outreach when needed to facilitate care transitions.

- **Provider Treatment Record Review:** Carelon assesses provider's compliance, and adherence to clinical practice guidelines and evidence-based care through our treatment record review process. These reviews are a vital component of our overall member safety program and ensure that members receive safe, high-quality care.

## Measuring the Effectiveness of the Carelon Clinical Team

Carelon recognizes that it is important to measure the effectiveness of our medically appropriate clinical team. We do that by performing the following quality assurance processes:

- **Call Tracking:** All dedicated Clinical Team calls are tracked by type of call. These include emergency, urgent, and routine referrals. All emergency and urgent calls are audited to ensure the service standards are met, and results are reviewed by the quality management and utilization management committee.

- **Quality Management Audits:** Our Clinical & Quality Management teams conduct monthly audits presentation, and submitted stay reviews completed by our dedicated Clinical Care Managers and team advisors. The audit tool evaluates whether medical necessity criteria were met for admission, whether the level of care approved was the most appropriate, least restrictive level of care based on the member's clinical needs, whether documentation timeliness standards were met, and that providers use evidence-based, dedicated Clinical Care Managers are evaluated at least monthly and more frequently for new employees. The audits are used as a tool in the orientation and training of new staff and as quality assurance in maintaining performance standards with regards to consistency in application of clinical clinical information and appropriate application of criteria. At the part of performance evaluations, and as to follow up on completing needed. During the telephone audits, the quality auditor allows analysts and evaluate the interactions, rework, rework, triage, assessment, treatment planning, hold and transfer capabilities, process compliance and resource reference resource.

- **Inter-rater Reliability Tool:** Carelon's team of Clinical Interrater Reliability (IRR) assessment across clinical and Medical staff, who are involved in making medical necessity level determinations, the IRR tests for consistent application and interpretation of medical necessity criteria. Compliance within this tool a passing score of 90 percent or above. This tool assists in ascertaining that our proper, fair and consistent in our review processes are effective and reliable across clinical review and consistent across the program standards.





## 5.15 Consolidated Appropriations Act (CAA)

Carelon will comply with the requirements of Section 3.14 Consolidated Appropriations Act.

> 1. The Offeror must provide a narrative describing how it will conduct and document its NQTL comparative analysis and confirm the analysis will be provided upon request. This narrative should also include a summary of its planned activities to ensure compliance with other provisions of the CAA, including, but not limited to, posting machine readable files related to claims payments, provider directory requirements, and enhancing transparency tools.

## Non-Quantitative Treatment Limitations (NQTL) Comparative Analysis

Carelon, along with our parent company Elevance Health, Inc. is a leader in Mental Health Parity. Recognizing its importance and ongoing efforts in the health care industry to meet new rules regarding Mental Health Parity and Addiction Equity Act (MHPAEA) and Consolidated Appropriations Act (CAA), we have developed an internal structure to ensure we can effectively assist our clients regarding parity questions and analyses. Carelon has a dedicated a team to mental health parity, including Account Management, legal, clinical and other subject matter experts to support the Empire Plan in its efforts to demonstrate mental health parity compliance.

As the controls major of the Empire Plan's mental health and substance use disorder (MH/SUD) benefits, Carelon will provide a written description of its MH/SUD protocols to assist the Empire Plan with compliance obligations, including non-quantitative treatment limitations (NQTL) as required by the Mental Health Parity and Addiction Equity Act (MHPAEA), and the Consolidated Appropriations Act. Carelon will provide assistance to help the Empire Plan to demonstrate Empire's compliance with MHPAEA disclosure requirements (e.g., utilization management) in accordance with current federal guidance (e.g., US Dept of Labor Self Compliance tool). Carelon has developed a tool that encourages a step wise approach to the analysis. Carelon will provide information needed to complete the steps and provide guidance as well as work with the other empire plan carriers to complete the tool to enable the Plan to arrive at a CAA compliant comparative analysis showing that all NQTLs are applied no more stringently on the behavioral health side than on the medical side.

As a managed behavioral health organization, Carelon does not establish the benefit coverage plan designs for its contracted client plans. As such, the Empire Plan has the responsibility for the financial testing and outcome data collection relating to quantitative treatment limitations (QTLs) applicable to MH/SUD benefits to ensure they meet MHPAEA's standard and are no more restrictive than the predominant financial requirements and QTLs applied to substantially all the medical and surgical benefits.

Carelon will provide information requested by the Empire Plan to assist with its annual analysis of quantitative treatment limitations. However, there may be a charge for more frequent requests or generated reports. Whether there is any additional charge would depend on the scope and frequency of the analysis and would need to be discussed and mutually agreed upon. Any fees for Mental Health Parity analyses and services is not pending activity.





## Compliance and Transparency in Coverage and Consolidated Appropriations Act

Carelon is prepared to support client compliance with the Transparency in Coverage (TiC) and Consolidated Appropriation Act (CAA) No Surprise Billing Act in the following ways:

### Payer Machine Readable Files (MRF)

As required by the Transparency in Coverage rules Carelon will create machine readable files that contain negotiated rates and historical payments for in-network and out-of-network providers. These files can be used to help create the payer cost transparency tools as currently required by law in 2023 and 2024.

### Continuity of Care

Carelon has policies and procedures to provide limited continued coverage at network rates for members with certain care situations when providers change network status or fully insured groups terminate. This includes notifying the members of the potential for network coverage for up to 90 days from the date of provider termination.

### Provider Network Directories

Carelon is in the process of revising our provider data processes and policies to comply with the CAA. This includes verification of certain components of provider data every 90 days within two business day required turnaround for updates received by providers and developing a provider directory suppression policy.

### Prohibition on Gag Clauses

Carelon notified our providers of the change in regulatory requirements which bans gag clauses in contracts between providers and health plans related to price or quality data.

### CAA Surprise Billing Dispute Resolution Process

The September 30, 2021, interim rule establishes the fees of independent dispute resolution (IDR) process that out of network (OON) providers, facilities, plans and issuers in the group and individual markets may use to determine the OON rate for applicable items or services, often an unsuccessful open negotiation. While we anticipate a low volume of inquiries related to this area, Carelon has a process to support your New York clients as required by contract. To note, we have had no IDR cases for the Empire Plan since the regulation went into effect.

If additional support not mentioned above is required, Carelon requests that this be discussed as additional fees may apply.



Case 25-09040-EPR    Document 115-1    Filed 04/28/25    Page 516 of 890

## 3.17 Transition and Termination of Contract

Offeror understands and will comply with the requirements of the Transition and Termination of Contract to ensure that any transition to a successor entity results in unserviced member access to benefits and customer service.

> The Offeror must provide a narrative describing in detail:
>
> 1. The process and level of customer service and clinical management that Offeror will provide in Phase One and Phase Two of the Transition Services, as specified in Section 3.16 of the RFP.

Offeror confirms that we will fully cooperate with the successor contractor to ensure the timely, smooth transfer of information necessary to administer the NHSUD Program. We will have a project schedule that is very comprehensive and will supply the necessary information in a timely and accurate process and not disrupt member treatment.

We recognize the importance of continuity of care and are committed to completing all outgoing transition tasks with great sensitivity. We will implement a detailed transition plan that includes written communication to enrollees and their dependents (members) to reduce confusion and disruption in care. We will take all necessary precautions to ensure continuity of services for members receiving treatment during the transition. We will also maintain engagement and help motivate them to continue their care during this critical time.

Our highest priority is to ensure that the transition process safeguards the continuity and quality of care that your members receive, avoids disruption, and minimizes as well as mitigates transition risks on behalf of the Empire Plan. To this degree, we will commit to not only providing the required data to the successful contractor, but we will provide them with the necessary knowledge transfer and support that will offer them a more thorough understanding of the data we supply (e.g., members in care, Intensive Case Management cases, continuation of benefit long, and claims history).

