UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JANE DOE, *as mother of Minor Doe*, *on behalf of themselves and all others similarly situated*, HANNAH LANDERER, *on behalf of themselves and all others similarly situated*, and STEVEN MARKS, *on behalf of themselves and all others similarly situated*,

                    Plaintiffs,

       – against –

CARELON BEHAVIORAL HEALTH, INC.,

                    Defendant.

---

**OPINION & ORDER**

25-cv-03489 (ER)

---

RAMOS, D.J.:

    Jane Doe as mother of Minor Doe, Hannah Landerer, and Steven Marks (together, "Plaintiffs") are insured by the New York State Health Insurance Program ("NYSHIP") and are suing Carelon Behavioral Health, Inc. ("Carelon"),[1] the administrator of the mental health portion of NYSHIP, alleging that Carelon publishes an inaccurate and misleading directory of in-network mental health providers. Doc. 1 ¶ 7. Plaintiffs bring this putative class action against Carelon alleging breach of contract, breach of the implied covenant of good faith and fair dealing, violations of New York General Business Law §§ 349 and 350, violations of New York Insurance Law § 4226, fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment. Doc. 1 ¶¶ 268–345. Before the Court is Carelon's motion to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 14. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

---

[1] Prior to March 2023, Carelon was known as Beacon Health Options. Doc. 1 ¶ 23.

## I.    BACKGROUND

### A.  Factual Background[2]

The State of New York operates NYSHIP to provide health insurance to state employees, retirees, and eligible dependents.  Doc. 1-1 at 2.  The State contracts with third-party health providers to administer services under NYSHIP.  Doc. 1 ¶¶ 131–32. State employees eligible for NYSHIP may choose to enroll in either a preferred provider organization plan administered by United Health Care and Carelon or a plan from one of various regional health maintenance organizations.[3]  *Id*. ¶ 131.  Members pay their medical premiums directly to NYSHIP, but Plaintiffs allege that NYSHIP directs a portion of members' premiums to Carelon.  *Id.* ¶¶ 84, 104, 122, 244.

#### 1.  The Contract

The New York State Department of Civil Service has a contract with Carelon[4] ("the Contract") to "administer the Mental Health and Substance Use . . . Disorder Program" for NYSHIP's preferred provider organization plan (the "NYSHIP Plan").[5] Docs. 1-1 at 2; 1 ¶¶ 23, 131–32.  The Contract provides that Carelon is engaged by New York to "deliver [NYSHIP] Administration Services, pursuant to the terms and conditions set forth in [the Contract]."[6]  Doc. 1-1 at 2.  Although NYSHIP Plan members are

---

[2] The following facts are drawn from allegations contained in the amended complaint, Doc. 1, which the Court accepts as true for purposes of the instant motion.  *Koch v. Christie's International, PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court also considers the contract between New York State and Carelon, Doc. 1-1, and its appendices, Doc. 1-2, which are both integral to and incorporated by reference in the amended complaint.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

[3] United Healthcare administers the medical and surgical portion of the preferred provider organization plan, while Carelon administers the mental health portion of the plan.  Doc. 1 ¶ 131.

[4] Carelon is a Massachusetts-based company registered to do business in New York.  Doc. 1 ¶ 24.

[5] In the complaint, Plaintiffs refer to Carelon as "the entity that administers the . . . Mental Health and Substance Use Program of the NYSHIP plan."  Doc. 1 ¶ 23.  In the memorandum of law in support of its motion to dismiss, Carelon refers to itself as a "claims administrator," and Plaintiffs do not dispute this characterization.  Doc. 16 at 14, 20, 22.

[6] Plaintiffs refer to the mental health portion of the New York State Health Insurance Program as "NYSHIP," the "Empire Plan," and the "Mental Health and Substance Use Program."  *See* Doc. 1 ¶¶ 8, 20, 23, 137, 145, 147, 151, 174, 302.  For simplicity, the Court will refer to the mental health portion of the New York State Health Insurance Program as "NYSHIP."

mentioned throughout the Contract, the only signatories to the Contract are the New York State Department of Civil Service and Carelon.[7]  Docs. 1-1 at 2, 56; 1 ¶ 272.

"[NYSHIP] was established by the New York State Legislature in 1957 to provide essential health insurance protection to eligible New York State . . . employees, retirees, and their [e]ligible [d]ependents."  Doc. 1-1 at 114.  New York State administers NYSHIP to provide behavioral health insurance protection to eligible members enrolled in the Empire Plan, Excelsior Plan, and Student Employee Health Plan.  *Id.* at 2.

The Contract states that Carelon "must have a contracted Provider network in place, that meets or exceeds the required access standards set forth in Section 5.10 of [the] Contract," Docs. 1-1 at 6; 1 ¶ 172, which specifies that Carelon's "proposed network within [New York State] must meet the network adequacy standards as defined by the [Department of Financial Services]."  Docs. 1-1 at 25; 1 ¶ 173.  Pursuant to Section 5.10.7(f), Carelon must have

> adequate network management and staff to manage the network, handle Provider inquiries and ensure updated [NYSHIP] Provider information is entered into [Carelon's] system and transmitted to the online directory.  An adequate [NYSHIP] Provider relations staff must be dedicated to New York State, where the majority of [NYSHIP] Disorder Program utilization occurs.

Docs. 1-1 at 26–27; 1 ¶ 174.  Further, pursuant to Section 7.2 of the Contract, Carelon is "expected to use its best efforts to substantially maintain the composition of Network Providers included in the [Mental Health and Substance Use] Disorder Program's current Provider Network."  Docs. 1-1 at 44; 1 ¶ 175.

Additionally, the Contract provides that Carelon "shall monitor network physicians to ascertain if their practices are open or closed to new patients."  Docs. 1-1 at 25; 1 ¶ 176.

---

[7] The first contract between New York State and Carelon was effective between February 26, 2016, and December 31, 2023, for $2,465,000,000, and the successor contract, effective between January 1, 2024, and December 31, 2028, is for $2,785,391,306.65.  Doc. 1 ¶ 132.

The Contract requires that Carelon "shall assist in developing the [NYSHIP] Plan Participating Provider Directories on an annual basis as required by New York State Insurance Law §§ 3217-a(a)(17) and 4324(a)(17) and Public Health Law § 4408(r)," and it must "provide a web link, for the Department's website, that is accessible to the general public and does not require Member log in." Docs. 1-2 at 25–26; 1 ¶ 178. Carelon's online directory must "provide Members with a user-friendly interface that allows them to search for Providers and Facilities, as indicated in the [NYSHIP] Plan Certificates . . . based on geographic location, name, or specialty," and it must "detail all [NYSHIP] Provider information as required by State and federal law." Docs. 1-2 at 26; 1 ¶ 178. The information Carelon provides about NYSHIP Providers "in all geographic locations shall be accessible through this single link and search functions." Docs. 1-2 at 26; 1 ¶ 178. The Contract requires that the directory "be updated weekly or more frequently, if necessary, to ensure Members have access to the most up-to-date information," and Carelon "must ensure the directory contains the most up-to-date information regarding network . . . Providers and Facilities, including if the . . . Provider is accepting new patients." Docs. 1-2 at 26; 1 ¶ 178.

Sections 3.10 and 5.11 of the Request for Proposal provide minimum access guarantees in urban, suburban, and rural areas.[8] Doc. 1-2 at 51–52; *id.* at 89–94. For example, in urban areas, 95% of enrollees will have at least: (1) one psychiatrist, psychologist, or masters level clinician within three miles; and (2) one mental health or substance use facility within five miles. Docs. 1-2 at 51–52; 1 ¶ 180.