## Phase Two

During Phase Two, as we approach our complete termination, we will continue to fulfill all requirements and provide all necessary and essential information to the new vendor. In addition, we will ensure that the new vendor and our case management team are communicating on a daily (or other designated period) basis to smoothly transition members in treatment to the next level of care necessary.

When we receive a notice for termination, we will immediately initiate our internal approach that includes the following functional steps:

- Administrative. Identify our internal team leads and schedule recurring meetings with the Department.

- Claims. Determine what data the plan needs to be kept and to whom, what information needs to be forwarded, and what steps are needed to resolve financial questions. We will also ensure that all queues are worked to completion and develop scripts for staff members resolving claims.

- Clinical. Review outlier criteria for ongoing care beyond the termination date, establish case coordination meetings for complex or special needs cases, furnish pending and open authorization data to the new vendor, and determine funding needs for the payout period.



- **Appeals:** Develop a plan for managing appeals during transition, determine appeals workflow, and implement a process for handling appeals through the run-out period.

- **Communications:** Determine whether to notify members and produce communications materials.

- **Customer Service:** Develop a transition plan and workscripts for call center staff; develop claim member communications as directed by the Department; produce data-attendant messaging about account considerations; customer service line, and a plan for final termination or fact sheet telephone number, when appropriate.

- **Finance:** Determine whether to open local Chase bank accounts as appropriate.

- **Network Rule:** Provider inquiries about transition.

- **Quality Management:** Transition workflows for complaints and grievances received after contract end date, and manage the transfer of information for those in the Critical Management Program.

- **Reporting:** Establish final reporting requirements and timeframes, forward transition data to new vendor, and to the Department as required.

The goal of our comprehensive transition plan is to minimize the potential disruption in member care and ensure that the appropriate information is shared with all parties involved. As with the call for cooperation plan, Carelon would enter such a proposal to ensure an effective and expeditious closure and transition of services through a well-developed and executed runout plan.

## Phase Two

During Phase Two, we will provide the highest level of coordinated care management service and clinical management that are required to period after the contract's termination. Carelon's priority until during any transition is to ensure member care is not disrupted. We have developed a standardized transition project plan that we have used successfully to transition services to a new organization in those instances where a contract is awarded to a different vendor. Our plan emphasizes ensuring a smooth transition of services to members in our care.

For example, if a member is receiving inpatient treatment on the effective date of transition, we would recommend that we continue to handle the case until discharge. We use a high level of care that ensures continuity of services for the members. We would prepare to meet with the new vendor and provide clinical information, in addition to the required standard authorization reports that are provided by our vendor. Additional clinical details, the new vendor will be better able to understand the treatment plans of this member, and their ongoing needs. The department would then commence utilization and care management of the case at the most important treatment cost update.



Case 25-cv-09384-ER    Document 15-1    Filed 04/28/25    Page 519 of 890

Case 25-0884 ER    Document 15-1    Filed 04/28/25    Page 850 of 890

Case 25-1094, Document 115-1, Filed 04/28/2025, Page 450 of 890

May 3, 2023

## ATTACHMENT 6



| | Performance Guarantees<br>RFP entitled:<br>"Mental Health and Substance Use (MHSU)<br>Disorder Program" |

Exhibit 1 - Performance Guarantees (RFP Att. 6)                    198

May 3, 2023

## ATTACHMENT 6



| | Performance Guarantees<br>RFP entitled:<br>"Mental Health and Substance Use (MHSU)<br>Disorder Program" |

Exhibit 1 - Performance Guarantees (RFP Att. 6)

199

May 3, 2023

## ATTACHMENT 6



| Performance Guarantees |
| :-: |
| RFP entitled: |
| "Mental Health and Substance Use (MHSU) |
| Disorder Program" |

Exhibit 1 - Performance Guarantees (RFP Att. 6)     200

May 3, 2023

## ATTACHMENT 6



| | Performance Guarantees<br>RFP entitled:<br>"Mental Health and Substance Use (MHSU)<br>Disorder Program" |

Exhibit 1 - Performance Guarantees (RFP Att. 6)                    201

May 3, 2023

# ATTACHMENT 6



| | |
|---|---|
| **NEW YORK** STATE OF OPPORTUNITY. **Department of Civil Service** | **Performance Guarantees** **RFP entitled:** **"Mental Health and Substance Use (MHSU) Disorder Program"** |

Exhibit 1 - Performance Guarantees (RFP Att. 6)    202

May 3, 2023

## ATTACHMENT 14

 **Department of Civil Service**

**Biographical Sketch Form - RFP entitled: "Mental Health and Substance Use (MHSU) Disorder Program"**

Prepare this form for each key staff individual, including subcontractor-provided key staff, if any, of the Offeror's proposed Account Team (RFP Section 5.2). Where individuals are not named, include qualifications of the individuals that will fill the positions. If additional space is needed you may add additional sheets.