---

[8] The Request for Proposal was issued by the New York State Department of Civil Service to secure the services of a vendor to administer the Mental Health and Substance Use Disorder Program for NYSHIP. Doc. 1-1 at 114. The Request for Proposal "defines minimum contract requirements, details response requirements, and outlines the Department's process for evaluating responses and selecting a qualified organization." *Id.* The Request for Proposal further provides that New York "will only contract with a single Offeror, which will be the sole contact regarding all provisions of the Contract. [The] Contract is defined as the agreement, resultant from this [Request for Proposal], entered into between the Department and the single Offeror." *Id.*

Notably, the Contract includes a "No Third-Party Beneficiaries" provision, which states that "[n]othing contained in the Contract, expressed or implied, is intended to confer upon any person or corporation, other than the Parties hereto . . . any rights or remedies under or by reason of the Contract."  Doc. 1-1 at 69.

2. *The Representations*

NYSHIP, the New York State Department of Civil Service, and Carelon each make representations concerning the availability of mental health services.  NYSHIP details plan benefits through its "At a Glance" booklet and its Certificate of Insurance, Doc. 1 ¶¶ 133–38, 155, 156–160; the New York State Department of Civil Service provided information about NYSHIP benefits to plan members in May of 2024 through a "Special Report," *id.* ¶¶ 150–53; and Carelon details its services on its website and through marketing materials, *id.* ¶¶ 182, 191, 193, 200, 201.

a. *The "At a Glance" Booklet*

NYSHIP publishes a booklet online detailing plan benefits called "At a Glance."  *Id.* ¶¶ 133, 155.  The booklet states that "[t]his guide briefly describes [NYSHIP] Plan benefits.  It is not a complete description and is subject to change.  For a complete description of your benefits and responsibilities, refer to your [NYSHIP] Plan Certificate and Certificate Amendments."  *Id.* ¶ 133.  Members and prospective members are told that "all plans have both inpatient and outpatient mental health coverage," that NYSHIP "offers both network and non-network benefits," and that there is a "$25 co-pay" when a member uses an in-network provider.  *Id.* ¶¶ 134–36.  The booklet states that "[e]ven if there are no network providers in your area, you are guaranteed access to network benefits within the United States and its territories."  *Id.* ¶¶ 137–38.

b. *The NYSHIP Certificate of Insurance*

The NYSHIP Certificate of Insurance provides that "[i]f [y]ou use [n]on-[n]etwork [h]ospitals and [f]acilities, [y]ou will receive network benefits for covered services" when "no [n]etwork [f]acility is available within 30 miles of [y]our residence"

5

or "no [n]etwork [f]acility within 30 miles of [y]our residence can provide the covered services [y]ou require." *Id.* ¶ 156. The Certificate of Insurance further states that

> [b]y using a [n]etwork [p]rovider, [y]ou will receive [n]etwork [c]overage for [m]edically [n]ecessary treatment. The Program's network gives [y]ou access to a wide range of [p]roviders when [y]ou need [m]ental [h]ealth [c]are or [s]ubstance [u]se [c]are. These [p]roviders are in [y]our community and many of them have been caring for [] Plan enrollees and their families for years.

*Id.* ¶ 158. The Certificate continues, stating that "[y]ou are guaranteed access to [n]etwork [c]overage. If [y]ou cannot locate a [n]etwork [p]rovider in [y]our area, then contact the Clinical Referral Line. On a case-by-case basis . . . [n]on-[n]etwork [c]overage may be considered [n]etwork [c]overage." *Id.* ¶ 159. If a member uses an out-of-network provider, the Certificate of Insurance explains that NYSHIP pays for certain covered percentages. *Id.* ¶ 160.

   c. *The "Special Report"*

   In May 2024, the New York State Department of Civil Service published a "Special Report" explaining to members that there was "[i]nformation about [their] new NYSHIP benefits effective July 1, 2024." *Id.* ¶ 150. The Special Report informed members that if they need a specialist and there are no network providers in their area, they should call the NYSHIP Plan, which "can assist you in obtaining network benefits from a medical/surgical provider if there is not a network provider within 30 miles or 30 minutes from your home address. Under [NYSHIP], if there are no network providers in your area, you have guaranteed access to network benefits if you use the [Clinical Referral Line]." *Id.* ¶ 151. The Special Report also notes that members can ensure a provider is in-network by "check[ing] the online directory on NYSHIP Online and select[ing] the link to the appropriate online directory" or "call[ing] [t]he [NYSHIP] Plan and select[ing] the appropriate Program." *Id.* ¶ 152.

### d. Carelon's Website

Carelon also maintains a public website, which, among other things, states that "what makes [it] different" is its "[r]obust specialty provider network," and that "[t]hrough [its] deep provider network and unrivaled care management, [it] improve[s] access to behavioral health services and help[s] deliver the right treatment, at the right time, and in the right setting." *Id.* ¶ 182. As of March 17, 2025, Carelon's website stated that it had "more than 115,000" in-network providers nationwide. *Id.* ¶ 193. Carelon represents that it maintains a "broad network of licensed clinicians [who are] available to fill gaps by providing access to care with comprehensive and vital resources." *Id.* ¶ 200. Carelon's Provider Handbook additionally states that "Carelon arranges for the provision of and access to a broad scope of behavioral health services for members through its provider networks, consisting of appropriately licensed and/or certified practitioners, facilities, providers, and programs offering varying levels of service." *Id.* ¶ 201.

Carelon also publishes a publicly available online directory of in-network doctors. *Id.* ¶ 183. Plaintiffs allege that this is the "definitive resource" to identify which providers are in Carelon's network. *Id.* ¶ 184. Carelon's "Provider Search" states that "Carelon makes every effort to maintain accurate and up-to-date information." *Id.* ¶ 202.

### e. Marketing Materials

Additionally, Carelon provides consumers with marketing and program materials, which Plaintiffs allege "promise mental health benefits and a robust network of in-network providers." *Id.* ¶ 191. Through these materials, Carelon represents that its network is adequately sized, that providers listed in the online directory are in-network, that there are available mental health care providers in its network, that members can rely on the directory to find and contact providers, and that mental health care coverage is comprehensive. *Id.* ¶¶ 187, 200, 204, 207, 214, 216, 239, 290, 303.

### B. Plaintiffs' Allegations

Plaintiff Jane Doe used Carelon's provider directory to attempt to find mental health care for her then 14-year-old daughter, Minor Doe, beginning in 2023. *Id.* ¶¶ 81–82. The Does were searching for a therapist with experience working with teenage girls, and they were willing to travel up to 25 miles to get in-person therapy. *Id.* The Does estimate they called over 100 providers listed as in-network on Carelon's directory but found that the vast majority were not actually in-network, and the rest were not accepting new patients. *Id.* ¶ 82. The Does ultimately sought care from out-of-network providers. *Id.* ¶ 83. The Does paid $68.96 for each visit, rather than the $25 they would have paid for an in-network provider. *Id.* ¶ 165. The Does have paid dozens of these charges to access care for Minor Doe. *Id.* ¶ 166. The Does pay a premium of approximately $62.28 every two weeks for their NYSHIP coverage. *Id.* ¶ 84.

Plaintiff Hannah Landerer used Carelon's directory to search for a mental health provider in-network with NYSHIP beginning in 2019. *Id.* ¶ 93. Landerer called nearly a dozen providers from the directory but found that most of the listed providers did not accept the NYSHIP Plan and the few who did were not accepting new patients. *Id.* ¶ 95. Landerer ultimately sought care from an out-of-network provider. *Id.* ¶ 98. Landerer paid $165 a session for eight sessions to meet her deductible, and she also paid a $33 copay for each session, and $360 for couples' therapy. *Id.* ¶ 102. Landerer pays a premium of approximately $362 every two weeks for her NYSHIP coverage. *Id.* ¶ 104.