**Offeror Name:  Carelon Behavioral Health, Inc.**

Exhibit 2 - Biographical Sketch Forms for Account Team (RFP Att. 14)        203

Case 2:25-cv-08049-R Document 15-1 Filed 04/28/25 Page 084 of 690

Case 2:25-cv-03480-JDR Document 15-1 Filed 04/28/25 Page 549 of 890

# Exhibit A-5

Case 1:25-cv-03409-DLF   Document 151   Filed 09/28/25   Page 551 of 890

Case 1:25-cv-03409-JLR    Document 151    Filed 09/28/25    Page 558 of 890

Case 25-094894 ER    Document 116-1   Filed 04/29/25   Page 756 of 890

Case 25-094 ER Document 115-1 Filed 04/29/25 Page 567 of 890

Case 1:25-cv-03893-ER Document 11-6 Filed 07/28/25 Page 205 of 690

Case 25-cv-0894-ER    Document 15-1   Filed 07/29/25   Page 457 of 690

Carelon Behavioral Health, Inc.    May 3, 2023

| ID | Task Name | Duration | Start | Finish | Resource Names |
|---|---|---|---|---|---|
| 1 | Empire Implementation Plan | 164 days | Thu 7/14/22 | Tue 2/28/23 | Carelon |
| 2 | Award | 0 days | Fri 7/22/22 | Fri 7/22/22 | Empire |
| 3 | Post Award Pre-Implementation Meeting | 7 days | Fri 7/22/22 | Mon 8/1/22 | Empire,Carelon Implementation Lead |
| 4 | Project Set Up | 5 days | Fri 7/22/22 | Thu 7/28/22 | Carelon Implementation Lead |
| 5 | Identify Implementation Leads (Functional Areas) | 5 days | Fri 7/22/22 | Thu 7/28/22 | Carelon Functional Area Leads,Carelon Implementation Lead |
| 6 | Obtain Contract, RFP, and any other Source Documents | 5 days | Fri 7/22/22 | Thu 7/28/22 | Carelon Implementation Lead |
| 7 | Review Underwriting | 5 days | Fri 7/22/22 | Thu 7/28/22 | Carelon Functional Area Leads,Carelon Implementation Lead |
| 8 | Kickoff Meetings | 10 days | Fri 7/22/22 | Thu 8/4/22 | Carelon Implementation Lead |
| 9 | Internal KO | 10 days | Fri 7/22/22 | Thu 8/4/22 | Carelon Implementation Lead |
| 10 | External KO | 10 days | Fri 7/22/22 | Thu 8/4/22 | Carelon Implementation Lead |
| 11 | Establish Governance (Project Communication Plan) | 10 days | Fri 7/22/22 | Thu 8/4/22 | Carelon Implementation Lead |
| 12 | Develop Project Management Plan and Draft Schedule | 10 days | Fri 7/22/22 | Thu 8/4/22 | Carelon Implementation Lead |
| 13 | Performance Guarantees | 10 days | Fri 7/22/22 | Thu 8/4/22 | Carelon Implementation Lead,Carelon Client Partnerships |
| 14 | Obtain PGs and SLAs from Contract | 10 days | Fri 7/22/22 | Thu 8/4/22 | Carelon Implementation Lead,Carelon Client Partnerships |
| 15 | Distribute to Functional Area Leads | 10 days | Fri 7/22/22 | Thu 8/4/22 | Carelon Implementation Lead |
| 16 | Review and Discuss PGs | 10 days | Fri 7/22/22 | Thu 8/4/22 | Carelon Functional Area Leads |
| 17 | Detailed Business Requirements Gathering (Discovery) | 40 days | Fri 7/22/22 | Thu 9/15/22 | Empire,Carelon |
| 18 | Client Partnerships | 20 days | Fri 7/22/22 | Thu 8/18/22 | Carelon Client Partnerships |
| 19 | Contract Execution | 20 days | Fri 7/22/22 | Thu 8/18/22 | Empire,Carelon Legal |
| 20 | Business Associate Agreement (BAA) | 5 days | Fri 7/22/22 | Thu 7/28/22 | Empire,Carelon Legal |
| 21 | Non-Disclosure Agreement (NDA) (if applicable) | 15 days | Fri 7/22/22 | Thu 8/11/22 | Empire,Carelon Legal |
| 22 | Communications Requirements | 40 days | Fri 7/22/22 | Thu 9/15/22 | Carelon Client Partnerships |
| 23 | Confirm Branding Approach (Co-Brand, White Label, etc.) | 40 days | Fri 7/22/22 | Thu 9/15/22 | Carelon Client Partnerships |
| 24 | Obtain Communication Style Guide from Empire | 40 days | Fri 7/22/22 | Thu 9/15/22 | Carelon Client Partnerships |
| 25 | Obtain logo from Empire | 40 days | Fri 7/22/22 | Thu 9/15/22 | Carelon Client Partnerships |
| 26 | Marketing Communication Plan | 45 days | Fri 7/22/22 | Thu 9/22/22 | Carelon Client Partnerships |
| 27 | Partner with Empire to Develop a Communication Plan (or provide input as applicable) | 45 days | Fri 7/22/22 | Thu 9/22/22 | Carelon Client Partnerships |
| 28 | Finalize Communication Plan | 45 days | Fri 7/22/22 | Thu 9/22/22 | Carelon Client Partnerships |
| 29 | Marketing Communication Plan Execution | 73 days | Fri 9/23/22 | Tue 1/3/23 | Carelon Client Partnerships |
| 30 | Member Communication | 73 days | Fri 9/23/22 | Tue 1/3/23 | Carelon Client Partnerships |
| 31 | Provider Communication | 73 days | Fri 9/23/22 | Tue 1/3/23 | Carelon Client Partnerships |
| 32 | Systems Configuration - Services and Benefits (CORE, Otpt, OTP, HLOC) | 105 days | Fri 7/22/22 | Thu 12/15/22 | Carelon System Configuration |
| 33 | Requirements | 50 days | Fri 7/22/22 | Thu 9/29/22 | Carelon System Configuration |
| 34 | Configure Services and Benefits | 45 days | Fri 9/30/22 | Thu 12/1/22 | Carelon System Configuration |
| 35 | Audit Services and Benefits | 45 days | Fri 10/14/22 | Thu 12/15/22 | Carelon System Configuration |
| 36 | Claims Administration | 110 days | Thu 7/14/22 | Wed 12/14/22 | Carelon Claims |
| 37 | Requirements (Timely Filing, Misrouted Claims, COB, etc.) | 50 days | Thu 7/14/22 | Wed 9/21/22 | Carelon Claims |
| 38 | Claims Workflows | 90 days | Thu 8/11/22 | Wed 12/14/22 | Carelon Claims |
| 39 | Claims P&Ps | 90 days | Thu 8/11/22 | Wed 12/14/22 | Carelon Claims |
| 40 | Claims Letters | 90 days | Thu 8/11/22 | Wed 12/14/22 | Carelon Claims |
| 41 | Claims Configuration | 90 days | Thu 8/11/22 | Wed 12/14/22 | Carelon Claims |
| 42 | ServiceConnect/CareConnect Set Up | 90 days | Thu 8/11/22 | Wed 12/14/22 | Carelon Claims |
| 43 | Clinical Operations | 105 days | Mon 8/1/22 | Fri 12/23/22 | Carelon Clinical |
| 44 | Requirements | 50 days | Mon 8/1/22 | Fri 10/7/22 | Carelon Clinical |
| 45 | Clinical Workflows | 90 days | Mon 8/22/22 | Fri 12/23/22 | Carelon Clinical |
| 46 | Internal | 90 days | Mon 8/22/22 | Fri 12/23/22 | Carelon Clinical |
| 47 | Joint | 90 days | Mon 8/22/22 | Fri 12/23/22 | Carelon Clinical |
| 48 | Clinical Policies and Procedures | 90 days | Mon 8/22/22 | Fri 12/23/22 | Carelon Clinical |
| 49 | Clinical Program Description | 90 days | Mon 8/22/22 | Fri 12/23/22 | Carelon Clinical |
| 50 | Clinical Letters | 90 days | Mon 8/22/22 | Fri 12/23/22 | Carelon Clinical |
| 51 | Continuity & Transition of Care Plan | 90 days | Mon 8/22/22 | Fri 12/23/22 | Carelon Clinical,Carelon CNS and CRL |
| 52 | ServiceConnect/CareConnect Set Up | 90 days | Mon 8/22/22 | Fri 12/23/22 | Carelon Clinical |
| 53 | Appeals & Grievances | 105 days | Mon 8/1/22 | Fri 12/23/22 | Carelon Appeals,Carelon QM |
| 54 | Requirements | 50 days | Mon 8/1/22 | Fri 10/7/22 | Carelon Appeals,Carelon QM |
| 55 | Appeals & Grievances Workflows | 90 days | Mon 8/22/22 | Fri 12/23/22 | Carelon Appeals,Carelon QM |
| 56 | Appeals & Grievances P&Ps | 90 days | Mon 8/22/22 | Fri 12/23/22 | Carelon Appeals,Carelon QM |
| 57 | Appeals & Grievances Correspondence | 90 days | Mon 8/22/22 | Fri 12/23/22 | Carelon Appeals,Carelon QM |
| 58 | Customer Service / After Hours / Call Center | 105 days | Fri 8/5/22 | Thu 12/29/22 | Carelon Customer Service |
| 59 | Requirements | 50 days | Fri 8/5/22 | Thu 10/13/22 | Carelon Customer Service,Carelon Central Night Service |
| 60 | Toll Free Scripting (Call Script) | 90 days | Fri 8/5/22 | Thu 12/8/22 | Carelon Customer Service,Carelon Central Night Service |
| 61 | Customer Service Workflows | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Customer Service |
| 62 | Central Night Services Workflows | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Central Night Service |
| 63 | Call Center Set Up | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Customer Service,Carelon Central Night Service |
| 64 | Customer Service P&Ps | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Customer Service |
| 65 | Member Manual (input, if applicable) | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Customer Service |
| 66 | Member FAQ (input, if applicable) | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Customer Service |
| 67 | MemberConnect Set Up | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Customer Service |
| 68 | ProviderConnect Set Up | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Customer Service |
| 69 | Network and Provider Relations | 105 days | Fri 8/5/22 | Thu 12/29/22 | Carelon Network Teams |
| 70 | Requirements | 50 days | Fri 8/5/22 | Thu 10/13/22 | Carelon Network Teams |
| 71 | Network Contracting and Credentialing | 50 days | Fri 10/14/22 | Thu 12/22/22 | Carelon Network Development |
| 72 | Network Configuration | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Network Operations |
| 73 | Network Correspondence | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Network Development,Carelon Credentialing |
| 74 | Network Workflows | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Network Development,Carelon Credentialing |
| 75 | Network P&Ps | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Network Development,Carelon Credentialing |
| 76 | Provider Manual | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Provider Relations |
| 77 | Provider Training | 23 days | Fri 8/26/22 | Tue 9/27/22 | Carelon Provider Relations |
| 78 | Provider Satisfaction Surveys Set Up | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Provider Relations,Carelon Quality Management |
| 79 | ProviderConnect Set Up | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Provider Relations |
| 80 | Quality Management | 105 days | Fri 8/5/22 | Thu 12/29/22 | Carelon Quality Management |
| 81 | Requirements | 50 days | Fri 8/5/22 | Thu 10/13/22 | Carelon Quality Management |
| 82 | QM/Complaints/Grievances/Critical Incident Workflows | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Quality Management |
| 83 | QM Policies and Procedures | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Quality Management |
| 84 | QIPD and Workplan | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Quality Management |