Plaintiff Steven Marks sought a mental health provider in 2023. *Id.* ¶ 112. Using Carelon's online directory, Marks selected a provider listed as in-network. *Id.* Soon after Marks saw that provider, he received an "Explanation of Benefits" from Carelon showing that Carelon only covered $537 of the total billed amount of $1,017, resulting in a much higher cost than the expected $25 co-pay. *Id.* ¶¶ 113, 136. Carelon told Marks that the provider dropped out of the network a month earlier and that Marks was responsible for the remaining balance. *Id.* ¶ 114. Searching for a provider who actually accepted the

8

NYSHIP Plan, Marks called approximately 15 providers from Carelon's online directory. *Id.* ¶ 115.  Although approximately half said they were in-network, none were accepting new patients.  *Id.*  Marks ultimately found an in-network provider using Carelon's directory.  *Id.* ¶ 118.  The provider, however, was listed with the incorrect address.  *Id.* ¶ 119.  Marks pays a premium of approximately $102.43 every two weeks for his NYSHIP coverage.  *Id.* ¶ 122.

### C.  Secret Shopper Surveys

Between November 2024 and February 2025, counsel for Plaintiffs conducted multiple "secret shopper" surveys designed to recreate the Plaintiffs' experiences searching for mental health providers.  *Id.* ¶ 77.  For each secret shopper survey, counsel searched for providers using Plaintiffs' criteria.  *Id.*  Counsel then called the first 100 names generated by Carelon's provider directory.  *Id.* ¶¶ 87, 106, 126.  Over several days, 3 attempts were made to call each provider.  *Id.*  Counsel then documented whether the provider was indeed the type of provider listed in the directory, whether they accepted NYSHIP, whether they were accepting new patients, and the wait time for an appointment.  *Id.* ¶¶ 77, 78.

On behalf of the Does, Plaintiffs' counsel used Carelon's directory to search for an in-network therapist with experience serving adolescent girls within 25 miles of their home.  *Id.* ¶ 87.  Of the first 100 providers listed in Carelon's directory, 18 were unreachable.[9]  *Id.* ¶ 89.  Among the 82 connected calls, 18 did not accept NYSHIP, 17 provided the "wrong type of service," 14 were not at the listed location, 2 accepted NYSHIP but did not have any availability within a month, 1 accepted NYSHIP but was not accepting new patients, 1 had no provider with the listed name, and 23 required the patient to book online with the submission of a registration form and insurance card

---

[9] Unreachable is defined as either a disconnected phone, an incorrect phone number, or three voicemail messages left with no return phone call.  Doc. 1 ¶ 89.

details. *Id.* ¶ 90. Out of the 100 providers called, it was possible to make 6 appointments. *Id.* ¶ 88.

On behalf of Hannah Landerer, Plaintiffs' counsel used Carelon's directory to search for an in-network therapist with experience serving adults within 25 miles of her home. *Id.* ¶ 106. Of the first 100 providers listed in Carelon's directory, 26 were unreachable. *Id.* ¶ 108. Among the 74 connected calls, 25 did not accept NYSHIP, 22 were not accepting new patients, 5 were not at the listed location, 4 accepted NYSHIP but did not have any availability within a month, 2 only offered hospital in-patient services, and 1 provided the "wrong type of service." *Id.* ¶ 109. Out of the 100 providers called, it was possible to make 27 appointments. *Id.*

On behalf of Steven Marks, Plaintiffs' counsel used Carelon's directory to search for an in-network therapist with experience serving adults within 25 miles of his home. *Id.* ¶ 126. Of the first 100 providers listed in Carelon's directory, 17 were unreachable. *Id.* ¶ 128. Among the 83 connected calls, 67 did not accept NYSHIP, 4 were not at the listed location, 3 were not accepting new patients, 3 only offered hospital in-patient services, 3 offered the "wrong type of service," and 1 accepted NYSHIP but did not have any availability within a month. *Id.* ¶ 129. Out of the 100 providers called, it was possible to make 14 appointments. *Id.*

Plaintiffs in the putative class are New York residents who are also employees, or the family members of employees, of the State of New York who are, or were previously, enrolled in the NYSHIP Plan from 2019 onward and who attempted to use Carelon's directory of mental health providers. *Id.* ¶ 258.

Plaintiffs allege that more than 80% of the providers listed in Carelon's online directory either do not exist, are listed with non-working or inaccurate telephone numbers, are unavailable to see new patients, are not actually in-network, are duplicate entries, or do not provide relevant mental health services. *Id.* ¶ 3; *see also id.* ¶¶ 186–190, 215.

10

Plaintiffs allege that they relied on the NYSHIP booklet, the Carelon website, and the Certificate of Insurance to understand their NYSHIP benefits. *Id.* ¶¶ 85, 101, 123. Plaintiffs allege they enrolled in the NYSHIP Plan because of Carelon's representations about the size and adequacy of its mental health provider network, the availability of providers in its network, the ability to rely on the directory to find and contact in-network providers, the freedom to choose any listed in-network provider, and the comprehensive coverage of mental health care. *Id.* ¶¶ 239, 320–24.

### D.  Procedural History

Plaintiffs filed this action on April 28, 2025, on behalf of all persons who are currently, or were previously, enrolled in the NYSHIP Plan at any point from 2019 through the date of class certification, who attempted to use Carelon's directory of mental health providers. [10]  Doc. 1 ¶¶ 257–58.  Plaintiffs bring claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violations of New York General Business Law §§ 349 and 350, violations of New York Insurance Law § 4226, fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment. *Id.* ¶¶ 268–345.  Plaintiffs bring these claims pursuant to 28 U.S.C. §§ 1331, 1332(a), and 1332(d)(2). *Id.* ¶¶ 15–17.

Carelon filed the instant motion to dismiss on August 29, 2025, pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  Doc. 14.  Carelon argues that Plaintiffs' claims for breach of contract and breach of the covenant of good faith and fair dealing must be dismissed because Plaintiffs fail to establish a contract that they can enforce, Doc. 16 at 12–16; the claims under New York's deceptive practices and deceptive advertising laws must be dismissed because the purportedly deceptive information was and remains fully disclosed to the public, Doc. 16 at 16–18; the claim under New York Insurance Law § 4226 must be dismissed because Carelon is not engaged in the business

---

[10] As Carelon was known as Beacon Health Options until 2023, this includes individuals who attempted to use Beacon Health Options' directory.  Doc. 1 ¶¶ 23, 258.

11

of health insurance in New York, Doc. 16 at 18–20; the claims for fraudulent and negligent misrepresentation must be dismissed because Plaintiffs fail to show reasonable reliance on any purported misrepresentations or a duty to disclose, Doc. 16 at 20–23; and the unjust enrichment claim must be dismissed because Plaintiffs did not plead that they conferred a benefit on Carelon and because it is impermissibly duplicative of Plaintiffs' other legal claims.  Doc. 16 at 23–25.

## II.    LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "[A] complaint . . . does not need detailed factual allegations" to survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006).  Thus, when ruling on a motion to dismiss pursuant to Rule

12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

## III.   DISCUSSION

### A.  Judicial Notice of External Documents

In support of their motion to dismiss, Carelon requests that the Court take judicial notice of the New York Department of Financial Services ("DFS") database, which contains the "'most current information maintained by the Department' of companies licensed to write insurance." Doc. 16 at 19 (quoting Department of Financial Services, *Insurance Company Search*, https://www.dfs.ny.gov/apps_and_licensing/insurance_ companies/search). Although the Court is generally "confined to the allegations contained within the four corners of [the] complaint" in deciding a Rule 12(b)(6) motion, the Court "may also consider any documents attached to the complaint as an exhibit or incorporated in it by reference," *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 212 (2d Cir. 2017) (internal quotations omitted), "matters of which judicial notice may be taken under Fed.R.Evid. 201," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991), or documents the Plaintiffs relied on in drafting the complaint, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

The Court "need not accept as true any allegations that are contradicted by documents deemed to be part of the complaint, or materials amenable to judicial notice." *In re MBIA, Inc., Securities Litigation*, 700 F. Supp. 2d 566, 576 (S.D.N.Y. 2010). Courts routinely take judicial notice of the records of government agencies. *See, e.g.*, *Simeone v. T. Marzetti Co.*, No. 21 Civ. 9111 (KMK), 2023 WL 2665444, at *1 (S.D.N.Y. Mar. 28, 2023).