Exhibit 3 - Sample Implementation Plan    244

Carelon Behavioral Health, Inc.                                                                                           May 3, 2023

| | | | | | |
|---|---|---|---|---|---|
| 85 | QM Empire Specific Reports | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Quality Management |
| 86 | QM Empire Committee Set Up (as applicable) | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Quality Management |
| **87** | **Compliance** | **105 days** | **Fri 8/5/22** | **Thu 12/29/22** | **Carelon Compliance** |
| 88 | Requirements (state specific, FW&A, other) | 50 days | Fri 8/5/22 | Thu 10/13/22 | Carelon Compliance |
| 89 | Incorporation into Compliance Plans as applicable | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Compliance |
| **90** | **Finance** | **105 days** | **Fri 8/5/22** | **Thu 12/29/22** | **Carelon Finance** |
| 91 | Requirements (Funding, Check Runs, Reporting, State Specific) | 50 days | Fri 8/5/22 | Thu 10/13/22 | Carelon Finance |
| 92 | Bank Account Set Up | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Finance |
| 93 | Finance System Configuration | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Finance |
| 94 | PaySpan Set Up | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon Finance |
| 95 | Capitation Set Up | 90 days | Fri 8/26/22 | Thu 12/29/22 | Empire,Carelon Finance |
| **96** | **IT** | **105 days** | **Fri 8/5/22** | **Thu 12/29/22** | **Carelon IT** |
| 97 | IT Project Set Up Tasks | 10 days | Fri 8/5/22 | Thu 8/18/22 | Carelon IT |
| **98** | **Telehealth Platform** | **101 days** | **Fri 8/5/22** | **Fri 12/23/22** | **Carelon IT** |
| 99 | Requirements | 50 days | Fri 8/5/22 | Thu 10/13/22 | Carelon IT |
| 100 | Telehealth Platform Set Up/Testing | 90 days | Mon 8/22/22 | Fri 12/23/22 | Carelon IT |
| **101** | **IT Operations Tasks** | **105 days** | **Fri 8/5/22** | **Thu 12/29/22** | **Carelon IT** |
| 102 | Requirements | 50 days | Fri 8/5/22 | Thu 10/13/22 | Carelon IT |
| 103 | End User Technology - Desktop Services | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon IT (End User Technology) |
| **104** | **EDI** | **105 days** | **Fri 8/5/22** | **Thu 12/29/22** | **Carelon IT (EDI)** |
| 105 | Requirements | 50 days | Fri 8/5/22 | Thu 10/13/22 | Carelon IT (EDI) |
| 106 | Eligibility (Import) | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon IT (EDI - Eligibility) |
| 107 | Encounter (Extract) | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon IT (EDI) |
| 108 | Provider Directory (Extract, if applicable) | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon IT (EDI) |
| **109** | **IT Correspondence** | **105 days** | **Fri 8/5/22** | **Thu 12/29/22** | **Carelon IT (Correspondence)** |
| 110 | Requirements | 50 days | Fri 8/5/22 | Thu 10/13/22 | Carelon IT (Correspondence) |
| 111 | ALA-AuthLetterConnect Set Up/Testing | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon IT (Correspondence) |
| 112 | Claims Correspondence Set Up/Testing (EOBs, Vouchers) | 90 days | Fri 8/26/22 | Thu 12/29/22 | Carelon IT (Correspondence) |
| **113** | **Data Analytics** | **90 days** | **Fri 8/5/22** | **Thu 12/8/22** | **Carelon Data Analytics** |
| 114 | Requirements | 50 days | Fri 8/5/22 | Thu 10/13/22 | Carelon Data Analytics |
| 115 | External Reporting | 90 days | Fri 8/5/22 | Thu 12/8/22 | Carelon Data Analytics |
| 116 | Internal Reporting | 90 days | Fri 8/5/22 | Thu 12/8/22 | Carelon Data Analytics |
| **117** | **Human Resources/Staffing** | **110 days** | **Mon 8/1/22** | **Fri 12/30/22** | **Carelon HR** |
| 118 | Requirements | 50 days | Mon 8/1/22 | Fri 10/7/22 | Carelon HR |
| 119 | HR Recruiting and Onboarding | 90 days | Mon 8/29/22 | Fri 12/30/22 | Carelon HR,Carelon Functional Area Leads |
| **120** | **Internal Training** | **105 days** | **Mon 8/1/22** | **Fri 12/23/22** | **Carelon Training** |
| 121 | Requirements | 105 days | Mon 8/1/22 | Fri 12/23/22 | Carelon Training |
| 122 | Training Plan | 10 days | Mon 10/24/22 | Fri 11/4/22 | Carelon Training |
| 123 | Training Delivery | 25 days | Mon 11/7/22 | Fri 12/9/22 | Carelon Training |
| **124** | **Model Office / Pre-Go Live Testing (as applicable)** | **34 days** | **Mon 11/7/22** | **Thu 12/22/22** | **Carelon Implementation Lead,Carelon Functional Area Leads** |
| 125 | Model Office Planning | 10 days | Mon 11/7/22 | Fri 11/18/22 | Carelon Implementation Lead,Carelon Functional Area Leads |
| 126 | Model Office Execution | 22 days | Mon 11/21/22 | Tue 12/20/22 | Carelon Implementation Lead,Carelon Functional Area Leads |
| 127 | Model Office Remediation | 22 days | Mon 11/21/22 | Tue 12/20/22 | Carelon Implementation Lead,Carelon Functional Area Leads |
| 128 | Model Office Sign-off | 2 days | Wed 12/21/22 | Thu 12/22/22 | Carelon Implementation Lead,Carelon Functional Area Leads |
| **129** | **Go Live** | **60 days** | **Tue 12/6/22** | **Mon 2/27/23** | **Carelon Implementation Lead** |
| 130 | Go Live Planning | 20 days | Tue 12/6/22 | Mon 1/2/23 | Carelon Implementation Lead |
| 131 | GO LIVE | 0 days | Mon 1/2/23 | Mon 1/2/23 | Project Team,Empire |
| 132 | Go Live Execution and Monitoring | 40 days | Tue 1/3/23 | Mon 2/27/23 | Carelon Implementation Lead |
| **133** | **Transition to Ongoing Operations** | **1 day** | **Tue 2/28/23** | **Tue 2/28/23** | **Carelon Implementation Lead** |

Exhibit 3 - Sample Implementation Plan                                                                                        245

May 3, 2023



# Overcoming stigma for better mental health

Fear of judgment and shame often prevent people from seeking help. Don't let the fear of being stigmatized keep you from getting the support you need.

Your <Carelon Behavioral Health> benefit offers support and resources at no extra cost. Use it to:

- Access information about mental health concerns.
- Find professional counseling online or in person.
- Learn tips for taking care of yourself.