Accordingly, the Court will take judicial notice of DFS records only for the fact that DFS maintains a database of companies licensed to write insurance in New York, and the database did not list Carelon as a licensed insurer in New York on August 28, 2025.

13

Doc. 16 at 19; Department of Financial Services, *Insurance Company Search*, https://www.dfs.ny.gov/apps_and_licensing/insurance_companies/search.

### B. Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

Carelon argues that Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing should be dismissed because Plaintiffs fail to establish the existence of an enforceable contract between themselves and Carelon. Doc. 16 at 12.

"Under New York law, a claim for breach of contract requires:  (i) the existence of an enforceable agreement; (ii) adequate performance of the contract by the plaintiff; (iii) a breach of that agreement by the defendant; and (iv) damages resulting from the breach." *Demand Electric, Inc. v. Innovative Technology Holdings, LLC*, 665 F. Supp. 3d 498, 504 (S.D.N.Y. 2023).  A breach of the covenant of good faith and fair dealing is "a breach of the underlying contract."  *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992).  Thus, "[t]here can be no breach of contract, or the implied covenant of good faith and fair dealing, without a governing valid contract."  *Garrett v. Music Publishing Co. of America, LLC*, 740 F. Supp. 2d 457, 463 (S.D.N.Y. 2010).

Carelon argues that each of Plaintiffs' theories to establish an enforceable contract fail.  First, Carelon argues that Plaintiffs, as participants of the NYSHIP Plan, are not in contractual privity with Carelon.  Doc. 16 at 12–15.[11]  Second, Carelon argues that its marketing materials do not establish a direct contractual relationship with Plaintiffs.  *Id.* at 13–15.  Third, Carelon argues that Plaintiffs are not third-party beneficiaries of the Contract.  *Id.* at 15–16.  The Court examines each argument in turn.

#### 1. *Privity of Contract as Insured and Administrator*

Under New York law, a plaintiff may not assert a cause of action for breach of contract against a party with whom it is not in privity.  *Luckow v. RBG Design-Build, Inc.*,

---

[11] Plaintiffs concede that they are not parties to the Contract.  Doc. 1 ¶ 269.

156 A.D.3d 1289, 1291 (3d Dep't 2017). Thus, "a non-party to a contract generally lacks standing to enforce that agreement." *Ancile Investment Co. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 303 (S.D.N.Y. 2011). New York courts have concluded that third-party administrators, like Carelon, are not in privity with insureds. *See, e.g.*, *S.P. v. Dongbu Insurance Co.*, 174 A.D.3d 911, 914 (2d Dep't 2019) (finding that a third-party claims administrator was not in privity with an insured).

Carelon, as a third-party administrator for NYSHIP, is not in privity with Plaintiffs, who are insured by NYSHIP. In *S.P. v. Dongbu Insurance Co.*, the court dismissed a breach of contract claim where the defendant was a claims administrator for the insurer because, among other reasons, "[t]he evidence . . . conclusively established that [the administrator] . . . has no contractual privity with . . . the plaintiff." 174 A.D.3d at 914. Like *S.P.*, this case involves a breach of contract claim brought by insurance plan participants against a third-party plan administrator. Carelon is not a party to a contract of insurance with Plaintiffs but instead contracted with New York to "administer the Mental Health and Substance Use [] Disorder Program" for NYSHIP. Doc. 1-1 at 2. Just as the third-party claims administrator was not in privity with the insurance plan participants in *S.P.*, Carelon is not in privity with Plaintiffs.

Plaintiffs attempt to distinguish *S.P.* by arguing that the *S.P.* court "dismissed the contract claim against the administrator only because the evidence 'conclusively established' that, *among other things*, it 'did not have independent authority to issue the disclaimer [of coverage] and only did so at the direction of the insurer.'" Doc. 19 at 13–14 n.2 (emphasis added) (quoting *S.P.*, 174 A.D.3d at 914). In other words, Plaintiffs argue that the lack of privity found in *S.P.* was not sufficient, by itself, to dismiss the contract claim. However, this Court reads the finding of a lack of privity in *S.P.* to be an independent and sufficient basis for the dismissal of the plaintiff's contract claims. *S.P.*, 174 A.D.3d at 914. In addition to finding a lack of privity between the administrator and plaintiff, the *S.P.* court found that the third-party administrator was "not an insurance

company" and did not have the independent authority to disclaim coverage of an injury the plaintiff allegedly sustained. *Id.* This Court reads each of these findings to be independent and sufficient bases for dismissal and therefore considers the finding of a lack of privity in *S.P.* to be persuasive. *Id.*

The case law Plaintiffs rely on to argue that as plan participants they are in privity with the third-party administrator is inapposite. Plaintiffs first rely on *Sprentall v. Beacon Health Options, Inc.*, No. 20 Civ 1703 (PG), 2021 WL 1063392 (S.D.N.Y. Mar 19, 2021). Doc. 19 at 12–13. In *Sprentall*, plaintiffs were participants in a previous iteration of the NYSHIP plan, and they sued Beacon Health Options, now known as Carelon, for breach of contract. *Sprentall*, 2021 WL 1063392, at *1. Similarly to the instant case, in *Sprentall*, Beacon Health Options argued that a NYSHIP insured's breach of contract claim against it should be dismissed for lack of privity. *Id.* at *5. The *Sprentall* court ultimately denied Beacon's motion to dismiss because: (1) Beacon "[did] not cite[] a single New York case dismissing a breach of contract claim on privity grounds where the claim is brought by a plan participant against a third-party administrator"; and (2) because "at least one court in this Circuit has allowed a breach of contract claim brought under New York law to proceed against an insurance administrator that managed a program under NYSHIP." *Id.* at *5–6 (citing *Uddoh v. United Healthcare*, No. 16 Civ. 1002 (BC), 2017 WL 563973 (E.D.N.Y. Feb. 10, 2017)).

The Court declines to follow *Sprentall*. First, as noted above, unlike the defendant in *Sprentall*, Carelon does cite New York cases in which breach of contract claims brought by plan participants against third-party plan administrators were dismissed on privity grounds. [12] *See* Doc. 16 at 14; Doc. 20 at 7; *see, e.g.*, *S.P.*, 174 A.D.3d at 914.

---

[12] Although the Court finds *S.P.*, 174 A.D.3d at 914, persuasive, Carelon's citation to *Lipton v. Unumprovident Corp.*,10 A.D.3d 703, 706 (2d Dep't 2004), is inapposite. Carelon cites *Lipton* as an example in which an "administrator not party to [an] insurance contract" was found to owe "no contractual duties" to the plaintiff, who was a member of a group insurance plan procured by his employer, and was therefore not "susceptible to [a] breach of contract suit." Doc. 20 at 7. The *Lipton* court dismissed a breach of contract claim against the employer that procured a group insurance plan for its employees because the employer "was not a party to the contract of insurance between participants in the plan" and the insurer.