---

**We are here to help.**

**To learn more about available resources and find support, contact us today.**

**<URL/client>**

## <000-000-0000>



Visit the <Carelon> website to access articles, videos, podcasts, and other tools that can help you and your loved ones with life's challenges. If you don't know where to start, take an assessment to find resources that meet your unique needs.



Exhibit 4 - Communication Samples

A02351MUMENCBH

246

May 3, 2023



# Helping children and adolescents find mental healthcare

Kids need access to mental healthcare just as much as adults. Resources are available to help young people and their families tackle mental health challenges ranging from the simple to the complex.

Your <Carelon Behavioral Health> benefit offers support and resources at no extra cost. Use it to:

- Learn about mental health related to children and teens.

- Explore parenting tips and tools.

- Understand how to keep your child safe at every age and stage.

- Find guidance on issues like bullying, behavior problems, and substance use.

Visit the <Carelon> website to access articles, videos, podcasts, and other tools that can help you and your loved ones with life's challenges. If you don't know where to start, take an assessment to find resources that meet your unique needs.

**We are here to help.**

**To learn more about available resources and find support, contact us today.**

**<URL/client>**

**<000-000-0000>**





Exhibit 4 - Communication Samples

A02354MUMENCBH

247

May 3, 2023

## ATTACHMENT 14



| NEW YORK STATE OF OPPORTUNITY. **Department of Civil Service** | **Biographical Sketch Form - RFP entitled: "Mental Health and Substance Use (MHSU) Disorder Program"** |

Prepare this form for each key staff individual, including subcontractor-provided key staff, if any, of the Offeror's proposed Account Team (RFP Section 5.2). Where individuals are not named, include qualifications of the individuals that will fill the positions. If additional space is needed you may add additional sheets.

**Offeror Name: Carelon Behavioral Health, Inc.**

Exhibit 5 - Biographical Sketches for Member Communication Support                    248

Case 1:25-cv-08894-JPR Document 116-1 Filed 04/28/25 Page 356 of 390

Case 25-1094, Document 116-1, Filed 04/29/25, Page 585 of 890

Case 25-cv-09384-EP   Document 16-1   Filed 04/28/25   Page 587 of 890

Case 25-1394, Document 116-1, Filed 04/28/2025, Page 569 of 690

**State of New York - Empire Plan**

# MHSA Program





Exhibit 6 -  Sample Financial Reports                                                                                      256

Case 1:25-cv-03944, Document 16-1, Filed 04/28/25, Page 450 of 630

May 3, 2023



# *New York State Empire Plan Managed Mental Health and Substance Abuse Program*

Exhibit 7 - Sample Utilization Reports                                                      299

Case 25-cv-09984-BR    Document 116-1    Filed 04/28/25    Page 642 of 890

Case 2:25-cv-08089-R Document 145-1 Filed 04/23/25 Page 160 of 690

# Exhibit A-6

Case 1:25-cv-03409-VEC   Document 157-1   Filed 09/28/25   Page 668 of 890

Case 1:25-cv-01394-ER Document 11-7 Filed 04/28/25 Page 66 of 90

Case 1:25-cv-03894, Document 117-1, Filed 04/28/25, Page 685 of 690

Case 2:25-cv-04844-BR    Document 17-1    Filed 04/28/25    Page 166 of 890

Case 25-2509, Document 115-1, Filed 04/28/2025, Page 688 of 890

Case 25-5-09404-9 BR    Document 17-1    Filed 04/28/25    Page 250 of 890

Case 1:25-cv-00894-BR Document 11-5 Filed 08/29/25 Page 703 of 890

Case 1:25-cv-00894-BR Document 11-7-1 Filed 04/28/25 Page 705 of 890

Case 25-1094, Document 115-1, Filed 04/28/2025, Page 537 of 890

Case 1:25-cv-03984-JHR    Document 117-1    Filed 04/28/25    Page 627 of 890

Case 25-cv-09384-ER   Document 17-1   Filed 04/28/25   Page 576 of 890

Case 1:25-cv-00394-EPR    Document 17-1    Filed 04/28/25    Page 76 of 90

Case 25-cv-09384-ER   Document 15-1   Filed 04/28/25   Page 716 of 890

Case 1:25-cv-01399-ER   Document 17-1   Filed 02/28/25   Page 476 of 690

Case 25-cv-09394-ER   Document 15-1   Filed 04/28/25   Page 787 of 890

Case 25-5094, Document 115-1, Filed 04/28/2025, Page 797 of 890

Case 25-cv-09384-ER   Document 15-1   Filed 04/28/25   Page 747 of 890

Case 25-1394 Document 117-1 Filed 04/28/2025 Page 756 of 890

Case 25-05-09489ER   Document 115-1   Filed 04/28/25   Page 757 of 890

Case 25-09094 ER    Document 15-1    Filed 04/28/25    Page 761 of 890

Case 25-1094, Document 115-1, Filed 04/29/25, Page 764 of 890

Case 2:25-cv-08498-R Document 175-1 Filed 08/29/25 Page 974 of 1690

Case 2:25-cv-03429R   Document 175-1   Filed 04/28/25   Page 780 of 1690

# Exhibit A-7

Case 1:25-cv-03409-RA    Document 151    Filed 08/28/25    Page 788 of 890

Case 1:25-cv-03409-JKB   Document 151   Filed 08/28/25   Page 790 of 890

Case 2:25-cv-09348-JR   Document 1-5   Filed 07/29/25   Page 137 of 390

Case 25-cv-09394-ER   Document 15-1   Filed 07/29/25   Page 805 of 890

May 3, 2023



Exhibit 8 – Data Sharing Agreement                                                                                    479

Case 25-09384 ER    Document 118-1   Filed 07/28/25   Page 836 of 890

For Illustrative Purposes – Entire Report Not Provided Here

May 3, 2023

## Beacon Health Options
**Provider Utilization 11/1/21 - 10/31/22**
**MHSU Practitioners**

**Instructions:**

a. Please provide the data requested for MHSU providers that represents 100% of total claims paid for the requested time period (i.e. INN and OON)

   b. Do **NOT** include Intermediate (e.g., partial hospitalization, residential treatment, intensive outpatient services) services in this section; they should be ir

**MH/CD Providers**          **Provider Physical Address--NOT the Billing Address**

| Tax ID | Natl Prov ID | First Name | Middle Initial | Last Name | Provider Office Address 1 | Office City | Office State | Office 5-Digit ZIP Code | Specialty | # Unique Claims | # Claims Processed | Billed Charges | Allowed Amount | Claims Paid—In or Out-of-Network? (In/Out) | Single-Case Agreement in Place? (Y/N) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |

Exhibit 9 - Sample Adhoc Reports                                                                    482

May 3, 2023

XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX
XXXX XXXX  XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX    XXXX  XXXX  XXXX    XXXX

Exhibit 9 - Sample Adhoc Reports                                    483

May 3, 2023

ncluded in the Facility Utilization Section.

Exhibit 9 - Sample Adhoc Reports                                                                                                          484

May 3, 2023

# Beacon Health Options
## Facility Utilization 11/1/21 - 10/31/22
### MHSU Facilities

**Instructions:**

a. Please provide the data requested for MHSU providers that represents 100% of total claims paid for the requested time period.

b. Please include Intermediate (e.g., partial hospitalization, residential treatment, intensive outpatient services) services/facilities in this section.