16

Second, although the *Uddoh* court "declined to pass upon" a breach of contract claim against United Healthcare, an insurance administrator that managed a program under NYSHIP, the *Uddoh* court did not address the issue of privity.  In *Uddoh*, a New York state employee enrolled in NYSHIP sued both NYSHIP and United Healthcare after United Healthcare denied him and his spouse medical benefits.  2017 WL 563973, at *1. In dismissing the plaintiffs' claims with leave to amend, the *Uddoh* court expressly declined to "pass upon" the plaintiffs' breach of contract claim against United Healthcare, noting that "in filing the amended complaint, plaintiffs would be well-served to make those claims more plausible."  *Id.* at *5.  The court did not rule on whether contractual privity existed between the plaintiffs and United Healthcare.  *Id.*

Plaintiffs' citations to *Nyasha Services, Inc. v. People Care Inc.*, 141 A.D.3d 785, 790– 91 (3d Dep't 2016), and *Nyasha Services, Inc. v. Recco Home Care Services, Inc.*, 141 A.D.3d 792, 797–98 (3d Dep't 2016), are also unpersuasive.  Doc. 19 at 13.  Both cases involved a third-party beneficiary theory and did not address Plaintiffs' privity theory.  *Nyasha*, 141 A.D.3d at 790–91; *Nyasha*, 141 A.D.3d at 797–98.  In both of the *Nyasha* cases, the court concluded that third-party beneficiary status was appropriate due to the "presence of an express indemnification clause" in the contract between a third-party trust administrator and the trust and the "corresponding absence of any language expressly negating enforcement by third parties."  141 A.D.3d at 790; *see also* 141 A.D.3d at 797 (discussing indemnification clause).  As discussed below, the Contract here expressly precludes enforcement by third parties and provides Plaintiffs no enforceable rights.  Accordingly, the *Nyasha* cases cited by Plaintiffs are inapposite.

Finally, Plaintiffs' citation to *Blue Cross of Northeastern New York, Inc. v. Ayotte*, 35 A.D.2d 258, 260 (3d Dep't 1970), to argue that privity is not required by New York

---

*Lipton*, 10 A.D.3d at 706.  While Carelon, as a third-party administrator, also was not a party to the contract of insurance between NYSHIP and its members, the relationship between an employer that procured a group insurance plan and its employees is distinct from the relationship between insurance plan participants and the third-party administrator of the insurance plan.

law when an insured seeks to enforce the terms of a group insurance policy, is inapplicable. Doc. 19 at 13. The plaintiffs in *Ayotte* were dependent beneficiaries of insureds while the defendant was the health insurance company itself. *Ayotte*, 35 A.D.2d at 259. Although the dependent beneficiaries were not a party to the insurance contract at issue, the court found that privity was unnecessary for the plaintiffs to enforce the terms of the insurance policy. *Id.* at 260. This conclusion was premised upon the relationship between an insurer and an insured's dependent beneficiary, which is distinct from the relationship between insurance plan members and a third-party administrator.

Accordingly, Carelon has adequately demonstrated that they are not in contractual privity with Plaintiffs.

### 2. *The Marketing Materials Do Not Create a Contractual Relationship between the Parties*

Carelon argues that they do not have a direct contractual relationship with Plaintiffs based on their marketing materials because: (1) Carelon is not Plaintiffs' insurer, thus caselaw showing that insureds can sustain breach of contract claims against their insurers is inapplicable; and (2) written representations made in marketing materials cannot establish a contract where one does not exist. Doc. 16 at 13.

As a preliminary matter, under the Contract, Carelon is not Plaintiffs' insurer, and Plaintiff's cited caselaw showing that insureds can sustain breach of contract claims against an insurer based on plan materials is inapplicable. *See Orlander v. Staples, Inc.*, 802 F.3d 289, 294 & n.5 (2d Cir. 2015) (demonstrating that insured has a breach of contract claim against insurance company based on marketing materials); *Salomon v. E. & W. Blanksteen Agency, Inc.*, 120 A.D.2d 427, 428–29 (1st Dep't 1986) (same).

Although Plaintiffs allege Carelon is their insurer, Doc. 1 ¶ 270, the Contract between New York and Carelon provides that Carelon will "administer the Mental Health and Substance Use [] Disorder Program" for NYSHIP. Doc. 1-1 at 2; *see also* Doc. 1 ¶ 23 (alleging Carelon "administers the [] Mental Health and Substance Use Program of

18

the NYSHIP plan"). As the language of the Contract demonstrates that New York State contracted with Carelon as a third-party administrator, not an insurer, the Court need not accept as true Plaintiffs' allegation that Carelon is their insurer.[13] Accordingly, no direct contract exists between Plaintiffs and Carelon.

Carelon also does not have a direct contractual relationship with Plaintiffs based on the "materials provided by the Defendant" because marketing materials cannot establish a contract where one does not exist. Doc. 19 at 14. A contract cannot be formed absent a "meeting of the minds on the agreement" and "[m]utual assent evincing the intention of the parties to form a contract." *Gomez v. Bicknell*, 302 A.D.2d 107, 115–16 (2d Dep't 2002). Marketing materials and advertisements "are not ordinarily intended or understood as offers to sell. . . . It is of course possible to make an offer by an advertisement directed to the general public, but there must ordinarily be some language of commitment or some invitation to take action without further communication." *Leonard v. Pepsico Inc.*, 88 F. Supp. 2d 116, 122–23 (S.D.N.Y. 1999) (citation omitted) (quoting Restatement (Second) of Contracts § 26 cmt. b (1979)).

Marketing materials may only provide or supplement the terms of an otherwise ambiguous agreement that already exists. *See Orlander*, 802 F.3d at 294; *Salomon*, 120 A.D.2d at 428–29. In *Orlander*, for example, the defendant did not dispute that a contractual relationship existed between the parties, as seller and buyer. *Orlander*, 802 F.3d at 294. The *Orlander* court therefore did not hold that a marketing brochure formed a contractual relationship, as Plaintiffs argue, but instead held that the brochure set forth the terms of an already established contractual relationship. *Id. Orlander* is therefore distinguishable. Similarly, while the plaintiffs in *Salomon* were "entitled to rely upon representations in solicitation materials as part of insurance contract binding the insurer,"

---

[13] The Court need not accept as true any allegations of a complaint which are contradicted by documents incorporated by reference therein. *In re Elan Corporation*, No. 02 Civ. 865 (RMB) (FM), 2004 WL 1305845, at *12 (S.D.N.Y. May 18, 2004).

19

the parties were in a contractual relationship as insurer and insured. *Salomon*, 120 A.D.2d at 428–29.[14]

Since Plaintiffs do not have an established contractual relationship with Carelon as insurer-insured, and marketing materials are not offers to sell under New York law, the materials distributed by Carelon fail to establish a direct contractual relationship between Carelon and Plaintiffs.

### 3.  Third-Party Beneficiary Theory

Carelon argues that Plaintiffs are not intended third-party beneficiaries of the Contract because (1) the Contract "contains no such language contemplating enforcement by Plaintiffs and, indeed, makes clear that no such enforcement is intended," Doc. 16 at 16; (2) Plaintiffs are not in privity with Carelon, Doc. 20 at 10, (3) the Contract is not an insurance contract, *id.*, and (4) Carelon did not render services under the Contract directly to Plaintiffs, *id.*

To succeed on a third-party beneficiary theory under New York law, "the language of the contract must clearly evidence an intent to permit enforcement by the third party." *Consolidated Edison, Inc. v. Northeast Utilities*, 426 F.3d 524, 528 (2d Cir. 2005) (internal quotations omitted). A no third-party beneficiary provision in a contract is enforceable unless the plaintiff identifies an exception to its application, or a basis for rejecting the provision, such as an express provision granting plaintiffs enforceable rights. *Fuisz v. 6 E. 72nd Street Corp.*, 222 A.D.3d 402, 404 (1st Dep't 2023); *Diamond Castle Partners IV PRC, L.P. v. IAC/InterActivecorp*, 82 A.D.3d 421, 422 (1st Dep't 2011).