**MH/CD Facilities**    **Provider Physical Address--NOT the Billing Address**

| Tax ID | National Provider Identifier (if available) | Facility Name | Facility Office Address 1 | Facility Office City | Facility Office State | Facility Office 5-Digit ZIP Code | Facility Type | Number of Unique Claimants | Number of Claims Processed | Billed Charges | Allowed Amount | Claims Paid—In or Out-of-Network? (In/Out) | Single-Case Agreement in Place? (Y/N) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |
| XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX | XXXX |

Exhibit 9 - Sample Adhoc Reports

485

May 3, 2023

XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX
XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX    XXXX  XXXX

Exhibit 9 - Sample Adhoc Reports

May 3, 2023

XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX
XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX
XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX
XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX
XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX
XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX
XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX
XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX
XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX
XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX
XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX  XXXX

Exhibit 9 - Sample Adhoc Reports                                                                                              487

<span style="color:orange">For Illustrative Purposes – Entire Report Not Provided Here</span>

May 3, 2023

*1) Provide the number of incurred claims for office visits/other outpatient services that were subject to copay. Also provide the number of enrollees who incurred or whose dependents incurred claims for office visits that were subject to copay for 2019, 2020, 2021 and 2022.*

| Item 1 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| Count of Office/Outpatient visit (POS 11 or 22) with Copay - Enrollee | XXX | XXX | XXX | XXX |
| Count of Office/Outpatient visit (POS 11 or 22) with Copay - Dependent | XXX | XXX | XXX | XXX |
| Unique count of Enrollees with an Office/Outpatient visit (POS 11 or 22) claim with copay | XXX | XXX | XXX | XXX |
| Unique count of Dependents with an Office/Outpatient visit (POS 11 or 22) claim with copay | XXX | XXX | XXX | XXX |

*2)      Provide the number of admissions for in-network utilization. Also provide the number of enrollees who incurred or whose dependents incurred claims for admissions to in-network hospitals for 2019, 2020, 2021 and 2022.*

| Item 2 | In Network | | | |
| | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| Inpatient Admissions - Enrollee | XXX | XXX | XXX | XXX |
| Inpatient Admissions - Dependent | XXX | XXX | XXX | XXX |
| Unique count of Enrollees with an Inpatient Admission | XXX | XXX | XXX | XXX |
| Unique count of Dependents with an Inpatient Admission | XXX | XXX | XXX | XXX |

*3) Provide the number of admissions for out of network utilization. Also provide the number of enrollees who incurred or whose dependents incurred claims for admissions to in-network hospitals for 2019, 2020, 2021 and 2022.*

| Item 3 | Out of Network | | | |
| | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| Inpatient Admissions - Enrollee | XXX | XXX | XXX | XXX |
| Inpatient Admissions - Dependent | XXX | XXX | XXX | XXX |
| Unique count of Enrollees with an Inpatient Admission | XXX | XXX | XXX | XXX |
| Unique count of Dependents with an Inpatient Admission | XXX | XXX | XXX | XXX |

*4)      Provide an Analysis of Beacon Health Participating providers and licensed providers by county and zip code, including membership by county and zip code for 2019, 2020, 2021 and 2022.*

See Tabs:

| 2019 INN Ind by County Zip | 2020 INN Ind by County Zip | 2021 INN Ind by County Zip | 2022 INN Ind by County Zip |
|---|---|---|---|
| 2019 INN Facility by County Zip | 2020 INN Facility by County Zip | 2021 INN Facility by County Zip | 2022 INN Facility by County Zip |
| 2019 PEF Mem by County Zip | 2020 PEF Mem by County Zip | 2021 PEF Mem by County Zip | 2022 PEF Mem by County Zip |

*5)  Provide the number of PS&T enrollees using participating and non-participating providers by county and zip code for 2019, 2020, 2021 and 2022.*

See Tabs:

| 2019 PEF Utilizers | 2020 PEF Utilizers | 2021 PEF Utilizers | 2022 PEF Utilizers |
|---|---|---|---|

*Telemedicine*

*1)      Provide claims and services that were subject to copay for 2019, 2020, 2021 and 2022.*

| Telehealth Item 1 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| Count of Telehealth  - Enrollee | XXX | XXX | XXX | XXX |
| Count of Telehealth  - Dependent | XXX | XXX | XXX | XXX |

*2)      Provide the number of enrollees who incurred or whose dependents incurred the claims that were subject to copay for 2019, 2020, 2021 and 2022.*

| Telehealth Item 2 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| Unique count of Enrollees with Telehealth | XXX | XXX | XXX | XXX |
| Unique count of Dependents with Telehealth | XXX | XXX | XXX | XXX |

Exhibit 9 - Sample Adhoc Reports

488

May 3, 2023

| NetworkDate | StateCode | County | Zip | APPLIED BEHAVIOR ANALYST | COUNSELOR | NURSE PRACTITIONER | OTHER LICENSE | PSYCHIATRIST | PSYCHOLOGIST | SOCIAL WORKER |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/01/2019 | NY | Albany | 12009 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12023 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12047 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12054 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12077 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12084 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12110 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12143 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12159 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12186 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12202 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12203 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12204 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12205 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12206 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12207 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12208 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12209 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12210 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Albany | 12211 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Allegany | 14727 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Allegany | 14744 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Allegany | 14803 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Allegany | 14806 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Allegany | 14813 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Allegany | 14895 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10451 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10452 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10453 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10454 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10455 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10456 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10457 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10458 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10459 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10460 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10461 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10462 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10463 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10465 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10466 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10467 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10468 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10469 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10470 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10471 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10472 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10473 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Bronx | 10475 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Broome | 13748 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Broome | 13760 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Broome | 13790 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Broome | 13850 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Broome | 13901 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Broome | 13903 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Broome | 13904 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Broome | 13905 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Cattaraugus | 14070 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Cattaraugus | 14706 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Cattaraugus | 14760 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Cattaraugus | 14779 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Cattaraugus | 14783 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Cayuga | 13021 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Cayuga | 13140 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Cayuga | 13160 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Cayuga | 13166 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chautauqua | 14048 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chautauqua | 14063 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chautauqua | 14701 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chautauqua | 14750 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chautauqua | 14787 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chemung | 14816 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chemung | 14845 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chemung | 14901 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chemung | 14904 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chemung | 14905 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chenango | 13411 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chenango | 13460 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chenango | 13730 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chenango | 13733 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chenango | 13778 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Chenango | 13815 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Clinton | 12901 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Clinton | 12903 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Clinton | 12912 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Clinton | 12919 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |
| 12/01/2019 | NY | Clinton | 12962 | XXX | XXX | XXX | XXX | XXX | XXX | XXX |

Exhibit 9 - Sample Adhoc Reports

Case 25-2509, Document 118-1, Filed 04/29/25, Page 536 of 590

Case 1:25-cv-00394-BR   Document 11-B-1   Filed 04/28/25   Page 835 of 890

Case 1:25-cv-04094-JER   Document 11-8-1   Filed 04/22/25   Page 603 of 1590

Case 25-1394, Document 118-1, Filed 04/29/25, Page 626 of 890

Case 1:25-cv-03984-JLR   Document 11-8   Filed 07/22/25   Page 623 of 590

Case 25-1094, Document 118-1, Filed 04/28/2025, Page 845 of 890

Empire Plan Mental Health and Substance Use Disorder Program
May 3, 2023



# Exhibit 11 – Provider Listings

As instructed in the RFP, we have provided the following files on USB:

Exhibit 11 – Provider Listings

510



# Exhibit 13 – GeoAccess



May 3, 2023



## ADHD disorders

- Are a chronic condition for school-age children and can last throughout adulthood.

- Affect up to 10% of the population.

- Have the highest prevalence of co-occurrence with depression, anxiety, learning disabilities, oppositional defiant disorder, conduct disorder, and substance use disorders.

- Can impact the child's schoolwork, self-esteem, and relationships with peers and family.

- Are treatable.

## When you sign up you will receive

- An ADHD screening tool.

- A tip sheet on understanding ADHD.

- Information on treatment options and conditions associated with ADHD.

- Information on coordination of care.