---

[14] The additional cases cited by Plaintiffs reach similar holdings. In *Rynasko*, the court's determination that "specific promises set forth in a school's bulletins, circulars and handbooks, which are material to the student's relationship with the school, can establish the existence of an implied contract" was specific to the relationship between a university and its students, and "New York courts have long recognized that the relationship between a university and its students is 'contractual in nature.'" *Rynasko v. New York University*, 63 F.4th 186, 197–98 (2d Cir. 2023). Similarly, the parties in *Lawrence v. Town of Irondequoit* were in a contractual relationship as employer and employees receiving healthcare benefits, the terms of which were governed by an employment manual. 246 F. Supp. 2d 150, 165–69 (W.D.N.Y. 2002).

The "No Third-Party Beneficiaries" provision of the Contract provides that "[n]othing contained in the Contract, expressed or implied, is intended to confer upon any person or corporation, other than the Parties hereto . . . any rights or remedies under or by reason of the Contract." Doc. 1-1 at 69. This provision clearly evinces an intent to prohibit third-party enforcement. *See Consolidated Edison*, 426 F.3d at 528. Under applicable New York law, the provision is enforceable.

Plaintiffs' arguments to the contrary are not persuasive. First, Plaintiffs argue that because they're in privity with Carelon, as insureds and third-party administrator, they can bring a third-party beneficiary claim. Doc. 19 at 16. However, as discussed above, Plaintiffs are not in privity with Carelon. *See* Doc. 1 ¶¶ 270–72; Doc. 19 at 15–16.

Second, Plaintiffs' arguments that they can recover as third-party beneficiaries to a group insurance policy are inapposite, as they fail to allege that the Contract establishes a group insurance policy rather than a contract for administrative services. Doc. 19 at 15–16; *see* Doc. 1-1 at 2. "Group insurance policies, unlike individual insurance policies, are contracts for the benefit of third parties. Under a group insurance program, a central entity—the group—enters a contract with an insurance provider and acts as the policyholder. Members of the group are the third-party beneficiaries of that contract." *Dubuisson v. Stonebridge Life Insurance Co.* 887 F.3d 567, 569 (2d Cir. 2018). Under New York law, when "the insureds are covered by a group insurance contract between their employer and the insurer, the insureds are . . . third-party beneficiaries of the insurance contract, and thus may enforce any rights they may have thereunder." *Brown v. Group Health Inc.*, 17 Misc.3d 1113(A), 2007 WL 2984005, at *4 (N.Y. Sup. Ct. 2007).

However, the Contract expressly provides that the Department is engaging Carelon "to deliver . . . [a]dministrative [s]ervices." Doc. 1-1 at 2. Here, because

Carelon is not Plaintiffs' insurer, the Contract is not a group insurance contract as contemplated by the caselaw that Plaintiffs cite.[15]

Finally, Plaintiffs argue that they can enforce the Contract as third-party beneficiaries because performance of the Contract is rendered directly to Plaintiffs. Doc. 19 at 16; *see Levin v. Tiber Holding Corp.*, 277 F.3d 243, 249 (2d Cir. 2002) ("[A] third party will be deemed an intended beneficiary where performance is rendered directly to it under the terms of the contract.").

The Contract states that "[t]he New York State Health Insurance Program . . . was established by the New York State Legislature in 1957 to provide essential health insurance protection to eligible New York State . . . employees, retirees, and their Eligible Dependents." Doc. 1-1 at 2. This stated purpose refers to the goal of NYSHIP as a whole, which was to provide health insurance to eligible employees. Although "state and municipal employees eligible to participate in the NYSHIP plan" are "mentioned throughout the Contract," Plaintiffs fail to identify any provision of the Contract requiring that Carelon provide any benefit directly to Plaintiffs. Doc. 1 ¶ 272. Instead, the Contract demonstrates that Carelon is delivering services to New York, not Plaintiffs, by providing "Program Administration Services" for NYSHIP. Doc. 1-1 at 2.

Plaintiffs do not contest that there are no applicable exceptions or bases for rejecting the "No Third-Party Beneficiaries" provision of the Contract. *See* Doc. 19 at 15–16. Accordingly, Plaintiffs are not third-party beneficiaries of the Contract because the language of the Contract makes clear that enforcement by the Plaintiffs is not intended.

---

[15] *See Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 569 (2d Cir. 2018) (explaining that, under a group insurance policy, members of the group are the third-party beneficiaries of that contract between the group and insurance provider); *Brown v. Group Health Inc.*, 17 Misc.3d 1113(A), 2007 WL 2984005, at *4 (N.Y. Sup. Ct. 2007) (when insureds are covered by a group insurance contract between their employer and the insurer, insureds are third-party beneficiaries of the insurance contract); *Ayotte*, 35 A.D.2d at 260 (an employee and their dependents are third party beneficiaries of a group insurance contract).

Carelon's motion to dismiss Plaintiffs' breach of contract and breach of the covenant and good faith and fair dealing claims is granted.

### C.  GBL §§ 349 and 350

Carelon argues that Plaintiffs' GBL §§ 349 and 350 claims should be dismissed, because:  (1) the alleged misrepresentations and omissions made through marketing materials and the provider directory were not materially misleading because they were "fully disclosed to the public through Carelon's public provider directory"; and (2) because the information allegedly omitted was in not in Carelon's sole control.  Doc. 16 at 16–18.

GBL § 349 imposes liability on anyone who engages in "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service" in New York.  N.Y. Gen. Bus. Law § 349(a).  "To make out a prima facie case under § 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result."  *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020).  "'Deceptive acts' are acts that are 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'"  *Id.* (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013)).

GBL § 350 imposes liability on anyone who uses false advertising in the conduct of any business, trade, or commerce, or in the furnishing of any service in New York.  N.Y. Gen. Bus. Law § 350.  "False advertising" includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," considering "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity . . . ."  N.Y. Gen. Bus. Law § 350-a(1).  GBL § 350 claims are "analyzed under the same 'reasonable consumer' standard as Section 349."  *Chufen Chen*, 954 F.3d at 500 (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).  Although the inquiry into whether a representation is

23

materially misleading may be decided as a matter of law, "this inquiry is generally a question of fact not suited for resolution at the motion to dismiss stage." *Duran v. Henkel of America, Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020); *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 96 (S.D.N.Y. 2021).

Under New York law, where an "allegedly deceptive practice is fully disclosed, there is no deception claim." *Mazella v. Coca-Cola Company*, 548 F. Supp. 3d 349, 357 (S.D.N.Y. 2021). This full disclosure doctrine is applicable where defendants themselves have "disclosed the very practices that were alleged to be deceptive." *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107, 125 (2d Cir. 2017). For example, *Mazella* involved an iced tea beverage labeled "Slightly Sweet," which the plaintiffs alleged would lead a consumer to believe the beverage to be low in sugar. 548 F. Supp. 3d at 357. The *Mazella* court held that the plaintiffs did not plausibly allege that the phrase "Slightly Sweet" on the product label would cause a reasonable consumer to assume that it is "low sugar" because the product disclosed the number of calories and amount of sugar on the label. *Id.*

In the instant case, taking the facts in the complaint as true, the Court finds that Carelon did not fully disclose information regarding the alleged inaccuracies of its network. Carelon's alleged misrepresentations about the size, breadth, and accuracy of its provider directory are not directly contradicted by Carelon's own representations.[16] *See* Doc. 1 ¶ 290; *Nick's Garage*, 875 F.3d at 125.[17] To the contrary, Carelon

_____

[16] Although Plaintiffs could determine if a given provider is in-network and available for appointments prior to enrolling in NYSHIP, this fact alone is not dispositive. Plaintiffs' allegations are not limited to misrepresentations about individual providers but instead allege that Carelon made false representations about its network as a whole, including that "Carelon has an adequately sized network; that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers; and that mental health care coverage is comprehensive." Doc. 1 ¶ 290.