## Contact us

**achievesolutions.net/empireplan**

**877-769-7447**
Select option 3, then option 3, and then option 6, for ADHD assistance.



**Privacy is a priority**
Your personal information is kept private as called for by federal and state laws. No one will know you have accessed the program services unless you grant permission or express a concern that presents a legal obligation to release information (for example, if it is believed you are a danger to yourself or to others).

This brochure is for informational purposes only and does not guarantee eligibility for program services. Carelon Wellbeing services do not replace regular medical care. In an emergency, seek help immediately.

A02432NYMENCBH

## Could Your Child Have ADHD?



Exhibit 15 - Sample ADHD Materials

539

May 3, 2023

Carelon Behavioral Health, the company that manages mental health and substance use disorder services for the New York State Empire Plan, is offering a program that can help you.

## The program includes

- A confidential screening tool that you can take online, by telephone, or by mail, at no cost to you.

- Information about ADHD symptoms and treatment.

- Assistance in assessing your child's treatment options and with obtaining provider referrals.

- An Intensive Case Management component. Carelon Behavioral Health will offer participation to those members with more severe symptoms.

## Participation is

- Confidential. We don't share information without your permission.

- Voluntary.

- Available at no cost to you. Carelon Behavioral Health offers this program as part of your behavioral health benefit.

- Easy. Just call Carelon Behavioral Health.

## Signs of ADHD in children

- Have a hard time paying attention.

- Are easily distracted.

- Have trouble controlling their actions (even when they want to).

- Are unusually active or "agitated" (overexcited).

- Have difficulty sitting still.

- Act without thinking first.

- Start things but do not finish them.

- Get bored after just a short while.

- Daydream or seem to be in another world.

- Get frustrated with school or homework.

- Are always moving—fingers, hands, arms, feet, or legs.

If you suspect your child may have ADHD, discuss his or her symptoms with the child's pediatrician and contact Carelon Behavioral Health.



Learn more about ADHD online in the Quick Links section at:
**achievesolutions.net/empireplan**

Exhibit 15 - Sample ADHD Materials

540

May 3, 2023



**Carelon** ℠
**Behavioral Health**

## Contact us

**achievesolutions.net/empireplan**

**877-769-7447**

Select option 3, then option 3, and then option 6, for depression assistance.



# When you participate

You can call to receive a copy of our depression fact sheets or access the information online. These materials contain important information about depression, its treatment, and suggestions for managing symptoms.

**Privacy is a priority**

Your personal information is kept private as called for by federal and state laws. No one will know you have accessed the program services unless you grant permission or express a concern that presents a legal obligation to release information (for example, if it is believed you are a danger to yourself or to others).

This brochure is for informational purposes only and does not guarantee eligibility for program services. Carelon Wellbeing services do not replace regular medical care. In an emergency, seek help immediately.

A02434NYMENCBH

# Could You Have Depression?



NEW YORK STATE | The Empire Plan

Exhibit 16 - Sample Materials for Depression Program

541

Carelon Behavioral Health, the company that manages mental health and substance use disorder services for the New York State Empire Plan, is offering a program that can help you.

## The program includes

- Confidential screening that you can take online, by telephone, or by mail at no cost to you.

- Information about depression, its symptoms and treatment.

- Assistance in assessing your treatment options.

- An Intensive Care Management component. Carelon Behavioral Health will invite those members with more severe symptoms to participate.

## Participation is

- Confidential. We don't share information without your permission.

- Voluntary.

- Available at no cost to you. Carelon Behavioral Health offers this program as part of your behavioral health benefit.

- Easy. Just call Carelon Behavioral Health.

## Signs of depression

- Have you lost interest in activities you usually enjoy?

- Are you sleeping too much, too little, or waking up very early?

- Are you having trouble focusing or remembering?

- Do you have unexplained physical symptoms that don't go away?

- Do you feel down, depressed, or hopeless?

If you answered "Yes" to any of these questions, you may have depression.

If you think you may be depressed, discuss your symptoms with your physician and contact Carelon Behavioral Health.

## Depression

- Is a common and serious medical condition.

- Affects nearly 10% of adults in the U.S.

- Is a leading cause of disability.

- Can impact your family, friends, health, and job.

- Is treatable.



May 3, 2023

Learn more about Depression online in the Quick Links section at: **achievesolutions.net/empireplan**

Exhibit 16 - Sample Materials for Depression Program

542



## Eating disorders

- Are a complex and serious medical condition

- Have the highest premature mortality rate of any psychiatric disorder

- Can impact your health, family, friends, and job

- Are treatable

## Sign up to receive

- Tip sheets on eating disorders

- An eating behavior quiz

- Educational information

- Tip sheet for parents of children and teens with an eating disorder

- Treatment options and support

- Information on coordination of care to ensure the right care at the right time

Exhibit 17 - Sample Materials for Eating Disorder Program

## Contact us

**achievesolutions.net/empireplan**

**877-769-7447**

Select option 3, then option 3, and then option 6, for eating disorder assistance.

**Privacy is a priority**

Your personal information is kept private as called for by federal and state laws. No one will know you have accessed the program services unless you grant permission or express a concern that presents a legal obligation to release information (for example, if it is believed you are a danger to yourself or to others).

This brochure is for informational purposes only and does not guarantee eligibility for program services. Carelon Wellbeing services do not replace regular medical care. In an emergency, seek help immediately.

A02433NYMENCBH

May 3, 2023



## Could You Have An Eating Disorder?



543

May 3, 2023

Carelon Behavioral Health, the company that manages mental health and substance use disorder services for the New York State Empire Plan, is offering a program that can help you.

## The program includes

- A confidential screening tool that you can take online, by telephone, or by mail at no cost to you

- Information about eating disorder symptoms and treatment

- Assistance in assessing your treatment options and in coordinating care among treatment providers

- An Intensive Care Management component. Carelon Behavioral Health will invite those members with more severe symptoms to participate.

## Participation is

- Confidential. We don't share information without your permission.

- Voluntary

- Available at no cost to you. Carelon Behavioral Health offers this program as part of your behavioral health benefit.

- Easy. Just call Carelon Behavioral Health.

# Signs of an eating disorder

## Anorexia and Bulimia

- Restricting food intake or eating excessive amounts of food followed by purging

- Obsession with calories, fat grams, and food

- Use of any medicines and/or exercise to keep from gaining weight

- Distorted body image—thinking you are fat even when at a normal or below normal weight

- A feeling that you can't stop eating or control how much you eat

## Binge Eating Disorder

- Eating excessive amounts of food in a short amount of time

- No purging, excessive exercise, or fasting

If you suspect you or your child may have an eating disorder, discuss your symptoms with your physician and contact Carelon Behavioral Health.

Learn more about Eating Disorders online in the Quick Links section at: **achievesolutions.net/empireplan**



Exhibit 17 - Sample Materials for Eating Disorder Program

544

# Exhibit B



# Provider Search

Find providers in your network

<div>

Leave blank to search by location only

</div>

<div>

📍 Location

</div>

<div>

🔍

</div>

The Excelsior Plan, The Student Employee Health Plan (SEHP), and The Empire Plan share the same network of providers. If your provider participates with The Empire Plan, they also participate in The Excelsior Plan and SEHP network.

## Help me find care today:

For help with substance use treatment or mental health care, we can help you find a quality, in-network provider who is currently accepting patients. We can even help you find an appointment. Call the **Carelon Referral Line at 1-877-7-NYSHIP**, press option 3 for the mental health/substance use program, Option 3 for enrollee, and Option 3 for the Clinical Referral Line. This service is confidential and available to you 24 hours a day, every day of the year.

If there are no in-network treatment options in your area, we can make sure you receive in-network benefits and receive the best care to meet your needs.

Carelon Behavioral Health of California (Carelon of California) is a subsidiary of Carelon Behavioral Health. In order to search for a provider in the Carelon of California Mental Health or Substance Use Disorder or Mental Disorder (MHSUD) and/or Employee Assistance Program (EAP) networks, you have been directed to the Carelon Behavioral Health Provider Search site.