[17] Carelon argues that *Nick's Garage* is distinguishable because the deceptive practice involved there "was not disclosed until after the insured experienced a loss and the estimate was provided." Doc. 20 at 11 (citing 875 F.3d at 112). However, the court's conclusion that the full disclosure doctrine applies when defendants themselves have "disclosed the very practices that were alleged to be deceptive" was premised on the fact that "[t]he essence of [plaintiff's] claims [was] that [i]nsurer did not do what its policy said it

24

affirmatively assured Plaintiffs that the directory was accurate and reliable.  Doc. 1 ¶¶ 202, 226, 239, 289–90, 292, 302–03, 318, 320, 324.  Carelon failed to disclose any information regarding the alleged inaccuracies of its network, and Plaintiffs only discovered the inaccuracies after months of attempting to obtain treatment from providers listed as in-network on the provider directory.  Doc. 1 ¶¶ 82, 93–97, 103, 115, 124.

Carelon's argument that it was not in exclusive control of the omitted information concerning provider's in-network status or contact information is similarly unavailing.  Doc. 16 at 17–18 (citing *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 529 (S.D.N.Y. 2003)).  A purportedly deceptive "omission" is actionable only where the defendant "alone possesses material information that is relevant to the consumer and fails to provide this information."  *Pelman*, 237 F. Supp. 2d at 529.  Plaintiffs adequately allege that Carelon omitted information beyond providers' in-network status and contact information, namely, that Carelon omitted information concerning "the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, . . . the costs of such services; and the number of hours and expenditures that would be needed to be made to find appropriate mental health care."  Doc. 1 ¶ 291.  Such information pertains to the adequacy of the network as a whole and is not available to Plaintiffs from "any given provider."  Doc. 16 at 18.  Notably, Carelon's "Provider Search" represents that it "makes every effort to maintain accurate and up-to-date information" in its online provider directory.  Doc. 1 ¶ 202.  Plaintiffs adequately alleged that Carelon alone possessed material information that it failed to provide to NYSHIP members, and the alleged omissions are therefore actionable.

---

would do and that the rates listed on [i]nsurer's estimates did not represent the prevailing competitive labor rates, as they purported to do."  875 F.3d at 125.  As in *Nick's Garage*, the essence of Plaintiffs' claims is that Carelon did not do what it represented it would do by failing to maintain an accurate, adequately sized, reliable, and comprehensive network.  Doc. 1 ¶ 290.

25

Carelon's motion to dismiss Plaintiffs' claims under GBL §§ 349 and 350 is denied.

### D.  New York Insurance Law § 4226

Carelon argues that Plaintiffs' claim under New York Insurance Law § 4226 should be dismissed because "Carelon is not an insurer under New York law."  Doc. 16 at 18.  The parties only dispute whether Carelon was, or has ever been, authorized to engage in the business of health insurance in New York.  Docs. 16 at 18–20; 19 at 20–21; 20 at 12–13.

New York Insurance Law § 4226(a)(1) states, in relevant part, that "[n]o insurer authorized to do in this state the business of . . . health insurance . . . shall . . . issue or circulate, or cause or permit to be issued or circulated on its behalf, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts."  N.Y. Ins. Law § 4226(a)(1).

The Complaint, filed on April 28, 2025, alleges that Carelon "is authorized to provide health insurance in New York."  Doc. 1 ¶ 311.  As discussed above, the Court may take judicial notice of the records of DFS.  DFS maintains a database of the "most current information maintained by the Department" of companies licensed to write insurance in New York, and this database does not list Carelon as a licensed insurer in the state as of August 28, 2025.  Docs. 16 at 19; 15 ¶¶ 4–7; 15-2, -3; Department of Financial Services, *Insurance Company Search*, https://www.dfs.ny.gov/apps_and_licensing/insurance_companies/search.

However, even considering the judicially noticed DFS records, Plaintiffs sufficiently allege that Carelon, or Beacon Health Options, was authorized to engage in the business of health insurance in New York between 2019 and the date of class certification.  Doc. 1 ¶¶ 258, 311.  The Court must assume "that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555.  Although Carelon was not listed on the DFS website as a licensed insurer on August 28, 2025, this

fact is not dispositive of whether Carelon was a licensed insurer at any other point during the time relevant to Plaintiffs' claim.  Since Carelon only disputes whether it was, or has ever been, authorized to engage in the business of health insurance in New York, and because the Court does not consider the DFS records to be dispositive of this dispute, Plaintiffs' § 4226 claim may proceed.  *Cf. Finkelstein v. Lincoln National Corp.*, 107 A.D.3d 759, 761 (2d Dep't 2013) (explaining that New York Insurance Law § 4226 prohibits an insurer from issuing or circulating materials misrepresenting the terms, benefits, or advantages of any of its policies); *Unibell Anesthesia v. Guardian Life Insurance Company of America*, 239 A.D.2d 248, 248 (1st Dep't 1997) (Section 4226 "reflects State policy that insurers deal fairly with their insureds and the public at large").

Carelon's motion to dismiss Plaintiffs' § 4226 claim is denied.[18]

### E.  Fraudulent Misrepresentation

Carelon argues that Plaintiffs' fraudulent misrepresentation claim fails because "Plaintiffs' do not plead facts that plausibly establish reasonable reliance."  Doc. 16 at 20; *see also id.* at 21 (citing *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 258 (S.D.N.Y. 1999)).  Specifically, Carelon argues that Plaintiffs' allegations are conclusory and fail to allege that Plaintiffs "actually read or saw" the provider directory prior to making their enrollment decisions.  *Id.* at 21 (quoting *Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d 735, 772 (W.D.N.Y. 2017)); *see also* Doc. 20 at 13–14.

In a claim for fraudulent misrepresentation, a plaintiff must allege "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  *Tsinias Enterprises Ltd. v. Taza Grocery, Inc.*, 172 A.D.3d 1271, 1272 (2d Dep't 2019).

---

[18] While the Court is allowing this claim to go forward at this juncture, whether Carelon was authorized to engage in the business of health insurance in New York during the time period relevant to Plaintiffs' claim is a matter of fact that can easily be confirmed or disproved.  Counsel is therefore cautioned to carefully investigate whether Carelon has ever been so authorized.

Directly contrary to Carelon's argument, Plaintiffs' complaint contains numerous allegations that they relied on Carelon's representations about its provider network in making health care decisions.  Plaintiffs allege that Carelon's

> representations about the size and breadth of the mental health provider network, the ease of finding mental health treatment by using the allegedly accurate provider directory, the freedom to choose any listed in-network provider, the ability to control costs by seeing an in-network provider, and the comprehensive coverage of mental health care would induce a reasonable consumer—and did induce Plaintiffs—to choose the NYSHIP plan.

Doc. 1 ¶ 239; *see also id.* ¶ 322 (Carelon's misrepresentations "induce[d] reliance by Plaintiffs and Class members as to the services and benefits that would be delivered to them as a result of choosing Defendant's plan"); *id.* ¶ 323 ("Plaintiffs and Class members justifiably relied on [Carelon's] representations.").  Plaintiffs further allege that "[h]ad Carelon accurately represented its mental health care coverage, the Plaintiffs would have had access to the care they were promised or made other financial and health care decisions about their mental health treatment."  *Id.* ¶ 255.  The Court finds that Plaintiffs' allegations are sufficient to draw the inference that they were induced by Carelon's representations to enroll in NYSHIP and might have made other health care decisions if not for Carelon's representations.