Carelon makes every effort to maintain accurate and up-to-date information. However, changes can occur at any time. The practice locations at which the provider/facility will see members is self-reported and verified during the initial credentialing process and every three years, as required by applicable state law. Self-reported practice location changes are updated on the website at least weekly.

To report possible inaccurate, incomplete, or misleading directory information, you may contact Carelon Behavioral Health by sending an email to prsfeedback@carelon.com or through the "Report Corrections" link within each individual provider's file. For practitioners participating with CAQH, updates are required to be made via CAQH for information to be visible within Carelon's Provider directory by authorizing release of your individual profile information to Carelon Behavioral Health, reviewing and attesting to your information. Facilities and Provider Groups may also change or update their information by visiting the provider portal or by calling the National Provider Services Line at 800-397-1630, Monday through Friday, 8 a.m.-8 p.m. ET, while members may call the toll-free number on their member identification card.

For consumers in Massachusetts, you may file complaints relating to Provider Directory inaccuracies or Provider network inadequacy to the Commonwealth's Division of Insurance. To do so, please visit https://www.mass.gov/how-to/filing-an-insurance-complaint and follow the instructions on how to submit online or by mail.

Members are entitled to full and equal access to covered services, including members with disabilities as required under the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973.

**IMPORTANT:** You can get an interpreter at no cost to talk to your doctor or health plan. To get an interpreter or to ask about written information in your language, first call the toll-free number on your member identification card.

<div>

English ⌄

</div>

Carelon Behavioral Health of California, Inc. (Carelon of California)

If you have an administrative question or inquiry regarding eligibility, benefit coverage or any other matter relating to the Carelon of California MHSUD or EAP benefit plans or if you believe you reasonably relied upon materially inaccurate, incomplete, or misleading directory information and wish to submit a complaint, you may telephone our Member Service Department at 800-228-1286 or call the telephone number listed in your Combined Evidence of Coverage and Disclosure Form. Our Member Services staff will work with you to resolve the matter.

IMPORTANT: You can get an interpreter at no cost to talk to your doctor or health plan. To get an interpreter or to ask about written information in your language, first call our Member Services Department at 800-228-1286. Someone who speaks your language can help you. If you need more help, you are encouraged to contact the Department of Managed Health Care, which protects consumers, by telephone at its toll-free number 888-466-2219, or at a TDD number for the hearing and speech impaired at 877-688-9891, or online at http://www.dmhc.ca.gov.

Members are entitled to full and equal access to covered services, including members with disabilities as required under the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973.

Provider Search (Búsqueda de proveedores) es un directorio en línea de Carelon Behavioral Health (Carelon) para localizar proveedores. Provider Search le ofrece la posibilidad de localizar proveedores e instalaciones de la red Carelon en todo el país. El uso de este directorio de proveedores no autoriza los beneficios ni los servicios. Antes de comenzar cualquier atención o programa con un proveedor, debe comunicarse con Carelon Behavioral Health para obtener beneficios y para que se le notifique sobre cualquier requisito específico que se aplique a su plan de beneficios según corresponda. Si no puede encontrar un proveedor dentro de la red a través de nuestro directorio, llame al número que está en el reverso de su tarjeta de seguro de salud a fin de obtener asistencia para encontrar un proveedor dentro de la red.

Carelon Behavioral Health of California (Carelon of California) es una subsidiaria de Carelon Behavioral Health. Para buscar un proveedor en las redes de Trastornos de la Salud Mental o de Abusos de Sustancias o de Trastornos Mentales (Mental Health or Substance Use Disorder or Mental Disorder, MHSUD) y/o en el Programa de Ayuda a los Empleados (Employee Assistance Program, EAP) de Carelon of California, ha sido direccionado al sitio de búsquedas de proveedores de Carelon Behavioral Health.

Carelon hace todo lo posible por mantener información precisa y actualizada. No obstante, puede haber cambios en cualquier momento. Las ubicaciones de los consultorios donde el proveedor/centro verá a los afiliados se informan individualmente y se verifican durante el proceso inicial de acreditación y cada tres años, según lo exigen las leyes estatales correspondientes. Los cambios de ubicación del consultorio informados por el interesado se actualizan en el sitio web al menos semanalmente.

Para reportar información de directorio posiblemente inexacta, incompleta o engañosa puede comunicarse con Carelon Behavioral Health por correo electrónico a prsfeedback@carelon.com o a través del enlace "Report Corrections" (Informar correcciones) dentro del archivo de cada proveedor individual. Después de autorizar la divulgación de la información de su perfil individual a Carelon Behavioral Health, los profesionales también pueden cambiar, actualizar, revisar y certificar su información a través de CAQH. Las instalaciones y los grupos de proveedores también pueden cambiar o actualizar su información a través del portal de proveedores o telefónicamente en la Línea Nacional de Servicios de Proveedores al 800-397-1630, de lunes a viernes, de 8 a. m. a 8 p. m., hora del Este, mientras que los afiliados pueden llamar al número gratuito que se encuentra en su tarjeta de identificación de afiliado.

Los consumidores de Massachusetts pueden presentar quejas relacionadas con imprecisiones en el directorio de proveedores o errores en la red del proveedor a la División de Seguros de la Mancomunidad. Para hacerlo, deben visitar https://www.mass.gov/how-to/filing-an-insurance-complaint y seguir las instrucciones sobre cómo hacer la presentación en línea o por correo electrónico.

Los afiliados tienen derecho al acceso total y equitativo a los servicios cubiertos, incluidos los afiliados con discapacidades según lo exige la Ley sobre Estadounidenses con Discapacidades (Americans with Disabilities Act) de 1990 y la sección 504 de la Ley de Rehabilitación (Rehabilitation Act) de 1973.

IMPORTANTE: Puede tener acceso, sin cargo, a un intérprete para que lo ayude a comunicarse con su médico o su plan de salud. Para acceder a un intérprete o solicitar información escrita en su idioma, primero llame al número gratuito que se encuentra en su tarjeta de identificación de afiliado.

Carelon Behavioral Health of California, Inc. (Carelon of California)

Si tiene una pregunta o una inquietud administrativa acerca de la elegibilidad, la cobertura de beneficios o cualquier otro asunto relacionado con los planes de beneficios de MHSUD o de EAP de Carelon of California, o bien, si cree que se basó razonablemente en información de directorio inexacta, incompleta o engañosa, y desea presentar una queja, puede llamar por teléfono a nuestro Departamento de Servicio para Afiliados al 800-228-1286 o al número que figura en su Evidencia de Cobertura y Formulario de Divulgación Combinados. El personal del Departamento de Servicios para Afiliados lo asistirá para resolver el problema.

IMPORTANTE: Puede tener acceso, sin cargo, a un intérprete para que lo ayude a comunicarse con su médico o su plan de salud. Para tener acceso a un intérprete o pedir información escrita en su idioma, primero llame a nuestro Departamento de Servicios para Afiliados al 800-228-1286. Alguien que hable en su idioma podrá ayudarlo. Si necesita más ayuda, le sugerimos que se ponga en contacto con el

English ▼

Departamento de Atención Médica Administrada, que protege a los consumidores, por teléfono al número gratuito 888-466-2219, o a un número TDD para personas con discapacidad auditiva y del habla al 877-688-9891, o en línea en http://www.dmhc.ca.gov.

Los afiliados tienen derecho al acceso total y equitativo a los servicios cubiertos, incluidos los afiliados con discapacidades según lo exige la Ley sobre Estadounidenses con Discapacidades (Americans with Disabilities Act) de 1990 y la sección 504 de la Ley de Rehabilitación (Rehabilitation Act) de 1973.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

English