Plaintiffs' fraudulent misrepresentation claim may also proceed insofar as it is based on purported fraudulent omissions.  Carelon argues that a "fraudulent omission is actionable only where there is a duty to disclose material information, such as a fiduciary duty owed to the plaintiff."  Doc. 16 at 20 (citing *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179 (2011)).  However, where "a plaintiff's theory of fraud is premised on both affirmative misrepresentations and material omissions, a plaintiff need not plead or prove the existence of a fiduciary duty."  *Monterey Bay Military Housing, LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 703 (S.D.N.Y. 2021) (internal quotations omitted).  Plaintiffs' theory of fraud is premised on affirmative misrepresentations, including that

"Carelon has an adequate network; that providers listed on the provider directory are in-network; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers; and that mental health care coverage is comprehensive," *and* material omissions, including "relevant facts that Plaintiffs and Class members would have used in selecting their health insurance plan." Doc. 1 ¶¶ 320–21. Accordingly, Carelon need not owe Plaintiffs a fiduciary duty for Plaintiffs' omission claims to be actionable. *See* Doc. 1 ¶¶ 318–321.

Carelon's motion to dismiss Plaintiffs' fraudulent misrepresentation claim is therefore denied.

### F.  Negligent Misrepresentation

Carelon seeks dismissal of Plaintiffs' negligent misrepresentation claim, arguing that (1) its relationship with Plaintiffs does not give rise to a duty to impart correct information and (2) Plaintiffs do not sufficiently plead reasonable reliance. Doc. 16 at 22–23.

A claim for negligent misrepresentation requires the plaintiff to demonstrate "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Ginsburg Development Companies, LLC v. Carbone*, 134 A.D.3d 890, 894 (2d Dep't 2015). Generally, no "special relationship of trust or confidence" arises from insurance contracts. *Fero*, 236 F. Supp. 3d at 773. However, there may be liability for negligent misrepresentation where

> there is a relationship between the parties such that there is an awareness that the information provided is to be relied upon for a particular purpose by a known party in furtherance of that purpose, and some conduct by the declarant linking it to the relying party and evincing the declarant's understanding of their reliance.

*Houlihan/Lawrence, Inc. v. Duval*, 228 A.D.2d 560, 561 (2d Dep't 1996).

29

As discussed above, Plaintiffs, as plan participants, fail to adequately allege that they are in privity with Carelon, as third-party claims administrator, or that they are parties to a direct contract.

However, Plaintiffs sufficiently allege that Carelon was aware that the information it provided in the NYSHIP directory would be relied upon by Plaintiffs. Plaintiffs allege that Carelon "direct[ed] . . . members to use the provider directory to find an in-network provider." Doc. 1 ¶ 205; *see id.* ¶¶ 210, 225, 226, 289–90, 302–03, 318, 320, 322, 324, 332. Plaintiffs allege that Carelon's online directory "is the definitive resource to identify which providers are in Carelon's network" and that, through marketing materials, Carelon represents that members can rely on the directory to find and contact providers. *Id.* ¶¶ 184, 204, 290. Since Carelon directed Plaintiffs to use the provider directory, Plaintiffs sufficiently allege that Carelon was aware that the information provided in its directory was to be relied upon by Plaintiffs in understanding their benefits. *See Silvercreek Management., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 453 (S.D.N.Y. 2017).

Second, Plaintiffs adequately allege reasonable reliance on Carelon's representations. Carelon's argument regarding reasonable reliance incorporates by reference the reliance argument it made in connection with the fraudulent misrepresentation claim. *See* Docs. 16 at 23; 20 at 13–14. For the reasons stated above regarding the fraudulent misrepresentation claim, Plaintiffs have adequately alleged reasonable reliance on Carelon's representations.

Carelon's motion to dismiss Plaintiffs' negligent misrepresentation claim is denied.

### G.  Unjust Enrichment

Finally, Carelon argues Plaintiffs' unjust enrichment claim must be dismissed because (1) Plaintiffs "fail to demonstrate they conferred a specific and direct benefit on Carelon" and (2) the claim "is duplicative of Plaintiffs' other legal claims, including their contract, tort, and statutory claims." Doc. 16 at 23, 24.

30

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish:  1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).  Additionally, "a plaintiff must show that the defendant actually received a benefit." *Regnante v. Securities & Exchange Officials*, 134 F. Supp. 3d 749, 772 (S.D.N.Y. 2015).  Under New York law, an "unjust enrichment claim requires no direct relationship between plaintiff and defendant," and "[i]t does not matter whether the benefit is directly or indirectly conveyed." *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (internal quotations omitted) (quoting *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 41 (1st Dep't 2004)).

Plaintiffs sufficiently demonstrate they conferred a benefit on Carelon.  Plaintiffs concede that they pay their premiums to NYSHIP, not Carelon.  Doc. 1 ¶¶ 84, 104, 122.  However, Plaintiffs allege that they enrolled in NYSHIP because of Carelon's representations regarding its provider network "and thereby direct[ed] their medical premiums to the Defendant."  Doc. 1 ¶¶ 324, 339.  Additionally, Plaintiffs allege that "[a] portion of members' premiums are paid to Carelon" and that increased membership in NYSHIP results in increased profits for Carelon.  Doc. 1 ¶¶ 244, 327, 338, 341.  Since Plaintiffs allege that their enrollment in NYSHIP increased Carelon's profits, Plaintiffs sufficiently demonstrated that they conferred a benefit on Carelon.

Plaintiffs' unjust enrichment claim is not duplicative of their other legal claims.  "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Ferdous v. Hasan*, 236 A.D.3d 992, 994 (2d Dep't 2025).  Unjust enrichment is available in those "unusual situations when, though the defendant has not . . . committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012).  Under Second Circuit precedent, plaintiffs may plead unjust enrichment in the alternative to their other legal claims, particularly when the

31

existence of a contract between the parties is disputed. *See Barnet v. Drawbridge Special Opportunities Fund, LP*, No. 14 Civ. 1376 (PKC), 2014 WL 4393320, at \*22 (S.D.N.Y. Sept. 5, 2014); *Rynasko v. New York University*, 63 F.4th 186, 202 (2d Cir. 2023) (holding that plaintiff was permitted to pursue claims for breach of contract and unjust enrichment because "[t]he Federal Rules specifically allow pleading in the alternative"); *see also Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 452 (S.D.N.Y. 2014) ("[E]ven though Plaintiffs may not ultimately *recover* under both the breach of contract and unjust enrichment claims, courts in this Circuit routinely allow plaintiffs to *plead* such claims in the alternative.").

As Plaintiffs plead unjust enrichment in the alternative to their contract and tort claims, and the existence of an enforceable contract between the parties is disputed, Plaintiffs' unjust enrichment claim is not duplicative of their other claims. Doc. 16 at 12–16.

Carelon's motion to dismiss Plaintiffs' unjust enrichment claim is denied.

IV.    **CONCLUSION**

For the reasons set forth above, Carelon's motion to dismiss the breach of contract and breach of the covenant of good faith and fair dealing claims is granted. Carelon's motion to dismiss the New York deceptive practices and deceptive advertising claims, the New York Insurance Law § 4226 claim, the claims for fraudulent and negligent misrepresentation, and the unjust enrichment claim is denied. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 14.

33

The parties are further directed to appear for a conference on April 28, 2026, at 11:30 a.m. in Courtroom 619 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007.

It is SO ORDERED.

Dated:    March 31, 2026
          New York, New York

_____

EDGARDO RAMOS, U.S.D.J.

33